10-Q 1 d10q.htm FORM 10-Q

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## FORM 10-Q

(Mark One)

☒    **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the quarterly period ended October 2, 2005

or

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from                    to                    .

Commission File No.: 0-33213

# MAGMA DESIGN AUTOMATION, INC.
**(Exact name of registrant as specified in its charter)**

| **Delaware** | **77-0454924** |
|---|---|
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification Number)** |

**5460 Bayfront Plaza**
**Santa Clara, California 95054**
**(Address of principal executive offices)**

**Telephone: (408) 565-7500**
**(Registrant's telephone number, including area code)**

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for at least the past 90 days.    Yes ☒    No ☐

Indicate by check mark whether the registrant is an accelerated filer (as defined in Rule 12b-2 of the Exchange Act).    Yes ☒    No ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).    Yes ☐    No ☒

On November 1, 2005, 35,273,484 shares of Registrant's Common Stock, $.0001 par value were outstanding.

**MAGMA DESIGN AUTOMATION, INC.**
**FORM 10-Q**
**QUARTERLY PERIOD ENDED OCTOBER 2, 2005**
**INDEX**

|  |  | Page |
|---|---|---:|
| Part I: Financial Information |  | 3 |
| Item 1: | Financial Statements (unaudited) | 3 |
|  | Condensed Consolidated Balance Sheets at October 2, 2005 and March 31, 2005 | 3 |
|  | Condensed Consolidated Statements of Operations for the Three and Six Months Ended October 2, 2005 and September 30, 2004 | 4 |
|  | Condensed Consolidated Statements of Cash Flows for the Six Months Ended October 2, 2005 and September 30, 2004 | 5 |
|  | Notes to Condensed Consolidated Financial Statements | 6 |
| Item 2: | Management's Discussion and Analysis of Financial Condition and Results of Operations | 22 |
| Item 3: | Quantitative and Qualitative Disclosures About Market Risk | 54 |
| Item 4: | Controls and Procedures | 55 |
| Part II: Other Information |  | 56 |
| Item 1: | Legal Proceedings | 56 |
| Item 4: | Submission of Matters to a Vote of Security Holders | 59 |
| Item 6: | Exhibits | 60 |
| Signatures |  | 62 |
| Exhibit Index |  | 63 |

**PART I: FINANCIAL INFORMATION**

Item 1.     **Financial Statements.**

**MAGMA DESIGN AUTOMATION, INC.**

**CONDENSED CONSOLIDATED BALANCE SHEETS**
**(in thousands)**
**(unaudited)**

| | October 2, 2005 | March 31, 2005 |
|---|---|---|
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 53,471 | $ 20,622 |
| Restricted cash | 253 | 2,950 |
| Short-term investments | 35,000 | 114,896 |
| Accounts receivable, net | 29,057 | 33,851 |
| Prepaid expenses and other current assets | 5,909 | 7,088 |
| Total current assets | 123,690 | 179,407 |
| Property and equipment, net | 20,697 | 21,309 |
| Intangibles, net | 86,350 | 69,573 |
| Goodwill | 42,723 | 43,194 |
| Restricted cash | 3,570 | — |
| Other assets | 5,704 | 5,741 |
| Total assets | $ 282,734 | $ 319,224 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Accounts payable | $ 1,850 | $ 3,010 |
| Accrued expenses | 26,093 | 22,321 |
| Deferred revenue | 21,986 | 20,745 |
| Total current liabilities | 49,929 | 46,076 |
| Convertible subordinated notes | 105,500 | 150,000 |
| Other long-term liabilities | 5,810 | 1,749 |
| Total liabilities | 161,239 | 197,825 |
| Commitments and contingencies (Note 10) | | |
| Stockholders' equity: | | |
| Common stock | 4 | 4 |
| Additional paid-in capital | 281,738 | 261,627 |
| Deferred stock-based compensation | (4,073) | (5,749) |
| Accumulated deficit | (122,287) | (115,644) |
| Treasury stock | (32,651) | (16,606) |
| Accumulated other comprehensive loss | (1,236) | (2,233) |
| Total stockholders' equity | 121,495 | 121,399 |
| Total liabilities and stockholders' equity | $ 282,734 | $ 319,224 |

See accompanying notes to unaudited condensed consolidated financial statements.

3

**MAGMA DESIGN AUTOMATION, INC.**
**CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS**
**(in thousands, except per share data)**
**(unaudited)**

| | For the Three Months Ended | | For the Six Months Ended | |
|---|---|---|---|---|
| | October 2, 2005 | September 30, 2004 | October 2, 2005 | September 30, 2004 |
| Revenue: | | | | |
| Licenses | $ 32,704 | $ 31,275 | $ 66,614 | $ 62,167 |
| Services | 7,182 | 5,653 | 12,104 | 10,790 |
| Total revenue | 39,886 | 36,928 | 78,718 | 72,957 |
| Cost of revenue: | | | | |
| Licenses | 6,483 | 1,695 | 10,897 | 3,003 |
| Services* | 4,525 | 3,815 | 8,382 | 7,549 |
| Total cost of revenue | 11,008 | 5,510 | 19,279 | 10,552 |
| Gross profit | 28,878 | 31,418 | 59,439 | 62,405 |
| Operating expenses: | | | | |
| Research and development | 11,381 | 10,524 | 22,356 | 20,093 |
| In-process research and development | — | — | — | 4,009 |
| Sales and marketing | 10,658 | 11,679 | 21,860 | 22,946 |
| General and administrative | 9,842 | 3,455 | 18,455 | 7,080 |
| Amortization of intangible assets | 2,882 | 4,093 | 6,470 | 8,568 |
| Amortization of stock-based compensation** | 1,273 | 116 | 2,945 | 574 |
| Restructuring charge | — | (63) | — | 439 |
| Total operating expenses | 36,036 | 29,804 | 72,086 | 63,709 |
| Operating income (loss) | (7,158) | 1,614 | (12,647) | (1,304) |
| Other income (expense): | | | | |
| Interest income | 586 | 556 | 1,246 | 1,109 |
| Interest expense | (224) | (251) | (432) | (497) |
| Other income (expense), net | (352) | (642) | 7,098 | (1,204) |
| Other income (expense), net | 10 | (337) | 7,912 | (592) |
| Net income (loss) before income taxes | (7,148) | 1,277 | (4,735) | (1,896) |
| Benefit from (provision) for income taxes | 528 | (990) | (1,908) | (352) |
| Net income (loss) | $ (6,620) | $ 287 | $ (6,643) | $ (2,248) |
| Net income (loss) per common share | | | | |
| Basic | $ (0.19) | $ 0.01 | $ (0.19) | $ (0.07) |
| Diluted | $ (0.19) | $ 0.01 | $ (0.19) | $ (0.07) |
| Shares used in calculation: | | | | |
| Basic | 34,098 | 33,734 | 34,115 | 33,702 |
| Diluted | 34,098 | 42,333 | 34,115 | 33,702 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| * Stock-based compensation included in cost of service revenue | $ | 47 | $ | 2 | $ | 47 | $ | 6 |

** Components of stock-based compensation included in operating expenses:

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Research and development | $ | 1,162 | $ | (16) | $ | 2,796 | $ | 274 |
| Sales and marketing | | 68 | | 18 | | 76 | | 43 |
| General and administrative | | 43 | | 114 | | 73 | | 257 |
| | $ | 1,273 | $ | 116 | $ | 2,945 | $ | 574 |

See accompanying notes to unaudited condensed consolidated financial statements.

4

## MAGMA DESIGN AUTOMATION, INC.
### CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS
#### (in thousands)
#### (unaudited)

| | Six Months Ended | |
| --- | --- | --- |
| | October 2, 2005 | September 30, 2004 |
| Cash flows from operating activities: | | |
| Net loss | $ (6,643) | $ (2,248) |
| Adjustments to reconcile net loss to net cash provided by operating activities: | | |
| Depreciation and amortization | 4,685 | 3,317 |
| Amortization of intangible assets | 16,898 | 11,306 |
| In-process research and development | — | 4,009 |
| Provision for (recovery from) doubtful accounts | (150) | 165 |
| Amortization of debt issuance costs | 371 | 497 |
| Impairment of or loss on strategic equity investments | 511 | 665 |
| Gain on repurchase of convertible notes, net of debt issuance cost write-off | (8,781) | — |
| Loss on sale of short-term investments | 661 | — |
| Amortization of stock-based compensation | 2,992 | 580 |
| Restructuring charge | — | 439 |
| Income tax benefit realized from gain on repurchase of convertible notes | 50 | — |
| Income tax benefit realized from debt issuance costs | 106 | — |
| Change in operating assets and liabilities, net of effect of acquisitions: | | |
| Accounts receivable | 5,196 | 2,456 |
| Prepaid expenses and other assets | 175 | 1,245 |
| Accounts payable | (1,160) | 826 |
| Accrued expenses | 7,664 | (4,902) |
| Deferred revenue | 1,241 | 99 |
| Other long-term liabilities | (390) | 446 |
| Net cash provided by operating activities | 23,426 | 18,900 |
| Cash flows from investing activities: | | |
| Purchase of intangible assets | (20,435) | (11,918) |
| Purchase of property and equipment | (1,995) | (9,183) |
| Purchase of short-term investments | (56,297) | (85,409) |
| Proceeds from sale and maturities of short-term investments | 136,349 | 104,544 |
| Purchase of strategic equity investments | (750) | (1,100) |
| Net cash provided by (used in) investing activities | 56,872 | (3,066) |
| Cash flows from financing activities: | | |
| Proceeds from issuance of common stock | 3,670 | 5,463 |
| Repurchase of common stock | (16,045) | (16,606) |
| Repurchase of convertible notes, net | (34,668) | — |
| Repayment of lease obligation | (332) | — |
| Net cash used in financing activities | (47,375) | (11,143) |
| Effect of foreign currency translation on cash and cash equivalents | (74) | 438 |
| Net increase in cash and cash equivalents | 32,849 | 5,129 |
| Cash and cash equivalents at beginning of period | 20,622 | 17,634 |
| Cash and cash equivalents at end of period | $ 53,471 | $ 22,763 |

Supplemental disclosure:

Non-cash investing and financing activities:

| | | |
|---|---|---|
| Deferred stock-based compensation | $ (1,089) | $ (458) |
| Issuance of common stock (or issuable) in connection with intangible asset purchase | $ 11,747 | $ 12,007 |
| Issuance of common stock warrant in connection with intangible asset purchase | $ 3,080 | $ — |
| Purchase of fixed assets under capital leases | $ 2,048 | $ — |

See accompanying notes to unaudited condensed consolidated financial statements.

5

## MAGMA DESIGN AUTOMATION, INC.
### NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
### (unaudited)

## Note 1. Basis of Presentation

The interim unaudited condensed consolidated financial statements included herein have been prepared by Magma Design Automation, Inc. ("Magma" or "the Company"), pursuant to the rules and regulations of the United States Securities and Exchange Commission ("SEC"). Certain information and note disclosures normally included in annual financial statements prepared in accordance with accounting principles generally accepted in the United States of America have been condensed or omitted, pursuant to these rules and regulations. However, management believes that the disclosures are adequate to ensure that the information presented is not misleading. The interim unaudited condensed consolidated financial statements reflect, in the opinion of management, all adjustments necessary (consisting only of normal recurring adjustments) to present a fair statement of results for the interim periods presented. The operating results for any interim period are not necessarily indicative of the results that may be expected for the entire fiscal year ending April 2, 2006. The accompanying unaudited condensed consolidated financial statements should be read in conjunction with the Company's Form 10-K for the year ended March 31, 2005, as filed with the SEC on June 14, 2005. The accompanying unaudited condensed consolidated balance sheet at March 31, 2005 is derived from audited consolidated financial statements at that date.

Preparation of consolidated financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenue and expenses during the reporting period. Actual results could differ from those estimates.

### Principles of Consolidation

The consolidated financial statements of Magma include the accounts of the Company and its wholly owned subsidiaries. All significant intercompany balances and transactions have been eliminated. Accounts denominated in foreign-currency have been translated using the U.S. dollar as the functional currency.

### Change in Fiscal Year End

On January 26, 2005, the Company's Board of Directors approved a change in Magma's fiscal year end from March 31 to a 52-53 week fiscal year ending on the first Sunday subsequent to March 31. After the fiscal year ended March 31, 2005, Magma's fiscal years will consist of four quarters of 13 weeks each except for each seventh fiscal year, which will include one quarter with 14 weeks. The current fiscal year ends on April 2, 2006. All references to years or quarters in these notes to consolidated financial statements represent fiscal years or fiscal quarters, respectively, unless otherwise noted. As a result of this change, the first quarter of Magma's fiscal year 2006 includes three additional days, the results of which are included in the accompanying condensed consolidated financial statements for the six months ended October 2, 2005.

### Reclassifications

Certain amounts in the fiscal 2005 financial statements have been reclassified to conform with the fiscal 2006 presentation. Certain auction rate securities have been reclassified from cash equivalents to short-term investments. Auction rate securities are variable rate bonds tied to short-term interest rates with maturities on the face of the securities in excess of 90 days. Auction rate securities have interest rate resets through a modified Dutch auction, at predetermined short-term intervals, usually every 7, 28 or 35 days. They trade at par and are callable at par on any interest payment date at the option of the issuer. Interest paid during a given period is based upon the interest rate determined during the prior auction.

6

## MAGMA DESIGN AUTOMATION, INC.
### NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)
### (unaudited)

Although these securities are issued and rated as long-term bonds, they are priced and traded as short-term instruments because of the liquidity provided through the interest rate reset. Based on the Company's ability either to liquidate the holdings or to roll the investment over to the next reset period, the Company had historically classified some or all of these instruments as cash equivalents if the period between interest rate resets was 90 days or less.

The Company accounts for its marketable securities in accordance with Statement of Financial Accounting Standards ("SFAS") No. 115, "Accounting for Certain Investments in Debt and Equity Securities." Such investments are classified as "available for sale" and are reported at fair value in the Company's balance sheets. The short-term nature and structure, the frequency with which the interest rate resets and the ability to sell auction rate securities at par and at the Company's discretion indicates that such securities should more appropriately be classified as short-term investments with the intent of meeting the Company's short-term working capital requirements.

Based upon the Company's re-evaluation of these securities, Magma reclassified as short-term investments any auction rate securities previously classified as cash equivalents for the fiscal 2005 and 2004 periods. As a result, purchases and sales of short-term investments included in the consolidated statements of cash flows have been revised to reflect the purchase of $52.9 million and sale of $76.5 million auction rate securities during the six months ended September 30, 2004. This resulted in a decrease in cash used in investing activities by $23.6 million for the six months ended September 30, 2004. These reclassifications had no impact on the previously reported net income or cash flows from operations.

*Recently Issued Accounting Pronouncements*

In July 2005, the Accounting Standards Board ("FASB") issued an Exposure Draft of a proposed interpretation "Accounting for Uncertain Tax Positions—an interpretation of FASB Statement No. 109." This proposal seeks to reduce the diversity in practice associated with certain aspects of the recognition and measurement requirements related to accounting for income taxes. Specifically, the interpretation requires that an enterprise recognize in its financial statements, the best estimate of the impact of a tax position only if that position is probable of being sustained on audit based solely on the technical merits of the position. In evaluating whether the probable recognition threshold has been met, this proposed interpretation would require the presumption that the tax position will be evaluated during an audit by taxing authorities. The Exposure Draft is scheduled to be finalized in the first quarter of calendar year 2006. The Company is currently reviewing the provisions in the Exposure Draft to determine its impact to its consolidated financial statements.

In June 2005, the Emerging Issues Task Force ("EITF") issued No. 05-06, "Determining the Amortization Period for Leasehold Improvements" ("EITF 05-6"). The pronouncement requires that leasehold improvements acquired in a business combination or purchase, subsequent to the inception of the lease, be amortized over the lesser of the useful life of the asset or the lease term that includes reasonably assured lease renewals as determined on the date of the acquisition of the leasehold improvement. This pronouncement is effective for leasehold improvements that are purchased or acquired in reporting periods beginning after June 29, 2005. The adoption of EITF 05-6 has not had a significant impact on the Company's financial position and results of operations.

In May 2005, the FASB issued SFAS No. 154, "Accounting Changes and Error Corrections" ("SFAS 154"). This new standard replaces APB Opinion No. 20, "Accounting Changes in Interim Financial Statements", and SFAS No. 3, "Reporting Accounting Changes in Interim Financial Statements", and represents another step in

## MAGMA DESIGN AUTOMATION, INC.

### NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)
### (unaudited)

the FASB's goal to converge its standards with those issued by the International Accounting Standards Board ("IASB"). Among other changes, SFAS 154 requires retrospective application to prior periods' financial statements of a voluntary change in accounting principle unless it is impracticable. SFAS 154 also provides that (1) a change in method of depreciating or amortizing a long-lived nonfinancial asset be accounted for as a change in estimate (prospectively) that was effected by a change in accounting principle, and (2) correction of errors in previously issued financial statements should be termed a "restatement." The new standard is effective for accounting changes and correction of errors made in fiscal years beginning after December 15, 2005. Early adoption of this standard is permitted for accounting changes and correction of errors made in fiscal years beginning after June 1, 2005. Management does not expect the adoption of SFAS 154 to have a material effect on the Company's consolidated financial statements.

In December 2004, the FASB issued SFAS No. 123 (revised 2004), "Share-Based Payment." ("SFAS 123R") SFAS 123R eliminates the ability to account for share-based compensation transactions using APB 25, and generally requires instead that such transactions be accounted for using a fair-value based method. Companies are required to recognize an expense for compensation cost related to share-based payment arrangements including stock options and employee stock purchase plans. The new rules will be applied on a modified prospective basis as defined in SFAS 123R, and will be effective for annual periods beginning after June 15, 2005 and, thus, will be effective for us no later than the first quarter of fiscal 2007. The Company is currently evaluating which transition method to use and option valuation methodologies and assumptions in light of SFAS 123R related to employee stock options and employee stock purchase plans. The adoption of SFAS 123R will have a significant impact on the Company's consolidated statement of operations as the Company will be required to expense the fair value of its stock option grants and stock purchases under its employee stock purchase plan rather than disclose the impact on its consolidated net income within the footnotes (see Note 2 to the Condensed Consolidated Financial Statements), as is the Company's current practice.

In March 2005, the SEC issued Staff Accounting Bulletin ("SAB") No. 107 "Share-Based Payment". SAB 107 provides guidance related to share-based payment transactions with non-employees, the transition from nonpublic to public entity status, valuation methods (including assumptions such as expected volatility and expected term), the accounting for certain redeemable financial instruments issued under share-based payment arrangements, the classification of compensation expense, non-GAAP financial measures, first-time adoption of SFAS 123R in an interim period, capitalization of compensation cost related to share-based payment arrangements, the accounting for income tax effects of share-based payment arrangements upon adoption of SFAS 123R, the modification of employee share options prior to adoption of SFAS 123R and disclosures in Management's Discussion and Analysis subsequent to adoption of SFAS 123R. The provisions of SAB 107, as appropriate, will be adopted upon implementation of SFAS 123R in fiscal 2007.

FASB Staff Position ("FSP") No. 109-2, "Accounting and Disclosure Guidance for the Foreign Earnings Repatriation Provision within the American Jobs Creation Act of 2004" ("FSP 109-2"), provides guidance under SFAS No. 109, "Accounting for Income Taxes," ("SFAS 109") with respect to recording the potential impact of the repatriation provisions of the American Jobs Creation Act of 2004 (the "Jobs Act") on enterprises' income tax expense and deferred tax liability. The Jobs Act was enacted on October 22, 2004. FSP 109-2 states that an enterprise is allowed time beyond the financial reporting period of enactment to evaluate the effect of the Jobs Act on its plan for reinvestment or repatriation of foreign earnings for purposes of applying SFAS 109. The Company has completed evaluating the impact of the repatriation provisions. The adoption of FSP 109-2 did not have any impact on the Company's results of operations or financial condition. Among other things, the Jobs Act repeals an export incentive and creates a new tax deduction for qualified domestic manufacturing activities. At this time, the Company does not expect that the deduction will have a material impact on its reported income tax rate.

MAGMA DESIGN AUTOMATION, INC.

NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

(unaudited)

## Note 2. Stock-Based Compensation

The Company accounts for stock-based employee compensation arrangements in accordance with provisions of Accounting Principles Board ("APB") Opinion No. 25, "Accounting for Stock Issued to Employees," as interpreted by FASB Interpretation No. 44 ("FIN 44"), "Accounting for Certain Transactions Involving Stock Compensation—an Interpretation of APB 25" and Emerging Issues Task Force No. 00-23 ("EITF 00-23"), "Issues related to the Accounting for Stock Compensation under APB 25 and FIN 44," and FASB Interpretation No. 28, "Accounting for Stock Appreciation Rights and Other Variable Stock Option or Award Plans," and complies with the disclosure provisions of SFAS No. 148, "Accounting for Stock-Based Compensation—Transition and Disclosure—an amendment of SFAS 123." Under APB Opinion No. 25, compensation expense is based on the difference, if any, on the date of the grant, between the fair value of the Company's stock and the exercise price. SFAS 123 as amended by SFAS 148 requires a fair-value based method of accounting for an employee stock option or similar equity instrument. Had compensation cost for the Company's stock-based compensation plan been determined using the Black-Scholes option pricing model at the grant date for awards granted in accordance with the provisions of SFAS 123, the Company's net loss would have been the amounts indicated below (in thousands, except net loss per share data):

| | Three Months Ended | | Six Months Ended | |
| --- | --- | --- | --- | --- |
| | October 2, 2005 | September 30, 2004 | October 2, 2005 | September 30, 2004 |
| Net income (loss): | | | | |
| As reported | $ (6,620) | $ 287 | $ (6,643) | $ (2,248) |
| Add: Stock-based employee compensation expense included in reported net loss | 1,320 | 118 | 2,992 | 580 |
| Deduct: Stock-based employee compensation expense determined under fair value method for all awards | (6,288) | (5,133) | (11,609) | (10,876) |
| Pro forma | $ (11,588) | $ (4,728) | $ (15,260) | $ (12,544) |
| Net income (loss) per share, basic and diluted: | | | | |
| As reported | $ (0.19) | $ 0.01 | $ (0.19) | $ (0.07) |
| Pro forma | $ (0.34) | $ (0.14) | $ (0.45) | $ (0.37) |

Such pro forma disclosures may not be representative of future compensation cost because options vest over several years and additional grants are made each year.

The weighted-average estimated fair value per share at the date of grant for options granted to employees and for share purchase rights granted under the employee stock purchase plans was as follows:

| | Three Months Ended | | Six Months Ended | |
| --- | --- | --- | --- | --- |
| | October 2, 2005 | September 30, 2004 | October 2, 2005 | September 30, 2004 |
| Stock options | $ 4.02 | $ 5.26 | $ 3.85 | $ 5.85 |
| Employee stock purchase plans | $ 3.93 | $ 3.56 | $ 2.58 | $ 3.58 |

9

MAGMA DESIGN AUTOMATION, INC.
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)
(unaudited)

The fair value of options at the date of grant was estimated using the Black-Scholes option pricing model, with the following weighted-average assumptions:

| | Three Months Ended | | Six Months Ended | |
| --- | --- | --- | --- | --- |
| | October 2, 2005 | September 30, 2004 | October 2, 2005 | September 30, 2004 |
| **Stock options:** | | | | |
| Risk-free interest rate | 4.01% | 3.29% | 3.97% | 3.10% |
| Expected dividend yield | 0% | 0% | 0% | 0% |
| Volatility | 63% | 43% | 62% | 44% |
| Expected life (years) | 2.94 | 3.14 | 3.00 | 2.91 |
| **Employee stock purchase plans:** | | | | |
| Risk-free interest rate | 4.36% | 2.37% | 4.24% | 2.03% |
| Expected dividend yield | 0% | 0% | 0% | 0% |
| Volatility | 62% | 43% | 62% | 44% |
| Expected life (years) | 1.14 | 1.19 | 1.16 | 1.17 |

The fair value option valuation model was developed for use in estimating the fair value of traded options, which have no vesting restrictions and are fully transferable. In addition, option valuation models require the input of highly subjective assumptions, including the expected stock price volatility. Because the Company's employee stock options have characteristics significantly different from those of traded options, and because changes in the subjective input assumptions can materially affect the fair value estimate, in management's opinion, the existing models do not necessarily provide a reliable single measure of the fair value of the Company's employee stock options.

**Note 3. Basic and Diluted Net Income (Loss) Per Share**

The Company computes net income (loss) per share in accordance with SFAS 128, "Earnings per Share". Basic net income (loss) per share is computed by dividing net income attributable to common stockholders (numerator) by the weighted average number of common shares outstanding (denominator) during the period. Diluted net income per share gives effect to all dilutive potential common shares outstanding during the period including stock options and convertible subordinated notes using the as-if-converted method.

The following is a reconciliation of the weighted average common shares used to calculate basic net income per share to the weighted average common and potential common shares used to calculate diluted net income per share for the three and six months ended October 2, 2005 and September 30, 2004 (in thousands):

| | Three Months Ended | | Six Months Ended | |
| --- | --- | --- | --- | --- |
| | October 2, 2005 | September 30, 2004 | October 2, 2005 | September 30, 2004 |
| Weighted average common shares used to calculate basic net income (loss) per share | 34,098 | 33,734 | 34,115 | 33,702 |
| Options outstanding using the treasury method | — | 1,515 | — | — |
| Convertible subordinated notes using the as-if-converted method | — | 6,562 | — | — |
| Warrants outstanding using the treasury stock method | — | — | — | — |
| Common stock subject to repurchase | — | 522 | — | — |
| Weighted average common and potential common shares used to calculate diluted net income per share | 34,098 | 42,333 | 34,115 | 33,702 |

10

MAGMA DESIGN AUTOMATION, INC.

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

(unaudited)

For the three and six months ended October 2, 2005 and the six months ended September 30, 2004, all potential common shares outstanding during the period were excluded from the computation of diluted net loss per share as their effect would be anti-dilutive. For the three months ended September 30, 2004, certain shares of stock option were excluded from computation of diluted net loss per share as their effect would be anti-dilutive. Such shares included the following:

| | Three Months Ended | | Six Months Ended | |
| --- | --- | --- | --- | --- |
| | October 2, 2005 | September 30, 2004 | October 2, 2005 | September 30, 2004 |
| Shares of common stock if converted under convertible subordinated notes | 4,615,000 | — | 4,615,000 | 6,562,000 |
| Shares of common stock issuable under stock option plans outstanding | 8,808,545 | 4,686,962 | 8,808,545 | 8,387,969 |
| Weighted average price of shares issuable under stock option plans | $ 10.83 | $ 20.14 | $ 10.83 | $ 15.75 |

**Note 4. Comprehensive Income (Loss)**

Comprehensive income (loss) includes net income (loss), unrealized gain (loss) on investments and foreign currency translation adjustments as follows (in thousands):

| | Three Months Ended | | Six Months Ended | |
| --- | --- | --- | --- | --- |
| | October 2, 2005 | September 30, 2004 | October 2, 2005 | September 30, 2004 |
| Net income (loss) | $ (6,620) | $ 287 | $ (6,643) | $ (2,248) |
| Unrealized gain (loss) on available-for-sale investments | (6) | 284 | 817 | (599) |
| Foreign currency translation adjustments | 81 | 199 | 180 | 276 |
| Comprehensive income (loss) | $ (6,545) | $ 770 | $ (5,646) | $ (2,571) |

Components of accumulated other comprehensive loss were as follows (in thousands):

| | October 2, 2005 | March 31, 2005 |
| --- | --- | --- |
| Unrealized loss on available-for-sale investments | $ (30) | $ (847) |
| Foreign currency translation adjustments | (1,206) | (1,386) |
| Accumulated other comprehensive loss | $ (1,236) | $ (2,233) |

11

MAGMA DESIGN AUTOMATION, INC.

NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

(unaudited)

## Note 5. Cash equivalents and investments

Cash equivalents and short-term investments are detailed as follows (in thousands):

| | Cost | Unrealized Gains | Unrealized Losses | Estimated Fair Value |
|---|---|---|---|---|
| **October 2, 2005** | | | | |
| Classified as current assets: | | | | |
| Cash | $ 15,332 | $ — | $ — | $ 15,332 |
| Money market funds | 7,138 | — | — | 7,138 |
| Commercial paper | 31,031 | — | (30) | 31,001 |
| Auction rate certificates | 35,000 | — | — | 35,000 |
| | $ 88,501 | $ — | $ (30) | $ 88,471 |
| **March 31, 2005** | | | | |
| Classified as current assets: | | | | |
| Cash | $ 16,979 | $ — | $ — | $ 16,979 |
| Money market funds | 395 | — | — | 395 |
| Commercial paper | 3,249 | — | (1) | 3,248 |
| Auction rate preferred securities | 6,998 | 2 | — | 7,000 |
| Government agencies | 49,499 | — | (525) | 48,974 |
| Corporate bonds | 37,506 | — | (316) | 37,190 |
| Auction rate certificates | 19,650 | — | — | 19,650 |
| Municipal obligations | 2,090 | — | (8) | 2,082 |
| | $136,366 | $ 2 | $ (850) | $135,518 |

As of October 2, 2005, the stated maturities of the Company's current investments (including $31.0 million classified as cash equivalent investments in the table above) are $31.0 million within one year and $35.0 million after ten years.

As of October 2, 2005, $30,000 of the unrealized losses has a duration of less than twelve months. The gross unrealized losses on these investments were primarily due to interest rate fluctuations and market-price movements. The Company reviewed the investment portfolio and determined that the gross unrealized losses on these investments at October 2, 2005 were temporary in nature. The Company has the ability and intent to hold these investments until recovery of their carrying values. The Company also believes that it will be able to collect both principal and interest amounts due to the Company at maturity, given the high credit quality of these investments.

In May 2005, the Company liquidated certain investments to repurchase a portion of the convertible subordinated notes, resulting in a realized loss of approximately $0.7 million. See Note 8 for information regarding the repurchase of convertible subordinated notes.

## Note 6. Asset Purchases

### Technology License

On June 30, 2005, the Company acquired a technology license from International Business Machines Corporation ("IBM") to copyrighted material pertinent to technology relating to electronic design automation

12

## MAGMA DESIGN AUTOMATION, INC.
### NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)
### (unaudited)

("EDA"), as well as other intellectual property owned by IBM. Also in connection with the technology license agreement, IBM and Magma entered into an amendment extending to 2010 the term of Magma's patent license agreement with IBM dated March 24, 2004. These two licenses cover IBM's patents and significant technology with respect to the development of EDA tools and products that perform physical implementation.

The total fee for the licenses was $7.0 million paid on June 30, 2005. In connection with the license agreements, the Company also entered into a warrant agreement pursuant to which IBM is entitled to purchase up to 500,000 shares of Magma common stock at an exercise price of $4.73 per share. The warrant is exercisable immediately and expires on the earlier of June 30, 2010 or immediately prior to a change of control of Magma. The warrant may be exercised by payment of the exercise price in cash or pursuant to a cashless net exercise provision. The fair value of the warrants was estimated to be $6.16 per share using the Black-Scholes option pricing model, with the following weighted-average assumptions:

| | |
|---|---|
| Risk-free interest rate | 3.72% |
| Expected dividend yield | 0% |
| Volatility | 65% |
| Expected life (years) | 5.00 |

The license fee of $7.0 million and $3.1 million fair value of the 500,000 shares of common stock warrant were included in the intangible asset balance on the Company's unaudited condensed consolidated balance sheet as of October 2, 2005 (see Note 7).

### Acquisition-Related Earnouts

For a number of Magma's acquisitions, the asset purchase or merger agreements, as applicable, included an earnout provision under which the Company may pay contingent consideration in cash and/or stock based on the achievement of certain technology milestones as outlined in the respective asset purchase or merger agreement.

In six months ended October 2, 2005, the Company recorded $23.6 million of intangible assets resulting from contingent consideration that was paid or became payable to stockholders of acquired companies as follows (in thousands):

| | Cash | Common Stock Value |
|---|---|---|
| Mojave, Inc. | $10,666 | $  10,666 |
| Aplus Design Technologies | 268 | 1,081 |
| Other | 914 | — |
| Total earnout consideration | $11,848 | $  11,747 |

In addition, during six months ended October 2, 2005, Magma recorded deferred stock-based compensation totaling $1.1 million related to the Mojave earnouts.

13

**MAGMA DESIGN AUTOMATION, INC.**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**(unaudited)**

### Note 7. Goodwill and Intangible Assets

The following table summarizes the components of goodwill, intangible assets and related accumulated amortization balances as of October 2, 2005 and March 31, 2005 (in thousands):

| | Weighted Average Life (months) | October 2, 2005 | | | March 31, 2005 | | |
|---|---|---|---|---|---|---|---|
| | | Gross Carrying Amount | Accumulated Amortization | Net Carrying Amount | Gross Carrying Amount | Accumulated Amortization | Net Carrying Amount |
| Goodwill | | $ 42,723 | $ — | $42,723 | $43,194 | $ — | $43,194 |
| Intangible assets: | | | | | | | |
| Developed technology | 47 | $ 82,539 | $ (26,697) | $55,842 | $59,083 | $ (16,488) | $42,595 |
| Licensed technology | 36 | 33,093 | (12,446) | 20,647 | 23,014 | (7,668) | 15,346 |
| Customer relationship or base | 61 | 2,200 | (859) | 1,341 | 2,200 | (637) | 1,563 |
| Patents | 59 | 11,932 | (4,634) | 7,298 | 11,792 | (3,355) | 8,437 |
| Acquired customer contracts | 36 | 900 | (590) | 310 | 900 | (438) | 462 |
| Assembled workforce | 43 | 1,235 | (504) | 731 | 1,235 | (330) | 905 |
| No shop right | 24 | 100 | (98) | 2 | 100 | (73) | 27 |
| Trademark | 45 | 400 | (221) | 179 | 400 | (162) | 238 |
| Total | | $132,399 | $ (46,049) | $86,350 | $98,724 | $ (29,151) | $69,573 |

During the six months ended October 2, 2005, the Company reduced its goodwill by $0.5 million to reflect purchase price adjustments primarily on an acquisition related to tax benefits recognized on net operating loss carryforwards.

The Company has included the amortization expense on intangible assets that relate to products sold in cost of license revenue, while the remaining amortization is shown as a separate line item on the Company's unaudited condensed consolidated statement of operations. For the three and six months ended October 2, 2005 and September 30, 2004, the amortization expense related to intangible assets was as follows (in thousands):

| | Three Months Ended | | Six Months Ended | |
|---|---|---|---|---|
| | October 2, 2005 | September 30, 2004 | October 2, 2005 | September 30, 2004 |
| Amortization of intangible assets included in: | | | | |
| Cost of revenue—licenses | $ 47 | $ 2 | $ 47 | $ 6 |
| Operating expenses | 1,273 | 116 | 2,945 | 574 |
| Total | $ 1,320 | $ 118 | $ 2,992 | $ 580 |

The expected future annual amortization expense of intangible assets is as follows (in thousands):

| Fiscal Year | Estimated Amortization Expense |
|---|---|
| 2006 (remaining six months) | $ 18,618 |
| 2007 | 36,043 |
| 2008 | 18,532 |
| 2009 | 12,131 |
| 2010 – 2020 | 1,026 |
| Total expected future annual amortization | $ 86,350 |

14

**MAGMA DESIGN AUTOMATION, INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(unaudited)**

**Note 8. Repurchase of Convertible Subordinated Notes**

In May 2005, the Company repurchased, in privately negotiated transactions, $44.5 million face amount (or approximately 29.7 percent of the total) of the Company's zero coupon convertible subordinated notes due May 2008 at an average discount to face value of approximately 22 percent. The Company spent approximately $34.8 million on the repurchases. The repurchase left approximately $105.5 million principal amount of convertible subordinated notes outstanding. In addition, a portion of the hedge and warrant transactions entered into by Magma in 2003 to limit potential dilution from conversion of the notes was terminated in connection with the repurchase. In the first quarter of fiscal 2006, the Company recorded a gain of $8.8 million on the repurchase of the convertible subordinated notes, which was net of the write-off of $0.9 million of deferred financing costs associated with the convertible subordinated notes. The net proceeds of $140,000 from the termination of a portion of the hedge and warrant were recorded against additional paid-in capital.

**Note 9. Restructuring Charge**

During the six months ended September 30, 2004, the Company recorded net restructuring charges of $0.4 million related to employee termination costs for 7 employees resulting from the Company's realignment to current business conditions. The Company has paid these termination costs as of September 30, 2004.

**Note 10. Contingencies**

*Synopsys, Inc. v. Magma Design Automation, Inc.*, Civil Action No. C04-03923, United States District Court, Northern District of California. In this action, filed September 17, 2004, Synopsys has sued the Company for alleged infringement of U.S. Patent Nos. 6,378,114 ("the '114 Patent"), 6,453,446 ("the '446 Patent"), and 6,725,438 ("the '438 Patent"). The patents-in-suit relate to methods for designing integrated circuits. The Complaint seeks unspecified monetary damages, injunctive relief, trebling of damages, fees and costs, and the imposition of a constructive trust for the benefit of Synopsys over any profits, revenues or other benefits allegedly obtained by the Company as a result of its alleged infringement of the patents-in-suit.

On October 21, 2004, the Company filed its answer and counterclaims ("Answer") to the Complaint. On November 10, 2004 Synopsys filed motions to strike and dismiss certain affirmative defenses and counterclaims in the Answer. On November 24, 2004 the Company filed an Amended Answer and Counterclaims ("Amended Answer"). By order dated November 29, 2004, the Court denied Synopsys' motions as moot in light of the Amended Answer. On December 10, 2004, Synopsys moved to strike and dismiss certain affirmative defenses and counterclaims in the Amended Answer. By order dated January 20, 2005, the Court denied in part and granted in part Synopsys' motion. In its pretrial preparation order dated January 21, 2005, the Court set forth a schedule for the case which, among other things, sets trial for April 24, 2006. Discovery is ongoing.

On February 3, 2005, Synopsys filed its Reply to the Amended Answer. On March 17, 2005, Synopsys filed a First Amended Complaint, which asserts seven causes of action against the Company and/or Lukas van Ginneken: (1) patent infringement (against both defendants), (2) breach of contract (against van Ginneken), (3) inducing breach of contract (against the Company), (4) fraud (against the Company), (5) conversion (against both defendants), (6) unjust enrichment/constructive trust (against both defendants), and (7) unfair competition (against both defendants). Synopsys seeks injunctive relief, declaratory relief, at least $100 million in damages, trebling of damages, punitive damages, fees and costs, and the imposition of a constructive trust for the benefit of Synopsys over any profits, revenues or other benefits allegedly obtained by the Company as a result of its alleged exploitation of the alleged inventions in the patents-in-suit. On April 1, 2005, the Company filed a motion to dismiss the third through seventh causes of action. This motion was granted in part and denied in part by order dated May 18, 2005.

15

## MAGMA DESIGN AUTOMATION, INC.
### NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)
### (unaudited)

On April 11, 2005, Synopsys voluntarily dismissed van Ginneken from the lawsuit without prejudice. Also on April 11, 2005, Synopsys filed against the Company a motion for partial summary judgment establishing unfair competition and a motion for partial summary judgment based on the doctrine of assignor estoppel.

On June 7, 2005, Synopsys filed a Second Amended Complaint that asserts six causes of action against the Company: (1) patent infringement, (2) inducing breach of contract/interference with contractual relations, (3) fraud, (4) conversion, (5) unjust enrichment/constructive trust/quasi-contract, and (6) unfair competition. Synopsys seeks injunctive relief, declaratory relief, at least $100 million in damages, trebling of damages, punitive damages, fees and costs, and the imposition of a constructive trust for the benefit of Synopsys over any profits, revenues or other benefits allegedly obtained by the Company as a result of its alleged exploitation of the alleged inventions in the patents-in-suit. On June 10, 2005, Magma moved for summary judgment as to the second through sixth causes of action in the Second Amended Complaint. On June 21, 2005, the Company moved to dismiss the third cause of action for fraud in the Second Amended Complaint and moved to strike certain allegations in the Second Amended Complaint. The court granted the Company's motion to dismiss and strike by order dated July 15, 2005.

On July 1, 2005, the Court granted Synopsys's motion for partial summary judgment regarding assignor estoppel, dismissing Magma's affirmative defenses and counterclaim alleging the invalidity of the '114 Patent. On July 14, 2005, the court vacated the hearings on Magma's motion for summary judgment on the second through sixth causes of action in the Second Amended Complaint and Synopsys's motion for partial summary judgment establishing unfair competition. The court stated that it would reset the motions for hearing, if necessary, after the claims construction hearing scheduled for August 15, 2005.

On July 29, 2005, Synopsys moved to preliminarily enjoin the Company from abandoning or dedicating to the public the '446 Patent or the '438 Patent. Also on July 29, 2005, Synopsys moved for partial summary judgment seeking dismissal of certain counterclaims and defenses asserted by the Company on the grounds of estoppel by contract. On September 16, 2005, Synopsys filed a revised motion for preliminary injunction. On September 30, 2005, the Company filed its oppositions to Synopsys's preliminary injunction motion and estoppel by contract motion. Both motions are scheduled to be heard December 2, 2005.

On August 3, 2005, Synopsys filed a Third Amended Complaint that asserts six causes of action against the Company: (1) patent infringement, (2) inducing breach of contract/interference with contractual relations, (3) fraud, (4) conversion, (5) unjust enrichment/constructive trust/quasi-contract, and (6) unfair competition. Synopsys seeks injunctive relief, declaratory relief, at least $100 million in damages, trebling of damages, punitive damages, fees and costs, and the imposition of a constructive trust for the benefit of Synopsys over any profits, revenues or other benefits allegedly obtained by the Company as a result of its alleged exploitation of the alleged inventions in the patents-in-suit.

On August 30, 2005, the Court issued a temporary restraining order against the Company restraining and enjoining the Company from taking any steps in the United States Patent and Trademark Office to abandon, suspend or disclaim the '446 and '438 Patents, failing or refusing to pay the maintenance fees for the '446 and '438 Patents, or seeking reexamination of the '446 and '438 Patents. The temporary restraining order will remain in effect until the hearing on Synopsys's motion for a preliminary injunction scheduled for December 2, 2005.

On September 2, 2005, the Company filed an Answer and Counterclaims to Synopsys's Third Amended Complaint. In that pleading, the Company alleges, *inter alia*, that IBM is a joint owner of the patents-in-suit and that, as a result, the Company cannot be liable for infringement because (1) Synopsys lacks standing to assert the patents-in-suit against Magma, and (2) the patents-in-suit are licensed to Magma by IBM.

16

## MAGMA DESIGN AUTOMATION, INC.
### NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)
### (unaudited)

On October 19, 2005, the Court granted in part and denied in part Synopsys's motion to strike certain affirmative defenses and to dismiss certain counterclaims in the Company's Answer and Counterclaims to Synopsys's Third Amended Complaint. The Court dismissed without leave to amend the Company's counterclaims seeking correction of inventorship of the '446 and '438 Patents. The Court also struck without leave to amend the Company's affirmative defenses of (1) invalidity of the '446 and '438 Patents based on failure to name all inventors, (2) unenforceability of the '446 and '438 patents due to inequitable conduct, and (3) unclean hands. The Court struck with leave to amend the Company's affirmative defenses of invalidity of the '446 and '438 Patents based on 35 U.S.C. §§ 102, 103 and 112, as well as the Company's affirmative defense that Synopsys is not the owner of any invention defined by the claims of the '446 and '438 Patents.

On October 24, 2005, the Company filed a motion for summary judgment as to the first cause of action (for patent infringement) in Synopsys's Third Amended Complaint on the grounds that IBM is an owner of all the patents-in-suit. Also on October 24, 2005, Synopsys filed (1) a motion for partial summary judgment to dismiss the Company's joint ownership defenses and counterclaims, and (2) a motion for partial summary judgment to dismiss allegations of co-ownership based on judicial and quasi-estoppel. All three motions are scheduled to be heard on December 2, 2005.

The Company intends to vigorously defend against the claims asserted by Synopsys and to fully enforce its rights against Synopsys. However, the results of any litigation are inherently uncertain and the Company can not assure that it will be able to successfully defend against the Complaint. A favorable outcome for Synopsys could have a material adverse effect on the Company's financial position, results of operations or cash flows. The Company is currently unable to assess the extent of damages and/or other relief, if any, that could be awarded to Synopsys; therefore, no contingent liability has been recorded on the Company's condensed consolidated balance sheet as of October 2, 2005.

On April 18, 2005, Synopsys, Inc. filed an action against the Company in Germany at the Landgericht München I (District Court in Munich) seeking to obtain ownership of the European patent application corresponding to the Company's '446 Patent. The action has been stayed pending the outcome of the above-referenced Synopsys action filed in the United States.

On July 29, 2005, Synopsys, Inc. filed an action against the Company in Japan in Civil Department No. 40 of the Tokyo District Court seeking to obtain ownership of the Japanese patent application corresponding to the Company's '446 Patent. The Company has engaged counsel in Japan and will seek to stay this action pending the outcome of the above-referenced Synopsys action filed in the United States.

On June 13, 2005, a putative shareholder class action lawsuit captioned *The Cornelia I. Crowell GST Trust vs. Magma Design Automation, Inc., Rajeev Madhavan, Gregory C. Walker and Roy E. Jewell.*, No. C 05 02394, was filed in U.S. District Court, Northern District of California. The complaint alleges that defendants failed to disclose information regarding the risk of Magma infringing intellectual property rights of Synopsys, Inc., in violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder, and prays for unspecified damages.

On July 26, 2005, a putative derivative complaint captioned *Susan Willis v. Magma Design Automation, Inc. et al.*, No. 1-05-CV-045834, was filed in the Superior Court of the State of California for the County of Santa Clara. The Complaint seeks unspecified damages purportedly on behalf of the Company for alleged breaches of fiduciary duties by various directors and officers, as well as for alleged violations of insider trading laws by executives during a period between October 23, 2002 and April 12, 2005. Defendants have demurred to the Complaint, and a hearing is scheduled for December 2005.

17

## MAGMA DESIGN AUTOMATION, INC.
### NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)
### (unaudited)

On September 26, 2005, Synopsys, Inc. filed an action against the Company in the Superior Court of the State of California in and for the County of Santa Clara, entitled *Synopsys, Inc. v. Magma Design Automation, Inc., et al.,* Case Number 105 CV 049638. Synopsys alleges that Magma committed unfair business practices by asserting defenses of non-infringement and invalidity to patent infringement allegations brought by Synopsys in the patent infringement action already pending against Magma in the Northern District of California. On October 19, 2005, the Company removed he action to the United States District Court for the Northern District of California. On October 26, 2005, the Company moved to strike and dismiss the complaint. On October 27, 2005, the Court granted the Company's motion to relate the removed action with the preexisting patent infringement action, and both actions are now assigned to Judge Maxine M. Chesney.

On September 26, 2005, Synopsys, Inc. filed an action against the Company in Delaware federal court, *Synopsys, Inc. v. Magma Design Automation, Inc., Civil Action No. 05-701.* The Complaint alleges infringement of U.S. Patent Nos. 6,434,733 ("the '733 Patent"), 6,766,501 ("the '501 Patent"), and 6,192,508 ("the '508 Patent") and seeks unspecified monetary damages, injunctive relief, trebling of damages, fees and costs, and the imposition of a constructive trust for the benefit of Synopsys over any profits, revenues or other benefits allegedly obtained by the Company as a result of its alleged infringement of the patents-in-suit.

On October 19, 2005, the Company filed its answer and counterclaims ("Answer") to Synopsys's Complaint. The Answer asserts that Magma's products do not infringe the patents-in-suit, that the patents-in-suit are unenforceable, and that the '733 Patent and the '501 Patent were fraudulently obtained by Synopsys and are therefore unenforceable. The Answer also asserts antitrust counterclaims based on Synopsys's assertion of the '733 and '501 Patents, as well as claims for product disparagement and trade libel, statutory and common law unfair competition, and tortuous interference with business relations. The counterclaims seek treble damages and other equitable relief for Synopsys's anticompetitive and tortuous conduct.

On October 25, 2005, the Company filed an Amended Answer, adding a counterclaim for infringement of U.S. Patent No. 6,505,328 ("the '328 Patent"). The Company seeks treble damages and an injunction against Synopsys for the sale and manufacture of products the Company alleges infringe the '328 Patent.

With respect to the above-referenced lawsuits, the Company is currently unable to assess the possible extent of damages and/or other relief, if any, that could be awarded against the Company, therefore, no contingent liability has been recorded on the Company's condensed consolidated balance sheet as of October 2, 2005. The ultimate resolution of this matter or other third party assertions could have a material adverse effect on the Company's financial position, results of operations or cash flows.

In addition to the above, from time to time, the Company is involved in disputes that arise in the ordinary course of business. The number and significance of these disputes is increasing as the Company's business expands and it grows larger. Any claims against the Company, whether meritorious or not, could be time consuming, result in costly litigation, require significant amounts of management time and result in the diversion of significant operational resources. As a result, these disputes could harm the Company's business, financial condition, results of operations or cash flows.

### Indemnification Obligations

The Company enters into standard license agreements in the ordinary course of business. Pursuant to these agreements, the Company agrees to indemnify its customers for losses suffered or incurred by them as a result of any patent, copyright, or other intellectual property infringement claim by any third party with respect to the

MAGMA DESIGN AUTOMATION, INC.

NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)
(unaudited)

Company's products. These indemnification obligations have perpetual terms. The Company's normal business practice is to limit the maximum amount of indemnification to the amount received from the customer. On occasion, the maximum amount of indemnification the Company may be required to make may exceed its normal business practices. The Company estimates the fair value of its indemnification obligations as insignificant, based upon its historical experience concerning product and patent infringement claims. Accordingly, the Company had no liabilities recorded for indemnification under these agreements as of October 2, 2005.

The Company has agreements whereby its officers and directors are indemnified for certain events or occurrences while the officer or director is, or was, serving at the Company's request in such capacity. The maximum potential amount of future payments the Company could be required to make under these indemnification agreements is unlimited; however, the Company has a directors' and officers' liability insurance policy that reduces its exposure under these agreements. As a result of the Company's insurance policy coverage, the Company believes the estimated fair value of these indemnification agreements is minimal. Accordingly, no liabilities have been recorded for these agreements as of October 2, 2005.

In connection with certain of the Company's recent business acquisitions, it has also agreed to assume, or cause Company subsidiaries to assume, the indemnification obligations of those companies to their respective officers and directors.

**Warranties**

The Company offers its customers a warranty that its products will conform to the documentation provided with the products. To date, there have been no payments or material costs incurred related to fulfilling these warranty obligations. Accordingly, the Company has no liabilities recorded for these warranties as of October 2, 2005. The Company assesses the need for a warranty accrual on a quarterly basis, and there can be no guarantee that a warranty accrual will not become necessary in the future.

**Note 11. Segment Information**

The Company adopted the provisions of SFAS No. 131, "Disclosures about Segments of an Enterprise and Related Information," which requires the reporting of segment information using the "management approach." Under this approach, operating segments are identified in substantially the same manner as they are reported internally and used by the Company's management for purposes of evaluating performance and allocating resources. Based on this approach, the Company has one reportable segment as the management reviews financial information on a basis consistent with that presented in the unaudited condensed consolidated financial statements.

Revenue from North America, Europe, Japan and the Asia-Pacific region, which includes, India, South Korea, Taiwan, Hong Kong and the People's Republic of China, was as follows (in thousands):

| | Three Months Ended | | Six Months Ended | |
| --- | --- | --- | --- | --- |
| | October 2, 2005 | September 30, 2004 | October 2, 2005 | September 30, 2004 |
| North America* | $    29,344 | $    20,137 | $    57,505 | $    43,115 |
| Europe | 4,495 | 5,415 | 8,696 | 10,265 |
| Japan | 3,739 | 9,705 | 7,975 | 15,271 |
| Asia-Pacific (excluding Japan) | 2,308 | 1,671 | 4,542 | 4,306 |
| | $    39,886 | $    36,928 | $    78,718 | $    72,957 |

19

MAGMA DESIGN AUTOMATION, INC.
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)
(unaudited)

| | Three Months Ended | | Six Months Ended | |
| --- | --- | --- | --- | --- |
| | October 2, 2005 | September 30, 2004 | October 2, 2005 | September 30, 2004 |
| North America* | 74% | 55% | 73% | 59% |
| Europe | 11 | 15 | 11 | 14 |
| Japan | 9 | 26 | 10 | 21 |
| Asia-Pacific (excluding Japan) | 6 | 4 | 6 | 6 |
| | 100% | 100% | 100% | 100% |

* The Company has substantially all its North America revenue in the United States for all periods presented.

As of October 2, 2005 and March 31, 2005, one customer accounted for 10% of accounts receivable.

Revenue attributable to significant customers, representing 10% or more of total revenue for at least one of the respective periods, is summarized as follows:

| | Three Months Ended | | Six Months Ended | |
| --- | --- | --- | --- | --- |
| | October 2, 2005 | September 30, 2004 | October 2, 2005 | September 30, 2004 |
| Customer A | 13% | 12% | 22% | 19% |
| Customer B | 15% | * | * | * |
| Customer C | * | 15% | * | * |

* Less than 10% of revenue.

The Company has substantially all of its long-lived assets located in the United States.

## Note 12. Stockholders' Equity

### Repurchase of Common Stock

On April 13, 2005, the Company announced that its Board of Directors authorized Magma to repurchase up to 2.0 million shares of its common stock. The stock repurchase was completed in May 2005, with repurchase prices ranging from $7.82 to $8.17 per share. The Company used approximately $16.0 million to repurchase 2.0 million shares of common stock. The repurchased shares are being held as treasury stock and are to be used for general corporate purposes.

### Option Exchange Program

In August 2005, the Company offered to its employees a voluntary stock option exchange program designed to promote employee retention and reward contributions to stockholder value. Directors and executive officers were not eligible to participate in this option exchange program. Under the program, the company offered to exchange outstanding options to purchase common stock at exercise prices greater than or equal to $10.50, for a smaller number of new options at an exercise price of $9.20, equal to fair market value on the date of grant, August 22, 2005. The exchange ratio ranged from 60% to 75% depending on exercise price of the old option. As a result of the exchange program, options to purchase an aggregate of approximately 4.4 million shares of its common stock were canceled (with exercise prices ranging from $10.50 to $30.28) and options to purchase an aggregate of approximately 3.0 million shares of its common stock were granted under the Company's 2001

20

MAGMA DESIGN AUTOMATION, INC.

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(unaudited)**

Stock Incentive Plan on August 22, 2005. The new options generally will vest and become exercisable over a two to four-year period, with 12.5% to 25% of each new option generally becoming exercisable after each six-month period of continued service following the grant date.

As a result of the exchange program and in accordance with the guidance of FIN 44, the Company is required to prospectively apply variable accounting to these new options (and any options granted with a lower exercise price than the canceled options in the six-month look-back and look-forward periods) until the options are exercised, cancelled or expire, unless the price of the Company's common stock at the end of each fiscal quarter is less than the exercise price of the newly granted stock options. In addition, in accordance with the guidance of the FASB's EITF 00-23, the options that were retained by eligible employees who did not participate in the exchange program, are also subject to variable accounting until the options in question are exercised, forfeited or expire unexercised. As of October 2, 2005, options to purchase an aggregate of approximately 5.5 million shares of its common stock were subject to variable accounting. The Company will be required to prospectively apply variable accounting to these options in this context until the Company adopts SFAS 123R, which it currently intends to do beginning with the first quarter of fiscal year 2007. As a result of variable accounting, the company recorded a compensation expense of approximately $213,000, relating to options granted during the six-month look-back period, for the fiscal quarter ended October 2, 2005.

21

## ITEM 2.  MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

This Management's Discussion and Analysis of Financial Condition and Results of Operation section should be read in conjunction with our unaudited condensed consolidated financial statements and results appearing elsewhere in this report. Throughout this section, we make forward-looking statements within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934. You can often identify forward looking statements by terms such as "becoming," "may," "will," "should," "predicts," "potential," "continue," "anticipates," "believes," "estimates," "seeks," "expects," "plans," "intends," or comparable terminology. These forward-looking statements include, but are not limited to, our expectations about revenue and various operating expenses. Although we believe that the expectations reflected in these forward-looking statements are reasonable, and we have based these expectations on our beliefs and assumptions, such expectations may prove to be incorrect. Our actual results of operations and financial performance could differ significantly from those expressed in or implied by our forward-looking statements. Factors that could cause or contribute to such differences include, but are not limited to: competition in the EDA market; our ability to integrate acquired businesses and technologies; potentially higher-than-anticipated costs of litigation; potentially higher-than-anticipated costs of compliance with regulatory requirements, including those relating to internal control over financial reporting; any delay of customer orders or failure of customers to renew licenses; weaker-than-anticipated sales of our products and services; weakness in the semiconductor or electronic systems industries; the ability to manage expanding operations; the ability to attract and retain management and technical personnel; our ability to continue to deliver competitive products to customers; and changes in accounting rules.

### Overview

Magma Design Automation provides electronic design automation ("EDA") software products and related services. Our software enables chip designers to reduce the time it takes to design and produce complex integrated circuits used in the communications, computing, consumer electronics, networking and semiconductor industries. Our products are used in all major phases of the chip development cycle, from initial design through physical implementation. Our focus is on software used to design the most technologically advanced integrated circuits, specifically those with minimum feature sizes of 0.13 micron and smaller. See "Item 1, Business" in our Annual Report on Form 10-K for the year ended March 31, 2005 for a more complete description of our business.

As an EDA software provider, we generate substantially all our revenue from the semiconductor and electronics industries. Our customers typically fund purchases of our software and services out of their research and development budgets. As a result, our revenue is heavily influenced by our customers' long-term business outlook and willingness to invest in new chip designs.

Beginning in late calendar 2000, the semiconductor industry entered its steepest and longest downturn of the past 20 years, with industry sales dropping significantly from late 2000 to early 2002. As a result, our customers have focused on controlling costs and reducing risk, lowering research and development ("R&D") expenditures, cutting back on design starts, purchasing from fewer suppliers, requiring more favorable pricing and payment terms from suppliers, and pursuing consolidation within their own industry. Further, during the downturn, many start-up semiconductor design companies failed or were acquired, and the pace of investment in new companies declined. While the semiconductor industry has experienced a moderate recovery in recent years, our customers have remained cautious. It is not yet clear when improved demand in our own customers' electronics end markets will result in significantly increased R&D spending or design starts, and corresponding spending on EDA tools.

To support our customers, we have focused on providing the most technologically advanced products to address each step in the integrated circuit ("IC") design process, as well as integrating these products into broad platforms, and expanding our product offerings. Our goal is to be the EDA technology supplier of choice for our customers as they pursue longer-term, broader and more flexible relationships with fewer suppliers.

22

Despite the condition of the semiconductor industry described above, we were able to achieve the following during the second quarter of fiscal 2006:

- We achieved record quarterly revenue of $39.9 million during the second quarter of fiscal 2006, up 3% from the prior quarter and up 8% from the same quarter in fiscal 2005. License sales for the quarter ended October 2, 2005 accounted for approximately 82% of total revenue, compared to 87% in the prior quarter and 85% from the same quarter in the prior year. Revenue increased primarily from sales of additional licenses, services and contract extensions to existing customers in North America.

- We continued to penetrate our market, and during the second quarter of fiscal 2006 we passed the 220-customer threshold.

- We neared completion of the rollout of new products developed as part of our 18-month-long Cobra initiative. With these products, we further widen our lead in producing the best quality of results as defined by chip performance, area and manufacturability.

- Our technology continues to be a top choice among designers working on the most advanced designs. A number of Magma customers are currently using our technology for 90 nanometer and 65 nanometer designs. Several customers have already completed 65 nanometer designs using Magma technology.

**Critical Accounting Policies and Estimates**

In preparing our financial statements, we make estimates, assumptions and judgments that can have a significant impact on our revenue, operating income or loss and net income or loss, as well as on the value of certain assets and liabilities on our balance sheet. We believe that the estimates, assumptions and judgments involved in the accounting policies described below have the most significant potential impact on our financial statements, so we consider these to be our critical accounting policies. We consider the following accounting policies related to revenue recognition, allowance for doubtful accounts, investments, asset purchases and business combinations, income taxes and valuation of long-lived assets to be our most critical policies due to the estimation processes involved in each.

*Revenue recognition*

We recognize revenue in accordance with Statement of Position ("SOP") 97-2, as modified by SOP 98-9, which generally requires revenue earned on software arrangements involving multiple elements (such as software products, upgrades, enhancements, maintenance, installation and training) to be allocated to each element based on the relative fair values of the elements. The fair value of an element must be based on evidence that is specific to us. If evidence of fair value does not exist for each element of a license arrangement and maintenance is the only undelivered element, then all revenue for the license arrangement is recognized over the term of the agreement. If evidence of fair value does exist for the elements that have not been delivered, but does not exist for one or more delivered elements, then revenue is recognized using the residual method, under which recognition of revenue for the undelivered elements is deferred and the residual license fee is recognized as revenue immediately.

Our revenue recognition policy is detailed in Note 1 of the Notes to Consolidated Financial Statements on Form 10-K for the year ended March 31, 2005. Management has made significant judgments related to revenue recognition; specifically, in connection with each transaction involving our products (referred to as an "arrangement" in the accounting literature) we must evaluate whether our fee is "fixed or determinable" and we must assess whether "collectibility is probable". These judgments are discussed below.

*The fee is fixed or determinable.* With respect to each arrangement, we must make a judgment as to whether the arrangement fee is fixed or determinable. If the fee is fixed or determinable, then revenue is recognized upon delivery of software (assuming other revenue recognition criteria are met). If the fee is not fixed or determinable, then the revenue recognized in each period (subject to application of other revenue recognition criteria) will be the lesser of the aggregate of amounts due and payable or the amount of the arrangement fee that would have been recognized if the fees were being recognized ratably.

23

Except in cases where we grant extended payment terms to a specific customer, we have determined that our fees are fixed or determinable at the inception of our arrangements based on the following:

- The fee our customers pay for our products is negotiated at the outset of an arrangement and is generally based on the specific volume of products to be delivered.
- Our license fees are not a function of variable-pricing mechanisms such as the number of units distributed or copied by the customer or the expected number of users of the product delivered.

In order for an arrangement to be considered fixed or determinable, 100% of the arrangement fee must be due within one year or less from the order date. We have a history of collecting fees on such arrangements according to contractual terms. Arrangements with payment terms extending beyond 12 months are considered not to be fixed or determinable.

*Collectibility is probable.* In order to recognize revenue, we must make a judgment about the collectibility of the arrangement fee. Our judgment of the collectibility is applied on a customer-by-customer basis pursuant to our credit review policy. We typically sell to customers for which there is a history of successful collection. New customers are subjected to a credit review process, which evaluates the customers' financial positions and ability to pay. If it is determined from the outset of an arrangement that collectibility is not probable based upon our credit review process, revenue is recognized on a cash receipts basis (as each payment is collected).

*License revenue*

We derive license revenue primarily from licenses of our design and implementation software and, to a much lesser extent, from licenses of our analysis and verification products. We license our products under time-based and perpetual licenses.

We recognize license revenue after the execution of a license agreement and the delivery of the product to the customer, provided that there are no uncertainties surrounding the product acceptance, fees are fixed or determinable, collection is probable and there are no remaining obligations other than maintenance. For licenses where we have vendor-specific objective evidence of fair value ("VSOE,") for maintenance, we recognize license revenue using the residual method. For these licenses, license revenue is recognized in the period in which the license agreement is executed assuming all other revenue recognition criteria are met. For licenses where we have no VSOE for maintenance, we recognize license revenue ratably over the maintenance period, or if extended payment terms exist, based on the amounts due and payable.

For transactions in which we bundle maintenance for the entire license term into a time-based license agreement, no VSOE of fair value exists for each element of the arrangement. For these agreements, where the only undelivered element is maintenance, we recognize revenue ratably over the contract term. If an arrangement involves extended payment terms—that is, where payment for less than 100% of the license, services and initial post contract support is due within one year of the contract date—we recognize revenue to the extent of the lesser of the portion of the amount due and payable or the ratable portion of the entire fee.

For our perpetual licenses and some time-based license arrangements, we unbundle maintenance by including maintenance for up to first year of the license term, with maintenance thereafter renewable by the customer at the substantive rates stated in their agreements with us. In these unbundled licenses, the aggregate renewal period is greater than or equal to the initial maintenance period. The stated rate for maintenance renewal in these contracts is VSOE of the fair value of maintenance in both our unbundled time-based and perpetual licenses. Where the only undelivered element is maintenance, we recognize license revenue using the residual method. If an arrangement involves extended payment terms, revenue recognized using the residual method is limited to amounts due and payable.

If we were to change any of these assumptions or judgments, it could cause a material increase or decrease in the amount of revenue that we report in a particular period. Amounts invoiced relating to arrangements where

24

revenue cannot be recognized are reflected on our balance sheet as deferred revenue and recognized over time as the applicable revenue recognition criteria are satisfied.

*Services revenue*

We derive services revenue primarily from consulting and training for our software products and from maintenance fees for our products. Most of our license agreements include maintenance, generally for a one-year period, renewable annually. Services revenue from maintenance arrangements is recognized on a straight-line basis over the maintenance term. Because we have VSOE of fair value for consulting and training services, revenue is recognized as these services are performed or completed. Our consulting and training services are generally not essential to the functionality of the software. Our products are fully functional upon delivery of the product. Additional factors considered in determining whether the revenue should be accounted for separately include, but are not limited to: degree of risk, availability of services from other vendors, timing of payments and impact of milestones or acceptance criteria on our ability to recognize the software license fee.

*Unbilled accounts receivable*

Unbilled accounts receivable represent revenue that has been recognized in advance of being invoiced to the customer. In all cases, the revenue and unbilled receivables are for contracts which are non-cancelable, there are no contingencies and where the customer has taken delivery of both the software and the encryption key required to operate the software. We typically generate invoices 45 days in advance of contractual due dates, and we invoice the entire amount of the unbilled accounts receivable within one year from the contract inception.

*Allowances for doubtful accounts*

We maintain allowances for doubtful accounts for estimated losses resulting from the inability of our customers to make required payments. We regularly review the adequacy of our accounts receivable allowance after considering the size of the accounts receivable balance, each customer's expected ability to pay and our collection history with each customer. We review significant invoices that are past due to determine if an allowance is appropriate using the factors described above. We also monitor our accounts receivable for concentration in any one customer, industry or geographic region.

As of October 2, 2005, one customer accounted for more than 10% of total receivables. The allowance for doubtful accounts represents our best estimate, but changes in circumstances relating to accounts receivable may result in a requirement for additional allowances in the future. If actual losses are significantly greater than the allowance we have established, that would increase our general and administrative expenses and reported net loss. Conversely, if actual credit losses are significantly less than our allowance, this would decrease our general and administrative expenses and our reported net income would increase.

*Accounting for asset purchases and business combinations*

We are required to allocate the purchase price of acquired assets and business combinations to the tangible and intangible assets acquired, liabilities assumed, as well as in-process research and development based on their estimated fair values. Such a valuation requires management to make significant estimates and assumptions, especially with respect to intangible assets.

Critical estimates in valuing certain of the intangible assets include but are not limited to: future expected cash flows from license sales, maintenance agreements, consulting contracts, customer contracts, acquired workforce and acquired developed technologies and patents; expected costs to develop the in-process research and development into commercially viable products and estimated cash flows from the projects when completed; the acquired company's brand awareness and market position, as well as assumptions about the period of time the acquired brand will continue to be used in the combined company's product portfolio; and discount rates.

25

Management's estimates of fair value are based upon assumptions believed to be reasonable, but which are inherently uncertain and unpredictable. Assumptions may be incomplete or inaccurate, and unanticipated events and circumstances may occur.

Other estimates associated with the accounting for these acquisitions may change as additional information becomes available regarding the assets acquired and liabilities assumed resulting in changes in the purchase price allocation.

### *Goodwill impairment*

Statement of Financial Accounting Standards No. 142, "Goodwill and Other Intangible Assets," requires that goodwill be tested for impairment at the reporting unit level (operating segment or one level below an operating segment) on an annual basis and between annual tests in certain circumstances. Application of the goodwill impairment test requires judgment, including the identification of reporting units, assigning assets and liabilities to reporting units, assigning goodwill to reporting unit, and determining the fair value of the reporting unit. We have determined that we have one reporting unit (see Note 11 of the Notes to the Condensed Consolidated Financial Statements in this Form 10-Q). Significant judgments required to estimate the fair value of a reporting unit include estimating future cash flows, determining appropriate discount rates and other assumptions. Changes in these estimates and assumptions could materially affect the determination of fair value for the reporting unit. Any impairment losses recorded in the future could have a material adverse impact on our financial condition and results of operations.

### *Valuation of intangibles and long-lived assets*

SFAS No. 144, "Accounting for the Impairment or Disposal of Long-Lived Assets," requires that we record an impairment charge on finite-lived intangibles or long-lived assets to be held and used when we determine that the carrying value of intangible assets and long-lived assets may not be recoverable. Based on the existence of one or more indicators of impairment, we measure any impairment of intangibles or long-lived assets based on a projected discounted cash flow method using a discount rate determined by our management to be commensurate with the risk inherent in our business model. Our estimates of cash flows require significant judgment based on our historical results and anticipated results and are subject to many factors.

### *Income taxes*

We account for income taxes in accordance with SFAS 109, "Accounting for Income Taxes." Significant judgment is required in determining our provision for income taxes. In the ordinary course of business, there are many transactions and calculations where the ultimate tax outcome is uncertain. The amount of income taxes we pay could be subject to audits by federal, state, and foreign tax authorities, which could result in proposed assessments. Although we believe that our estimates are reasonable, no assurance can be given that the final outcome of these tax matters will not be different than that which is reflected in our historical income tax provisions.

We assess the likelihood that our net deferred tax assets will be recovered from future taxable income and to the extent we believe that recovery is not likely, we establish a valuation allowance. We consider all available positive and negative evidence including our past operating results, the existence of cumulative losses in the most recent fiscal years, future taxable income, and ongoing prudent and feasible tax planning strategies in assessing the amount of the valuation allowance. The Company will continue to evaluate the realizability of the deferred tax assets on a quarterly basis. Future reversals or increases to our valuation allowance could have a significant impact on our future earnings.

### *Strategic investments in privately-held companies*

Our strategic equity investments consist of preferred stock and convertible notes that are convertible into preferred or common stock of several privately-held companies. As of October 2, 2005, $0.6 million of the notes

has been converted into an investee company's preferred stock. The carrying value of our portfolio of strategic equity investments in non-marketable equity securities (privately-held companies) totaled $2.5 million at October 2, 2005. Our ability to recover our investments in private, non-marketable equity securities and to earn a return on these investments is primarily dependent on how successfully these companies are able to execute on their business plans and how well their products are accepted, as well as their ability to obtain additional capital funding to continue operations. In the current equity market environment, their ability to obtain additional funding as well as to take advantage of liquidity events, such as initial public offerings, mergers and private sales, may be significantly constrained.

Under our accounting policy, the carrying value of a non-marketable investment is the amount paid for the investment unless it has been determined to be other than temporarily impaired, in which case we write the investment down to its estimated fair value. We review all of our investments periodically for impairment; however, for non-marketable equity securities, the fair value analysis requires significant judgment. This analysis includes assessment of each investee's financial condition, the business outlook for its products and technology, its projected results and cash flows, the likelihood of obtaining subsequent rounds of financing and the impact of any relevant contractual equity preferences held by us or others. If an investee obtains additional funding at a valuation lower than our carrying amount, we presume that the investment is other than temporarily impaired, unless specific facts and circumstances indicate otherwise, such as when we hold contractual rights that give us a preference over the rights of other investors. As the equity markets have declined significantly over the past few years, we have experienced substantial impairments in our portfolio of non-marketable equity securities. If equity market conditions do not improve, as companies within our portfolio attempt to raise additional funds, the funds may not be available to them, or they may receive lower valuations, with more onerous investment terms than in previous financings, and the investments will likely become impaired. However, we are not able to determine at the present time which specific investments are likely to be impaired in the future, or the extent or timing of individual impairments. We recorded impairment charges related to these non-marketable equity investments of $0.1 million and $0.5 million during the three and six months ended October 2, 2005, respectively. Similarly, we recorded impairment charges related to these non-marketable equity investments of $0.3 million and $0.7 million during the three and six months ended September 30, 2004, respectively.

## Results of Operations

### Revenue

Revenue consists of licenses revenue and services revenue. License revenue consists of fees for time-based or perpetual licenses of our products. Services revenue consists of fees for services, such as post-contract customer support ("PCS"), customer training and consulting. We recognize revenue based on the specific terms and conditions of the license contracts with our customer for our products and services as described in detail above in our "Critical Accounting Policies and Estimates." For management reporting and analysis purposes we classify our revenue into the following four categories:

- Ratable
- Due & Payable
- Cash Receipts
- "Turns or Up-front"/ Perpetual or Time-Based

We classify our license arrangements as either bundled or unbundled. Bundled license contracts include maintenance with the license fee and do not include optional maintenance periods. Unbundled license contracts have separate maintenance fees and include optional maintenance periods.

We use this classification of license revenue to provide greater insight into the reporting and monitoring of trends in the components of our revenue and to assist us in managing our business. It is important to note that the

27

characterization of an individual contract may change over time. For example, a contract originally characterized as Ratable may be redefined as Cash Receipts if that customer has difficulty in making payments in a timely fashion. In cases where a contract has been re-characterized for management reporting purposes, prior periods are not restated to reflect that change. The following table shows the breakdown of license revenue by category as defined for management reporting and analysis purposes:

| | | October 2, 2005 | % of Revenue | September 30, 2004 | % of Revenue |
|---|---|---|---|---|---|
| **Revenue category:** | | | | | |
| **Three Months Ended:** | | | | | |
| License revenue | | | | | |
| Ratable | Bundled and Unbundled | $ 6,257 | 16% | $ 4,309 | 12% |
| Due & Payable | Unbundled | 14,539 | 36% | 12,933 | 35% |
| Cash Receipts | Unbundled | 2,612 | 7% | 2,848 | 8% |
| Turns | Unbundled | 9,296 | 23% | 11,185 | 30% |
| Total license revenue | | 32,704 | 82% | 31,275 | 85% |
| Services revenue | | 7,182 | 18% | 5,653 | 15% |
| Total Revenue | | $39,886 | 100% | $ 36,928 | 100% |
| **Six Months Ended:** | | | | | |
| License revenue | | | | | |
| Ratable | Bundled and Unbundled | $11,264 | 14% | $ 9,172 | 13% |
| Due & Payable | Unbundled | 28,132 | 36% | 28,284 | 39% |
| Cash Receipts | Unbundled | 4,488 | 6% | 5,425 | 7% |
| Turns | Unbundled | 22,730 | 29% | 19,286 | 26% |
| Total license revenue | | 66,614 | 85% | 62,167 | 85% |
| Services revenue | | 12,104 | 15% | 10,790 | 15% |
| Total Revenue | | $78,718 | 100% | $ 72,957 | 100% |

*Bundled and Unbundled Licenses: Ratable.* For bundled time-based licenses, we recognize license revenue ratably over the contract term, or as customer payments become due and payable, if less. The revenue for these bundled arrangements for both license and maintenance is classified as license revenue in our statement of operations. For unbundled time-based with a term of less than 15 months, we recognize license revenue ratably over the license term, or as customer payments become due and payable, if earlier. For management reporting and analysis purposes, we refer to both these types of licenses generally as "Ratable" and we generally refer to all time-based licenses recognized on a ratable basis as "Long Term," independent of the actual length of term of the license.

We classify unbundled perpetual or time-based licenses with a term of fifteen months or greater based on the payment term structure, as "Due and Payable," "Cash Receipts" or "Perpetual":

*Unbundled Licenses: Due and Payable/Time-Based licenses with long term payments.* For unbundled time-based licenses where the payment terms extend greater than one year from the arrangement effective date, we recognize license revenue on a due and payable basis and we recognize maintenance and services revenue ratably over the maintenance term. For management reporting and analysis purposes, we refer to this type of license generally as "Due and Payable/Long Term Time-Based Licenses."

*Unbundled Licenses: Cash Receipts.* We recognize revenue from customers who have not met our predetermined credit criteria on a cash receipts basis to the extent that revenue has otherwise been earned. Such customers generally order short-term time based licenses or separate annual maintenance. We recognize license revenue as we receive cash payments from these customers. Maintenance is recognized ratably over the

28

maintenance term after the customer has remitted payment. For management reporting and analysis purposes, we refer to this type of license revenue as "Cash Receipts."

*Unbundled Licenses: "Turns"/Perpetual License or Time-Based licenses with short-term payments.* For unbundled time-based and perpetual licenses, we recognize license revenue upon shipment as long as the payment terms require the customer to pay 100% of the license fee and the initial period of PCS within one year from the agreement date and payments are generally linear. We recognize maintenance revenue ratably over the maintenance term. In all of these cases, the contracts are non-cancelable, and the customer has taken delivery of both the software and the encryption key required to operate the software. For management reporting and analysis purposes, we refer to this type of license generally as "Turns," where the license is either perpetual or time-based.

Our license revenue in any given quarter depends upon the mix and volume of perpetual or short term licenses ordered during the quarter and the amount of long-term ratable or due and payable, and cash receipts license revenue recognized during the quarter. In general, we refer to license revenue recognized from perpetual or time based licenses during the quarter as "Up-front" or "turns" revenue, for management reporting and analysis purposes. All other types of revenue are generally referred to as revenue from backlog. We set our revenue targets for any given period based, in part, upon an assumption that we will achieve a certain level of orders and a certain mix of short term licenses. The precise mix of orders fluctuates substantially from period to period and affects the revenue we recognize in the period. If we achieve our target level of total orders but are unable to achieve our target license mix, we may not meet our revenue targets (if we have more-than-expected long term licenses) or may exceed them (if we have more-than-expected short term or perpetual licenses). If we achieve the target license mix but the overall level of orders is below the target level, then we may not meet our revenue targets as described in the risk factors below.

### Revenue, cost of revenue and gross profit

The table below sets forth the fluctuations in revenue, cost of revenue and gross profit data for the three and six months ended October 2, 2005 and September 30, 2004 (in thousands, except percentage data):

| | October 2, 2005 | % of Revenue | September 30, 2004 | % of Revenue | Dollar Change | % Change |
|---|---|---|---|---|---|---|
| **Three Months Ended:** | | | | | | |
| Revenue: | | | | | | |
| Licenses | $ 32,704 | 82% | $ 31,275 | 85% | $ 1,429 | 5% |
| Services | 7,182 | 18% | 5,653 | 15% | 1,529 | 27% |
| Total revenue | 39,886 | 100% | 36,928 | 100% | 2,958 | 8% |
| Cost of revenue: | | | | | | |
| Licenses | 6,483 | 16% | 1,695 | 5% | 4,788 | 282% |
| Services | 4,525 | 11% | 3,815 | 10% | 710 | 19% |
| Total cost of revenue | 11,008 | 27% | 5,510 | 15% | 5,489 | 100% |
| Gross profit | $ 28,878 | 73% | $ 31,418 | 85% | $ (2,540) | (8)% |
| **Six Months Ended:** | | | | | | |
| Revenue: | | | | | | |
| Licenses | $ 66,614 | 85% | $ 62,167 | 85% | $ 4,447 | 7% |
| Services | 12,104 | 15% | 10,790 | 15% | 1,314 | 12% |
| Total revenue | 78,718 | 100% | 72,957 | 100% | 5,761 | 8% |
| Cost of revenue: | | | | | | |
| Licenses | 10,897 | 14% | 3,003 | 4% | 7,894 | 263% |
| Services | 8,382 | 11% | 7,549 | 10% | 833 | 11% |
| Total cost of revenue | 19,279 | 25% | 10,552 | 14% | 8,727 | 83% |
| Gross profit | $ 59,439 | 75% | $ 62,405 | 86% | $ (2,966) | (5)% |

29