Table of Contents

in cash to purchase a technology license and made earnout payments relating to prior asset purchases. In addition, we acquired property and equipment totaling $0.4 million in cash and $1.8 million through capital leases. We expect to make capital expenditures of approximately $7.8 million for the remainder of fiscal 2006. These capital expenditures will be used to support selling, marketing and product development activities. We will use capital lease financing as well as our cash and cash equivalents and/or investments to fund these purchases. In addition, we may make additional strategic equity investments in the future by using our cash, cash equivalents and/or investments.

Net cash provided by investing activities was $2.5 million in the first quarter of fiscal 2005. We had net proceeds of $16.7 million from maturities of short-term investments. Partially offsetting the cash inflow, we used a total of $9.1 million in cash to complete the Mojave and Lemmatis transactions during the quarter in order to broaden our product offerings and to incorporate certain key technologies into our existing products. We also made strategic investment of $0.3 million in a privately held technology companies for business and strategic purposes. In addition, we acquired property and equipment totaling $4.8 million. The property and equipment expenditures were primarily for purchases of computer equipment and research and development tools to support our growing operations.

### Net cash used in financing activities

Net cash used in financing activities was $49.0 million in the first quarter of fiscal 2005. We used $34.8 million to repurchase a portion of our convertible subordinated notes and received net proceeds of $140,000 from termination of the related portion of the bond hedge and warrant. In addition, we used $16.0 million to repurchase 2,000,000 shares of common stock on the open market, as authorized by the board of directors in April 2005, and made payments of $0.1 million on our capital leases. The primary source of cash was $1.8 million in cash received from the exercise of stock options and shares purchased under the employee stock purchase plan during the period.

Net cash provided by financing activities was $2.6 million in the first quarter of fiscal 2005, which consisted of proceeds from issuance of common stock.

#### Capital resources

We believe that our existing cash and cash equivalents and short-term investments will be sufficient to meet our anticipated operating and working capital expenditure requirements in the ordinary course of business for at least the next 12 months. If we require additional capital resources to grow our business internally or to acquire complementary technologies and businesses at any time in the future, we may use cash or need to sell additional equity or debt securities. The sale of additional equity or convertible debt securities may result in more dilution to our existing stockholders. Financing arrangements may not be available to us, or may not be available in amounts or on terms acceptable to us.

Our acquisition agreements related to certain business combination and asset purchase transactions obligate us to pay certain contingent cash compensation based on continued employment and meeting certain revenue or project milestones. Total cash contingent compensation that could be paid under our acquisition agreements assuming all contingencies are met is $49.3 million as of July 3, 2005.

#### Contractual obligations

As of July 3, 2005, our principal commitments consisted of operating leases, with an aggregated future amount of $12.8 million through fiscal 2011 for office facilities, and repayment of the convertible subordinated notes of $105.5 million due in fiscal 2009. During the three months ended July 3, 2005, other than the decrease of $44.5 million in the convertible subordinated notes, there were no material changes in our reported payments due under contractual obligations at March 31, 2005. Although we have no material commitments for capital

32

expenditures, we anticipate a substantial increase in our capital expenditures and lease commitments with our anticipated growth in operations, infrastructure, and personnel. In addition, we have other obligations for goods and services entered into in the normal course of business. These obligations, however, either are not enforceable or legally binding or are subject to change based on our business decisions.

### Off-balance Sheet Arrangements

As of July 3, 2005, we did not have any significant "off-balance-sheet arrangements," as defined in Item 303(a)(4)(ii) of Regulation S-K.

### Indemnification Obligations

We enter into standard license agreements in the ordinary course of business. Pursuant to these agreements, we agree to indemnify our customers for losses suffered or incurred by them as a result of any patent, copyright, or other intellectual property infringement claim by any third party with respect to our products. These indemnification obligations have perpetual terms. Our normal business practice is to limit the maximum amount of indemnification to the amount received from the customer. On occasion, the maximum amount of indemnification we may be required to make may exceed its normal business practices. We estimate the fair value of its indemnification obligations as insignificant, based on our historical experience concerning product and patent infringement claims. Accordingly, we have no liabilities recorded for indemnification under these agreements as of July 3, 2005.

We have agreements whereby our officers and directors are indemnified for certain events or occurrences while the officer or director is, or was, serving at our request in such capacity. The maximum potential amount of future payments we could be required to make under these indemnification agreements is unlimited; however, we have a directors and officers insurance policy that reduces our exposure and enables us to recover a portion of future amounts paid. As a result of our insurance policy coverage, we believe the estimated fair value of these indemnification agreements is minimal. Accordingly, no liabilities have been recorded for these agreements as of July 3, 2005.

In connection with recent business acquisitions, we agreed to assume, or cause our subsidiaries to assume, indemnification obligations to the officers and directors of acquired companies.

### Warranties

We offer our customers a warranty that our products will conform to the documentation provided with the products. To date, there have been no payments or material costs incurred related to fulfilling these warranty obligations. Accordingly, we have no liabilities recorded for these warranties as of July 3, 2005. We assess the need for a warranty accrual on a quarterly basis, and there can be no guarantee that a warranty accrual will not become necessary in the future.

Table of Contents

## FACTORS THAT MAY AFFECT OUR BUSINESS AND FUTURE RESULTS OF OPERATIONS AND FINANCIAL CONDITION

*Our business faces many risks. The risks described below may not be the only risks we face. Additional risks that we do not yet know of or that we currently think are immaterial may also impair our business operations. If any of the events or circumstances described in the following risks actually occur, our business, financial condition or results of operations could suffer, and the trading price of our common stock could decline.*

**Our limited operating history makes it difficult to evaluate our business and prospects.**

We were incorporated in April 1997 and introduced our first principal software product, Blast Fusion, in April 1999. We have a limited history of generating revenue from our software products, and the revenue and income potential of our business and market is still unproven. As a result of our short operating history, we have limited financial data that can be used to evaluate our business. We have only been profitable for eight of the last thirteen fiscal quarters, and we were not profitable prior to fiscal 2003. Our software products represent a new approach to the challenges presented in the electronic design automation market, which to date has been dominated by established companies with longer operating histories. Key markets within the electronic design automation industry may fail to adopt our proprietary technologies and software products. Any evaluation of our business and our prospects must be considered in light of our limited operating history and the risks and uncertainties often encountered by relatively young companies.

**We have a history of losses prior to fiscal 2003 and subsequent to fiscal 2004 and have an accumulated deficit of approximately $115.7 million as of July 3, 2005; if we do not increase profitability, the public trading price of our stock would be likely to decline.**

We had an accumulated deficit of approximately $115.7 million as of July 3, 2005. Although we achieved profitability in fiscal 2003 and fiscal 2004, we incurred losses in prior years, in fiscal 2005 and the first quarter of fiscal 2006. If we incur new losses, or do not increase profitability at a level expected by securities analysts or investors, the market price of our common stock is likely to decline. If we incur net losses, we may not be able to maintain or increase our number of employees or our investment in capital equipment, sales, marketing, and research and development programs, and we may not be able to continue to operate.

**Our quarterly results are difficult to predict, and if we miss quarterly financial expectations, our stock price could decline.**

Our quarterly revenue and operating results are difficult to predict, and fluctuate from quarter to quarter. It is likely that our operating results in some periods will be below investor expectations. If this happens, the market price of our common stock is likely to decline. Fluctuations in our future quarterly operating results may be caused by many factors, including:

- size and timing of customer orders, which are received unevenly and unpredictably throughout a fiscal year;
- the mix of products licensed and types of license agreements;
- our ability to recognize revenue in a given quarter;
- higher than anticipated costs in connection with patent litigation with Synopsys, Inc.;
- timing of customer license payments;
- the relative mix of time-based licenses bundled with maintenance, unbundled time-based license agreements and perpetual license agreements, each of which has different revenue recognition practices;
- size and timing of revenue recognized in advance of actual customer billings and customers with graduated payment schedules which may result in higher accounts receivable balances and days sales outstanding ("DSO");

34

Table of Contents

- the relative mix of our license and services revenue;

- our ability to win new customers and retain existing customers;

- changes in our pricing and discounting practices and licensing terms and those of our competitors;

- changes in the level of our operating expenses, including increases in incentive compensation payments that may be associated with future revenue growth;

- changes in the interpretation of the authoritative literature under which we recognize revenue;

- the timing of product releases or upgrades by us or our competitors; and

- the integration, by us or our competitors, of newly-developed or acquired products.

**We currently face a patent infringement lawsuit brought by Synopsys, Inc., and we may face additional intellectual property infringement claims against us or our customers. We are also subject to the ongoing risk of commercial litigation unrelated to intellectual property infringement claims, including that from pending lawsuits. In June 2005 a putative shareholder class action lawsuit was filed against us, and, in July 2005 a putative shareholder derivative lawsuit was filed against us. Similar lawsuits could follow. Lawsuits can be costly to defend, can take the time of our management and employees away from day-to-day operations, and could result in our loss of significant rights and/or financial resources.**

On September 17, 2004, Synopsys, Inc., filed suit against us for patent infringement in the United States District Court (please see the discussion in Part II. Item 1.—"Legal Proceedings" below for further detail), and in the future other parties may assert intellectual property infringement claims against us or our customers. We have also acquired or may hereafter acquire software as a result of our past or future acquisitions, and we may be subject to claims that such software infringes the intellectual property rights of third parties.

Our products may be found to infringe intellectual property rights of third parties, including third-party patents. In addition, many of our contracts contain provisions in which we agree to indemnify our customers from third-party intellectual property infringement claims that are brought against them based on their use of our products. Also, we may be unaware of filed patent applications that relate to our software products. We believe the patent portfolios of our competitors are far larger than ours, and this may increase the risk that they may sue us for patent infringement and may limit our ability to counterclaim for patent infringement or settle through patent cross-licenses.

Due to intellectual property litigation, including the pending Synopsys, Inc. litigation, we could lose critical proprietary rights and incur substantial unexpected operating costs. Intellectual property litigation is expensive and time-consuming and could divert management's attention from our business. If there is a successful claim of infringement, we may be ordered to pay substantial monetary damages (including punitive damages), we may be prevented from distributing all or some of our products, and we may be required to develop non-infringing technology or enter into royalty or license agreements, which may not be available on acceptable terms, if at all. Our failure to develop non-infringing technologies or license the proprietary rights on a timely basis would harm our business.

On April 18, 2005, Synopsys, Inc. filed an action against us in Germany seeking to obtain ownership of the European patent application corresponding to Magma's '446 Patent (as defined in Item II, Part I -"Legal Proceedings"). We have engaged counsel in Germany and this action will be stayed pending the outcome of the above-referenced Synopsys action filed in the United States.

On July 29, 2005, Synopsys, Inc. filed an action against us in Japan seeking to obtain ownership of the Japanese patent application corresponding to Magma's '446 Patent (as defined in Item II, Part I - "Legal Proceedings"). We are in the process of engaging counsel in Japan and will seek to stay this action pending the outcome of the above-referenced Synopsys action filed in the United States.

Table of Contents

In June 13, 2005, a putative shareholder class action lawsuit was filed against us in federal court as further identified in Part II, Item 1.—"Legal Proceedings." Generally, the complaint in this lawsuit alleges that defendants (Magma, Rajeev Madhavan, Gregory C. Walker and Roy E. Jewell) failed to disclose information regarding the risk of Magma infringing intellectual property rights of Synopsys, Inc., in violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder, and prays for unspecified damages.

On July 26, 2005, a putative derivative lawsuit was filed against us in state court as further identified in Part II, Item 1.—"Legal Proceedings." The Complaint in this lawsuit seeks unspecified damages purportedly on behalf of the Company for alleged breaches of fiduciary duties by various directors and officers, as well as for alleged violations of insider trading laws by executives.

With respect to the above-referenced Synopsys, Inc. lawsuit, the June 13, 2005 lawsuit and the July 26, 2005 lawsuit, we are currently unable to assess the possible extent of damages and/or other relief, if any, that could be awarded against us, therefore, with respect to the Synopsys, Inc. lawsuit and the June 13, 2005 lawsuit, no contingent liability has been recorded on our condensed consolidated balance sheet as of July 3, 2005.

Publicly announced developments in our litigation matters that are perceived to be adverse to us, have caused, and, may in the future cause our stock price to decline sharply and suddenly. In addition, the stock market has historically experienced significant price and volume fluctuations that have adversely affected the market prices of common stock of technology companies. These broad market fluctuations may reduce the market price of our common stock. Accordingly, we are subject to ongoing risk of securities class action litigation related to volatility in the market price for our securities. In addition, there is the possibility that additional lawsuits related to the above-referenced June 13, 2005 and July 26, 2005 lawsuits will be filed against us.

In addition to the above matters, we are often involved in or threatened with commercial litigation unrelated to intellectual property infringement claims such as labor litigation and contract claims, and we may acquire companies that are actively engaged in such litigation.

We may not be successful in defending some or all claims that may be brought against us. Regardless of the outcome, litigation can result in substantial expense and could divert the efforts of our management and technical personnel from our business. In addition, the ultimate resolution of the above-referenced lawsuits or other third party assertions could have a material adverse effect on our financial position, results of operations and cash flows and harm our ability to execute our business plan.

**We may not be able to hire and/or retain the number of qualified personnel required for our business, particularly engineering personnel, which would harm the development and sales of our products and limit our ability to grow.**

Competition in our industry for senior management, technical, sales, marketing and other key personnel is intense. If we are unable to retain our existing personnel, or attract and train additional qualified personnel, our growth may be limited due to a lack of capacity to develop and market our products.

In particular, we continue to experience difficulty in hiring and retaining skilled engineers with appropriate qualifications to support our growth strategy. Our success depends on our ability to identify, hire, train and retain qualified engineering personnel with experience in integrated circuit design. Specifically, we need to continue to attract and retain field application engineers to work with our direct sales force to technically qualify new sales opportunities and perform design work to demonstrate our products' capabilities to customers during the benchmark evaluation process. Competition for qualified engineers is intense, particularly in Silicon Valley where our headquarters is located.

Retaining our employees has become more challenging due to the decline in our stock price over the past several years. Many of the stock options held by our employees have an exercise price that is significantly higher than the current trading price of our stock, and these "underwater" options do not serve their purpose as

36

Table of Contents

incentives for our employees to remain with Magma. Although, as discussed below, we are attempting to address this problem in part via a stock option exchange program that will allow eligible employees to exchange existing underwater options for options exercisable for a smaller number of shares at the current trading price, we cannot guarantee that this program will satisfy our employees. In addition, the increased volatility of our stock price due to the pendency of, and developments in, the Synopsys litigation and above-referenced shareholder litigation may affect employee morale. If we lose the services of a significant number of our employees and/or if we cannot hire additional employees, we will be unable to increase our sales or implement or maintain our growth strategy.

**Our success is highly dependent on the technical, sales, marketing and managerial contributions of key individuals, and we may be unable to recruit and retain these personnel.**

We depend on our senior executives and certain key research and development and sales and marketing personnel, who are critical to our business. We do not have long-term employment agreements with our key employees, and we do not maintain any key person life insurance policies. Furthermore, our larger competitors may be able to offer more generous compensation packages to executives and key employees, and therefore we risk losing key personnel to those competitors. If we lose the services of any of our key personnel, our product development processes and sales efforts could be slowed. We may also incur increased operating expenses and be required to divert the attention of our senior executives to search for their replacements. The integration of our new executives or any new personnel could disrupt our ongoing operations.

**Customer payment defaults may cause us to be unable to recognize revenue from backlog, and changes in the type of orders comprising backlog could affect the proportion of revenue recognized from backlog each quarter, which could have a material adverse effect on our financial condition and results of operations and on investor expectations.**

A portion of our revenue backlog is variable based on volume of usage of our products by the customers or includes specific future deliverables or is recognized in revenue on a cash receipts basis. Management has estimated variable usage based on customers' forecasts, but there can be no assurance that these estimates will be realized. In addition, it is possible that customers from whom we expect to derive revenue from backlog will default and as a result we may not be able to recognize expected revenue from backlog. If a customer defaults and fails to pay amounts owed, or if the level of defaults increases, our bad debt expense is likely to increase. Any material payment default by our customers could have a material adverse effect on our financial condition and results of operations.

**Our lengthy and unpredictable sales cycle, and the large size of some orders, makes it difficult for us to forecast revenue and increases the magnitude of quarterly fluctuations, which could harm our stock price.**

Customers for our software products typically commit significant resources to evaluate available software. The complexity of our products requires us to spend substantial time and effort to assist potential customers in evaluating our software and in benchmarking it against our competition. As the complexity of the products we sell increases, we expect the sales cycle to lengthen. In addition, potential customers may be limited in their current spending by existing time-based licenses with their legacy vendors. In these cases, customers delay a significant new commitment to our software until the term of the existing license has expired. Also, because our products require a significant investment of time and cost by our customers, we must target those individuals within the customer's organization who are able to make these decisions on behalf of their companies. These individuals tend to be senior management in an organization, typically at the vice president level. We may face difficulty identifying and establishing contact with such individuals. Even after initial acceptance, the negotiation and documentation processes can be lengthy. Our sales cycle typically ranges between three and nine months, but can be longer. Any delay in completing sales in a particular quarter could cause our operating results to fall below expectations.

37

Table of Contents

**We rely on a small number of customers for a significant portion of our revenue, and our revenue could decline due to delays of customer orders or the failure of existing customers to renew licenses or if we are unable to maintain or develop relationships with current or potential customers.**

Our business depends on sales to a small number of customers. We had one customer that accounted for 32% of our revenue in the first quarter of fiscal 2006, as compared to 27% in the same quarter of prior year.

We expect that we will continue to depend upon a relatively small number of customers for a substantial portion of our revenue for the foreseeable future. If we fail to sell sufficient quantities of our products and services to one or more customers in any particular period, or if a large customer reduces purchases of our products or services, defers orders, or fails to renew licenses, our business and operating results will be harmed.

Most of our customers license our software under time-based licensing agreements, with terms that typically vary from 15 months to 48 months. Most of our license agreements automatically expire at the end of the term unless the customer renews the license with us or purchases a perpetual license. If our customers do not renew their licenses, we may not be able to maintain our current revenue or may not generate additional revenue. Some of our license agreements allow customers to terminate an agreement prior to its expiration under limited circumstances—for example, if our products do not meet specified performance requirements or goals. If these agreements are terminated prior to expiration or we are unable to collect under these agreements, our revenue may decline.

Some contracts with extended payment terms provide for payments which are weighted toward the later part of the contract term. Accordingly, as the payment terms are extended, the revenue from these contracts is not recognized evenly over the contract term, but is recognized as the lesser of the cumulative amounts due and payable or ratably for bundled agreements, and as amounts become due and payable for unbundled agreements, at each period end. Revenue recognized under these arrangements will be higher in the later part of the contract term, which puts our revenue recognition in the future at greater risk of the customer's continuing credit-worthiness. In addition, some of our customers have extended payment terms, which creates additional credit risk.

**We compete against companies that hold a large share of the electronic design automation market and competition is increasing among EDA vendors as customers tightly control their EDA spending and use fewer vendors to meet their needs. If we cannot compete successfully, we will not gain market share and our revenue could decline.**

We currently compete with companies that hold dominant shares in the electronic design automation market, such as Cadence and Synopsys. Each of these companies has a longer operating history and significantly greater financial, technical and marketing resources than we do, as well as greater name recognition and larger installed customer bases. Our competitors are better able to offer aggressive discounts on their products, a practice they often employ. Our competitors offer a more comprehensive range of products than we do; for example, we do not offer logic simulation, full-feature custom layout editing, analog or mixed signal products, which can sometimes be an impediment to our winning a particular customer order. In addition, our industry has traditionally viewed acquisitions as an effective strategy for growth in products and market share and our competitors' greater cash resources and higher market capitalization may give them a relative advantage over us in buying companies with promising new chip design products or companies that may be too large for us to acquire without a strain on our resources.

Competition in the EDA Market has increased as customers rationalized their EDA spending by using products from fewer EDA vendors and continued consolidation in the electronic design automation market could intensify this trend. Also, many of our competitors, including Cadence and Synopsys, have established relationships with our current and potential customers and can devote substantial resources aimed at preventing us from establishing or enhancing our customer relationships. Competitive pressures may prevent us from obtaining new customers and gaining market share, may require us to reduce the price of products and services or cause us to lose existing customers, which could harm our business. To execute our business strategy successfully, we must continue our efforts to increase our sales worldwide. If we fail to do so in a timely manner or at all, we may not be able to gain market share and our business and operating results could suffer.

38

Table of Contents

Also, a variety of small companies continue to emerge, developing and introducing new products. Any of these companies could become a significant competitor in the future. We also compete with the internal chip design automation development groups of our existing and potential customers. Therefore, these customers may not require, or may be reluctant to purchase, products offered by independent vendors.

Our competitors may develop or acquire new products or technologies that have the potential to replace our existing or new product offerings. The introduction of these new or additional products by competitors may cause potential customers to defer purchases of our products. If we fail to compete successfully, we will not gain market share and our business will fail.

**We may not be successful in integrating the operations of acquired companies and acquired technology.**

We expect to continuously evaluate the possibility of accelerating our growth through acquisitions, as is customary in the electronic design automation industry. Achieving the anticipated benefits of past and possible future acquisitions will depend in part upon whether we can integrate the operations, products and technology of acquired companies with our operations, products and technology in a timely and cost-effective manner. The process of integrating with acquired companies and acquired technology is complex, expensive and time consuming, and may cause an interruption of, or loss of momentum in, the product development and sales activities and operations of both companies. In addition, the earnout arrangements we use, and expect to continue to use, to consummate some of our acquisitions, pursuant to which we agreed to pay additional amounts of contingent consideration based on the achievement of certain revenue, bookings or product development milestones, can sometimes complicate integration efforts. We cannot be sure that any part or all of the integration will be accomplished on a timely basis, or at all. Assimilating previously acquired companies such as Silicon Metrics Corporation and Mojave, Inc., or any other companies we may seek to acquire in the future, involves a number of other risks, including, but not limited to:

- adverse effects on existing customer relationships, such as cancellation of orders or the loss of key customers;
- difficulties in integrating or an inability to retain key employees of the acquired company;
- the risk that earnouts based on revenue will prove difficult to administer due to the complexities of revenue recognition accounting;
- the risk that actions incentivized by earnout provisions will ultimately prove not to be in Magma's best interest as its interests may change over time;
- difficulties in integrating the operations of the acquired company, such as information technology resources, manufacturing processes, and financial and operational data;
- difficulties in integrating the technologies of the acquired company into our products;
- diversion of management attention;
- potential incompatibility of business cultures;
- potential dilution to existing stockholders if we have to incur debt or issue equity securities to pay for any future acquisitions; and
- additional expenses associated with the amortization of intangible assets.

**Our operating results may be harmed if our customers do not adopt, or are slow to adopt, 65-nanometer design geometries.**

Many Magma customers are currently working on 90-nanometer designs. Magma continues to work toward developing and enhancing its product line in anticipation of increased customer demand for 65-nanometer (sub-90 nanometer) design geometries. Similarly, Magma has acquired Mojave personnel and technology to better address customers' needs for designing and verifying semiconductors that are manufacturable with higher yield and performance, which is a key design parameter when moving to 65-nanometer geometries. Notwithstanding

39

Table of Contents

our efforts to support 65-nanometer geometries, customers may fail to adopt or may be slower to adopt 65-nanometer geometries and we may be unable to convince our customers to purchase our related software products. Accordingly, any revenues we receive from enhancements to our products or acquired technologies may be less than the development or acquisition costs. If customers fail to adopt 65-nanometer design geometries or are slow to adopt 65-nanometer design geometries, our operating results may be harmed.

**Our operating results will be harmed if chip designers do not adopt Blast Fusion and products released under our Cobra initiative.**

Blast Fusion has accounted for a significant majority of our revenue since our inception and we believe that revenue from Blast Fusion and related products will account for most of our revenue for the foreseeable future. In addition, we have dedicated significant resources to developing and marketing products developed under our Cobra development initiative. We must gain market penetration of Blast Fusion and products released under our Cobra initiative in order to achieve our growth strategy and financial success. Moreover, if integrated circuit designers do not continue to adopt Blast Fusion, our operating results will be significantly harmed.

**If the industries into which we sell our products experience recession or other cyclical effects affecting our customers' research and development budgets, our revenue would be likely to decline.**

Demand for our products is driven by new integrated circuit design projects. The demand from semiconductor and systems companies is uncertain and difficult to predict. Slower growth in the semiconductor and systems industries, a reduced number of design starts, reduction of electronic design automation budgets or continued consolidation among our customers would harm our business and financial condition. We have experienced slower growth in revenue than we anticipated as a result of the prolonged downturn and decreased spending by our customers in the semiconductor and systems industries.

The primary customers for our products are companies in the communications, computing, consumer electronics, networking and semiconductor industries. Any significant downturn in our customers' markets or in general economic conditions that results in the cutback of research and development budgets or the delay of software purchases would likely result in lower demand for our products and services and could harm our business. For example, the United States economy, including the semiconductor industry, experienced a slowdown starting in 2000, which negatively impacted and may continue to impact our business and operating results. While the semiconductor industry experienced a moderate recovery in recent years, our customers have remained cautious, and it is not yet clear when increased R&D spending will occur. The continuing threat of terrorist attacks in the United States, the ongoing events in Iraq and other worldwide events including those in the Middle East have increased uncertainty in the United States economy. If the economy declines as a result of this economic, political and social turmoil, existing customers may delay their implementation of our software products and prospective customers may decide not to adopt our software products, either of which could negatively impact our business and operating results.

In recent years, some Asian countries have experienced significant economic difficulties, including devaluation and instability, business failures and a depressed business environment. These difficulties triggered a significant downturn in the semiconductor market, resulting in reduced budgets for chip design tools, which, in turn, negatively impacted us. We have experienced delayed orders and slower deployment of our products under new orders as a result of reduced budgets for chip design tools. In addition, the electronics industry has historically been subject to seasonal and cyclical fluctuations in demand for its products, and this trend may continue in the future. These industry downturns have been, and may continue to be, characterized by diminished product demand, excess manufacturing capacity and subsequent erosion of average selling prices.

**Difficulties in developing and achieving market acceptance of new products and delays in planned release dates of our software products and upgrades may harm our business.**

To succeed, we will need to develop innovative new products. We may not have the financial resources necessary to fund all required future innovations. Expanding into new technologies or extending our product line

40

Table of Contents

into areas we have not previously addressed may be more costly or difficult than anticipated. Also, any revenue that we receive from enhancements or new generations of our proprietary software products may be less than the costs of development. If we fail to develop and market new products in a timely manner, our reputation and our business will suffer.

**Our costs of customer engagement and support are high, so our gross margin may decrease if we incur higher-than-expected costs associated with providing support services in the future or if we reduce our prices.**

Because of the complexity of our products, we typically incur high field application engineering support costs to engage new customers and assist them in their evaluations of our products. If we fail to manage our customer engagement and support costs, our operating results could suffer. In addition, our gross margin may decrease if we are unable to manage support costs associated with the services revenue we generate or if we reduce prices in response to competitive pressure.

**Product defects could cause us to lose customers and revenue, or to incur unexpected expenses.**

Our products depend on complex software, both internally developed and licensed from third parties. Our customers may use our products with other companies' products, which also contain complex software. If our software does not meet our customers' performance requirements, our customer relationships may suffer. Also, a limited number of our contracts include specified ongoing performance criteria. If our products fail to meet these criteria, it may lead to termination of these agreements and loss of future revenue. Complex software often contains errors. Any failure or poor performance of our software or the third-party software with which it is integrated could result in:

- delayed market acceptance of our software products;
- delays in product shipments;
- unexpected expenses and diversion of resources to identify the source of errors or to correct errors;
- damage to our reputation;
- delayed or lost revenue; and
- product liability claims.

Our product functions are often critical to our customers, especially because of the resources our customers expend on the design and fabrication of integrated circuits. Many of our licensing agreements contain provisions to provide a limited warranty, which provides the customer with a right of refund for the license fees if we are unable to correct errors reported during the warranty period. If our contractual limitations are unenforceable in a particular jurisdiction or if we are exposed to claims that are not covered by insurance, a successful claim could harm our business. We currently carry insurance coverages and limits that we believe are consistent with similarly situated companies within the EDA industry.

**Much of our business is international, which exposes us to risks inherent to doing business internationally that could harm our business. We also intend to expand our international operations. If our revenue from this expansion does not exceed the expenses associated with this expansion, our business and operating results could suffer.**

We generated 27% of our total revenue from sales outside North America for the first quarter of fiscal 2006, compared to 36% for our same quarter in the prior year. While most of our international sales to date have been denominated in U.S. dollars, our international operating expenses have been denominated in foreign currencies. As a result, a decrease in the value of the U.S. dollar relative to the foreign currencies could increase the relative costs of our overseas operations, which could reduce our operating margins.

41

Table of Contents

The expansion of our international operations includes the maintenance of sales offices in Europe, the Middle East, and the Asia Pacific region. If our revenue from international operations does not exceed the expense of establishing and maintaining our international operations, our business could suffer. Additional risks we face in conducting business internationally include:

- difficulties and costs of staffing and managing international operations across different geographic areas;

- changes in currency exchange rates and controls;

- uncertainty regarding tax and regulatory requirements in multiple jurisdictions;

- the possible lack of financial and political stability in foreign countries, preventing overseas sales growth;

- on-going events in Iraq; and

- the effects of terrorist attacks in the United States and any related conflicts or similar events worldwide.

**Future changes in accounting standards, specifically changes affecting revenue recognition, could cause adverse unexpected revenue fluctuations.**

Future changes in accounting standards for interpretations thereof, specifically those changes affecting software revenue recognition, could require us to change our methods of revenue recognition. These changes could result in deferral of revenue recognized in current periods to subsequent periods or in accelerated recognition of deferred revenue to current periods, each of which could cause shortfalls in meeting the expectations of investors and securities analysts. Our stock price could decline as a result of any shortfall. Implementation of internal controls reporting and attestation requirements, as further described below, will impose additional financial and administrative obligations on us and will cause us to incur substantial implementation costs from third party consultants, which could adversely affect our results.

**Changes in laws and regulations that affect the governance of public companies have increased our operating expenses and will continue to do so.**

Recently enacted changes in the laws and regulations affecting public companies, including the provisions of the Public Company Accounting Reform and Investor Protection Act of 2002 (the "Sarbanes-Oxley Act of 2002") and the listing requirements for The Nasdaq Stock Market have imposed new duties on us and on our executives, directors, attorneys and independent registered public accounting firms. In order to comply with these new rules, we have hired additional personnel and use additional outside legal, accounting and advisory services, all of which have increased and may continue to increase our operating expenses over time. In particular, we have incurred and will continue to incur additional administrative expenses relating to the implementation of Section 404 of the Sarbanes-Oxley Act of 2002, which requires the implementation and maintenance of an effective system of internal control over financial reporting, and, annual certification of Section 404 compliance by our independent registered public accounting firm. For example, we have incurred significant expenses and will continue to incur expenses in connection with the implementation, documentation and continued testing of our internal control systems. Management time associated with these compliance efforts necessarily reduces time available for other operating activities, which could adversely affect operating results. For the year ended March 31, 2005, our independent registered public accounting firm certified that we were in compliance with the provision of Section 404 relating to effective internal control over financial reporting, however, our internal control obligations are ongoing and subject to continued review and testing. If we are unable to maintain full and timely compliance with the foregoing regulatory requirements, we could be required to incur additional costs, expend additional management time on remedial efforts and make related public disclosures that could adversely affect our stock price and result in securities litigation.

42

<u>Table of Contents</u>

**Forecasting the Company's tax rates is complex and subject to uncertainty.**

Management must make significant assumptions, judgments and estimates to determine our current provision for income taxes, deferred tax assets and liabilities, and any valuation allowance that may be recorded against our deferred tax assets. These assumptions, judgments and estimates are difficult to make due to their complexity and the relevant tax law is often changing. Our future effective tax rates could be adversely affected by the following:

- an increase in expenses not deductible for tax purposes, including deferred stock-based compensation and write-offs of acquired in-process research and development;

- changes in the valuation of our deferred tax assets and liabilities;

- future changes in ownership as defined by Internal Revenue Code Sections 382 and 383 which may limit realization of certain assets;

- changes in forecasts of pre-tax profits and losses by jurisdiction used to estimate tax expense by jurisdiction;

- assessment of additional taxes as a result of federal, state, or foreign tax examinations; or

- changes in tax laws or interpretations of such tax laws.

**Our success will depend on our ability to keep pace with the rapidly evolving technology standards of the semiconductor industry. If we are unable to keep pace with rapidly changing technology standards, our products could be rendered obsolete, which would cause our operating results to decline.**

The semiconductor industry has made significant technological advances. In particular, recent advances in deep sub-micron technology have required electronic design automation companies to continuously develop or acquire new products and enhance existing products. The evolving nature of our industry could render our existing products and services obsolete. Our success will depend, in part, on our ability to:

- enhance our existing products and services;

- develop and introduce new products and services on a timely and cost-effective basis that will keep pace with technological developments and evolving industry standards;

- address the increasingly sophisticated needs of our customers; and

- acquire other companies that have complementary or innovative products.

If we are unable, for technical, legal, financial or other reasons, to respond in a timely manner to changing market conditions or customer requirements, our business and operating results could be seriously harmed.

**If we fail to offer and maintain competitive stock option packages for our employees, or if our stock price declines materially for a protracted period of time, we might have difficulty retaining our employees and our business may be harmed.**

In today's competitive technology industry, employment decisions of highly skilled personnel are influenced by stock option packages, which offer incentives above traditional compensation only where there is a consistent, long-term upward trend over time of a company's stock price. Our stock price has declined significantly over the past several years due to market conditions and has recently been negatively affected by uncertainty surrounding the outcome of our patent litigation with Synopsys, Inc. (discussed below under Part II, Item 1, "Legal Proceedings"). As a result, many of the options held by our non-executive employees have an exercise price significantly above the current trading price of our stock; on July 3, 2005 approximately 86% of the options held by our non-executive employees were "underwater."

On June 22, 2005, our stockholders approved a stock option exchange program ("Exchange Program") allowing non-executive employees holding options to purchase our common stock at exercise prices greater than

43

Table of Contents

or equal to $10.50 to exchange those options for a smaller number of new options at an exercise price equal to fair market value on the date of grant. The date of grant is expected to be August 22, 2005. If the closing trading price of our stock on August 22, 2005 or the terms of the Exchange Program are not satisfactory to employees who participate in the Exchange Program, or, if our stock price drops after August 22, 2005, our ability to retain employees could be affected.

If our stock price continues to decline in the future due to market conditions, investors' perceptions of the technology industry or managerial or performance problems we have, we may be forced to grant additional options to retain employees. This in turn could result in:

- immediate and substantial dilution to investors resulting from the grant of additional options necessary to retain employees; and

- compensation charges against the company, which would negatively impact our operating results.

In addition, the new accounting requirements for employee stock options discussed below may adversely affect our option grant practices and our ability to recruit and retain employees.

**When the accounting treatment for employee stock options changes, our reported results of operations will likely be adversely affected and we may be forced to change our employee compensation and benefits practices.**

We currently account for the issuance of employee stock options under principles that do not require us to record compensation expense for options granted at fair market value. In December 2004, the FASB issued SFAS 123R, "Share-Based Payment," which eliminates the ability to account for share-based compensation transactions using APB 25, and generally requires instead that such transactions be accounted for using a fair-value based method. Under SFAS 123R, companies are required to recognize an expense for compensation cost related to share-based payment arrangements including stock options and employee stock purchase plans. We will be required to adopt the new rules no later than the first quarter of our fiscal year 2007. We are currently assessing the impact of the adoption of SFAS 123R on our business practices; however, this change in accounting treatment will likely adversely affect our reported results of operations and hinder our ability to achieve profitability. Accordingly, we may consider changing our employee compensation practices, and those changes could make it harder for us to retain existing employees and attract qualified candidates.

**If our sales force compensation arrangements are not designed effectively, we may lose sales personnel and resources.**

Designing an effective incentive compensation structure for our sales force is critical to our success. We have experimented, and continue to experiment, with different systems of sales force compensation. If our incentives are not well designed, we may experience reduced revenue generation, and we may also lose the services of our more productive sales personnel, either of which would reduce our revenue or potential revenue.

**Fluctuations in our growth place a strain on our management systems and resources, and if we fail to manage the pace of our growth our business could be harmed.**

Periods of growth followed by efforts to realign costs when revenue growth is slower than anticipated have placed a strain on our management, administrative and financial resources. For example, in fiscal year 2005 and the third quarter of fiscal year 2003, we decreased our workforce by 23 and 32 employees, respectively. Over time we have significantly expanded our operations in the United States and internationally, and we plan to continue to expand the geographic scope of our operations. To pace the growth of our operations with the growth in our revenue, we must continue to improve administrative, financial and operations systems, procedures and controls. Failure to improve our internal procedures and controls could hinder our efforts to adequately manage our growth, disrupt operations, lead to deficiencies under the requirements of Section 404 of the Sarbanes-Oxley Act of 2002, and ultimately harm to our business.

44

Table of Contents

**If chip designers and manufacturers do not integrate our software into existing design flows, or if other software companies do not cooperate in working with us to interface our products with their design flows, demand for our products may decrease.**

To implement our business strategy successfully, we must provide products that interface with the software of other electronic design automation software companies. Our competitors may not support our or our customers' efforts to integrate our products into their existing design flows. We must develop cooperative relationships with competitors so that they will work with us to integrate our software into a customer's design flow. Currently, our software is designed to interface with the existing software of Cadence, Synopsys and others. If we are unable to convince customers to adopt our software products instead of those of competitors offering a broader set of products, or if we are unable to convince other software companies to work with us to interface our software with theirs to meet the demands of chip designers and manufacturers, our business and operating results will suffer.

**We may not obtain sufficient patent protection, which could harm our competitive position and increase our expenses.**

Our success and ability to compete depends to a significant degree upon the protection of our software and other proprietary technology. We currently have a number of issued patents in the United States, but this number is relatively few in relation to our competitors.

These legal protections afford only limited protection for our technology. In addition, rights that may be granted under any patent application that may issue in the future may not provide competitive advantages to us. Further, patent protection in foreign jurisdictions where we may need this protection may be limited or unavailable. It is possible that:

- our pending U.S. and non-U.S. patents may not be issued;

- competitors may design around our present or future issued patents or may develop competing non-infringing technologies;

- present and future issued patents may not be sufficiently broad to protect our proprietary rights; and

- present and future issued patents could be successfully challenged for validity and enforceability.

We believe the patent portfolios of our competitors are far larger than ours, and this may increase the risk that they may sue us for patent infringement and may limit our ability to counterclaim for patent infringement or settle through patent cross-licenses.

**We rely on trademark, copyright and trade secret laws and contractual restrictions to protect our proprietary rights, and if these rights are not sufficiently protected, it could harm our ability to compete and generate income.**

To establish and protect our proprietary rights, we rely on a combination of trademark, copyright and trade secret laws, and contractual restrictions, such as confidentiality agreements and licenses. Our ability to compete and grow our business could suffer if these rights are not adequately protected. We seek to protect our source code for our software, documentation and other written materials under trade secret and copyright laws. We license our software pursuant to agreements, which impose certain restrictions on the licensee's ability to utilize the software. We also seek to avoid disclosure of our intellectual property by requiring employees and consultants with access to our proprietary information to execute confidentiality agreements. Our proprietary rights may not be adequately protected because:

- laws and contractual restrictions in U.S. and foreign jurisdictions may not prevent misappropriation of our technologies or deter others from developing similar technologies;

- competitors may independently develop similar technologies and software code;

45

Table of Contents

- for some of our trademarks, federal U.S. trademark protection may be unavailable to us;
- our trademarks may not be protected or protectable in some foreign jurisdictions;
- the validity and scope of our U.S. and foreign trademarks could be successfully challenged; and
- policing unauthorized use of our products and trademarks is difficult, expensive and time-consuming, and we may be unable to determine the extent of this unauthorized use.

The laws of some countries in which we market our products may offer little or no protection of our proprietary technologies. Reverse engineering, unauthorized copying or other misappropriation of our proprietary technologies could enable third parties to benefit from our technologies without paying us for it, which would harm our competitive position and market share.

**Our directors, executive officers and principal stockholders own a substantial portion of our common stock and this concentration of ownership may allow them to elect most of our directors and could delay or prevent a change in control of Magma.**

Our directors, executive officers and stockholders who currently own over 5% of our common stock beneficially own a substantial portion of our outstanding common stock. These stockholders, in a combined vote, will be able to significantly influence all matters requiring stockholder approval. For example, they may be able to elect most of our directors, delay or prevent a transaction in which stockholders might receive a premium over the market price for their shares or prevent changes in control or management.

**We may need additional capital in the future, but there is no assurance that funds would be available on acceptable terms.**

In the future we may need to raise additional capital in order to achieve growth or other business objectives. This financing may not be available in sufficient amounts or on terms acceptable to us and may be dilutive to existing stockholders. If adequate funds are not available or are not available on acceptable terms, our ability to expand, develop or enhance services or products, or respond to competitive pressures would be limited.

**Our certificate of incorporation, bylaws and Delaware corporate law contain anti-takeover provisions which could delay or prevent a change in control even if the change in control would be beneficial to our stockholders. We could also adopt a stockholder rights plan, which could also delay or prevent a change in control.**

Delaware law, as well as our certificate of incorporation and bylaws, contain anti-takeover provisions that could delay or prevent a change in control of our company, even if the change of control would be beneficial to the stockholders. These provisions could lower the price that future investors might be willing to pay for shares of our common stock. These anti-takeover provisions:

- authorize the Board of Directors without prior stockholder approval to create and issue preferred stock that can be issued increasing the number of outstanding shares and deter or prevent a takeover attempt;
- prohibit stockholder action by written consent, thereby requiring all stockholder actions to be taken at a meeting of our stockholders;
- establish a classified Board of Directors requiring that not all members of the board be elected at one time;
- prohibit cumulative voting in the election of directors, which would otherwise allow less than a majority of stockholders to elect director candidates;
- limit the ability of stockholders to call special meetings of stockholders; and
- require advance notice requirements for nominations for election to the Board of Directors and proposals that can be acted upon by stockholders at stockholder meetings.

46

Table of Contents

In addition, Section 203 of the Delaware General Corporation Law and the terms of our stock option plans may discourage, delay or prevent a change in control of our company. That section generally prohibits a Delaware corporation from engaging in a business combination with an interested stockholder for three years after the date the stockholder became an interested stockholder. Also, our stock option plans include change-in-control provisions that allow us to grant options or stock purchase rights that will become vested immediately upon a change in control of us.

The board of directors also has the power to adopt a stockholder rights plan, which could delay or prevent a change in control even if the change in control appeared to be beneficial to stockholders. These plans, sometimes called "poison pills," are sometimes criticized by institutional investors or their advisors and could affect our rating by such investors or advisors. If the board were to adopt such a plan it might have the effect of reducing the price that new investors are willing to pay for shares of our common stock.

**We are subject to risks associated with changes in foreign currency exchange rates.**

We transact some portions of our business in various foreign currencies. Accordingly, we are subject to exposure from adverse movements in foreign currency exchange rates. This exposure is primarily related to operating expenses in the United Kingdom, Europe and Japan, which are denominated in the respective local currencies. As of July 3, 2005, we had no hedging contracts outstanding. We do not currently use financial instruments to hedge operating expenses denominated in Euro, British Pounds and Japanese Yen. We assess the need to utilize financial instruments to hedge currency exposures on an ongoing basis.

**The convertible notes we issued in May 2003 are debt obligations that must be repaid in cash in May 2008 if they are not converted into our common stock at an earlier date, which is unlikely to occur if the price of our common stock does not exceed the conversion price.**

In May 2003, we issued $150.0 million principal amount of our zero coupon convertible notes due May 2008. In May 2005, we repurchased, in privately negotiated transactions, $44.5 million face amount (or approximately 29.7 percent of the total) of these notes at an average discount to face value of approximately 22 percent. Magma spent an aggregate of approximately $34.8 million on the repurchases. The repurchase leaves approximately $105.5 million aggregate principal amount of convertible subordinated notes outstanding. We will be required to repay that principal amount in full in May 2008 unless the holders of those notes elect to convert them into our common stock before the repayment date. The conversion price of the notes is $22.86 per share. If the price of our common stock does not rise above that level, conversion of the notes is unlikely and we would be required to repay the principal amount of the notes in cash. There have been previous quarters in which we have experienced shortfalls in revenue and earnings from levels expected by securities analysts and investors, which have had an immediate and significant adverse effect on the trading price of our common stock. In addition, the stock market in recent years has experienced extreme price and trading volume fluctuations that often have been unrelated or disproportionate to the operating performance of individual companies. These broad market fluctuations may adversely affect the price of our stock, regardless of our operating performance. Because the notes are convertible into shares of our common stock, volatility or depressed prices for our common stock could have a similar effect on the trading price of the notes.

**Hedging transactions and other transactions may affect the value of our common stock and our convertible notes.**

We entered into hedging arrangements with Credit Suisse First Boston International at the time we issued our convertible notes, with the objective of reducing the potential dilutive effect of issuing common stock upon conversion of the notes. At the time of our May 2005 repurchase of our zero coupon convertible notes, a portion of the hedging arrangements were retired. These hedging arrangements are likely to have caused Credit Suisse First Boston International and others to take positions in our common stock in secondary market transactions or to enter into derivative transactions at or after the sale of the notes. Any market participants entering into hedging arrangements are likely to modify their hedge positions from time to time prior to conversion or maturity of the

47

Table of Contents

notes by purchasing and selling shares of our common stock or other securities, which may increase the volatility and reduce the market price of our common stock.

**Our convertible notes are subordinated and there are no financial covenants in the indenture.**

Our convertible notes are general unsecured obligations of Magma and are subordinated in right of payment to all of our existing and future senior indebtedness, which we may incur in the future. In the event of our bankruptcy, liquidation or reorganization, or upon acceleration of the notes due to an event of default under the indenture and in certain other events, our assets will be available to pay obligations on the notes only after all senior indebtedness has been paid. As a result, there may not be sufficient assets remaining to pay amounts due on any or all of the outstanding notes. In addition, we will not make any payments on the notes in the event of payment defaults or other specified defaults on our designated senior indebtedness.

Neither we nor our subsidiaries are restricted under the indenture for the notes from incurring additional debt, including senior indebtedness. If we or our subsidiaries incur additional debt or other liabilities, our ability to pay our obligations on the notes could be further adversely affected. We expect that we and our subsidiaries from time to time will incur additional indebtedness and other liabilities.

**We may be unable to meet the requirements under the indenture to purchase our convertible notes upon a change in control.**

Upon a change in control, which is defined in the indenture to include some cash acquisitions and private company mergers, note holders may require us to purchase all or a portion of the notes they hold. If a change in control were to occur, we might not have enough funds to pay the purchase price for all tendered notes. Future credit agreements or other agreements relating to our indebtedness might prohibit the redemption or repurchase of the notes and provide that a change in control constitutes an event of default. If a change in control occurs at a time when we are prohibited from purchasing the notes, we could seek the consent of our lenders to purchase the notes or could attempt to refinance this debt. If we do not obtain a consent, we could not purchase the notes. Our failure to purchase tendered notes would constitute an event of default under the indenture, which might constitute a default under the terms of our other debt. In such circumstances, or if a change in control would constitute an event of default under our senior indebtedness, the subordination provisions of the indenture would possibly limit or prohibit payments to note holders. Our obligation to offer to purchase the notes upon a change in control would not necessarily afford note holders protection in the event of a highly leveraged transaction, reorganization, merger or similar transaction involving us.

**Failure to obtain export licenses could harm our business by preventing us from transferring our technology outside of the United States.**

We are required to comply with U.S. Department of Commerce regulations when shipping our software products and/or transferring our technology outside of the United States or to certain foreign nationals. We believe we have complied with applicable export regulations, however, these regulations are subject to change, and, future difficulties in obtaining export licenses for current, future developed and acquired products and technology could harm our business, financial conditions and operating results.

**Our business operations may be adversely affected in the event of an earthquake or other natural disaster.**

Our corporate headquarters and much of our research and development operations are located in Silicon Valley, California, which is an area known for its seismic activity. An earthquake, fire or other significant natural disaster could have a material adverse impact on our business, financial condition and/or operating results.

Table of Contents

## ITEM 3. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

### Interest Rate Risk

Our exposure to market risk for changes in interest rates relates primarily to our investment portfolio. The primary objective of our investment activities is to preserve principal while maximizing yields without significantly increasing risk. This is accomplished by investing in widely diversified short-term and long-term investments, consisting primarily of investment grade securities, substantially all of which mature within the next twenty-four months. As of July 3, 2005, a hypothetical 100 basis point increase in interest rates would result in approximately a $26,000 decline in the fair value of our available-for-sale securities.

The fair value of our fixed rate long-term debt is sensitive to interest rate changes. Interest rate changes would result in increases or decreases in the fair value of our debt, due to differences between market interest rates and rates in effect at the inception of our debt obligation. Changes in the fair value of our fixed rate debt have no impact on our cash flows or consolidated financial statements.

### Credit Risk

We completed an offering on May 22, 2003 of $150.0 million principal amount of convertible subordinated notes due May 15, 2008. Concurrent with the issuance of the convertible notes, we entered into convertible bond hedge and warrant transactions with respect to our common stock, the exposure for which is held by Credit Suisse First Boston International. Both the bond hedge and warrant transactions may be settled at our option either in cash or net shares and expire on May 15, 2008. The transactions are expected to reduce the potential dilution from conversion of the notes. Subject to the movement in the share price of our common stock, we could be exposed to credit risk in the settlement of these options in our favor. Based on a review of the possible net settlements and the credit strength of Credit Suisse First Boston International and its affiliates, we believe that we do not have a material exposure to credit risk arising from these option transactions.

In April 2005, the Company repurchased $44.5 million face value of its convertible notes for $34.8 million. In doing so, the Company liquidated investments that generated a realized loss of approximately $0.7 million. A portion of the hedge and warrant transactions entered into by Magma in 2003 was terminated in connection with the repurchase. The Company believes that it was in the best interests of the stockholders to reduce the balance sheet debt despite the one-time loss resulting from the liquidation of marketable securities.

### Foreign Currency Exchange Rate Risk

A majority of our revenue, expense, and capital purchasing activities are transacted in U.S. dollars. However, we transact some portions of our business in various foreign currencies, primarily related to a portion of revenue in Japan and operating expenses in Europe, Japan and Asia-Pacific. Accordingly, we are subject to exposure from adverse movements in foreign currency exchange rates. As of July 3, 2005, we had no currency hedging contracts outstanding. We do not currently use financial instruments to hedge revenue and operating expenses denominated in foreign currencies. We assess the need to utilize financial instruments to hedge currency exposures on an ongoing basis.

## ITEM 4. CONTROLS AND PROCEDURES

**Evaluation of disclosure controls and procedures.** We maintain "disclosure controls and procedures," as such term is defined in Rule 13a-15(e) under the Securities Exchange Act of 1934 (the "Exchange Act"), that are designed to ensure that information required to be disclosed by us in reports that we file or submit under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in Securities and Exchange Commission rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure. In designing and evaluating our disclosure controls and procedures, management recognized that disclosure controls and procedures, no matter how well conceived and operated, can

Table of Contents

provide only reasonable, not absolute, assurance that the objectives of the disclosure controls and procedures are met. Additionally, in designing disclosure controls and procedures, our management necessarily was required to apply its judgment in evaluating the cost-benefit relationship of possible disclosure controls and procedures. The design of any disclosure controls and procedures also is based in part upon assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions. However, our disclosure controls and procedures have been designed to meet, and management believes that they meet, reasonable assurance standards.

Based on their evaluation as of the end of the period covered by this Quarterly Report on Form 10-Q, our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures were effective to ensure that material information relating to us, including our consolidated subsidiaries, is made known to them by others within those entities, particularly during the period in which this Quarterly Report on Form 10-Q was being prepared. Although our principal executive officer and principal accounting officer concluded that our disclosure controls and procedures were effective as of the end of the period covered by this report, we continue to enhance our controls by hiring qualified personnel in key functional areas, implementing a new computerized system to automate a number of procedures related to quarterly and year-end close processes, and creating procedures to address the impact of acquisitions on a timely basis.

**Changes in Internal Control over Financial Reporting.** There were no changes in our internal control or to our knowledge, in other factors that could significantly affect our internal control over financial reporting (as defined in Rule 13a-15(f) under the Exchange Act) that occurred during our last fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

50

Table of Contents

# PART II. OTHER INFORMATION
## ITEM 1. LEGAL PROCEEDINGS

*Synopsys, Inc. v. Magma Design Automation, Inc.*, Civil Action No. C04-03923 ("MMC"), United States District Court, Northern District of California. In this action, filed September 17, 2004, Synopsys has sued the Company for alleged infringement of U.S. Patent Nos. 6,378,114 ("the '114 Patent"), 6,453,446 ("the '446 Patent"), and 6,725,438 ("the '438 Patent"). The patents-in-suit relate to methods for designing integrated circuits. The Complaint seeks unspecified monetary damages, injunctive relief, trebling of damages, fees and costs, and the imposition of a constructive trust for the benefit of Synopsys over any profits, revenues or other benefits allegedly obtained by the Company as a result of its alleged infringement of the patents-in-suit.

On October 21, 2004, the Company filed its answer and counterclaims ("Answer") to the Complaint. On November 10, 2004 Synopsys filed motions to strike and dismiss certain affirmative defenses and counterclaims in the Answer. On November 24, 2004 the Company filed an Amended Answer and Counterclaims ("Amended Answer"). By order dated November 29, 2004, the Court denied Synopsys' motions as moot in light of the Amended Answer. On December 10, 2004, Synopsys moved to strike and dismiss certain affirmative defenses and counterclaims in the Amended Answer. By order dated January 20, 2005, the Court denied in part and granted in part Synopsys' motion. In its pretrial preparation order dated January 21, 2005, the Court set forth a schedule for the case which, among other things, sets trial for April 24, 2006. Discovery is ongoing.

On February 3, 2005, Synopsys filed its Reply to the Amended Answer. On March 17, 2005, Synopsys filed a First Amended Complaint, which asserts seven causes of action against the Company and/or Lukas van Ginneken: (1) patent infringement (against both defendants), (2) breach of contract (against van Ginneken), (3) inducing breach of contract (against the Company), (4) fraud (against the Company), (5) conversion (against both defendants), (6) unjust enrichment/constructive trust (against both defendants), and (7) unfair competition (against both defendants). Synopsys seeks injunctive relief, declaratory relief, at least $100 million in damages, trebling of damages, punitive damages, fees and costs, and the imposition of a constructive trust for the benefit of Synopsys over any profits, revenues or other benefits allegedly obtained by the Company as a result of its alleged exploitation of the alleged inventions in the patents-in-suit. On April 1, 2005, the Company filed a motion to dismiss the third through seventh causes of action. This motion was granted in part and denied in part by order dated May 18, 2005.

On April 11, 2005, Synopsys voluntarily dismissed van Ginneken from the lawsuit without prejudice. Also on April 11, 2005, Synopsys filed against the Company a motion for partial summary judgment establishing unfair competition and a motion for partial summary judgment based on the doctrine of assignor estoppel.

On June 7, 2005, Synopsys filed a Second Amended Complaint that asserts six causes of action against the Company: (1) patent infringement, (2) inducing breach of contract/interference with contractual relations, (3) fraud, (4) conversion, (5) unjust enrichment/constructive trust/quasi-contract, and (6) unfair competition. Synopsys seeks injunctive relief, declaratory relief, at least $100 million in damages, trebling of damages, punitive damages, fees and costs, and the imposition of a constructive trust for the benefit of Synopsys over any profits, revenues or other benefits allegedly obtained by the Company as a result of its alleged exploitation of the alleged inventions in the patents-in-suit. On June 10, 2005, Magma moved for summary judgment as to the second through sixth causes of action in the Second Amended Complaint. On June 21, 2005, the Company moved to dismiss the third cause of action for fraud in the Second Amended Complaint and moved to strike certain allegations in the Second Amended Complaint. The court granted the Company's motion to dismiss and strike by order dated July 15, 2005.

On July 1, 2005, the Court granted Synopsys's motion for partial summary judgment regarding assignor estoppel, dismissing Magma's affirmative defenses and counterclaim alleging the invalidity of the '114 Patent. On July 14, 2005, the court vacated the hearings on Magma's motion for summary judgment on the second

Table of Contents

through sixth causes of action in the Second Amended Complaint and Synopsys's motion for partial summary judgment establishing unfair competition. The court stated that it would reset the motions for hearing, if necessary, after the claims construction hearing scheduled for August 15, 2005.

On July 29, 2005, Synopsys moved to preliminarily enjoin the Company from abandoning or dedicating to the public the '446 Patent or the '438 Patent. Also on July 29, 2005, Synopsys moved for partial summary judgment dismissing certain counterclaims and defenses by the Company on the grounds of estoppel by contract. Both motions are scheduled to be heard September 9, 2005.

On August 3, 2005, Synopsys filed a Third Amended Complaint that asserts six causes of action against the Company: (1) patent infringement, (2) inducing breach of contract/interference with contractual relations, (3) fraud, (4) conversion, (5) unjust enrichment/constructive trust/quasi-contract, and (6) unfair competition. Synopsys seeks injunctive relief, declaratory relief, at least $100 million in damages, trebling of damages, punitive damages, fees and costs, and the imposition of a constructive trust for the benefit of Synopsys over any profits, revenues or other benefits allegedly obtained by the Company as a result of its alleged exploitation of the alleged inventions in the patents-in-suit.

The Company intends to vigorously defend against the claims asserted by Synopsys and to fully enforce its rights against Synopsys. However, the results of any litigation are inherently uncertain and the Company can not assure that it will be able to successfully defend against the Complaint. A favorable outcome for Synopsys could have a material adverse effect on the Company's financial position, results of operations or cash flows. The Company is currently unable to assess the extent of damages and/or other relief, if any, that could be awarded to Synopsys; therefore, no contingent liability has been recorded on our condensed consolidated balance sheet as of July 3, 2005.

On April 18, 2005, Synopsys, Inc. filed an action against the Company in Germany seeking to obtain ownership of the European patent application corresponding to the Company's '446 Patent. The Company has engaged counsel in Germany and this action will be stayed pending the outcome of the above-referenced Synopsys action filed in the United States.

On July 29, 2005, Synopsys, Inc. filed an action against the Company in Japan seeking to obtain ownership of the Japanese patent application corresponding to the Company's '446 Patent. The Company is in the process of engaging counsel in Japan and will seek to stay this action pending the outcome of the above-referenced Synopsys action filed in the United States.

On June 13, 2005, a putative shareholder class action lawsuit captioned *The Cornelia I. Crowell GST Trust vs. Magma Design Automation, Inc., Rajeev Madhavan, Gregory C. Walker and Roy E. Jewell.*, No. C 05 02394, was filed in U.S. District Court, Northern District of California. The complaint alleges that defendants failed to disclose information regarding the risk of Magma infringing intellectual property rights of Synopsys, Inc., in violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder, and prays for unspecified damages. The Company is currently unable to assess the possible range or extent of damages and/or other relief, if any, that could be awarded to the shareholder class; therefore, no contingent liability has been recorded on our condensed consolidated balance sheet as of July 3, 2005. The ultimate resolution of this matter or other third party assertions could have a material adverse effect on the Company's financial position, results of operations or cash flows.

On July 26, 2005, a putative derivative complaint captioned *Susan Willis v. Magma Design Automation, Inc. et al.*, No. 1-05-CV-045834, was filed in the Superior Court of the State of California for the County of Santa Clara. The Complaint seeks unspecified damages purportedly on behalf of the Company for alleged breaches of fiduciary duties by various directors and officers, as well as for alleged violations of insider trading laws by executives during a period between October 23, 2002 and April 12, 2005. The Company is currently unable to assess the possible range or extent of damages and/or other relief, if any, that could be awarded; therefore, no contingent liability has been recorded on our condensed consolidated balance sheet as of July 3, 2005. The

52

Table of Contents

ultimate resolution of this matter or other third party assertions could have a material adverse effect on the Company's financial position, results of operations or cash flows.

In addition to the above, from time to time, the Company is involved in disputes that arise in the ordinary course of business. The number and significance of these disputes is increasing as the Company's business expands and it grows larger. Any claims against the Company, whether meritorious or not, could be time consuming, result in costly litigation, require significant amounts of management time and result in the diversion of significant operational resources. As a result, these disputes could harm the Company's business, financial condition, results of operations or cash flows.

Table of Contents

## ITEM 2. UNREGISTERED SALES OF EQUITY SECURITIES AND USE OF PROCEEDS

### Recent Sales Of Unregistered Securities

Magma previously reported its issuance of a warrant to IBM in its Form 8-K filing dated June 30, 2005. The warrant is also discussed under Note 5 to the Company's Consolidated Financial Statements.

### Issuer Purchases of Equity Securities

#### ISSUER PURCHASES OF EQUITY SECURITIES

| Period | Total Number of Shares Purchased | Average Price Paid per Share | Total Number of Shares Purchased as Part of Publicly Announced Plans or Programs * | Approximate Dollar Value of Shares that May Yet Be Purchased Under the Plans or Programs |
|---|---|---|---|---|
| April 1 – April 30, 2004 | 0 | N/A | 0 | 0 |
| May 1 – May 31, 2005 | 2,000,000 | $ 7.99 | 2,000,000 | 0 |
| June 1 – July 3, 2005 | 0 | N/A | 0 | 0 |
| Total | 2,000,000 | $ 7.99 | 2,000,000 | 0 |

* On April 13, 2005, the Company announced that its Board of Directors had authorized a share repurchase program of up to 2,000,000 shares of Company common stock, as further described in Note 12 to the condensed consolidated financial statements. The repurchase program was completed during the quarter ended July 3, 2005.

## ITEM 4. SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS.

A Special Meeting of Stockholders (the "Special Meeting") was held on June 22, 2005 in order for stockholders to vote on whether to approve a stock option exchange program (the "Exchange Program") that allows Magma employees (other than executive officers) to exchange stock options with an exercise price per share of $10.50 or greater for options to purchase a lesser number of shares at an exercise price equal to the fair market value of Magma's common stock on the date such new options are granted*. The results of the vote were as follows:

| For | Against | Abstain |
|---|---|---|
| 21,729,578 | 3,233,723 | 5,629 |

* Exchange Program is currently ongoing and new options are expected to be granted on August 22, 2005.

## ITEM 5. OTHER INFORMATION

### Departure and Appointment of Directors

On June 10, 2005, Wade Meyercord resigned as a member of the Company's Board of Directors (the "Board"). Mr. Meyercord had served on the Board since January 2004. Mr. Meyercord's resignation was not due to any disagreement with the Company known to an executive officer of the Company on any matter relating to the Company's operations, policies or practices.

The Board appointed Susumu Kohyama as a member of the Board, effective upon his acceptance of that appointment on June 10, 2005. Dr. Kohyama has not yet been appointed to any committees of the Board. There is no arrangement between Dr. Kohyama and any other person pursuant to which he was selected as a director. There is no family relationship between Dr. Kohyama and any other Company executive officer or director. In connection with his appointment, Dr. Kohyama is entitled to the Company's standard director compensation arrangements.

The foregoing events were reported in the Company's Form 8-K filing dated June 10, 2005.

54

**Table of Contents**

**ITEM 6. EXHIBITS**

The following documents are filed as Exhibits to this report:

| Exhibit Number | Exhibit Description | Incorporated by Reference | | | | Filed Herewith |
|---|---|---|---|---|---|---|
| | | Form | File No. | Exhibit | Filing Date | |
| 4.1 | Amended and Restated Certificate of Incorporation | 10-K | 000-33213 | 3.1 | June 28, 2002 | |
| 4.2 | Certificate of Correction to the Amended and Restated Certificate of Incorporation | 10-K | 000-33213 | 3.2 | June 28, 2002 | |
| 4.3 | Amended and Restated Bylaws | 10-K | 000-33213 | 3.3 | June 28, 2002 | |
| 4.4 | Amended and Restated Investors' Rights Agreement dated July 31, 2001, by and among the Registrant and the parties that are signatories thereto | 10-K | 000-33213 | 4.2 | June 28, 2002 | |
| 4.5 | Form of Common Stock Certificate | S-1/A | 333-60838 | 4.1 | November 15, 2001 | |
| 10.1 | Warrant Agreement | | | | | X |
| 31.1 | Rule 13a-14(a)/15d-14(a) Certification of Principal Executive Officer | | | | | X |
| 31.2 | Rule 13a-14(a)/15d-14(a) Certification of Principal Financial Officer | | | | | X |
| 32.1 | Section 1350 Certification of Principal Executive Officer | | | | | X |
| 32.2 | Section 1350 Certification of Principal Financial Officer | | | | | X |

55

**Table of Contents**

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

MAGMA DESIGN AUTOMATION, INC.

Dated: August 11, 2005                    By            /s/   GREGORY C. WALKER
_____

**Gregory C. Walker**
**Senior Vice President—Finance and Chief**
**Financial Officer**
**(Principal Financial and Accounting Officer**
**and Duly Authorized Signatory)**

56

Table of Contents

# EXHIBIT INDEX
## TO
### MAGMA DESIGN AUTOMATION, INC.
### QUARTERLY REPORT ON FORM 10-Q
### FOR THE QUARTER ENDED JULY 3, 2005

| Exhibit Number | Exhibit Description | Incorporated by Reference | | | | Filed Herewith |
| --- | --- | --- | --- | --- | --- | --- |
| | | Form | File No. | Exhibit | Filing Date | |
| 4.1 | Amended and Restated Certificate of Incorporation | 10-K | 000-33213 | 3.1 | June 28, 2002 | |
| 4.2 | Certificate of Correction to the Amended and Restated Certificate of Incorporation | 10-K | 000-33213 | 3.2 | June 28, 2002 | |
| 4.3 | Amended and Restated Bylaws | 10-K | 000-33213 | 3.3 | June 28, 2002 | |
| 4.4 | Amended and Restated Investors' Rights Agreement dated July 31, 2001, by and among the Registrant and the parties that are signatories thereto | 10-K | 000-33213 | 4.2 | June 28, 2002 | |
| 4.5 | Form of Common Stock Certificate | S-1/A | 333-60838 | 4.1 | November 15, 2001 | |
| 10.1 | Warrant Agreement | | | | | X |
| 31.1 | Rule 13a-14(a)/15d-14(a) Certification of Principal Executive Officer | | | | | X |
| 31.2 | Rule 13a-14(a)/15d-14(a) Certification of Principal Financial Officer | | | | | X |
| 32.1 | Section 1350 Certification of Principal Executive Officer | | | | | X |
| 32.2 | Section 1350 Certification of Principal Financial Officer | | | | | X |

57