Westlaw.

--- F.3d ----
Page 1

--- F.3d ----, 2005 WL 2470530 (C.A.2 (N.Y.)), 2005-2 Trade Cases P 74,958
**(Cite as: --- F.3d ----)**

**H**
Briefs and Other Related Documents

United States Court of Appeals,Second Circuit.
Gregory F. DANIEL, M.D., Ian W. Cummings,
M.D., John A. Timmons, M.D., Reed E. Paulson,
M.D., Albert J. Romanosky, M.D., Bruce W.
McNulty, M.D., On Behalf of Themselves and All
Others Similarly Situated, Plaintiffs-Appellants,
Joseph L. Albright, Jr., M.D., Lloyd G. Alch, M.D.,
Richard Alexander, M.D., Jeffrey S. Anderson,
M.D., Robert J. Aquino, M.D., Yadon Arad, M.D.,
Joseph P. Arno, M.D., David E. Baum, M.D.,
James R. Beutnagel, M.D., Joel S. Bogner, M.D.,
Charles L. Boursier, M.D., Scott J. Campbell, M.D.,
Kenneth W. Cartaxo, M.D., Edgar H. Castellanos,
M.D., Joseph F. Ceravolo, M.D., Manoj V. Chag,
M.D., Patricia C. Chase, M.D., Kenneth G.
Christian, Jr., M.D., Mark S. Clippinger, M.D.,
John T. Columbus, M.D., Michael Cooks, M.D.,
Craig J. Cott, M.D., Mary Dampier, M.D., David
M. Davis, M.D., Patrick J. DiFonzo, M.D., Andrew
B. Edwards, M.D., Nancy J. Ferguson, M.D.,
Denise F. Ferraris, M.D., Kathy W. Forred, M.D.,
Daniel S. Frank, M.D., Michael S. Gelfond, M.D.,
Michael G. Ginder, M.D., Keith S. Goldstein, M.D.,
Maria T. Granzotti, M.D., Robert E. Gross, M.D.,
Thomas K. Hall, M.D., John A. Hatherley, M.D.,
Anthony J. Horwitz, M.D., Donald A. Human,
M.D., Jonathan A. Jarman, M.D., Jerry Jones, III,
M.D., Mark R. Kaehler, M.D., Allen Kagan, M.D.,
K. Michael Keil, M.D., Martin E. Kernberg, M.D.,
Herschell King, M.D., M. Stephen Kramer, M.D.,
Steven M. Kushel, M.D., Charles J. Kutner, M.D.,
Richard E. Lally, M.D., Peter Lamelas, M.D.,
Lucille Lanna, M.D., Stephen G. Larkin, M.D.,
Phillip J. Lastella, M.D., Robert N. Leach, M.D.,
Richard E. Leahy, M.D., Arthur H. Legate, M.D.,
Jack M. Levin, M.D., Ronald J. Lugo, M.D., James
W. Lunan, M.D., Soren S. Madden, M.D., Mian A.
Majeed, M.D., Thomas A. Malone, M.D., Michael
R. Monolescu, M.D., John A. Mardones, M.D., Gil
Z. Marzinek, M.D., Stanley D. Meers, M.D.,
Douglas M. Middleton, M.D., Lance E. Montauk,

M.D., Charles Jay Morris, M.D., J.D., Peter J.
Muran, M.D., Julia I. Nathan, M.D., Kurt F.
Papenfus, M.D., Jay L. Patankar, M.D., Howard A.
Peth, Jr., M.D., Thomas J. Pliura, M.D., David A.
Poggemeier, M.D., Yashbir S. Rana, M.D., Allan
Jay Raskin, M.D., Karin V. Rhodes, M.D., Atwood
L. Rice, III, M.D., Manuel A. Rivera, M.D., Albert
J. James Rosenthal, M.D., John W. Sanders, M.D.,
Martin N. Schnell, M.D., Steven M. Schreiber,
M.D., Michael J. Shaw, M.D., Robin R. Shaw,
M.D., David M. Siwicki, M.D., Robert A. Slutsky,
M.D., Robin P. Smith, D.O., Perry J. Spavento,
M.D., Leo W. Sullivan, M.D., Robert B. Sussman,
M.D., Michael S. Taplits, M.D., Richard E. Thistle,
Jr., M.D., Hartley M. Thomas, M.D., Richard Y.
Thorpe III, M.D., Jane E. Tonkin, M.D., William
D. Torres, M.D., Allen G. Tucker, M.D., Laurie D.
Vogel, M.D., Deborah S. Weber, M.D., Anthony T.
White, M.D., Kipp A. Young, M.D.
Plaintiffs-Appellants,
Donald P. Ables, M.D., Carlos Alvarado, M.D.,
Daniel J. Anhalt, M.D., Robert W. Bates, M.D.,
George B. Beranek, M.D., Jeffrey D. Blodgett,
D.O., Michael L. Brown, M.D., Philip A. Brown,
M.D., Marianne C. Burke, M.D., Kwok Wai Chiu,
M.D., David S. Clark, M.D., Daria M. Davidson,
D.O., Sylvester A. Domme, Jr., M.D., Thomas L.
Eaton, M.D., David S. Engelhardt, M.D., Michael
C. Finger, M.D., William F. Flader, M.D., Jessica
A. Furer, M.D., Kenneth J. Gallant, D.O., Virind D.
Gupta, M.D., Steven D. Hanks, M.D., John R.
Harris, M.D., Stanley E. Hartman, M.D., James W.
Hayden, M.D., Beth E. Haynes, M.D., Joseph F.
Hederman, M.D., Dan Heslinga, M.D., Jeffrey P.
Howard, M.D., Gloria S. Huckeby, M.D., Raymond
F. Jarris, Jr., M.D., Robert J. Jeddeloh, M.D.,
Daniel H. Kallmerten, M.D., James F. Kenny,
M.D., Garry J. Kiernan, M.D., Jahangir Koleini,
M.D., G. Thomas Kraus, M.D., Joseph B. Liebman,
M.D., Robert Lippa, M.D., Etta Lovitt, M.D.,
Michael R. Lozano, M.D., Paul F. Paschall, M.D.,
Deborah Porter, M.D., Frank L. Prasnal, Jr., M.D.,
Peter J. Reden, M.D., Karl Richey, M.D., David J.
Ricketts-Kingfisher, M.D., Coleen Riley, M.D.,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                    Page 2

--- F.3d ----, 2005 WL 2470530 (C.A.2 (N.Y.)), 2005-2 Trade Cases P 74,958
(Cite as: --- F.3d ----)

Rodrigo Rojas, M.D., Kathleen L. Roth, M.D., Julie M. Sabatinos, M.D., Louis Shicker, M.D., Chester J. Skiba, Jr., M.D., R. Giuseppi Slater, M.D., Lee Slavin, M.D., Ronald K. Sterrenberg, D.O., Thomas S. Talkowski, M.D., Robert S. Tano, M.D., Bruce R. Tizes, M.D., Monique M. Van Berkum, M.D., Louis V. Verre, D.O., Hector J. Villanueva, M.D., Barry A. Wayne, M.D., James A. Wichser, M.D., Joseph D. Zirneskie, M.D., Philip A. Zurowsky, M.D., Plaintiffs,
v.
AMERICAN BOARD OF EMERGENCY MEDICINE, Children's Hospital of Michigan, Detroit Receiving Hospital and University Health Center, Forsyth Memorial Hospital, Loma Linda University Medical Center, Mercy Catholic Medical Center-Misericordia Division, St. Anthony Hospital, Council of Emergency Medicine Residency Directors, Mercy Hospital and Medical Center, Methodist Hospital of Indiana, Saint Francis Hospital & Medical Center, Defendants-Appellees, Richard Stennes, Michael Bishop, Richard Braen, Joseph Clinton, Gerald Healy, Bruce Janiak, Scott M. Jones, Robert Knopp, Harvey Meislin, Benson Munger, Robert Neerhout, Douglas Rund, Judith Tintinalli, Michael Vance, Gerald Whelan, Henry A. Thiede, M.D., Richard I. Shader, M.D., Steven J. Davidson, M.D., Leonard D. Hudson, M.D., Children's Hospital (San Diego), Kettering Medical Center, Lincoln Medical & Mental Health Center, Lutheran General Hospital, Medical College of Pennsylvania and Hospital, Our Lady of Mercy Medical Center, Tri-City Medical Center, Ohio State University, Oregon Health Sciences University Hospital, University Medical Center (Tucson, Arizona), Frank A. Disney, M.D., The Johns Hopkins Hospital, Part of the Johns Hopkins Health System, Ohio State University Hospital, Porter Memorial Hospital, Riverside Methodist Hospitals, UCLA Medical Center, University of California (Irvine) Medical Center, University of California (San Diego) Medical Center, University Hospital-SUNY at Stony Brook, University Hospital at the University of New Mexico School of Medicine, University of Massachusetts Medical Center, Defendants,
v.
United States of America, Intervenor-Plaintiff.
**Docket Nos. 03-6153(L), 03-6163(XAP),**

**03-6165(XAP), 03-6157(XAP), 03-6185(XAP), 03-6187(XAP), 03-6167(XAP) and 03-6177(XAP).**

Argued: Oct. 25, 2004.
Decided: Oct. 7, 2005.

**Background:** Emergency medicine physicians brought suit against medical specialty certification board for emergency medicine, and hospitals operating residency programs in emergency medicine, alleging that defendants conspired to unreasonably restrict competition in the market for emergency medicine physicians, in violation of the Sherman and Clayton Acts. Following summary judgment in favor of certain hospitals found not to be operating residency programs, 237 F.Supp.2d 336, defendants moved to dismiss and physicians moved for class certification. The District Court, Richard J. Arcara, Chief Judge, adopting the Report and Recommendation of Foschio, United States Magistrate Judge, 269 F.Supp.2d 159, dismissed action, and plaintiffs appealed.

**Holdings:** The Court of Appeals, Raggi, Circuit Judge, held that:

2(1) Clayton Act's worldwide service of process provision applies only in cases in which its venue provision is satisfied;

9(2) certification board did not "transact business" in the Western District of New York for purposes of the Clayton Act's venue provision;

10(3) venue was not proper under the general federal venue provision; and

22(4) physicians did not have antitrust standing.

Affirmed.

Katzmann, Circuit Judge, filed opinion concurring in part and dissenting in part.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                    Page 3

--- F.3d ----, 2005 WL 2470530 (C.A.2 (N.Y.)), 2005-2 Trade Cases P 74,958
**(Cite as: --- F.3d ----)**

[1] **Federal Courts 170B** ☞**776**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
        170BVIII(K)1 In General
            170Bk776 k. Trial De Novo. Most
Cited Cases
Court of Appeals reviews de novo the district
court's legal conclusions regarding personal
jurisdiction.

[2] **Monopolies 265** ☞**28(3)**

265 Monopolies
    265II Trusts and Other Combinations in
Restraint of Trade
        265k28 Actions for Damages by
Combinations or Monopolies
            265k28(3) k. Jurisdiction and Venue.
Most Cited Cases
Clayton Act's worldwide service of process
provision applies, and therefore establishes personal
jurisdiction, only in cases in which its venue
provision is satisfied. Clayton Act, § 12, 15
U.S.C.A. § 22.

[3] **Statutes 361** ☞**188**

361 Statutes
    361VI Construction and Operation
        361VI(A) General Rules of Construction
        361k187 Meaning of Language
            361k188 k. In General. Most Cited
Cases

**Statutes 361** ☞**205**

361 Statutes
    361VI Construction and Operation
        361VI(A) General Rules of Construction
        361k204 Statute as a Whole, and Intrinsic
Aids to Construction
            361k205 k. In General. Most Cited
Cases

**Statutes 361** ☞**208**

361 Statutes

    361VI Construction and Operation
        361VI(A) General Rules of Construction
        361k204 Statute as a Whole, and Intrinsic
Aids to Construction
            361k208 k. Context and Related
Clauses. Most Cited Cases
Plainness or ambiguity of statutory language is
determined by reference to the language itself, the
specific context in which that language is used, and
the broader context of the statute as a whole.

[4] **Statutes 361** ☞**188**

361 Statutes
    361VI Construction and Operation
        361VI(A) General Rules of Construction
        361k187 Meaning of Language
            361k188 k. In General. Most Cited
Cases

**Statutes 361** ☞**190**

361 Statutes
    361VI Construction and Operation
        361VI(A) General Rules of Construction
        361k187 Meaning of Language
            361k190 k. Existence of Ambiguity.
Most Cited Cases

**Statutes 361** ☞**217.4**

361 Statutes
    361VI Construction and Operation
        361VI(A) General Rules of Construction
        361k213 Extrinsic Aids to Construction
            361k217.4 k. Legislative History in
General. Most Cited Cases
If the meaning of a statute is plain, courts inquire no
further; only if courts discern ambiguity do they
resort first to canons of statutory construction, and,
if the meaning remains ambiguous, to legislative
history.

[5] **Federal Courts 170B** ☞**71**

170B Federal Courts
    170BII Venue
        170BII(A) In General
            170Bk71 k. Territorial Limitations and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                      Page 4

--- F.3d ----, 2005 WL 2470530 (C.A.2 (N.Y.)), 2005-2 Trade Cases P 74,958
**(Cite as: --- F.3d ----)**

Venue in General. Most Cited Cases
Analysis of special venue provisions must be specific to the statute, because Congress's intent may be permissive in some circumstances and restrictive in others.

[6] **Monopolies 265 ☞28(3)**

265 Monopolies
   265II Trusts and Other Combinations in Restraint of Trade
      265k28 Actions for Damages by Combinations or Monopolies
        265k28(3) k. Jurisdiction and Venue. Most Cited Cases
If the general venue statute is the basis for venue in an antitrust action, an antitrust plaintiff cannot employ the Clayton Act's worldwide service of process provision to secure personal jurisdiction; in such circumstances, a plaintiff must look to other service of process provisions, notably those specified in the Federal Rules or incorporated therein from state law to satisfy this requirement. Clayton Act, § 12, 15 U.S.C.A. § 22; 28 U.S.C.A. § 1391; Fed.Rules Civ.Proc.Rule 4, 28 U.S.C.A.

[7] **Monopolies 265 ☞28(3)**

265 Monopolies
   265II Trusts and Other Combinations in Restraint of Trade
      265k28 Actions for Damages by Combinations or Monopolies
        265k28(3) k. Jurisdiction and Venue. Most Cited Cases
Clayton Act's worldwide service of process provision did not permit district court to exercise personal jurisdiction over emergency medical care organization and out-of-state hospitals in antitrust action brought by emergency medicine physicians, where the organization and the hospitals did not conduct business in the district. Clayton Act, § 12, 15 U.S.C.A. § 22.

[8] **Monopolies 265 ☞28(3)**

265 Monopolies
   265II Trusts and Other Combinations in Restraint of Trade

      265k28 Actions for Damages by Combinations or Monopolies
        265k28(3) k. Jurisdiction and Venue. Most Cited Cases
Technical criteria such as "mere solicitation" or "solicitation plus" are not determinative of whether a corporate defendant "transacts business" in a district for purposes of the Clayton Act's venue provision; rather, the propriety of venue turns on the nature of the corporate defendant's business. Clayton Act, § 12, 15 U.S.C.A. § 22.

[9] **Monopolies 265 ☞28(3)**

265 Monopolies
   265II Trusts and Other Combinations in Restraint of Trade
      265k28 Actions for Damages by Combinations or Monopolies
        265k28(3) k. Jurisdiction and Venue. Most Cited Cases
Medical specialty certification board did not "transact business" in the Western District of New York for purposes of the Clayton Act's venue provision; although board certified emergency medicine physicians in New York, received revenue from application fees of physicians in New York, and mailed a copy of its application form to physician in the district, it neither developed its certification standards nor administered its certification examinations in the district, did not own or lease any real estate in the district, and did not maintain an office, telephone, bank account, or mailing address there. Clayton Act, § 12, 15 U.S.C.A. § 22.

[10] **Monopolies 265 ☞28(3)**

265 Monopolies
   265II Trusts and Other Combinations in Restraint of Trade
      265k28 Actions for Damages by Combinations or Monopolies
        265k28(3) k. Jurisdiction and Venue. Most Cited Cases
Proper venue for antitrust action against medical specialty certification board was not in Western District of New York under provision of the general federal venue statute making venue proper in

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                    Page 5

--- F.3d ----, 2005 WL 2470530 (C.A.2 (N.Y.)), 2005-2 Trade Cases P 74,958
**(Cite as: --- F.3d ----)**

district in which a "substantial part" of events or omissions giving rise to the underlying claim occurred; vast majority of acts underlying the claims occurred outside of New York, and board's transmittal into the district of a half-dozen letters rejecting applications to sit for its certification examination outside New York was only insignificant part of events or omissions giving rise to the claims. 28 U.S.C.A. § 1391(b)(2).

[11] **Federal Courts 170B** ☞**87.5**

170B Federal Courts
   170BII Venue
      170BII(A) In General
         170Bk87 District Where Claim Arose
           170Bk87.5 k. In General. Most Cited Cases
Provision of the general federal venue statute making venue proper in district in which substantial part of the events or omissions giving rise to underlying claim occurred does not restrict venue to the district in which the "most substantial" events or omissions giving rise to a claim occurred. 28 U.S.C.A. § 1391(b)(2).

[12] **Federal Courts 170B** ☞**87.5**

170B Federal Courts
   170BII Venue
      170BII(A) In General
         170Bk87 District Where Claim Arose
           170Bk87.5 k. In General. Most Cited Cases
Provision of the general federal venue statute making venue proper in district in which substantial part of the events or omissions giving rise to underlying claim occurred contemplates that venue can be appropriate in more than one district and permits venue in multiple judicial districts as long as a substantial part of the underlying events took place in those districts. 28 U.S.C.A. § 1391(b)(2).

[13] **Federal Courts 170B** ☞**87.5**

170B Federal Courts
   170BII Venue
      170BII(A) In General
         170Bk87 District Where Claim Arose

           170Bk87.5 k. In General. Most Cited Cases
When a plaintiff relies on provision of the general federal venue statute making venue proper in the district in which a "substantial part" of the events or omissions giving rise to underlying claim occurred to defeat a venue challenge, a two-part inquiry is appropriate: first, a court should identify the nature of the claims and the acts or omissions that the plaintiff alleges give rise to those claims; second, the court should determine whether a substantial part of those acts or omissions occurred in the district where suit was filed, that is, whether significant events or omissions material to those claims have occurred in the district in question. 28 U.S.C.A. § 1391(b)(2).

[14] **Federal Courts 170B** ☞**87.5**

170B Federal Courts
   170BII Venue
      170BII(A) In General
         170Bk87 District Where Claim Arose
           170Bk87.5 k. In General. Most Cited Cases
"Substantiality" for purposes of provision of the general federal venue statute making venue proper in the district in which a "substantial part" of the events or omissions giving rise to underlying claim occurred is more a qualitative than a quantitative inquiry, determined by assessing the overall nature of the plaintiff's claims and the nature of the specific events or omissions in the forum, and not by simply adding up the number of contacts. 28 U.S.C.A. § 1391(b)(2).

[15] **Federal Courts 170B** ☞**87.5**

170B Federal Courts
   170BII Venue
      170BII(A) In General
         170Bk87 District Where Claim Arose
           170Bk87.5 k. In General. Most Cited Cases
When material acts or omissions within the forum bear a close nexus to the claims, they are properly deemed "significant" and, thus, substantial, but when a close nexus is lacking, so too is the substantiality necessary to support venue under

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                     Page 6

--- F.3d ----, 2005 WL 2470530 (C.A.2 (N.Y.)), 2005-2 Trade Cases P 74,958
**(Cite as: --- F.3d ----)**

provision of the general federal venue statute making venue proper in the district in which a " substantial part" of the events or omissions giving rise to underlying claim occurred. 28 U.S.C.A. § 1391(b)(2).

**[16] Monopolies 265 ⇐28(3)**

265 Monopolies
    265II Trusts and Other Combinations in Restraint of Trade
        265k28 Actions for Damages by Combinations or Monopolies
        265k28(3) k. Jurisdiction and Venue. Most Cited Cases
Proper venue for antitrust action against medical specialty certification board was not in Western District of New York under provision of the general federal venue statute making venue proper in judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought; although individual defendant resided in the district, substantial part of alleged events giving rise to the plaintiffs' claims took place in Western District of Michigan, where the board was located, making venue appropriate there. 28 U.S.C.A. § 1391(b)(3).

**[17] Federal Courts 170B ⇐103**

170B Federal Courts
    170BII Venue
        170BII(B) Change of Venue
            170BII(B)1 In General; Venue Laid in Proper Forum
                170Bk103 k. Discretion of Court. Most Cited Cases
Courts enjoy considerable discretion in deciding whether to transfer a case in the interest of justice. 28 U.S.C.A. § 1406(a).

**[18] Federal Courts 170B ⇐104**

170B Federal Courts
    170BII Venue
        170BII(B) Change of Venue
            170BII(B)1 In General; Venue Laid in Proper Forum
                170Bk104 k. Matters Considered. Most

Cited Cases
Court's limited jurisdiction to decide whether to transfer or dismiss a case over which it lacks jurisdiction includes a power of limited review of the merits. 28 U.S.C.A. § 1406(a).

**[19] Federal Courts 170B ⇐97**

170B Federal Courts
    170BII Venue
        170BII(A) In General
            170Bk97 k. Determination of Venue Questions. Most Cited Cases

**Federal Courts 170B ⇐104**

170B Federal Courts
    170BII Venue
        170BII(B) Change of Venue
            170BII(B)1 In General; Venue Laid in Proper Forum
                170Bk104 k. Matters Considered. Most Cited Cases
If "a peek at the merits," reveals that the case is a sure loser in the court that has jurisdiction in the conventional sense over it, then the court in which it is initially filed but that does not have jurisdiction should dismiss the case rather than waste the time of another court. 28 U.S.C.A. § 1406(a).

**[20] Monopolies 265 ⇐28(1.6)**

265 Monopolies
    265II Trusts and Other Combinations in Restraint of Trade
        265k28 Actions for Damages by Combinations or Monopolies
        265k28(1.6) k. Persons Entitled to Sue. Most Cited Cases
While the United States is authorized to sue anyone violating the federal antitrust laws, a private plaintiff must demonstrate standing.

**[21] Monopolies 265 ⇐28(1.4)**

265 Monopolies
    265II Trusts and Other Combinations in Restraint of Trade
        265k28 Actions for Damages by

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----

--- F.3d ----, 2005 WL 2470530 (C.A.2 (N.Y.)), 2005-2 Trade Cases P 74,958
**(Cite as: --- F.3d ----)**

Combinations or Monopolies
265k28(1.1) Right of Action
265k28(1.4) k. Injury to Business or Property. Most Cited Cases

**Monopolies 265 ☞28(1.6)**

265 Monopolies
265II Trusts and Other Combinations in Restraint of Trade
265k28 Actions for Damages by Combinations or Monopolies
265k28(1.6) k. Persons Entitled to Sue. Most Cited Cases
Four factors that are generally relevant to determining antitrust standing: an injury in fact (1) to plaintiffs' "business or property"; (2) that is not remote from or duplicative of that sustained by a more directly injured party; (3) that qualifies as an " antitrust injury"; and (4) that translates into reasonably quantifiable damages. Clayton Act, § 4, 15 U.S.C.A. § 15.

[22] **Monopolies 265 ☞28(1.4)**

265 Monopolies
265II Trusts and Other Combinations in Restraint of Trade
265k28 Actions for Damages by Combinations or Monopolies
265k28(1.1) Right of Action
265k28(1.4) k. Injury to Business or Property. Most Cited Cases

**Monopolies 265 ☞28(1.6)**

265 Monopolies
265II Trusts and Other Combinations in Restraint of Trade
265k28 Actions for Damages by Combinations or Monopolies
265k28(1.6) k. Persons Entitled to Sue. Most Cited Cases
Emergency medicine physicians did not suffer antitrust injury when medical specialty certification board denied them opportunity to take certification examination because they had not completed a formal residency program in emergency medicine, and thus did not have standing to pursue antitrust

action against the board; physicians claimed that their salaries were lower because they were not certified, but sought only to join rather than end the exclusive certification arrangement in order to acquire a share of the super-competitive profits. Clayton Act, § 4, 15 U.S.C.A. § 15.

[23] **Monopolies 265 ☞28(1.4)**

265 Monopolies
265II Trusts and Other Combinations in Restraint of Trade
265k28 Actions for Damages by Combinations or Monopolies
265k28(1.1) Right of Action
265k28(1.4) k. Injury to Business or Property. Most Cited Cases
Whether the relief they seek is legal or equitable, plaintiffs in antitrust action must demonstrate that they themselves have sustained an "antitrust injury," which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. Clayton Act, § 4, 15 U.S.C.A. § 15.

[24] **Monopolies 265 ☞28(1.6)**

265 Monopolies
265II Trusts and Other Combinations in Restraint of Trade
265k28 Actions for Damages by Combinations or Monopolies
265k28(1.6) k. Persons Entitled to Sue. Most Cited Cases
Even if emergency medicine physicians suffered antitrust injury when medical specialty certification board denied them opportunity to take certification examination because they had not completed a formal residency program in emergency medicine, they were not efficient enforcers of the antitrust laws, and thus did not have standing to pursue antitrust action against the board; physicians had no natural economic self-interest in reducing the cost of emergency medical care to consumers, while private and government health care insurers had a direct and undivided economic interest in obtaining lower costs. Clayton Act, § 4, 15 U.S.C.A. § 15.

[25] **Monopolies 265 ☞28(1.4)**

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                    Page 8

--- F.3d ----, 2005 WL 2470530 (C.A.2 (N.Y.)), 2005-2 Trade Cases P 74,958
**(Cite as: --- F.3d ----)**

265 Monopolies
    265II   Trusts   and  Other  Combinations  in Restraint of Trade
       265k28    Actions    for    Damages    by Combinations or Monopolies
          265k28(1.1) Right of Action
            265k28(1.4) k. Injury to Business or Property. Most Cited Cases

**Monopolies 265 ☞28(1.6)**

265 Monopolies
    265II   Trusts   and  Other  Combinations  in Restraint of Trade
       265k28    Actions    for    Damages    by Combinations or Monopolies
          265k28(1.6) k. Persons Entitled to Sue. Most Cited Cases
Showing of antitrust injury is necessary, but not always sufficient, to establish antitrust standing. Clayton Act, § 4, 15 U.S.C.A. § 15.

[26] **Monopolies 265 ☞28(1.6)**

265 Monopolies
    265II   Trusts   and  Other  Combinations  in Restraint of Trade
       265k28    Actions    for    Damages    by Combinations or Monopolies
          265k28(1.6) k. Persons Entitled to Sue. Most Cited Cases
Other reasons may sometimes indicate that a party who states an antitrust injury is nevertheless not a proper antitrust plaintiff; these other reasons may prevent the plaintiff from being an efficient enforcer of the antitrust laws. Clayton Act, § 4, 15 U.S.C.A. § 15.

[27] **Monopolies 265 ☞28(1.6)**

265 Monopolies
    265II   Trusts   and  Other  Combinations  in Restraint of Trade
       265k28    Actions    for    Damages    by Combinations or Monopolies
          265k28(1.6) k. Persons Entitled to Sue. Most Cited Cases
Among the other factors other than antitrust injury generally considered relevant to standing are (1) directness or indirectness of the asserted injury; (2) existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement; (3) the speculativeness of the alleged injury; and (4) the difficulty of identifying damages and apportioning them among direct and indirect victims so as to avoid duplicative recoveries. Clayton Act, § 4, 15 U.S.C.A. § 15.

Jeremy R. Kasha, Proskauer Rose LLP, New York, New York (Colin A. Underwood, Proskauer Rose LLP, New York, New York; Ralph L. Halpern, Mitchell J. Banas, Jr., Jaeckle Fleischmann & Mugel LLP, Buffalo, New York, on the brief), for Plaintiff-Appellant Gregory F. Daniel, M.D., on behalf of himself and others similarly situated.
Jeffrey D. Ubersax, Jones Day, Cleveland, Ohio ( Robert H. Rawson, Jr., Elizabeth A. Grove, on the brief), for Defendant-Appellee American Board of Emergency Medicine.
Jonathan A. Damon, LeBoeuf, Lamb, Greene & MacRae, LLP, New York, New York, for Defendants-Appellees Children's Hospital of Michigan, Detroit Receiving Hospital and University Health Center, Loma Linda Medical Center and St. Anthony Hospital-Central.
Robert E. Glanville, Phillips Lytle, LLP, Buffalo, New York, for Defendant-Appellee Council of Emergency Medicine Residency Directors.
Douglass G. Hewitt, Michael Best & Friedrich, LLP, Chicago, Illinois, for Defendant-Appellee Methodist Hospital of Indiana.
Samuel W. Silver, Schnader Harrison Segal & Lewis LLP, Philadelphia, Pennsylvania, for Defendant-Appellee Mercy Catholic Medical Center-Misericordia Division.
Nancy G. Lischer, Hinshaw & Culbertson, Chicago, Illinois, for Defendant-Appellee St. Francis Hospital & Medical Center.
Denise M. Gunter, Nelson, Mullins, Riley & Scarborough, Winston-Salem, North Carolina, for Defendant-Appellee Forsyth Memorial Hospital.

Before: McLAUGHLIN, KATZMANN, and RAGGI, Circuit Judges.

RAGGI, Circuit Judge:

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                 Page 9

--- F.3d ----, 2005 WL 2470530 (C.A.2 (N.Y.)), 2005-2 Trade Cases P 74,958
**(Cite as: --- F.3d ----)**

**\*1** Plaintiffs-appellants are licensed physicians who practice or had practiced emergency medicine throughout the United States although they did not complete formal residency training programs in that specialty. They allege that the defendants, the American Board of Emergency Medicine ("ABEM"), the Council of Emergency Medicine Residency Directors ("CORD"), twenty-eight named hospitals, and various individuals now or previously associated with these institutions and organizations, colluded to restrain trade in connection with the practice of emergency medicine in violation of Section 1 of the Sherman Act, *see* 15 U.S.C. § 1, and to monopolize or attempt to monopolize the market for ABEM-certified and -eligible doctors in violation of Section 2 of the Sherman Act, *see id.* § 2. Plaintiffs specifically complain that the defendants manipulated the residency training requirement for ABEM certification to limit the number of doctors certified in emergency medicine in order to guarantee super-competitive compensation for such doctors and to deny certification and its attendant compensation benefits to members of the plaintiff class.

Plaintiffs now appeal a judgment of the United States District Court for the Western District of New York (Richard J. Arcara, *Judge; Leslie G. Foschio, Magistrate Judge* ), entered on June 20, 2003, dismissing their Second Amended Complaint for lack of antitrust standing. *See Daniel v. American Bd. of Emergency Med.,* 269 F.Supp.2d 159 (W.D.N.Y.2003). Defendants insist that the case was properly dismissed not only for lack of antitrust standing but also for lack of personal jurisdiction and venue in the Western District of New York. We agree with the defendants that the lack of personal jurisdiction and venue supports dismissal. While such a conclusion might permit us to order transfer of this case to a district where personal jurisdiction and venue properly obtain, we conclude that such a transfer is not in the interests of justice in this case because the plaintiffs lack antitrust standing to pursue their claims. Accordingly, we affirm the judgment of the district court dismissing the plaintiffs' complaint in its entirety.

## I. *Background*

### A. *The Parties*

As background to our discussion of the plaintiffs' antitrust claims, we briefly outline the roles played by the parties in the delivery of emergency medical care.

#### 1. *The Defendants-Appellees*

##### a. *American Board of Emergency Medicine*

Defendant ABEM is a Michigan not-for-profit corporation that was established in 1976 to certify physicians in emergency medicine. Its offices, records, and staff are located in East Lansing, Michigan, and its day-to-day activities take place there.

Like twenty-three other medical certification boards representing different disciplines of medicine and surgery, ABEM is a member of the American Board of Medical Specialties ("ABMS"), an umbrella organization formed to assist the member specialty boards in fulfilling their missions. ABEM's professed mission, as stated in its by-laws, is to " improve the quality of emergency medical care," to "establish and maintain high standards of excellence in the specialty of emergency medicine," to " improve medical education and facilities for training emergency physicians," to "administer evaluations of specialists in emergency medicine applying for certification and recertification," to " grant and issue qualified physicians certificates or other recognition of special knowledge and skills in emergency medicine and ... suspend or revoke same, " and to "serve the public, physicians, hospitals and medical schools by furnishing lists of those Diplomates certified by" ABEM. ABEM By-Laws, art. II.

**\*2** ABEM is not a membership organization. Rather, like other ABMS boards, ABEM establishes educational criteria for its medical specialty, administers an examination, and certifies those who

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                                    Page 10

--- F.3d ----, 2005 WL 2470530 (C.A.2 (N.Y.)), 2005-2 Trade Cases P 74,958
**(Cite as: --- F.3d ----)**

pass as ABEM "Diplomates." Notably, for purposes of this action, ABEM has never administered its certification examination in New York State.

ABEM certification is not a license required to practice emergency medicine in any state. Nor is ABEM the only board that certifies physicians in emergency medicine. The American Academy of Emergency Medicine and the American Board of Osteopathic Medicine also award certifications in emergency medicine based on their own standards. Nevertheless, plaintiffs assert that some hospitals restrict their hiring to ABEM-certified physicians, while others base compensation and promotion decisions on ABEM certification. Plaintiffs submit that alternative board certifications do not afford physicians the same prestige or opportunities for high remuneration as ABEM certification, a result of defendants' purposeful efforts to make ABEM certification the "*sine qua non* of the practice of emergency medicine." Appellants' Br. at 7.

In 1976, when ABEM initially sought approval as a specialty board from ABMS, only thirty emergency medicine residency programs existed in the United States. To accelerate recognition of the specialty, ABEM proposed two initial eligibility tracks for doctors seeking to take its certification examination: (1) the practice track, which required applicants to have completed 7,000 hours and 60 months of practicing or teaching emergency medicine; and (2) the residency track, which required applicants to have completed an approved residency training program. FN1 From the start, ABEM expressly stated that the practice track was an interim eligibility alternative to remain available only for eight years following the first administration of ABEM's certification examination in 1980. FN2 It was expected that, in that time frame, additional residency training programs would be developed and accredited, making it practical to require residency training in emergency medicine, rather than practical experience, as the eligibility requirement for the certification examination. FN3

As planned, ABEM closed its practice track on June 30, 1988. Since that date, only physicians who have completed a residency program in emergency medicine have been eligible to take the ABEM

certification exam. A notable exception operated between 1990 and 1995 when a number of physicians, already board certified in internal medicine after completing a residency program in that specialty, were permitted to take the ABEM certification examination without completing another residency program in emergency medicine. Plaintiffs assert that ABEM's recognition of this exception was itself part of the defendants' conspiratorial scheme.

### b. *Council of Emergency Medicine Residency Directors*

Defendant CORD, also a Michigan not-for-profit corporation, was established in 1990 as a national association to facilitate communication among the directors of emergency medicine residency training programs around the country. CORD's stated purposes include improving the quality of emergency medical care, establishing and maintaining high standards of excellence in emergency medicine programs, and improving the quality of instruction by the exchange of ideas among the faculties of such programs. Plaintiffs assert that CORD seeks to maintain formal residency training as the exclusive prerequisite to taking the ABEM certification exam.

### c. *The Hospital Defendants*

**\*3** Twenty-eight hospitals were named as defendants in plaintiffs' Second Amended Complaint. To the extent these hospitals hire ABEM-certified doctors to perform emergency medical services, they may be viewed as consumers who, plaintiffs submit, pay a premium for the ABEM credential. To the extent these hospital defendants also operate residency training programs, they may be viewed as suppliers of the only doctors presently eligible to take the ABEM certification exam. Plaintiffs submit that the hospitals, like CORD, thus have an interest in perpetuating formal residency training as the essential prerequisite for the ABEM certification exam.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                    Page 11

--- F.3d ----, 2005 WL 2470530 (C.A.2 (N.Y.)), 2005-2 Trade Cases P 74,958
**(Cite as: --- F.3d ----)**

Of the twenty-eight hospitals originally sued in this case, only nine remain as appellees: Children's Hospital of Michigan, Detroit Receiving Hospital and University Health Center, Forsyth Memorial Hospital, Loma Linda University Medical Center, Mercy Catholic Medical Center-Misericordia Division, St. Anthony Hospital, Mercy Hospital and Medical Center, Methodist Hospital of Indiana, and Saint Francis Hospital and Medical Center (the " hospital defendants"). FN4 Each of these defendants is incorporated in a state other than New York and maintains its principal place of business outside New York. FN5

### 2. The Plaintiffs-Appellants

Plaintiff-appellant Dr. Gregory F. Daniel, the other 175 named plaintiffs, and the approximately 14,000 members of the proposed plaintiff class are physicians who practice or have practiced emergency medicine. They allege that ABEM has refused or would refuse to allow plaintiffs to take its certification examination because they have not completed residency training programs in emergency medicine or they failed to meet the practice track requirements before ABEM closed that option in 1988. FN6 Plaintiffs claim that they could satisfy the practice eligibility alternative at present, if allowed to do so.

To use Dr. Daniel as an example, he applied to take the ABEM certification test in 1988, before the practice track closed. ABEM rejected his application because he had not completed a residency training program in emergency medicine and he then lacked the required 60 months' experience. Apparently, Dr. Daniel had practiced emergency medicine for the required 7,000 hours, but he had acquired that experience in less than five years. By the time Dr. Daniel completed 60 months' work in emergency medicine, ABEM had closed the practice track alternative to take its certification examination. Dr. Daniel nonetheless presently holds an alternative certification in emergency medicine from the American Academy of Emergency Medicine. He has held an attending physician position in the emergency medicine department of Sisters of Charity Hospital in Buffalo, New York,

and a staff physician position in emergency medicine at St. Joseph's Medical Center Hospital in Cheektowaga, New York. Certain other named plaintiffs have similarly qualified for alternative certifications in emergency medicine and have held positions in hospital emergency medicine departments during the pendency of this action.

### B. The Alleged Antitrust Conspiracy

**\*4** Plaintiffs allege that ABEM, CORD, numerous named and unnamed hospitals, and various individuals associated with these organizations and institutions, by closing the ABEM practice track while placing a premium on ABEM certification, have unlawfully restrained trade and monopolized the market for ABEM-certified and -eligible physicians, injuring competition generally and plaintiffs specifically. FN7

With respect to the effect on competition, plaintiffs allege that defendants conspired to limit the pool of candidates eligible to sit for the ABEM certification examination to doctors who had completed formal residency programs (with the limited exception from 1990 to 1995 for doctors already certified in internal medicine), deliberately excluding physicians like the plaintiffs who, despite their lack of residency training, possess years of emergency medicine experience. They submit that, as a result of this scheme, the defendants have created an artificial shortage of ABEM-certified and - eligible physicians, thereby allowing doctors possessing this credential to demand super-competitive remuneration.

With specific reference to themselves, plaintiffs assert that the conspiracy has unreasonably prevented them from competing in the relevant market because the hospital defendants and "the majority of desirable and or/better-paying emergency departments, now require, or will soon require," ABEM certification as a prerequisite to employment or professional advancement. Second Am. Compl. ¶ 82. As a result, plaintiffs submit that they receive "substantially less remuneration than ABEM certified physicians" and they have " suffered and continue[ ] to suffer substantial losses

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----, 2005 WL 2470530 (C.A.2 (N.Y.)), 2005-2 Trade Cases P 74,958
**(Cite as: --- F.3d ----)**

of income for that period during which they would have been eligible to take the ABEM certification examination and compete for higher salaries." *Id.* ¶ 104. Plaintiffs further assert that, as a result of the conspiracy, they have been "denied emergency medicine positions at hospitals, trauma centers, and academic centers throughout the United States solely by reason of not being ABEM certified or ABEM eligible"; "forced to compete for an ever-decreasing pool of positions available to non-ABEM certified emergency physicians"; and precluded from obtaining positions "in more desirable locations." *Id.* ¶¶ 104-107. Finally, plaintiffs allege that their lack of ABEM certification has resulted in members of the class being discharged, demoted, and relegated to undesirable work assignments, "all with concomitant losses of remuneration." *Id.* ¶¶ 108-09. FN8

### C. *The Procedural Background*

The history of proceedings in this case is extensive and complex. We here reference only those parts relevant to this appeal.

### 1. *The Original and First Amended Complaints*

When this action commenced on September 25, 1990, no antitrust violation was pleaded. Instead, a single plaintiff, Dr. Daniel, sued a single defendant, ABEM, in New York State court for alleged violations of the New York Human Rights Law, *see* N.Y. Exec. Law §§ 290-301, as well as the Due Process and Equal Protection Clauses of the Constitution, *see* U.S. Const., amend. XIV, as a result of ABEM's 1988 refusal to allow Daniel to sit for its certification examination. FN9 ABEM removed the action to federal court and moved to dismiss the complaint, prompting Daniel to amend his pleading to substitute federal antitrust claims for those raised under the Constitution and to add ABEM's board members as individual defendants. *See* First Am. Compl. ¶¶ 28, 85-100.

**\*5** On April 5, 1991, ABEM and its board members moved to dismiss the first amended pleading. The

matter was referred to Magistrate Judge Leslie G. Foschio who, on February 2, 1992, issued the first of what would be many carefully reasoned, detailed reports in this case. Magistrate Judge Foschio recommended that the district court grant dismissal for lack of personal jurisdiction as to all individual defendants except Dr. Henry A. Thiede, a New York resident who had formerly served as an ABEM board member and director. He further recommended that the defendants' motion to dismiss for failure to state an antitrust claim be denied. The district court adopted these recommendations on August 20, 1992. *See Daniel v. American Bd. of Emergency Med.,* 802 F.Supp. 912, 918 (W.D.N.Y.1992) (incorporating magistrate judge's report).

### 2. *The Second Amended Complaint*

Two years later, on January 13, 1994, Dr. Daniel amended his complaint a second time, adding 175 physicians as named plaintiffs and CORD, twenty-eight hospitals, and Frank A. Disney, a former ABEM director who resided in the district, as named defendants. The named plaintiffs sought to represent a class consisting of 14,000 physicians who "currently practice or have practiced emergency medicine in the United States." Second Am. Compl. ¶ 23. The original Human Rights Law claim was deleted from the Second Amended Complaint, which now alleged only antitrust causes of action. This Second Amended Complaint is the operative pleading for purposes of this appeal.

### a. *The Initial Motion to Dismiss the Second Amended Complaint*

In May 1994, after preliminary discovery limited to issues of jurisdiction and immunity, the defendants moved to dismiss the Second Amended Complaint or, alternatively, for summary judgment, on various grounds including the statute of limitations, failure to state a claim, certain immunity defenses, lack of personal jurisdiction, and improper venue. After receiving two reports from Magistrate Judge Foschio recommending against dismissal, the district court so ruled on November 19, 1997. *See*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----, 2005 WL 2470530 (C.A.2 (N.Y.)), 2005-2 Trade Cases P 74,958
**(Cite as: --- F.3d ----)**

*Daniel v. American Bd. of Emergency Med.,* 988 F.Supp. 112, 117 (W.D.N.Y.1997) (adopting recommendation to deny defendants' motion to dismiss on grounds of statute of limitations and failure to state a claim and incorporating magistrate judge's report); *Daniel v. American Bd. of Emergency Med.,* 988 F.Supp. 127, 143-45 (W.D.N.Y.1997) (adopting recommendation to deny defendants' motion to dismiss for lack of personal jurisdiction and improper venue and incorporating magistrate judge's report). FN10

With respect to personal jurisdiction, an argument that had been raised in support of dismissal by all defendants-appellees except ABEM, the district court concluded that New York law did not provide for personal jurisdiction over CORD and the hospital defendants but that Section 12 of the Clayton Act did. *See id.* at 143-44, 197-205. FN11 As for the defendants' venue challenge, the district court concluded that venue was proper in the Western District of New York as to ABEM under Section 12 of the Clayton Act and as to all defendants under the general federal venue statute, 28 U.S.C. § 1391(b). *See id.* at 144, 256-63, 271-76. On October 9, 2002, CORD, Mercy Hospital, and Methodist Hospital, joined by other defendants, moved the district court to certify for interlocutory appeal its Section 12 rulings as to personal jurisdiction and venue, but the district court never ruled on this motion.

b. *The Second Motion to Dismiss the Second Amended Complaint*

**\*6** The parties proceeded to a second phase of discovery limited to issues related to class certification. When, upon completion of this discovery, plaintiffs moved for class certification, defendants cross-moved once again for dismissal, this time asserting plaintiffs' lack of "antitrust standing." Once again, the motions were referred to Magistrate Judge Foschio, whose report recommending dismissal was adopted by the district court on June 30, 2003. *See Daniel v. American Bd. of Emergency Med.,* 269 F.Supp.2d 159, 163-64 (W.D.N.Y.2003) (granting dismissal and incorporating magistrate judge's report). Applying a

two-part analysis to the antitrust standing inquiry, the district court concluded that plaintiffs (1) failed to allege an "antitrust injury" because they were themselves seeking to charge super-competitive fees for their services; and (2) were not "efficient enforcers" of the antitrust laws because they sought to join, not to disband, the complained-of cartel in order to share in the "higher levels of compensation created by the charged conspiracy." *See id.* at 163-64. This appeal followed.

**II. *Discussion***

A. *Section 12 of the Clayton Act Does Not Permit the Exercise of Personal Jurisdiction Over CORD and the Hospital Defendants in the Western District of New York*

With the exception of ABEM, all defendants before us on this appeal had moved in the district court for dismissal of this action for lack of personal jurisdiction. FN12 The district court rejected the motion on the merits, ruling that, although New York law did not afford personal jurisdiction over these defendants, *see* N.Y.C.P.L.R. §§ 301-302, Section 12 of the Clayton Act did. *See Daniel v. American Bd. of Emergency Med.,* 988 F.Supp. at 197-255. Plaintiffs do not dispute the district court's conclusion about New York law, but defendants-appellees (again with the exception of ABEM) do challenge the district court's construction of Clayton Act Section 12 to support personal jurisdiction in this case. Accordingly, these "jurisdiction defendants" submit that lack of personal jurisdiction affords an alternative ground for affirmance of the judgment of dismissal in this case. *See. e.g., ACEquip Ltd. v. American Eng'g Corp.,* 315 F.3d 151, 155 (2d Cir.2003) ("Our court may, of course, affirm the district court's judgment on any ground appearing in the record, even if the ground is different from the one relied on by the district court."). FN13

[1] We review *de novo* the district court's legal conclusions regarding personal jurisdiction, *see Sunward Elecs., Inc. v. McDonald,* 362 F.3d 17, 22 (2d Cir.2004); *U.S. Titan, Inc. v. Guangzhou Zhen*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                              Page 14

--- F.3d ----, 2005 WL 2470530 (C.A.2 (N.Y.)), 2005-2 Trade Cases P 74,958
**(Cite as: --- F.3d ----)**

*Hua Shipping Co.,* 241 F.3d 135, 151 (2d Cir.2001), and we conclude that Section 12 of the Clayton Act did *not* confer personal jurisdiction over the jurisdiction defendants in this case.

1. *The Worldwide Service of Process Provision of Clayton Act Section 12 Can Supply Personal Jurisdiction Only in Cases Where Venue Is Established Under Section 12*

a. *Section 12*

*7 Section 12 of the Clayton Act states:
Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found.

15 U.S.C. § 22. As this language makes plain, the section consists of two parts. The part before the semicolon addresses venue, permitting antitrust actions against corporations to be maintained "not only in the judicial district whereof [the corporate defendant] is an inhabitant, but also in any district wherein it may be found or transacts business." The part after the semicolon provides for worldwide service of process and, therefore, the exercise of personal jurisdiction "in such cases." In this case, it is undisputed that the venue provision of Section 12 does not apply to any of the jurisdiction defendants. FN14 Thus, in reviewing the district court's exercise of personal jurisdiction over these defendants, we must decide whether service of process (and personal jurisdiction) is available under Section 12 only in cases satisfying the section's specific venue provision or regardless how venue is established.

The answer turns on construction of the introductory phrase "in such cases" in the process provision, which defines the scope of its applicability. Plainly, the phrase refers back to the venue provision; the question is whether it refers back in whole or in part. If "in such cases" refers back to the phrase "[a]ny suit, action, or proceeding

under the antitrust laws," then worldwide process would be available in every antitrust case, without regard to how venue was established. On the other hand, if "in such cases" refers only to those antitrust actions in which venue is established pursuant to Section 12, then the worldwide process provision would be of no help in establishing personal jurisdiction in cases where venue depended on other statutes.

b. *The Circuit Split on the Relationship Between Venue and Service of Process in Section 12*

Our sister circuits are split over the proper interpretation of the venue and process provisions of Section 12. The Third and Ninth Circuits hold that Section 12's service of process provision is "independent of and does not require satisfaction of" the section's venue provision. *In re Auto. Refinishing Paint Antitrust Litig.,* 358 F.3d 288, 297 (3d Cir.2004); *see Action Embroidery Corp. v. Atlantic Embroidery, Inc.,* 368 F.3d 1174, 1179-80 (9th Cir.2004) (holding that, "under Section 12 of the Clayton Act, the existence of personal jurisdiction over an antitrust defendant does not depend upon there being proper venue in that court"); *Go-Video, Inc. v. Akai Elec. Co.,* 885 F.2d 1406, 1408-13 (9th Cir.1989) (rejecting argument that antitrust plaintiff must satisfy Section 12's venue provision to avail itself of its worldwide service of process authorization). The District of Columbia Circuit, however, holds that "[t]he language of the statute is plain, and its meaning seems clear: ... [I]nvocation of the nationwide service clause rests on satisfying the venue provision." *GTE New Media Servs. Inc. v. BellSouth Corp.,* 199 F.3d 1343, 1351 (D.C.Cir.2000). We have acknowledged this split, without ourselves deciding the issue. *See In re Magnetic Audiotape Antitrust Litig.,* 334 F.3d 204, 207 (2d Cir.2003).

*8 [2] Not insignificantly, however, this court was among the first to consider the relationship between the venue and service provisions of Section 12 of the Clayton Act. Over forty years ago, in *Goldlawr, Inc. v. Heiman,* we noted that the two parts of Section 12 were so closely related that "the extraterritorial service privilege is given *only* when

--- F.3d ----, 2005 WL 2470530 (C.A.2 (N.Y.)), 2005-2 Trade Cases P 74,958
**(Cite as: --- F.3d ----)**

the other requirements [pertaining to venue] are satisfied," 288 F.2d 579, 581 (2d Cir.1961) (emphasis added), *rev'd on other grounds,* 369 U.S. 463, 82 S.Ct. 913, 8 L.Ed.2d 39 (1962). Because *Goldlawr* 's observation was not necessary to the court's ruling, it constitutes *dictum* that does not specifically control this case. Nevertheless, we recognize that the influence of *Goldlawr* 's *dictum* has been significant. When the D.C. Circuit construed the service of process provision of Section 12 to depend on satisfaction of the section's venue provision, it specifically cited *Goldlawr* and emphasized that, "[o]n the question of the meaning of Section 12, we align ourselves with the position taken by the Second Circuit." *GTE New Media Servs. Inc. v. BellSouth Corp.,* 199 F.3d at 1351. Today, we bring the process full circle, joining the D.C. Circuit in concluding that the plain language of Section 12 indicates that its service of process provision applies (and, therefore, establishes personal jurisdiction) only in cases in which its venue provision is satisfied.

#### c. *Construing the Scope of Section 12's Service of Process Provision*

#### (1) *The Statutory Language*

[3] [4] In reaching this conclusion, we begin with the text of Section 12 to determine whether its language is clear or ambiguous. *See, e.g., Robinson v. Shell Oil Co.,* 519 U.S. 337, 340, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997); *accord Freier v. Westinghouse Elec. Corp.,* 303 F.3d 176, 197 (2d Cir.2002). "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.,* 519 U.S. at 341, 117 S.Ct. 843. If the meaning is plain, we inquire no further. *Id.* ("Our inquiry must cease if the statutory language is unambiguous and the statutory scheme is coherent and consistent." (quotation marks and citation omitted)); *Freier v. Westinghouse Elec. Corp.,* 303 F.3d at 197 (and cases cited therein). Only if we discern ambiguity do we resort first to canons of statutory

construction, *see United States v. Dauray,* 215 F.3d 257, 262 (2d Cir.2000), and, if the meaning remains ambiguous, to legislative history, *id.* at 264.

Applying these principles to this case, we conclude from the language and context of "in such cases" in the service of process provision of Section 12, that the phrase plainly refers to those cases qualifying for venue in the immediately preceding clause. The common meaning of the word "such" is "having a quality already or just specified"; "of this or that character, quality, or extent: of the sort or degree previously indicated or implied"; or "previously characterized or described: aforementioned." *Webster's Third New International Dictionary (Unabridged)* 2283 (1986); *see generally Morse v. Republican Party of Va.,* 517 U.S. 186, 254, 116 S.Ct. 1186, 134 L.Ed.2d 347 (1996) ("When words in a statute are not otherwise defined, it is fundamental that they will be interpreted as taking their ordinary, contemporary, common meaning." (quotation marks and citation omitted)). The " quality" of the cases specified in the provision of Section 12 preceding the semicolon is not simply that they are antitrust cases, or even antitrust cases against corporations; it is that they are antitrust cases against corporations brought in the particular venues approved by Section 12: where the defendant is an "inhabitant," where it "may be found," or where it "transacts business." 15 U.S.C. § 22. It is "in such cases," *i.e.,* such venued cases, that Section 12 makes worldwide service of process available. We cannot make this point more clearly than Judge Moore did, writing for the panel in *Goldlawr:*
*9 Section 12 of the Clayton Act specifies where suit against a corporation under the antitrust laws may be brought, namely, in a district where it is an inhabitant and also where "it may be found or transacts business." Conversely, it should follow that if a corporation is not an inhabitant of, is not found in, and does not transact business in, the district, suit may not be so brought. By statutory grant *if suit is brought as prescribed in this section* " all process in such cases may be served in the district of which it (the corporation) is an inhabitant, or wherever it may be found." Thus, "in such cases," Congress has seen fit to enlarge the limits of the otherwise restricted territorial areas of process. In

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                              Page 16

--- F.3d ----, 2005 WL 2470530 (C.A.2 (N.Y.)), 2005-2 Trade Cases P 74,958
**(Cite as: --- F.3d ----)**

other words, *the extraterritorial service privilege is given only when the other requirements are satisfied.*

*Goldlawr, Inc. v. Heiman,* 288 F.2d at 581 (footnote and citation omitted) (emphasis added). Indeed, *Goldlawr* 's construction of Section 12 finds some support in an early Supreme Court discussion of the statute. In *Eastman Kodak Co. of New York v. Southern Photo Materials Co.,* 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684 (1927), the Court observed:[A]s applied to suits against corporations for injuries sustained by violations of the Anti-Trust Act, [Section 12's] necessary effect was to enlarge the local jurisdiction of the district courts so as to establish the venue of such a suit not only, as theretofore, in a district in which the corporation resides or is "found," but also in any district in which it "transacts business"-although neither residing nor "found" therein-*in which case the process may be issued to and served* in a district in which the corporation either resides or is "found."

*Id.* at 372-73, 47 S.Ct. 400 (emphasis added). The Supreme Court's use of "in which case" in the highlighted phrase to link Section 12's process provision to the satisfaction of its venue clause suggests that the phrase "in such cases" in the statute serves the same purpose.

Accordingly, we now reiterate the conclusion originally reached by this court in *Goldlawr* and formally adopted by the D.C. Circuit: the extraterritorial service provision of Clayton Act Section 12 may be invoked to establish personal jurisdiction only when the requirements of the section's venue provision are satisfied.

(2) *The Statutory History*

Because we conclude that the language of Section 12 is plain, we need not resort to legislative history, as have those of our sister circuits that construe Section 12 to be ambiguous. We do, however, note that such legislative history as exists does not support a conclusion that Congress enacted Section 12's service of process provision with the intent that it operate independently from or reach beyond the section's venue provision.

Undoubtedly, Congress viewed Section 12's "main contribution to be its expansion of the bounds of *venue.*" *Go-Video, Inc. v. Akai Elec. Co.,* 885 F.2d at 1410 (citing *United States v. Scophony Corp. of Am.,* 333 U.S. 795, 806-08, 68 S.Ct. 855, 92 L.Ed. 1091 (1948)) (emphasis added). The purpose of the service provision, however, is less clear. Debate in the House of Representatives on the matter was sparse, and debate in the Senate, which added the service of process provision to an already drafted venue provision, is non-existent. *See Go-Video, Inc. v. Akai Elec. Co.,* 885 F.2d at 1410 (outlining sparse legislative history). FN15 If the legislative history of Section 12 provides no clear insights as to Congress's purpose in enacting expanded antitrust venue and process provisions in a single sentence, that history can hardly evidence congressional approval for now divorcing Section 12's venue and process provisions so as to combine the latter with an expanded general venue statute enacted decades later, an application that obviously could not have been in the minds of any of the enacting legislators.

**\*10** Indeed, as the Supreme Court has noted, although Congress intended the Clayton Act "to provide broader and more effective relief, both substantively and procedurally, for persons injured by violations of its antitrust policy," it was, in fact, quite careful in expanding venue, rejecting several broader proposals than the one finally enacted in Section 12. *United States v. National City Lines,* 334 U.S. 573, 588, 68 S.Ct. 1169, 92 L.Ed. 1584 (1948) (noting that "[i]n adopting section 12 Congress was not willing to give the plaintiffs free rein to haul defendants hither and yon at their caprice"), *superseded in part by statute,* 28 U.S.C. § 1404(a) (superseding venue transfer holding). To the extent the legislative history speaks at all, then, it suggests Congress's intent to "fix[ ] the limits within which [the parties] could claim advantage in venue and beyond which neither could seek it." *Id.* at 588, 68 S.Ct. 1169. Thus, before the addition of a service of process amendment to Section 12, one member of Congress voiced concern that service might not be possible in some places where the expanded antitrust venue would obtain, *see*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                               Page 17

--- F.3d ----, 2005 WL 2470530 (C.A.2 (N.Y.)), 2005-2 Trade Cases P 74,958
**(Cite as: --- F.3d ----)**

*Go-Video, Inc. v. Akai Elec. Co.,* 885 F.2d at 1410 (discussing objection of Rep. Webb), but nothing in the legislative history suggests that any member intended to extend service of process *beyond* the carefully expanded venue provision. Viewed in this context, Congress's decision in Section 12 to provide for worldwide service of process only "in such cases" as satisfied the expanded venue provision sensibly served to maintain the desired venue balance at the same time that it ensured its effective operation.

### (3) *Expanded Venue and Service of Process Provisions in Other Statutes Are of Little Assistance in Construing Section 12*

[5] In reaching a different conclusion, the district court appears to have relied, in part, on other statutes containing special venue and service of process provisions that it concluded could operate independently of one another, notably the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78aa, and the Racketeer and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1965. *See Daniel v. American Bd. of Emergency Med.,* 988 F.Supp. at 199-200. Preliminarily, we observe that courts must proceed cautiously in drawing such analogies. As the Supreme Court has warned, " analysis of special venue provisions must be specific to the statute" because Congress's intent may be permissive in some circumstances and restrictive in others. *Cortez Byrd Chips, Inc. v. Bill Harbert Constr. Co.,* 529 U.S. 193, 204, 120 S.Ct. 1331, 146 L.Ed.2d 171 (2000) (contrasting Congress's restrictive intent with respect to venue in patent cases, actions against national banks, and geographic reach of Title VII, with its permissive intent under the Federal Arbitration Act). In any event, attempts to analogize the venue and service of process provisions of Section 12 with counterpart provisions in the Exchange Act and RICO offer little help in resolving the parties' personal jurisdiction dispute because the text and structure of those statutes differ in important respects from the Clayton Act.

*11 Notably, the venue provision of the Exchange Act reaches even more broadly than Section 12 of the Clayton Act, permitting suit "in the district where any act or transaction constituting the violation occurred." *Compare* 15 U.S.C. § 78aa FN16 *with* 15 U.S.C. § 22 (providing for venue where the defendant is "an inhabitant," "may be found," or "transacts business"). Thus, our court has had no occasion to consider the independent operation of the Exchange Act's service of process provision because we have yet to confront a case where a plaintiff sought to establish venue through some other, broader statute. *See, e.g., Mariash v. Morrill,* 496 F.2d 1138, 1144 (2d Cir.1974) (declining to decide whether, for purposes of venue under the Exchange Act, defendant "transacts business" in the Southern District of New York because it was "clear that an act or transaction constituting the (alleged) violation (has) occurred" in that district). *Leasco Data Processing Equipment Corp. v. Maxwell,* 468 F.2d 1326 (2d Cir.1972), is to the same effect: the alleged fraudulent misrepresentations were made in the Southern District of New York where venue was laid. Viewed in this context, Judge Friendly's observation in that case that certain parts of Section 27 deal with venue, while another "speaks expressly only to service of process," *id.* at 1340, hardly supports a conclusion that the service of process provision operates independently from the venue provision. Indeed, it appears doubtful that any such circumstance would arise because, as Judge Friendly further noted, Congress intended for the venue and service provisions of Section 27 "to extend personal jurisdiction to the full reach permitted by the due process clause." *Id.* at 1339.

As for the RICO statute, *see* 18 U.S.C. § 1965, which the Ninth Circuit also relied on in construing Section 12's service of process provision to operate independently of its venue provision, *see Action Embroidery Corp. v. Atlantic Embroidery, Inc.,* 368 F.3d at 1179, we note an important structural difference. While Section 12 of the Clayton Act discusses venue and service of process in one sentence, RICO separates these provisions into non-sequential, lettered subsections. *Compare* 15 U.S.C. § 22 *with* 18 U.S.C. § 1965(a), (d). More important still is a textual difference between the two statutes. The language of RICO's service of process provision does not limit its application to "

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----, 2005 WL 2470530 (C.A.2 (N.Y.)), 2005-2 Trade Cases P 74,958
**(Cite as: --- F.3d ----)**

such cases" as are referred to in the statute's venue provision. Rather, in RICO, Congress specifically provides for the service of process provision to apply "in any action or proceeding *under this chapter,* " that is, the chapter dealing with racketeering. 18 U.S.C. § 1965(d) (emphasis added). Given that the Clayton Act served as a model for RICO, *see United States v. Bonanno Org. Crime Family of La Cosa Nostra,* 879 F.2d 20, 24 (2d Cir.1989), these language and structural differences between the two statutes in their treatment of venue and process only reinforce the conclusion that Congress was expressly rendering independent under RICO concepts that it had plainly linked under Clayton Act Section 12, *cf. id.* at 25-27 (discussing other similarities and differences between RICO and the Clayton Act that reveal Congress's intent with respect to reach of these statutes). Thus, while plaintiffs urge us to construe Section 12's service of process clause to apply to the entire antitrust chapter, the narrower language of Section 12 will not support that interpretation.

*\*12* In sum, when we interpret Section 12 " 'the way it is written,' " we are obliged to conclude that its service of process provision can properly confer personal jurisdiction over a defendant " 'only when the action is brought in the district where the defendant resides, is found, or transacts business,' " that is, the district where Section 12 venue lies. *GTE New Media Servs. Inc. v. BellSouth Corp.,* 199 F.3d at 1351 (quoting Herbert Hovenkamp, *Personal Jurisdiction and Venue in Private Antitrust Actions in the Federal Courts,* 67 Iowa L.Rev. 485, 509 (1982)).

[6] This is not to suggest that the general venue statute does not remain available to plaintiffs in antitrust actions. Quite the contrary. *See* 15 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3818 (2d ed. 1986) ("[I]t is now clear beyond any doubt that the general venue statutes apply to antitrust cases."). But if 28 U.S.C. § 1391 is the basis for venue, an antitrust plaintiff cannot employ Section 12's service of process provision to secure personal jurisdiction. In such circumstances, a plaintiff must look to other service of process provisions, notably

those specified in Fed.R.Civ.P. 4 or incorporated therein from state law to satisfy this requirement.

### 2. *Applying Section 12 to the Jurisdiction Defendants*

[7] In view of this construction of Section 12's service of process provision, we cannot sustain the district court's exercise of personal jurisdiction over CORD and the nine remaining hospital defendants. The district court expressly ruled that these jurisdiction defendants did not satisfy Section 12's venue provision because they did not transact business in the district. *See Daniel v. American Bd. of Emergency Med.,* 988 F.Supp. at 263-71. Plaintiffs do not challenge this venue ruling on appeal. FN17 Accordingly, for the reasons just discussed in the previous subsection of this opinion, we conclude that, because plaintiffs cannot establish venue in the Western District of New York under Section 12, they cannot avail themselves of that statute's worldwide service of process provision to establish personal jurisdiction in that district. We, therefore, affirm dismissal of plaintiffs' Second Amended Complaint against CORD and the hospital defendants for lack of personal jurisdiction.

### B. *Neither the Clayton Act nor 28 U.S.C. § 1391(b) Supports Venue in the Western District of New York with Respect to ABEM*

Although ABEM did not raise a personal jurisdiction challenge in the district court, and does not do so on appeal, it does challenge the district court's conclusion that venue over this action properly resides in the Western District of New York. *See Daniel v. American Bd. of Emergency Med.,* 988 F.Supp. at 258-63. Accordingly, it submits that lack of venue provides an alternative ground for affirming the judgment of dismissal. We agree. Because ABEM's venue challenge is based upon essentially undisputed facts, we review the district court's venue determination *de novo, see Gulf Ins. Co. v. Glasbrenner,* 417 F.3d 353, 355 (2d Cir.2005), and conclude that venue is not proper under either the Clayton Act or the general venue statute.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                    Page 19

--- F.3d ----, 2005 WL 2470530 (C.A.2 (N.Y.)), 2005-2 Trade Cases P 74,958
**(Cite as: --- F.3d ----)**

### 1. *Venue Under Section 12 of the Clayton Act*

**\*13** The district court concluded that plaintiffs' claims against ABEM were properly venued in the Western District of New York under Section 12 of the Clayton Act because ABEM "transacts business" in that district. *Daniel v. American Bd. of Emergency Med.,* 988 F.Supp. at 258-63. We must disagree.

### a. *Section 12's "Transacts Business" Requirement*

[8] The Supreme Court has construed the phrase " transacts business," as used in the venue provision of Clayton Act Section 12, to refer to "the practical, everyday business or commercial concept of doing business or carrying on business of any substantial character." *United States v. Scophony Corp.,* 333 U.S. at 807, 68 S.Ct. 855; *accord Banana Distribs., Inc. v. United Fruit Co.,* 269 F.2d 790, 794 (2d Cir.1959) (quoting *Scophony* ); *see also Eastman Kodak Co. of N.Y. v. Southern Photo Materials Co.,* 273 U.S. at 373, 47 S.Ct. 400 ("[A] corporation is engaged in transacting business in a district ... although not present by agents carrying on business of such character and in such manner that it is ' found' therein and is amenable to local process-if in fact, in the ordinary and usual sense, it 'transacts business' therein of any substantial character."). Under this construction, "[t]echnical criteria such as 'mere solicitation' or 'solicitation plus' are not determinative." *Banana Distribs., Inc. v. United Fruit Co.,* 269 F.2d at 794 (quoting *Scophony,* 333 U.S. at 807, 68 S.Ct. 855). Rather, the propriety of venue turns on the nature of the corporate defendant's business.

A defendant manufacturer that promotes its goods in a judicial district through product demonstrations, that solicits orders through its salesmen in that district, and that ships its goods into that district clearly "transacts business" under Section 12. *See Eastman Kodak Co. of N.Y. v. Southern Photo Materials Co.,* 273 U.S. at 374-77, 47 S.Ct. 400; *see also Banana Distribs., Inc. v. United Fruit Co.,* 269 F.2d at 794 & n. 8 (finding company transacts business where it solicits sales, maintains office, and provides customer assistance in district). But, in the view of the D.C. Circuit, so too does a defendant charged with accrediting institutions when it conducts field inspections in the judicial district as part of the accreditation process. *See Levin v. Joint Comm'n on Accreditation of Hosps.,* 354 F.2d 515, 517-18 (D.C.Cir.1966). Meanwhile, the Third Circuit has concluded that a defendant professional organization transacts business in a district when it enforces its standards against constituent organizations through direct, continual supervision of those organizations in the judicial district. *See Myers v. American Dental Assoc.,* 695 F.2d 716, 730 (3d Cir.1983).

On the other hand, when an association's business is "public relations and professional advancement," the Fourth Circuit has ruled that it does not transact business within a particular district merely because some of its members reside there and it solicits advertising time in and transmits advertisements and other professional materials into the district. *See Bartholomew v. Virginia Chiropractors Assoc.,* 612 F.2d 812, 816 (4th Cir.1979), *abrogated on other grounds, Union Labor Life Ins. Co. v. Pireno,* 458 U.S. 119, 102 S.Ct. 3002, 73 L.Ed.2d 647 (1982). Similarly, the Fifth Circuit has concluded that an association of golf professionals does not transact business in a district where some of its members reside and where it advertises in magazines, makes membership materials available, and conducts a five-day program for its members. *See Golf City, Inc. v. Wilson Sporting Goods, Inc.,* 555 F.2d 426, 436-38 (5th Cir.1977).

**\*14** In each of these cases, the determination whether a defendant transacted business in a district depended on a realistic assessment of the nature of the defendant's business and of whether its contacts with the venue district could fairly be said to evidence the "practical, everyday business or commercial concept of doing business or carrying on business of any substantial character." *United States v. Scophony Corp.,* 333 U.S. at 807, 68 S.Ct. 855.

### b. *ABEM Does Not "Transact Business" in the Western District of New York*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----, 2005 WL 2470530 (C.A.2 (N.Y.)), 2005-2 Trade Cases P 74,958
**(Cite as: --- F.3d ----)**

[9] The district court concluded that ABEM transacts business in the Western District of New York because it "maintains continuous contacts which amount to business continuity within this district," as evidenced by the following circumstances: (1) ABEM certified an unspecified number of physicians in New York State and, in so doing, communicated with them in this state; (2) application fees constitute 99% of ABEM's revenue, and ABEM received an unspecified amount of that revenue from the application fees of physicians in New York State; and (3) ABEM mailed a copy of its application form to plaintiff Dr. Daniel in the district. *Daniel v. American Bd. of Emergency Med.,* 988 F.Supp. at 259-62. These facts, however, are insufficient to show that ABEM "transacts business" in the Western District of New York.

Preliminarily, we note that, with the exception of the application mailed to Dr. Daniel, the cited contacts are with the State of New York as a whole, not specifically the Western District of New York. Only the latter contact is relevant to Section 12 venue. *See* 15 U.S.C. § 22 ("Any suit ... may be brought not only in the judicial district whereof [the defendant corporation] is an inhabitant, but also *the district ... wherein it ... transacts business.* " (emphasis added)); *see also Eastman Kodak Co. of N.Y. v. Southern Photo Materials Co.,* 273 U.S. at 374, 47 S.Ct. 400 (holding that solicitation of orders from and sale and shipment of goods to "the Georgia district ... was transacting business in that district").

In any event, these contacts must be considered in light of the nature of ABEM's business, which is certifying doctors who meet its training and testing standards in the field of emergency medicine. ABEM, which operates out of its headquarters in Michigan, neither develops its standards nor administers its certification examinations in the Western District of New York. It does not own or lease any real estate in the district. It does not maintain an office, telephone, bank account, or mailing address there. It employs no agent to carry on its operations or promote its activities in the Western District of New York. It does not advertise or solicit applicants for its certification examination

in the district. Indeed, inquiries or contacts are initiated by potential applicants *to* ABEM, not the reverse. To the extent the district court found that 99% of ABEM's revenues derive from examination application fees, *see Daniel v. American Bd. of Emergency Med.,* 988 F.Supp. at 261, it made no finding as to how much of that fee revenue derived from applicants in the Western District of New York. Indeed, the only evidence on that point appears to be an affidavit of ABEM's executive director (in support of ABEM's motion to dismiss plaintiffs' Second Amended Complaint), which states that the revenue ABEM receives from examination applications in the Western District of New York is *de minimis* "in relation to ABEM's total revenues." Munger Aff. ¶ 7 (July 20, 1994).

*15 With this understanding of ABEM's business, it is impossible to conclude that an unspecified number of communications by ABEM into the district in response to inquiries about tests to be administered outside the district, even when coupled with an unspecified but apparently minimal amount of revenue from test fees transmitted from applicants residing in the district, evidences the sort of "practical, everyday business or commercial concept of doing business or carrying on business of any substantial character" that the Supreme Court has equated to "transact[ing] business" for purposes of Section 12 venue. *See United States v. Scophony Corp.,* 333 U.S. at 807, 68 S.Ct. 855; *Bartholomew v. Virginia Chiropractors Assoc.,* 612 F.2d at 816; *Golf City, Inc. v. Wilson Sporting Goods, Inc.,* 555 F.2d at 436-38.

Accordingly, because we conclude that, as a matter of law, plaintiffs failed to demonstrate that ABEM "transacts business" in the Western District of New York, venue could not rest in that district pursuant to Section 12 of the Clayton Act.

*2. Venue Under the 28 U.S.C. § 1391(b)*

Plaintiffs submit that, even if venue does not lie in the Western District of New York under Section 12 of the Clayton Act, the district court correctly concluded that it had venue pursuant to the general federal venue statute, 28 U.S.C. § 1391(b).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----, 2005 WL 2470530 (C.A.2 (N.Y.)), 2005-2 Trade Cases P 74,958
**(Cite as: --- F.3d ----)**

Although the district court's conclusions were not limited to ABEM, because we have already concluded that the district court lacked personal jurisdiction over CORD and the hospital defendants, we focus our § 1391(b) discussion on ABEM.

Title 28 U.S.C. § 1391(b) provides in relevant part:
A civil action wherein jurisdiction is not founded solely on diversity of citizenship may, except as otherwise provided by law, be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred ..., or (3) a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought.

We conclude that none of the three grounds for venue identified in the statute permit plaintiffs to pursue their antitrust claims against ABEM in the Western District of New York.

### a. Section 1391(b)(1)

Plaintiffs' reliance on § 1391(b)(1) merits little discussion because all defendants do not reside in New York State. To the extent the district court thought otherwise, its conclusion was informed by its misconstruction of the service of process provision of Section 12 of the Clayton Act.

Title 28 U.S.C. § 1391(c) defines the residence of a corporation as "any judicial district in which it is subject to personal jurisdiction at the time the action is commenced." Because the district court ruled that personal jurisdiction over all defendants could be obtained in the Western District of New York pursuant to the worldwide service of process provision of Section 12, it concluded that all defendants were residents of New York State. Properly construed, however, Section 12's service of process provision did not permit the district court to exercise personal jurisdiction over CORD or the hospital defendants. *See supra* Part II.A. Thus, these defendants cannot be deemed residents of New York pursuant to § 1391(c), and the district

court lacked venue under § 1391(b)(1) to hear this claim against ABEM.

### b. Section 1391(b)(2)

**\*16** [10] In fact, it is § 1391(b)(2), not § 1391(b)(1), on which plaintiffs primarily rely to support venue over ABEM in the Western District of New York, arguing that a "substantial part of the events or omissions giving rise to [their antitrust] claim[s] occurred" in that district. In ruling in plaintiffs' favor on this point, the district court concluded that ABEM's "denial of the [certification test] applications and appeals by Daniel and five other individual plaintiffs and [its] official communication of this action to Plaintiffs in New York is sufficient to constitute a substantial part of the events giving rise to Plaintiffs' claims." *Daniel v. American Bd. of Emergency Med.,* 988 F.Supp. at 274-75. FN18 Once again, we must disagree.

[11] [12] Although our court has had few occasions to interpret § 1391(b)(2) since that statute was amended in 1990, certain principles are clear. Section 1391(b)(2) does not restrict venue to the district in which the "most substantial" events or omissions giving rise to a claim occurred. *See Bates v. C & S Adjusters, Inc.,* 980 F.2d 865, 868 (2d Cir.1992); David D. Siegel, "Commentary on the 1988 and 1990 Revisions of Section 1391, Subdivision (a), Clause (2)," *printed in* 28 U.S.C.A. § 1391 at 9-10 (West 1993); *see also First of Mich. Corp. v. Bramlet,* 141 F.3d 260, 264 (6th Cir.1998) (interpreting analogous "substantial part of the events or omission" language in 28 U.S.C. § 1391(a)(2) (relating to jurisdiction founded only on diversity)); *Setco Enters. Corp. v. Robbins,* 19 F.3d 1278, 1281 (8th Cir.1994) (same). Rather, as we recently explained, § 1391(b)(2) "contemplates that venue can be appropriate in more than one district" and "permits venue in multiple judicial districts as long as a 'substantial part' of the underlying events took place in those districts." *Gulf Ins. Co. v. Glasbrenner,* 417 F.3d at 356. Nevertheless, the " substantial events or omissions" requirement does limit the forums available to plaintiffs. *See id.* at 357 (cautioning district courts to "take seriously the adjective 'substantial' " in discharging duty to "

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----, 2005 WL 2470530 (C.A.2 (N.Y.)), 2005-2 Trade Cases P 74,958
**(Cite as: --- F.3d ----)**

construe the venue statute strictly"). This is so because, as the Supreme Court explained before the amendment of section 1391, "[i]n most instances, the purpose of statutorily defined venue is to protect the *defendant* against the risk that a plaintiff will select an unfair or inconvenient place of trial." *Leroy v. Great W. United Corp.,* 443 U.S. 173, 183-84, 99 S.Ct. 2710, 61 L.Ed.2d 464 (1979) (emphasis in original); *see also Bates v. C & S Adjusters, Inc.,* 980 F.2d at 867 (noting that *Leroy* and other pre-amendment precedents "remain important sources of guidance" in construing the venue statute and recognizing 1990 amendments to § 1391 as "at most a marginal expansion of the [general] venue provision" aimed at reducing litigation about "where the claim arose" under the former venue provision); *Cottman Transmission Sys. v. Martino,* 36 F.3d 291, 294 (3d Cir.1994) (explaining that "the current statutory language still favors the defendant in a venue dispute by requiring that the events or omissions supporting a claim be ' substantial' " and "is intended to preserve the element of fairness so that a defendant is not haled into a remote district having no real relationship to the dispute"); *Woodke v. Dahm,* 70 F.3d 983, 985 (8th Cir.1995) (explaining that "by referring to ' events and omissions giving rise to the claim,' Congress meant to require courts to focus on relevant activities of the defendant, not of the plaintiff").

**\*17** [13] Thus, when a plaintiff relies on § 1391(b)(2) to defeat a venue challenge, a two-part inquiry is appropriate. First, a court should identify the nature of the claims and the acts or omissions that the plaintiff alleges give rise to those claims. *See Gulf Ins. Co. v. Glasbrenner,* 417 F.3d at 357. Second, the court should determine whether a substantial part of those acts or omissions occurred in the district where suit was filed, that is, whether " significant events or omissions material to [those] claim[s] ... have occurred in the district in question." *See id.* (emphasis removed); *see also Jenkins Brick Co. v. Bremer,* 321 F.3d 1366, 1372 (11th Cir.2003) (asking (1) "What acts or omissions by [defendant] gave rise to [plaintiff's] claim?" and (2) "Of those acts, did a 'substantial part' of them take place in [the chosen venue]?"); *cf. Cottman Transmission Sys. v. Martino,* 36 F.3d at 295-96 (identifying

alleged acts or omissions and then asking whether they are substantial).

[14] [15] "Substantiality" for venue purposes is more a qualitative than a quantitative inquiry, determined by assessing the overall nature of the plaintiff's claims and the nature of the specific events or omissions in the forum, and not by simply adding up the number of contacts. *See Gulf Ins. Co. v. Glasbrenner,* 417 F.3d at 357; *Cottman Transmission Sys. v. Martino,* 36 F.3d at 295-96 (" In assessing whether events or omissions giving rise to the claims are substantial, it is necessary to look at the nature of the dispute."). When material acts or omissions within the forum bear a close nexus to the claims, they are properly deemed "significant" and, thus, substantial, but when a close nexus is lacking, so too is the substantiality necessary to support venue. *See Jenkins Brick Co. v. Bremer,* 321 F.3d at 1372 (explaining that substantiality requirement of § 1391(b)(2) requires consideration only of acts or omissions that "have a close nexus to the wrong").

This principle has informed our venue analysis in other cases, even if we have not articulated the substantiality requirement specifically in terms of the nexus between the acts or omissions in the chosen forum and the nature of plaintiffs' claims. Most recently, we concluded that judgment holders' request and receipt of an order lifting an automatic bankruptcy stay in the district, which permitted the judgment holders to obtain their judgment, together with the submission, approval, or issuance in the district of the insurance policy under which the judgment allegedly must be paid, could constitute a substantial part of the events giving rise to a claim sounding in contract. *See Gulf Ins. Co. v. Glasbrenner,* 417 F.3d at 357-58 (vacating and remanding for venue determination). Similarly, in *Bates v. C & S Adjusters, Inc.,* 980 F.2d at 868, we concluded that plaintiff's receipt of a collection notice in the district was a substantial part of the events giving rise to a claim under the Fair Debt Collection Practices Act because the statute seeks to curb the effect on consumers of abusive debt practices like the collection notices sent to the plaintiff. Also, where two agreements giving rise to a defense were negotiated through a series of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.