--- F.3d ----, 2005 WL 2470530 (C.A.2 (N.Y.)), 2005-2 Trade Cases P 74,958
**(Cite as: --- F.3d ----)**

communications directed to one party in the Southern District of New York, we concluded that a substantial part of the plaintiff's claim to a right to arbitration under those agreements occurred in that district and supported venue there. *See U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.,* 241 F.3d at 153. But when all events supporting a claim for dissolution of a defendant company (including commingling of funds, improper transactions, and failure to maintain corporate records) occurred in Illinois, we concluded that the fact of defendant's incorporation in New York, its servicing of New York hospitals, its collection of money from New York debtors, and its employment of a New York law firm did not support venue in the Southern District of New York because the New York actions did not constitute a substantial part (or, indeed, any part) of the events or omissions giving rise to plaintiff's claims. *See Friedman v. Revenue Mgmt. of N.Y., Inc.,* 38 F.3d 668, 672 (2d Cir.1994).

*18 Other circuits have similarly resolved venue disputes by considering the connection between the acts or omissions in the filing forum and the asserted claims. *See, e.g., Jenkins Brick Co. v. Bremer,* 321 F.3d at 1372-73 (11th Cir.) (rejecting Alabama venue for plaintiff company with headquarters in that state when events giving rise to claim for breach of non-compete agreement all occurred in Southern District of Georgia); *Uffner v. La Reunion Francaise,* 244 F.3d 38, 42-43 (1st Cir.2001) (concluding that District of Puerto Rico was proper venue because loss of vessel in district's waters is substantial part of events giving rise to claim by vessel owner for wrongful denial of insurance claim); *First of Mich. Corp. v. Bramlet,* 141 F.3d at 263-64 (6th Cir.) (concluding that Eastern District of Michigan was proper venue in case involving dispute over investment advice because financial advisor did business and underlying transactions and investments took place there); *Woodke v. Dahm,* 70 F.3d at 985-86 (8th Cir.) (holding venue improper in Northern District of Iowa where plaintiff resided and felt effects of charged trademark violations because neither alleged "passing off" nor any other event having substantial connection to claims occurred there); *Cottman Transmission Sys., Inc. v. Martino,* 36 F.3d at 295-96 (3d Cir.) (holding venue improper in

Eastern District of Pennsylvania when all but one event relevant to contract, trademark, and unfair trade practice claims took place in Michigan).

Applying these principles to this case, we conclude that § 1391(b)(2) does not support venue in the Western District of New York. Plaintiffs allege a series of actions by defendants to support their antitrust claims: in 1988, ABEM closed the practice track to qualify for its certification exam; since that time, ABEM has consistently refused to permit plaintiffs to take the ABEM certification exam; meanwhile, the hospital defendants have refused to hire, promote, or pay top remuneration to doctors not certified by ABEM. Plainly, the vast majority of these acts occurred outside the Western District of New York, indeed, outside the State of New York. ABEM's decision to close the practice-track was made at its headquarters in Michigan. Similarly, ABEM's rejections of plaintiffs' applications to take its certification exam were made in Michigan. To the extent ABEM communicated its decision to plaintiffs by mail sent to their home states, plaintiffs point to only six of the 176 named plaintiffs who received such rejection notices in the Western District of New York. As for the hospitals, whose alleged failure to hire, promote, or pay plaintiffs in a manner comparable to ABEM-certified doctors is the main alleged injury, of the twenty-eight sued in this case, not one is located in the Western District of New York.

Viewed in this context, ABEM's transmittal into the Western District of New York of a half-dozen letters rejecting applications to sit for its certification examination outside New York constitutes only an insignificant and certainly not "a substantial part of the events or omissions giving rise to the [plaintiff's antitrust] claim[s]." We conclude that these coincidental contacts are insufficient to afford venue in the Western District of New York pursuant to § 1391(b)(2).

### c. Section 1391(b)(3)

*19 [16] Plaintiffs contend that venue over their antitrust claims is proper in the Western District of New York pursuant to § 1391(b)(3) because, at the

--- F.3d ----                                                                                      Page 24

--- F.3d ----, 2005 WL 2470530 (C.A.2 (N.Y.)), 2005-2 Trade Cases P 74,958
**(Cite as: --- F.3d ----)**

time this action was filed, individual defendant Henry A. Thiede resided in the Western District of New York and, given the geographic diversity of the other named defendants, there is no other district in which this action could reasonably be brought.

As this court has previously explained in discussing an analogous venue alternative in § 1391(a)(3) (relating to diversity jurisdiction), the phrase "if there is no district in which the action may otherwise be brought" indicates that venue may be based on that subsection only if venue cannot be established in another district pursuant to any other venue provision. *See Doctor's Assocs. v. Stuart,* 85 F.3d 975, 983 (2d Cir.1996) (citing 1A *Moore's Federal Practice* ¶ 0.342[3], at 4083); *see also* Wright, Miller & Cooper, 15 *Federal Practice and Procedure* § 3802.1 (Supp.2005) (describing § 1391(a)(3), like § 1391(b)(3), as a "fallback" provision available only when there is no district in which venue can be laid pursuant to (a)(1) and (a)(2)).

In this case, § 1391(b)(2) does establish another venue for plaintiffs' antitrust claims: the Western District of Michigan. As our discussion of the facts demonstrates, a "substantial part" of the alleged events giving rise to the plaintiffs' antitrust claims occurred in East Lansing, Michigan. It is there that ABEM has its headquarters. It was there that ABEM created and then closed the practice track for its certification examination, the crux of the charged antitrust scheme. It was from there that ABEM rejected plaintiffs' applications to sit for its exam. It was there that CORD purportedly strove to maintain formal residency training as the unwaivable requirement for ABEM certification. Thus, because plaintiffs could have satisfied § 1391(b)(2) in the Western District of Michigan, they cannot rely on § 1391(b)(3) to support venue in the Western District of New York.

In sum, because neither Section 12 of the Clayton Act nor 28 U.S.C. § 1391(b) establishes venue in the Western District of New York to hear this case against ABEM, we can affirm dismissal of this action against ABEM on this alternative ground.

**C.** *The Transfer of this Case to Another District Where Jurisdiction and Venue Are Proper Is Not in the Interest of Justice*

*1. Discretion to Transfer*

The identified defects in personal jurisdiction and venue preclude plaintiffs from pursuing this case in the Western District of New York, despite its long history in that forum. *See Christianson v. Colt Indus. Operating Corp.,* 486 U.S. 800, 818, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988) (noting " age-old rule that a court may not in any case, even in the interest of justice, extend its jurisdiction where none exists," a rule that applies even to parties who "spend years litigating claims only to learn that their efforts and expense were wasted in a court that lacked jurisdiction"). A question remains, however, as to whether we should simply affirm dismissal on these grounds or, in the interest of justice, order transfer of the action to another district where jurisdiction and venue properly obtain. *See* 28 U.S.C. § 1406(a) (permitting court to cure venue defect "in the interest of justice" by transferring case "to any district or division in which it could have been brought"); *see also Goldlawr, Inc. v. Heiman,* 369 U.S. at 465-66, 82 S.Ct. 913 (reversing dismissal of antitrust action because district court was authorized to transfer under § 1406(a) even though it lacked personal jurisdiction over defendants); *Corke v. Sameiet M.S. Song of Norway,* 572 F.2d 77, 79 (2d Cir.1978) (concluding that § 1406(a) permits courts to transfer in interest of justice whenever either personal jurisdiction or venue are improper); *SongByrd, Inc. v. Estate of Grossman,* 206 F.3d 172, 179 n. 9 (2d Cir.2000) (citing *Corke* and recognizing propriety of § 1406 transfer to cure lack of personal jurisdiction even when venue proper).

**\*20** [17] Courts enjoy considerable discretion in deciding whether to transfer a case in the interest of justice. *See Phillips v. Seiter,* 173 F.3d 609, 610 (7th Cir.1999). A "compelling reason" for transfer is generally acknowledged when a plaintiff's case, if dismissed, would be time-barred on refiling in the proper forum. *Id.; accord Corke v. Sameiet M.S. Song of Norway,* 572 F.2d at 80 (noting an "

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                           Page 25

--- F.3d ----, 2005 WL 2470530 (C.A.2 (N.Y.)), 2005-2 Trade Cases P 74,958
**(Cite as: --- F.3d ----)**

important purpose" of § 1406(a) transfer is to alleviate burden of statutes of limitations operating as "procedural obstacles" to merits consideration).

[18] [19] In this case, it is possible that the four-year statute of limitations applicable to antitrust actions, *see* 15 U.S.C. § 15b, might preclude plaintiffs from refiling the exact same antitrust complaint in the Western District of Michigan, unless, of course, plaintiffs could demonstrate a continuing wrong. *See Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 338, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971) ("In the context of a continuing conspiracy to violate the antitrust laws ... each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and that, as to those damages, the statute of limitations runs from the commission of the act." (citations omitted)); *accord Higgins v. New York Stock Exch., Inc.,* 942 F.2d 829, 832 (2d Cir.1991). Even in such circumstances, however, courts will not "waste judicial resources by transferring a case that is clearly doomed." *Phillips v. Seiter,* 173 F.3d at 610. As Judge Posner observed in *Phillips,* a court's limited jurisdiction "to decide whether to transfer or dismiss" a case over which it lacks jurisdiction thus includes "a power of limited review of the merits." *Id.* at 611. If "a peek at the merits," *id.* at 620, " reveals that the case is a sure loser in the court that has jurisdiction (in the conventional sense) over it, then the court in which it is initially filed-the court that does not have jurisdiction-should dismiss the case rather than waste the time of another court," *id.* at 611. Following these principles, this court recently affirmed dismissal of a Tucker Act claim, refusing to order § 1631 transfer to the Court of Claims because the record failed to establish the " entitlement" necessary to support the plaintiff's due process claim. *Adeleke v. United States,* 355 F.3d 144, 152 (2d Cir.2004); *see also Aura Lamp & Lighting v. International Trading Corp.,* 325 F.3d 903, 909-10 (7th Cir.2003) (ordering dismissal rather than transfer of appeal that was plainly lacking in merit); *Haugh v. Booker,* 210 F.3d 1147, 1150 (10th Cir.2000) (affirming dismissal without requiring transfer of habeas challenge that was without merit).

So in this case, in which the issue of antitrust standing was fully litigated in the district court and has been the focus of briefing and argument on appeal, we agree with the district court that plaintiffs lack antitrust standing to pursue their claim and conclude that transfer to another district is not in the interest of justice. Accordingly, the judgment of dismissal should be affirmed.

### 2. *The Requirement of Antitrust Standing*

#### a. *The Factors Relevant to Standing*

**\*21** [20] It is a well-established principle that, while the United States is authorized to sue anyone violating the federal antitrust laws, a private plaintiff must demonstrate "standing." *See Cargill, Inc. v. Monfort of Colo.,* 479 U.S. 104, 110 & nn. 5-6, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986); *see also Crimpers Promotions, Inc. v. Home Box Office, Inc.,* 724 F.2d 290, 292-93 (2d Cir.1983) (Friendly, J.) (explaining requirements of antitrust standing). This standing requirement originates in the Supreme Court's recognition that, although Section 4 of the Clayton Act appears to confer a broad private right of action for antitrust damages, FN19 "Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation." *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 534, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). Just as in common-law tort and contract litigation, concepts such as "foreseeability and proximate cause, directness of injury, certainty of damages, and privity of contract" circumscribe a party's right to recovery, so in antitrust actions "the plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them," can limit the right to sue. *Id.* at 532-33, 535-36, 103 S.Ct. 897 (noting "similarity between the struggle of common-law judges to articulate a precise definition of the concept of 'proximate cause,' and the struggle of federal judges to articulate a precise test to determine whether a party injured by an antitrust violation may recover treble damages" (footnotes omitted)). The same logic applies to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                     Page 26

--- F.3d ----, 2005 WL 2470530 (C.A.2 (N.Y.)), 2005-2 Trade Cases P 74,958
**(Cite as: --- F.3d ----)**

claims for injunctive relief under Section 16 of the Clayton Act. FN20 *See Cargill, Inc. v. Monfort of Colo., Inc.,* 479 U.S. at 110-13, 107 S.Ct. 484 (applying antitrust standing requirement to claims for injunctive relief).

Because the theory of antitrust standing is not codified but was developed by courts over time in response to myriad concerns presented in particular cases, it cannot easily be reduced to a "black-letter rule that will dictate the result in every case." *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. at 536, 103 S.Ct. 897. Nevertheless, certain basic principles can be identified. For example, the fact that the plaintiffs charge the defendants, at least in part, with a *per se* violation of the antitrust laws does not absolve them of the obligation to demonstrate standing. *See Atlantic Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 344, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990). Further, it is useful to distinguish the question of whether an antitrust violation occurred from whether plaintiffs have standing to pursue it. To avoid confusing these issues, some courts and commentators have suggested assuming the existence of a violation in addressing the issue of standing. *See SAS of Puerto Rico v. Puerto Rico Tel. Co.,* 48 F.3d 39, 43, 46 (1st Cir.1995); *see also* 2 Phillip E. Areeda, Herbert Hovenkamp, & Roger D. Blair, *Antitrust Law* ¶ 335f, at 299 & n.63 (2d ed.2000) (collecting cases). Thus, while the issue of an antitrust violation in this case is by no means clear, for purposes of this appeal we assume the alleged violation and assess only plaintiffs' standing to pursue their claim.

**\*22** [21] Finally, we identify four factors that are generally deemed relevant to determining antitrust standing: an injury in fact (1) to plaintiffs' "business or property," *see* 15 U.S.C. § 15; (2) that is not remote from or duplicative of that sustained by a more directly injured party, *see Associated Gen. Contractors of California v. California State Council of Carpenters,* 459 U.S. at 540-42, 103 S.Ct. 897; (3) that qualifies as an "antitrust injury," *see Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977); and (4) that translates into reasonably quantifiable damages, *see Associated Gen.*

*Contractors of California v. California State Council of Carpenters,* 459 U.S. at 545, 103 S.Ct. 897. *See also* 2 Areeda, Hovenkamp & Blair, *Antitrust Law* ¶ 335a, at 286 (identifying four factors and noting that antitrust standing "requires more than the constitutional minimum [of a] 'case or controversy' "). Material factual disputes exist between the parties as to the first and fourth factors. Thus, like the district court, we do not assume at this stage that these factors would necessarily be resolved against the plaintiffs. We focus instead on the remaining two factors: whether the plaintiffs have adequately demonstrated that the alleged injury to their business or property is one that the antitrust laws were intended to prevent and whether they qualify as efficient enforcers of the antitrust claims at issue.

### b. *The Antitrust Injury*

[22] [23] The fact that private plaintiffs have been injured by acts that violate the antitrust laws is not enough to confer standing to sue. Whether the relief they seek is legal or equitable, plaintiffs must demonstrate that they themselves have sustained an "*antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. at 489, 97 S.Ct. 690 (emphasis in original); *see also Cargill, Inc. v. Monfort of Colo., Inc.,* 479 U.S. at 110-13, 107 S.Ct. 484. In this regard, it has long and frequently been observed that "the antitrust laws ... were enacted 'for the protection of *competition,* not *competitors.*' " *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. at 488, 97 S.Ct. 690 (quoting *Brown Shoe v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962) (emphasis in original)); *accord Cargill, Inc. v. Monfort of Colo., Inc.,* 479 U.S. at 110, 107 S.Ct. 484; *George Haug Co. v. Rolls Royce Motor Cars Inc.,* 148 F.3d 136, 139 (2d Cir.1998); *see also Geneva Pharms. Tech. Corp. v. Barr Labs., Inc.,* 386 F.3d 485, 511 (2d Cir.2004) (noting that "focus of [Clayton Act] § 7, like the Sherman Act, is on competition not competitors").

To      evaluate      whether      plaintiffs-would-be

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----, 2005 WL 2470530 (C.A.2 (N.Y.)), 2005-2 Trade Cases P 74,958
**(Cite as: --- F.3d ----)**

competitors in a market that they define as ABEM-certified and -eligible doctors-demonstrate "antitrust injury" as a result of the defendants' actions, it is first necessary carefully to consider the nature of plaintiffs' claim. They assert that ABEM, by insisting upon completion of a formal residency program in emergency medicine as a precondition to taking its certification test, except for the few practicing physicians allowed post-1988 to take the exam without emergency medicine residency training, artificially restricts the supply of ABEM-certified doctors. As a result, the remuneration presently received by ABEM-certified doctors is inflated, and these higher costs are then "passed on to consumers of and the persons and entities who pay for such services." Second Am. Compl. ¶ 96. In detailing their own financial injury from this scheme, plaintiffs allege that they "have been and continue to receive substantially less remuneration than ABEM certified emergency physicians" and that they are unable to "compete for the higher salaries paid to ABEM eligible and ABEM certified emergency physicians." *Id.* ¶ 104. Indeed, plaintiffs specifically plead their remuneration injury by reference to the difference between their own earnings and those of ABEM-certified doctors: "an average amount of no less than $50,000 annually." *Id.* In short, their theory of injury is not simply that ABEM-certified doctors command super-competitive remuneration; their injury is the inability to do likewise.

**\*23** As the Seventh Circuit observed in *Sanjuan v. American Board of Psychiatry and Neurology, Inc.,* such a theory does not state "an antitrust injury." 40 F.3d 247, 251-52 (7th Cir.1995). The *Sanjuan* plaintiffs were also doctors denied board certification in their field of medical specialty, in that case because they failed to pass the defendant's certification examination. Plaintiffs complained that, because English was not their native language, they were at an unfair disadvantage in taking the oral part of the examination compared to doctors born in the United States. As a result of not receiving board certification, the plaintiffs claimed that they earned less than their board-certified colleagues.

Judge Easterbrook, writing for the *Sanjuan* panel,

rejected this theory of injury: "The claim that a practice reduces (particular) producers' incomes has nothing to do with the antitrust laws, which are designed to drive producers' prices down rather than up." *Id.* at 251. He tartly concluded: "Plaintiffs, who want to obtain a credential that will help them charge higher prices, have pleaded themselves out of court on the antitrust claim." *Id.* at 252.

Plaintiffs before this court submit that *Sanjuan* is distinguishable because the complaining doctors in that case were permitted to sit for their specialty certification exam, while they are not. They argue that the *Sanjuan* doctors were not "excluded from competition"; they "failed in competition." Appellants' Br. at 32. That argument, however, goes to whether the *Sanjuan* plaintiffs stated an antitrust violation, not whether they had antitrust standing to pursue such a claim. The Seventh Circuit appears to have concluded that, even if the defendant's challenged examination practice violated the antitrust laws, dismissal was required because the injury alleged by plaintiffs-their inability to earn higher pay-was not "an antitrust injury."

This is not to suggest that a would-be competitor can never demonstrate standing to challenge an exclusionary scheme that precludes him from entering a market simply because he sues to recover the profits that he otherwise would have earned. Indeed, both the Supreme Court and this court have concluded to the contrary. *See generally Atlantic Richfield Co. v. USA Petroleum Co.,* 495 U.S. at 345-46, 110 S.Ct. 1884 (recognizing that, depending on the nature of the injury alleged, competitors may suffer antitrust injury); *Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council,* 857 F.2d 55, 67 (2d Cir.1988) (concluding putative cartel member has antitrust standing). To the extent the district court's opinion has been read to suggest that competitors seeking higher compensation do not state an antitrust injury, *see* Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 335, at 108 (2004 Supp.) (noting decision and expressing doubt that competitor claiming inability to obtain "higher compensation" as antitrust injury would be an unsuitable plaintiff to challenge a boycott), we think that characterization inapt. As the magistrate and district judges who long labored with this case

--- F.3d ----                                                                    Page 28

--- F.3d ----, 2005 WL 2470530 (C.A.2 (N.Y.)), 2005-2 Trade Cases P 74,958
**(Cite as: --- F.3d ----)**

recognized, the theory of antitrust injury pleaded by plaintiffs in their Second Amended Complaint was not that they were denied the competitive remuneration that the market would have awarded but for domination by the defendants' cartel. Instead, through years of litigation, plaintiffs' singular complaint was that they were denied the opportunity to command the same *super* -competitive pay earned by their ABEM-certified colleagues. *See Daniel v. American Bd. of Emergency Med.*, 269 F.Supp.2d at 176-77. In a Memorandum of Law filed to support class certification, plaintiffs described the common injury to the class as follows: defendants' "conspiracy has prevented all Plaintiffs from obtaining *the higher salaries that ABEM and ABEM eligible emergency physicians command." Id.* at 176 (quoting Pls.' Mem. at 26 (Doc. 70) (emphasis added)) (quotation marks omitted). Similarly, at his deposition, lead plaintiff Dr. Daniel stated that he sought ABEM certification in order to "command a higher hourly rate" that would afford him economic "*parity* " with other ABEM-certified physicians. *Id.* (quoting Daniel Dep. at 135-36 (emphasis added)).

*24 The conclusion that plaintiffs do not state an antitrust injury is reinforced by the narrow scope of their injunctive prayer, by which they seek only to join rather than end the exclusive ABEM arrangement in order to acquire a share of the super-competitive profits. Assuming *arguendo* that the defendants' control over the supply of ABEM-certified doctors does injure competition by restricting supply, FN21 plaintiffs cannot themselves state an antitrust injury when their purpose is to join the cartel rather than disband it. *See* 2 Areeda, Hovenkamp, & Blair, *Antitrust Law* ¶ 348e, at 401 ("[T]here is no antitrust right to join a cartel."). As this court noted in *Volvo North America Corp. v. Men's International Professional Tennis Council,* a cartel member-or would-be member-who seeks to remove a restraint "that merely prevents a cartel member from acquiring a greater share of the fruits of the cartel" does not suffer antitrust injury. 857 F.2d at 67. If, however, a cartel-member plaintiff seeks to remove the restraint so he may be "free to compete-such that the member's interest coincides with the public interest in vigorous competition-" he satisfies the antitrust

injury requirement. *Id.* at 67-70 (concluding that putative cartel-member plaintiff suffered antitrust injury because plaintiff's "interest may diverge from the interests of the cartel as a whole" where plaintiff challenged and sought to end five cartel practices). That is not this case. Plaintiffs do not, after all, sue to eliminate the eligibility criteria for ABEM certification that they claim allows defendants to limit market supply. Certainly, they do not seek an injunction allowing any licensed doctor to take the ABEM exam so that all who pass can receive board certification in emergency medicine. Plaintiffs do not even seek to eliminate the residency training requirement. They sue only to restore-temporarily-the practice track as an alternative to residency training so that *they* can qualify for the ABEM exam, after which they are satisfied to have the certification door shut on any other test applicants. FN22 In sum, by seeking relief that would permit them to join but not end the alleged exclusive arrangement, plaintiffs make plain that they are not complaining of an antitrust injury.

*Todorov v. DCH Healthcare Authority,* 921 F.2d 1438 (11th Cir.1991), a case relied on by the district court, supports this conclusion. In *Todorov,* the plaintiff doctor sought hospital privileges in order to join the charged anticompetitive scheme and thereby secure a share of the allegedly anticompetitive benefits. *Id.* at 1453-55. But a plaintiff who "seeks to join the exclusive arrangement" of which he complains "while leaving the exclusivity requirement otherwise intact" is simply "not a victim of antitrust injury." 2 Areeda, Hovenkamp, & Blair, *Antitrust Law* ¶ 348e, at 401. Thus, the private action in *Todorov* was dismissed for lack of standing. *Todorov v. DCH Healthcare Auth.,* 921 F.2d at 1455.

*25 To the extent that we would consider transferring this case to the Western District of Michigan, we have no reason to think that the Sixth Circuit takes a different view of antitrust standing. In *Potters Medical Center v. City Hospital Association,* 800 F.2d 568 (6th Cir.1986), that court allowed a plaintiff hospital to sue a rival hospital to force it to end its anticompetitive practice of denying hospital privileges to physicians who also had privileges with plaintiff. This conclusion is

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                              Page 29

--- F.3d ----, 2005 WL 2470530 (C.A.2 (N.Y.)), 2005-2 Trade Cases P 74,958
**(Cite as: --- F.3d ----)**

consistent with the principle that, when a plaintiff thus "seeks to forbid exclusivity-first on its own behalf and implicitly on behalf of others," the plaintiff does state an antitrust injury because it seeks "to destroy an anticompetitive arrangement." 2 Areeda, Hovenkamp & Blair, *Antitrust Law* ¶ 348e, at 401. FN23 As already noted, in this case, plaintiffs do not sue to destroy, but rather to join, defendants' alleged exclusive arrangement for supplying the market with ABEM-certified doctors so that plaintiffs can command a share of the super-competitive remuneration that the cartel scheme makes available to ABEM-certified doctors.

Essentially conceding the merits of the magistrate judge's conclusion that a suit to achieve this goal would not state an antitrust injury, the plaintiffs argued in their objections to the report and recommendation that they should be allowed to amend their complaint for a third time, to limit their prayer for damages to the difference between their actual earnings and the amount they would have earned in a competitive market absent the conspiracy. *See generally* Fed.R.Civ.P. 15(a). They did not, however, alter the injunctive relief sought. We cannot conclude that the district court abused its discretion in denying leave to amend. *See Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. at 330, 91 S.Ct. 795; *see generally Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP,* 322 F.3d 147, 168 (2d Cir.2003) (concluding district court did not abuse discretion in denying leave to amend "because there was 'a repeated failure to cure deficiencies by amendments previously allowed' " (citation omitted)). Assuming such an amended claim would state an antitrust injury, as the district court noted, the proposed amendment represented a third change in pleadings over thirteen years of litigation. This raised legitimate concerns as to both undue delay and prejudice because plaintiffs proposed "to change their entire theory of the case" in a way that was unsupported by any expert economic analysis. *Daniel v. American Bd. of Emergency Med.,* 269 F.Supp.2d at 164; *see Barrows v. Forest Labs., Inc.,* 742 F.2d 54, 58-59 (2d Cir.1984) (upholding district court's denial of leave to amend complaint to effect "a radical shift" in theory of recovery); *cf. Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9

L.Ed.2d 222 (1962) (recognizing delay and prejudice as grounds for denying leave to amend).

On appeal, plaintiffs submit that the amendment represented only a clarification, not a departure, from their prior theory of antitrust injury. They further submit that the theory is supported by basic economic principles of supply and demand, requiring no expert evidence that their entry into the market would lower prices for consumers. The first argument is belied by the record, which, as we have already discussed, demonstrates that plaintiffs' core complaint was their inability to command the same super-competitive compensation available to ABEM-certified doctors. Indeed, even after plaintiffs proposed to amend their prayer for damages, they offered no modification to their equitable demand. To the extent, then, that plaintiffs continued to seek an injunction requiring a temporary reinstatement of the practice track to allow *them* to enter the alleged cartel, while otherwise preserving its exclusive certification arrangement (and super-competitive remuneration opportunities), there was still reason to question whether they were seeking relief for an antitrust injury even after amendment. As for plaintiffs' second argument, we note simply that the pro-competitive effect for *consumers* of having plaintiffs provide emergency health care at higher rates as ABEM-certified doctors than they had as non-certified practitioners is by no means obvious. FN24 Plaintiffs' economic expert conceded that he had performed *no* analysis of the consumer effect of defendants' purportedly anticompetitive conduct. Plaintiffs attempt to excuse this omission by arguing that the issue had not been the focus of discovery up to that point. Their argument is unconvincing. The fact that plaintiffs had not yet been called upon to provide defendants with that economic analysis in discovery does not explain why, after a decade of litigation, their own expert had not been asked to consider this critical issue. Under these circumstances, we cannot conclude that, the district court abused its discretion in refusing to allow plaintiffs, after more than a decade of litigation, to substitute an untested theory of antitrust injury for one that was deficient as a matter of law.

**\*26** Because plaintiffs fail to demonstrate the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                    Page 30

--- F.3d ----, 2005 WL 2470530 (C.A.2 (N.Y.)), 2005-2 Trade Cases P 74,958
**(Cite as: --- F.3d ----)**

antitrust injury necessary to support standing, there is no point in transferring this case to another district.

### c. *Efficient Enforcers*

[24] [25] [26] [27] Even if we were to conclude that the plaintiffs had adequately stated an antitrust injury, that would not necessarily establish their standing to sue in this case. "A showing of antitrust injury is necessary, but not always sufficient," to establish standing. *Cargill, Inc. v. Monfort of Colo., Inc.,* 479 U.S. at 110 n. 5, 107 S.Ct. 484; *accord G.K.A. Beverage Corp. v. Honickman,* 55 F.3d 762, 766 (2d Cir.1995). "[O]ther reasons" may sometimes indicate that a party who states an antitrust injury is nevertheless not a proper antitrust plaintiff. *Associated Gen. Contractors of California v. California State Council of Carpenters,* 459 U.S. at 540-45, 103 S.Ct. 897; *Cargill, Inc. v. Monfort of Colo., Inc.,* 479 U.S. at 110 n. 5, 107 S.Ct. 484. These other reasons may "prevent the plaintiff from being an efficient enforcer of the antitrust laws." *Balaklaw v. Lovell,* 14 F.3d 793, 798 n. 9 (2d Cir.1994) (citing *Todorov v. DCH Healthcare Auth.,* 921 F.2d at 1449). Among the "other" factors generally considered relevant to standing are (1) "the directness or indirectness of the asserted injury"; (2) "the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement"; (3) the speculativeness of the alleged injury; and (4) the difficulty of identifying damages and apportioning them among direct and indirect victims so as to avoid duplicative recoveries.

*Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council,* 857 F.2d at 66 (quoting *Associated Gen. Contractors of California v. California State Council of Carpenters,* 459 U.S. at 540-45, 103 S.Ct. 897). The extent to which these factors apply when plaintiffs sue for injunctive relief depends on the circumstances of the case. *See Cargill, Inc. v. Monfort of Colo., Inc.,* 479 U.S. at 111 n. 6, 107 S.Ct. 484 (noting with respect to duplicative recoveries that "one injunction is as effective as 100, " and "100 injunctions are no more effective than

one" (quotation marks and citation omitted)); *see also Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council,* 857 F.2d at 66 ("Some, but not all, of these secondary factors may also limit a plaintiff's right to injunctive relief under § 16 [of the Clayton Act].")). Similarly, the weight to be given the various factors will necessarily vary with the circumstances of particular cases. *See generally Sullivan v. Tagliabue,* 25 F.3d 43, 46 (1st Cir.1994) (noting that the Supreme Court has provided "little guidance as to how to weigh the various factors" relevant to antitrust standing).

In this case, where plaintiffs sue for both money damages and injunctive relief, one factor raises particular standing concerns: the presence of other efficient antitrust enforcers "whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement." *Associated Gen. Contractors of California v. California State Council of Carpenters,* 459 U.S. at 542, 103 S.Ct. 897. In considering this factor, we recognize, as the district court observed, that plaintiffs "have no natural economic self-interest" in reducing the cost of emergency medical care to consumers. *Daniel v. American Bd. of Emergency Med.,* 269 F.Supp.2d at 182. This same concern may frequently arise when competitors sue to vindicate the antitrust laws, without automatically depriving such plaintiffs of antitrust standing. But in this case, the concern is not theoretical. There is a long litigation history in which the relief pursued by plaintiffs has been to gain entry into an exclusive arrangement that they otherwise seek to maintain in order to share in the super-competitive remuneration allegedly made possible by ABEM exclusivity.

**\*27** While it is questionable whether plaintiffs' damages demand and their particular prayer for injunctive relief would genuinely promote the public interest in antitrust enforcement, no such concern would arise if defendants' actions were challenged by another group of plaintiffs: the health care insurers, including employers and government agencies, who compensate hospitals for most emergency medical care. It would be unrealistic to expect emergency care patients, who can hardly make a deliberate selection of an emergency physician, let alone inquire into the doctor's board

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                  Page 31

--- F.3d ----, 2005 WL 2470530 (C.A.2 (N.Y.)), 2005-2 Trade Cases P 74,958
**(Cite as: --- F.3d ----)**

certification, to pursue an antitrust action to challenge an artificially inflated compensation rate. As for the hospitals, we recognize that they play a dual role in the alleged scheme. As consumers who purportedly overpaid for emergency medical care, they might be seen as victims of the alleged anticompetitive conduct and potential plaintiffs. On the other hand, as suppliers of residency training in emergency medicine, the hospitals have an alleged interest in limiting ABEM certification to doctors with such training. But private and government health care insurers that routinely reimburse hospitals for millions of dollars in emergency care provided to thousands of covered patients have a direct and undivided economic interest in obtaining lower costs, as well as the legal sophistication and resources necessary to pursue an antitrust challenge. The fact that none has done so to date does not support recognizing plaintiffs' standing. Rather, it reinforces the conclusion that no public interest is sacrificed by dismissing this action for lack of personal jurisdiction and venue without transfer to another district. *See Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. at 542, 103 S.Ct. 897.

### III. *Conclusion*

To summarize, we conclude that the district court could not acquire personal jurisdiction over CORD or the hospital defendants through the service of process provision of Section 12 of the Clayton Act unless venue was established pursuant to that section. Because Section 12 venue did not obtain in this case, the action against CORD and the hospital defendants is properly dismissed for lack of personal jurisdiction. We further conclude that the action against ABEM is properly dismissed for lack of venue because neither Section 12 of the Clayton Act nor 28 U.S.C. § 1391 permits this case to be heard in the Western District of New York. Finally, we conclude that transfer of this case to any other district where jurisdiction and venue might properly be obtained is not in the interest of justice because plaintiffs lack antitrust standing to pursue this case further.

The June 30, 2003 judgment of the district court

dismissing all claims is AFFIRMED.

KATZMANN, Circuit Judge, concurring in part and dissenting in part:
I concur in the majority's well-reasoned determinations that personal jurisdiction in the Western District of New York does not exist over CORD and the Hospital Defendants, and that venue in the Western District is not supported for ABEM. I respectfully dissent, however, from the conclusion that transfer to another district is not in the interest of justice because the plaintiffs lack antitrust standing.

**\*28** I respectfully disagree with the two conclusions underlying the majority's view that the plaintiffs here cannot demonstrate standing: 1) that they have not demonstrated antitrust injury, and 2) that even if they could show antitrust injury, they do not have an adequate self-interest in securing relief to vindicate the public interest in antitrust enforcement.

### *Antitrust Injury*

I believe the antitrust injury inquiry is in fact a simple one. The antitrust injury requirement " ensure[s] that 'a plaintiff can recover only if the loss stems from a competition-reducing aspect or effect of the defendant's behavior.' " *Primetime 24 Joint Venture v. NBC,* 219 F.3d 92, 103 (2d Cir.2000) (quoting *Atlantic Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 334, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990)). Here the allegations in the Second Amended Complaint meet this burden. They state that because the defendants closed the practice track and continue to forbid practice-track physicians from taking the certification exam, the plaintiffs are being "unreasonably restrained from competing in the market" for ABEM-certified emergency physicians, and that as a consequence, the plaintiffs "have been and continue to receive substantially less remuneration than ABEM certified emergency physicians." ¶ 104. These allegations suffice, in my view, to allege losses stemming from a competition-reducing aspect or effect of the defendant's behavior.

Indeed, this case is not unlike other antitrust cases

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

in which courts have held that health care providers alleging harm from anti-competitive practices have demonstrated antitrust standing. In *Brader v. Allegheny General Hospital,* 64 F.3d 869 (3d Cir.1995), a physician claimed that a conspiracy had resulted in the termination of his hospital privileges, and that the loss of these privileges prevented him from obtaining privileges at other hospitals. *Id.* at 871-72. He alleged that this constituted a Sherman Act violation, *id.,* stating that the defendants' actions "prevented the Plaintiff and others from engaging in the practice of general vascular trauma surgery in the relevant market," which "prevented competition in the relevant product market within the relevant geographic market." *Id.* at 875-76. The court concluded that these allegations-which are similar in all important respects to the plaintiffs' allegation here-sufficed to demonstrate antitrust injury. *Id.* at 876-77. *See also Angelico v. Lehigh Valley Hosp., Inc.,* 184 F.3d 268, 272-73 (3rd Cir.1999) (holding that a surgeon-plaintiff who had sued three hospitals for effectively excluding him from staff privileges had shown antitrust injury and antitrust standing).

The majority, however, concludes that the plaintiffs cannot possibly demonstrate antitrust injury because the plaintiffs' "theory of remuneration is not simply that ABEM-certified doctors command super-competitive remuneration; their injury is the inability to do likewise." Majority Op. at ----. To support the assertion that the plaintiffs seek to earn " super-competitive" wages, the majority makes several assertions about the relief the plaintiffs seek. In my view, these assertions are problematic.

**\*29** First, the majority contends that the plaintiffs' theory "was not that they were denied the competitive remuneration that the market would have awarded but for domination by the defendants' cartel." Majority Op. at ---- - ----. I believe, however, that this statement is belied by the Second Amended Complaint, which states that the plaintiffs have been deprived of the opportunity to "*compete for the higher salaries paid to ABEM eligible and ABEM certified emergency physicians.*" ¶ 104 (emphasis added). Because the complaint specifies that the plaintiffs, if they obtain the remedy they seek, will compete with existing ABEM-eligible

and ABEM-certified emergency physicians, the complaint makes clear that the plaintiffs do in fact seek the compensation that the market would have awarded them but for domination by the defendants' cartel. True, these salaries will be higher than the plaintiffs' current salaries. However, the plaintiffs' demands are consistent with consumer benefit, in that increased supply could result in lower salaries for ABEM-certified physicians in general, and lower prices for consumers of their services. In the end, if the practice-track exclusion is anti-competitive in violation of the Sherman Act, and plaintiffs are awarded the relief they seek, consumers will have more choices as they seek the highest quality ABEM-certified service at the lowest price-exactly the sort of outcome the Sherman Act is designed to foster. *See Northern Pac. Ry. Co. v. United States,* 356 U.S. 1, 4, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958) (stating that the Sherman Act rests on the premise that competition " will yield the best allocation of our economic resources, the lowest prices, the highest quality and the greatest material progress" and adding that "the policy unequivocally laid down by the Act is competition").

Second, the majority states that the "[p]laintiffs do not ... sue to eliminate the eligibility criteria for ABEM certification that they claim allows defendants to limit market supply." Majority Op. at ----. However, the Second Amended Complaint seeks to have ABEM "permit plaintiffs and the class they represent who, as of the date of judgment herein, or with the passage of time, meet ABEM's practice track criteria ... to take the ABEM certification examination." In my view, this would constitute the elimination of the eligibility criteria that the plaintiffs claim allows the defendants to limit market supply illegally.

Third, the majority states that the plaintiffs "do not seek an injunction allowing any licensed doctor to take the ABEM exam so that all who pass can receive board certification in emergency medicine." Majority Op. at ----. This is true. However, this only means that the plaintiffs will earn " super-competitive" remuneration if one assumes that *all* restrictions on who may take the certification exam are illegally anti-competitive.

--- F.3d ----                                                                                           Page 33

--- F.3d ----, 2005 WL 2470530 (C.A.2 (N.Y.)), 2005-2 Trade Cases P 74,958
**(Cite as: --- F.3d ----)**

The plaintiffs do not allege the illegality of restrictions other than the restriction on practice-track physicians. Whether excluding physicians who are neither residency-track nor practice-track physicians is lawful might be the subject of some other litigation brought by some other set of excluded plaintiffs. At this stage of this litigation, however, without further discovery, I believe we must accept not only the plaintiffs' allegations that excluding practice-track physicians is illegally anti-competitive, but also the view-implicit in the complaint-that excluding all physicians other than residency-track physicians and practice-track physicians is reasonable and not illegal. FN25

**\*30** Fourth, the majority states that the plaintiffs seek to restore practice-track eligibility only " temporarily." Majority Op. at ----. However, the Second Amended Complaint seeks to have the certification exam open to all class members "who, as of the date of judgment herein, or *with the passage of time,* meet ABEM's practice track criteria." (emphasis added). I believe the complaint thus seeks relief that is by no means temporary. A footnote in the majority opinion suggests that at oral argument plaintiffs' counsel admitted that the sought-after remedy is less than permanent. Majority Op. at ---- n. 22. In the relevant portion of the oral argument, counsel was asked whether, because "demand is exceeding supply" in the market for emergency medicine services, the total cost of such services would stay the same, even if relief were granted. **Oral Arg. Recording at 10:55:53.** Counsel responded, in part, that even if demand is currently "exceeding supply," that might change if a court granted the relief the plaintiffs seek, so that supply would increase to fulfill demand, and "have market forces take over entirely. " *Id.* **at 10:56:10.** Later, in response to a follow-up question, counsel stated that once practice-track physicians are permitted to take the certification exam, and supply has increased, "the violation presumably will have ceased." *Id.* **at 10:56:43.** I view these responses as simply assuming hypothetically that market forces have taken over and violations have ceased *because* the plaintiffs have obtained the ongoing relief they seek. Neither response indicates a concession "that, at some

future point, ... it would be appropriate to close the practice track."

For these reasons, I do not believe that the plaintiffs seek to earn "super-competitive" wages, or any other relief that is inconsistent with their allegations that 1) prohibiting practice-track physicians from taking the certification exam is illegally anti-competitive and 2) the plaintiffs have suffered antitrust injury as a consequence.

Of course, it may be that the plaintiffs are not entitled to relief on the merits. Perhaps the exclusion of practice-track physicians is entirely reasonable because, in fact, its pro-competitive benefits outweigh its anti-competitive effects. For example, perhaps physicians who would qualify for the exam only through practice experience are fundamentally less skilled than those who have completed an approved residency program. These issues, however, are classic "rule of reason" questions, distinct from the antitrust standing question. FN26 *See Geneva Pharms. Tech. Corp. v. Barr Labs., Inc.,* 386 F.3d 485, 506-07 (2d Cir.2004) (summarizing rule of reason analysis); *Angelico,* 184 F.3d at 272-76 (holding that a surgeon-plaintiff who had sued three hospitals for effectively excluding him from staff privileges had antitrust standing, and distinguishing between antitrust standing and anti-competitive market effect under the rule of reason analysis); *Fine v. Barry & Enright Prods.,* 731 F.2d 1394, 1397-99 (9th Cir.1984) (holding that a plaintiff who was not permitted to be a contestant on a game show because of restrictions on repeat appearances had standing to sue but did not demonstrate sufficient injury to the contestant market under a rule of reason analysis).

**\*31** The majority relies principally on *Sanjuan v. American Board of Psychiatry and Neurology, Inc.,* 40 F.3d 247 (7th Cir.1995). I believe *Sanjuan* is fundamentally different from the case before us. In that case, the physician-plaintiffs had failed an oral examination of the American Board of Psychiatry and Neurology. *See id.* at 248. The plaintiffs had neglected to show that their exclusion harmed consumers, instead demonstrating only that it harmed the plaintiffs. *See id.* at 251 (observing that "

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----, 2005 WL 2470530 (C.A.2 (N.Y.)), 2005-2 Trade Cases P 74,958
**(Cite as: --- F.3d ----)**

[i]t is hard to see how the Board's activities could amount to an exercise of market power, which entails cutting back output in the market and thus driving up prices to consumers," and adding that " [w]hen challenged, plaintiffs revealed that they want to show injury to producers"). *Sanjuan* is thus a classic case of alleging harm to competitors, not competition, which, as the majority rightly points out, does not suffice for Sherman Act protection. *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 488, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977) ("The antitrust laws, however, were enacted for 'the protection of competition, not competitors.' ") (quoting *Brown Shoe Co. v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962) ). Here, by contrast, the plaintiffs have alleged that the defendants have "severely limit[ed] the output of ABEM certified and ABEM eligible emergency physicians" and that "higher costs of ABEM emergency physicians have been passed on to consumers of ... such services." Second Amended Complaint at ¶¶ 94, 96. Because they have alleged that relevant conduct does in fact harm consumers and not just themselves, I believe the plaintiffs in our case have alleged "injury of the type the antitrust laws were intended to prevent." *Brunswick Corp.,* 429 U.S. at 489, 97 S.Ct. 690.

The majority also cites to *Todorov v. DCH Healthcare Authority,* 921 F.2d 1438 (11th Cir.1991). I believe this case is also inapposite. In *Todorov,* an appeal from a summary judgment grant, the Eleventh Circuit concluded that if a local hospital granted the plaintiff-physician privileges to administer CT scans, that physician-a neurologist who did not specialize in CT scans-would " administer and interpret CT scans of the head less efficiently than the radiologists," who would " reduce the price of CT scans of the head until [the plaintiff] could no longer participate in the market at a profit." *Id.* at 1453. The plaintiff "eventually would either be driven from the market or reach some agreement with the radiologists to fix prices," an outcome that "would not benefit consumers," and the Seventh Circuit thus affirmed the grant of summary judgment to the defendants for lack of antitrust standing. *Id.* at 1453-55. Here, we consider the antitrust injury question on a motion to dismiss, when only limited discovery has been conducted. In

this posture, there is no basis to conclude that 1) if practice-track physicians were permitted to sit for the certification exam, those who passed would provide emergency medicine services less efficiently than do residency-track physicians; 2) that residency-track physicians would reduce their prices until the practice-track physicians were either driven from the market or agreed to fix prices; and 3) that consumers would not benefit. Consequently, I do not believe *Todorov* affords a basis for concluding that the plaintiffs cannot show antitrust injury. FN27

*Self-Interest in Securing Relief and the* Associated General Contractors *Factors*

**\*32** Second, the majority concludes that the plaintiffs cannot demonstrate standing based on one of the "other reasons" courts sometimes consider in analyzing antitrust standing. Majority Op. at ----. These additional factors, analyzed once antitrust injury has been demonstrated, were originally identified in *Associated General Contractors v. California State Council of Carpenters,* 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983) and are sometimes referred to collectively as the "efficient enforcer" analysis.

Here, the majority bases its conclusion on just one of the *Associated General Contractors* points: " [t]he existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement." *Id.* at 542, 103 S.Ct. 897. The majority expresses concern that the plaintiffs have no "natural economic self-interest" in reducing the cost of emergency medical care to consumers. Majority Op. at ----. Of course, it cannot be the case that any plaintiff seeking to increase its income fails the *Associated General Contractors* analysis. Such a rule would essentially prohibit antitrust suits by competitors, which the majority acknowledges is simply not the law. Majority Op. at ----. Rather, the majority rests its holding on a different ground: that health insurers are better suited than the plaintiffs to vindicate the public's interest in lower costs.

In *Associated General Contractors,* the Supreme

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                           Page 35

--- F.3d ----, 2005 WL 2470530 (C.A.2 (N.Y.)), 2005-2 Trade Cases P 74,958
**(Cite as: --- F.3d ----)**

Court grappled with the problem that a literal reading of section four of the Clayton Act "is broad enough to encompass every harm that can be attributed directly or indirectly to the consequences of an antitrust violation." *Id.* at 529, 103 S.Ct. 897. As the majority opinion here observes, *Associated General Contractors* concluded that Congress must have intended that litigation under section four of the Clayton Act "would be subject to constraints comparable to well-accepted common-law rules," such as "foreseeability and proximate cause, directness of injury, certainty of damages, and privity of contract." *Id.* at 532-33, 103 S.Ct. 897. To stay faithful to this congressional intent, the Court laid out the factors we now call the "efficient enforcer" analysis to "guide the exercise of judgment" in determining "whether a party injured by an antitrust violation may recover treble damages " under the Clayton Act. *Id.* at 536-37, 103 S.Ct. 897. The *Associated General Contractors* plaintiffs were unions alleging that a multi-employer association and its members coerced third parties and association members into business relationships with non-union firms. *Id.* at 520, 103 S.Ct. 897. Applying the multi-factor analysis, the Court held that these "allegations of consequential harm" were "insufficient as a matter of law." *Id.* at 545, 103 S.Ct. 897.

*Associated General Contractors* offers no guidance as to how many factors must weigh against a plaintiff in order to find that a Clayton Act remedy is precluded, or which factors are the most important. It seems clear, however, that the ultimate purpose of the "efficient enforcer" analysis is not to find the *ideal* plaintiff, nor the most altruistic one, nor the one most grievously injured by the anti-competitive conduct. Rather, the purpose is to ensure that the statute is not read so broadly that any person who has been harmed by anti-competitive conduct, however remotely or indirectly, is granted a right to sue. *See also Verizon Communications, Inc. v. Law Offices of Curtis V. Trinko, LLP,* 540 U.S. 398, 416-17, 124 S.Ct. 872, 157 L.Ed.2d 823 (Stevens, *J.,* concurring) (observing that the *Associated General Contractors* interpretation of section four was intended to avoid duplicative recoveries and complex apportionment of damages, and stating that this interpretation "has

thus adhered to Justice Holmes' observation that the 'general tendency of the law, in regard to damages at least, is not to go beyond the first step' ") (quoting *Southern Pacific Co. v. Darnell-Taenzer Lumber Co.,* 245 U.S. 531, 533, 38 S.Ct. 186, 62 L.Ed. 451 (1918)).

**\*33** I simply do not believe it is necessary, in order to effectuate this purpose, to preclude suit by the plaintiffs in the present case solely because insurance companies appear to have a greater self-interest in vindicating the public interest in antitrust enforcement. In my view, the *Associated General Contractors* issues here are similar to those in *Potters Medical Center v. City Hospital Association,* 800 F.2d 568 (6th Cir.1986), in which the Sixth Circuit considered antitrust claims brought by a small hospital, Potters Medical Center, against the East Liverpool City Hospital, a nearby larger hospital. *Id.* at 570-71. Potters alleged that City Hospital violated the Clayton Act by refusing to grant staff privileges to doctors with privileges at Potters, pressuring doctors with City Hospital privileges not to obtain Potters privileges, and harassing doctors to prevent them from referring patients to Potters. *Id.* at 571. The district court had ruled that the plaintiffs lacked antitrust standing based on a multi-factor test similar to our "efficient enforcer" analysis and derived from *Associated General Contractors. Id.* at 575. The Sixth Circuit reversed, finding that 1) Potters was "clearly a competitor" in the market for inpatient physician services-a fact that weighed *in favor of* standing; 2) Potters's injuries flowed directly from the alleged antitrust violation; 3) damages were somewhat speculative, but not enough to preclude standing; and 4) the risk of duplicative recovery was minimal. *Id.* at 576, 580. It seems that the identical multi-factor analysis would yield the same result in this case. Moreover, presumably, insurance companies would have been as well situated to demand that City Hospital grant staff privileges to Potters physicians as insurers are in our case to demand that the defendants reopen the practice track. This possibility apparently did not trouble the Sixth Circuit. FN28

The majority attempts to differentiate *Potters* by suggesting that the plaintiffs here, unlike those in

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                      Page 36

--- F.3d ----, 2005 WL 2470530 (C.A.2 (N.Y.)), 2005-2 Trade Cases P 74,958
**(Cite as: --- F.3d ----)**

*Potters,* do not seek to "forbid exclusivity" by trying "to destroy an anticompetitive arrangement." Majority Op. at ---- - ----. However, as noted above, the plaintiffs here seek to forbid the exclusion of practice-track physicians from ABEM certification, which would destroy an allegedly anti-competitive arrangement. True, as the majority points out, their relief would preserve *some* exclusivity for the certification exam. Majority Op. at ----. But again, I believe this only means that the plaintiffs see some restrictions on who may take the exam as reasonable and legal, even though, they contend, prohibiting practice-track physicians from taking the exam is illegally anti-competitive. In the Sixth Circuit case, Potters itself engaged in the common practice of only granting staff privileges to certain physicians, *Potters,* 800 F.2d at 571, but this did not prohibit it from contesting the defendants' allegedly illegally anti-competitive practices.

**\*34** Thus, I cannot agree with the majority that the plaintiffs lack standing based on the *Associated General Contractors* "efficient enforcer" factors.

### The Competitor/Consumer Baseline and the Likelihood of Success

I add only one further point concerning antitrust standing. A review of cases and commentaries indicates that courts do indeed dispute the circumstances under which a party that is neither a competitor nor a consumer may demonstrate antitrust injury or satisfy the *Associated General Contractors* analysis. However, I believe there is agreement that competitors and consumers constitute a baseline set of parties that generally *do* meet these tests. See *Illinois ex rel. Ryan v. Brown,* 227 F.3d 1042, 1046 (7th Cir.2000) ("[N]ormally only consumers or competitors have standing ...."); *Carpet Group Int'l v. Oriental Rug Imps. Ass'n,* 227 F.3d 62, 76-77 (3d Cir.2000) ("[G]enerally only competitors and consumers will suffer antitrust injury ...."); *Serpa Corp. v. McWane, Inc.,* 199 F.3d 6, 10 (1st Cir.1999) ("Competitors and consumers in the market where trade is allegedly restrained are presumptively the proper plaintiffs to allege antitrust injury."); *Fla. Seed v. Monsanto Co.,* 105 F.3d 1372, 1374 (11th Cir.1997) (stating that "

[b]asically, a plaintiff must show that it is a customer or competitor in the relevant antitrust market" to show it is an efficient enforcer); *Bell v. Dow Chem. Co.,* 847 F.2d 1179, 1183 (5th Cir.1988) ("Restraint in the market affects consumers and competitors in the market; as such, they are the parties that have standing to sue."); *Gen. Indus. Corp. v. Hartz Mountain Corp.,* 810 F.2d 795, 809 (8th Cir.1987) ("[S]tanding to sue under the Sherman Act is limited to a consumer or competitor that proximately suffers antitrust injury." ) (quotation marks omitted); *Bhan v. NME Hosps., Inc.,* 772 F.2d 1467, 1470 (9th Cir.1985) (stating that the efficient enforcer analysis requires "that the injured party be a participant in the same market as the alleged malefactors"); *see also* C. Douglas Floyd, *Antitrust Victims Without Antitrust Remedies: The Narrowing of Standing in Private Antitrust Actions,* 82 Minn. L.Rev. 1, 2 (1997) (observing that lower federal courts have distilled Supreme Court holdings to the principle that antitrust standing "should be limited, either absolutely or presumptively, to consumers or competitors adversely affected by the defendant's anticompetitive conduct"). In my view, to suggest, as the majority does, that a competitor does *not* have standing if 1) the competitor seeks to earn a higher wage by ending some but not all exclusions from a market, or 2) some other class of competitors or consumers apparently has a greater self-interest in remedying the violation, departs from the mainstream of antitrust standing cases.

And, of course, here, we are not even deciding the standing issue conclusively. We need only decide whether the plaintiffs have a likelihood of demonstrating antitrust standing in another district, such that the plaintiffs have not "plainly fail[ed]" to demonstrate a meritorious claim. *Adeleke v. United States,* 355 F.3d 144, 152 (2d Cir.2004); *see also Phillips v. Seiter,* 173 F.3d 609, 611 (7th Cir.1999) (stating that transfer is inappropriate when "the case is a sure loser" after transfer, because transferring would simply "waste the time of another court"). For the reasons described above, I believe that the plaintiffs' chances of success are significantly better than this.

**\*35** Consequently, although I concur in the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----, 2005 WL 2470530 (C.A.2 (N.Y.)), 2005-2 Trade Cases P 74,958
**(Cite as: --- F.3d ----)**

jurisdiction and venue analyses, I respectfully dissent from the majority opinion to the extent it refuses to transfer this matter to another district.

FN1. This proposal was submitted, in the first instance, to the various specialty boards and medical associations under whose sponsorship ABEM operated from 1976 until 1986. These sponsors included the American Boards of Family Practice, Internal Medicine, Obstetrics and Gynecology, Otolaryngology, Pediatrics, Psychiatry and Neurology, and Surgery, as well as the American Medical Association, the American College of Emergency Physicians, and the Society for Academic Emergency Medicine.

FN2. ABEM's 1976 application to ABMS for specialty recognition described the practice eligibility track alternative as follows:
To be eligible under this category, the applicant must have:
A. Accumulated 7,000 hours in practice and/or teaching of emergency medicine
1. accumulated 2,800 of the 7,000 hours within any 24 month period prior to any application
2. accumulated the 7,000 hours over a minimum of 5 years
B. Accumulated 50 hours of approved continuing medical education in emergency medicine for each year in practice after 1973.
*Eight years after the first examination administration, the practice eligibility category will expire.*
ABEM Application to ABMS (Munger Aff. Ex. F (Jan. 27, 1995)) (emphasis added).

FN3. Other ABMS-approved specialty boards also utilized a temporary practice track during the early years of the specialty. Of the six new medical specialty boards established since 1950, including ABEM, all offered practice-track

alternatives to residency training for between four and ten years, after which successful completion of residency training became the essential qualification to sit for a certification exam. Of thirty-three ABMS-approved subspecialties established since 1975, all offered practice-track alternatives for between two and five years before insisting on residency training. Munger Aff. ¶¶ 27-28 & Ex. J.

FN4. Of the other defendants named in this action, the district court dismissed fifteen hospitals and all but two individual defendants in various decisions not challenged on appeal. *See Daniel v. American Bd. of Emergency Med.*, 212 F.R.D. 134 (W.D.N.Y.2002); *Daniel v. American Bd. of Emergency Med.*, 235 F.Supp.2d 194 (W.D.N.Y.2002); *Daniel v. American Bd. of Emergency Med.*, 237 F.Supp.2d 336 (W.D.N.Y.2002); *Daniel v. American Bd. of Emergency Med.*, 988 F.Supp. 127, 278-79 (W.D.N.Y.1997); *Daniel v. American Bd. of Emergency Med.*, 802 F.Supp. 912 (W.D.N.Y.1992). In addition, plaintiffs reached prejudgment settlements with three dismissed and two remaining hospital defendants. Finally, the appeal to this court was withdrawn or voluntarily dismissed with respect to the two remaining individual defendants, Henry A. Thiede and Frank A. Disney, and two hospital defendants, Our Lady of Mercy Medical Center and The Johns Hopkins Hospital, Part of the Johns Hopkins Health System.

FN5. Of the twenty-eight original hospital defendants, none was located in the Western District of New York, and only two were located in New York State: University Hospital-State University of New York at Stony Brook, located in Suffolk County, and Lincoln Medical and Mental Health Center, located in New York City. These hospitals were dismissed and are not before us on appeal.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                              Page 38

--- F.3d ----, 2005 WL 2470530 (C.A.2 (N.Y.)), 2005-2 Trade Cases P 74,958
**(Cite as: --- F.3d ----)**

FN6. Named plaintiff John A. Timmons, M.D., has now taken and passed the ABEM certification exam, although he was originally denied the opportunity to do so when he attempted to establish eligibility under the practice track after that option closed in 1988.

FN7. Plaintiffs allege that the relevant geographic market is the United States and the relevant product market is the market for "ABEM certified and ABEM eligible ... emergency physicians." Second Am. Compl. ¶¶ 91-92. Defendants submit that the relevant product market is broader, including all emergency room physicians, not only those who are ABEM certified or eligible. Because the district court structured discovery to concentrate the parties' efforts on certain topics other than the relevant geographic and product markets, we do not attempt to resolve this dispute on the present record. For purposes of this appeal, we assume that the relevant markets are as alleged by the plaintiffs.

FN8. Plaintiffs have not always been consistent in labeling the theory of their antitrust claims. In their initial brief to this court, they appeared to argue a group boycott. Group boycotts "generally consist of agreements by two or more persons not to do business with other individuals, or to do business with them only on specified terms." *Balaklaw v. Lovell,* 14 F.3d 793, 800 (2d Cir.1994) (citation and emphasis omitted). Defendants, however, note in their appellate brief that the plaintiffs expressly disclaimed that theory in the district court, explaining that their claim is "[n]ot technically" a group boycott but, instead, "a conspiracy [claim] to raise the prices and keep the prices up." *Daniel v. American Bd. of Emergency Med.,* 90-CV-1086A, Tr. at 63 (W.D.N.Y. May 23, 2003). In their reply brief, plaintiffs omitted any reference to a group boycott, focusing instead on a theory of market exclusion. At oral argument, they

explained that, in fact, their theory would depend on the relevant market: if the market is defined to include all emergency physicians, their theory is group boycott; if the market is limited to ABEM-certified and -eligible physicians, their theory is market exclusion. As noted in the immediately preceding footnote, on this appeal, we assume that plaintiffs' narrower market definition will prevail. Nevertheless, it makes no difference to our analysis which market definition controls this case nor whether plaintiffs' claims are presented on a group-boycott or market-exclusion theory.

FN9. Daniel alleged that ABEM violated the New York Human Rights Law by requiring him "to submit a photograph with his application to take the test," Compl. ¶ 7, and the Fourteenth Amendment "by subjecting [him] to arbitrary and capricious requirements on a selective basis when the same are not required of others seeking to be qualified as Diplomates of the American Board of Emergency Medicine," *id.* ¶ 13.

FN10. In its second November 19, 1997 opinion, the district court rejected both a constitutional challenge to the service of process provision in Section 12 of the Clayton Act and defendant Forsyth Memorial Hospital's motion to certify that question for interlocutory appeal. *Daniel v. American Bd. of Emergency Med.,* 988 F.Supp. at 144-45. The constitutional challenge had prompted the United States' intervention in this action. *See* 28 U.S.C. § 2403(a). This issue is not before us on appeal, nor is the United States.

FN11. The two individual defendants named in the Second Amended Complaint, Thiede and Disney, both Rochester, New York residents, also did not raise jurisdictional defenses, *see Daniel v. American Bd. of Emergency Med.,* 988 F.Supp. at 148 n. 4, but these individuals

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----

--- F.3d ----, 2005 WL 2470530 (C.A.2 (N.Y.)), 2005-2 Trade Cases P 74,958
**(Cite as: --- F.3d ----)**

are not before us on appeal, as noted *supra* note 5.

FN12. Apparently, the district court had concluded on its consideration of defendants' motion to dismiss the First Amended Complaint that it had personal jurisdiction over ABEM pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, a conclusion defendants did not dispute. *See Daniel v. American Bd. of Emergency Med.,* 802 F.Supp. at 918-19. ABEM never objected to personal jurisdiction in the district court with respect to the Second Amended Complaint, arguing only that venue was improper in the district. *See Daniel v. American Bd. of Emergency Med.,* 988 F.Supp. at 197.

FN13. Indeed, while defendants initially filed a cross-appeal raising challenges to interlocutory rulings by the district court, including its rulings on personal jurisdiction and venue, our court dismissed the cross-appeal as unnecessary. *See Powell v. Schriver,* 175 F.3d 107, 113 (2d Cir.1999) (concluding that, without cross-appeal, defendant may raise as alternative ground for affirmance qualified immunity defense rejected by district court).

FN14. To establish venue as to these defendants, the plaintiffs apparently relied on the general venue statute, 28 U.S.C. § 1391(b). *See infra* Part II.B.3.

FN15. While we are disinclined to speculate from congressional silence or to afford undue weight to punctuation, we note that it would have been curious for Congress to have amended an existing sentence providing for expanded venue by inserting, after a semicolon, another sentence providing for service of process if the two provisions were intended to operate independently of one another. *See* William Strunk, Jr. & E.B. White, *The*

*Elements of Style* 6 (4th ed.2000) (observing that compound sentence joined by semicolon is a better way to "suggest[ ] the close relationship between the two statements" than separate sentences punctuated by periods).

FN16. Section 27 of the Exchange Act states in pertinent part:
Any criminal proceeding [under this chapter] may be brought in the district wherein any act or transaction constituting the violation occurred. Any suit or action to enforce any liability or duty created by this chapter or rules and regulations thereunder, or to enjoin any violation of such chapter or rules and regulations, may be brought in any such district or in the district wherein the defendant is found or is an inhabitant or transacts business, and process in such cases may be served in any other district of which the defendant is an inhabitant or wherever the defendant may be found.

FN17. The plaintiffs did not argue before the district court, nor do they contend on appeal, that any of the jurisdiction defendants is an "inhabitant" of the Western District of New York or may be " found" there. Thus, these alternative grounds for Section 12 venue have never been at issue.

FN18. The district court rejected as a basis for venue, and properly so in our view, the New York residence of then-ABEM president G. Richard Braen and former board member and director Henry A. Thiede. *See Daniel v. American Bd. of Emergency Med.,* 988 F.Supp. at 275. There is no claim that these individuals took any action at all in New York related to the antitrust claim, let alone any action that might constitute a "substantial part of the events or omissions giving rise to the" antitrust claim. Nor is it alleged that any part of the activities of CORD or the hospital defendants alleged to give rise to

--- F.3d ----                                                                           Page 40

--- F.3d ----, 2005 WL 2470530 (C.A.2 (N.Y.)), 2005-2 Trade Cases P 74,958
**(Cite as: --- F.3d ----)**

the antitrust claims occurred in New York.

FN19. Section 4 states in pertinent part:
[A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.
15 U.S.C. § 15(a).

FN20. Section 16 states in pertinent part:
Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws ....
15 U.S.C. § 26.

FN21. We note, but need not here discuss, defendants' statistical showing that the supply of doctors eligible to take the ABEM certification exam has, in fact, grown by several multiples between the closing of the practice track in 1988, a year in which 367 doctors entered residency training programs, and 1999, a year in which 1,039 doctors graduated from such training programs.

FN22. At oral argument on appeal, plaintiffs' counsel indicated that his clients do not, in fact, question ABEM's right to limit its certification to doctors who have completed residency training programs, a significant concession because that decision had appeared to be the critical factor supporting their claim of restraint on trade. Counsel explained that plaintiffs assert that ABEM, by offering a practice-track option for certification-but only for eight years-restricts competition between those doctors who qualified for ABEM certification under the practice

track and those who no longer have that option. Carried to its logical conclusion, plaintiffs' argument would require ABEM to maintain a practice track alternative in perpetuity. When asked about that possibility, however, counsel conceded that, at some future point, presumably after plaintiffs also acquired ABEM certification, it would be appropriate to close the practice track. This suggests that plaintiffs' complaint is not about the qualification restrictions ABEM puts on doctors wishing to sit for its certification examination. It is not even about the propriety of a practice-track option to allow competition with doctors who acquire ABEM certification after residency training. Instead, plaintiffs' case reduces to a dispute about *when* ABEM could retire the practice-track option. But now here in the record do plaintiffs demonstrate that it was premature for ABEM to retire the practice track in 1988 (after giving medical students and doctors eight years' notice), much less do plaintiffs show that they suffered any antitrust injury from closure at this time rather than at some later date that would allow them entry into the purported ABEM cartel.

FN23. *Ertag v. Naples Cmty. Hosp.,* No. 95-3134, slip op. at 2, 121 F.3d 721 (11th Cir. Aug. 1, 1997) (unpublished), an unpublished decision of the Eleventh Circuit relied on extensively by plaintiffs, similarly involves plaintiffs who sought to end the allegedly anticompetitive practice at issue, not to join it.

FN24. For example, if as ABEM diplomates, plaintiffs could, in fact, command $50,000 more in annual remuneration (the difference identified in their complaint between themselves and ABEM-certified counterparts), *see* Second Am. Compl. ¶ 104, then the total cost to consumers (hospitals, patients, and insurers) of emergency medical care would increase, a result of no interest to antitrust

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----, 2005 WL 2470530 (C.A.2 (N.Y.)), 2005-2 Trade Cases P 74,958
**(Cite as: --- F.3d ----)**

law. Even if plaintiffs' entry into the ABEM market resulted in a decrease in the pay presently commanded by certified doctors but an increase in plaintiffs' pay, that would not necessarily translate into a total cost savings for consumers. As the magistrate judge observed with respect to plaintiffs' pleaded theory of injury: "the economic complexities of the health care services market, including a high degree of government regulation and financial involvement," require "sophisticated economic analysis" to determine if "the normal laws of supply and demand can even be applied" in this case. *Daniel v. American Bd. of Emergency Med.,* 269 F.Supp.2d at 182-83. The same conclusion applies to plaintiffs' proposed amended theory of injury. Careful economic analysis is necessary to determine the overall competitive effect and consumer benefit from an action that would move a significant number of doctors-namely, the plaintiffs-out of one product market, where physicians not certified by ABEM provide emergency medical care for modest compensation, into another market, where a limited number of ABEM-certified doctors charge significantly higher rates for essentially the same services.

FN25. Of course, not all exclusions are violations of the Sherman Act. *See, e.g., White Motor Co. v. United States,* 372 U.S. 253, 263, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963) (stating that vertical territorial limitations "may be allowable protections against aggressive competitors or the only practicable means a small company has for breaking into or staying in business" and hence permissible under the antitrust laws); *Angelico,* 184 F.3d at 276 n. 3 (stating in a health care exclusion case that "[g]roup boycotts or concerted refusals to deal are not always per se violations of the Sherman Act; rather, the analysis turns on the facial effects of the challenged practice. "); *Retina Assocs., P.A. v. Southern Baptist Hosp.,* 105 F.3d 1376 (11th Cir.1997)

(holding that a referral agreement between non-specialized ophthalmologists and a retina specialist, under which the plaintiffs, retina specialists, received virtually no referrals, was neither per se unreasonable nor illegal under the rule of reason analysis).

FN26. Moreover, such questions simply cannot be resolved without significant additional discovery, a fact that the majority opinion seems to acknowledge, when it states that "[c]areful economic analysis is necessary to determine the overall competitive effect and consumer benefit from" permitting non-ABEM-certified emergency medicine physicians to become ABEM-certified. Majority Op. at ---- n. 24.

FN27. Indeed, at least one commentator has concluded "[t]he Todorov court's approach to antitrust injury was wrong," because the antitrust injury question does not require the involved economic analysis engaged in by *Todorov,* analysis that is more relevant "to antitrust liability, to causation, and to determining the amount of damages." Ronald W. Davis, *Standing on Shaky Ground: The Strangely Elusive Doctrine of Antitrust Injury,* 70 Antitrust L.J. 697, 750 (2003).

FN28. It is worth noting that were we to transfer this case, we would presumably transfer it the Western District of Michigan, where ABEM is located, and where the plaintiffs' applications were denied. Because Michigan is in the Sixth Circuit, if the *Potters* facts relating to antitrust standing are essentially similar to those here, as I believe they are, *Potters* would control.

C.A.2 (N.Y.),2005.
Daniel v. American Bd. of Emergency Medicine
--- F.3d ----, 2005 WL 2470530 (C.A.2 (N.Y.)), 2005-2 Trade Cases P 74,958

Briefs and Other Related Documents (Back to top)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                    Page 42

--- F.3d ----, 2005 WL 2470530 (C.A.2 (N.Y.)), 2005-2 Trade Cases P 74,958
**(Cite as: --- F.3d ----)**


• 2004 WL 3559512 (Appellate Brief) Brief of Defendants-Appellees (Aug. 20, 2004) Original Image of this Document (PDF)
• 2004 WL 3559514 (Appellate Brief) Reply Brief of Plaintiffs-Appellants (Aug. 20, 2004) Original Image of this Document (PDF)
• 2004 WL 3559513 (Appellate Brief) Brief of Defendants-Appellees on Alternative Grounds to Affirm (Jun. 18, 2004) Original Image of this Document (PDF)
• 2004 WL 3559511 (Appellate Brief) Brief of Plaintiffs-Appellants (May. 04, 2004) Original Image of this Document with Appendix (PDF)
• 03-6177 (Docket) (Aug. 12, 2003)
• 03-6185 (Docket) (Aug. 12, 2003)
• 03-6187 (Docket) (Aug. 11, 2003)
• 03-6167 (Docket) (Aug. 07, 2003)
• 03-6157 (Docket) (Aug. 05, 2003)
• 03-6163 (Docket) (Aug. 05, 2003)
• 03-6165 (Docket) (Aug. 05, 2003)
• 03-6153 (Docket) (Jul. 22, 2003)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.