Westlaw.

Not Reported in F.Supp.2d                                                Page 1

Not Reported in F.Supp.2d, 2001 WL 1241007 (E.D.Pa.), Fed. Sec. L. Rep. P 91,614
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Briefs and Other Related Documents

United States District Court, E.D. Pennsylvania.
IN RE: NAHC, INC., Securities Litigation.
**No. CIV.A. 00-4020.**

Oct. 17, 2001.

*MEMORANDUM*

REED, S.J.

*Table of Contents*

| | | | |
|---|---|---|---|
| I. | INTRODUCTION. | | .---- |
| II. | BACKGROUND. | | .---- |
| III. | NATURE OF THE ACTION. | | .---- |
| IV. | ANALYSIS. | | .---- |
| | A. | Motion of the NovaCare Defendants for Judicial Notice. | .---- |
| | B. | Motion of the NovaCare Defendants to Dismiss. | .---- |
| | | 1. *Statute of Limitations.* | .---- |
| | | 2. *Rule 10b-5 Claims.* | .---- |
| | | a. *Misleading Statements and Omissions.* | .---- |

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2001 WL 1241007 (E.D.Pa.), Fed. Sec. L. Rep. P 91,614
**(Cite as: Not Reported in F.Supp.2d)**

|  |  |  |  |  |
|---|---|---|---|---|
|  |  | i. | *O & P Divestiture.* | .---- |
|  |  | ii. | *Long-Term Care Services Divestiture.* | .---- |
|  |  | iii. | *NCES Divestiture.* | .---- |
|  |  | iv. | *PROH Divestiture.* | .---- |
|  |  | v. | *Failure to Write Off PROH and NCES Goodwill.* | .---- |
|  | b. |  | *Scienter.* | .---- |
|  |  | i. | *Motive and Opportunity* | ---- |
|  |  | ii. | *Conscious Misbehavior or Recklessness* | ---- |
|  | 3. |  | *Section 14(a) Claims .* | .---- |
|  |  | a. | *Material Misrepres entation or Omission.* | .---- |
|  |  | b. | *Transaction Causation.* | .---- |
|  | 4. |  | *Failure to Plead with Particularity Against the Individual Defendants.* | .---- |

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                 Page 3

Not Reported in F.Supp.2d, 2001 WL 1241007 (E.D.Pa.), Fed. Sec. L. Rep. P 91,614
**(Cite as: Not Reported in F.Supp.2d)**

| | 5. | *Section 20(a) Claim.* | .---- |
| | | | |
| C. | | Motion of Defendant PwC to Dismiss. | .---- |
| D. | | Motion of Defendant Wasserstein to Dismiss. | .---- |
| | 1. | *Materiality.* | .---- |
| E. | | Leave to Amend. | .---- |

V.   CONCLUSION.                                                      .----

## I. INTRODUCTION

*1 This action is brought by a group of plaintiffs seeking to represent the following two classes: (1) investors who purchased the stock of NovaCare, Inc., now known as NAHC, Inc. ("NovaCare" or " the Company"), between May 20, 1998 and November 22, 1999, and (2) NovaCare shareholders of record as of July 30, 1999. The plaintiffs have brought suit against NovaCare, a number of the Company's officers and directors (the "Individual Defendants") (collectively with NovaCare, the "NovaCare Defendants"), FN1 PricewaterhouseCoopers, L.L.P. ("PwC"), and Wasserstein Perella & Co. ("Wasserstein"), under Sections 10(b), 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78n(a) and 78t(a), and Rules 10b-5 and 14a-9 promulgated thereunder, 17 C.F.R. §§ 240.10b-5 and 240.14a-9. All of the defendants have filed motions to dismiss (Doc. Nos. 43, 47, and 48) the consolidated amended complaint ("the Complaint") under Fed.R.Civ.P. 12(b)(6) and the Private Securities Litigation Reform Act (the " PSLRA"), 15 U.S.C. § 78u-4, *et seq.* In addition, the NovaCare Defendants have filed a motion for judicial notice in support of their motion to dismiss

(Doc. Nos. 44 and 45). For the reasons set forth below, the motion of the NovaCare Defendants for judicial notice and the motions of the defendants to dismiss will be granted.

> FN1. The following officers and directors of NovaCare have been named as defendants: (1) John Foster ("J. Foster"), the Chairman of the Board of Directors; (2) Timothy E. Foster ("T. Foster"), the chief executive officer and member of the Board of Directors; (3) Robert E. Healy, Jr. ("Healy"), the senior vice president for finance and administration and chief financial officer; and (4) James McLane (" McLane"), the president, chief operating officer and member of the Board of Directors.

## II. BACKGROUND

NovaCare was a national provider of physical rehabilitation and employee benefits management services. (Compl. ¶ 30.) NovaCare operated in three industry segments: (1) long-term care services, consisting of physical rehabilitation services; (2) outpatient services, comprising physical rehabilitation and occupational health services ("

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 4

Not Reported in F.Supp.2d, 2001 WL 1241007 (E.D.Pa.), Fed. Sec. L. Rep. P 91,614
(Cite as: Not Reported in F.Supp.2d)

PROH") as well as orthotic and prosthetic services ( "O & P"); and (3) employee benefits management services, through a majority-owned subsidiary, NovaCare Employee Services, Inc. ("NCES"). (Compl. ¶ 31.) The Company experienced substantial growth from its inception in 1985; by the end of the fiscal year ending June 30, 1998, NovaCare claimed the nation's highest market share in the long-term care and orthotic and prosthetic rehabilitation markets. (Compl. ¶ 33.) NovaCare was also the nation's second largest provider of outpatient physical rehabilitation and occupational health services, and, through NCES, was the second largest employee services provider. (*Id.*) By the beginning of the class period in May of 1998, NovaCare common stock, listed on the New York Stock Exchange, traded generally in the range of $12 to $13 per share. (Compl. ¶ 97.)

On May 12, 1998, the Health Care Financing Administration ("HCFA") issued preliminary regulations implementing the Balanced Budget Act of 1997 ("BBA"). (Compl. ¶¶ 35, 115.) The regulations altered the method of reimbursement by Medicare and Medicaid to long-term care providers of contract therapy services, switching from reimbursement on a cost basis to reimbursement based on a per diem and specific fee schedule structure. (Compl. ¶ 35.) Approximately one week following the issuance of the HCFA guidelines, ten NovaCare executives collectively sold nearly 600,000 shares of NovaCare stock; one of the executives was Defendant T. Foster, who sold roughly $4.1 million in shares on May 20, 1998. (Compl. ¶ 114.)

Following the implementation of the HCFA guidelines, NovaCare reported increasingly diminished revenues for its long-term care services segment in each quarter of the 1999 fiscal year. (Compl. ¶¶ 47-9.) The BBA's impact on NovaCare's long-term care business eventually led to a significant decline in the company's stock price listing. On September 22, 1998, after the Company announced expectations of significant declines in first quarter earnings as a result of unanticipated delays in the transition to the new reimbursement system, the company's stock dropped by approximately $3 per share. (Compl. ¶ 99.) By

April 1, 1999, NovaCare was trading at $1.188 per share. (Compl. ¶ 100.) Despite the BBA's materially adverse effect on the Company's financial condition, the Company did not adjust the value of goodwill as an asset of the long-term care division in the financial statements on the Securities and Exchange Commission ("SEC") Form 10-K for the 1998 fiscal year (the "1998 Form 10-K") or on the SEC Forms 10-Q for the first and second quarter of the 1999 fiscal year (the "1st Quarter 10-Q" and " 2nd Quarter 10-Q," respectively). (Compl. ¶¶ 41, 47-8.)

**\*2** From April 1999 onwards, NovaCare began to implement a series of restructuring plans to retire its bank debt and improve its capital structure; this ultimately resulted in the sale of all of the Company's operating lines of business. On April 5, 1999, the Company announced that it had entered into an agreement to sell its O & P business to Hanger Orthopedic Group, Inc. ("Hanger") for $455 million. (Compl. ¶ 57.) On May 28, 1999, NovaCare announced that it had agreed to divest its long-term care services business to Chance Murphy, Inc. ("Chance Murphy") for only nominal consideration. (Compl. ¶ 52.)

On May 30, 1999, T. Foster, McLane, and Healy renegotiated their employment contracts, providing for transaction and retention bonuses tied to the sale of NCES, the sale of PROH, and the earlier of either the liquidation of the Company or June 30, 2000. (Compl. ¶ 79.)

On August 16, 1999, the Board of Directors of NovaCare announced that it had approved a proposal to sell the PROH division and the Company's shares in NCES to satisfy the Company's outstanding debentures, and to reinvest or to liquidate and distribute to stockholders any remaining proceeds ("Restructuring Plan"). (Compl. ¶ 68.) On August 13, 1999, NovaCare filed with the SEC and mailed to its shareholders proxy materials announcing a special meeting for the shareholders to vote on the Restructuring Plan (" Proxy Statement"). (Compl. ¶ 70.) The Proxy Statement estimated that the proceeds available for distribution in the event of a liquidation would range from $1.76 to $3.94 per common share.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 5

Not Reported in F.Supp.2d, 2001 WL 1241007 (E.D.Pa.), Fed. Sec. L. Rep. P 91,614
**(Cite as: Not Reported in F.Supp.2d)**

(Compl. ¶ 77.) On September 8, 1999, the Company announced that it had entered into an agreement, subject to shareholder approval of the Restructuring Plan, to sell its shares in NCES to an investment group at $2.50 per share, amounting to approximately $48.5 million. (Compl. ¶ 84.) On September 10, the Company filed and sent additional proxy materials, which included an opinion letter by Wasserstein assessing the fairness of the NCES transaction.

On September 20, 1999, the Company filed an SEC Form 10-K for the 1999 fiscal year. (Compl. ¶ 56.) The Company did not reassess the Company's goodwill in light of the Restructuring Plan or adjust the value of goodwill as an asset in the 1999 Form 10-K's financial statements. (*Id.*)

*3 The shareholders of NovaCare approved of the Restructuring Plan on September 21, 1999. (Compl. ¶ 87.) On October 4, 1999, the Company announced that it had agreed to sell the PROH division to Select Medical Corporation ("Select Medical") for approximately $200 million in cash and debt assumption. (Compl. ¶ 89.)

On November 22, 1999, the Company filed its Form 10-Q with the SEC, releasing its financial results for the first quarter of the 2000 fiscal year. (Compl. ¶ 94.) This Form 10-Q disclosed the following developments:
(a) Hanger had claimed there was a $29 million shortfall in NovaCare's calculation of the O & P division's working capital, for which NovaCare was responsible pursuant to the sale agreement's working capital guarantee;
(b) NovaCare was writing off assets that it had retained from the long-term care services business, and that between the write-off and the working capital guarantee that it provided to Chance Murphy, the Company would incur roughly $24.4 million in losses related to the long-term care services business;
(c) NovaCare had placed more than $13 million in escrow in support of guarantee to the NCES investors for four years of gross profits from a services agreement with the PROH business, a guarantee on which NovaCare was required to perform when Select Medical declined to enter into

the agreement; and
(d) the Company had to hold in escrow $36.8 million of the sale proceeds from the PROH sale, and pay $26 million in transaction costs and other liabilities, so NovaCare would receive only $99 million in cash proceeds from Select Medical.

(Compl. ¶ 94.) The Form 10-Q also revealed that as a result of the foregoing developments, the estimated liquidation value now ranged from $0.10 to $1.00 per share. (Compl. ¶ 104.) On November 26, 1999, the first day of trading following the release of Form 10-Q, the stock price for NovaCare dropped 75% to $0.12 1/2 per share. (*Id.*)

On November 14, 2000, NovaCare disclosed that there would be no liquidated dividend, and that the Company held insufficient funds to satisfy its outstanding debt. (Compl. ¶ 110.)

### III. NATURE OF THE ACTION

Count I of the Complaint asserts Rule 10b-5 claims against the NovaCare Defendants. The plaintiffs allege that the NovaCare Defendants engaged in a course of conduct from May 20, 1998, to November 22, 1999, in which they knowingly or recklessly issued materially false and misleading financial statements and failed to disclose significant terms of various asset sales in order to artificially inflate and maintain the price of NovaCare common stock. (Compl. ¶ 113.) Although allegations of the misrepresentations are strewn throughout the Complaint, for purposes of convenience and clarity, and as guided by the motion papers and responses of the parties, I will categorize the claims brought against the NovaCare Defendants in Count I of the Complaint into the following six groups:
• Claim (A): failure to adjust the goodwill of the long-term care services division in light of the BBA's impact, (Compl. ¶¶ 41, 47-8);
*4 • Claim (B): failure to disclose that proceeds from the sale of the O & P division would be reduced because of overstated working capital, (Compl. ¶¶ 57, 59, 65, 66, 69, 71, 74, 77, 83, and 88);
• Claim (C): failure to disclose that proceeds from the sale of the long-term care division would be

Not Reported in F.Supp.2d, 2001 WL 1241007 (E.D.Pa.), Fed. Sec. L. Rep. P 91,614
**(Cite as: Not Reported in F.Supp.2d)**

reduced because of (i) overstated working capital and (ii) uncollectible accounts receivable, (Compl. ¶¶ 52, 62, 63, 65, 69, 71, 74, 77, 88);

• Claim (D): failure to disclose that proceeds from the sale of the NCES division would be reduced because (i) the purchaser of PROH would not enter into an employment services contract with NCES, nor assume the Company's guarantee of the contract; and (ii) NovaCare had placed funds in escrow to support the guarantee of the employment services contract, (Compl. ¶¶ 71, 74, 76, 77, 82, 85, 88, 91, 92);

• Claim (E): failure to disclose that proceeds from the sale of the PROH division would be materially reduced because (i) the Company would lose the funds escrowed in support of the financial representations in the sales agreement due to the overstatement of the PROH working capital and accounts receivable, and (ii) the Company would place $36 million in escrow in support of the financial representations and would incur $26 million in transactions costs and liabilities, (Compl. ¶¶ 71, 74, 75, 77, 82, 88, 89, 90, 93); and

• Claim (F): failure to adjust the Company's goodwill despite the planned sale of all operating assets under the Restructuring Plan, (Compl ¶ 56).

Count II of the Complaint asserts Rule 10b-5 claims against PwC. The plaintiffs claim that PwC issued materially false and misleading audit reports for NovaCare's 1998 and 1999 Forms 10-K. (Compl. ¶ 46, 54, 123.)

Count III of the Complaint asserts Rule 10b-5 claims against Wasserstein for issuing a materially false and misleading fairness opinion regarding the NCES transaction in the proxy materials. (Compl. ¶ 86, 128-29.)

Count IV of the Complaint asserts Section 20(a) claims against the Individual Defendants, as control persons of the Company during the time of the alleged underlying violations of Rule 10b-5 and Rule 14a-9. (Compl. ¶ 135.)

Count V of the Complaint asserts Rule 14a-9 claims against all of the defendants except PwC for issuing proxy materials with materially false or misleading

statements regarding Claims (B) through (E) of Count I of the Complaint as listed above. (Compl. ¶ ¶ 36, 74-9, 140.)

## IV. ANALYSIS

### A. Motion of the NovaCare Defendants for Judicial Notice

The NovaCare Defendants have filed a motion for judicial notice of three categories of documents in support of their motion to dismiss: (1) documents relied upon in the complaint (thirty-two documents, comprising company SEC filings and press releases); (2) documents filed with the SEC, but not relied upon in the complaint (seven documents); and (3) stock price data compiled by the Dow Jones news service (two exhibits, including a printout of the historical prices of NovaCare stock and a corresponding graph).

Pursuant to Federal Rule of Evidence 201(b)(2), this Court may take judicial notice of facts that are " not subject to reasonable dispute" and that are " capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Under Federal Rule of Evidence 201(d), this Court must take judicial notice "if requested by a party and supplied with the necessary information."

**\*5** Decisions by the Third Circuit Court of Appeals support the motion for judicial notice of the documents in each category. *See In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1426 (3d Cir.1997) (court may consider a document "integral to or explicitly relied upon in the complaint" on motion to dismiss); *Oran v. Stafford,* 226 F.3d 275, 289 (3d Cir.2000) (taking judicial notice of properly-authenticated public disclosure documents filed with SEC); *Ieradi v. Mylan Lab., Inc.,* 230 F.3d 594, 600 n. 3 (3d Cir.2000) (taking judicial notice of stock prices reported by Quotron Chart Services).

Plaintiffs do not dispute that these categories may be judicially noticed, but they argue that the SEC

Not Reported in F.Supp.2d                                                                          Page 7

Not Reported in F.Supp.2d, 2001 WL 1241007 (E.D.Pa.), Fed. Sec. L. Rep. P 91,614
(Cite as: Not Reported in F.Supp.2d)

documents and the documents referred to in the complaint may only be considered for what the documents state, not for the truth of their contents. This argument relies upon the persuasive reasoning behind the decisions of a number of courts of appeal to take judicial notice of SEC filings. See *Oran,* 226 F.3d at 289 ("[T]he documents are the very documents alleged to contain the various misrepresentations or omissions and are relevant not to prove the truth of their contents but only to determine what the documents stated.") (quoting *Kramer v. Time Warner Inc.,* 937 F.2d 767, 774 (2d Cir.1991)). The NovaCare Defendants assert that the relevant documents are offered for judicial notice because they allegedly contain cautionary statements, financial disclosures, and other information pertaining to this action. Thus, the truth or falsity of the documents' statements should be irrelevant for purposes of resolving the underlying motion to dismiss. The offered documents should be considered for their contents rather than for the truth of the contained statements.

The plaintiffs also argue that if this Court considers matters outside the pleadings, the motion to dismiss must be converted into a motion for summary judgment. Such conversion is unnecessary when the matters considered are documents in the categories listed above. See *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.,* 998 F.2d 1192, 1196-97 (3d Cir.1993) (no need to convert motion to dismiss to motion for summary judgment when considering undisputedly authentic documents on which complaint relied) ("When a complaint relies on a document ... the plaintiff obviously is on notice of the contents of the document, and the need for a chance to refute evidence is greatly diminished."); *In re Rockefeller Ctr. Props. Sec. Litig.,* 184 F.3d 280, 293 (3d Cir.1999) (Nygaard, Circuit J., concurring and dissenting) (district court may properly consider authenticated copies of SEC filings on motion to dismiss).

The NovaCare Defendants do not specify in their motion for judicial notice what purpose the above-referenced documents will serve. Nevertheless, parsing through their motion to dismiss, it appears that they wish to rely on the documents to argue that: (1) T. Foster retained

stock options in the Company, and thus did not sell 100% of his holdings; (2) the working capital for the long-care services was not overstated, and the guarantee to Chance Murphy was satisfied in full; (3) the accounts receivable for PROH were deemed uncollectible only in the second quarter for fiscal 2000, and NovaCare disclosed Select's claim for indemnity in the reporting period when the claim was made; and (4) NovaCare had disclosed the elimination of goodwill upon the approval of the Restructuring Plan in the proxy materials by including pro forma financial statements reflecting the proposed sales of NCES and PROH. Arguments (1) and (3) are not essential to the arguments in the motion of the NovaCare Defendants to dismiss, and it is possible to review the motion without reliance upon the cited documents.

*6 In contrast, Arguments (2) and (4) are dispositive of two of the plaintiffs' claims. When considering undisputedly authentic documents on which the complaint relied, there is no need to convert the motion to dismiss to one for summary judgment. See *Pension Benefit Guar. Corp.,* 998 F.2d at 1196-97. The NovaCare Defendants cite the SEC Form 10-Q filed by the Company on November 22, 1999, to support Argument (2), and cite the proxy materials issued on August 13, 1999, to support Argument (4); the plaintiffs relied on these materials in the complaint, and do not dispute their authenticity. Thus, I will take judicial notice of these materials for purposes of considering the motion of the NovaCare Defendants to dismiss without converting the motion to one for summary judgment.

Additionally, although Wasserstein has not moved for judicial notice of the above-referenced documents, it too relies upon these documents in its motion to dismiss, and has attached them accordingly. The documents include those referenced and relied upon in the complaint, public filings with the SEC, and NovaCare stock price information from Bloomberg L.P. Wasserstein notes in a footnote that this Court may consider these documents without converting the motion into a motion for summary judgment. (Wasserstein Br. at 4, n. 1.) The plaintiffs do not dispute Wasserstein's request nor the authenticity of the

Not Reported in F.Supp.2d, 2001 WL 1241007 (E.D.Pa.), Fed. Sec. L. Rep. P 91,614
**(Cite as: Not Reported in F.Supp.2d)**

documents.

Wasserstein relies heavily on the attached documents for two main purposes: (1) to show that the information regarding the need to place funds in escrow in support of the PROH guarantee was in fact included in SEC filings prior to the allegedly fraudulent statements; and (2) to show that the stock price of NovaCare was unaffected by the disclosure of the $13.4 million in the NCES escrow. The documents support Wasserstein's arguments, and the issue of the Company's stock price is essential to Wasserstein's motion to dismiss. Under *Ieradi,* it is appropriate to take judicial notice of historical stock prices as "a fact not subject to reasonable dispute that is capable of accurate and ready determination by resort to a source whose accuracy cannot be reasonably questioned." *Ieradi,* 230 F.3d at 600 n. 3 . Accordingly, this Court will take judicial notice of the NovaCare stock prices as listed in the document attached to Wasserstein's motion to dismiss.

B. Motion of the NovaCare Defendants to Dismiss

*7 The NovaCare Defendants have moved to dismiss the claims against them in Counts I, IV and V of the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) and the PSLRA upon the following grounds: (1) all claims based on the impact of the BBA on the long-term care services are time-barred under the statute of limitations; (2) the plaintiffs did not plead their Rule 10b-5 claim against NovaCare with sufficient particularity pursuant to the PSLRA, by failing to identify each fraudulent statement allegedly made, by failing to support their allegations as to why the statement was fraudulent, and by failing to plead scienter with particular facts giving rise to a "strong inference of fraud"; (3) the plaintiffs did not plead their Section 14(a) claim adequately, by failing to allege that the Proxy Statement contained any material misrepresentation or omission, and failing to establish a causal link between the corporate action authorized and the injury to the plaintiffs; (4) the plaintiffs failed to plead their Rule 10b-5 claims with sufficient particularity under the PSLRA against each of the Individual Defendants; and (5) the plaintiffs' claims against the Individual

Defendants as control persons under Section 20(a) must fail because of the failure to plead adequately an underlying Section 10(b) violation by the NovaCare Defendants.

In deciding a motion to dismiss under Rule 12(b)(6) , a court must take all well pleaded facts in the complaint as true and view them in the light most favorable to the plaintiff. *See Jenkins v. McKeithen,* 395 U.S. 411, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969) . A motion to dismiss should be granted if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). In considering a motion to dismiss, the proper inquiry is not whether a plaintiff will ultimately prevail, but rather whether a plaintiff is permitted to offer evidence to support its claims. *See Children's Seashore House v. Waldman,* 197 F.3d 654, 658 (3d Cir.1999), *cert. denied,* 530 U.S. 1275, 120 S.Ct. 2742, 147 L.Ed.2d 1006 (2000) (quoting *Nami v. Fauver,* 82 F.3d 63, 65 (3d Cir.1996)). The moving party bears the burden of showing that the non-moving party has failed to state a claim for which relief can be granted. *See Gould Elecs., Inc. v. United States,* 220 F.3d 169, 178 (3d Cir.2000).

1. *Statute of Limitations*

Under Claim (A) of Count I of the Complaint, FN2 the plaintiffs plead that the NovaCare Defendants overstated the value of the goodwill of the Company's long-term care services division after the implementation of the BBA by failing to reflect any impairment of the division's goodwill in the 1998 Form 10-K, the 1st Quarter 10-Q, and the 2nd Quarter 10-Q (filed on September 16, 1998, November 13, 1998, and February 16, 1999, respectively) (Compl. ¶ 39-41, 47-8.) The plaintiffs allege that this overstatement was a material misrepresentation in violation of generally accepted accounting principles ("GAAP"). The NovaCare Defendants have moved to dismiss this claim as time-barred.

FN2. This claim is described herein and in

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                         Page 9

Not Reported in F.Supp.2d, 2001 WL 1241007 (E.D.Pa.), Fed. Sec. L. Rep. P 91,614
**(Cite as: Not Reported in F.Supp.2d)**

Section III, Nature of the Action, *supra.*

The statute of limitations for actions brought pursuant to Sections 10(b) and 14(a) of the Exchange Act is one year from the discovery of the facts constituting the violation and within three years after such violation. *See* 15 U.S.C. § 76i(e), codifying *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 111 S.Ct., 2773, 115 L.Ed.2d 321 (1991). Allegations regarding the impact of the BBA on the goodwill of the Company's long-term care services division were first asserted by the plaintiffs on September 19, 2000. FN3 Thus, to the extent the plaintiffs were on notice prior to September 19, 1999, of the alleged overvaluation of goodwill of NovaCare's long-term care services division in the aforementioned financial statements, this claim of fraudulent misrepresentation is barred.

> FN3. The Complaint is a consolidation of six complaints that were filed by the plaintiffs. Although the first complaint was filed on August 9, 2000, the claim of misrepresentations regarding the goodwill of the long-term services division was first asserted in a complaint filed on September 19, 2000. The plaintiffs do not dispute that the September 2000 filing is the time from which to measure the statute of limitations. (Pl. Br. at 68).

**\*8** Although the Third Circuit Court of Appeals has not yet determined when the limitation period begins to run in a securities fraud action, other courts of appeal, as well as the majority of courts within this circuit have adopted an "inquiry notice" standard. *See, e.g., Rosen v. Comm. Servs. Group, Inc.,* 155 F.Supp.2d 310 (E.D.Pa.2001); *Leach v. Quality Health Servs.,* 902 F.Supp. 554, 557 (E.D.Pa.1995); *Gruber v. Price Waterhouse,* 697 F.Supp. 859, 864 (E.D.Pa.1988), *aff'd,* 911 F.2d 960 (3d Cir.1990); *In re Prudential Ins. Co. of Am. Sales Practices Litig.,* 975 F.Supp. 584, 599 (D.N.J.1996) (citing cases); *see also Mathews v. Kidder, Peabody & Co.,* 260 F.3d 239, 251 (3d Cir.2001) (applying "inquiry notice" standard in RICO claim predicated on securities fraud). In light of the necessity to adhere to a uniform federal statute of limitations for federal securities cases, see *Prudential,* 975 F.Supp. at 599 (citing *In re Data Access Sys. Sec. Litig.,* 843 F.2d 1537, 1549 (3d Cir.1988)), this court is persuaded to adopted the "inquiry notice" standard.

Under the "inquiry notice" standard, the one-year period begins to run when the plaintiffs "discovered or in the exercise of reasonable diligence should have discovered the basis for their claim" against the defendant. *See Gruber,* 697 F.Supp. at 863. Whether the plaintiffs, in the exercise of reasonable diligence, should have known of the basis for their claims depends on whether they had "sufficient information of possible wrongdoing to place them on 'inquiry notice' or to excite 'storm warnings' of culpable activity." *Id.* at 864. The test for "storm warnings" is an objective one, based on whether a "reasonable investor of ordinary intelligence would have discovered the information and recognized it as a storm warning." *Mathews,* 260 F.3d at 252. The plaintiffs need not know all of the details or "narrow aspects" of the alleged fraud to trigger the limitations period; instead, the period begins to run from "the time at which plaintiff should have discovered the general fraudulent scheme." *Prudential,* 975 F.Supp. at 599 (quoting *McCoy v. Goldberg,* 748 F.Supp. 146, 158 (S.D.N.Y.1990)). "Once on inquiry notice, plaintiffs have a duty to exercise reasonable diligence to uncover the basis for their claims, and are held to have constructive notice of all facts that could have been learned through diligent investigation during the limitations period." *Gruber,* 697 F.Supp. at 864. On a motion to dismiss, the defendant bears a heavier burden in showing that inquiry notice existed more than one year before the plaintiff filed the complaint; the complaint must show facial non-compliance with the limitations period and the affirmative defense must clearly appear on the face of the pleading. *See In re Equimed, Inc. Sec. Litig.,* Civ. No. 98-5374, 2000 U.S. Dist. LEXIS 6209, \*24 (E.D.Pa. May 9, 2000).

On the face of the pleading, the plaintiffs have alleged the following facts relevant to this issue. In the 1998 Form 10-K, filed on September 16, 1998, the Company reported $327 million in long-term

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                      Page 10

Not Reported in F.Supp.2d, 2001 WL 1241007 (E.D.Pa.), Fed. Sec. L. Rep. P 91,614
**(Cite as: Not Reported in F.Supp.2d)**

care services division assets, a substantial portion of which was goodwill. (Compl. ¶ 38.) The Company indicated in the 1998 Form 10-K that the new reimbursement rates issued by the HCFA pursuant to the BBA had been used to calculate future cash flows for purposes of estimating labor costs and severance payments. (Compl. ¶ 40.) In the 1st Quarter 10-Q, filed on November 13, 1998, the Company reported that long-term care services' revenue had declined to $142 million as a result of the new HCFA reimbursement guidelines implemented in the previous financial quarter, but it assessed the value of the long-term care services' assets, principally goodwill, at $311 million. (Compl. ¶ 47.) In the 2nd Quarter 10-Q, filed on February 16, 1999, the Company reported that long-term care services' revenue had declined to $122 million, but it continued to assess the value of the long-term care services' assets, principally goodwill, at $303 million. (Compl. ¶ 48.) "By April 1999, the financial markets had discounted the long-term care services segment entirely, and NovaCare common stock reflected the valuation of NovaCare's other lines of business." (Compl. ¶ 100.) By May 17, 1999, the Company announced in an SEC Form 10-Q for the third quarter of the 1999 fiscal year ("3rd Quarter 10-Q"), that it was exiting selected long-term care markets and accordingly recording a charge of $111.9 million. (Compl. ¶ 51.) The remaining long-term care services division assets were valued at approximately $172 million. (*Id.*) On May 28, 1999, NovaCare announced that it had entered into an agreement to sell the long-term care services division to Chance Murphy for only " nominal consideration." (Compl. ¶ 52.) Finally, the Company filed an SEC Form 8-K on June 16, 1999, attaching a copy of the completed sales contract with Chance Murphy, and announced that the Company was exiting the long-term care services business entirely. (Compl. ¶ 52.)

**\*9** Although the definition of goodwill has taken different forms over the years, the shorthand description of good-will is "the expectancy of continued patronage." *See Newark Morning Ledger Co. v. United States,* 507 U.S. 546, 555, 113 S.Ct. 1670, 123 L.Ed.2d 288 (1993). Goodwill as an asset is intertwined with the business as a going concern and cannot be disposed of independently.

*See Metropolitan Bank v. St. Louis Dispatch Co.,* 149 U.S. 436, 446, 13 S.Ct. 944, 37 L.Ed. 799 (1893) (holding newspaper's goodwill did not survive after it was purchased and ceased publishing under its old name). Thus, no goodwill would have remained in the Company's long-term care division following the Chance Murphy transaction, in light of the Company's clear indication that NovaCare was exiting the market and would generate no future business.

The plaintiffs argue that the June 16, 1999 Form 8-K reflected no adjustment to goodwill after the Chance Murphy transaction, and that in light of the retention of long-term care services division assets on the balance sheets, this indicated that there remained long-term care services operations that supported the valuation of goodwill. Yet, the sheer inconsistency of any representation that long-term care goodwill remained on the balance sheet following the sale of the long-term care business should have put a reasonable investor on notice of " possible wrongdoing." Moreover, as alleged by the plaintiffs, it was clear by April 1999 that NovaCare's long-term care division was discounted entirely by the securities market, and by June 16, 1999, that the Company would not receive any consideration for its goodwill from the transaction with Chance Murphy. (Compl. ¶¶ 52, 100.) Furthermore, the fact that NovaCare had used the reimbursement rates issued by the HCFA to calculate future cash flows, an allegation upon which the plaintiffs rely to plead scienter, was apparent from the 1998 Form 10-K. (Compl. ¶ 40.) These collectively constituted "storm warnings" sufficient to place the plaintiffs on inquiry notice that the previous valuations of goodwill had been overstated in derogation of GAAP. The plaintiffs have not alleged facts to show why in the exercise of reasonable diligence, they could not have discovered the overstatement of goodwill prior to September 19, 1999.

**\*10** I conclude that plaintiffs as reasonable stockholders were at least on inquiry notice of their claims by June 16, 1999, and, in the exercise of reasonable diligence, should have discovered the basis for the claims within one year. Because the claim regarding the overstatement of the long-term

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 11

Not Reported in F.Supp.2d, 2001 WL 1241007 (E.D.Pa.), Fed. Sec. L. Rep. P 91,614
**(Cite as: Not Reported in F.Supp.2d)**

care services' goodwill was not asserted until September 19, 2000, this action was not commenced within the one year limitations period. Consequently, I conclude that the BBA-related claims are time-barred and will dismiss Claim (A) in Count I of the Complaint. FN4

> FN4. This claim is described herein and in Section III, Nature of the Action, *supra.*

### 2. Rule 10b-5 Claims

The NovaCare Defendants move to dismiss Count I of the Complaint for failure to state a cause of action under Rule 10b-5 or to comply with the pleading requirements of the PSLRA. To state a valid securities fraud claim under Rule 10b-5, a plaintiff must first plead that the defendant, in connection with the purchase or sale of a security, made a materially false or misleading statement or omitted to state a material fact necessary to make a statement not misleading; that the defendant acted with scienter; and that plaintiff's reasonable reliance on defendant's misstatement proximately caused him injury. *See Oran,* 226 F.3d at 282.

In addition, plaintiffs asserting a claim under the federal securities laws must meet the heightened pleading standards set forth under the PSLRA, which was enacted in 1997 to restrict abuses in securities class-action litigation. First, it requires that the complaint specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, all facts with particularity on which that belief is formed. *See* 15 U.S.C. § 78u-4(b)(1). Second, the PSLRA requires that a securities fraud complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *See* 15 U.S.C. § 78u-4(b)(2).

### a. Misleading Statements and Omissions

#### i. O & P Divestiture

*11 Under Claim (B) in Count I of the Complaint, FN5 the plaintiffs plead that the NovaCare Defendants failed to disclose that the sale proceeds from Hanger would be reduced by $10 million, and later further reduced by approximately $25 million, because of the overstated O & P working capital. The plaintiffs allege that this omission made the following statements misleading: (1) the April 5, 1999 press release announcing the agreement to sell O & P for $455 million, (Compl. ¶ 57); (2) the May 11, 1999 announcement by T. Foster accompanying the press release for the third quarter of the 1999 fiscal year, (Compl. ¶ 59); (3) the July 1, 1999 press release, (announcing the completion of the O & P sale for $445 million) (Compl. ¶ 64); (4) the July 8, 1999 press release, (responding to the downgrading of the Company's debt by Standard & Poor's ("S & P")) (Compl. ¶ 65); (5) the July 14, 1999 SEC Form 8-K, (attaching the agreement of sale to Hanger, including the provision for a $94 million working capital guarantee) (Compl. ¶ 66); (6) the letter sent by J. Foster on August 13, 1999, (Compl. ¶ 71); (7) proxy materials sent on August 13, 1999, (Compl. ¶¶ 74, 77); (8) the August 16, 1999 press release, (regarding the proposed Restructuring Plan) (Compl. ¶ 69); (9) the September 3, 1999 supplemental proxy materials, (Compl. ¶ 83); and (9) the September 27, 1999 letter sent to the shareholders from J. Foster, T. Foster and McLane, (Compl. ¶ 88).

> FN5. This claim is described herein and in Section III, Nature of the Action, *supra.*

The NovaCare Defendants have moved to dismiss this claim for failure to allege a statement that was misleading when made. To be actionable, a statement or omission must have been misleading at the time it was made; liability cannot be imposed on the basis of subsequent events. *See In re Nice Sys., Ltd. Sec. Litig.,* 135 F.Supp.2d 551, 586 (D.N.J.2001); *In re Milestone Sci. Sec. Litig.,* 103 F.Supp.2d 425, 466-67 (D.N.J.2000); *Novak v. Kasaks,* 216 F.3d 300, 309 (2d Cir.2000) (" allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2001 WL 1241007 (E.D.Pa.), Fed. Sec. L. Rep. P 91,614
**(Cite as: Not Reported in F.Supp.2d)**

claim of securities fraud"). To plead a valid claim of securities fraud by omission, "a plaintiff must show that the omitted information in fact existed at the time that the allegedly misleading statement was made." *Zucker v. Quasha,* 891 F.Supp. 1010, 1017 (D.N.J.1995), *aff'd,* 82 F.3d 408 (3d Cir.1996). The defendants are not obligated to predict future events unless there is reason to believe that they will occur. *See id.*

The plaintiffs do not allege that Hanger had in fact negotiated a $10 million price reduction prior to the announcement by the Company of the reduction on July 1, 1999, nor do they allege that Hanger had in fact presented the working capital claim of $29 million prior to NovaCare's announcement of the claim on November 22, 1999. Instead, the plaintiffs claim that NovaCare should have disclosed in the allegedly fraudulent statements that the sale proceeds were going to be reduced because Hanger was going to negotiate the price downward and present a working capital claim in the future. Insofar as the plaintiffs plead that NovaCare was under a duty to disclose these events prior to their occurrence, their claim is not cognizable under Section 10(b). "Corporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them." *Nice Systems,* 135 F.Supp.2d at 586. The plaintiffs have alleged no particularized facts to support the conclusory statement that the NovaCare Defendants knew or anticipated that these events would occur. I conclude that the Complaint fails to allege facts regarding the O & P sale which are actionable under Section 10(b); thus, Claim (B) in Count I of the Complaint, FN6 regarding the O & P divestiture, will be dismissed.

> FN6. This claim is described herein and in Section III, Nature of the Action, *supra.*

#### ii. *Long-Term Care Services Divestiture*

**\*12** Under Claim (C) in Count I of the Complaint, FN7 the plaintiffs claim that the NovaCare Defendants failed to disclose that they would lose an additional $24 million as a result of the transaction with Chance Murphy because the Company had (i) overstated the working capital for the long-term care services business by $11 million, and (ii) had not written off $13 million in uncollectible accounts. The plaintiffs allege that this omission made the following statements misleading: (1) the June 16, 1999 SEC Form 8-K, (attaching the agreement of sale with Chance Murphy) (Compl. ¶ ¶ 52, 62); (2) the June 30, 1999 Amended SEC Form 8-K, (announcing a loss of $6 million in the transaction) (Compl. ¶ 63); (3) the July 8, 1999 press release, (responding to the S & P downgrade) (Compl. ¶ 65); (4) the letter sent by J. Foster on August 16, 1999, (Compl. ¶ 71); (5) the proxy materials sent on August 13, 1999, (Compl. ¶¶ 74, 77); (6) the August 16, 1999 press release, (announcing the Restructuring Plan) (Compl. ¶ 69); and (7) the September 27, 1999 letter to the shareholders from J. Foster, T. Foster, and McLane, (Compl. ¶ 88).

> FN7. This claim is described herein and in Section III, Nature of the Action, *supra.*

The NovaCare Defendants have moved to dismiss Claim (C)(i) in Count I of the Complaint, FN8 for failure to allege any facts to support the conclusory statement that the working capital for the Company's long-term care services division was overstated. The NovaCare Defendants argue that the working capital for the Company's long-term care services sector had not been overstated, and that the working capital guarantee provided to Chance Murphy was satisfied in full. According to the SEC Form 10-Q that the Company filed on November 22, 1999, the working capital guarantee given to Chance Murphy was satisfied and the Company was released from the guarantee. FN9 (NovaCare Exh. 32 at 6.) The plaintiffs do not dispute this statement in their responsive papers. In light of the clear language of the SEC Form 10-Q filed on November 22, 1999, and in the absence of any other allegations regarding the working capital of the Company's long-term care services division, I conclude that the plaintiffs fail to plead that the NovaCare Defendants' statements were misleading with regard to this issue. Consequently, Claim (C)(i) in Count I of the Complaint will be dismissed. FN10

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2001 WL 1241007 (E.D.Pa.), Fed. Sec. L. Rep. P 91,614
**(Cite as: Not Reported in F.Supp.2d)**

FN8. This claim is described herein and in Section III, Nature of the Action, *supra.*

FN9. Specifically, the 10-Q states, in pertinent part:
Included in the net assets of discontinued operations below, are accounts receivable of the long-term care services Western operations, which were closed in fiscal 1999, and accounts receivable related to the operations sold in fiscal 1999 to Chance Murphy, Inc. ("Chance Murphy"). These receivables amounted to $25,700[,000] (including $21,200[,000] related to the business sold to Chance Murphy) at September 30, 1999. Pursuant to the agreement, the Company provided a working capital guarantee of $30,000 [,000] and Chance Murphy agreed to pay to the Company the amount, if any, of working capital in excess of $30,000[,000] or, as applicable, to transfer to the Company any remaining accounts receivable relating to periods prior to June 1, 1999 once the working capital guarantee has been satisfied. On November 11, 1999, the Company was released from the commitment under the guarantee and the remaining accounts receivable ($18,700[,000] as of November 11, 1999) reverted back to the Company.

FN10. This claim is described herein and in Section III, Nature of the Action, *supra.*

The NovaCare Defendants further move to dismiss Claim (C)(ii) in Count I of the Complaint, FN11 for failure to allege that the uncollectible accounts should have been written off prior to November 22, 1999. Plaintiffs may not rely on an inference based upon events subsequent to the statements; instead they must allege specific facts that directly support the claim that the uncollectible accounts should have been written off at an earlier date. *See Zucker,* 891 F.Supp. at 1017 (filing for bankruptcy four months after offering could not be used to support claim that corporation was in precarious financial position at time of offering). Plaintiffs have failed to comply with this requirement. The allegation that

NovaCare wrote off the uncollectible accounts in the long-term care services division on November 22, 1999, does not by itself support the claim that the accounts should have been written off when the NovaCare Defendants issued the allegedly misleading statements.

FN11. This claim is described herein and in Section III, Nature of the Action, *supra.*

The only other fact in the Complaint relevant to this issue is the allegation that the Company retained assets from NovaCare's long-term care services division on its balance sheet after selling the division to Chance Murphy in June 1999 and exiting the industry. (Compl. ¶¶ 52, 65.) This fact does not support the inference that the accounts receivables of the Company's long-term care services division were uncollectible prior to when the Company wrote off the accounts on November 22, 1999. I conclude that the plaintiffs fail to plead that the above-referenced statements by the NovaCare Defendants were misleading when made with regard to this issue. Consequently, Claim (C) in Count I of the Complaint will be dismissed. FN12

FN12. This claim is described herein and in Section III, Nature of the Action, *supra.*

iii. *NCES Divestiture*

**\*13** Under Claim (D) in Count I of the Complaint, FN13 the plaintiffs claim that the NovaCare Defendants failed to disclose that proceeds from the sale of the NCES division would be reduced because (i) the purchaser of PROH would not enter into an employment services contract with NCES nor assume the guarantee of the employment services contract that the Company had made to the purchasers of NCES; and (ii) the Company had placed $13 million in escrow in support of the employment services contract guarantee. The plaintiffs claim that this omission made the following statements misleading: (1) the letter sent by J. Foster of August 13, 1999, (Compl. ¶ 71); (2) the proxy materials issued on August 13, 1999, (Compl. ¶¶ 74, 76-7); (3) the August 31, 1999

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                Page 14

Not Reported in F.Supp.2d, 2001 WL 1241007 (E.D.Pa.), Fed. Sec. L. Rep. P 91,614
**(Cite as: Not Reported in F.Supp.2d)**

press release, (Compl. ¶ 82); (4) the additional proxy materials sent out on September 10, 1999, (Compl. ¶ 85); (3) the September 27, 1999 letter to the shareholders from J. Foster, T. Foster, McLane, (Compl. ¶ 88); (4) the October 14, 1999 SEC Form 8-K, (attaching the NCES sales agreement) (Compl. ¶ 91); and (5) the November 2, 1999 SEC Form 8-K, (disclosing the $13.4 million placed in escrow) (Compl. ¶ 92).

> FN13. This claim is described herein and in Section III, Nature of the Action, *supra.*

The NovaCare Defendants have moved to dismiss Claim (D)(i) in Count I of the Complaint, FN14 for failure to allege that the defendants issued a statement that was misleading when made. As discussed above, there is no duty to disclose hypothetical future events, absent some reason to believe that they will occur. *See Zucker,* 891 F.Supp. at 1018. The eventual loss of the escrowed funds resulted from events that occurred subsequent to the allegedly fraudulent statements. The reduction in the proceeds from the NCES sale came about after the PROH sale was completed, on November 19, 1999. The plaintiffs have alleged no facts from which it may be inferred that the NovaCare defendants knew that the purchaser of PROH would not assume the guarantee or would not enter into the employment agreement with NCES. I conclude that the plaintiffs cannot impose securities fraud liability on the NovaCare Defendants for statements that did not reveal the loss of the escrowed funds prior to the date on which the sale was completed.

> FN14. This claim is described herein and in Section III, Nature of the Action, *supra.*

The plaintiffs also allege, under Claim D(ii) in Count I of the Complaint, FN15 that NovaCare knew or should have known that they would need to escrow $13.4 million to support the guarantee for the employment contract, and that they failed to make such disclosure until November 2, 1999. If true, this would be sufficient to qualify the statements prior to November 2, 1999, as

misleading when made. Nevertheless, upon consideration of Wasserstein's motion to dismiss, this Court concludes that this omission was immaterial as a matter of law. "In the context of an ' efficient' market, the concept of materiality translates into information that alters the price of the firm's stock." *Burlington Coat Factory,* 114 F.3d at 1425. Accordingly, when the release of information has a negligible effect on the stock price, "[t]his is, in effect, a representation that the information was not material." *Id.; see also Oran,* 226 F.3d at 282 (applying the Court of Appeals for the Third Circuit materiality test). The need to escrow $13.4 million from the NCES sales proceeds was disclosed on November 2, 1999, in an SEC Form 8-K. (Compl. ¶ 92.) According to Bloomberg L.P. data, this disclosure had no negative impact on the stock price of NovaCare on or immediately following November 2, 1999. (Wass. Exh. 11). Under the materiality test of the Third Circuit Court of Appeals, this price stability establishes the immateriality of the omitted information. I therefore conclude that Claim D in Count I of the Complaint will be dismissed. FN16

> FN15. This claim is described herein and in Section III, Nature of the Action, *supra.*

> FN16. This claim is described herein and in Section III, Nature of the Action, *supra.*

### iv. *PROH Divestiture*

**\*14** Under Claim (E) in Count I of the Complaint, FN17 the plaintiffs claim that the NovaCare Defendants failed to disclose that the sales proceeds from the PROH divestiture would be materially reduced because (i) the Company would lose the funds escrowed in support of the financial representations in the sales agreement due to the overstatement of the PROH working capital and accounts receivable, and (ii) the Company would place $36 million in escrow in support of the financial representations and would incur $26 million in transactions costs and liabilities. The plaintiffs claim that these omissions made the following statements misleading: (1) the letter from J. Foster on August 13, 1999, (Compl. ¶ 71); (2)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 15

Not Reported in F.Supp.2d, 2001 WL 1241007 (E.D.Pa.), Fed. Sec. L. Rep. P 91,614
**(Cite as: Not Reported in F.Supp.2d)**

proxy materials sent on August 13, 1999, (Compl. ¶¶ 74, 75, 77); (2) the August 31, 1999 press release, (announcing an adjustment for uncollectible PROH receivables) (Compl. ¶ 82); (3) the October 4, 1999 press release, (announcing the agreement to sell PROH) (Compl. ¶¶ 89-90); and (4) the November 19, 1999 press release, (announcing the completion of the PROH sale) (Compl. ¶ 93).

> FN17. This claim is described herein and in Section III, Nature of the Action, *supra.*

The NovaCare Defendants move to dismiss Claim (E)(i) in Count I of the Complaint, FN18 for failure to allege a statement that was misleading when made. Insofar as the plaintiffs base their claim on Select Medical's eventual claim for indemnification pursuant to the financial representations of the sales agreement, the statements are not actionable for securities fraud. For an actionable claim of a misleading omission, the plaintiffs must show that the omitted information in fact existed at the time the statement was made. *See Zucker,* 891 F.Supp. at 1017. The defendants are not obligated to predict future events unless there is reason to believe that they will occur. *See id.* at 1018. Select Medical asserted its claim for indemnification after the NovaCare Defendants issued the allegedly misleading statements. Thus, the statements are actionable only if the plaintiffs can allege facts to show that the NovaCare Defendants had reason to believe that Select Medical would assert an indemnification claim prior to issuing the allegedly misleading statements.

> FN18. This claim is described herein and in Section III, Nature of the Action, *supra.*

The plaintiffs argue that the NovaCare Defendants knew or should have anticipated that Select Medical would make a claim because they were aware of the material levels of uncollectible accounts receivable in the PROH division. The only relevant fact alleged in the Complaint with regard to this issue was the press release issued on August 31, 1999, announcing a $15.3 million charge to provide for the uncollectible PROH receivables. (Compl. ¶

82.) The press release explained that the uncollectible receivables had been recorded during and prior to a conversion by NovaCare to centralized billing systems, and that newly hired independent collecting agencies had revealed that the Company's bad debt reserve had understated the uncollectible amount of the receivables. (*Id.*) This allegation fails to show that any remaining PROH receivables were uncollectible at the time of the misleading statements, or that the NovaCare Defendants were aware of any further uncollectible receivables. Moreover, the press release disclosed and explained the problems with the PROH accounts receivable to the plaintiffs. The plaintiffs have not alleged that the NovaCare Defendants possessed any other information regarding the PROH receivables. Because the plaintiffs have not alleged any facts to support the inference that the NovaCare Defendants were aware of material levels of uncollectible PROH receivables, consequently, the plaintiffs have failed to allege any facts to demonstrate that the NovaCare Defendants knew or should have anticipated Select Medical's claim for indemnification. Thus, I conclude that the NovaCare Defendants' statements were not misleading when made with regard to the failure to disclose the likelihood of the loss of the escrow or the allegedly false financial representations. Consequently, Claim (E)(i) in Count I of the Complaint will be dismissed. FN19

> FN19. This claim is described herein and in Section III, Nature of the Action, *supra.*

**\*15** Insofar as the plaintiffs base Claim (E)(ii) FN20 on the failure of the NovaCare Defendants to disclose the need to place $36 million of the PROH sales proceeds in escrow and to disclose the high transaction costs, only some of the allegedly misleading statements may be actionable. As discussed above, the defendants are not liable for failure to anticipate future events and disclose them prior to their occurrence. *See Novak,* 216 F.3d at 309. The agreement to escrow PROH sales proceeds and the high transaction costs would not have existed prior to the agreement to sell PROH in October 1999. The plaintiffs do not allege any facts to support the inference that the NovaCare

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 16

Not Reported in F.Supp.2d, 2001 WL 1241007 (E.D.Pa.), Fed. Sec. L. Rep. P 91,614
(Cite as: Not Reported in F.Supp.2d)

Defendants anticipated the escrow or transaction costs prior to entering into the agreement with Select. Thus, I conclude that the statements made in the August 13, 1999 proxy materials and August 31, 1999 press release which did not disclose any need to place PROH sales proceeds in escrow or reveal the high transaction costs were not misleading when made. Consequently, the statements made prior to the October 4, 1999 press release will not be actionable.

> FN20. This claim is described herein and in Section III, Nature of the Action, *supra.*

Claim (E)(i) in Count I of the Complaint, FN21 insofar as it relies upon the October 4 and November 19, 1999 press releases, may be actionable but will be subject to further determination under the remaining issues set forth in the NovaCare Defendants' motion to dismiss.

> FN21. This claim is described herein and in Section III, Nature of the Action, *supra.*

#### v. *Failure to Write Off PROH and NCES Goodwill*

**\*16** Finally, under Claim (F) in Count I of the Complaint, FN22 the plaintiffs claim that despite the Company's anticipated sale of its operating assets under the Restructuring Plan, the NovaCare Defendants failed to reassess the value of goodwill or to adjust the value of the Company's long-term assets on the SEC Form 10-K for the 1999 fiscal year.

> FN22. This claim is described herein and in Section III, Nature of the Action, *supra.*

The NovaCare Defendants have moved to dismiss the claim for failure to identify the GAAP principle from which the defendants allegedly departed. Failure to specify the accounting or auditing principle on which the plaintiffs' claim relies is insufficient to plead fraud with particularity under Rule 9(b) and the PSLRA. *See Christidis v. First Pennsylvania Mortg. Trust,* 717 F.2d 96, 100 (3d

Cir.1983) (rejecting claim largely because of failure to identify accounting or auditing standards). Plaintiffs have referred to the general principle that subsequent events which relate to a condition at the date of the financial statements to be reflected in the financial statements themselves. (Compl. ¶ 54.) Thus, they have identified the accounting principle on which the claim relies sufficiently for purposes of the pleading requirements. *See In re Ikon Office Solutions, Inc.,* 66 F.Supp.2d 622, 636 (E.D.Pa.1999) (plaintiffs specified the accounting and auditing principles at issue).

Nevertheless, the plaintiffs have failed to state a claim under Section 10(b) with regard to the overstatement of goodwill of the Company in the 1999 Form 10-K. Under Section 10(b), a private cause of action arises when purchasers or sellers can identify a false representation of material fact or omission that makes a disclosed statement materially misleading. *See Burlington Coat Factory,* 114 F.3d at 1419. A fact or omission is material only if "there is a substantial likelihood that the it would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information" available to the investor. *See Basic Inc. v. Levinson,* 485 U.S. 224, 231-32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). Although the question of materiality is generally peculiarly for the trier of facts, "if the alleged misrepresentations or omissions are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality," it is appropriate for the district court to rule that the allegations are inactionable as a matter of law. *Shapiro v. UJB Fin. Corp.,* 964 F.2d 272, 281 n. 11 (3d Cir.), *cert. denied,* 506 U.S. 934, 113 S.Ct. 365, 121 L.Ed.2d 278 (1992). Where the information omitted from the allegedly misleading statements was previously or concurrently disclosed, even in another form, this may affect the materiality of the later omission. *See Ieradi,* 230 F.3d at 599-600 (affirming dismissal of claim for lack of materiality) (disclosure of FTC investigation was sufficient to offset omission of existence of potentially illegal exclusive contracts); *Vosgerichian v. Commodore Int'l,* 862 F.Supp. 1371, 1376-77 (E.D.Pa.1994) (dismissing claim for lack of materiality) (disclosure of litigation settlement and warrants in securities filings

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 17

Not Reported in F.Supp.2d, 2001 WL 1241007 (E.D.Pa.), Fed. Sec. L. Rep. P 91,614
**(Cite as: Not Reported in F.Supp.2d)**

rendered their irregular accounting treatment immaterial).

On August 13, 1999, NovaCare filed with the SEC and sent to its shareholders proxy materials regarding the Restructuring Plan. (Compl. ¶ 70.) The proxy materials included pro forma financial statements that clearly reflected the total elimination of the Company's goodwill in the event of the Restructuring Plan's approval. (NovaCare Exh. 16 at 27-8, Lines "Excess cost of net assets acquired.") The Company thus disclosed the impact of the proposed liquidation of the Company on the carrying value of goodwill. Thus, I conclude that any alleged subsequent misstatement of this information from the 1999 Form 10-K would not have altered the "total mix" of information available to the investors, and the alleged misstatement was not materially misleading. I conclude that the plaintiffs have not stated a claim under Section 10(b) with regard to the overstatement of the goodwill of the Company in the 1999 Form 10-K, nor have plaintiffs alleged any facts that could allow the complaint to be amended as to this theory of liability. Consequently, Claim (F) in Count I of the Complaint will be dismissed. FN23

> FN23. This claim is described herein and in Section III, Nature of the Action, *supra.*

**\*17** To recapitulate, Claims (B), (C), (D)(i), (E)(ii) and (F) in Count I of the Complaint, FN24 regarding the O & P divestiture, the divestiture of long-term care services, the loss of the NCES escrow, and the probable loss of the PROH escrow will be dismissed for failure to allege a statement by the NovaCare Defendants that was misleading when made. In addition, Claims (D)(ii) and (F) in Count I of the Complaint, FN25 regarding the need for the NCES escrow and the failure to write down the PROH and NCES goodwill, will be dismissed for failure to allege an omission or misrepresentation of a material fact by the NovaCare Defendants.

> FN24. These claims are described in Section III, Nature of the Action, *supra.*

FN25. These claims are described in Section III, Nature of the Action, *supra.*

Claim E(i) in Count I of the Complaint, FN26 regarding the post-October 4, 1999 statements omitting the PROH escrow and transaction costs, satisfies the first requirement for the PSLRA for purposes of a motion to dismiss. The complaint sufficiently identifies each statement alleged to have been misleading, when and how each statement was made, and explains clearly how and why the plaintiffs believe each statement was misleading. *See In re Advanta Sec. Litig.,* 180 F.3d 525, 539 (3d Cir.1999) (new pleading standard requires plaintiff to plead "the who, what, when, where, and how"). However, this claim will be subject to further determination under the remaining issues set forth in the NovaCare Defendants' motion to dismiss.

> FN26. This claim is described in Section III, Nature of the Action, *supra,* and Section IV, Subsection (B)(2)(a)(iv), PROH Divestiture, *supra.*

#### b. *Scienter*

The NovaCare Defendants have moved to dismiss the plaintiffs' Rule 10b-5 claims for failure to adequately allege scienter. The PSLRA requires that a complaint in a Rule 10b-5 action "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *See* 15 U.S.C. § 78u-4(b)(2). The plaintiff may plead scienter for a Rule 10b-5 action by either (a) alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. *See Advanta,* 180 F.3d at 534-35 (adopting standard set by Second Circuit Court of Appeals).

#### i. *Motive and Opportunity*

**\*18** Under the PSLRA, "catch-all allegations that defendants stood to benefit from wrongdoing and had the opportunity to implement a fraudulent

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2001 WL 1241007 (E.D.Pa.), Fed. Sec. L. Rep. P 91,614
**(Cite as: Not Reported in F.Supp.2d)**

scheme are no longer sufficient" to allege scienter. *See Advanta,* 180 F.3d at 534-35. Allegations of motive and opportunity must be supported by facts stated "with particularity" that give rise to a "strong inference"of scienter. *Id.* "Motive would entail concrete benefits that could be realized by one or more of the statements and wrongful disclosures alleged." *Ikon Office Solutions,* 66 F.Supp.2d at 628 (citing *In re Aetna Sec. Litig.,* 34 F.Supp.2d 935, 955 (E.D.Pa.1999)). The complaint's only allegations regarding motive were that (1) ten NovaCare insiders had sold their holdings in the Company from May 20 through May 22, 1998, and (2) the Individual Defendants had arranged for and received bonuses that were tied to the approval and implementation of the Restructuring Plan. (Compl. ¶¶ 114-16.)

Sales of company stock by corporate executives made "at times and in quantities that were suspicious " may support the necessary strong inference of scienter. *See Burlington Coat Factory,* 114 F.3d at 1424. Nevertheless, "[a] broad temporal distance between stock sales and a disclosure of bad news defeats any inference of scienter." *In re Party City Sec. Litig.,* 147 F.Supp.2d 282, 313 (D.N.J.2001). As pleaded in the complaint, the NovaCare Defendants issued the first allegedly misleading statement in September of 1998, four months after the corporate insiders had sold their stock. FN27 The sale of stock from May 20 to May 22, 1998, may or may not be construed as evidence of the company's early awareness of the impact of the BBA on the long-term care services division; they do not, however, reveal any motive for the defendants to inflate the value of the Company's stock after May 22, 1998.

> FN27. I note that the plaintiffs have framed the purported class period to begin from May 20, 1998, to coincide with T. Foster's sale of NovaCare stock. "It is axiomatic that a private action for securities fraud must be dismissed when a plaintiff fails to plead that he or she reasonably and justifiably relied on an alleged misrepresentation." *Semerenko v. Cendant Corp.,* 223 F.3d 165, 178 (3d

Cir.2000); *cert. denied,* 2001 U.S. LEXIS 1188 (Feb. 20, 2001). Because any investors who purchased their stock prior to the allegedly fraudulent statements cannot plead reliance, they have no viable claim for securities fraud. *See Weiner v. Quaker Oats Co.,* 129 F.3d 310, 321 (3d Cir.1997) (affirming dismissal of part of the claims, and remanding the rest) (observing that district court may limit class period to begin from date of first fraudulently misleading statement). Thus, although the plaintiffs have not yet moved for class certification, upon any such motion, the class period would be limited to begin from the time of the first actionable misleading statement.

Moreover, allegations of stock sales by corporate insiders do not necessarily lead to a "strong inference" of motive when several of the named individual defendants had not sold their company stock during the relevant time frame. *See Oran,* 226 F.3d at 289-91 (lack of scienter where failure to show "concerted insider effort to dispose of shares" ); *Advanta,* 180 F.3d at 540-41 (lack of stock sales by several defendants raised doubts as to allegations of motive to profit from inflated stock prices) (citing *Acito v. IMCERA Group,* 47 F.3d 47, 54 (2d Cir.1995)). Of the Individual Defendants, only Defendant T. Foster, the NovaCare chief executive officer, has been alleged to have sold NovaCare stock during the May 20 to May 22, 1998 time period. In contrast, there were no allegations of any sales of Company stock during the proposed class period by J. Foster, the Chairman of the Board of Directors, Healy, the chief financial officer, or McLane, the chief operating officer and member of the Board of Directors. Consequently, I conclude that the May 1998 trades do not establish the requisite strong inference of scienter.

Similarly, the plaintiffs' allegations regarding the ties of bonuses for the Individual Defendants to the successful approval and implementation of the Restructuring Plan do not reveal a motive for the defendants to inflate the value of NovaCare stock. Allegations that the defendants benefitted from an alleged fraud by incentive compensation or

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2001 WL 1241007 (E.D.Pa.), Fed. Sec. L. Rep. P 91,614
**(Cite as: Not Reported in F.Supp.2d)**

retention of their employment privileges have been held insufficient to plead motive under the PSLRA standard. *See Burlington Coat Factory,* 114 F.3d at 1423 n. 12 (no scienter alleged where plaintiffs failed to explain how a "temporary inflation of ... stock price would help management increase its compensation or preserve its jobs"); *In re CDNOW, Inc. Sec. Litig.,* 138 F.Supp.2d 624, 643-44 (E.D.Pa.2001) (allegations that defendants benefit by retaining position with merged company held insufficient to plead motive); *cf. In re Resource Am. Sec. Litig.,* Civ.No. 98-5446, 2000 U.S. Dist. LEXIS 10640, **18-21 (E.D.Pa. July 26, 2000) (allegations of company's desire to raise capital for secondary offering sufficient to establish motive because stock inflation would increase capital raised). Moreover, the creation of a bonus system to retain key corporate executives during a volatile period of change is a valid business purpose that benefits the company, and correspondingly benefits the shareholders. *See Int'l Ins. Co. v. Johns,* 874 F.2d 1447, 1462-64 (11th Cir.1989) (explaining reasons for and benefits of retention incentive plan). Rather than leading to a strong inference of a motive for fraud, the retention bonus system leads to the strong inference that the Company was attempting to ensure the continuity of leadership during a delicate period of restructuring in order to achieve the highest prices for the asset sales. Consequently, I conclude that the plaintiffs have not sufficiently alleged motive and opportunity for the NovaCare Defendants to commit fraud to establish, nor would the uncontradicted facts permit, the strong inference of scienter required under the PSLRA. Accordingly, the plaintiffs' claims under Count I of the Complaint will survive a motion to dismiss only if the Complaint has alleged facts that constitute "strong circumstantial evidence of conscious misbehavior or recklessness" sufficient to establish scienter. *See Advanta,* 180 F.3d at 534-35.

### ii. *Conscious Misbehavior or Recklessness*

*\*19* Like allegations of motive and opportunity, allegations of intentional, conscious or reckless behavior must be supported by facts stated "with particularity" that give rise to a "strong inference" of scienter. *See id.* Plaintiffs' remaining Rule 10b-5

claim, Claim E(i) in Count I of the Complaint, FN28 alleges a failure by the NovaCare Defendants to disclose the PROH escrow and transaction costs in the October 4, 1999, and November 19, 1999 press releases. The complaint's only allegations regarding the NovaCare Defendants' consciousness or recklessness with regard to this claim were that the Individual Defendants were the Company's officers and directors, were involved in the Company's day-to-day affairs, and had access to detailed information regarding the segments and lines of business of NovaCare's operations. (Compl. ¶¶ 12-16, 20, 22.) For the following reasons, these conclusory allegations are not legally adequate to meet the particularity and strong inference requirements under the PSLRA.

> FN28. This claim is described in Section III, Nature of the Action, *supra,* and Section IV, Subsection (B)(2)(a)(iv), PROH Divestiture, *supra.*

Blanket statements that the defendant must have been aware of impending losses or that a statement was false or misleading by virtue of his position within the company are inadequate to withstand Rule 9(b) or PSLRA scrutiny. *See Advanta,* 180 F.3d at 539. "Generalized imputations of knowledge do not suffice, regardless of the defendants' positions within the company." *Id.* Where plaintiffs contend that the defendants had access to contrary facts, they must specifically identify the reports or statements containing this information. *See Novak,* 216 F.3d at 309; *see also Shaw v. Digital Equip. Corp.,* 82 F.3d 1194, 1224 (1st Cir.1996) (dictum noting that absent indication of specific factual content of any single report, general allegation of "highly efficient" reporting system is not independent basis from which to infer knowledge). In the absence of any allegations regarding the factual content of any single report received by the Individual Defendants that would have provided a basis for advance knowledge of the falsity of their statements, I conclude that the plaintiffs' allegations that the NovaCare Defendants must have known that the statements were misleading through virtue of their positions within the Company are insufficient to adequately plead

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                          Page 20

Not Reported in F.Supp.2d, 2001 WL 1241007 (E.D.Pa.), Fed. Sec. L. Rep. P 91,614
**(Cite as: Not Reported in F.Supp.2d)**

conscious or reckless behavior.

**\*20** In their responsive papers, the plaintiffs further argue that the short time period that elapsed between the issuance of the October 4, 1999 press release and the SEC Form 10-Q filed on November 22, 1999, is sufficient to give rise to an inference of scienter. Contrary to the plaintiffs' arguments, "the short time frame between an allegedly fraudulent statement or omission and a later disclosure of inconsistent information does not, standing alone, provide a sufficient factual grounding to satisfy Rule 9(b)...." *Shaw,* 82 F.3d at 1225. The theory that the problems "couldn't have happened overnight," without allegations of particularized facts contemporaneous to the issuance of the allegedly misleading statements to support the theory, is simply not enough to withstand a motion to dismiss. *See Castlerock Mgmt., Ltd. v. Ultralife Batteries, Inc.,* 68 F.Supp.2d 480, 489 (D.N.J.1999) . Thus, I conclude that the allegation of the short period between the disclosure by the NovaCare Defendants and the allegedly misleading statements does not by itself constitute strong circumstantial evidence of conscious misbehavior or recklessness, as required under the PSLRA.

I conclude that the plaintiffs have failed to state with particularity facts giving rise to a strong inference of scienter as required under the PSLRA to adequately plead a Rule 10b-5 claim against the NovaCare Defendants. Consequently, Count I of the Complaint will be dismissed.

### 3. Section 14(a) Claims

**\*21** Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides, in pertinent part that:
[n]o solicitation subject to this regulation shall be made by means of any proxy statement ... which, at the time ... it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading.

17 C.F.R. § 240.14a-9. To prevail on a Section 14(a) claim, a plaintiff must show that (1) a proxy statement contained a material misrepresentation or omission which (2) caused the plaintiff injury and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was " an essential link in the accomplishment of the transaction." *See Gen. Elec. Co. v. Cathcart,* 980 F.2d 927, 932 (3d Cir.1992).

#### a. *Material Misrepresentation or Omission*

The NovaCare Defendants challenge the plaintiffs' Section 14(a) claims under Count V of the Complaint for failure to show that the proxy statement contained a material misrepresentation for the same reasons articulated in the Rule 10b-5 discussion above. The Complaint alleged that the proxy materials dated August 13, 1999, and September 10, 1999, violated Section 14(a) and Rule 14a-9 because they had misrepresented the liquidation values of NovaCare. (Compl. ¶ 140.) Specifically, the Complaint alleged that the proxy materials omitted the following information: (1) NovaCare was facing a reduction in the sales price of the O & P business of more than $25 million; (2) the Company faced material liabilities in connection with the Chance Murphy transaction; (3) the Company would likely realize a loss on the sale of NCES; and (4) the Company would face a materially larger loss on the sale of PROH due to the level of uncollectible accounts and other factors. (Compl. ¶ 77.) The Complaint further alleges that the proxy materials failed to disclose fully the extent of bonuses that the Company executives had negotiated for themselves. (Compl. ¶ 79.)

Under the heightened pleading standard of the PSLRA, the complaint in a Section 14(a) action must specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, all facts with particularity on which that belief is formed. *See* 15 U.S.C. § 78u-4(b)(1). As explained above, plaintiffs have failed to allege particularized facts to support the allegation that the statements regarding the following issues were materially false when the NovaCare defendants issued the proxy materials: (1) the O & P

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2001 WL 1241007 (E.D.Pa.), Fed. Sec. L. Rep. P 91,614
**(Cite as: Not Reported in F.Supp.2d)**

divestiture; (2) the divestiture of the Company's long-term care services division; (3) the NCES divestiture; and (4) the PROH divestiture. Thus, I conclude that the plaintiffs' Section 14(a) claims with regard to these issues will be dismissed.

### b. *Transaction Causation*

**\*22** The NovaCare defendants further challenge the Section 14(a) claim in Count V of the Complaint for failure to show transaction causation. Under *Mills v. Elec. Auto-Lite Co.,* 396 U.S. 375, 384-85, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970), plaintiffs do not have to prove that the particular defect in the proxy materials affected the results of the shareholder vote; they need only show that the proxy solicitation itself was an "essential link" in the accomplishment of the transaction. Nevertheless, damages are recoverable under Section 14(a) only when the transaction that was approved through the false proxy statement was the "direct cause of the pecuniary injury for which recovery is sought." *See Cathcart,* 980 F.2d at 933 (holding there was " insufficient nexus" between fraudulent proxy materials that led to election of directors and alleged monetary loss that resulted from corporate mismanagement). Because the damages recoverable from a Section 14(a) claim must have resulted directly from the approved transaction, the plaintiffs must plead that they were directly harmed by the Restructuring Plan.

*Gannon v. Continental Ins. Co.,* 920 F.Supp. 566 (D.N.J.1996), provides some guidance in this area. In *Gannon,* the plaintiff asserted, among other claims, that the corporate defendant had made material misrepresentations in the proxy solicitation for the approval of a merger. *Id.* at 581. The *Gannon* court concluded that the merger itself had not caused the injury to the plaintiffs, but that the price received by the shareholders in the merger was reduced as a result of corporate mismanagement. *Id.* at 584. The court held that this was not a sufficient nexus between the proxy statement and the alleged monetary loss, and that therefore the plaintiff's claim did not meet the transaction causation requirement of a Section 14(a) claim. *Id.* at 584.

Here, the only relevant fact alleged in the Complaint with regard to any direct harm suffered from the approved transaction was the allegation that the plaintiffs "sustained damages as a result of the implementation of the [Restructuring P]lan...." (Compl. ¶ 142.) This conclusory allegation insufficiently pleads causation for the claim to survive a motion to dismiss. As in *Gannon,* the plaintiffs here do not allege that the divestitures were wrongful, but that the sales proceeds of the divestitures were less than the plaintiffs had anticipated. The plaintiffs have alleged no facts to illustrate how their position as stockholders would have been different had the Restructuring Plan not been approved. Although the plaintiffs argue in their response that the shareholders would still possess two functioning subsidiaries that might have subsequently become profitable, neither this fact nor any allegations to support it were pleaded in the Complaint. Because the plaintiffs fail to allege any facts as to how the plaintiffs sustained damage directly from the approval of the Restructuring Plan, I conclude that they have failed to state a claim under Section 14(a). Consequently, Count V of the Complaint will be dismissed as against the NovaCare Defendants.

### 4. *Failure to Plead with Particularity Against the Individual Defendants*

**\*23** The Individual Defendants have moved to dismiss Counts I and V of the Complaint for failure to particularize each person's role in the alleged fraud as required under the PSLRA. They argue that plaintiffs have improperly relied upon the group pleading doctrine to impute NovaCare's alleged misrepresentations to the Individual Defendants. In light of the conclusions in the preceding discussion to dismiss both Counts I and V of the Complaint against the NovaCare Defendants, the Court will not reach this issue.

### 5. *Section 20(a) Claim*

The NovaCare Defendants have moved to dismiss Count IV of the Complaint, which asserts claims against the Individual Defendants as "control

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2001 WL 1241007 (E.D.Pa.), Fed. Sec. L. Rep. P 91,614
**(Cite as: Not Reported in F.Supp.2d)**

persons" under Section 20(a) of the Exchange Act, for failure to plead an underlying Section 10(b) violation by NovaCare. Claims under Section 20(a) are derivative, requiring proof of a separate underlying violation of the Exchange Act. *See Advanta,* 180 F.3d at 541. Because I conclude that plaintiffs have not pleaded a predicate violation of the Exchange Act, Count IV of the Complaint will be dismissed.

### C. Motion of Defendant PwC to Dismiss

Count II of the Complaint asserts Rule 10b-5 claims against PwC, alleging that: (1) PwC failed to reassess the long-term care services goodwill in NovaCare's 1998 Form 10-K and the goodwill of the Company in NovaCare's 1999 Form 10-K as required under GAAP and generally accepted auditing standards ("GAAS"), and (2) PwC issued an unqualified audit report for the 1998 and 1999 Forms 10-K that were materially false and misleading. (Compl. ¶¶ 123-25.) PwC has moved to dismiss the claims against it pursuant to Federal Rule of Civil Procedure 12(b)(6).

For the reasons discussed above in the consideration of the motion of the NovaCare Defendants to dismiss, I conclude that plaintiffs as reasonable stockholders were at least on inquiry notice of the claim regarding the overstatement of goodwill in the 1998 Form 10-K by June 16, 1999, and, in the exercise of reasonable diligence, should have discovered the basis for the claim within one year of that date. Because the claim regarding the overstatement of goodwill in the 1998 Form 10-K was not asserted until September 19, 2000, I conclude that this claim is time-barred under the one year statute of limitations for federal securities fraud claims. *See* 15 U.S.C. § 76i(e).

Also for the reasons discussed above in the consideration of the motion of the NovaCare Defendants to dismiss, I conclude from the uncontradicted facts of the record and from the proxy materials filed with the SEC filing of which I take judicial notice, that the disclosure of the impact of the proposed liquidation of the Company in the proxy materials filed with the SEC and sent on

August 13, 1999, rendered immaterial any subsequent misstatement regarding the goodwill of the Company in the 1999 Form 10-K. The alleged misstatement in the 1999 Form 10-K would not have altered the "total mix" of information available to the investors. I conclude that the plaintiffs' claim regarding the 1999 Form 10-K fails to allege a material misrepresentation as required to state a claim under Rule 10b-5.

Accordingly, the plaintiffs' claims against PwC in Count II of the Complaint will be dismissed.

### D. Motion of Defendant Wasserstein to Dismiss

**\*24** The plaintiffs assert Rule 10b-5 and Section 14(a) claims against Wasserstein in Counts III and V of the Complaint. They allege that Wasserstein fraudulently omitted material information regarding the loss of the $13.4 million escrow for the NCES employment guarantee from the opinion letter included in the proxy materials dated September 10, 1999. Wasserstein has moved to dismiss the claims against it pursuant to Federal Rule of Civil Procedure 12(b)(6).

For the reasons discussed above in the consideration of the motion of the NovaCare Defendants to dismiss, there is no duty to disclose hypothetical future events, absent some reason to believe that they will occur. *See Zucker,* 891 F.Supp. at 1018. The eventual loss of the NCES escrow occurred after the PROH sale was completed on November 19, 1999. Insofar as the plaintiffs' claim is based on events that took place after Wasserstein's allegedly fraudulent statements, I conclude that they are not actionable for securities fraud; Wasserstein cannot be held liable for not disclosing a loss that had not yet occurred. Thus, the only remaining claim against Wasserstein under Counts III and V of the Complaint is its alleged failure to disclose the Company's need to escrow $13.4 million of the NCES proceeds to support the guarantee for the employment contract with PROH.

### 1. *Materiality*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                           Page 23

Not Reported in F.Supp.2d, 2001 WL 1241007 (E.D.Pa.), Fed. Sec. L. Rep. P 91,614
**(Cite as: Not Reported in F.Supp.2d)**

Wasserstein has moved to dismiss the claims against it in Counts III and V of the Complaint for failure to allege the misrepresentation of a material fact. It argues that the alleged failure to disclose the need to escrow $13.4 million of the NCES proceeds to support the guarantee for the employment contract with PROH was immaterial as a matter of law because the stock of the Company was undisturbed after the disclosure of this information. "Because in an efficient market 'the concept of materiality translates into information that alters the price of the firm's stock,' if a company's disclosure of information has no effect on stock prices, 'it follows that the information disclosed was immaterial as a matter of law.' " *See Oran,* 226 F.3d at 282 (citing *Burlington Coat Factory,* 114 F.3d at 1425). The disclosure of the $13.4 million escrow on November 2, 1999, had no negative effect on the stock price of NovaCare. (Compl. ¶ 92; Wass. Exh. 11). Under the rule of materiality fashioned by the Court of Appeals for the Third Circuit, I conclude that this price stability establishes the immateriality of the omitted information as a matter of law.

The plaintiffs argue that even if the information is deemed immaterial for their Rule 10b-5 claim, this does not preclude a finding of materiality for Section 14(a) purposes. They argue that, unlike a claim for securities fraud, a Section 14(a) claim does not depend upon the efficiency of the market. Information is deemed material for purposes of a Section 14(a) claim "if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *TSC Industries v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976). The test for materiality is whether there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.* This definition of materiality is the same for both Section 10(b) and Section 14(a) claims. *See Basic,* 485 U.S. at 231-32 (adopting *TSC* standard for Rule 10b-5 claim); *SEC v. Steadman,* 967 F.2d 636, 643 (D.C.Cir.1992) ( *TSC* definition is generally accepted definition of materiality under federal securities laws). The stability of the NovaCare stock price following the

release of the omitted information indicates that there is no "substantial likelihood" that the information would have "significantly altered" the " total mix" of information available to the shareholders. *Cf. In re Meridian Sec. Litig.,* 772 F.Supp. 223 (E.D.Pa.1991) (concluding that finding of materiality for Rule 10b-5 claim sufficiently establishes materiality for Rule 14a-9 claim). I conclude that the plaintiffs have failed to allege a material misrepresentation by Wasserstein as required to state a claim under Rule 10b-5 and Section 14(a).

Consequently, Counts III and V of the Complaint will be dismissed.

### E. Leave to Amend

**\*25** The plaintiffs have requested in general argument that, in the event the Complaint was dismissed, they be given leave to replead. Under Federal Rule of Civil Procedure 15(a), "leave [to amend] shall be freely given when justice so requires." *Burlington Coat Factory,* 114 F.3d at 1434. Generally, leave to amend is granted when a complaint has been dismissed on Rule 9(b) "failure to plead with particularity" grounds. *See id.* However, leave to replead has been denied on other grounds, such as undue delay, bad faith, dilatory motive, prejudice, and futility. *See id.* Futility means that the complaint, as amended, would fail to state a claim upon which relief could be granted, under the same standard of legal sufficiency as Rule 12(b)(6). *See id.*

Several of the claims asserted by the plaintiff would clearly be futile to amend. The claim regarding the overstatement of goodwill in the 1998 Form 10-K is time-barred under the statute of limitations. In addition, the claims regarding the need for the NCES escrow and the overstatement of goodwill in the 1999 Form 10-K will not survive a Rule 12(b)(6) motion even if made with more particularity. The facts underlying my conclusions are uncontroverted, and by the nature of these facts, there is no suggestion that they will change.

The defendants argue that plaintiffs should not be

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 24

Not Reported in F.Supp.2d, 2001 WL 1241007 (E.D.Pa.), Fed. Sec. L. Rep. P 91,614
**(Cite as: Not Reported in F.Supp.2d)**

given leave to replead any of the claims for reasons of undue delay, prejudice and futility. It should be noted that ten law firms, several with extensive securities class action expertise, took roughly six months to coordinate and prepare the Complaint, a 59-page consolidation of six complaints, the first of which had been filed more than one year ago. There is no doubt that the action is mature from a pleading perspective. In addition, although the NovaCare Defendants provided extensive arguments as to why the plaintiffs should be denied any leave to replead, the plaintiffs failed to respond to these arguments and only cursorily request leave to amend. The plaintiffs' responsive papers include no representation as to any new information that the plaintiffs might have received since filing the Complaint, nor did they provide proposed amendments or specific facts that would cure the Complaint's pleading deficiencies.

Additionally, the defendants argue that the plaintiffs should not be given leave to replead in light of the specific language and goals of the PSLRA. The purpose of the PSLRA was specifically to
restrict abuses in securities class-action litigation, including: (1) the practice of filing lawsuits against issuers of securities in response to any significant change in stock price, regardless of defendants' culpability; (2) the targeting of "deep pocket" defendants; (3) the abuse of the discovery process to coerce settlement; and (4) manipulation of clients by class action attorneys.

*Advanta,* 180 F.3d at 531 (citing H.R. Conf. Rep. No. 104-369, at 28 (1995), reprinted in 1995 U.S.C.C.A.N. 679, 748). Accordingly, the PSLRA provided for an automatic stay of discovery proceedings during the pendency of any motion to dismiss, and adopted heightened pleading standards for a complaint to state a claim under the federal securities law. *See* 15 U.S.C. § 78u-4(b).

**\*26** The United States District Court for the Eastern District of Michigan has ruled that the PSLRA " restricts" application of Rule 15 in federal securities cases, such that complaints that fail to meet the heightened pleading requirements should be dismissed with prejudice. *See In re Champion Enters., Inc. Sec. Litig.,* 145 F.Supp.2d 871, 872-74

(E.D.Mich.2001). While there are some factual distinctions between this case and *Champion Enters.,* I adopt the reasoning of that Court's interpretation of the intent of Congress in placing higher burdens upon plaintiffs in pleading this type of cause of action. The PSLRA's stay of discovery procedures was intended by Congress to protect innocent defendants from having to pay nuisance settlements in securities fraud actions in which a foundation for the suit cannot be pleaded; rather than lead to the conclusion that plaintiffs should receive more leniency in amending their pleadings, the stay of discovery procedures adopted in conjunction with the heightened pleading standards under the PSLRA is a reflection of the objective of Congress "to provide a filter at the earliest stage (the pleading stage) to screen out lawsuits that have no factual basis." *Id.* at 874 (quoting Selected Bill Provisions of the Conference Report to H.R. 1058/S. 240, 141 Cong. Rec. S19152 (daily ed. Dec. 22, 1995)). This objective would be thwarted if, considering the history of this case, plaintiffs were liberally permitted leave to amend again; this is particularly true where, as here, there is a stark absence of any suggestion by the plaintiffs that they have developed any facts since the action was commenced which would, if true, cure the defects in the pleadings under the heightened requirements of the PSLRA.

In light of the foregoing discussion, the plaintiffs' request for leave to amend is denied.

## V. CONCLUSION

Securities trading is an inherently risky activity. While the Court sympathizes with the shareholders who have lost on their investments, the federal securities laws are not a guarantee against reversals of fortune. The new Medicare and Medicaid reimbursement rates issued by the HCFA altered the landscape of the physical rehabilitation services industry. NovaCare's attempts to adapt to the altered environment, and later attempts to salvage its losses, ultimately failed. As the Court of Appeals for the Seventh Circuit has articulated, "[t]he story in this complaint is familiar to securities litigation. At one time the firm bathes itself in a favorable

Not Reported in F.Supp.2d                                                                                                    Page 25

Not Reported in F.Supp.2d, 2001 WL 1241007 (E.D.Pa.), Fed. Sec. L. Rep. P 91,614
**(Cite as: Not Reported in F.Supp.2d)**

light. Later the firm discloses that things are less rosy. The plaintiff contends that the difference must be attributable to fraud." *DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir.1990). Nevertheless, for relief under the federal securities laws, the plaintiffs must allege specific facts to support their allegations of fraud. The plaintiffs have failed to do so here. All Counts of the Complaint will be dismissed with prejudice.

An appropriate Order follows.

### ORDER

**\*27** AND NOW, this 17th day of October, 2001, upon consideration of the motion of defendants NAHC, Inc., John H. Foster, Timothy E. Foster, James W. McLane, and Robert E. Healy, Jr. for judicial notice in support of their motion to dismiss (Document Nos. 44, 45), and the motions of defendants NAHC, Inc., John H. Foster, Timothy E. Foster, James W. McLane, and Robert E. Healy, Jr. (Document No. 43), defendant PricewaterhouseCoopers L.L.P. (Document No. 47) and defendant Wasserstein Perella & Co., Inc. (Document No. 48) to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) and the Private Securities Litigation Reform Act, having reviewed the responses (Document Nos. 54, 55), as well as the replies (Document Nos. 58, 60, 61, 62), and for the reasons set forth in the foregoing memorandum, IT IS HEREBY ORDERED that: (1) the motion for judicial notice if GRANTED, and (2) the motions to dismiss are GRANTED and the consolidated and amended complaint is DISMISSED in its entirety.

JUDGMENT is hereby ENTERED in favor of defendants NAHC, Inc., John H. Foster, Timothy E. Foster, James W. McLane, Robert E. Healy, Jr., PricewaterhouseCoopers L.L.P, and Wasserstein Perella & Co., Inc., and against putative class representatives Franz Schleicher, Barry Weisberg, Bruce Bardone, Frank J. Siefert, and others similarly situated.

This is a final order.

E.D.Pa.,2001.

In re NAHC, Inc. Securities Litigation
Not Reported in F.Supp.2d, 2001 WL 1241007 (E.D.Pa.), Fed. Sec. L. Rep. P 91,614

Briefs and Other Related Documents (Back to top)

• 2:00CV04020 (Docket) (Aug. 09, 2000)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.