EXHIBIT A

*News Release*

**CONTACTS:**
Magma Design Automation Inc.:

Monica Marmie
Director, Marketing Communications
(408) 565-7689
monical@magma-da.com

Milan G. Lazich
Vice President, Corporate Marketing
(408) 565-7706
milan.lazich@magma-da.com

**Magma Reports Record Revenue of $41.3 Million in Third-Quarter Financial Results**

SANTA CLARA, Calif., Feb. 2, 2006 — Magma Design Automation Inc. (Nasdaq: LAVA), a provider of semiconductor design software, today announced it achieved record revenue of $41.3 million for its 2006 fiscal third quarter, ended Jan. 1, 2006, an increase of 11 percent over the $37.3 million reported for the year-ago third quarter ended Dec. 31, 2004.

**GAAP Results**

In accordance with generally accepted accounting principles (GAAP), Magma reported a net loss of $(8.1) million, or $(0.23) per share (basic and diluted), for the quarter, compared to a net loss of $(0.7) million, or $(0.02) per share (basic and diluted), for the year-ago third quarter.

**Non-GAAP Results**

Magma reported non-GAAP net income of $3.5 million for its fiscal 2006 third quarter, or $0.09 per share (diluted). This compares to a non-GAAP net income of $8.4 million, or $0.20 per share (diluted), for the year-ago third quarter.

Non-GAAP net income for the third quarter of fiscal 2006 excludes the effects of amortization of developed technology, amortization of intangible assets, amortization of deferred stock-based compensation, charges associated with losses in equity investments, acquisition-related expenses, in-process research and development expenses and the tax effects of these adjustments. Non-GAAP net income for the third quarter of fiscal 2005 excludes the effects of amortization of developed technology, amortization of intangible assets, amortization of deferred stock-based compensation, acquisition-related expenses, miscellaneous marketing expenses, restructuring expenses, charges associated with losses in equity investments, in-process research and development expenses and the tax effects of these adjustments. A reconciliation of our non-GAAP results to GAAP results is included in this press release.

The costs of Magma's patent litigation with Synopsys continued to have an impact on profitability. Litigation expenses in the third-quarter were $6.2 million, or $0.15 per share. Litigation expenses increased by $2.3 million, or $0.06 per share, in the third-quarter compared to the second quarter of fiscal 2006. In the third-quarter Magma generated cash flow from operations of approximately $6.4 million. The company generated $5.2 million free cash flow (defined as cash flow from operations less capital expenditures).

"It was a good quarter for Magma in all aspects of our operation," said Rajeev Madhavan, chairman and CEO of Magma. "We achieved record revenue again – the third quarter in a row we have accomplished that – and all key financial metrics finished within our target ranges. More and more customers are finding Magma to be the best software for designing large, complex and high-performance designs. And we are at a record number of employees – very talented technologists, particularly in the R&D and application engineering teams, are finding that Magma is the place for them."

**GAAP Reconciliation**

Magma provides non-GAAP financial information to assist investors in assessing its current and future operations in the way that Magma's management evaluates those operations. Magma believes that this non-GAAP information provides useful information to investors by excluding the effect of some expenses that are required to be recorded under GAAP but that Magma believes are not indicative of Magma's core operating results, or that are expected to be incurred over a limited period of time.

Magma's management evaluates and makes operating decisions about its business operations primarily based on bookings, revenue and the core costs of those business operations. Management believes that the amortization of developed technology and intangible assets, amortization of deferred stock-based compensation, in-process research and development charges, integration and other acquisition-related expenses, workforce realignment restructuring charges, and the tax effects of its non-GAAP adjustments (yielding a non-GAAP effective tax rate of 16 percent for the third quarter of fiscal 2006) and other significant unusual items are not operating costs of its core software and service business operations. Therefore, management presents non-GAAP financial measures, along with GAAP measures, in this earnings release by excluding these items from the period expenses. The income statement line items affected are as follows: (1) cost of revenue, licenses; (2) cost of revenue, services; (3) total cost of revenue; (4) gross profit; (5) operating expenses, research and development; (6) operating expenses, general and administrative; (7) total operating expenses; (8) operating income (loss); (9) other income (expense), net; (10) total interest and other income (expense), net; (11) net income (loss) before income taxes; (12) benefit from (provision for) income taxes; (13) net income (loss); and (14) net income (loss) per share. To determine its non-GAAP provision for income taxes, Magma recalculates tax based on non-GAAP income before income taxes and adjusts accordingly.

For each such non-GAAP financial measure, the adjustment provides management with information about Magma's underlying operating performance that enables a more meaningful comparison of its financial results in different reporting periods. For example, since Magma does not undertake significant

restructuring or realignments on a predictable cycle, management would have difficulty evaluating Magma's profitability as measured by gross profit, operating profit, income before taxes and net income on a period-to-period basis unless it excluded these charges. Similarly, since Magma does not acquire businesses on a predictable cycle, management excludes acquisition-related charges, such as in-process research and development charges, in order to make more consistent and meaningful evaluations of Magma's operating expenses. Management also uses these measures to help it make budgeting decisions between those expenses that affect operating expenses and operating margin (such as research and development, sales and marketing, and general and administrative expenses), and those expenses that affect cost of revenue and gross margin (such as product development expenses).

Further, the availability of non-GAAP financial information helps management track actual performance relative to financial targets, including both internal targets and publicly announced targets. Making this non-GAAP financial information available also helps investors compare Magma's performance with the announced operating results of its principal competitors, which regularly provide similar non-GAAP financial information.

Management recognizes that the use of these non-GAAP measures has limitations, including the fact that management must exercise judgment in determining whether some types of charges, such as those relating to workforce reductions executed in the ordinary course of business, should be excluded from non-GAAP financial measures. Management believes, however, that providing this non-GAAP financial information facilitates consistent comparison of Magma's financial performance over time. Magma has historically provided non-GAAP results to the investment community, not as an alternative but as a supplement to GAAP information, to enable investors to evaluate Magma's core operating performance in the way that management does.

**Reconciliation of Third Quarter GAAP and Non-GAAP Financial Results**

| Income Statement Reconciliation<br>(in thousands) | Three Months Ended | | Nine Months Ended | |
| --- | --- | --- | --- | --- |
| | January 1,<br>2006 | December<br>31, 2004 | January 1,<br>2006 | December<br>31, 2004 |
| GAAP net loss | $(8,068) | $(719) | $(14,711) | $(2,967) |
| Amortization of developed technology | 6,524 | 1,628 | 16,952 | 4,366 |
| Amortization of intangible assets | 2,682 | 4,680 | 9,152 | 13,248 |
| Amortization of stock-based compensation | 918 | 357 | 3,910 | 937 |
| Acquisition related expenses | 485 | 1,161 | 1,251 | 2,843 |
| Legal settlement expense | - | - | 750 | - |
| Miscellaneous marketing expenses | - | (236) | - | 108 |
| In-process research and development | 450 | 355 | 450 | 4,364 |
| Restructuring charge | - | 259 | - | 698 |
| Net gain on repurchase of convertible notes and loss on sale of marketable securities in conjunction with the repurchase | - | - | (8,120) | - |
| Loss on equity investments | 343 | 352 | 854 | 1,016 |
| Tax effect | 124 | 566 | 405 | (867) |
| Non-GAAP net income | $3,458 | $8,403 | $10,893 | $      23,746 |

| Earnings Per Share Reconciliation | Three Months Ended | | Nine Months Ended | |
| --- | --- | --- | --- | --- |
| | January 1,<br>2006 | December<br>31, 2004 | January 1,<br>2006 | December<br>31, 2004 |
| GAAP net loss | $(0.23) | $(0.02) | $(0.43) | $(0.09) |
| Amortization of developed technology | 0.19 | 0.05 | 0.50 | 0.13 |
| Amortization of intangible assets | 0.08 | 0.14 | 0.27 | 0.39 |
| Amortization of stock-based compensation | 0.03 | 0.01 | 0.11 | 0.03 |
| Acquisition related expenses | 0.01 | 0.03 | 0.04 | 0.09 |
| Legal settlement expense | - | - | 0.02 | - |
| Miscellaneous marketing expenses | - | (0.01) | - | - |
| In-process research and development | 0.01 | 0.01 | 0.01 | 0.13 |
| Restructuring charge | - | 0.01 | - | 0.02 |
| Net gain on repurchase of convertible notes and loss on sale of marketable securities in conjunction with the repurchase | - | - | (0.24) | - |
| Loss on equity investments | 0.01 | 0.01 | 0.03 | 0.03 |
| Tax effect | - | 0.02 | 0.01 | (0.03) |
| Non-GAAP net income (basic) | $0.10 | $0.25 | $0.32 | $0.70 |
| Non-GAAP net income (diluted) | $0.09 | $0.20 | $0.27 | $0.56 |
| Basic shares used in calculation | 34,470 | 33,829 | 34,237 | 33,742 |
| Diluted shares used in calculation | 40,052 | 41,749 | 39,937 | 42,317 |

**Business Outlook**

For Magma's fiscal 2006 fourth quarter, ending April 2, 2006, the company expects total revenue in the range of $39 million to $43 million. GAAP net loss per share is expected to be in the range of $(0.17) to $(0.13) and non-GAAP earnings per share (EPS) is expected to be in the range of $0.09 to $0.13. A schedule showing a reconciliation of the projected non-GAAP EPS to GAAP projections is included in this release. A Financial Data Supplement containing detailed financial information intended to provide guidance and further insight into our business is available online at http://investor.magma-da.com/supplement.cfm in the Investor Relations section of the Magma website.

**Conference Call**

Magma will discuss the financial results for the recently completed quarter, including guidance going forward, during a live webcast and earnings call today at 1:30 p.m. PST. The call will be available live by both webcast and telephone. To listen live via webcast, visit the Investor Relations section of Magma's website at http://investor.magma-da.com/home.cfm. To listen live via telephone call either of the numbers below:

| | |
|---|---|
| U.S. & Canada: | (800) 661-8947, conference ID #3991101 |
| Elsewhere: | (706) 634-2358, conference ID #3991101 |

Following completion of the call, a webcast replay of the call will be available at http://investor.magma-da.com/home.cfm through Feb. 9, 2006. Those without Internet access may listen to a replay of the call by telephone through Feb. 9 by calling:

| | |
|---|---|
| U.S. & Canada: | (800) 642-1687, conference ID #3991101 |
| Elsewhere: | (706) 645-9291, conference ID #3991101 |

**Forward-Looking Statements**

This press release contains forward-looking statements within the meaning of the "safe harbor" provision of the Private Securities Litigation Reform Act of 1995. These forward-looking statements include statements in the "Business Outlook" section and in quotations from Magma's management. These forward-looking statements are subject to risks and uncertainties that could cause actual results to differ materially from Magma's current expectations. Factors that could cause or contribute to such differences include, but are not limited to: competition in the EDA market; Magma's ability to integrate acquired businesses and technologies; potentially higher-than-anticipated costs of litigation; potentially higher-than-anticipated costs of compliance with regulatory requirements, including those relating to internal control over financial reporting; any delay of customer orders or failure of customers to renew licenses; weaker-than-anticipated sales of Magma's products and services; weakness in the semiconductor or electronic systems industries; the ability to manage expanding operations; the ability to attract and retain the key management and technical personnel needed to operate Magma successfully; the ability to continue to deliver competitive products to customers; and changes in accounting rules. Further discussion of these and other potential risk factors may be found in Magma's public filings with the Securities and Exchange Commission (www.sec.gov).  Magma undertakes no additional obligation to update these forward-looking statements.

**About Magma**

Magma is a leading provider of software for semiconductor design. The world's top chip companies use Magma's EDA products to design and verify complex, high-performance integrated circuits (ICs) for communications, computing, consumer electronics and networking applications, while at the same time reducing design time and costs. Magma provides software for IC implementation, analysis, physical verification, characterization and programmable logic design, and the company's integrated RTL-to-GDSII design flow offers "The Fastest Path from RTL to Silicon"[TM]. Magma is headquartered in Santa Clara, Calif. with offices around the world. The company's stock trades on Nasdaq under the ticker symbol LAVA. Visit Magma Design Automation on the Web at www.magma-da.com.

*Magma is a registered trademark and "The Fastest Path from RTL to Silicon" is a trademark of Magma Design Automation. All other product and company names are trademarks and registered trademarks of their respective companies.*

**MAGMA DESIGN AUTOMATION, INC.**
**CONDENSED CONSOLIDATED BALANCE SHEETS**
(in thousands)
(unaudited)

| | January 1, 2006 | March 31, 2005 |
|---|---|---|
| **ASSETS** | | |
| Current assets: | | |
|    Cash and cash equivalents | $ 52,885 | $ 20,622 |
|    Restricted cash | 55 | 2,950 |
|    Short-term investments | 36,500 | 114,896 |
|    Accounts receivable, net | 28,349 | 33,851 |
|    Prepaid expenses and other current assets | 5,607 | 7,088 |
|     Total current assets | 123,396 | 179,407 |
| Property and equipment, net | 19,713 | 21,309 |
| Intangibles, net | 77,841 | 69,573 |
| Goodwill | 44,130 | 43,194 |
| Restricted cash | 3,804 | — |
| Other assets | 5,042 | 5,741 |
|    Total assets | $ 273,926 | $ 319,224 |
| | | |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Current liabilities: | | |
|    Accounts payable | $ 2,286 | $ 3,010 |
|    Accrued expenses | 26,220 | 22,321 |
|    Deferred revenue, current | 18,785 | 20,745 |
|     Total current liabilities | 47,291 | 46,076 |
| | | |
| Convertible subordinated notes | 105,500 | 150,000 |
| Other long-term liabilities | 5,864 | 1,749 |
|     Total non-current liabilities | 111,364 | 151,749 |
|     Total liabilities | 158,655 | 197,825 |
| | | |
| Stockholders' equity: | | |
|    Common stock | 4 | 4 |
|    Additional paid-in capital | 282,756 | 261,627 |
|    Deferred stock-based compensation | (3,347) | (5,749) |
|    Accumulated deficit | (130,355) | (115,644) |
|    Treasury stock at cost | (32,651) | (16,606) |
|    Accumulated other comprehensive loss | (1,136) | (2,233) |
|     Total stockholders' equity | 115,271 | 121,399 |
|     Total liabilities and stockholders' equity | $ 273,926 | $ 319,224 |

**MAGMA DESIGN AUTOMATION, INC.**
**NON-GAAP CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS**
**IMPACT OF NON-GAAP ADJUSTMENTS ON REPORTED NET LOSS**
(in thousands, except per share data)

| (Unaudited) | For the Quarter Ended January 1, 2006 | | | For the Quarter Ended December 31, 2004 | | |
|---|---|---|---|---|---|---|
| | GAAP Basis | Adjust-ments | Non-GAAP Basis | GAAP Basis | Adjust-ments | Non-GAAP Basis |
| Revenue: | | | | | | |
| Licenses | $ 34,889 | $ — | $ 34,889 | $ 31,663 | $ — | $ 31,663 |
| Services | 6,431 | — | 6,431 | 5,643 | — | 5,643 |
| Total revenue | 41,320 | — | 41,320 | 37,306 | — | 37,306 |
| Cost of revenue: | | | | | | |
| Licenses | 6,702 | (6,524) | 178 | 1,740 | (1,628) | 112 |
| Services | 4,183 | (4) | 4,179 | 3,839 | 5 | 3,844 |
| Total cost of revenue | 10,885 | (6,528) | 4,357 | 5,579 | (1,623) | 3,956 |
| Gross profit | 30,435 | 6,528 | 36,963 | 31,727 | 1,623 | 33,350 |
| Operating expenses: | | | | | | |
| Research and development | 10,830 | (485) | 10,345 | 10,223 | (1,161) | 9,062 |
| In-process research and development | 450 | (450) | — | 355 | (355) | — |
| Sales and marketing | 11,487 | — | 11,487 | 11,043 | 236 | 11,279 |
| General and administrative | 11,179 | — | 11,179 | 4,576 | — | 4,576 |
| Amortization of intangible assets | 2,682 | (2,682) | — | 4,680 | (4,680) | — |
| Amortization of stock-based compensation | 914 | (914) | — | 362 | (362) | — |
| Restructuring charge | — | — | — | 259 | (259) | — |
| Total operating expenses | 37,542 | (4,531) | 33,011 | 31,498 | (6,581) | 24,917 |
| Operating income (loss) | (7,107) | 11,059 | 3,952 | 229 | 8,204 | 8,433 |
| Interest and other income (expense): | | | | | | |
| Interest income | 795 | — | 795 | 551 | — | 551 |
| Interest expense | (197) | — | (197) | (249) | — | (249) |
| Other income (expense), net | (776) | 343 | (433) | 473 | 352 | 825 |
| Total interest and other income (expense), net | (178) | 343 | 165 | 775 | 352 | 1,127 |
| Net income (loss) before income taxes | (7,285) | 11,402 | 4,117 | 1,004 | 8,556 | 9,560 |
| Benefit from (provision for) income taxes | (783) | 124 | (659) | (1,723) | 566 | (1,157) |
| Net income (loss) | $ (8,068) | $ 11,526 | $ 3,458 | $ (719) | $ 9,122 | $ 8,403 |
| Net income (loss) per share – basic | $ (0.23) | | $ 0.10 | $ (0.02) | | $ 0.25 |
| Net income (loss) per share – diluted* | $ (0.23) | | $ 0.09 | $ (0.02) | | $ 0.20 |
| Shares used in calculation: | | | | | | |
| Basic | 34,470 | | 34,470 | 33,829 | | 33,829 |
| Diluted* | 34,470 | | 40,052 | 33,829 | | 41,749 |

**MAGMA DESIGN AUTOMATION, INC.**
**NON-GAAP CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS**
**IMPACT OF NON-GAAP ADJUSTMENTS ON REPORTED NET LOSS**
(in thousands, except per share data)
(Unaudited)

| | For the Nine Months Ended January 1, 2006 | | | For the Nine Months Ended December 31, 2004 | | |
|---|---|---|---|---|---|---|
| | GAAP Basis | Adjust-ments | Non-GAAP Basis | GAAP Basis | Adjust-ments | Non-GAAP Basis |
| Revenue: | | | | | | |
| Licenses | $101,503 | $ — | $101,503 | $ 93,830 | $ — | $ 93,830 |
| Services | 18,535 | — | 18,535 | 16,433 | — | 16,433 |
| Total revenue | 120,038 | — | 120,038 | 110,263 | — | 110,263 |
| Cost of revenue: | | | | | | |
| Licenses | 17,598 | (16,952) | 646 | 4,743 | (4,366) | 377 |
| Services | 12,566 | (51) | 12,515 | 11,388 | (1) | 11,387 |
| Total cost of revenue | 30,164 | (17,003) | 13,161 | 16,131 | (4,367) | 11,764 |
| Gross profit | 89,874 | 17,003 | 106,877 | 94,132 | 4,367 | 98,499 |
| Operating expenses: | | | | | | |
| Research and development | 33,186 | (1,251) | 31,935 | 30,316 | (2,843) | 27,473 |
| In-process research and development | 450 | (450) | — | 4,364 | (4,364) | — |
| Sales and marketing | 33,347 | — | 33,347 | 33,989 | (108) | 33,881 |
| General and administrative | 29,634 | (750) | 28,884 | 11,656 | — | 11,656 |
| Amortization of intangible assets | 9,152 | (9,152) | — | 13,248 | (13,248) | — |
| Amortization of stock-based compensation | 3,859 | (3,859) | — | 936 | (936) | — |
| Restructuring charge | — | — | — | 698 | (698) | — |
| Total operating expenses | 109,628 | (15,462) | 94,166 | 95,207 | (22,197) | 73,010 |
| Operating income (loss) | (19,754) | 32,465 | 12,711 | (1,075) | 26,564 | 25,489 |
| Interest and other income (expense): | | | | | | |
| Interest income | 2,042 | — | 2,042 | 1,660 | — | 1,660 |
| Interest expense | (629) | — | (629) | (746) | — | (746) |
| Other income (expense), net | 6,322 | (8,120) 854 | (944) | (731) | 1,016 | 285 |
| Total interest and other income (expense), net | 7,735 | (7,266) | 469 | 183 | 1,016 | 1,199 |
| Net income (loss) before income taxes | (12,019) | 25,199 | 13,180 | (892) | 27,580 | 26,688 |
| Provision for income taxes | (2,692) | 405 | (2,287) | (2,075) | (867) | (2,942) |
| Net income (loss) | $ (14,711) | $ 25,604 | $10,893 | $ (2,967) | $ 26,713 | $ 23,746 |
| Net income (loss) per share – basic | $ (0.43) | | $ 0.32 | $ (0.09) | | $ 0.70 |
| Net income (loss) per share – diluted* | $ (0.43) | | $ 0.27 | $ (0.09) | | $ 0.56 |
| Shares used in calculation: | | | | | | |
| Basic | 34,237 | | 34,237 | 33,742 | | 33,742 |
| Diluted* | 34,237 | | 39,937 | 33,742 | | 42,317 |

* *Gives effect to the potential issuance of common stock upon conversion of convertible subordinated notes and to the effect of all dilutive potential common shares outstanding during the period, including stock options, using the treasury stock method*

**MAGMA DESIGN AUTOMATION, INC.**
**AS OF JANUARY 1, 2006**
**IMPACT OF KNOWN NON-GAAP ADJUSTMENTS ON FORWARD-LOOKING NET INCOME AND**
**DILUTED NET INCOME PER SHARE**
(Unaudited)

|  | Quarter Ending April 2, 2006 |
|---|---|
| GAAP diluted net loss per share | $ (0.17) to $ (0.13) |
| Amortization of developed technology and intangibles | $0.23 |
| Amortization of deferred stock-based compensation | $0.02 |
| Acquisition related expenses | $0.01 |
| Non-GAAP diluted net income per share | $0.09 to $0.13 |

| (in millions) | Quarter Ending April 2, 2006 |
|---|---|
| GAAP net loss | $ (7) to $ (5) |
| Amortization of developed technology and intangibles | $9 |
| Amortization of deferred stock-based compensation | $1 |
| Acquisition related expenses | $1 |
| Non-GAAP net income | $4 to $6 |

# EXHIBIT B

# MAGMA DESIGN AUTOMATION INC

## FORM 10-Q
### (Quarterly Report)

## Filed 2/9/2006 For Period Ending 1/1/2006

| | |
|---|---|
| Address | 5460 BAYFRONT PLAZA |
| | SANTA CLARA, California 95054 |
| Telephone | 408-565-7500 |
| CIK | 0001065034 |
| Industry | Software & Programming |
| Sector | Technology |
| Fiscal Year | 03/31 |

Powered By EDGAR Online

http://www.edgar-online.com/
© Copyright 2006. All Rights Reserved.
Distribution and use of this document restricted under EDGAR Onlines Terms of Use.

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

---

# FORM 10-Q

---

(Mark One)

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the quarterly period ended January 1, 2006

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from            to            .

Commission File No.: 0-33213

---

# MAGMA DESIGN AUTOMATION, INC.
### (Exact name of registrant as specified in its charter)

---

| | |
|---|---|
| **Delaware** | **77-0454924** |
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification Number)** |

**5460 Bayfront Plaza**
**Santa Clara, California 95054**
**(Address of principal executive offices)**

**Telephone: (408) 565-7500**
**(Registrant's telephone number, including area code)**

---

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for at least the past 90 days.   Yes ☒   No ☐

Indicate by check mark whether the registrant is large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act. (Check one):   Large accelerated filer ☐   Accelerated filer ☒   Non-accelerated filer ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐   No ☒

On February 1, 2006, 35,549,713 shares of Registrant's Common Stock, $.0001 par value were outstanding.

**Table of Contents**

**MAGMA DESIGN AUTOMATION, INC.**
**FORM 10-Q**
**QUARTERLY PERIOD ENDED JANUARY 1, 2006**
**INDEX**

| | | | **Page** |
|---|---|---|---|
| Part I: Financial Information | | | 3 |
| | Item 1: | Financial Statements (unaudited) | 3 |
| | | Condensed Consolidated Balance Sheets at January 1, 2006 and March 31, 2005 | 3 |
| | | Condensed Consolidated Statements of Operations for the Three and Nine Months Ended January 1, 2006 and December 31, 2004 | 4 |
| | | Condensed Consolidated Statements of Cash Flows for the Nine Months Ended January 1, 2006 and December 31, 2004 | 5 |
| | | Notes to Condensed Consolidated Financial Statements | 6 |
| | Item 2: | Management's Discussion and Analysis of Financial Condition and Results of Operations | 25 |
| | Item 3: | Quantitative and Qualitative Disclosures About Market Risk | 58 |
| | Item 4: | Controls and Procedures | 59 |
| Part II: Other Information | | | 60 |
| | Item 1: | Legal Proceedings | 60 |
| | Item 6: | Exhibits | 65 |
| Signatures | | | 67 |
| Exhibit Index | | | |

2

**Table of Contents**

**PART I: FINANCIAL INFORMATION**

**Item 1.        Financial Statements.**

**MAGMA DESIGN AUTOMATION, INC.**

**CONDENSED CONSOLIDATED BALANCE SHEETS**
**(in thousands)**
**(unaudited)**

| | January 1, 2006 | March 31, 2005 |
|---|---:|---:|
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $  52,885 | $  20,622 |
| Restricted cash | 55 | 2,950 |
| Short-term investments | 36,500 | 114,896 |
| Accounts receivable, net | 28,349 | 33,851 |
| Prepaid expenses and other current assets | 5,607 | 7,088 |
| Total current assets | 123,396 | 179,407 |
| Property and equipment, net | 19,713 | 21,309 |
| Intangibles, net | 77,841 | 69,573 |
| Goodwill | 44,130 | 43,194 |
| Restricted cash | 3,804 | — |
| Other assets | 5,042 | 5,741 |
| Total assets | $ 273,926 | $ 319,224 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Accounts payable | $  2,286 | $  3,010 |
| Accrued expenses | 26,220 | 22,321 |
| Deferred revenue | 18,785 | 20,745 |
| Total current liabilities | 47,291 | 46,076 |
| Convertible subordinated notes | 105,500 | 150,000 |
| Other long-term liabilities | 5,864 | 1,749 |
| Total liabilities | 158,655 | 197,825 |
| Commitments and contingencies (Note 11) | | |
| Stockholders' equity: | | |
| Common stock | 4 | 4 |
| Additional paid-in capital | 282,756 | 261,627 |
| Deferred stock-based compensation | (3,347) | (5,749) |
| Accumulated deficit | (130,355) | (115,644) |
| Treasury stock | (32,651) | (16,606) |
| Accumulated other comprehensive loss | (1,136) | (2,233) |
| Total stockholders' equity | 115,271 | 121,399 |
| Total liabilities and stockholders' equity | $ 273,926 | $ 319,224 |

See accompanying notes to unaudited condensed consolidated financial statements.

3

Table of Contents

**MAGMA DESIGN AUTOMATION, INC.**

**CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS**
**(in thousands, except per share data)**
**(unaudited)**

| | For the Three Months Ended | | For the Nine Months Ended | |
|---|---|---|---|---|
| | January 1, 2006 | December 31, 2004 | January 1, 2006 | December 31, 2004 |
| Revenue: | | | | |
| Licenses | $ 34,889 | $ 31,663 | $101,503 | $ 93,830 |
| Services | 6,431 | 5,643 | 18,535 | 16,433 |
| Total revenue | 41,320 | 37,306 | 120,038 | 110,263 |
| Cost of revenue: | | | | |
| Licenses | 6,702 | 1,740 | 17,598 | 4,743 |
| Services* | 4,183 | 3,839 | 12,566 | 11,388 |
| Total cost of revenue | 10,885 | 5,579 | 30,164 | 16,131 |
| Gross profit | 30,435 | 31,727 | 89,874 | 94,132 |
| Operating expenses: | | | | |
| Research and development | 10,830 | 10,223 | 33,186 | 30,316 |
| In-process research and development | 450 | 355 | 450 | 4,364 |
| Sales and marketing | 11,487 | 11,043 | 33,347 | 33,989 |
| General and administrative | 11,179 | 4,576 | 29,634 | 11,656 |
| Amortization of intangible assets | 2,682 | 4,680 | 9,152 | 13,248 |
| Amortization of stock-based compensation** | 914 | 362 | 3,859 | 936 |
| Restructuring charge | — | 259 | — | 698 |
| Total operating expenses | 37,542 | 31,498 | 109,628 | 95,207 |
| Operating income (loss) | (7,107) | 229 | (19,754) | (1,075) |
| Other income (expense): | | | | |
| Interest income | 795 | 551 | 2,042 | 1,660 |
| Interest expense | (197) | (249) | (629) | (746) |
| Other income (expense), net | (776) | 473 | 6,322 | (731) |
| Other income (expense), net | (178) | 775 | 7,735 | 183 |
| Net income (loss) before income taxes | (7,285) | 1,004 | (12,019) | (892) |
| Provision for income taxes | (783) | (1,723) | (2,692) | (2,075) |
| Net loss | $ (8,068) | $ (719) | $(14,711) | $ (2,967) |
| Net loss per common share | | | | |
| Basic and diluted | $ (0.23) | $ (0.02) | $ (0.43) | $ (0.09) |
| Shares used in calculation: | | | | |
| Basic and diluted | 34,470 | 33,829 | 34,237 | 33,742 |
| * Stock-based compensation included in cost of services revenue | $ 4 | $ (5) | $ 51 | $ 1 |
| ** Components of stock-based compensation included in operating expenses: | | | | |
| Research and development | $ 813 | $ 205 | $ 3,608 | $ 479 |
| Sales and marketing | 13 | 66 | 89 | 109 |
| General and administrative | 88 | 91 | 162 | 348 |

|  | $ | 914 | $ | 362 | $ | 3,859 | $ | 936 |

See accompanying notes to unaudited condensed consolidated financial statements.

4

Table of Contents

**MAGMA DESIGN AUTOMATION, INC.**

**CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(in thousands)**
**(unaudited)**

| | Nine Months Ended | |
|---|---|---|
| | January 1, 2006 | December 31, 2004 |
| **Cash flows from operating activities:** | | |
| Net loss | $ (14,711) | $ (2,967) |
| Adjustments to reconcile net loss to net cash provided by operating activities: | | |
| Depreciation and amortization | 7,054 | 5,501 |
| Amortization of intangible assets | 26,103 | 17,614 |
| In-process research and development | 450 | 4,364 |
| Provision for (recovery from) doubtful accounts | (349) | 455 |
| Amortization of debt issuance costs | 544 | 742 |
| Impairment of or loss on strategic equity investments | 854 | 1,016 |
| Gain on repurchase of convertible notes, net of debt issuance cost write-off | (8,781) | — |
| Loss on sale of short-term investments | 661 | — |
| Amortization of stock-based compensation | 3,910 | 937 |
| Restructuring charge | — | 698 |
| Income tax benefit realized from gain on repurchase of convertible notes | 853 | — |
| Income tax benefit realized from debt issuance costs | 65 | 147 |
| Change in operating assets and liabilities, net of effect of acquisitions: | | |
| Accounts receivable | 6,267 | 636 |
| Prepaid expenses and other assets | 768 | 2,487 |
| Accounts payable | (1,105) | 321 |
| Accrued expenses | 9,639 | (5,067) |
| Deferred revenue | (1,960) | (965) |
| Other long-term liabilities | (440) | 195 |
| Net cash provided by operating activities | 29,822 | 26,114 |
| **Cash flows from investing activities:** | | |
| Purchase of intangible assets | (25,333) | (26,899) |
| Purchase of property and equipment | (3,240) | (12,275) |
| Purchase of short-term investments | (83,746) | (110,237) |
| Proceeds from sale and maturities of short-term investments | 162,289 | 137,880 |
| Purchase of strategic equity investments | (750) | (2,150) |
| Net cash provided by (used in) investing activities | 49,220 | (13,681) |
| **Cash flows from financing activities:** | | |
| Proceeds from issuance of common stock | 4,617 | 7,746 |
| Repurchase of common stock | (16,045) | (16,610) |
| Repurchase of convertible notes, net | (34,668) | — |
| Repayment of lease obligation | (556) | — |
| Net cash used in financing activities | (46,652) | (8,864) |
| Effect of foreign currency translation on cash and cash equivalents | (127) | 98 |
| Net increase in cash and cash equivalents | 32,263 | 3,667 |
| Cash and cash equivalents at beginning of period | 20,622 | 17,634 |
| Cash and cash equivalents at end of period | $ 52,885 | $ 21,301 |
| **Supplemental disclosure:** | | |
| Non-cash investing and financing activities: | | |
| Deferred stock-based compensation | $ (997) | $ (458) |

| | | | |
|---|---|---|---|
| Issuance of common stock (or issuable) in connection with intangible asset purchase | $ 10,865 | $ 14,980 |
| Issuance of common stock warrant in connection with intangible asset purchase | $ 3,080 | $ — |
| Purchase of fixed assets under capital leases | $ 2,186 | $ — |

See accompanying notes to unaudited condensed consolidated financial statements.

5

Table of Contents

## MAGMA DESIGN AUTOMATION, INC.
## NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
### (unaudited)

## Note 1. Basis of Presentation

The interim unaudited condensed consolidated financial statements included herein have been prepared by Magma Design Automation, Inc. ("Magma" or "the Company"), pursuant to the rules and regulations of the United States Securities and Exchange Commission ("SEC"). Certain information and note disclosures normally included in annual financial statements prepared in accordance with accounting principles generally accepted in the United States of America have been condensed or omitted, pursuant to these rules and regulations. However, management believes that the disclosures are adequate to ensure that the information presented is not misleading. The interim unaudited condensed consolidated financial statements reflect, in the opinion of management, all adjustments necessary (consisting only of normal recurring adjustments) to present a fair statement of results for the interim periods presented. The operating results for any interim period are not necessarily indicative of the results that may be expected for the entire fiscal year ending April 2, 2006. The accompanying unaudited condensed consolidated financial statements should be read in conjunction with the Company's Form 10-K for the year ended March 31, 2005, as filed with the SEC on June 14, 2005. The accompanying unaudited condensed consolidated balance sheet at March 31, 2005 is derived from audited consolidated financial statements at that date.

Preparation of consolidated financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenue and expenses during the reporting period. Actual results could differ from those estimates.

### Principles of Consolidation

The consolidated financial statements of Magma include the accounts of the Company and its wholly owned subsidiaries. All significant intercompany balances and transactions have been eliminated. Accounts denominated in foreign-currency have been translated using the U.S. dollar as the functional currency.

### Change in Fiscal Year End

On January 26, 2005, the Company's Board of Directors approved a change in Magma's fiscal year end from March 31 to a 52-53 week fiscal year ending on the first Sunday subsequent to March 31. After the fiscal year ended March 31, 2005, Magma's fiscal years will consist of four quarters of 13 weeks each except for each seventh fiscal year, which will include one quarter with 14 weeks. The current fiscal year ends on April 2, 2006. All references to years or quarters in these notes to consolidated financial statements represent fiscal years or fiscal quarters, respectively, unless otherwise noted. As a result of this change, the first quarter of Magma's fiscal year 2006 includes three additional days, the results of which are included in the accompanying condensed consolidated financial statements for the nine months ended January 1, 2006.

### Reclassifications

Certain amounts in the fiscal 2005 financial statements have been reclassified to conform with the fiscal 2006 presentation. Certain auction rate securities have been reclassified from cash equivalents to short-term investments. Auction rate securities are variable rate bonds tied to short-term interest rates with maturities on the face of the securities in excess of 90 days. Auction rate securities have interest rate resets through a modified Dutch auction, at predetermined short-term intervals, usually every 7, 28 or 35 days. They trade at par and are callable at par on any interest payment date at the option of the issuer. Interest paid during a given period is based upon the interest rate determined during the prior auction.

6

Table of Contents

**MAGMA DESIGN AUTOMATION, INC.**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(unaudited)**

Although these securities are issued and rated as long-term bonds, they are priced and traded as short-term instruments because of the liquidity provided through the interest rate reset. Based on the Company's ability either to liquidate the holdings or to roll the investment over to the next reset period, the Company had historically classified some or all of these instruments as cash equivalents if the period between interest rate resets was 90 days or less.

The Company accounts for its marketable securities in accordance with Statement of Financial Accounting Standards ("SFAS") No. 115, "Accounting for Certain Investments in Debt and Equity Securities." Such investments are classified as "available for sale" and are reported at fair value in the Company's balance sheets. The short-term nature and structure, the frequency with which the interest rate resets and the ability to sell auction rate securities at par and at the Company's discretion indicates that such securities should more appropriately be classified as short-term investments with the intent of meeting the Company's short-term working capital requirements.

Based upon the Company's re-evaluation of these securities, Magma reclassified as short-term investments any auction rate securities previously classified as cash equivalents for the fiscal 2005 periods. As a result, purchases and sales of short-term investments included in the consolidated statements of cash flows have been revised to reflect the purchase of $59.2 million and sale of $107.4 million auction rate securities during the nine months ended December 31, 2004. This resulted in a decrease in cash used in investing activities by $48.2 million for the nine months ended December 31, 2004. These reclassifications had no impact on the previously reported net income or cash flows from operations.

*Recently Issued Accounting Pronouncements*

In November 2005, the Financial Accounting Standards Board ("FASB") issued FASB Staff Position ("FSP") Nos. FAS115-1 and FAS 124-1, "The Meaning of Other-Than-Temporary Impairment and Its Application to Certain Investments." This FSP addresses the determination as to when an investment is considered impaired, whether that impairment is other than temporary, and the measurement of an impairment loss. This FSP also includes accounting considerations subsequent to the recognition of other-than-temporary impairments. The guidance in this FSP will be applied to reporting periods beginning after December 15, 2005. The adoption of this FSP is not expected to have a significant impact on the Company's financial position and results of operations.

In July 2005, the FASB issued an Exposure Draft of a proposed interpretation, "Accounting for Uncertain Tax Positions—an interpretation of FASB Statement No. 109." This proposal seeks to reduce the diversity in practice associated with certain aspects of the recognition and measurement requirements related to accounting for income taxes. Specifically, the interpretation requires that an enterprise recognize in its financial statements, the best estimate of the impact of a tax position only if that position is probable of being sustained on audit based solely on the technical merits of the position. In evaluating whether the probable recognition threshold has been met, this proposed interpretation would require the presumption that the tax position will be evaluated during an audit by taxing authorities. The Exposure Draft is scheduled to be finalized in the first quarter of calendar year 2006. The Company is currently reviewing the provisions in the Exposure Draft to determine its impact to its consolidated financial statements.

In June 2005, the Emerging Issues Task Force ("EITF") issued No. 05-06, "Determining the Amortization Period for Leasehold Improvements" ("EITF 05-6"). The pronouncement requires that leasehold improvements acquired in a business combination or purchase, subsequent to the inception of the lease, be amortized over the

7

Table of Contents

**MAGMA DESIGN AUTOMATION, INC.**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(unaudited)**

lesser of the useful life of the asset or the lease term that includes reasonably assured lease renewals as determined on the date of the acquisition of the leasehold improvement. This pronouncement is effective for leasehold improvements that are purchased or acquired in reporting periods beginning after June 29, 2005. The adoption of EITF 05-6 has not had a significant impact on the Company's financial position and results of operations.

In May 2005, the FASB issued SFAS No. 154, "Accounting Changes and Error Corrections" ("SFAS 154"). This new standard replaces APB Opinion No. 20, "Accounting Changes in Interim Financial Statements", and SFAS No. 3, "Reporting Accounting Changes in Interim Financial Statements", and represents another step in the FASB's goal to converge its standards with those issued by the International Accounting Standards Board ("IASB"). Among other changes, SFAS 154 requires retrospective application to prior periods' financial statements of a voluntary change in accounting principle unless it is impracticable. SFAS 154 also provides that (1) a change in method of depreciating or amortizing a long-lived nonfinancial asset be accounted for as a change in estimate (prospectively) that was effected by a change in accounting principle, and (2) correction of errors in previously issued financial statements should be termed a "restatement." The new standard is effective for accounting changes and correction of errors made in fiscal years beginning after December 15, 2005. Early adoption of this standard is permitted for accounting changes and correction of errors made in fiscal years beginning after June 1, 2005. Management does not expect the adoption of SFAS 154 to have a material effect on the Company's consolidated financial statements.

In December 2004, the FASB issued SFAS No. 123 (revised 2004), "Share-Based Payment." ("SFAS 123R") SFAS 123R eliminates the ability to account for share-based compensation transactions using APB 25, and generally requires instead that such transactions be accounted for using a fair-value based method. Companies are required to recognize an expense for compensation cost related to share-based payment arrangements including stock options and employee stock purchase plans. The new rules will be effective for annual periods beginning after June 15, 2005 and, thus, will be effective for us no later than the first quarter of fiscal 2007. The Company is currently evaluating which transition method to use and option valuation methodologies and assumptions in light of SFAS 123R related to employee stock options and employee stock purchase plans. The adoption of SFAS 123R will lead to substantial additional compensation expense and therefore will have a material adverse effect on the Company's consolidated statement of operations, as the Company will be required to expense the fair value of its stock option grants and stock purchases under its employee stock purchase plan, rather than disclose the impact on its consolidated net income within the footnotes (see Note 2 to the Condensed Consolidated Financial Statements), as is the Company's current practice.

In March 2005, the SEC issued Staff Accounting Bulletin ("SAB") No. 107 "Share-Based Payment". SAB 107 provides guidance related to share-based payment transactions with non-employees, the transition from nonpublic to public entity status, valuation methods (including assumptions such as expected volatility and expected term), the accounting for certain redeemable financial instruments issued under share-based payment arrangements, the classification of compensation expense, non-GAAP financial measures, first-time adoption of SFAS 123R in an interim period, capitalization of compensation cost related to share-based payment arrangements, the accounting for income tax effects of share-based payment arrangements upon adoption of SFAS 123R, the modification of employee share options prior to adoption of SFAS 123R and disclosures in Management's Discussion and Analysis subsequent to adoption of SFAS 123R. The provisions of SAB 107, as appropriate, will be adopted upon implementation of SFAS 123R in fiscal 2007.

FASB Staff Position No. 109-2, "Accounting and Disclosure Guidance for the Foreign Earnings Repatriation Provision within the American Jobs Creation Act of 2004" ("FSP 109-2"), provides guidance under

8

Table of Contents

**MAGMA DESIGN AUTOMATION, INC.**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**(unaudited)**

SFAS No. 109, "Accounting for Income Taxes," ("SFAS 109") with respect to recording the potential impact of the repatriation provisions of the American Jobs Creation Act of 2004 (the "Jobs Act") on enterprises' income tax expense and deferred tax liability. The Jobs Act was enacted on October 22, 2004. FSP 109-2 states that an enterprise is allowed time beyond the financial reporting period of enactment to evaluate the effect of the Jobs Act on its plan for reinvestment or repatriation of foreign earnings for purposes of applying SFAS 109. The Company has completed evaluating the impact of the repatriation provisions. The adoption of FSP 109-2 did not have any impact on the Company's results of operations or financial condition. Among other things, the Jobs Act repeals an export incentive and creates a new tax deduction for qualified domestic manufacturing activities. At this time, the Company does not expect that the deduction will have a material impact on its reported income tax rate.

**Note 2. Stock-Based Compensation**

The Company accounts for stock-based employee compensation arrangements in accordance with provisions of Accounting Principles Board Opinion No. 25 ("APB 25"), "Accounting for Stock Issued to Employees," as interpreted by FASB Interpretation No. 44 ("FIN 44"), "Accounting for Certain Transactions Involving Stock Compensation—an Interpretation of APB 25", EITF No. 00-23, "Issues related to the Accounting for Stock Compensation under APB 25 and FIN 44," and FIN No. 28, "Accounting for Stock Appreciation Rights and Other Variable Stock Option or Award Plans," and complies with the disclosure provisions of SFAS 148, "Accounting for Stock-Based Compensation—Transition and Disclosure—an amendment of SFAS 123." Under APB 25, compensation expense is based on the difference, if any, on the date of the grant, between the fair value of the Company's stock and the exercise price. SFAS 123 as amended by SFAS 148 requires a fair-value based method of accounting for an employee stock option or similar equity instrument. Had compensation cost for the Company's stock-based compensation plan been determined using the Black-Scholes option pricing model at the grant date for awards granted in accordance with the provisions of SFAS 123, the Company's net loss would have been the amounts indicated below (in thousands, except net loss per share data):

|  | Three Months Ended | | Nine Months Ended | |
| --- | --- | --- | --- | --- |
|  | January 1, 2006 | December 31, 2004 | January 1, 2006 | December 31, 2004 |
| **Net loss:** | | | | |
| As reported | $ (8,068) | $ (719) | $ (14,711) | $ (2,967) |
| Add: Stock-based employee compensation expense included in reported net loss | 918 | 357 | 3,910 | 937 |
| Deduct: Stock-based employee compensation expense determined under fair value method for all awards | (6,124) | (4,955) | (18,552) | (15,887) |
| Pro forma | $ (13,274) | $ (5,317) | $ (29,353) | $ (17,917) |
| **Net loss per share, basic and diluted:** | | | | |
| As reported | $ (0.23) | $ (0.02) | $ (0.43) | $ (0.09) |
| Pro forma | $ (0.39) | $ (0.16) | $ (0.86) | $ (0.53) |

Such pro forma disclosures may not be representative of future compensation cost because options vest over several years and additional grants are made each year.

9

Table of Contents

**MAGMA DESIGN AUTOMATION, INC.**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(unaudited)**

The weighted-average estimated fair value per share at the date of grant for options granted to employees and for share purchase rights granted under the employee stock purchase plans was as follows:

| | Three Months Ended | | Nine Months Ended | |
| --- | --- | --- | --- | --- |
| | January 1, 2006 | December 31, 2004 | January 1, 2006 | December 31, 2004 |
| Stock options | $ 3.94 | $ 3.64 | $ 3.85 | $ 5.27 |
| Employee stock purchase plans | $ 3.50 | $ 3.39 | $ 2.63 | $ 3.47 |

The fair value of options at the date of grant was estimated using the Black-Scholes option pricing model, with the following weighted-average assumptions:

| | Three Months Ended | | Nine Months Ended | |
| --- | --- | --- | --- | --- |
| | January 1, 2006 | December 31, 2004 | January 1, 2006 | December 31, 2004 |
| **Stock options:** | | | | |
| Risk-free interest rate | 4.33% | 2.84% | 3.99% | 3.03% |
| Expected dividend yield | 0% | 0% | 0% | 0% |
| Volatility | 61% | 43% | 62% | 43% |
| Expected life (years) | 3.45 | 2.36 | 3.02 | 2.76 |
| **Employee stock purchase plans:** | | | | |
| Risk-free interest rate | 4.34% | 2.71% | 4.25% | 2.24% |
| Expected dividend yield | 0% | 0% | 0% | 0% |
| Volatility | 61% | 43% | 62% | 43% |
| Expected life (years) | 1.13 | 1.22 | 1.16 | 1.18 |

The fair value option valuation model was developed for use in estimating the fair value of traded options, which have no vesting restrictions and are fully transferable. In addition, option valuation models require the input of highly subjective assumptions, including the expected stock price volatility. Because the Company's employee stock options have characteristics significantly different from those of traded options, and because changes in the subjective input assumptions can materially affect the fair value estimate, in management's opinion, the existing models do not necessarily provide a reliable single measure of the fair value of the Company's employee stock options.

**Note 3. Basic and Diluted Net Income (Loss) Per Share**

The Company computes net income (loss) per share in accordance with SFAS 128, "Earnings per Share". Basic net income (loss) per share is computed by dividing net income attributable to common stockholders (numerator) by the weighted average number of common shares outstanding (denominator) during the period. Diluted net income per share gives effect to all dilutive potential common shares outstanding during the period including stock options and convertible subordinated notes using the as-if-converted method.

For the three and nine months ended January 1, 2006 and December 31, 2004, all potential common shares outstanding during the period were excluded from the computation of diluted net loss per share as their effect would be anti-dilutive. Such shares included the following:

| | Three and Nine Months Ended | |
| --- | --- | --- |
| | January 1, 2006 | December 31, 2004 |
| Shares of common stock if converted under convertible subordinated notes | 4,615,000 | 6,562,000 |
| Shares of common stock issuable under stock option plans outstanding | 8,994,930 | 8,514,078 |
| Weighted average price of shares issuable under stock option plans | $ 10.72 | $ 15.64 |

10

Table of Contents

**MAGMA DESIGN AUTOMATION, INC.**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**(unaudited)**

## Note 4. Comprehensive Loss

Comprehensive loss includes net loss, unrealized gain (loss) on investments and foreign currency translation adjustments as follows (in thousands):

| | Three Months Ended | | Nine Months Ended | |
|---|---|---|---|---|
| | January 1, 2006 | December 31, 2004 | January 1, 2006 | December 31, 2004 |
| Net loss | $ (8,068) | $ (719) | $(14,711) | $ (2,967) |
| Unrealized gain (loss) on available-for-sale investments | (9) | (206) | 808 | (805) |
| Foreign currency translation adjustments | 109 | (763) | 289 | (486) |
| Comprehensive loss | $ (7,968) | $ (1,688) | $(13,614) | $ (4,258) |

Components of accumulated other comprehensive loss were as follows (in thousands):

| | January 1, 2006 | March 31, 2005 |
|---|---|---|
| Unrealized loss on available-for-sale investments | $ (39) | $ (847) |
| Foreign currency translation adjustments | (1,097) | (1,386) |
| Accumulated other comprehensive loss | $ (1,136) | $ (2,233) |

## Note 5. Cash equivalents and investments

Cash, cash equivalents and short-term investments are detailed as follows (in thousands):

| | Cost | Unrealized Gains | Unrealized Losses | Estimated Fair Value |
|---|---|---|---|---|
| **January 1, 2006** | | | | |
| Cash | $ 16,296 | $ — | $ — | $ 16,296 |
| Money market funds | 5,063 | — | — | 5,063 |
| Commercial paper | 31,556 | — | (39) | 31,517 |
| Government agencies | 9 | — | — | 9 |
| Auction rate certificates | 36,500 | — | — | 36,500 |
| | $ 89,424 | $ — | $ (39) | $ 89,385 |
| **March 31, 2005** | | | | |
| Cash | $ 16,979 | $ — | $ — | $ 16,979 |
| Money market funds | 395 | — | — | 395 |
| Commercial paper | 3,249 | — | (1) | 3,248 |
| Auction rate preferred securities | 6,998 | 2 | — | 7,000 |
| Government agencies | 49,499 | — | (525) | 48,974 |
| Corporate bonds | 37,506 | — | (316) | 37,190 |
| Auction rate certificates | 19,650 | — | — | 19,650 |
| Municipal obligations | 2,090 | — | (8) | 2,082 |
| | $136,366 | $ 2 | $ (850) | $135,518 |

As of January 1, 2006, the stated maturities of the Company's current investments (including $31.5 million classified as cash equivalent investments in the table above) are $31.5 million within one year and $36.5 million after ten years.

11

Table of Contents

**MAGMA DESIGN AUTOMATION, INC.**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**(unaudited)**

As of January 1, 2006, $39,000 of the unrealized losses has a duration of less than twelve months. The gross unrealized losses on these investments were primarily due to interest rate fluctuations and market-price movements. The Company reviewed the investment portfolio and determined that the gross unrealized losses on these investments at January 1, 2006 were temporary in nature. The Company has the ability and intent to hold these investments until recovery of their carrying values. The Company also believes that it will be able to collect both principal and interest amounts due to the Company at maturity, given the high credit quality of these investments.

In May 2005, the Company liquidated certain investments to repurchase a portion of the convertible subordinated notes, resulting in a realized loss of approximately $0.7 million. See Note 8 for information regarding the repurchase of convertible subordinated notes.

**Note 6. Business Combination**

**ACAD Corporation** ("ACAD")

On November 29, 2005, the Company acquired ACAD, a privately-held company that develops circuit simulation software, to broaden its product portfolio into simulation, addressing a new market, and to enhance certain other existing Magma products, all of which help integrated circuit ("IC") manufacturers produce higher quality chips more efficiently. The acquisition of ACAD further supports Magma's focus to deliver effective EDA software to IC manufactures, enabling IC designers to meet critical time-to-market objectives, improve chip performance, and handle multimillion-gate designs.

The Company acquired ACAD for an initial consideration of approximately $453,000 in cash and assumption of its net liabilities of approximately $3.9 million as of November 29, 2005. The Company also agreed to pay up to $5.65 million of cash in contingent consideration to the ACAD shareholders upon achieving or exceeding certain financial and technical milestones. As of January 1, 2006 none of the contingent consideration has been earned. The Company does not consider the ACAD acquisition material to its results of operations and therefore is not presenting pro forma statements of operations for the periods ended January 1, 2006.

Pursuant to the terms of the Share Purchase Agreements, $0.2 million of the initial consideration was retained by the Company in a segregated bank account to secure certain indemnification obligations of the ACAD shareholders, and was recorded as restricted cash, which is separately disclosed on the Company's consolidated balance sheet as of January 1, 2006. As of January 1, 2006, the Company has made a total net payment of $3.6 million on the liabilities assumed.

12

Table of Contents

**MAGMA DESIGN AUTOMATION, INC.**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(unaudited)**

The acquisition was accounted for as a business combination. The purchase price was allocated to the assets acquired and liabilities assumed based on their respective fair values. A summary of the purchase price allocations pertaining to the ACAD acquisition and the amortization periods of the intangible assets acquired is as follows (in thousands):

| | |
|---|---:|
| Cash consideration paid | $ 453 |
| | |
| Total purchase price | $ 453 |
| | |
| Allocation of purchase price: | |
| Current assets | $ 581 |
| Current liabilities | (4,512) |
| | |
| Net liabilities assumed | (3,931) |
| Intangible assets acquired: | |
| Customer relationship or base | 110 |
| Developed technology | 1,860 |
| Acquired customer contracts | 190 |
| Non-competition agreements | 300 |
| In-process research and development | 450 |
| Goodwill | 1,474 |
| | |
| | $ 453 |
| | |
| Amortization period of intangibles (in years) | |
| Customer relationship or base | 4 |
| Developed technology | 4 |
| Acquired customer contracts | 1-2 |
| Non-competition agreements | 3 |

The excess of the purchase price over the estimated value of the net tangible assets acquired was allocated to various intangible assets, consisting primarily of developed technology, customer and contract-related assets and goodwill. The goodwill is not expected to be deductible for income tax purposes.

The values assigned to developed technologies were based upon future discounted cash flows related to the existing products' projected income streams using discount rates ranging from 15% to 21%. The Company believes these rates were appropriate given the business risks inherent in marketing and selling these products. Factors considered in estimating the discounted cash flows to be derived from the existing technology include risks related to the characteristics and applications of the technology, existing and future markets and an assessment of the age of the technology within its life span.

Other intangibles include the value of an existing customer relationship or base, non-competition agreements and existing customer contracts. These intangible assets were valued using discount rates ranging from 15% to 25%.

The valuation method used to value in-process research and development is a form of discounted cash flow method commonly known as the "percentage of completion" approach. This approach is a widely recognized appraisal method and is commonly used to value technology assets. The value of the in-process technology is the sum of the discounted expected future cash flows attributable to the in-process technology, taking into consideration the percentage of completion of products utilizing this technology, utilization of pre-existing technology, the risks related to the characteristics and applications of the technology, existing and future markets

13

Table of Contents

**MAGMA DESIGN AUTOMATION, INC.**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**(unaudited)**

and the technological risk associated with completing the development of the technology. The cash flows derived from the in-process technology projects were discounted at a rate of 30%. The Company believes the rate used was appropriate given the risks associated with the technologies for which commercial feasibility had not been established and there was no alternative use. The percentage of completion for each in-process project was determined by identifying the elapsed time invested in the project as a ratio of the total time required to bring the project to technical and commercial feasibility. Schedules were based on management's estimate of tasks completed and the tasks to be completed to bring the project to technical and commercial feasibility.

Development of in-process technology remains a substantial risk to the Company due to a variety of factors including the remaining effort to achieve technical feasibility, rapidly changing customer requirements and competitive threats from other companies and technologies. Additionally, the value of other intangible assets acquired may become impaired. The in-process research and development valuation, as well as the valuation of other intangible assets was prepared by management or an independent appraisal firm, based on input from the Company and the acquired companies' management, using valuation methods that are in accordance with the generally accepted accounting principles and are recognized by the United States Securities and Exchange Commission staff.

**Note 7. Asset Purchases**

**Technology License**

On June 30, 2005, the Company acquired a technology license from International Business Machines Corporation ("IBM") to copyrighted material pertinent to technology relating to electronic design automation ("EDA"), as well as other intellectual property owned by IBM. Also in connection with the technology license agreement, IBM and Magma entered into an amendment extending to 2010 the term of Magma's patent license agreement with IBM dated March 24, 2004. These two licenses cover IBM's patents and significant technology with respect to the development of EDA tools and products that perform physical implementation.

The total fee for the licenses was $7.0 million paid on June 30, 2005. In connection with the license agreements, the Company also entered into a warrant agreement pursuant to which IBM is entitled to purchase up to 500,000 shares of Magma common stock at an exercise price of $4.73 per share. The warrant is exercisable immediately and expires on the earlier of June 30, 2010 or immediately prior to a change of control of Magma. The warrant may be exercised by payment of the exercise price in cash or pursuant to a cashless net exercise provision. The fair value of the warrants was estimated to be $6.16 per share using the Black-Scholes option pricing model, with the following weighted-average assumptions:

| | |
|---|---|
| Risk-free interest rate | 3.72% |
| Expected dividend yield | 0% |
| Volatility | 65% |
| Expected life (years) | 5.00 |

The license fee of $7.0 million and $3.1 million fair value of the 500,000 shares of common stock warrant were included in the intangible asset balance on the Company's unaudited condensed consolidated balance sheet as of January 1, 2006 (see Note 8).

**Acquisition-Related Earnouts**

For a number of Magma's acquisitions, the asset purchase or merger agreements, as applicable, included an earnout provision under which the Company may pay contingent consideration in cash and/or stock based on the achievement of certain technology milestones as outlined in the respective asset purchase or merger agreement.

14

Table of Contents

**MAGMA DESIGN AUTOMATION, INC.**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(unaudited)**

In the nine months ended January 1, 2006, the Company recorded $21.8 million of intangible assets resulting from contingent consideration that was paid or became payable to stockholders of acquired companies as follows (in thousands):

|  | Cash | Common Stock Value |
|---|---|---|
| Mojave, Inc. | $ 9,784 | $ 9,784 |
| Aplus Design Technologies | 268 | 1,081 |
| Other | 914 | — |
| Total earnout consideration | $10,966 | $ 10,865 |

In addition, during the nine months ended January 1, 2006, Magma recorded deferred stock-based compensation totaling $1.0 million related to the Mojave earnouts.

**Note 8. Goodwill and Intangible Assets**

The following table summarizes the components of goodwill, intangible assets and related accumulated amortization balances as of January 1, 2006 and March 31, 2005 (in thousands):

|  | Weighted Average Life (months) | January 1, 2006 | | | March 31, 2005 | | |
|---|---|---|---|---|---|---|---|
|  |  | Gross Carrying Amount | Accumulated Amortization | Net Carrying Amount | Gross Carrying Amount | Accumulated Amortization | Net Carrying Amount |
| Goodwill |  | $ 44,130 | $ — | $44,130 | $43,194 | $ — | $43,194 |
| Intangible assets: |  |  |  |  |  |  |  |
| Developed technology | 47 | $ 82,635 | $ (32,202) | $50,433 | $59,083 | $ (16,488) | $42,595 |
| Licensed technology | 36 | 33,093 | (15,204) | 17,889 | 23,014 | (7,668) | 15,346 |
| Customer relationship or base | 60 | 2,310 | (968) | 1,342 | 2,200 | (637) | 1,563 |
| Patents | 59 | 11,932 | (5,276) | 6,656 | 11,792 | (3,355) | 8,437 |
| Acquired customer contracts | 32 | 1,090 | (665) | 425 | 900 | (438) | 462 |
| Assembled workforce | 43 | 1,235 | (581) | 654 | 1,235 | (330) | 905 |
| Non-competition agreements | 36 | 300 | (8) | 292 | — | — | — |
| No shop right | 24 | 100 | (100) | — | 100 | (73) | 27 |
| Trademark | 45 | 400 | (250) | 150 | 400 | (162) | 238 |
| Total |  | $133,095 | $ (55,254) | $77,841 | $98,724 | $ (29,151) | $69,573 |

During the nine months ended January 1, 2006, the Company reduced its goodwill by $0.5 million to reflect purchase price adjustments primarily on an acquisition related to tax benefits recognized on net operating loss carryforwards.

15

Table of Contents

**MAGMA DESIGN AUTOMATION, INC.**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**(unaudited)**

The Company has included the amortization expense on intangible assets that relate to products sold in cost of license revenue, while the remaining amortization is shown as a separate line item on the Company's unaudited condensed consolidated statement of operations. For the three and nine months ended January 1, 2006 and December 31, 2004, the amortization expense related to intangible assets was as follows (in thousands):

| | Three Months Ended | | Nine Months Ended | |
| --- | --- | --- | --- | --- |
| | January 1, 2006 | December 31, 2004 | January 1, 2006 | December 31, 2004 |
| Amortization of intangible assets included in: | | | | |
| Cost of revenue—licenses | $ 6,524 | $ 1,628 | $ 16,951 | $ 4,366 |
| Operating expenses | 2,682 | 4,680 | 9,152 | 13,248 |
| Total | $ 9,206 | $ 6,308 | $ 26,103 | $ 17,614 |

The expected future annual amortization expense of intangible assets is as follows (in thousands):

| Fiscal Year | Estimated Amortization Expense |
| --- | --- |
| 2006 (remaining three months) | $ 9,405 |
| 2007 | 36,270 |
| 2008 | 18,654 |
| 2009 | 12,198 |
| 2010 – 2020 | 1,314 |
| Total expected future annual amortization | $ 77,841 |

**Note 9. Repurchase of Convertible Subordinated Notes**

In May 2005, the Company repurchased, in privately negotiated transactions, $44.5 million face amount (or approximately 29.7 percent of the total) of the Company's zero coupon convertible subordinated notes due May 2008 at an average discount to face value of approximately 22 percent. The Company spent approximately $34.8 million on the repurchase. The repurchase left approximately $105.5 million principal amount of convertible subordinated notes outstanding. In addition, a portion of the hedge and warrant transactions entered into by Magma in 2003 to limit potential dilution from conversion of the notes was terminated in connection with the repurchase. In the first quarter of fiscal 2006, the Company recorded a gain of $8.8 million on the repurchase of the convertible subordinated notes, which was net of the write-off of $0.9 million of deferred financing costs associated with the convertible subordinated notes. The net proceeds of $140,000 from the termination of a portion of the hedge and warrant were recorded against additional paid-in capital.

**Note 10. Restructuring Charge**

During the three and nine months ended December 31, 2004, the Company recorded net restructuring charges of $0.3 million and $0.7 million, respectively, related to employee termination costs resulting from the Company's realignment to current business conditions. As of December 31, 2004, the unpaid balance of approximately $50,000, which related to charges incurred in the third quarter of fiscal 2005, was recorded as accrued liabilities on the Company's unaudited condensed consolidated balance sheet and the amount was paid in the fourth quarter of fiscal 2005.

16

Table of Contents

## MAGMA DESIGN AUTOMATION, INC.

### NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)
#### (unaudited)

**Note 11. Contingencies**

*Synopsys, Inc. v. Magma Design Automation, Inc.* , Civil Action No. C04-03923, United States District Court, Northern District of California. In this action, filed September 17, 2004, Synopsys has sued the Company for alleged infringement of U.S. Patent Nos. 6,378,114 ("the '114 Patent"), 6,453,446 ("the '446 Patent"), and 6,725,438 ("the '438 Patent"). The patents-in-suit relate to methods for designing integrated circuits. The Complaint seeks unspecified monetary damages, injunctive relief, trebling of damages, fees and costs, and the imposition of a constructive trust for the benefit of Synopsys over any profits, revenues or other benefits allegedly obtained by the Company as a result of its alleged infringement of the patents-in-suit.

On October 21, 2004, the Company filed its answer and counterclaims ("Answer") to the Complaint. On November 10, 2004, Synopsys filed motions to strike and dismiss certain affirmative defenses and counterclaims in the Answer. On November 24, 2004 the Company filed an Amended Answer and Counterclaims ("Amended Answer"). By order dated November 29, 2004, the Court denied Synopsys' motions as moot in light of the Amended Answer. On December 10, 2004, Synopsys moved to strike and dismiss certain affirmative defenses and counterclaims in the Amended Answer. By order dated January 20, 2005, the Court denied in part and granted in part Synopsys' motion. In its pretrial preparation order dated January 21, 2005, the Court set forth a schedule for the case which, among other things, sets trial for April 24, 2006.

On February 3, 2005, Synopsys filed its Reply to the Amended Answer. On March 17, 2005, Synopsys filed a First Amended Complaint, which asserts seven causes of action against the Company and/or Lukas van Ginneken: (1) patent infringement (against both defendants), (2) breach of contract (against van Ginneken), (3) inducing breach of contract (against the Company), (4) fraud (against the Company), (5) conversion (against both defendants), (6) unjust enrichment/constructive trust (against both defendants), and (7) unfair competition (against both defendants). Synopsys seeks injunctive relief, declaratory relief, at least $100 million in damages, trebling of damages, punitive damages, fees and costs, and the imposition of a constructive trust for the benefit of Synopsys over any profits, revenues or other benefits allegedly obtained by the Company as a result of its alleged exploitation of the alleged inventions in the patents-in-suit. On April 1, 2005, the Company filed a motion to dismiss the third through seventh causes of action. This motion was granted in part and denied in part by order dated May 18, 2005.

On April 11, 2005, Synopsys voluntarily dismissed van Ginneken from the lawsuit without prejudice. Also on April 11, 2005, Synopsys filed against the Company a motion for partial summary judgment establishing unfair competition and a motion for partial summary judgment based on the doctrine of assignor estoppel.

On June 7, 2005, Synopsys filed a Second Amended Complaint that asserts six causes of action against the Company: (1) patent infringement, (2) inducing breach of contract/interference with contractual relations, (3) fraud, (4) conversion, (5) unjust enrichment/constructive trust/quasi-contract, and (6) unfair competition. Synopsys seeks injunctive relief, declaratory relief, at least $100 million in damages, trebling of damages, punitive damages, fees and costs, and the imposition of a constructive trust for the benefit of Synopsys over any profits, revenues or other benefits allegedly obtained by the Company as a result of its alleged exploitation of the alleged inventions in the patents-in-suit. On June 10, 2005, Magma moved for summary judgment as to the second through sixth causes of action in the Second Amended Complaint based on the applicable statutes of limitations. On June 21, 2005, the Company moved to dismiss the third cause of action alleging fraud in the Second Amended Complaint and moved to strike certain allegations in the Second Amended Complaint. The Court granted the Company's motion to dismiss and strike by order dated July 15, 2005.

On July 1, 2005, the Court granted Synopsys's motion for partial summary judgment regarding assignor estoppel, dismissing Magma's affirmative defenses and counterclaim alleging the invalidity of the '114 Patent.

17

Table of Contents

**MAGMA DESIGN AUTOMATION, INC.**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(unaudited)**

On July 14, 2005, the Court vacated the hearings on Magma's motion for summary judgment on the second through sixth causes of action in the Second Amended Complaint and Synopsys's motion for partial summary judgment establishing unfair competition. The Court stated that it would reset the motions for hearing, if necessary, after the claims construction hearing scheduled for August 15, 2005.

On July 29, 2005, Synopsys moved to preliminarily enjoin the Company from abandoning or dedicating to the public the '446 Patent or the '438 Patent. Also on July 29, 2005, Synopsys moved for partial summary judgment seeking dismissal of certain counterclaims and defenses asserted by the Company on the grounds of estoppel by contract. On September 16, 2005, Synopsys filed a revised motion for preliminary injunction. On September 30, 2005, the Company filed its oppositions to Synopsys's preliminary injunction motion and estoppel by contract motion.

On August 3, 2005, Synopsys filed a Third Amended Complaint that asserts six causes of action against the Company: (1) patent infringement, (2) inducing breach of contract/interference with contractual relations, (3) fraud, (4) conversion, (5) unjust enrichment/constructive trust/quasi-contract, and (6) unfair competition. Synopsys seeks injunctive relief, declaratory relief, at least $100 million in damages, trebling of damages, punitive damages, fees and costs, and the imposition of a constructive trust for the benefit of Synopsys over any profits, revenues or other benefits allegedly obtained by the Company as a result of its alleged exploitation of the alleged inventions in the patents-in-suit.

On August 30, 2005, the Court issued a temporary restraining order against the Company restraining and enjoining the Company from taking any steps in the United States Patent and Trademark Office to abandon, suspend or disclaim the '446 and '438 Patents, failing or refusing to pay the maintenance fees for the '446 and '438 Patents, or seeking reexamination of the '446 and '438 Patents. The temporary restraining order was scheduled to remain in effect until the hearing on Synopsys's motion for a preliminary injunction that was scheduled for December 2, 2005. On December 1, 2005, the Court, vacated the hearing and granted Synopsys's motion for preliminary injunction. The Court entered the preliminary injunction enjoining the Company from abandoning, dedicating to the public or seeking reexamination in the United States Patent and Trademark Office of the '446 Patent or the '438 Patent.

On September 2, 2005, the Company filed an Answer and Counterclaims to Synopsys's Third Amended Complaint. In that pleading, the Company alleges, *inter alia* , that IBM is a joint owner of the patents-in-suit and that, as a result, the Company cannot be liable for infringement because (1) Synopsys lacks standing to assert the patents-in-suit against Magma, and (2) IBM has granted the Company a license under the patents-in-suit.

On October 14, 2005, the Court granted Synopsys's request for permission to file an amended opposition to Magma's motion for summary judgment on the second through sixth causes of action in the Second Amended Complaint. Synopsys filed its amended opposition on December 20, 2005, and the Company filed its reply on January 13, 2006. The motion was set for hearing on January 27, 2006, but the Court vacated the hearing date and took the matter under submission.

On October 19, 2005, the Court granted in part and denied in part Synopsys's motion to strike certain affirmative defenses and to dismiss certain counterclaims in the Company's Answer and Counterclaims to Synopsys's Third Amended Complaint. The Court dismissed without leave to amend the Company's counterclaims seeking correction of inventorship of the '446 and '438 Patents. The Court also struck without leave to amend the Company's affirmative defenses of (1) invalidity of the '446 and '438 Patents based on failure to name all inventors, (2) unenforceability of the '446 and '438 patents due to inequitable conduct, and

18

Table of Contents

**MAGMA DESIGN AUTOMATION, INC.**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(unaudited)**

(3) unclean hands. The Court struck with leave to amend the Company's affirmative defenses of invalidity of the '446 and '438 Patents based on 35 U.S.C. §§ 102, 103 and 112, as well as the Company's affirmative defense that Synopsys is not the owner of any invention defined by the claims of the '446 and '438 Patents.

On October 24, 2005, the Company filed a motion for summary judgment as to the first cause of action (for patent infringement) in Synopsys's Third Amended Complaint on the grounds that IBM is an owner of all the patents-in-suit. Also on October 24, 2005, Synopsys filed (1) a motion for partial summary judgment to dismiss the Company's joint ownership defenses and counterclaims, and (2) a motion for partial summary judgment to dismiss allegations of co-ownership based on judicial and quasi-estoppel. All three motions were scheduled to be heard on December 2, 2005, but the Court vacated the hearing date and took the matters under submission.

On November 2, 2005, the Company filed a motion for leave to file an amended answer and counterclaims to Synopsys's Third Amended Complaint, requesting leave to amend the Company's answer to add affirmative defenses of invalidity of the '446 and '438 Patents based on 35 U.S.C. §§ 102, 103 and 112. The Company's motion was set for hearing on December 16, 2005, but the Court vacated the hearing date and took the matter under submission.

On November 8, 2005, Synopsys filed a motion for sanctions against the Company based on the Company's assertion of non-infringement defenses and counterclaims in the litigation. The Company opposed the motion, which was set for hearing on December 16, 2005. The hearing and the motion was taken under submission by the Court. Also on November 8, 2005, the Company filed a motion seeking leave to file a motion for reconsideration of the Court's October 19, 2005 Order striking certain of the Company's defenses without leave to amend. The Court granted the Company's request on November 21, 2005.

On November 10, 2005, fact discovery closed. Expert discovery is ongoing and is currently scheduled to close on March 31, 2006.

On December 9, 2005, the Company filed a motion for reconsideration of the Court's October 19, 2005 Order striking the Company's affirmative defense of unclean hands and for leave to amend the Company's answer to assert an unclean hands defense. The motion was set for hearing on January 13, 2006, but the Court vacated the hearing and took the matter under submission.

On December 23, 2005, Synopsys filed a motion for partial summary judgment regarding the Company's statute of limitations defense. The Company opposed the motion, which was set for hearing on January 27, 2006. The hearing was vacated and the motion taken under submission by the Court.

On December 29, 2005, the Company filed a notice of interlocutory appeal to the Court of Appeals for the Federal Circuit of the Court's December 1, 2005, preliminary injunction against the Company. The Company's opening brief on appeal is due March 16, 2006.

On January 20, 2006, the Company filed a motion to bifurcate the trial into issues of patent ownership and all other issues. The Company's motion is currently set for hearing on February 24, 2006.

The Court had a Case Management Conference on February 3, 2006.

On April 18, 2005, Synopsys, Inc. filed an action against the Company in Germany at the Landgericht München I (District Court in Munich) seeking to obtain ownership of the European patent application corresponding to the Company's '446 Patent. The action has been stayed pending the outcome of the above-referenced Synopsys action filed in the United States.

19

Table of Contents

## MAGMA DESIGN AUTOMATION, INC.

### NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)
#### (unaudited)

On July 29, 2005, Synopsys, Inc. filed an action against the Company in Japan in Civil Department No. 40 of the Tokyo District Court seeking to obtain ownership of the Japanese patent application corresponding to the Company's '446 Patent. The Company has engaged counsel in Japan and will seek to stay this action pending the outcome of the above-referenced Synopsys action filed in the United States. The Japanese Court held a hearing on January 18, 2006 and set a further hearing on March 6, 2006.

The Company intends to vigorously defend against the claims asserted by Synopsys and to fully enforce its rights against Synopsys. However, the results of any litigation are inherently uncertain and the Company can not assure that it will be able to successfully defend against the Complaint. A favorable outcome for Synopsys could have a material adverse effect on the Company's financial position, results of operations or cash flows. The Company is currently unable to assess the extent of damages and/or other relief, if any, that could be awarded to Synopsys; therefore, no contingent liability has been recorded on the Company's condensed consolidated balance sheet as of January 1, 2006.

On June 13, 2005, a putative shareholder class action lawsuit captioned *The Cornelia I. Crowell GST Trust vs. Magma Design Automation, Inc., Rajeev Madhavan, Gregory C. Walker and Roy E. Jewell.* , No. C 05 02394, was filed in U.S. District Court, Northern District of California. The complaint alleges that defendants failed to disclose information regarding the risk of Magma infringing intellectual property rights of Synopsys, Inc., in violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder, and prays for unspecified damages.

On July 26, 2005, a putative derivative complaint captioned *Susan Willis v. Magma Design Automation, Inc. et al.* , No. 1-05-CV-045834, was filed in the Superior Court of the State of California for the County of Santa Clara. The Complaint seeks unspecified damages purportedly on behalf of the Company for alleged breaches of fiduciary duties by various directors and officers, as well as for alleged violations of insider trading laws by executives during a period between October 23, 2002 and April 12, 2005. Defendants have demurred to the Complaint, and the action has been stayed pending further developments in the putative shareholder class action referenced above.

On September 26, 2005, Synopsys, Inc. filed an action against the Company in the Superior Court of the State of California in and for the County of Santa Clara, entitled *Synopsys, Inc. v. Magma Design Automation, Inc., et al.,* Case Number 105 CV 049638. Synopsys alleges that Magma committed unfair business practices by asserting defenses of non-infringement and invalidity to patent infringement allegations brought by Synopsys in the patent infringement action already pending against Magma in the Northern District of California. The Complaint seeks unspecified monetary damages, an unspecified restitutionary/disgorgement award, injunctive relief, fees and costs, and an accounting of all revenues and profits derived from licensing the technology at issue. On October 19, 2005, the Company removed he action to the United States District Court for the Northern District of California. On October 26, 2005, the Company moved to strike and dismiss the complaint. On October 27, 2005, the Court granted the Company's motion to relate the removed action with the preexisting patent infringement action, and both actions are now assigned to Judge Maxine M. Chesney. The Court vacated the hearing on the Company's motion to strike and dismiss the complaint and has taken the matter under submission.

On September 26, 2005, Synopsys, Inc. filed an action against the Company in Delaware federal court, *Synopsys, Inc. v. Magma Design Automation, Inc., Civil Action No. 05-701*. The Complaint alleges infringement of U.S. Patent Nos. 6,434,733 ("the '733 Patent"), 6,766,501 ("the '501 Patent"), and 6,192,508 ("the '508 Patent") and seeks unspecified monetary damages, injunctive relief, trebling of damages, fees and costs, and the imposition of a constructive trust for the benefit of Synopsys over any profits, revenues or other benefits allegedly obtained by the Company as a result of its alleged infringement of the patents-in-suit.

20

Table of Contents

**MAGMA DESIGN AUTOMATION, INC.**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(unaudited)**

On October 19, 2005, the Company filed its answer and counterclaims ("Answer") to Synopsys's Complaint. The Answer asserts that Magma's products do not infringe the patents-in-suit, that the patents-in-suit are unenforceable, and that the '733 Patent and the '501 Patent were fraudulently obtained by Synopsys and are therefore unenforceable. The Answer also asserts antitrust counterclaims based on Synopsys's assertion of the '733 and '501 Patents, as well as claims for product disparagement and trade libel, statutory and common law unfair competition, and tortuous interference with business relations. The counterclaims seek treble damages and other equitable relief for Synopsys's anticompetitive and tortuous conduct.

On October 25, 2005, the Company filed an Amended Answer, adding a counterclaim for infringement of U.S. Patent No. 6,505,328 ("the '328 Patent"). The Company seeks treble damages and an injunction against Synopsys for the sale and manufacture of products the Company alleges infringe the '328 Patent.

On November 22, 2005, Synopsys filed a motion to dismiss the Company's antitrust and other commercial counterclaims. The Company opposed that motion on December 7, 2005. Synopsys filed its reply brief on December 14, 2005. No hearing date has yet been set for this motion.

On January 9, 2006, Synopsys filed a request for the United States Patent and Trademark Office to reexamine its '733 and '501 Patents in light of two prior art references that it had not previously disclosed to the Patent Office. On January 23, 2006, Synopsys filed a motion with the Delaware federal court to bifurcate and stay its claims for infringement of its '733 and '501 Patents and the Company's counterclaims except for its claim for infringement of the '328 Patent, based in part on Synopsys's having filed the request for patent reexamination. The Company's opposition to that motion was filed on February 6, 2006. No hearing date has yet been set for this motion.

With respect to the above-referenced lawsuits, the Company is currently unable to assess the possible extent of damages and/or other relief, if any, that could be awarded against the Company, therefore, no contingent liability has been recorded on the Company's condensed consolidated balance sheet as of January 1, 2006. The ultimate resolution of this matter or other third party assertions could have a material adverse effect on the Company's financial position, results of operations or cash flows.

In addition to the above, from time to time, the Company is involved in disputes that arise in the ordinary course of business. The number and significance of these disputes is increasing as the Company's business expands and it grows larger. Any claims against the Company, whether meritorious or not, could be time consuming, result in costly litigation, require significant amounts of management time and result in the diversion of significant operational resources. As a result, these disputes could harm the Company's business, financial condition, results of operations or cash flows.

**Indemnification Obligations**

The Company enters into standard license agreements in the ordinary course of business. Pursuant to these agreements, the Company agrees to indemnify its customers for losses suffered or incurred by them as a result of any patent, copyright, or other intellectual property infringement claim by any third party with respect to the Company's products. These indemnification obligations have perpetual terms. The Company's normal business practice is to limit the maximum amount of indemnification to the amount received from the customer. On occasion, the maximum amount of indemnification the Company may be required to make may exceed its normal business practices. The Company estimates the fair value of its indemnification obligations as insignificant, based upon its historical experience concerning product and patent infringement claims. Accordingly, the Company had no liabilities recorded for indemnification under these agreements as of January 1, 2006.

Table of Contents

**MAGMA DESIGN AUTOMATION, INC.**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**(unaudited)**

The Company has agreements whereby its officers and directors are indemnified for certain events or occurrences while the officer or director is, or was, serving at the Company's request in such capacity. The maximum potential amount of future payments the Company could be required to make under these indemnification agreements is unlimited; however, the Company has a directors' and officers' liability insurance policy that reduces its exposure under these agreements. As a result of the Company's insurance policy coverage, the Company believes the estimated fair value of these indemnification agreements is minimal. Accordingly, no liabilities have been recorded for these agreements as of January 1, 2006.

In connection with certain of the Company's recent business acquisitions, it has also agreed to assume, or cause Company subsidiaries to assume, the indemnification obligations of those companies to their respective officers and directors.

**Warranties**

The Company offers its customers a warranty that its products will conform to the documentation provided with the products. To date, there have been no payments or material costs incurred related to fulfilling these warranty obligations. Accordingly, the Company has no liabilities recorded for these warranties as of January 1, 2006. The Company assesses the need for a warranty accrual on a quarterly basis, and there can be no guarantee that a warranty accrual will not become necessary in the future.

**Note 12. Segment Information**

The Company adopted the provisions of SFAS No. 131, "Disclosures about Segments of an Enterprise and Related Information," which requires the reporting of segment information using the "management approach." Under this approach, operating segments are identified in substantially the same manner as they are reported internally and used by the Company's management for purposes of evaluating performance and allocating resources. Based on this approach, the Company has one reportable segment as management reviews financial information on a basis consistent with that presented in the unaudited condensed consolidated financial statements.

Revenue from North America, Europe, Japan and the Asia-Pacific region, which includes, India, South Korea, Taiwan, Hong Kong and the People's Republic of China, was as follows (in thousands):

|  | Three Months Ended | | Nine Months Ended | |
|  | January 1, 2006 | December 31, 2004 | January 1, 2006 | December 31, 2004 |
|---|---|---|---|---|
| North America* | $ 20,939 | $ 18,952 | $ 78,443 | $ 62,066 |
| Europe | 15,407 | 10,049 | 24,103 | 20,314 |
| Japan | 3,210 | 6,854 | 11,185 | 22,125 |
| Asia-Pacific (excluding Japan) | 1,764 | 1,451 | 6,307 | 5,758 |
|  | $ 41,320 | $ 37,306 | $ 120,038 | $ 110,263 |

|  | Three Months Ended | | Nine Months Ended | |
|  | January 1, 2006 | December 31, 2004 | January 1, 2006 | December 31, 2004 |
|---|---|---|---|---|
| North America* | 51% | 51% | 65% | 56% |
| Europe | 37 | 27 | 20 | 19 |
| Japan | 8 | 18 | 9 | 20 |
| Asia-Pacific (excluding Japan) | 4 | 4 | 6 | 5 |
|  | 100% | 100% | 100% | 100% |

* The Company has substantially all its North America revenue in the United States for all periods presented.

22

Table of Contents

**MAGMA DESIGN AUTOMATION, INC.**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**(unaudited)**

As of January 1, 2006, two customers accounted for 10% or more of accounts receivable. As of March 31, 2005, none of the customers accounted for 10% or more of accounts receivable.

Revenue attributable to significant customers, representing 10% or more of total revenue for at least one of the respective periods, is summarized as follows:

|  | Three Months Ended | | Nine Months Ended | |
| --- | --- | --- | --- | --- |
|  | January 1, 2006 | December 31, 2004 | January 1, 2006 | December 31, 2004 |
| Customer A | 17% | 25% | *% | *% |
| Customer B | 11 | 13 | 18 | 17 |
| Customer C | * | 11 | * | * |

\*  Less than 10% of revenue.

The Company has substantially all of its long-lived assets located in the United States.

### Note 13. Stockholders' Equity

#### Inducement Award Plan

The 2004 Employment Inducement Award Plan ("Inducement Plan") was adopted by the Board of Directors on August 30, 2004. Under the Inducement Plan, the Company, with the approval of the Compensation Committee of the Board of Directors (the "Committee"), may grant non-qualified stock options to "New Hire" employees who are not executive officers of the Company. These employees may also be awarded restricted common shares, stock appreciation rights ("SARs") or stock unit awards ("Stock Units"). The Committee determines whether an award may be granted, the number of shares/options awarded, the date an award may be exercised, vesting and the exercise price. Each award must be subject to an agreement between each applicable employee and the company. The term of the plan continues until May 4, 2011 unless it is terminated earlier in accordance with its terms. On January 24, 2006, the Inducement Plan was amended by the Committee to increase the maximum aggregate number of options, SARs, Stock Units and restricted shares that may be awarded under the Inducement Plan from 1,000,000 shares to 2,000,000 shares.

#### Repurchase of Common Stock

On April 13, 2005, the Company announced that its Board of Directors authorized Magma to repurchase up to 2,000,000 shares of its common stock. The stock repurchase was completed in May 2005, with repurchase prices ranging from $7.82 to $8.17 per share. The Company used approximately $16.0 million to repurchase 2,000,000 shares of common stock. Part of the repurchased shares (1,000,000 shares) will be used to fund the increased shares approved by the Committee under the Inducement Plan. The remaining 1,000,000 shares are being held as treasury stock and are to be used for general corporate purposes.

#### Option Exchange Program

In June 2005, the Company offered to its employees a voluntary stock option exchange program designed to promote employee retention and reward contributions to stockholder value. Directors and executive officers were not eligible to participate in this option exchange program. Under the program, the Company offered to exchange outstanding options to purchase common stock at exercise prices greater than or equal to $10.50, for a smaller number of new options at an exercise price of $9.20, equal to fair market value on the date of grant, August 22, 2005. The exchange ratio ranged from 60% to 75% depending on exercise price of the old option. As a result of the exchange program, options to purchase an aggregate of approximately 4.4 million shares of its common stock

23

Table of Contents

**MAGMA DESIGN AUTOMATION, INC.**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(unaudited)**

were canceled (with exercise prices ranging from $10.50 to $30.28) and options to purchase an aggregate of approximately 3.0 million shares of its common stock were granted under the Company's 2001 Stock Incentive Plan on August 22, 2005. The new options generally will vest and become exercisable over a two to four-year period, with 12.5% to 25% of each new option generally becoming exercisable after each six-month period of continued service following the grant date.

As a result of the exchange program and in accordance with the guidance of FIN 44, the Company is required to prospectively apply variable accounting to these new options (and any options granted with a lower exercise price than the canceled options in the six-month look-back and look-forward periods) until the options are exercised, cancelled or expire. In addition, in accordance with the guidance of the FASB's EITF 00-23, the options that were retained by eligible employees who did not participate in the exchange program are also subject to variable accounting until the options in question are exercised, forfeited or expire unexercised. As of January 1, 2006, options to purchase an aggregate of approximately 4.3 million shares of its common stock were subject to variable accounting. The Company will be required to prospectively apply variable accounting to these options in this context until the Company adopts SFAS 123R, which it currently intends to do beginning with the first quarter of fiscal year 2007. As a result of variable accounting, the Company recorded a compensation expense of approximately $16,000 and $229,000, respectively, relating to options granted during the six-month look-back period, for the three and nine months ended January 1, 2006.

24

Table of Contents

**ITEM 2.     MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

This Management's Discussion and Analysis of Financial Condition and Results of Operation section should be read in conjunction with our unaudited condensed consolidated financial statements and results appearing elsewhere in this report. Throughout this section, we make forward-looking statements within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934. You can often identify forward looking statements by terms such as "becoming," "may," "will," "should," "predicts," "potential," "continue," "anticipates," "believes," "estimates," "seeks," "expects," "plans," "intends," or comparable terminology. These forward-looking statements include, but are not limited to, our expectations about revenue and various operating expenses. Although we believe that the expectations reflected in these forward-looking statements are reasonable, and we have based these expectations on our beliefs and assumptions, such expectations may prove to be incorrect. Our actual results of operations and financial performance could differ significantly from those expressed in or implied by our forward-looking statements. Factors that could cause or contribute to such differences include, but are not limited to: competition in the EDA market; our ability to integrate acquired businesses and technologies; potentially higher-than-anticipated costs of litigation; potentially higher-than-anticipated costs of compliance with regulatory requirements, including those relating to internal control over financial reporting; any delay of customer orders or failure of customers to renew licenses; weaker-than-anticipated sales of our products and services; weakness in the semiconductor or electronic systems industries; the ability to manage expanding operations; the ability to attract and retain management and technical personnel; our ability to continue to deliver competitive products to customers; and changes in accounting rules.

**Overview**

Magma Design Automation provides electronic design automation ("EDA") software products and related services. Our software enables chip designers to reduce the time it takes to design and produce complex integrated circuits used in the communications, computing, consumer electronics, networking and semiconductor industries. Our products are used in all major phases of the chip development cycle, from initial design through physical implementation. Our focus is on software used to design the most technologically advanced integrated circuits, specifically those with minimum feature sizes of 0.13 micron and smaller. See "Item 1, Business" in our Annual Report on Form 10-K for the year ended March 31, 2005 for a more complete description of our business.

As an EDA software provider, we generate substantially all our revenue from the semiconductor and electronics industries. Our customers typically fund purchases of our software and services out of their research and development budgets. As a result, our revenue is heavily influenced by our customers' long-term business outlook and willingness to invest in new chip designs.

The semiconductor industry is highly volatile and cost-sensitive. Our customers focus on controlling costs and reducing risk, lowering research and development ("R&D") expenditures, cutting back on design starts, purchasing from fewer suppliers, and requiring more favorable pricing and payment terms from suppliers. In addition, intense competition among suppliers of EDA products has resulted in pricing pressure on EDA products.

To support our customers, we have focused on providing the most technologically advanced products to address each step in the integrated circuit ("IC") design process, as well as integrating these products into broad platforms, and expanding our product offerings. Our goal is to be the EDA technology supplier of choice for our customers as they pursue longer-term, broader and more flexible relationships with fewer suppliers.

25

Table of Contents

Our accomplishments during the third quarter of fiscal 2006 include:

• We achieved record quarterly revenue of $41.3 million during the third quarter of fiscal 2006, up 4% from the prior quarter and up 11% from the same quarter in fiscal 2005. License sales for the quarter ended January 1, 2006 accounted for approximately 84% of total revenue, compared to 82% in the prior quarter and 85% from the same quarter in the prior year. Revenue increased primarily from sales of additional licenses, services and contract extensions to existing customers in North America.

• We continued to penetrate our market, and during the third quarter of fiscal 2006 we added 10 new customers and now have approximately 230 customers.

• We neared completion of the rollout of new products developed as part of our Cobra initiative. With these products, we further enhance our quality of results as defined by chip performance, area and manufacturability.

• Our technology continues to be a top choice among designers working on the most advanced designs. Numerous Magma customers are currently using our technology for 90 nanometer and 65 nanometer designs. Several customers have already completed 65 nanometer designs using Magma technology.

## Critical Accounting Policies and Estimates

In preparing our financial statements, we make estimates, assumptions and judgments that can have a significant impact on our revenue, operating income or loss and net income or loss, as well as on the value of certain assets and liabilities on our balance sheet. We believe that the estimates, assumptions and judgments involved in the accounting policies described below have the most significant potential impact on our financial statements, so we consider these to be our critical accounting policies. We consider the following accounting policies related to revenue recognition, allowance for doubtful accounts, investments, asset purchases and business combinations, income taxes and valuation of long-lived assets to be our most critical policies due to the estimation processes involved in each.

### Revenue recognition

We recognize revenue in accordance with Statement of Position ("SOP") 97-2, as modified by SOP 98-9, which generally requires revenue earned on software arrangements involving multiple elements (such as software products, upgrades, enhancements, maintenance, installation and training) to be allocated to each element based on the relative fair values of the elements. The fair value of an element must be based on evidence that is specific to us. If evidence of fair value does not exist for each element of a license arrangement and maintenance is the only undelivered element, then all revenue for the license arrangement is recognized over the term of the agreement. If evidence of fair value does exist for the elements that have not been delivered, but does not exist for one or more delivered elements, then revenue is recognized using the residual method, under which recognition of revenue for the undelivered elements is deferred and the residual license fee is recognized as revenue immediately.

Our revenue recognition policy is detailed in Note 1 of the Notes to Consolidated Financial Statements on Form 10-K for the year ended March 31, 2005. Management has made significant judgments related to revenue recognition; specifically, in connection with each transaction involving our products (referred to as an "arrangement" in the accounting literature) we must evaluate whether our fee is "fixed or determinable" and we must assess whether "collectibility is probable". These judgments are discussed below.

*The fee is fixed or determinable.* With respect to each arrangement, we must make a judgment as to whether the arrangement fee is fixed or determinable. If the fee is fixed or determinable, then revenue is recognized upon delivery of software (assuming other revenue recognition criteria are met). If the fee is not fixed or determinable, then the revenue recognized in each period (subject to application of other revenue recognition criteria) will be the lesser of the aggregate of amounts due and payable or the amount of the arrangement fee that would have been recognized if the fees were being recognized ratably.

26

Table of Contents

Except in cases where we grant extended payment terms to a specific customer, we have determined that our fees are fixed or determinable at the inception of our arrangements based on the following:

- The fee our customers pay for our products is negotiated at the outset of an arrangement and is generally based on the specific volume of products to be delivered.
- Our license fees are not a function of variable-pricing mechanisms such as the number of units distributed or copied by the customer or the expected number of users of the product delivered.

In order for an arrangement to be considered fixed or determinable, 100% of the arrangement fee must be due within one year or less from the order date. We have a history of collecting fees on such arrangements according to contractual terms. Arrangements with payment terms extending beyond 12 months are considered not to be fixed or determinable.

*Collectibility is probable.* In order to recognize revenue, we must make a judgment about the collectibility of the arrangement fee. Our judgment of the collectibility is applied on a customer-by-customer basis pursuant to our credit review policy. We typically sell to customers for which there is a history of successful collection. New customers are subjected to a credit review process, which evaluates the customers' financial positions and ability to pay. If it is determined from the outset of an arrangement that collectibility is not probable based upon our credit review process, revenue is recognized on a cash receipts basis (as each payment is collected).

*License revenue*

We derive license revenue primarily from licenses of our design and implementation software and, to a much lesser extent, from licenses of our analysis and verification products. We license our products under time-based and perpetual licenses.

We recognize license revenue after the execution of a license agreement and the delivery of the product to the customer, provided that there are no uncertainties surrounding the product acceptance, fees are fixed or determinable, collection is probable and there are no remaining obligations other than maintenance. For licenses where we have vendor-specific objective evidence of fair value ("VSOE,") for maintenance, we recognize license revenue using the residual method. For these licenses, license revenue is recognized in the period in which the license agreement is executed assuming all other revenue recognition criteria are met. For licenses where we have no VSOE for maintenance, we recognize license revenue ratably over the maintenance period, or if extended payment terms exist, based on the amounts due and payable.

For transactions in which we bundle maintenance for the entire license term into a time-based license agreement, no VSOE of fair value exists for each element of the arrangement. For these agreements, where the only undelivered element is maintenance, we recognize revenue ratably over the contract term. If an arrangement involves extended payment terms—that is, where payment for less than 100% of the license, services and initial post contract support is due within one year of the contract date—we recognize revenue to the extent of the lesser of the portion of the amount due and payable or the ratable portion of the entire fee.

For our perpetual licenses and some time-based license arrangements, we unbundle maintenance by including maintenance for up to the first year of the license term, with maintenance thereafter renewable by the customer at the substantive rates stated in their agreements with us. In these unbundled licenses, the aggregate renewal period is greater than or equal to the initial maintenance period. The stated rate for maintenance renewal in these contracts is VSOE of the fair value of maintenance in both our unbundled time-based and perpetual licenses. Where the only undelivered element is maintenance, we recognize license revenue using the residual method. If an arrangement involves extended payment terms, revenue recognized using the residual method is limited to amounts due and payable.

If we were to change any of these assumptions or judgments, it could cause a material increase or decrease in the amount of revenue that we report in a particular period. Amounts invoiced relating to arrangements where

27

Table of Contents

revenue cannot be recognized are reflected on our balance sheet as deferred revenue and recognized over time as the applicable revenue recognition criteria are satisfied.

*Services revenue*

We derive services revenue primarily from consulting and training for our software products and from maintenance fees for our products. Most of our license agreements include maintenance, generally for a one-year period, renewable annually. Services revenue from maintenance arrangements is recognized on a straight-line basis over the maintenance term. Because we have VSOE of fair value for consulting and training services, revenue is recognized as these services are performed or completed. Our consulting and training services are generally not essential to the functionality of the software. Our products are fully functional upon delivery of the product. Additional factors considered in determining whether the revenue should be accounted for separately include, but are not limited to: degree of risk, availability of services from other vendors, timing of payments and impact of milestones or acceptance criteria on our ability to recognize the software license fee.

**Unbilled accounts receivable**

Unbilled accounts receivable represent revenue that has been recognized in advance of being invoiced to the customer. In all cases, the revenue and unbilled receivables are for contracts which are non-cancelable, there are no contingencies and where the customer has taken delivery of both the software and the encryption key required to operate the software. We typically generate invoices 45 days in advance of contractual due dates, and we invoice the entire amount of the unbilled accounts receivable within one year from the contract inception.

**Allowances for doubtful accounts**

We maintain allowances for doubtful accounts for estimated losses resulting from the inability of our customers to make required payments. We regularly review the adequacy of our accounts receivable allowance after considering the size of the accounts receivable balance, each customer's expected ability to pay and our collection history with each customer. We review significant invoices that are past due to determine if an allowance is appropriate using the factors described above. We also monitor our accounts receivable for concentration in any one customer, industry or geographic region.

As of January 1, 2006, two customers each accounted for more than 10% of total receivables. The allowance for doubtful accounts represents our best estimate, but changes in circumstances relating to accounts receivable may result in a requirement for additional allowances in the future. If actual losses are significantly greater than the allowance we have established, that would increase our general and administrative expenses and reported net loss. Conversely, if actual credit losses are significantly less than our allowance, this would decrease our general and administrative expenses and our reported net income would increase.

**Accounting for asset purchases and business combinations**

We are required to allocate the purchase price of acquired assets and business combinations to the tangible and intangible assets acquired, liabilities assumed, as well as in-process research and development based on their estimated fair values. Such a valuation requires management to make significant estimates and assumptions, especially with respect to intangible assets.

Critical estimates in valuing certain of the intangible assets include but are not limited to: future expected cash flows from license sales, maintenance agreements, consulting contracts, customer contracts, acquired workforce and acquired developed technologies and patents; expected costs to develop the in-process research and development into commercially viable products and estimated cash flows from the projects when completed; the acquired company's brand awareness and market position, as well as assumptions about the period of time the acquired brand will continue to be used in the combined company's product portfolio; and discount rates.

28

Table of Contents

Management's estimates of fair value are based upon assumptions believed to be reasonable, but which are inherently uncertain and unpredictable. Assumptions may be incomplete or inaccurate, and unanticipated events and circumstances may occur.

Other estimates associated with the accounting for these acquisitions may change as additional information becomes available regarding the assets acquired and liabilities assumed resulting in changes in the purchase price allocation.

### Goodwill impairment

Statement of Financial Accounting Standards No. 142, "Goodwill and Other Intangible Assets," requires that goodwill be tested for impairment at the reporting unit level (operating segment or one level below an operating segment) on an annual basis and between annual tests in certain circumstances. Application of the goodwill impairment test requires judgment, including the identification of reporting units, assigning assets and liabilities to reporting units, assigning goodwill to reporting unit, and determining the fair value of the reporting unit. We have determined that we have one reporting unit (see Note 11 of the Notes to the Condensed Consolidated Financial Statements in this Form 10-Q). Significant judgments required to estimate the fair value of a reporting unit include estimating future cash flows, determining appropriate discount rates and other assumptions. Changes in these estimates and assumptions could materially affect the determination of fair value for the reporting unit. Any impairment losses recorded in the future could have a material adverse impact on our financial condition and results of operations.

### Valuation of intangibles and long-lived assets

SFAS No. 144, "Accounting for the Impairment or Disposal of Long-Lived Assets," requires that we record an impairment charge on finite-lived intangibles or long-lived assets to be held and used when we determine that the carrying value of intangible assets and long-lived assets may not be recoverable. Based on the existence of one or more indicators of impairment, we measure any impairment of intangibles or long-lived assets based on a projected discounted cash flow method using a discount rate determined by our management to be commensurate with the risk inherent in our business model. Our estimates of cash flows require significant judgment based on our historical results and anticipated results and are subject to many factors.

### Income taxes

We account for income taxes in accordance with SFAS 109, "Accounting for Income Taxes." Significant judgment is required in determining our provision for income taxes. In the ordinary course of business, there are many transactions and calculations where the ultimate tax outcome is uncertain. The amount of income taxes we pay could be subject to audits by federal, state, and foreign tax authorities, which may result in proposed adjustments. Although we believe that our estimates are reasonable, we cannot guarantee that the final outcome of these tax matters will be no different than what has been reflected in our historical income tax provisions.

We also assess the likelihood that our net deferred tax assets will be recovered from future taxable income and to the extent we believe that it is more likely than not that we will not utilize the deferred tax assets, we establish a valuation allowance. We consider all available positive and negative evidence including our past operating results, the existence of cumulative losses in the most recent fiscal years, future taxable income, and ongoing prudent and feasible tax planning strategies in assessing the amount of the valuation allowance. The Company will continue to evaluate the realizability of the deferred tax assets on a quarterly basis. Future increases or decreases in our valuation allowance could have a significant impact on our future earnings.

### Strategic investments in privately-held companies

Our strategic equity investments consist of preferred stock and convertible notes that are convertible into preferred or common stock of several privately-held companies. As of January 1, 2006, $0.6 million of the notes has been converted into an investee company's preferred stock. The carrying value of our portfolio of strategic

29

Table of Contents

equity investments in non-marketable equity securities (privately-held companies) and convertible notes totaled $2.2 million at January 1, 2006. Our ability to recover our investments in private, non-marketable equity securities and convertible notes, and to earn a return on these investments is primarily dependent on how successfully these companies are able to execute on their business plans and how well their products are accepted, as well as their ability to obtain additional capital funding to continue operations. In the current equity market environment, their ability to obtain additional funding as well as to take advantage of liquidity events, such as initial public offerings, mergers and private sales, may be significantly constrained.

Under our accounting policy, the carrying value of a non-marketable investment is the amount paid for the investment unless it has been determined to be other than temporarily impaired, in which case we write the investment down to its estimated fair value. For equity investment with ownership between 20% to 50%, we record our share of net equity income (loss) of the investee based on our proportionate ownership. We review all of our investments periodically for impairment; however, for non-marketable equity securities, the fair value analysis requires significant judgment. This analysis includes assessment of each investee's financial condition, the business outlook for its products and technology, its projected results and cash flows, the likelihood of obtaining subsequent rounds of financing and the impact of any relevant contractual equity preferences held by us or others. If an investee obtains additional funding at a valuation lower than our carrying amount, we presume that the investment is other than temporarily impaired, unless specific facts and circumstances indicate otherwise, such as when we hold contractual rights that give us a preference over the rights of other investors. As the equity markets have declined significantly over the past few years, we have experienced substantial impairments in our portfolio of non-marketable equity securities. If equity market conditions do not improve, as companies within our portfolio attempt to raise additional funds, the funds may not be available to them, or they may receive lower valuations, with more onerous investment terms than in previous financings, and the investments will likely become impaired. However, we are not able to determine at the present time which specific investments are likely to be impaired in the future, or the extent or timing of individual impairments. We recorded impairment charges and share of equity loss related to these non-marketable equity investments of $0.3 million and $0.9 million during the three and nine months ended January 1, 2006, respectively. Similarly, we recorded impairment charges and share of equity loss related to these non-marketable equity investments of $0.4 million and $1.0 million during the three and nine months ended December 31, 2004, respectively.

## Results of Operations

### Revenue

Revenue consists of licenses revenue and services revenue. License revenue consists of fees for time-based or perpetual licenses of our products. Services revenue consists of fees for services, such as post-contract customer support ("PCS"), customer training and consulting. We recognize revenue based on the specific terms and conditions of the license contracts with our customer for our products and services as described in detail above in our "Critical Accounting Policies and Estimates." For management reporting and analysis purposes we classify our revenue into the following four categories:

- Ratable

- Due & Payable

- Cash Receipts

- "Turns" or "Up-front"/ Perpetual or Time-Based

We classify our license arrangements as either bundled or unbundled. Bundled license contracts include maintenance with the license fee and do not include optional maintenance periods. Unbundled license contracts have separate maintenance fees and include optional maintenance periods.

We use this classification of license revenue to provide greater insight into the reporting and monitoring of trends in the components of our revenue and to assist us in managing our business. It is important to note that the characterization of an individual contract may change over time. For example, a contract originally characterized

30

Table of Contents

as Ratable may be redefined as Cash Receipts if that customer has difficulty in making payments in a timely fashion. In cases where a contract has been re-characterized for management reporting purposes, prior periods are not restated to reflect that change. The following table shows the breakdown of license revenue by category as defined for management reporting and analysis purposes:

| | | January 1, 2006 | % of Revenue | December 31, 2004 | % of Revenue |
|---|---|---|---|---|---|
| **Revenue category:** | | | | | |
| **Three Months Ended:** | | | | | |
| Licenses revenue | | | | | |
| Ratable | Bundled and Unbundled | $ 7,428 | 18% | $ 5,751 | 15% |
| Due & Payable | Unbundled | 15,188 | 37% | 14,871 | 40% |
| Cash Receipts | Unbundled | 1,515 | 3% | 769 | 2% |
| Turns | Unbundled | 10,758 | 26% | 10,272 | 28% |
| Total licenses revenue | | 34,889 | 84% | 31,663 | 85% |
| Services revenue | | 6,431 | 16% | 5,643 | 15% |
| Total Revenue | | $ 41,320 | 100% | $ 37,306 | 100% |
| **Nine Months Ended:** | | | | | |
| Licenses revenue | | | | | |
| Ratable | Bundled and Unbundled | $ 18,692 | 16% | $ 14,924 | 13% |
| Due & Payable | Unbundled | 43,320 | 36% | 43,156 | 39% |
| Cash Receipts | Unbundled | 6,004 | 5% | 6,194 | 6% |
| Turns | Unbundled | 33,487 | 28% | 29,556 | 27% |
| Total licenses revenue | | 101,503 | 85% | 93,830 | 85% |
| Services revenue | | 18,535 | 15% | 16,433 | 15% |
| Total Revenue | | $120,038 | 100% | $ 110,263 | 100% |

*Bundled and Unbundled Licenses: Ratable.* For bundled time-based licenses, we recognize license revenue ratably over the contract term, or as customer payments become due and payable, if less. The revenue for these bundled arrangements for both license and maintenance is classified as license revenue in our statement of operations. For unbundled time-based with a term of less than 15 months, we recognize license revenue ratably over the license term, or as customer payments become due and payable, if earlier. For management reporting and analysis purposes, we refer to both these types of licenses generally as "Ratable" and we generally refer to all time-based licenses recognized on a ratable basis as "Long Term," independent of the actual length of term of the license.

We classify unbundled perpetual or time-based licenses with a term of fifteen months or greater based on the payment term structure, as "Due and Payable," "Cash Receipts" or "Turns":

*Unbundled Licenses: Due and Payable/Time-Based licenses with long term payments.* For unbundled time-based licenses where the payment terms extend greater than one year from the arrangement effective date, we recognize license revenue on a due and payable basis and we recognize maintenance and services revenue ratably over the maintenance term. For management reporting and analysis purposes, we refer to this type of license generally as "Due and Payable/Long Term Time-Based Licenses."

*Unbundled Licenses: Cash Receipts.* We recognize revenue from customers who have not met our predetermined credit criteria on a cash receipts basis to the extent that revenue has otherwise been earned. Such customers generally order short-term time based licenses or separate annual maintenance. We recognize license

31

Table of Contents

revenue as we receive cash payments from these customers. Maintenance is recognized ratably over the maintenance term after the customer has remitted payment. For management reporting and analysis purposes, we refer to this type of license revenue as "Cash Receipts."

*Unbundled Licenses: "Turns"/Perpetual License or Time-Based licenses with short-term payments.* For unbundled time-based and perpetual licenses, we recognize license revenue upon shipment as long as the payment terms require the customer to pay 100% of the license fee and the initial period of PCS within one year from the agreement date and payments are generally linear. We recognize maintenance revenue ratably over the maintenance term. In all of these cases, the contracts are non-cancelable, and the customer has taken delivery of both the software and the encryption key required to operate the software. For management reporting and analysis purposes, we refer to this type of license generally as "Turns," where the license is either perpetual or time-based.

Our license revenue in any given quarter depends upon the mix and volume of perpetual or short term licenses ordered during the quarter and the amount of long-term ratable or due and payable, and cash receipts license revenue recognized during the quarter. In general, we refer to license revenue recognized from perpetual or time based licenses during the quarter as "Up-front" or "turns" revenue, for management reporting and analysis purposes. All other types of revenue are generally referred to as revenue from backlog. We set our revenue targets for any given period based, in part, upon an assumption that we will achieve a certain level of orders and a certain mix of short term licenses. The precise mix of orders fluctuates substantially from period to period and affects the revenue we recognize in the period. If we achieve our target level of total orders but are unable to achieve our target license mix, we may not meet our revenue targets (if we have more-than-expected long term licenses) or may exceed them (if we have more-than-expected short term or perpetual licenses). If we achieve the target license mix but the overall level of orders is below the target level, then we may not meet our revenue targets as described in the risk factors below.

*Revenue, cost of revenue and gross profit*

The table below sets forth the fluctuations in revenue, cost of revenue and gross profit data for the three and nine months ended January 1, 2006 and December 31, 2004 (in thousands, except percentage data):

| | January 1, 2006 | % of Revenue | December 31, 2004 | % of Revenue | Dollar Change | % Change |
|---|---|---|---|---|---|---|
| **Three Months Ended:** | | | | | | |
| Revenue: | | | | | | |
| Licenses | $ 34,889 | 84% | $ 31,663 | 85% | $ 3,226 | 10% |
| Services | 6,431 | 16% | 5,643 | 15% | 788 | 14% |
| Total revenue | 41,320 | 100% | 37,306 | 100% | 4,014 | 11% |
| Cost of revenue: | | | | | | |
| Licenses | 6,702 | 16% | 1,740 | 5% | 4,962 | 285% |
| Services | 4,183 | 10% | 3,839 | 10% | 344 | 9% |
| Total cost of revenue | 10,885 | 26% | 5,579 | 15% | 5,306 | 95% |
| Gross profit | $ 30,435 | 74% | $ 31,727 | 85% | $ (1,292) | (4)% |
| **Nine Months Ended:** | | | | | | |
| Revenue: | | | | | | |
| Licenses | $101,503 | 85% | $ 93,830 | 85% | $ 7,673 | 8% |
| Services | 18,535 | 15% | 16,433 | 15% | 2,102 | 13% |
| Total revenue | 120,038 | 100% | 110,263 | 100% | 9,775 | 9% |
| Cost of revenue: | | | | | | |
| Licenses | 17,598 | 15% | 4,743 | 4% | 12,855 | 271% |
| Services | 12,566 | 10% | 11,388 | 10% | 1,178 | 10% |
| Total cost of revenue | 30,164 | 25% | 16,131 | 15% | 14,033 | 87% |
| Gross profit | $ 89,874 | 75% | $ 94,132 | 85% | $ (4,258) | (5)% |

Table of Contents

We market our products and related services to customers in four geographic regions: North America, Europe (Europe, the Middle East and Africa), Japan, and Asia-Pacific. Internationally, we market our products and services primarily through our subsidiaries and various distributors. Revenue is attributed to geographic areas based on the country in which the customer is domiciled. The table below sets forth geographic distribution of revenue data for the three and nine months ended January 1, 2006 and December 31, 2004 (in thousands, except percentage data):

| | January 1, 2006 | % of Revenue | December 31, 2004 | % of Revenue | Dollar Change | % Change |
|---|---|---|---|---|---|---|
| **Three Months Ended:** | | | | | | |
| Domestic | $ 20,939 | 51% | $ 18,952 | 51% | $ 1,987 | 10% |
| International: | | | | | | |
| Europe | 15,407 | 37% | 10,049 | 27% | 5,358 | 53% |
| Japan | 3,210 | 8% | 6,854 | 18% | (3,644) | (53)% |
| Asia-Pacific (excluding Japan) | 1,764 | 4% | 1,451 | 4% | 313 | 22% |
| Total International | 20,381 | 49% | 18,354 | 49% | 2,027 | 11% |
| Total revenue | $ 41,320 | 100% | $ 37,306 | 100% | $ 4,014 | 11% |
| **Nine Months Ended:** | | | | | | |
| Domestic | $ 78,443 | 65% | $ 62,066 | 56% | $ 16,377 | 26% |
| International: | | | | | | |
| Europe | 24,103 | 20% | 20,314 | 19% | 3,789 | 19% |
| Japan | 11,185 | 9% | 22,125 | 20% | (10,940) | (49)% |
| Asia-Pacific (excluding Japan) | 6,307 | 6% | 5,758 | 5% | 549 | 10% |
| Total International | 41,595 | 35% | 48,197 | 44% | (6,602) | (14)% |
| Total revenue | $120,038 | 100% | $ 110,263 | 100% | $ 9,775 | 9% |

*Revenue*

- **Revenue** for the three and nine months ended January 1, 2006 was $41.3 million and $120.0 million, respectively, up 11% and 9% from the comparable periods in the prior year.

- **Licenses revenue** increased in the three and nine months ended January 1, 2006 compared to the comparable periods in the prior year primarily due to large orders executed during fiscal 2006 in North America and Europe. These orders came from new customers and existing customers who extended license periods and added license capacity due to the continued proliferation of existing and new Magma products, amongst their design group designers. The increase in domestic revenue was partially offset by a decrease in revenue from Japan for both the three and nine months ended January 1, 2006 compared to the comparable periods in fiscal 2005. Two customers each accounted for greater than 10% of the revenue for the quarter ended January 1, 2006 and one customer accounted for greater than 10% of the revenue for the nine months ended January 1, 2006. License revenue as a percentage of revenue was fairly consistent in the three and nine months ended January 1, 2006 as compared to the comparable period in fiscal 2005.

- **Services revenue** increased in the three and nine months ended January 1, 2006 compared to the comparable periods in the prior year primarily due to a $1.1 million and $2.5 million, respectively, increase in maintenance revenue. The increase in maintenance revenue was primarily due to our large customers accelerating their deployment of our licenses and placing additional service orders.

- **Domestic revenue** as a percentage of total revenue was consistent at 51% of total revenue in the three months ended January 1, 2006 compared to the comparable period in the prior year. For the nine months

Table of Contents

ended January 1, 2006, domestic revenue as a percentage of total revenue increased from 56% to 65% as compared to the comparable period in the prior year. This increase in the nine months ended January 1, 2006 was primarily due to a one time, non recurring payment for the termination of an existing customer's license agreement. The payment arose from sale of this customer's semiconductor division to a third party. The third party, also an existing Magma customer, purchased additional software licenses for use by engineers transferred in the acquisition. The increase in domestic revenue was also due to a customer in North America purchasing additional capacity for existing licenses and licenses to new technology products during the nine months ended January 1, 2006.

- **International revenue** as a percentage of total revenue was consistent at 49% of total revenue in the three months ended January 1, 2006 compared to the comparable period in the prior year. For the nine months ended January 1, 2006, international revenue as a percentage of total revenue decreased from 44% to 35% as compared to the comparable period in the prior year primarily due to our existing customers in Japan and Europe requiring less capacity for existing licenses and fewer licenses to new technology products.

### Cost of Revenue

- **Cost of licenses revenue** primarily consists of amortization of acquired developed technology and other intangible assets, software maintenance costs, royalties and allocated outside sale representative expenses. Cost of license revenue increased by $5.0 million and $12.9 million, respectively, in the three and nine months ended January 1, 2006 compared to the comparable periods in the prior year primarily due to the change in classification, from operating expenses to cost of license revenue, of a $4.1 million and $10.0 million, respectively, amortization relating to certain developed technologies, as the Company began recognizing revenue from products based on these developed technologies during fiscal 2006. The remainder of the increase was due to amortization of new intangibles, such as earnouts related to previous acquisitions.

- **Cost of services revenue** primarily consists of personnel and related costs to provide product support, consulting services and training. Cost of services revenue also includes asset depreciation, allocated outside sale representative expenses and amortization of deferred stock-based compensation. Cost of services revenue increased by $0.3 million and $1.2 million, respectively, in the three and nine months ended January 1, 2006 compared to the comparable periods in the prior year, primarily due to an increase of personnel and related costs for application engineers that corresponded to higher consulting and maintenance activities in the fiscal 2006 periods.

### Operating expenses

The table below sets forth operating expense data for the three and nine months ended January 1, 2006 and December 31, 2004 (in thousands, except percentage data):

| | January 1, 2006 | % of Revenue | December 31, 2004 | % of Revenue | Dollar Change | % Change |
|---|---|---|---|---|---|---|
| **Three Months Ended:** | | | | | | |
| Operating expenses: | | | | | | |
| Research and development | $ 10,830 | 26% | $  10,223 | 27% | $   607 | 6% |
| In-process research and development | 450 | 1% | 355 | 1% | 95 | 27% |
| Sales and marketing | 11,487 | 28% | 11,043 | 30% | 444 | 4% |
| General and administrative | 11,179 | 27% | 4,576 | 12% | 6,603 | 144% |
| Amortization of intangible assets | 2,682 | 6% | 4,680 | 13% | (1,998) | (43)% |
| Amortization of stock-based compensation | 914 | 2% | 362 | 1% | 552 | 152% |
| Restructuring costs | — | —% | 259 | 1% | (259) | (100)% |
| Total operating expenses | $ 37,542 | 91% | $  31,498 | 84% | $ 6,044 | 19% |

34

**Table of Contents**

| | January 1, 2006 | % of Revenue | December 31, 2004 | % of Revenue | Dollar Change | % Change |
|---|---|---|---|---|---|---|
| **Nine Months Ended:** | | | | | | |
| Operating expenses: | | | | | | |
| Research and development | $ 33,186 | 28% | $ 30,316 | 27% | $ 2,870 | 9% |
| In-process research and development | 450 | 0% | 4,364 | 4% | (3,914) | (90)% |
| Sales and marketing | 33,347 | 28% | 33,989 | 31% | (642) | (2)% |
| General and administrative | 29,634 | 25% | 11,656 | 11% | 17,978 | 154% |
| Amortization of intangible assets | 9,152 | 8% | 13,248 | 12% | (4,096) | (31)% |
| Amortization of stock-based compensation | 3,859 | 3% | 936 | 1% | 2,923 | 312% |
| Restructuring costs | — | —% | 698 | 1% | (698) | (100)% |
| Total operating expenses | $109,628 | 91% | $ 95,207 | 86% | $14,421 | 15% |

- **Research and development expense** increased in the three and nine months ended January 1, 2006 compared to the comparable periods in the prior year primarily due to an increase in payroll related expenses of $0.9 million and $4.0 million, respectively, which included an increase in bonus expense of $0.4 million and $2.4 million, respectively, and an increase in salaries and related expenses of $0.2 million and $1.1 million, respectively, due to the increase of senior and experienced staff in research and development through direct hiring and business acquisitions. For the nine months ended January 1, 2006, the increase in research and development expense was also caused by higher allocated common expenses (e.g., facility related expenses) of $0.4 million compared to the same period in the prior year. The increases in research and development expense in the three and nine months ended January 1, 2006 compared to the comparable periods in the prior year were partially offset by a decrease in software maintenance costs of $0.4 million and $1.5 million, respectively, due to the fact that a major software maintenance contract expired in the last quarter of fiscal 2005. The remainder of the fluctuation in research and development expense was accounted for by other individually insignificant items. We expect our quarterly research and development expense in the remaining quarter of fiscal 2006 to increase moderately compared with the amounts in the first three quarters of fiscal 2006 as our research and development headcount will increase driving up both fixed and variable compensation levels.

- **In-process research and development ("IPR&D")** expense of $450,000 for the three and nine months ended January 1, 2006 consisted of a charge recorded in connection with our acquisition of ACAD in November 2005. IPR&D expense of $355,000 for the three months ended December 31, 2004 consisted of a charge recorded in connection with our acquisitions of Fortis, Inc. in December 2004. IPR&D expense of $4.4 million for the nine months ended December 31, 2004 also consisted of a charge recorded in connection with our acquisitions of Mojave, Inc. in April 2004. The charges were recorded based on management's final purchase price allocation. There has been no material change to the IPR&D project schedule as of January 1, 2006. Revenue resulting from the Mojave IPR&D project commenced around the end of the first quarter of fiscal 2006.

- **Sales and marketing expense** increased in the three months ended January 1, 2006 compared to the comparable period in the prior year primarily due to an increase in payroll related expenses of $0.9 million, which primarily consisted of increases in payroll cost of $0.3 million, fringe benefit of $0.3 million and bonus expense of $0.2 million. The increase in payroll related expenses in the three months ended January 1, 2006 compared to the comparable period in the prior year was partially offset by a decrease in marketing communications of $0.3 million, an increase in expenses allocated to cost of service revenue (primarily application engineering costs) of $0.2 million and a decrease in commission expense of $0.1 million. Sales and marketing expense decreased in the nine months ended January 1, 2006 compared to the comparable period in the prior year primarily due to a decrease in commission expense of $0.8 million, an increase in expenses allocated to cost of service revenue (primarily application engineering costs) of $1.0 million, a decrease in travel and entertainment expense of

35

Table of Contents

$0.3 million, and a decrease in professional services of $0.4 million. The decreases in sales and marketing in the nine months ended January 1, 2006 compared to the comparable periods in the prior year were partially offset by an increase in allocated common expenses (e.g., facility related expenses) of $0.4 million and an increase in payroll related expenses of $1.6 million, which consisted of an increase in bonus expense of $1.3 million and an increase in salaries and related expenses of $0.3 million. We expect our quarterly sales and marketing expenses in the remaining quarter of fiscal 2006 to increase significantly compared with the amounts in the first three quarters of fiscal 2006, primarily as a function of increased variable compensation costs driven by bookings and revenue growth.

- **General and administrative expense** increased in the three and nine months ended January 1, 2006 compared to the comparable periods in the prior year primarily due to increases in professional service fees of $5.5 million and $14.7 million, respectively, payroll related expenses of $1.0 million and $1.4 million, respectively, and asset depreciation of $0.2 million and $1.5 million, respectively, partially offset by a decrease in bad debt expense of $0.3 million and $0.4 million, and an increase in allocated cost to other functional areas of $0.1 million and $0.9 million, respectively, due to higher common expenses in fiscal 2006 compared to the same periods in the prior year. The increase in professional service fees in the three and nine months ended January 1, 2006 primarily consisted of legal expenses of $6.2 million and $13.1 million, respectively, which were accrued for as incurred, specifically related to patent litigation with Synopsys, Inc. The remainder of the fluctuation in general and administrative expense was accounted for by other individually insignificant items. We expect that our quarterly general and administrative expense in the remaining quarter of fiscal 2006 will decline moderately compared with the prior quarter and will be consistent with the amounts in the first and second quarter of fiscal 2006 as our general and administrative head count growth will be moderate, legal expenses and professional services related to litigation will decrease slightly and variable compensation will grow moderately driven by increased revenue.

- **Restructuring costs** in the fiscal 2005 periods consisted of employee termination charges resulting from the Company's realignment to current business conditions in the first quarter of fiscal 2005.

- **Amortization of intangible assets** decreased in the three and nine months ended January 1, 2006 compared to the comparable periods in the prior year primarily due to the change in classification, from operating expenses to cost of licenses revenue, of $2.8 million and $6.6 million, respectively, amortization relating to certain developed technologies. The Company began recognizing revenues from products based on these developed technologies during fiscal 2006. The decrease was partially offset by amortization of new intangible assets acquired subsequent to the third quarter of fiscal 2005. The intangible assets being amortized include technology licenses, trademarks, customer contracts, customer relationships, no shop rights and non-competition agreements that were identified in the purchase price allocation for each business combination and asset purchase transaction.

- **Amortization of deferred stock-based compensation** increased in the three and nine months ended January 1, 2006 compared to the comparable periods in the prior year, primarily due to an increase in amortization of deferred stock-based compensation of $0.7 million and $2.3 million, respectively, related to deferred stock compensation recorded in connection with the Company's 2005 Key Contributor Incentive Plan. For the nine months ended January 1, 2006, the increase was also due to a stock-based compensation expense of $0.2 million related to the option exchange in August 2005, and an increase in amortization of deferred stock-based compensation of $0.7 million related to the Mojave acquisition. The increases in the three and nine months ended January 1, 2006 were partially offset by a decrease in amortization of deferred stock-based compensation of $0.1 million and $0.4 million, respectively, related to deferred stock compensation recorded in connection with our IPO in November 2001.

During the second quarter of 2005, we offered a voluntary stock option exchange program to our employees which resulted in variable accounting treatment for, at the time of the exchange, options to purchase an aggregate of approximately 5.5 million shares of its common stock. We are accounting for all replacement stock options, as well as all options that were subject to the exchange program but were retained by employees, using variable accounting until adoption of SFAS 123R. Under variable

36

Table of Contents

accounting, cumulative stock compensation expense at any balance sheet date must equal accumulated amortization of the current intrinsic value of the outstanding variable stock awards recorded prospectively from the date variable accounting commences over their remaining vesting periods. Upon adoption of SFAS 123R, in accordance with its rules, the amount of stock compensation expense will be fixed based on initial estimated fair values of the replacement stock options and amortized over the remaining vesting periods of these options. Stock compensation expense recognized until adoption of SFAS 123R using variable accounting will not be reversed upon adoption. Variable accounting treatment may result in unpredictable and potentially significant charges or credits recorded to stock-based compensation, which will be dependent upon fluctuations in the quoted market prices of our common stock.

In December 2004, the FASB issued SFAS 123R, "Share-Based Payment." SFAS 123R eliminates the ability to account for share-based compensation transactions using APB 25, and generally requires instead that such transactions be accounted for using a fair-value based method. Companies are required to recognize an expense for compensation cost related to share-based payment arrangements including stock options and employee stock purchase plans. The new rules will be effective for annual periods beginning after June 15, 2005 and, thus, will be effective for us no later than the first quarter of fiscal 2007. We are currently evaluating which transition method to use and option valuation methodologies and assumptions in light of SFAS 123R related to employee stock options and employee stock purchase plans. The adoption of SFAS 123R will lead to substantial additional compensation expense and therefore will have a material adverse effect on our consolidated statement of operations, as we will be required to expense the fair value of our stock option grants and stock purchases under our employee stock purchase plan, rather than disclose the impact on our consolidated net income within the footnotes (see Note 2 to the Condensed Consolidated Financial Statements), as is our current practice.

*Other items*

The table below sets forth other data for the three and nine months ended January 1, 2006 and December 31, 2004 (in thousands, except percentage data):

| | January 1, 2006 | % of Revenue | December 31, 2004 | % of Revenue | Dollar Change | | % Change |
|---|---|---|---|---|---|---|---|
| **Three Months Ended:** | | | | | | | |
| Other income (expense), net: | | | | | | | |
| Interest income | $   795 | 2% | $   551 | 1% | $   244 | | 44% |
| Interest expense | (197) | —% | (249) | (1)% | 52 | | (21)% |
| Other expense, net | (776) | (2)% | 473 | 1% | (1,249) | | (264)% |
| Total other income (expense), net | $   (178) | —% | $   775 | 2% | $   (953) | | |
| Provision for income taxes | $   (783) | (2)% | $   (1,723) | 5% | $   940 | | |
| **Nine Months Ended:** | | | | | | | |
| Other income (expense), net: | | | | | | | |
| Interest income | $  2,042 | 2% | $  1,660 | 2% | $   382 | | 23% |
| Interest expense | (629) | (1)% | (746) | (1)% | 117 | | (16)% |
| Other income (expense), net | 6,322 | 5% | (731) | (1)% | 7,053 | | (965)% |
| Total other income (expense), net | $  7,735 | 6% | $   183 | —% | $  7,552 | | |
| Provision for income taxes | $ (2,692) | (2)% | $  (2,075) | (2)% | $   (617) | | |

37

**Table of Contents**

- **Interest income** increased in the three and nine months ended January 1, 2006 compared to the comparable periods in the prior year primarily due to higher interest rates on our cash and investments balance during the fiscal 2006 periods. Even though our total cash and investment balance was lower in fiscal 2006 periods, the combination of higher short-term interest rates, together with the liquidation of long-term instruments during fiscal 2006 which were purchased at much lower rates and the subsequent reinvestment of maturing funds into higher short-term yielding instruments produced higher interest income in the three and nine months ended January 1, 2006 compared to the comparable periods in fiscal 2005.

- **Interest expense** primarily represents amortization of debt discount and issuance costs, which were recorded in connection with our convertible subordinated debt offering completed in May 2003. In May 2005, we repurchased approximately 29.7% of the convertible subordinated debt. In connection with the repurchase, we wrote off $0.9 million of the unamortized debt issuance costs related to the repurchased portion of the convertible subordinated debt. As a result, amortization of debt issuance costs decreased by $73,000 and $192,000, respectively, in the three and nine months ended January 1, 2006 compared to the comparable periods in the prior year. The decrease was partially offset by increase of interest expense on capital leases in fiscal 2006 periods.

- **Other income (expense), net** in the three and nine months ended January 1, 2006 consisted of a charge of $0.3 million and $0.9 million, respectively, associated with other than temporary impairment in our strategic investments and a foreign exchange loss of $0.4 million and $0.9 million, respectively. Other income, net in the nine months ended January 1, 2006 also included a $9.7 million gain on repurchase of $44.5 million of the convertible subordinated debt, partially offset by a $0.9 million write-off of the debt issuance costs related to the repurchase and a $0.7 million of loss on sale of short-term investments. Other expense, net in the three and nine months ended December 31, 2004 consisted of a charge of $0.4 million and $1.0 million, respectively, associated with other than temporary impairment in our strategic investments and a foreign exchange gain of $0.8 million and $0.3 million, respectively. The impairment charge was determined based on our periodic review of the investee company's financial performance, financial conditions and near-term prospects. The foreign exchange loss in the fiscal 2006 periods was caused by an unfavorable exchange rate fluctuation between the U.S. Dollar and the Japanese Yen.

- **Provision for income taxes.** The income tax provided for the three months ended January 1, 2006 was $783,000, compared to an expense of $1.7 million for the three months ended December 31, 2004. The tax provision of $783,000 consisted primarily of the federal, state and foreign taxes provided for the income derived from our normal operations as well as certain discrete items including but are not limited to gain on the partial retirement of the convertible bond, impairment of certain equity investments, loss on disposal of certain investments, and the write-off of In-Process Research and Development related to the acquisition of ACAD. The income tax provisions are $2.7 and $2.1 million for the nine months ended January 1, 2006 and December 31,2004, respectively. Our effective tax rates vary from the U.S. statutory rates primarily due to changes in our valuation allowance, foreign income taxed at other than U.S. rates, in-process research and development, research and development tax credits, and foreign withholding taxes.

We are in a net deferred tax asset position, for which a full valuation allowance has been recorded. We will continue to provide a valuation allowance on our net deferred tax assets until it becomes more likely than not that the deferred tax assets will be realized. The Company will continue to evaluate the realizability of the deferred tax assets on a quarterly basis.

In the event of a future change in ownership, as defined under federal and state tax laws, our net operating loss and tax credit carryforwards may be subject to an annual limitation. The annual limitation may result in an increase to our current income tax provision, and the net operating loss and tax credit carryforwards may expire before they are utilized.

Table of Contents

**Liquidity and Capital Resources**

| (Dollars in Thousands) | January 1, 2006 | | March 31, 2005 | |
|---|---|---|---|---|
| Cash, cash equivalents and short-term investments | $ | 89,385 | $ | 135,518 |

| | Nine Months Ended | | | |
|---|---|---|---|---|
| | January 1, 2006 | | December 31, 2004 | |
| Net cash provided by operating activities | $ | 29,822 | $ | 26,114 |
| Net cash provided by (used in) investing activities | $ | 49,220 | $ | (13,681) |
| Net cash used in financing activities | $ | (46,652) | $ | (8,864) |

During the fourth quarter of fiscal 2005, we reclassified auction rate securities of $6.9 million and $55.1 million as of December 31, 2004 and March 31, 2004, respectively, from cash and cash equivalents to short-term investments. We have reclassified the purchases and sales of these auction rate securities in our condensed consolidated statements of cash flows, which decreased our cash used in investing activities by $48.2 million for the nine months ended December 31, 2004.

Our cash, cash equivalents and short-term investments, excluding restricted cash, were approximately $89.4 million at January 1, 2006, a decrease of $46.1 million or 34% from March 31, 2005. The decrease primarily reflected cash generated from operations and proceeds from common stock issuances, which in fiscal 2006 was more than offset by cash used for repurchase of a portion of the convertible subordinated notes, repurchase of common stock, purchases of intangible assets, equity investments and capital investments. Our investment portfolio consists of high-grade fixed-income securities diversified among corporate, US agency and municipal issuers with maturities of two years or less. A portion of the portfolio is allocated to auction rate securities which provide liquidity at par every 28 days with underlying longer-term maturities.

On April 13, 2005, we announced that our Board of Directors authorized Magma to repurchase up to 2,000,000 shares of our common stock. The stock repurchase program was completed in May 2005. We used approximately $16.0 million to repurchase 2,000,000 shares of common stock. 1,000,000 of the repurchased shares are reserved for the Inducement Plan and the remaining 1,000,000 shares are to be used for general corporate purposes. (see Note 13 to the Condensed Consolidated Financial Statements)

In early May 2005, we repurchased, in privately negotiated transactions, $44.5 million face amount (or approximately 29.7 percent of the total) of our convertible subordinated notes, at an average discount to face value of approximately 22 percent. We spent an aggregate of approximately $34.8 million on the repurchase. The repurchase leaves approximately $105.5 million aggregate principal amount of convertible subordinated notes outstanding. At the same time we terminated a portion (approximately 29.7 percent) of the hedging arrangements.

*Net cash provided by operating activities*

Net cash provided by operating activities was $29.8 million in the nine months ended January 1, 2006 compared to $26.1 million in the comparable period in the prior year. The $3.7 million increase was primarily due to a $13.6 million increase in cash from customers, a $12.6 million decrease in payments associated with accounts payable and accrued liabilities and a $1.2 million increase in cash from interest income. These increases in cash flow were partially offset by a $21.2 million increase in costs and expenses, and a $2.5 million increase in payments associated with prepaid and other assets balances. The increase in cash from customers was primarily due to higher cash collection on accounts receivable during the nine months ended January 1, 2006 compared to the comparable period in fiscal 2005. The payment of accrued liabilities during the nine months ended December 31, 2004 was primarily related to a payout of accrued bonuses during the period. The increase in payments associated with prepaid expenses during the nine months ended January 1, 2006 was primarily caused by an increase of $1.9 million payment on prepaid software maintenance expense.

39

Table of Contents

*Net cash provided by (used in) investing activities*

Net cash provided by investing activities was $49.2 million in the nine months ended January 1, 2006. We had net proceeds of $78.5 million from sales of marketable securities as we liquidated these investments to repurchase a portion of the convertible subordinated notes. Partially offsetting the cash inflow, we used a total of $25.3 million in cash to acquire ACAD, to purchase a technology license and make earnout payments relating to prior asset purchases. We also made an investment of $0.8 million in a privately held technology company for business and strategic purposes. We may make additional strategic equity investments in the future by using our cash, cash equivalents and/or short-term investments. In addition, we acquired property and equipment totaling $3.2 million in cash and $2.2 million through capital leases. We expect to make capital expenditures of approximately $2.6 million for the remainder of fiscal 2006. These capital expenditures will be used to support selling, marketing and product development activities. We will use capital lease financing as well as our cash and cash equivalents and/or short-term investments to fund these purchases.

Net cash used in investing activities was $13.7 million in the nine months ended December 31, 2004. We used cash to complete the Mojave, Lemmatis and Fortis asset purchase transactions during the nine months ended December 31, 2004 in order to broaden our product offerings and to incorporate certain key technologies into our existing products and paid a total of $9.5 million in cash, net of cash acquired. We also made investments of $2.2 million in three privately held technology companies for business and strategic purposes. In August 2004, we made a total of $16.0 million milestone payment relating to prior asset purchases. During the nine months ended December 31, 2004, we acquired property and equipment totaling $12.3 million. The property and equipment expenditures were primarily for purchases of computer equipment and research and development tools to support our growing operations. The primary source of cash from investing activities was net proceeds of $27.6 million from maturities of short-term investments.

*Net cash used in financing activities*

Net cash used in financing activities was $46.7 million in the nine months ended January 1, 2006. We used $34.8 million to repurchase a portion of our convertible subordinated notes and received net proceeds of $140,000 from termination of the related portion of the bond hedge and warrant. In addition, we used $16.0 million to repurchase 2,000,000 shares of common stock on the open market, as authorized by the board of directors in April 2005, and made payments of $0.6 million on our capital leases. The primary source of cash was $4.6 million in cash received from the exercise of stock options and shares purchased under the employee stock purchase plan during the period.

Net cash used in financing activities was $8.9 million in the nine months ended December 31, 2004. The primary source of cash was $7.7 million of cash received from the exercise of stock options and the purchase of shares under the employee stock purchase plan. We used $16.6 million to repurchase 1,000,000 shares of common stock on the open market, as authorized by the board of directors in July 2004.

*Capital resources*

We believe that our existing cash and cash equivalents and short-term investments will be sufficient to meet our anticipated operating and working capital expenditure requirements in the ordinary course of business for at least the next 12 months. If we require additional capital resources to grow our business internally or to acquire complementary technologies and businesses at any time in the future, we may use cash or need to sell additional equity or debt securities. The sale of additional equity or convertible debt securities may result in more dilution to our existing stockholders. Financing arrangements may not be available to us, or may not be available in amounts or on terms acceptable to us.

Our acquisition agreements related to certain business combination and asset purchase transactions obligate us to pay certain contingent cash and stock considerations based on meeting certain booking or project

40

Table of Contents

milestones and continued employment. Total amounts of cash and stock contingent consideration that could be paid or issued under our acquisition agreements, assuming all contingencies are met, were $53.2 million and $46.6 million, respectively, as of January 1, 2006. The number of contingent shares to be issued depends on the market price of our common stock near when the milestones are achieved.

### Contractual obligations

As of January 1, 2006, our principal commitments consisted of operating leases, with an aggregated future amount of $11.7 million through fiscal 2011 for office facilities, and repayment of the convertible subordinated notes of $105.5 million due in fiscal 2009. During the nine months ended January 1, 2006, other than the decrease of $44.5 million in the convertible subordinated notes, there were no material changes in our reported payments due under contractual obligations at March 31, 2005. Although we have no material commitments for capital expenditures, we anticipate a substantial increase in our capital expenditures and lease commitments with our anticipated growth in operations, infrastructure, and personnel. In addition, we have other obligations for goods and services entered into in the normal course of business. These obligations, however, either are not enforceable or legally binding or are subject to change based on our business decisions.

### Off-balance Sheet Arrangements

As of January 1, 2006, we did not have any significant "off-balance sheet arrangements," as defined in Item 303(a)(4)(ii) of Regulation S-K.

### Indemnification Obligations

We enter into standard license agreements in the ordinary course of business. Pursuant to these agreements, we agree to indemnify our customers for losses suffered or incurred by them as a result of any patent, copyright, or other intellectual property infringement claim by any third party with respect to our products. These indemnification obligations have perpetual terms. Our normal business practice is to limit the maximum amount of indemnification to the amount received from the customer. On occasion, the maximum amount of indemnification we may be required to make may exceed our normal business practices. We estimate the fair value of its indemnification obligations as insignificant, based on our historical experience concerning product and patent infringement claims. Accordingly, we had no liabilities recorded for indemnification under these agreements as of January 1, 2006.

We have agreements whereby our officers and directors are indemnified for certain events or occurrences while the officer or director is, or was, serving at our request in such capacity. The maximum potential amount of future payments we could be required to make under these indemnification agreements is unlimited; however, we have a directors' and officers' liability insurance policy that reduces our exposure under these agreements. As a result of our insurance policy coverage, we believe the estimated costs of these indemnification agreements is minimal. Accordingly, no liabilities have been recorded for these agreements as of January 1, 2006.

In connection with recent business acquisitions, we agreed to assume, or cause our subsidiaries to assume, indemnification obligations to the officers and directors of acquired companies.

### Warranties

We offer our customers a warranty that our products will conform to the documentation provided with the products. To date, there have been no payments or material costs incurred related to fulfilling these warranty obligations. Accordingly, we have no liabilities recorded for these warranties as of January 1, 2006. We assess the need for a warranty accrual on a quarterly basis, and there can be no guarantee that a warranty accrual will not become necessary in the future.

41

Table of Contents

### FACTORS THAT MAY AFFECT OUR BUSINESS AND FUTURE RESULTS OF OPERATIONS AND FINANCIAL CONDITION

*Our business faces many risks. The risks described below may not be the only risks we face. Additional risks that we do not yet know of or that we currently think are immaterial may also impair our business operations. If any of the events or circumstances described in the following risks actually occur, our business, financial condition or results of operations could suffer, and the trading price of our common stock could decline.*

### Our limited operating history makes it difficult to evaluate our business and prospects.

We were incorporated in April 1997 and introduced our first principal software product, Blast Fusion, in April 1999. We have a limited history of generating revenue from our software products, and the revenue and income potential of our business and market is still unproven. As a result of our short operating history, we have limited financial data that can be used to evaluate our business. We have only been profitable for eight of the last fourteen fiscal quarters, and we were not profitable prior to fiscal 2003. Our software products represent a new approach to the challenges presented in the electronic design automation market, which to date has been dominated by established companies with longer operating histories. Key markets within the electronic design automation industry may fail to adopt our proprietary technologies and software products. Any evaluation of our business and our prospects must be considered in light of our limited operating history and the risks and uncertainties often encountered by relatively young companies.

### We have a history of losses, except for fiscal 2003 and fiscal 2004, and have an accumulated deficit of approximately $130.4 million as of January 1, 2006; if we do not increase profitability, the public trading price of our stock would be likely to decline.

We had an accumulated deficit of approximately $130.4 million as of January 1, 2006. Although we achieved profitability in fiscal 2003 and fiscal 2004, we incurred losses in other fiscal years and the first and second quarter of fiscal 2006. If we continue to incur losses, or if we fail to achieve profitability at levels expected by securities analysts or investors, the market price of our common stock is likely to decline. If we incur net losses, we may not be able to maintain or increase our number of employees or our investment in capital equipment, sales, marketing, and research and development programs, and we may not be able to continue to operate.

### Our quarterly results are difficult to predict, and if we miss quarterly financial expectations, our stock price could decline.

Our quarterly revenue and operating results fluctuate from quarter to quarter and are difficult to predict. It is likely that our operating results in some periods will be below investor expectations. If this happens, the market price of our common stock is likely to decline. Fluctuations in our future quarterly operating results may be caused by many factors, including:

- size and timing of customer orders, which are received unevenly and unpredictably throughout a fiscal year;

- the mix of products licensed and types of license agreements;

- our ability to recognize revenue in a given quarter;

- higher than anticipated costs in connection with patent litigation with Synopsys, Inc.;

- timing of customer license payments;

- the relative mix of time-based licenses bundled with maintenance, unbundled time-based license agreements and perpetual license agreements, each of which has different revenue recognition practices;

- size and timing of revenue recognized in advance of actual customer billings and customers with graduated payment schedules which may result in higher accounts receivable balances and days sales outstanding ("DSO");

42

Table of Contents

- the relative mix of our license and services revenue;

- our ability to win new customers and retain existing customers;

- changes in our pricing and discounting practices and licensing terms and those of our competitors;

- changes in the level of our operating expenses, including increases in incentive compensation payments that may be associated with future revenue growth;

- variability in stock-based compensation charges related to our option exchange program;

- changes in the interpretation of the authoritative literature under which we recognize revenue;

- the timing of product releases or upgrades by us or our competitors; and

- the integration, by us or our competitors, of newly-developed or acquired products.

**We currently face lawsuits brought by Synopsys, Inc. related to patent infringement, and we may face additional intellectual property infringement claims or other litigation. Lawsuits can be costly to defend, can take the time of our management and employees away from day-to-day operations, and could result in our losing important rights and paying significant damages.**

On September 17, 2004, Synopsys, Inc., filed suit against us for patent infringement, and it subsequently filed patent related litigation in Germany and Japan (please see the discussion in Part II. Item 1.—"Legal Proceedings" below for further detail). Other related litigation may follow. In the future other parties may assert intellectual property infringement claims against us or our customers. We may have acquired or may in the future acquire software as a result of our acquisitions, and we could be subject to claims that such software infringes the intellectual property rights of third parties. In addition, we are often involved in or threatened with commercial litigation unrelated to intellectual property infringement claims such as labor litigation and contract claims, and we may acquire companies that are actively engaged in such litigation.

Our products may be found to infringe intellectual property rights of third parties, including third-party patents. In addition, many of our contracts contain provisions in which we agree to indemnify our customers from third-party intellectual property infringement claims that are brought against them based on their use of our products. Also, we may be unaware of filed patent applications that relate to our software products. We believe the patent portfolios of our competitors are far larger than ours, and this may increase the risk that they may sue us for patent infringement and may limit our ability to counterclaim for patent infringement or settle through patent cross-licenses.

The outcome of intellectual property litigation, such as the pending Synopsys litigation (discussed herein), could be our loss of critical proprietary rights and unexpected operating costs. Intellectual property litigation is expensive and time-consuming and could divert management's attention from our business. If there is a successful claim of infringement, we may be ordered to pay substantial monetary damages (including punitive damages), we may be prevented from distributing all or some of our products, and we may be required to develop non-infringing technology or enter into royalty or license agreements, which may not be available on acceptable terms, if at all. Our failure to develop non-infringing technologies or license the proprietary rights on a timely basis would harm our business.

In June, 2005, a putative shareholder class action lawsuit was filed against us in federal court as further identified in Part II, Item 1.— "Legal Proceedings." Generally, the complaint in this lawsuit alleges that we and some of our executive officers failed to disclose information about the risk of Magma infringing intellectual property rights of Synopsys, Inc..

In July, 2005, a putative derivative lawsuit was filed against us in state court as further identified in Part II, Item 1.—"Legal Proceedings." The complaint in this lawsuit seeks unspecified damages purportedly on behalf of the Company for alleged breaches of fiduciary duties by various directors and officers, as well as for alleged violations of insider trading laws by executives.

43

**Table of Contents**

On September 26, 2005, Synopsys, Inc. filed an action against the Company in the Superior Court of the State of California alleging that Magma committed unfair business practices by asserting defenses of non-infringement and invalidity to patent infringement allegations brought by Synopsys in the September 17, 2004 patent infringement action. On the Company's motion, the action was removed to the United States District Court and related to the September 17, 2004 action. (See also Item II, Part I—"Legal Proceedings")

On September 26, 2005, Synopsys, Inc. filed an action against the Company in Delaware federal court, alleging infringement of U.S. Patent Nos. 6,434,733 ("the '733 Patent"), 6,766,501 ("the '501 Patent"), and 6,192,508 ("the '508 Patent") and seeks unspecified monetary damages, injunctive relief, trebling of damages, fees and costs, and the imposition of a constructive trust for the benefit of Synopsys over benefits allegedly obtained by the Company as a result of its alleged infringement. On October 19, 2005, the Company filed its answer and counterclaims to Synopsys' Complaint. On October 25, 2005, the Company filed an Amended Answer, adding a counterclaim for infringement of U.S. Patent No. 6,505,328 ("the '328 Patent"). The Company seeks treble damages and an injunction against Synopsys for the sale and manufacture of products the Company alleges infringe the '328 Patent.

With respect to the above-referenced lawsuits, we are currently unable to assess the possible extent of damages or other relief, if any, that might be awarded and no contingent liability was recorded as of January 1, 2006.

Publicly announced developments in our litigation matters may cause our stock price to decline sharply and suddenly. Other factors may reduce the market price of our common stock, and we are subject to ongoing risks of securities class action litigation related to volatility in the market price for our common stocks.

We may not be successful in defending some or all claims that may be brought against us. Regardless of the outcome, litigation can result in substantial expense and could divert the efforts of our management and technical personnel from our business. In addition, the ultimate resolution of the lawsuits could have a material adverse effect on our financial position, results of operations and cash flows and harm our ability to execute our business plan.

**We may not be able to hire and/or retain the number of qualified personnel required for our business, particularly engineering personnel, which would harm the development and sales of our products and limit our ability to grow.**

Competition in our industry for senior management, technical, sales, marketing and other key personnel is intense. If we are unable to retain our existing personnel, or attract and train additional qualified personnel, our growth may be limited due to a lack of capacity to develop and market our products.

In particular, we continue to experience difficulty in hiring and retaining skilled engineers with appropriate qualifications to support our growth strategy. Our success depends on our ability to identify, hire, train and retain qualified engineering personnel with experience in integrated circuit design. Specifically, we need to continue to attract and retain field application engineers to work with our direct sales force to technically qualify new sales opportunities and perform design work to demonstrate our products' capabilities to customers during the benchmark evaluation process. Competition for qualified engineers is intense, particularly in Silicon Valley where our headquarters is located.

Retaining our employees has become more challenging due to the decline in our stock price over the past several years. Many of the stock options held by our employees may have an exercise price that is significantly higher than the current trading price of our stock, and these "underwater" options do not serve their purpose as incentives for our employees to remain with Magma. Although, as discussed below, we have attempted to address this problem in part via a stock option exchange program that allowed eligible employees to exchange existing underwater options for options exercisable for a smaller number of shares at the price of $9.20 per share,

44

Table of Contents

we cannot guarantee that this program will satisfy our employees. In addition, the increased volatility of our stock price due to the pendency of, and developments in, the Synopsys litigation and above-referenced shareholder litigation may affect employee morale. If we lose the services of a significant number of our employees and/or if we cannot hire additional employees, we will be unable to increase our sales or implement or maintain our growth strategy.

**Our success is highly dependent on the technical, sales, marketing and managerial contributions of key individuals, and we may be unable to recruit and retain these personnel.**

We depend on our senior executives and certain key research and development and sales and marketing personnel, who are critical to our business. We do not have long-term employment agreements with our key employees, and we do not maintain any key person life insurance policies. Furthermore, our larger competitors may be able to offer more generous compensation packages to executives and key employees, and therefore we risk losing key personnel to those competitors. If we lose the services of any of our key personnel, our product development processes and sales efforts could be slowed. We may also incur increased operating expenses and be required to divert the attention of our senior executives to search for their replacements. The integration of our new executives or any new personnel could disrupt our ongoing operations.

**Customer payment defaults may cause us to be unable to recognize revenue from backlog, and changes in the type of orders comprising backlog could affect the proportion of revenue recognized from backlog each quarter, which could have a material adverse effect on our financial condition and results of operations and on investor expectations.**

A portion of our revenue backlog is variable based on volume of usage of our products by the customers or includes specific future deliverables or is recognized in revenue on a cash receipts basis. Management has estimated variable usage based on customers' forecasts, but there can be no assurance that these estimates will be realized. In addition, it is possible that customers from whom we expect to derive revenue from backlog will default and as a result we may not be able to recognize expected revenue from backlog. If a customer defaults and fails to pay amounts owed, or if the level of defaults increases, our bad debt expense is likely to increase. Any material payment default by our customers could have a material adverse effect on our financial condition and results of operations.

**Our lengthy and unpredictable sales cycle, and the large size of some orders, makes it difficult for us to forecast revenue and increases the magnitude of quarterly fluctuations, which could harm our stock price.**

Customers for our software products typically commit significant resources to evaluate available software. The complexity of our products requires us to spend substantial time and effort to assist potential customers in evaluating our software and in benchmarking it against our competition. As the complexity of the products we sell increases, we expect the sales cycle to lengthen. In addition, potential customers may be limited in their current spending by existing time-based licenses with their legacy vendors. In these cases, customers delay a significant new commitment to our software until the term of the existing license has expired. Also, because our products require a significant investment of time and cost by our customers, we must target those individuals within the customer's organization who are able to make these decisions on behalf of their companies. These individuals tend to be senior management in an organization, typically at the vice president level. We may face difficulty identifying and establishing contact with such individuals. Even after initial acceptance, the negotiation and documentation processes can be lengthy. Our sales cycle typically ranges between three and nine months, but can be longer. Any delay in completing sales in a particular quarter could cause our operating results to fall below expectations. Furthermore, technological changes, litigation risk or other competitive factors could cause some customers to shorten the terms of deals significantly, and such shorter terms of deals could in turn have an impact on our total results for orders for this fiscal year.

Table of Contents

**We rely on a small number of customers for a significant portion of our revenue, and our revenue could decline due to delays of customer orders or the failure of existing customers to renew licenses or if we are unable to maintain or develop relationships with current or potential customers.**

Our business depends on sales to a small number of customers. We had one customer that accounted for 18% of our revenue in the nine months ended January 1, 2006, as compared to 17% in the comparable period of prior year.

We expect that we will continue to depend upon a relatively small number of customers for a substantial portion of our revenue for the foreseeable future. If we fail to sell sufficient quantities of our products and services to one or more customers in any particular period, or if a large customer reduces purchases of our products or services, defers orders, or fails to renew licenses, our business and operating results will be harmed.

Most of our customers license our software under time-based licensing agreements, with terms that typically vary from 15 months to 48 months. Most of our license agreements automatically expire at the end of the term unless the customer renews the license with us or purchases a perpetual license. If our customers do not renew their licenses, we may not be able to maintain our current revenue or may not generate additional revenue. Some of our license agreements allow customers to terminate an agreement prior to its expiration under limited circumstances—for example, if our products do not meet specified performance requirements or goals. If these agreements are terminated prior to expiration or we are unable to collect under these agreements, our revenue may decline.

Some contracts with extended payment terms provide for payments which are weighted toward the later part of the contract term. Accordingly, as the payment terms are extended, the revenue from these contracts is not recognized evenly over the contract term, but is recognized as the lesser of the cumulative amounts due and payable or ratably for bundled agreements, and as amounts become due and payable for unbundled agreements, at each period end. Revenue recognized under these arrangements will be higher in the later part of the contract term, which puts our revenue recognition in the future at greater risk of the customer's continuing credit-worthiness. In addition, some of our customers have extended payment terms, which creates additional credit risk.

**We compete against companies that hold a large share of the electronic design automation market and competition is increasing among EDA vendors as customers tightly control their EDA spending and use fewer vendors to meet their needs. If we cannot compete successfully, we will not gain market share and our revenue could decline.**

We currently compete with companies that hold dominant shares in the electronic design automation market, such as Cadence and Synopsys. Each of these companies has a longer operating history and significantly greater financial, technical and marketing resources than we do, as well as greater name recognition and larger installed customer bases. Our competitors are better able to offer aggressive discounts on their products, a practice they often employ. Our competitors offer a more comprehensive range of products than we do; for example, we do not offer logic simulation, full-feature custom layout editing, analog or mixed signal implementation products, which can sometimes be an impediment to our winning a particular customer order. In addition, our industry has traditionally viewed acquisitions as an effective strategy for growth in products and market share and our competitors' greater cash resources and higher market capitalization may give them a relative advantage over us in buying companies with promising new chip design products or companies that may be too large for us to acquire without a strain on our resources.

Competition in the EDA Market has increased as customers rationalized their EDA spending by using products from fewer EDA vendors and continued consolidation in the electronic design automation market could intensify this trend. Also, many of our competitors, including Cadence and Synopsys, have established relationships with our current and potential customers and can devote substantial resources aimed at preventing

46

Table of Contents

us from establishing or enhancing our customer relationships. Competitive pressures may prevent us from obtaining new customers and gaining market share, may require us to reduce the price of products and services or cause us to lose existing customers, which could harm our business. To execute our business strategy successfully, we must continue our efforts to increase our sales worldwide. If we fail to do so in a timely manner or at all, we may not be able to gain market share and our business and operating results could suffer.

Also, a variety of small companies continue to emerge, developing and introducing new products. Any of these companies could become a significant competitor in the future. We also compete with the internal chip design automation development groups of our existing and potential customers. Therefore, these customers may not require, or may be reluctant to purchase, products offered by independent vendors.

Our competitors may develop or acquire new products or technologies that have the potential to replace our existing or new product offerings. The introduction of these new or additional products by competitors may cause potential customers to defer purchases of our products. If we fail to compete successfully, we will not gain market share and our business will fail.

**We may not be successful in integrating the operations of acquired companies and acquired technology.**

We expect to continuously evaluate the possibility of accelerating our growth through acquisitions, as is customary in the electronic design automation industry. Achieving the anticipated benefits of past and possible future acquisitions will depend in part upon whether we can integrate the operations, products and technology of acquired companies with our operations, products and technology in a timely and cost-effective manner. The process of integrating with acquired companies and acquired technology is complex, expensive and time consuming, and may cause an interruption of, or loss of momentum in, the product development and sales activities and operations of both companies. In addition, the earnout arrangements we use, and expect to continue to use, to consummate some of our acquisitions, pursuant to which we agreed to pay additional amounts of contingent consideration based on the achievement of certain revenue, bookings or product development milestones, can sometimes complicate integration efforts. We cannot be sure that any part or all of the integration will be accomplished on a timely basis, or at all. Assimilating previously acquired companies such as Silicon Metrics Corporation and Mojave, Inc., or any other companies we may seek to acquire in the future, involves a number of other risks, including, but not limited to:

- adverse effects on existing customer relationships, such as cancellation of orders or the loss of key customers;
- difficulties in integrating or an inability to retain key employees of the acquired company;
- the risk that earnouts based on revenue will prove difficult to administer due to the complexities of revenue recognition accounting;
- the risk that actions incentivized by earnout provisions will ultimately prove not to be in Magma's best interest as its interests may change over time;
- difficulties in integrating the operations of the acquired company, such as information technology resources, manufacturing processes, and financial and operational data;
- difficulties in integrating the technologies of the acquired company into our products;
- diversion of management attention;
- potential incompatibility of business cultures;
- potential dilution to existing stockholders if we have to incur debt or issue equity securities to pay for any future acquisitions; and
- additional expenses associated with the amortization of intangible assets.

47

Table of Contents

**Our operating results may be harmed if our customers do not adopt, or are slow to adopt, 65-nanometer design geometries.**

Many Magma customers are currently working on 90-nanometer designs. Magma continues to work toward developing and enhancing its product line in anticipation of increased customer demand for 65-nanometer (sub-90 nanometer) design geometries. Similarly, Magma has acquired Mojave personnel and technology to better address customers' needs for designing and verifying semiconductors that are manufacturable with higher yield and performance, which is a key design parameter when moving to 65-nanometer geometries. Notwithstanding our efforts to support 65-nanometer geometries, customers may fail to adopt or may be slower to adopt 65-nanometer geometries and we may be unable to convince our customers to purchase our related software products. Accordingly, any revenues we receive from enhancements to our products or acquired technologies may be less than the development or acquisition costs. If customers fail to adopt 65-nanometer design geometries or are slow to adopt 65-nanometer design geometries, our operating results may be harmed.

**Our operating results will be harmed if chip designers do not adopt Blast Fusion or products released under our Cobra initiative or our other future products.**

Blast Fusion has accounted for a significant majority of our revenue since our inception and we believe that revenue from Blast Fusion and related products will account for most of our revenue for the foreseeable future. In addition, we have dedicated significant resources to developing and marketing products developed under our Cobra development initiative. We must gain market penetration of Blast Fusion and products released under our Cobra initiative in order to achieve our growth strategy and financial success. Moreover, if integrated circuit designers do not continue to adopt Blast Fusion, our operating results will be significantly harmed.

**If the industries into which we sell our products experience recession or other cyclical effects affecting our customers' research and development budgets, our revenue would be likely to decline.**

Demand for our products is driven by new integrated circuit design projects. The demand from semiconductor and systems companies is uncertain and difficult to predict. Slower growth in the semiconductor and systems industries, a reduced number of design starts, reduction of electronic design automation budgets or continued consolidation among our customers would harm our business and financial condition.

The primary customers for our products are companies in the communications, computing, consumer electronics, networking and semiconductor industries. Any significant downturn in our customers' markets or in general economic conditions that results in the cutback of research and development budgets or the delay of software purchases would likely result in lower demand for our products and services and could harm our business. For example, the United States economy, including the semiconductor industry, experienced a slowdown starting in 2000, which negatively impacted and may continue to impact our business and operating results. While the semiconductor industry experienced a moderate recovery in recent years, our customers have remained cautious, and it is not yet clear when increased R&D spending will occur. The continuing threat of terrorist attacks in the United States, the ongoing events in Iraq and other worldwide events including those in the Middle East have increased uncertainty in the United States economy. If the economy declines as a result of this economic, political and social turmoil, existing customers may delay their implementation of our software products and prospective customers may decide not to adopt our software products, either of which could negatively impact our business and operating results.

The electronics industry has historically been subject to seasonal and cyclical fluctuations in demand for its products, and this trend may continue in the future. These industry downturns have been, and may continue to be, characterized by diminished product demand, excess manufacturing capacity and subsequent erosion of average selling prices.

48

Table of Contents

**Difficulties in developing and achieving market acceptance of new products and delays in planned release dates of our software products and upgrades may harm our business.**

To succeed, we will need to develop innovative new products. We may not have the financial resources necessary to fund all required future innovations. Expanding into new technologies or extending our product line into areas we have not previously addressed may be more costly or difficult than anticipated. Also, any revenue that we receive from enhancements or new generations of our proprietary software products may be less than the costs of development. If we fail to develop and market new products in a timely manner, our reputation and our business will suffer.

**Our costs of customer engagement and support are high, so our gross margin may decrease if we incur higher-than-expected costs associated with providing support services in the future or if we reduce our prices.**

Because of the complexity of our products, we typically incur high field application engineering support costs to engage new customers and assist them in their evaluations of our products. If we fail to manage our customer engagement and support costs, our operating results could suffer. In addition, our gross margin may decrease if we are unable to manage support costs associated with the services revenue we generate or if we reduce prices in response to competitive pressure.

**Product defects could cause us to lose customers and revenue, or to incur unexpected expenses.**

Our products depend on complex software, both internally developed and acquired or licensed from third parties. Our customers may use our products with other companies' products, which also contain complex software. If our software does not meet our customers' performance requirements, our customer relationships may suffer. Also, a limited number of our contracts include specified ongoing performance criteria. If our products fail to meet these criteria, it may lead to termination of these agreements and loss of future revenue. Complex software often contains errors. Any failure or poor performance of our software or the third-party software with which it is integrated could result in:

- delayed market acceptance of our software products;

- delays in product shipments;

- unexpected expenses and diversion of resources to identify the source of errors or to correct errors;

- damage to our reputation;

- delayed or lost revenue; and

- product liability claims.

Our product functions are often critical to our customers, especially because of the resources our customers expend on the design and fabrication of integrated circuits. Many of our licensing agreements contain provisions to provide a limited warranty, which provides the customer with a right of refund for the license fees if we are unable to correct errors reported during the warranty period. If our contractual limitations are unenforceable in a particular jurisdiction or if we are exposed to claims that are not covered by insurance, a successful claim could harm our business. We currently carry insurance coverage and limits that we believe are consistent with similarly situated companies within the EDA industry.

**Much of our business is international, which exposes us to risks inherent to doing business internationally that could harm our business. We also intend to expand our international operations. If our revenue from this expansion does not exceed the expenses associated with this expansion, our business and operating results could suffer.**

We generated 35% of our total revenue from sales outside North America for the nine months of fiscal 2006, compared to 44% for the same period in the prior year. While most of our international sales to date have

49

been denominated in U.S. dollars, our international operating expenses have been denominated in foreign currencies. As a result, a decrease in the value of the U.S. dollar relative to the foreign currencies could increase the relative costs of our overseas operations, which could reduce our operating margins.

The expansion of our international operations includes the maintenance of sales offices in Europe, the Middle East, and the Asia Pacific region. If our revenue from international operations does not exceed the expense of establishing and maintaining our international operations, our business could suffer. Additional risks we face in conducting business internationally include:

- difficulties and costs of staffing and managing international operations across different geographic areas;

- changes in currency exchange rates and controls;

- uncertainty regarding tax and regulatory requirements in multiple jurisdictions;

- the possible lack of financial and political stability in foreign countries, preventing overseas sales growth;

- on-going events in Iraq; and

- the effects of terrorist attacks in the United States and any related conflicts or similar events worldwide.

**Future changes in accounting standards, specifically changes affecting revenue recognition, could cause adverse unexpected revenue fluctuations.**

Future changes in accounting standards for interpretations thereof, specifically those changes affecting software revenue recognition, could require us to change our methods of revenue recognition. These changes could result in deferral of revenue recognized in current periods to subsequent periods or in accelerated recognition of deferred revenue to current periods, each of which could cause shortfalls in meeting the expectations of investors and securities analysts. Our stock price could decline as a result of any shortfall. Implementation of internal controls reporting and attestation requirements, as further described below, will impose additional financial and administrative obligations on us and will cause us to incur substantial implementation costs from third party consultants, which could adversely affect our results.

**Changes in laws and regulations that affect the governance of public companies have increased our operating expenses and will continue to do so.**

Recently enacted changes in the laws and regulations affecting public companies, including the provisions of the Public Company Accounting Reform and Investor Protection Act of 2002 (the "Sarbanes-Oxley Act of 2002") and the listing requirements for The Nasdaq Stock Market have imposed new duties on us and on our executives, directors, attorneys and independent registered public accounting firms. In order to comply with these new rules, we have hired additional personnel and use additional outside legal, accounting and advisory services, all of which have increased and may continue to increase our operating expenses over time. In particular, we have incurred and will continue to incur additional administrative expenses relating to the implementation of Section 404 of the Sarbanes-Oxley Act of 2002, which requires the implementation and maintenance of an effective system of internal control over financial reporting, and, annual certification of Section 404 compliance by our independent registered public accounting firm. For example, we have incurred significant expenses and will continue to incur expenses in connection with the implementation, documentation and continued testing of our internal control systems. Management time associated with these compliance efforts necessarily reduces time available for other operating activities, which could adversely affect operating results. For the year ended March 31, 2005, our independent registered public accounting firm certified that we were in compliance with the provision of Section 404 relating to effective internal control over financial reporting; however, our internal control obligations are ongoing and subject to continued review and testing. If we are unable to maintain full and timely compliance with the foregoing regulatory requirements, we could be required to incur additional costs, expend additional management time on remedial efforts and make related public disclosures that could adversely affect our stock price and result in securities litigation.

50

Table of Contents

**The effectiveness of disclosure controls is inherently limited.**

We do not expect that our disclosure controls and procedures, or our internal control over financial reporting, will prevent all errors and all fraud. A control system, no matter how well designed and operated, can provide only reasonable, not absolute, assurance that the control system objectives will be met. The design of a control system must also reflect applicable resource constraints, and the benefits of controls must be considered relative to their costs. As a result of these inherent limitations, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, within Magma have been detected. Failure of the control systems to prevent error or fraud could materially adversely impact our financial results and our business. Management assessed the effectiveness of our internal control over financial reporting as of October 2, 2005, and this assessment identified a material weakness in our internal control over financial reporting related to the completeness and accuracy of our accounting for stock-based compensation expenses and Mojave earnout related compensation expense incurred during the second quarter ended October 2, 2005. Management assigned a high priority to the improvement of our internal control over financial reporting and began efforts to remediate this material weakness. Failing to remedy this material weakness could have a material adverse effect on our business, and could adversely affect the price of our common stock and lead to expensive litigation. Our efforts to remedy this material weakness could cause us to incur significant additional costs and expend significant additional management time on remedial efforts, which could also impact our financial performance.

**Forecasting the Company's tax rates is complex and subject to uncertainty.**

Management must make significant assumptions, judgments and estimates to determine our current provision for income taxes, deferred tax assets and liabilities, and any valuation allowance that may be recorded against our deferred tax assets. These assumptions, judgments and estimates are difficult to make due to their complexity, and the relevant tax law is often changing. Our future effective tax rates could be adversely affected by the following:

- an increase in expenses not deductible for tax purposes, including deferred stock-based compensation and write-offs of acquired in-process research and development;

- changes in the valuation of our deferred tax assets and liabilities;

- future changes in ownership as defined by Internal Revenue Code Sections 382 and 383 which may limit realization of certain assets;

- changes in forecasts of pre-tax profits and losses by jurisdiction used to estimate tax expense by jurisdiction;

- assessment of additional taxes as a result of federal, state, or foreign tax examinations; or

- changes in tax laws or interpretations of such tax laws.

**Our success will depend on our ability to keep pace with the rapidly evolving technology standards of the semiconductor industry. If we are unable to keep pace with rapidly changing technology standards, our products could be rendered obsolete, which would cause our operating results to decline.**

The semiconductor industry has made significant technological advances. In particular, recent advances in deep sub-micron technology have required electronic design automation companies to continuously develop or acquire new products and enhance existing products. The evolving nature of our industry could render our existing products and services obsolete. Our success will depend, in part, on our ability to:

- enhance our existing products and services;

- develop and introduce new products and services on a timely and cost-effective basis that will keep pace with technological developments and evolving industry standards;

- address the increasingly sophisticated needs of our customers; and

- acquire other companies that have complementary or innovative products.

51

Table of Contents

If we are unable, for technical, legal, financial or other reasons, to respond in a timely manner to changing market conditions or customer requirements, our business and operating results could be seriously harmed.

**If we fail to offer and maintain competitive stock option packages for our employees, or if our stock price declines materially for a protracted period of time, we might have difficulty retaining our employees and our business may be harmed.**

In today's competitive technology industry, employment decisions of highly skilled personnel are influenced by stock option packages, which offer incentives above traditional compensation only where there is a consistent, long-term upward trend over time of a company's stock price. Our stock price has declined significantly over the past several years due to market conditions and has recently been negatively affected by uncertainty surrounding the outcome of our patent litigation with Synopsys, Inc. (discussed below under Part II, Item 1, "Legal Proceedings"). As a result, many of the options held by our non-executive employees have an exercise price significantly above the current trading price of our stock; on January 1, 2006 approximately 82% of the options held by our non-executive employees were "underwater."

On June 22, 2005, our stockholders approved a stock option exchange program ("Exchange Program") allowing non-executive employees holding options to purchase our common stock at exercise prices greater than or equal to $10.50 to exchange those options for a smaller number of new options at an exercise price equal to fair market value on the date of grant. Magma implemented this Exchange Program, and the date of grant was August 22, 2005, at which date the closing trading price of our stock was $9.20 per share. Therefore, the exercise price for new options under this Exchange Program is $9.20 per share. If this exercise price of $9.20 per share or the terms of the Exchange Program are not satisfactory to employees who participate in the Exchange Program, or, if our stock price drops below the grant price of $9.20, our ability to retain employees could be affected.

If our stock price continues to decline in the future due to market conditions, investors' perceptions of the technology industry or managerial or performance problems we have, we may be forced to grant additional options to retain employees. This in turn could result in:

- immediate and substantial dilution to investors resulting from the grant of additional options necessary to retain employees; and

- compensation charges against the company, which would negatively impact our operating results.

In addition, the new accounting requirements for employee stock options discussed below may adversely affect our option grant practices and our ability to recruit and retain employees.

**When the accounting treatment for employee stock options changes, our reported results of operations will likely be adversely affected and we may be forced to change our employee compensation and benefits practices.**

We currently account for the issuance of employee stock options under principles that do not require us to record compensation expense for options granted at fair market value. In December 2004, the FASB issued SFAS 123R, "Share-Based Payment," which eliminates the ability to account for share-based compensation transactions using APB 25, and generally requires instead that such transactions be accounted for using a fair-value based method. Under SFAS 123R, companies are required to recognize an expense for compensation cost related to share-based payment arrangements including stock options and employee stock purchase plans. We will be required to adopt the new rules no later than the first quarter of our fiscal year 2007. We are currently assessing the impact of the adoption of SFAS 123R on our business practices; however, this change in accounting treatment will likely adversely affect our reported results of operations and hinder our ability to achieve profitability. Accordingly, we may consider changing our employee compensation practices, and those changes could make it harder for us to retain existing employees and attract qualified candidates.

Table of Contents

**If our sales force compensation arrangements are not designed effectively, we may lose sales personnel and resources.**

Designing an effective incentive compensation structure for our sales force is critical to our success. We have experimented, and continue to experiment, with different systems of sales force compensation. If our incentives are not well designed, we may experience reduced revenue generation, and we may also lose the services of our more productive sales personnel, either of which would reduce our revenue or potential revenue.

**Fluctuations in our growth place a strain on our management systems and resources, and if we fail to manage the pace of our growth our business could be harmed.**

Periods of growth followed by efforts to realign costs when revenue growth is slower than anticipated have placed a strain on our management, administrative and financial resources. For example, in fiscal year 2005 and the third quarter of fiscal year 2003, we decreased our workforce by 23 and 32 employees, respectively. Over time we have significantly expanded our operations in the United States and internationally, and we plan to continue to expand the geographic scope of our operations. To pace the growth of our operations with the growth in our revenue, we must continue to improve administrative, financial and operations systems, procedures and controls. Failure to improve our internal procedures and controls could hinder our efforts to adequately manage our growth, disrupt operations, lead to deficiencies under the requirements of Section 404 of the Sarbanes-Oxley Act of 2002, and ultimately harm to our business.

**If chip designers and manufacturers do not integrate our software into existing design flows, or if other software companies do not cooperate in working with us to interface our products with their design flows, demand for our products may decrease.**

To implement our business strategy successfully, we must provide products that interface with the software of other electronic design automation software companies. Our competitors may not support our or our customers' efforts to integrate our products into their existing design flows. We must develop cooperative relationships with competitors so that they will work with us to integrate our software into customers' design flow. Currently, our software is designed to interface with the existing software of Cadence, Synopsys and others. If we are unable to convince customers to adopt our software products instead of those of competitors offering a broader set of products, or if we are unable to convince other software companies to work with us to interface our software with theirs to meet the demands of chip designers and manufacturers, our business and operating results will suffer.

**We may not obtain sufficient patent protection, which could harm our competitive position and increase our expenses.**

Our success and ability to compete depends to a significant degree upon the protection of our software and other proprietary technology. We currently have a number of issued patents in the United States, but this number is relatively few in relation to our competitors.

These legal protections afford only limited protection for our technology. In addition, rights that may be granted under any patent application that may issue in the future may not provide competitive advantages to us. Further, patent protection in foreign jurisdictions where we may need this protection may be limited or unavailable. It is possible that:

- our pending U.S. and non-U.S. patents may not be issued;

- competitors may design around our present or future issued patents or may develop competing non-infringing technologies;

- present and future issued patents may not be sufficiently broad to protect our proprietary rights; and

- present and future issued patents could be successfully challenged for validity and enforceability.

53

Table of Contents

We believe the patent portfolios of our competitors are far larger than ours, and this may increase the risk that they may sue us for patent infringement and may limit our ability to counterclaim for patent infringement or settle through patent cross-licenses.

**We rely on trademark, copyright and trade secret laws and contractual restrictions to protect our proprietary rights, and if these rights are not sufficiently protected, it could harm our ability to compete and generate income.**

To establish and protect our proprietary rights, we rely on a combination of trademark, copyright and trade secret laws, and contractual restrictions, such as confidentiality agreements and licenses. Our ability to compete and grow our business could suffer if these rights are not adequately protected. We seek to protect our source code for our software, documentation and other written materials under trade secret and copyright laws. We license our software pursuant to agreements, which impose certain restrictions on the licensee's ability to utilize the software. We also seek to avoid disclosure of our intellectual property by requiring employees and consultants with access to our proprietary information to execute confidentiality agreements. Our proprietary rights may not be adequately protected because:

- laws and contractual restrictions in U.S. and foreign jurisdictions may not prevent misappropriation of our technologies or deter others from developing similar technologies;

- competitors may independently develop similar technologies and software code;

- for some of our trademarks, federal U.S. trademark protection may be unavailable to us;

- our trademarks may not be protected or protectable in some foreign jurisdictions;

- the validity and scope of our U.S. and foreign trademarks could be successfully challenged; and

- policing unauthorized use of our products and trademarks is difficult, expensive and time-consuming, and we may be unable to determine the extent of this unauthorized use.

The laws of some countries in which we market our products may offer little or no protection of our proprietary technologies. Reverse engineering, unauthorized copying or other misappropriation of our proprietary technologies could enable third parties to benefit from our technologies without paying us for it, which would harm our competitive position and market share.

**Our directors, executive officers and principal stockholders own a substantial portion of our common stock and this concentration of ownership may allow them to elect most of our directors and could delay or prevent a change in control of Magma.**

Our directors, executive officers and stockholders who currently own over 5% of our common stock beneficially own a substantial portion of our outstanding common stock. These stockholders, in a combined vote, will be able to significantly influence all matters requiring stockholder approval. For example, they may be able to elect most of our directors, delay or prevent a transaction in which stockholders might receive a premium over the market price for their shares or prevent changes in control or management.

**We may need additional capital in the future, but there is no assurance that funds would be available on acceptable terms.**

In the future we may need to raise additional capital in order to achieve growth or other business objectives. This financing may not be available in sufficient amounts or on terms acceptable to us and may be dilutive to existing stockholders. If adequate funds are not available or are not available on acceptable terms, our ability to expand, develop or enhance services or products, or respond to competitive pressures would be limited.

54

Table of Contents

**Our certificate of incorporation, bylaws and Delaware corporate law contain anti-takeover provisions which could delay or prevent a change in control even if the change in control would be beneficial to our stockholders. We could also adopt a stockholder rights plan, which could also delay or prevent a change in control.**

Delaware law, as well as our certificate of incorporation and bylaws, contain anti-takeover provisions that could delay or prevent a change in control of our company, even if the change of control would be beneficial to the stockholders. These provisions could lower the price that future investors might be willing to pay for shares of our common stock. These anti-takeover provisions:

- authorize the Board of Directors without prior stockholder approval to create and issue preferred stock that can be issued increasing the number of outstanding shares and deter or prevent a takeover attempt;

- prohibit stockholder action by written consent, thereby requiring all stockholder actions to be taken at a meeting of our stockholders;

- establish a classified Board of Directors requiring that not all members of the board be elected at one time;

- prohibit cumulative voting in the election of directors, which would otherwise allow less than a majority of stockholders to elect director candidates;

- limit the ability of stockholders to call special meetings of stockholders; and

- require advance notice requirements for nominations for election to the Board of Directors and proposals that can be acted upon by stockholders at stockholder meetings.

In addition, Section 203 of the Delaware General Corporation Law and the terms of our stock option plans may discourage, delay or prevent a change in control of our company. That section generally prohibits a Delaware corporation from engaging in a business combination with an interested stockholder for three years after the date the stockholder became an interested stockholder. Also, our stock option plans include change-in-control provisions that allow us to grant options or stock purchase rights that will become vested immediately upon a change in control of us.

The board of directors also has the power to adopt a stockholder rights plan, which could delay or prevent a change in control even if the change in control appeared to be beneficial to stockholders. These plans, sometimes called "poison pills," are sometimes criticized by institutional investors or their advisors and could affect our rating by such investors or advisors. If the board were to adopt such a plan it might have the effect of reducing the price that new investors are willing to pay for shares of our common stock.

**We are subject to risks associated with changes in foreign currency exchange rates.**

We transact some portions of our business in various foreign currencies. Accordingly, we are subject to exposure from adverse movements in foreign currency exchange rates. This exposure is primarily related to operating expenses in the United Kingdom, Europe and Japan, which are denominated in the respective local currencies. As of January 1, 2006, we had no hedging contracts outstanding. We do not currently use financial instruments to hedge operating expenses denominated in Euro, British Pounds and Japanese Yen. We assess the need to utilize financial instruments to hedge currency exposures on an ongoing basis.

**The convertible notes we issued in May 2003 are debt obligations that must be repaid in cash in May 2008 if they are not converted into our common stock at an earlier date, which is unlikely to occur if the price of our common stock does not exceed the conversion price.**

In May 2003, we issued $150.0 million principal amount of our zero coupon convertible notes due May 2008. In May 2005, we repurchased, in privately negotiated transactions, $44.5 million face amount (or approximately 29.7 percent of the total) of these notes at an average discount to face value of approximately

55

Table of Contents

22 percent. Magma spent an aggregate of approximately $34.8 million on the repurchases. The repurchase leaves approximately $105.5 million aggregate principal amount of convertible subordinated notes outstanding. We will be required to repay that principal amount in full in May 2008 unless the holders of those notes elect to convert them into our common stock before the repayment date. The conversion price of the notes is $22.86 per share. If the price of our common stock does not rise above that level, conversion of the notes is unlikely and we would be required to repay the principal amount of the notes in cash. There have been previous quarters in which we have experienced shortfalls in revenue and earnings from levels expected by securities analysts and investors, which have had an immediate and significant adverse effect on the trading price of our common stock. In addition, the stock market in recent years has experienced extreme price and trading volume fluctuations that often have been unrelated or disproportionate to the operating performance of individual companies. These broad market fluctuations may adversely affect the price of our stock, regardless of our operating performance. Because the notes are convertible into shares of our common stock, volatility or depressed prices for our common stock could have a similar effect on the trading price of the notes.

**Hedging transactions and other transactions may affect the value of our common stock and our convertible notes.**

We entered into hedging arrangements with Credit Suisse First Boston International at the time we issued our convertible notes, with the objective of reducing the potential dilutive effect of issuing common stock upon conversion of the notes. At the time of our May 2005 repurchase of our zero coupon convertible notes, a portion of the hedging arrangements were retired. These hedging arrangements are likely to have caused Credit Suisse First Boston International and others to take positions in our common stock in secondary market transactions or to enter into derivative transactions at or after the sale of the notes. Any market participants entering into hedging arrangements are likely to modify their hedge positions from time to time prior to conversion or maturity of the notes by purchasing and selling shares of our common stock or other securities, which may increase the volatility and reduce the market price of our common stock.

**Our convertible notes are subordinated and there are no financial covenants in the indenture.**

Our convertible notes are general unsecured obligations of Magma and are subordinated in right of payment to all of our existing and future senior indebtedness, which we may incur in the future. In the event of our bankruptcy, liquidation or reorganization, or upon acceleration of the notes due to an event of default under the indenture and in certain other events, our assets will be available to pay obligations on the notes only after all senior indebtedness has been paid. As a result, there may not be sufficient assets remaining to pay amounts due on any or all of the outstanding notes. In addition, we will not make any payments on the notes in the event of payment defaults or other specified defaults on our designated senior indebtedness.

Neither we nor our subsidiaries are restricted under the indenture for the notes from incurring additional debt, including senior indebtedness. If we or our subsidiaries incur additional debt or other liabilities, our ability to pay our obligations on the notes could be further adversely affected. We expect that we and our subsidiaries from time to time will incur additional indebtedness and other liabilities.

**We may be unable to meet the requirements under the indenture to purchase our convertible notes upon a change in control.**

Upon a change in control, which is defined in the indenture to include some cash acquisitions and private company mergers, note holders may require us to purchase all or a portion of the notes they hold. If a change in control were to occur, we might not have enough funds to pay the purchase price for all tendered notes. Future credit agreements or other agreements relating to our indebtedness might prohibit the redemption or repurchase of the notes and provide that a change in control constitutes an event of default. If a change in control occurs at a time when we are prohibited from purchasing the notes, we could seek the consent of our lenders to purchase the notes or could attempt to refinance this debt. If we do not obtain a consent, we could not purchase the notes. Our

56

Table of Contents

failure to purchase tendered notes would constitute an event of default under the indenture, which might constitute a default under the terms of our other debt. In such circumstances, or if a change in control would constitute an event of default under our senior indebtedness, the subordination provisions of the indenture would possibly limit or prohibit payments to note holders. Our obligation to offer to purchase the notes upon a change in control would not necessarily afford note holders protection in the event of a highly leveraged transaction, reorganization, merger or similar transaction involving us.

**Failure to obtain export licenses could harm our business by preventing us from transferring our technology outside of the United States.**

We are required to comply with U.S. Department of Commerce regulations when shipping our software products and/or transferring our technology outside of the United States or to certain foreign nationals. We believe we have complied with applicable export regulations, however, these regulations are subject to change, and, future difficulties in obtaining export licenses for current, future developed and acquired products and technology could harm our business, financial conditions and operating results.

**Our business operations may be adversely affected in the event of an earthquake or other natural disaster.**

Our corporate headquarters and much of our research and development operations are located in Silicon Valley, California, which is an area known for its seismic activity. An earthquake, fire or other significant natural disaster could have a material adverse impact on our business, financial condition and/or operating results.

57

Table of Contents

## ITEM 3.    QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

### Interest Rate Risk

Our exposure to market risk for changes in interest rates relates primarily to our investment portfolio. The primary objective of our investment activities is to preserve principal while maximizing yields without significantly increasing risk. This is accomplished by investing in widely diversified short-term and long-term investments, consisting primarily of investment grade securities, substantially all of which mature within the next twenty-four months. As of January 1, 2006, a hypothetical 100 basis point increase in interest rates would result in approximately a $24,000 decline in the fair value of our available-for-sale securities.

The fair value of our fixed rate long-term debt is sensitive to interest rate changes. Interest rate changes would result in increases or decreases in the fair value of our debt, due to differences between market interest rates and rates in effect at the inception of our debt obligation. Changes in the fair value of our fixed rate debt have no impact on our cash flows or consolidated financial statements.

### Credit Risk

We completed an offering on May 22, 2003 of $150.0 million principal amount of convertible subordinated notes due May 15, 2008. Concurrent with the issuance of the convertible notes, we entered into convertible bond hedge and warrant transactions with respect to our common stock, the exposure for which is held by Credit Suisse First Boston International. Both the bond hedge and warrant transactions may be settled at our option either in cash or net shares and expire on May 15, 2008. The transactions are expected to reduce the potential dilution from conversion of the notes. Subject to the movement in the share price of our common stock, we could be exposed to credit risk in the settlement of these options in our favor. Based on a review of the possible net settlements and the credit strength of Credit Suisse First Boston International and its affiliates, we believe that we do not have a material exposure to credit risk arising from these option transactions.

In April 2005, the Company repurchased $44.5 million face value of its convertible notes for $34.8 million. In doing so, the Company liquidated investments that generated a realized loss of approximately $0.7 million. A portion of the hedge and warrant transactions entered into by Magma in 2003 was terminated in connection with the repurchase. The Company believes that it was in the best interests of the stockholders to reduce the balance sheet debt despite the one-time loss resulting from the liquidation of marketable securities.

### Foreign Currency Exchange Rate Risk

A majority of our revenue, expense, and capital purchasing activities are transacted in U.S. dollars. However, we transact some portions of our business in various foreign currencies, primarily related to a portion of revenue in Japan and operating expenses in Europe, Japan and Asia-Pacific. Accordingly, we are subject to exposure from adverse movements in foreign currency exchange rates. As of January 1, 2006, we had no currency hedging contracts outstanding. We do not currently use financial instruments to hedge revenue and operating expenses denominated in foreign currencies. We assess the need to utilize financial instruments to hedge currency exposures on an ongoing basis.

Table of Contents

## ITEM 4.    CONTROLS AND PROCEDURES

### Evaluation of disclosure controls and procedures

We maintain "disclosure controls and procedures," as such term is defined in Rule 13a-15(e) under the Securities Exchange Act of 1934 (the "Exchange Act"), that are designed to ensure that information required to be disclosed by us in reports that we file or submit under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in Securities and Exchange Commission rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure. In designing and evaluating our disclosure controls and procedures, management recognized that disclosure controls and procedures, no matter how well conceived and operated, can provide only reasonable, not absolute, assurance that the objectives of the disclosure controls and procedures are met. Additionally, in designing disclosure controls and procedures, our management necessarily was required to apply its judgment in evaluating the cost-benefit relationship of possible disclosure controls and procedures. The design of any disclosure controls and procedures also is based in part upon assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions. However, our disclosure controls and procedures have been designed to meet, and management believes that they meet, reasonable assurance standards.

Based on their evaluation as of the end of the period covered by this Quarterly Report on Form 10-Q, our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures were effective to ensure that material information relating to us, including our consolidated subsidiaries, is made known to them by others within those entities, particularly during the period in which this Quarterly Report on Form 10-Q was being prepared. Although our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective as of the end of the period covered by this report, we continue to enhance our controls by hiring qualified personnel in key functional areas, implementing a new computerized system to automate a number of procedures related to quarterly and year-end close processes, and creating procedures to address the impact of acquisitions on a timely basis.

### Remediation of Material Weakness

We previously identified a material weakness in our internal controls over financial reporting as defined in Public Company Accounting Oversight Board ("PCAOB") Standard No. 2 in relation to the quarter ended October 2, 2005 as set forth in our Quarterly Report on Form 10-Q for the three months ended October 2, 2005. This material weakness was related to our failure to maintain effective controls over the completeness and accuracy of our accounting for stock-based compensation and Mojave earnout related compensation expense. We have assigned a high priority to the improvement of our internal control over financial reporting and began efforts to remediate the material weakness. Specifically, our evaluation and remediation efforts were as follows: during the quarter ended January 1, 2006, we retained an independent accounting consultant to advise us on technical accounting matters such as stock-based compensation and other significant nonrecurring transactions. We have also formalized the documentation and review process related to earnout calculations. We plan to evaluate the adequacy of these measures and to take additional steps as may be necessary in the future.

### Changes in Internal Control over Financial Reporting

There were no changes in our internal control or to our knowledge, in other factors that could significantly affect our internal control over financial reporting (as defined in Rule 13a-15(f) under the Exchange Act) that occurred during our last fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

Table of Contents

## PART II. OTHER INFORMATION
### ITEM 1.    LEGAL PROCEEDINGS

*Synopsys, Inc. v. Magma Design Automation, Inc.* , Civil Action No. C04-03923, United States District Court, Northern District of California. In this action, filed September 17, 2004, Synopsys has sued the Company for alleged infringement of U.S. Patent Nos. 6,378,114 ("the '114 Patent"), 6,453,446 ("the '446 Patent"), and 6,725,438 ("the '438 Patent"). The patents-in-suit relate to methods for designing integrated circuits. The Complaint seeks unspecified monetary damages, injunctive relief, trebling of damages, fees and costs, and the imposition of a constructive trust for the benefit of Synopsys over any profits, revenues or other benefits allegedly obtained by the Company as a result of its alleged infringement of the patents-in-suit. In addition to the below discussion, this case was also discussed in our Quarterly Reports on Form 10-Q for the three months ended October 2, 2005 and for the three months ended July 3, 2005.

On October 21, 2004, the Company filed its answer and counterclaims ("Answer") to the Complaint. On November 10, 2004, Synopsys filed motions to strike and dismiss certain affirmative defenses and counterclaims in the Answer. On November 24, 2004 the Company filed an Amended Answer and Counterclaims ("Amended Answer"). By order dated November 29, 2004, the Court denied Synopsys' motions as moot in light of the Amended Answer. On December 10, 2004, Synopsys moved to strike and dismiss certain affirmative defenses and counterclaims in the Amended Answer. By order dated January 20, 2005, the Court denied in part and granted in part Synopsys' motion. In its pretrial preparation order dated January 21, 2005, the Court set forth a schedule for the case which, among other things, sets trial for April 24, 2006.

On February 3, 2005, Synopsys filed its Reply to the Amended Answer. On March 17, 2005, Synopsys filed a First Amended Complaint, which asserts seven causes of action against the Company and/or Lukas van Ginneken: (1) patent infringement (against both defendants), (2) breach of contract (against van Ginneken), (3) inducing breach of contract (against the Company), (4) fraud (against the Company), (5) conversion (against both defendants), (6) unjust enrichment/constructive trust (against both defendants), and (7) unfair competition (against both defendants). Synopsys seeks injunctive relief, declaratory relief, at least $100 million in damages, trebling of damages, punitive damages, fees and costs, and the imposition of a constructive trust for the benefit of Synopsys over any profits, revenues or other benefits allegedly obtained by the Company as a result of its alleged exploitation of the alleged inventions in the patents-in-suit. On April 1, 2005, the Company filed a motion to dismiss the third through seventh causes of action. This motion was granted in part and denied in part by order dated May 18, 2005.

On April 11, 2005, Synopsys voluntarily dismissed van Ginneken from the lawsuit without prejudice. Also on April 11, 2005, Synopsys filed against the Company a motion for partial summary judgment establishing unfair competition and a motion for partial summary judgment based on the doctrine of assignor estoppel.

On June 7, 2005, Synopsys filed a Second Amended Complaint that asserts six causes of action against the Company: (1) patent infringement, (2) inducing breach of contract/interference with contractual relations, (3) fraud, (4) conversion, (5) unjust enrichment/constructive trust/quasi-contract, and (6) unfair competition. Synopsys seeks injunctive relief, declaratory relief, at least $100 million in damages, trebling of damages, punitive damages, fees and costs, and the imposition of a constructive trust for the benefit of Synopsys over any profits, revenues or other benefits allegedly obtained by the Company as a result of its alleged exploitation of the alleged inventions in the patents-in-suit. On June 10, 2005, Magma moved for summary judgment as to the second through sixth causes of action in the Second Amended Complaint. On June 21, 2005, the Company moved to dismiss the third cause of action alleging fraud in the Second Amended Complaint and moved to strike certain allegations in the Second Amended Complaint. The Court granted the Company's motion to dismiss and strike by order dated July 15, 2005.

On July 1, 2005, the Court granted Synopsys's motion for partial summary judgment regarding assignor estoppel, dismissing Magma's affirmative defenses and counterclaim alleging the invalidity of the '114 Patent.

60

Table of Contents

On July 14, 2005, the Court vacated the hearings on Magma's motion for summary judgment on the second through sixth causes of action in the Second Amended Complaint and Synopsys's motion for partial summary judgment establishing unfair competition. The Court stated that it would reset the motions for hearing, if necessary, after the claims construction hearing scheduled for August 15, 2005.

On July 29, 2005, Synopsys moved to preliminarily enjoin the Company from abandoning or dedicating to the public the '446 Patent or the '438 Patent. Also on July 29, 2005, Synopsys moved for partial summary judgment seeking dismissal of certain counterclaims and defenses asserted by the Company on the grounds of estoppel by contract. On September 16, 2005, Synopsys filed a revised motion for preliminary injunction. On September 30, 2005, the Company filed its oppositions to Synopsys's preliminary injunction motion and estoppel by contract motion.

On August 3, 2005, Synopsys filed a Third Amended Complaint that asserts six causes of action against the Company: (1) patent infringement, (2) inducing breach of contract/interference with contractual relations, (3) fraud, (4) conversion, (5) unjust enrichment/constructive trust/quasi-contract, and (6) unfair competition. Synopsys seeks injunctive relief, declaratory relief, at least $100 million in damages, trebling of damages, punitive damages, fees and costs, and the imposition of a constructive trust for the benefit of Synopsys over any profits, revenues or other benefits allegedly obtained by the Company as a result of its alleged exploitation of the alleged inventions in the patents-in-suit.

On August 30, 2005, the Court issued a temporary restraining order against the Company restraining and enjoining the Company from taking any steps in the United States Patent and Trademark Office to abandon, suspend or disclaim the '446 and '438 Patents, failing or refusing to pay the maintenance fees for the '446 and '438 Patents, or seeking reexamination of the '446 and '438 Patents. The temporary restraining order was scheduled to remain in effect until the hearing on Synopsys's motion for a preliminary injunction that was scheduled for December 2, 2005. On December 1, 2005, the Court, vacated the hearing and granted Synopsys's motion for preliminary injunction. The Court entered the preliminary injunction enjoining the Company from abandoning, dedicating to the public or seeking reexamination in the United States Patent and Trademark Office of the '446 Patent or the '438 Patent.

On September 2, 2005, the Company filed an Answer and Counterclaims to Synopsys's Third Amended Complaint. In that pleading, the Company alleges, *inter alia* , that IBM is a joint owner of the patents-in-suit and that, as a result, the Company cannot be liable for infringement because (1) Synopsys lacks standing to assert the patents-in-suit against Magma, and (2) IBM has granted the Company a license under the patents-in-suit.

On October 14, 2005, the Court granted Synopsys's request for permission to file an amended opposition to Magma's motion for summary judgment on the second through sixth causes of action in the Second Amended Complaint. Synopsys filed its amended opposition on December 20, 2005, and the Company filed its reply on January 13, 2006. The motion was set for hearing on January 27, 2006, but the Court vacated the hearing date and took the matter under submission.

On October 19, 2005, the Court granted in part and denied in part Synopsys's motion to strike certain affirmative defenses and to dismiss certain counterclaims in the Company's Answer and Counterclaims to Synopsys's Third Amended Complaint. The Court dismissed without leave to amend the Company's counterclaims seeking correction of inventorship of the '446 and '438 Patents. The Court also struck without leave to amend the Company's affirmative defenses of (1) invalidity of the '446 and '438 Patents based on failure to name all inventors, (2) unenforceability of the '446 and '438 patents due to inequitable conduct, and (3) unclean hands. The Court struck with leave to amend the Company's affirmative defenses of invalidity of the '446 and '438 Patents based on 35 U.S.C. §§ 102, 103 and 112, as well as the Company's affirmative defense that Synopsys is not the owner of any invention defined by the claims of the '446 and '438 Patents.

On October 24, 2005, the Company filed a motion for summary judgment as to the first cause of action (for patent infringement) in Synopsys's Third Amended Complaint on the grounds that IBM is an owner of all the

61

patents-in-suit. Also on October 24, 2005, Synopsys filed (1) a motion for partial summary judgment to dismiss the Company's joint ownership defenses and counterclaims, and (2) a motion for partial summary judgment to dismiss allegations of co-ownership based on judicial and quasi-estoppel. All three motions were scheduled to be heard on December 2, 2005, but the Court vacated the hearing date and took the matters under submission.

On November 2, 2005, the Company filed a motion for leave to file an amended answer and counterclaims to Synopsys's Third Amended Complaint, requesting leave to amend the Company's answer to add affirmative defenses of invalidity of the '446 and '438 Patents based on 35 U.S.C. §§ 102, 103 and 112. The Company's motion was set for hearing on December 16, 2005, but the Court vacated the hearing date and took the matter under submission.

On November 8, 2005, Synopsys filed a motion for sanctions against the Company based on the Company's assertion of non-infringement defenses and counterclaims in the litigation. The Company opposed the motion, which was set for hearing on December 16, 2005. The hearing and the motion was taken under submission by the Court. Also on November 8, 2005, the Company filed a motion seeking leave to file a motion for reconsideration of the Court's October 19, 2005 Order striking certain of the Company's defenses without leave to amend. The Court granted the Company's request on November 21, 2005.

On November 10, 2005, fact discovery closed. Expert discovery is ongoing and is currently scheduled to close on March 31, 2006.

On December 9, 2005, the Company filed a motion for reconsideration of the Court's October 19, 2005 Order striking the Company's affirmative defense of unclean hands and for leave to amend the Company's answer to assert an unclean hands defense. The motion was set for hearing on January 13, 2006, but the Court vacated the hearing and took the matter under submission.

On December 23, 2005, Synopsys filed a motion for partial summary judgment regarding the Company's statute of limitations defense. The Company opposed the motion, which was set for hearing on January 27, 2006. The hearing was vacated and the motion taken under submission by the Court.

On December 29, 2005, the Company filed a notice of interlocutory appeal to the Court of Appeals for the Federal Circuit of the Court's December 1, 2005, preliminary injunction against the Company. The Company's opening brief on appeal is due March 16, 2006.

On January 20, 2006, the Company filed a motion to bifurcate the trial into issues of patent ownership and all other issues. The Company's motion is currently set for hearing on February 24, 2006.

The Court had a Case Management Conference on February 3, 2006.

On April 18, 2005, Synopsys, Inc. filed an action against the Company in Germany at the Landgericht München I (District Court in Munich) seeking to obtain ownership of the European patent application corresponding to the Company's '446 Patent. The action has been stayed pending the outcome of the above-referenced Synopsys action filed in the United States. This action was also discussed in our Quarterly Reports on Form 10-Q for the three months ended October 2, 2005 and for the three months ended July 3, 2005.

On July 29, 2005, Synopsys, Inc. filed an action against the Company in Japan in Civil Department No. 40 of the Tokyo District Court seeking to obtain ownership of the Japanese patent application corresponding to the Company's '446 Patent. The Company has engaged counsel in Japan and will seek to stay this action pending the outcome of the above-referenced Synopsys action filed in the United States. The Japanese Court held a hearing on January 18, 2006 and set a further hearing on March 6, 2006. This action was also discussed in our Quarterly Reports on Form 10-Q for the three months ended October 2, 2005 and for the three months ended July 3, 2005.

Table of Contents

The Company intends to vigorously defend against the claims asserted by Synopsys and to fully enforce its rights against Synopsys. However, the results of any litigation are inherently uncertain and the Company can not assure that it will be able to successfully defend against the Complaint. A favorable outcome for Synopsys could have a material adverse effect on the Company's financial position, results of operations or cash flows. The Company is currently unable to assess the extent of damages and/or other relief, if any, that could be awarded to Synopsys; therefore, no contingent liability has been recorded on the Company's condensed consolidated balance sheet as of January 1, 2006.

On June 13, 2005, a putative shareholder class action lawsuit captioned *The Cornelia I. Crowell GST Trust vs. Magma Design Automation, Inc., Rajeev Madhavan, Gregory C. Walker and Roy E. Jewell.* , No. C 05 02394, was filed in U.S. District Court, Northern District of California. The complaint alleges that defendants failed to disclose information regarding the risk of Magma infringing intellectual property rights of Synopsys, Inc., in violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder, and prays for unspecified damages. This lawsuit was also discussed in our Quarterly Reports on Form 10-Q for the three months ended October 2, 2005 and for the three months ended July 3, 2005.

On July 26, 2005, a putative derivative complaint captioned *Susan Willis v. Magma Design Automation, Inc. et al.* , No. 1-05-CV-045834, was filed in the Superior Court of the State of California for the County of Santa Clara. The Complaint seeks unspecified damages purportedly on behalf of the Company for alleged breaches of fiduciary duties by various directors and officers, as well as for alleged violations of insider trading laws by executives during a period between October 23, 2002 and April 12, 2005. Defendants have demurred to the Complaint, and the action has been stayed pending further developments in the putative shareholder class action referenced above. This lawsuit was also discussed in our Quarterly Reports on Form 10-Q for the three months ended October 2, 2005 and for the three months ended July 3, 2005.

On September 26, 2005, Synopsys, Inc. filed an action against the Company in the Superior Court of the State of California in and for the County of Santa Clara, entitled *Synopsys, Inc. v. Magma Design Automation, Inc., et al.* , Case Number 105 CV 049638. Synopsys alleges that Magma committed unfair business practices by asserting defenses of non-infringement and invalidity to patent infringement allegations brought by Synopsys in the patent infringement action already pending against Magma in the Northern District of California. The Complaint seeks unspecified monetary damages, an unspecified restitutionary/disgorgement award, injunctive relief, fees and costs, and an accounting of all revenues and profits derived from licensing the technology at issue. On October 19, 2005, the Company removed the action to the United States District Court for the Northern District of California. On October 26, 2005, the Company moved to strike and dismiss the complaint. On October 27, 2005, the Court granted the Company's motion to relate the removed action with the preexisting patent infringement action, and both actions are now assigned to Judge Maxine M. Chesney. The Court vacated the hearing on the Company's motion to strike and dismiss the complaint and has taken the matter under submission. This action was also discussed in our Quarterly Reports on Form 10-Q for the three months ended October 2, 2005.

On September 26, 2005, Synopsys, Inc. filed an action against the Company in Delaware federal court, *Synopsys, Inc. v. Magma Design Automation, Inc.* , Civil Action No. 05-701. The Complaint alleges infringement of U.S. Patent Nos. 6,434,733 ("the '733 Patent"), 6,766,501 ("the '501 Patent"), and 6,192,508 ("the '508 Patent") and seeks unspecified monetary damages, injunctive relief, trebling of damages, fees and costs, and the imposition of a constructive trust for the benefit of Synopsys over any profits, revenues or other benefits allegedly obtained by the Company as a result of its alleged infringement of the patents-in-suit. In addition to the below discussion, this case was also discussed in our Quarterly Reports on Form 10-Q for the three months ended October 2, 2005.

On October 19, 2005, the Company filed its answer and counterclaims ("Answer") to Synopsys's Complaint. The Answer asserts that Magma's products do not infringe the patents-in-suit, that the patents-in-suit are unenforceable, and that the '733 Patent and the '501 Patent were fraudulently obtained by Synopsys and are

63

Table of Contents

therefore unenforceable. The Answer also asserts antitrust counterclaims based on Synopsys's assertion of the '733 and '501 Patents, as well as claims for product disparagement and trade libel, statutory and common law unfair competition, and tortuous interference with business relations. The counterclaims seek treble damages and other equitable relief for Synopsys's anticompetitive and tortuous conduct.

On October 25, 2005, the Company filed an Amended Answer, adding a counterclaim for infringement of U.S. Patent No. 6,505,328 ("the '328 Patent"). The Company seeks treble damages and an injunction against Synopsys for the sale and manufacture of products the Company alleges infringe the '328 Patent.

On November 22, 2005, Synopsys filed a motion to dismiss the Company's antitrust and other commercial counterclaims. The Company opposed that motion on December 7, 2005. Synopsys filed its reply brief on December 14, 2005. No hearing date has yet been set for this motion.

On January 9, 2006, Synopsys filed a request for the United States Patent and Trademark Office to reexamine its '733 and '501 Patents in light of two prior art references that it had not previously disclosed to the Patent Office. On January 23, 2006, Synopsys filed a motion with the Delaware federal court to bifurcate and stay its claims for infringement of its '733 and '501 Patents and the Company's counterclaims except for its claim for infringement of the '328 Patent, based in part on Synopsys's having filed the request for patent reexamination. The Company's opposition to that motion was filed on February 6, 2006. No hearing date has yet been set for this motion.

In addition to the above, from time to time, the Company is involved in disputes that arise in the ordinary course of business. The number and significance of these disputes is increasing as the Company's business expands and it grows larger. Any claims against the Company, whether meritorious or not, could be time consuming, result in costly litigation, require significant amounts of management time and result in the diversion of significant operational resources. As a result, these disputes could harm the Company's business, financial condition, results of operations or cash flows.

64

**Table of Contents**

**ITEM 6.    EXHIBITS**

The following documents are filed as Exhibits to this report:

| Exhibit Number | Exhibit Description | Form | File No. | Exhibit | Filing Date | Filed Herewith |
|---|---|---|---|---|---|---|
| | | | Incorporated by Reference | | | |
| 4.1 | Amended and Restated Certificate of Incorporation | 10-K | 000-33213 | 3.1 | June 28, 2002 | |
| 4.2 | Certificate of Correction to the Amended and Restated Certificate of Incorporation | 10-K | 000-33213 | 3.2 | June 28, 2002 | |
| 4.3 | Amended and Restated Bylaws | 10-K | 000-33213 | 3.3 | June 28, 2002 | |
| 4.4 | Amended and Restated Investors' Rights Agreement dated July 31, 2001, by and among the Registrant and the parties that are signatories thereto | 10-K | 000-33213 | 4.2 | June 28, 2002 | |
| 4.5 | Form of Common Stock Certificate | S-1/A | 333-60838 | 4.1 | November 15, 2001 | |
| 10.1 | Form of Notice of Grant of Stock Options and Stock Option Agreement pursuant to Magma's 2001 Stock Incentive Plan for U.S. Employees (other than Executive Officers) | 10-Q | 000-33213 | 10.1 | November 14, 2005 | |
| 10.2 | Form Notice of Grant of Stock Options pursuant to Magma's 2001 Stock Incentive Plan for Executive Officers | 10-Q | 000-33213 | 10.2 | November 14, 2005 | |
| 10.3 | Form of Notice of Grant of Stock Options and Stock Option Agreement pursuant to Magma's 2001 Stock Incentive Plan for Employees residing in countries other than the United States, China, Israel, Italy and the United Kingdom | 10-Q | 000-33213 | 10.3 | November 14, 2005 | |
| 10.4 | Form of Notice of Grant of Stock Options and Stock Option Agreement pursuant to Magma's 2001 Stock Incentive Plan for Employees residing in China, Israel, and Italy | 10-Q | 000-33213 | 10.4 | November 14, 2005 | |
| 10.5 | Notice of Grant of Stock Options and Stock Option Agreement pursuant to Magma's 2001 Stock Incentive Plan for Employees residing in the United Kingdom | 10-Q | 000-33213 | 10.5 | November 14, 2005 | |
| 10.6 | Notice of Restricted Share Award and Restricted Share Agreement pursuant to Magma's 2001 Stock Incentive Plan for non-Executive Employees | 10-Q | 000-33213 | 10.6 | November 14, 2005 | |
| 10.7 | Notice of Restricted Share Award and Restricted Share Agreement pursuant to Magma's 2001 Stock Incentive Plan for Executive Officers | 10-Q | 000-33213 | 10.7 | November 14, 2005 | |
| 10.8 | 2005 Key Contributor Long-Term Incentive Plan | 10-Q | 000-33213 | 10.8 | November 14, 2005 | |

**Table of Contents**

|  |  | Incorporated by Reference | | | |  |
|---|---|---|---|---|---|---|
| Exhibit Number | Exhibit Description | Form | File No. | Exhibit | Filing Date | Filed Herewith |
| 31.1 | Rule 13a-14(a)/15d-14(a) Certification of Principal Executive Officer | | | | | X |
| 31.2 | Rule 13a-14(a)/15d-14(a) Certification of Principal Financial Officer | | | | | X |
| 32.1 | Section 1350 Certification of Principal Executive Officer | | | | | X |
| 32.2 | Section 1350 Certification of Principal Financial Officer | | | | | X |

66

Table of Contents

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

MAGMA DESIGN AUTOMATION, INC.

Dated: February 9, 2006                                   By  _____ /s/  G REGORY C. W ALKER

**Gregory C. Walker**
**Senior Vice President—Finance and Chief**
**Financial Officer**
**(Principal Financial and Accounting Officer**
**and Duly Authorized Signatory)**

67

Table of Contents

# EXHIBIT INDEX
## TO
## MAGMA DESIGN AUTOMATION, INC.
## QUARTERLY REPORT ON FORM 10-Q
## FOR THE QUARTER ENDED JANUARY 1, 2006

| Exhibit Number | Exhibit Description | Incorporated by Reference | | | | Filed Herewith |
|---|---|---|---|---|---|---|
| | | Form | File No. | Exhibit | Filing Date | |
| 4.1 | Amended and Restated Certificate of Incorporation | 10-K | 000-33213 | 3.1 | June 28, 2002 | |
| 4.2 | Certificate of Correction to the Amended and Restated Certificate of Incorporation | 10-K | 000-33213 | 3.2 | June 28, 2002 | |
| 4.3 | Amended and Restated Bylaws | 10-K | 000-33213 | 3.3 | June 28, 2002 | |
| 4.4 | Amended and Restated Investors' Rights Agreement dated July 31, 2001, by and among the Registrant and the parties that are signatories thereto | 10-K | 000-33213 | 4.2 | June 28, 2002 | |
| 4.5 | Form of Common Stock Certificate | S-1/A | 333-60838 | 4.1 | November 15, 2001 | |
| 10.1 | Form of Notice of Grant of Stock Options and Stock Option Agreement pursuant to Magma's 2001 Stock Incentive Plan for U.S. Employees (other than Executive Officers) | 10-Q | 000-33213 | 10.1 | November 14, 2005 | |
| 10.2 | Form Notice of Grant of Stock Options pursuant to Magma's 2001 Stock Incentive Plan for Executive Officers | 10-Q | 000-33213 | 10.2 | November 14, 2005 | |
| 10.3 | Form of Notice of Grant of Stock Options and Stock Option Agreement pursuant to Magma's 2001 Stock Incentive Plan for Employees residing in countries other than the United States, China, Israel, Italy and the United Kingdom | 10-Q | 000-33213 | 10.3 | November 14, 2005 | |
| 10.4 | Form of Notice of Grant of Stock Options and Stock Option Agreement pursuant to Magma's 2001 Stock Incentive Plan for Employees residing in China, Israel, and Italy | 10-Q | 000-33213 | 10.4 | November 14, 2005 | |
| 10.5 | Notice of Grant of Stock Options and Stock Option Agreement pursuant to Magma's 2001 Stock Incentive Plan for Employees residing in the United Kingdom | 10-Q | 000-33213 | 10.5 | November 14, 2005 | |
| 10.6 | Notice of Restricted Share Award and Restricted Share Agreement pursuant to Magma's 2001 Stock Incentive Plan for non-Executive Employees | 10-Q | 000-33213 | 10.6 | November 14, 2005 | |

## Table of Contents

| Exhibit Number | Exhibit Description | Incorporated by Reference | | | | Filed Herewith |
|---|---|---|---|---|---|---|
| | | Form | File No. | Exhibit | Filing Date | |
| 10.7 | Notice of Restricted Share Award and Restricted Share Agreement pursuant to Magma's 2001 Stock Incentive Plan for Executive Officers | 10-Q | 000-33213 | 10.7 | November 14, 2005 | |
| 10.8 | 2005 Key Contributor Long-Term Incentive Plan | 10-Q | 000-33213 | 10.8 | November 14, 2005 | |
| 31.1 | Rule 13a-14(a)/15d-14(a) Certification of Principal Executive Officer | | | | | X |
| 31.2 | Rule 13a-14(a)/15d-14(a) Certification of Principal Financial Officer | | | | | X |
| 32.1 | Section 1350 Certification of Principal Executive Officer | | | | | X |
| 32.2 | Section 1350 Certification of Principal Financial Officer | | | | | X |

**Rule 13a-14(a)/15d-14(a) Certification,**
**as Adopted Pursuant to**
**Section 302 of the Sarbanes-Oxley Act of 2002**

I, Rajeev Madhavan, certify that:

1. I have reviewed this quarterly report on Form 10-Q of Magma Design Automation, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 9, 2006

/s/   R ajeev M adhavan
_____

**Rajeev Madhavan**
**Chief Executive Officer**
**(Principal Executive Officer)**

**Rule 13a-14(a)/15d-14(a) Certification,**
**as Adopted Pursuant to**
**Section 302 of the Sarbanes-Oxley Act of 2002**

I, Gregory C. Walker, certify that:

1. I have reviewed this quarterly report on Form 10-Q of Magma Design Automation, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 9, 2006

/s/   G REGORY C. W ALKER
_____

**Gregory C. Walker**
**Senior Vice President—Finance and Chief Financial Officer**
**(Principal Financial Officer)**

**Section 1350 Certification,**
**As Adopted Pursuant To**
**Section 906 of The Sarbanes-Oxley Act of 2002**

In connection with the Quarterly Report of Magma Design Automation, Inc. (the "Company") on Form 10-Q for the period ending January 1, 2006, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Rajeev Madhavan, Chief Executive Officer of the Company, certify to the best of my knowledge, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

(1) The Report fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934, as amended; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and result of operations of the Company for the periods presented therein.

/s/   R AJEEV M ADHAVAN

**Rajeev Madhavan**
**Chief Executive Officer**

February 9, 2006

A signed original of this written statement required by Section 906 has been provided to the Company and will be retained by the Company and furnished to the Securities and Exchange Commission or its staff upon request.

**Section 1350 Certification,**
**As Adopted Pursuant To**
**Section 906 of The Sarbanes-Oxley Act of 2002**

In connection with the Quarterly Report of Magma Design Automation, Inc. (the "Company") on Form 10-Q for the period ending January 1, 2006, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Gregory C. Walker, Chief Financial Officer of the Company, certify to the best of my knowledge, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

(1) The Report fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934, as amended; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and result of operations of the Company for the periods presented therein.

/s/   GREGORY C. WALKER

**Gregory C. Walker**
**Senior Vice President—Finance and Chief Financial Officer**

February 9, 2006

A signed original of this written statement required by Section 906 has been provided to the Company and will be retained by the Company and furnished to the Securities and Exchange Commission or its staff upon request.

EXHIBIT C



1117 California Avenue
Palo Alto, CA 94304-1106
+1 650 813 4800 Main
+1 650 813 4848 Fax
www.dechert.com

**ESTHER H. LA**
esther.la@dechert.com
+1 650 813 4865 Direct

December 14, 2005

<u>Via Facsimile</u>

James Pooley, Esq.
Milbank Tweed Hadley & McCloy
Five Palo Alto Square
3000 El Camino Real
Palo Alto, CA 94306

Re:     *Synopsys v. Magma, et al.*
        USDC D. Del. No. C-05-701 GMS

Dear Mr. Pooley:

This responds to the issues raised in your December 13 letter to Michael Edelman.

First, your letter states that a number of the disks that we produced on Friday are "corrupted and cannot be read." We are investigating the disks identified in your letter. Please be advised, however, that we received a number of "corrupted" disks from Magma and that may be the reason some of the disks "cannot be read." In any event, given that the disks we produced were originally produced by Magma, Magma already has copies of these disks and is in the best position to identify what is on them.

Second, your suggestion that Synopsys cannot use the documents produced on Friday in the present litigation absent permission from Magma's counsel in the California action does not make any sense. It was *Magma* that requested the production of these documents in the present litigation. By asking Synopsys to inject these documents into the present action, Magma waived any restraints on Synopsys' ability to use these documents in the present action. In any event, we are copying the O'Melveny firm on this letter. Given that Synopsys produced these documents in the present litigation at *Magma's request*, however, Magma can no longer seriously claim that these documents are not available for use in this litigation.

Third, regarding meet and confer over the parties' document requests, Magma's document requests are so overbroad that we estimate it would require the production of

BOSTON  CHARLOTTE  HARRISBURG  HARTFORD  NEW YORK  NEWPORT BEACH  PALO ALTO  PHILADELPHIA
PRINCETON  SAN FRANCISCO  WASHINGTON DC  BRUSSELS  FRANKFURT  LONDON  LUXEMBOURG  MUNICH
PARIS



James Pooley, Esq.
December 14, 2005
Page 2

several billion pages of documents that would take years to gather and review. Accordingly, we suggest that Magma withdraw its requests in their entirety and re-propound new requests which are at least in the ballpark of something the parties can meet and confer over.  We believe this would be the most productive approach, rather than attempting to meet and confer on requests that clearly are not even in the ballpark of what is appropriate in this case.

Fourth (and just one example of the enormous overbreadth of Magma's document requests), Magma's request for "Synopsys's entire source code database from the time of formation to the present" is absurdly overbroad, as are Magma's other document requests.  Moreover, it will take far longer than two weeks to investigate and produce the appropriate source code in this case.  In any event, whether Magma seeks production in two weeks or six months, its demand for the production of "Synopsys' entire source code database from the time of formation to the present" cannot be serious.  It is Magma's obligation to propound document requests that are reasonable in scope. Accordingly, we again ask Magma to withdraw its enormously overbroad document requests and re-propound new requests so that the parties can meet and confer meaningfully.

Finally, with respect to the draft Protective Order proposed by Magma, we will provide you with our comments by tomorrow.

Very truly yours,

Esther H. La

cc:  George Riley, Esq. (via facsimile)

EXHIBIT D



1117 California Avenue
Palo Alto, CA 94304-1106
+1 650 813 4800 Main
+1 650 813 4848 Fax
www.dechert.com

**ESTHER H. LA**
esther.la@dechert.com
+1 650 813 4865 Direct

December 15, 2005

<u>**VIA FACSIMILE**</u>

James Pooley, Esq.
Milbank Tweed Hadley & McCloy
Five Palo Alto Square
3000 El Camino Real
Palo Alto, CA 94306

Re:  *Synopsys v. Magma, et al.*
     USDC D. Del. No. C-05-701 GMS

Dear Mr. Pooley:

This letter responds to yours of today.

First, with respect to the 134 disks produced on Friday, Synopsys produced the materials contained on these disks because Magma requested them. Your suggestion that documents produced by Magma in the California case may not be responsive in the Delaware case because they were produced in response to a different set of document requests fails to appreciate the enormous scope of documents requested by Magma. For example, Magma has requested the production of "all documents relating to . . . the EDA industry," and "all documents and tangible things relating to [the infringing] Magma Products." Given the enormous scope of these document requests, practically all documents produced by Magma in the California case would be responsive in the Delaware case.

Second, your demand that Synopsys provide an index of its production and specify, by bates range, which documents are responsive to which document request is unreasonable. Indeed, Magma has never provided an index for its productions and has never specified, by bates numbers (or in any other manner), which documents are responsive to which document request. We have produced the disks in the manner they were kept in the usual course of business, which is all that is required under FRCP 34.

12219383.1

BOSTON  CHARLOTTE  HARRISBURG  HARTFORD  NEW YORK  NEWPORT BEACH  PALO ALTO  PHILADELPHIA
PRINCETON  SAN FRANCISCO  WASHINGTON DC  BRUSSELS  FRANKFURT  LONDON  LUXEMBOURG  MUNICH
PARIS



James Pooley, Esq.
December 15, 2005
Page 2

Third, Synopsys has never refused and is not refusing to meet and confer with Magma. My letter to you yesterday (and Mr. Edelman's letter to you today) simply point out that Magma's document requests are absurdly overbroad and suggest that it would be more logical for Magma to withdraw its requests and re-propound requests that are reasonable in scope. Your letter indicates that Magma either has no interest in propounding reasonable document requests or has no understanding of the tremendous breadth of its requests. We believe that you will have a better understanding of Synopsys' concerns once you receive Synopsys' responses. Accordingly, if Magma is unwilling to withdraw its pending requests, Synopsys proposes that the parties meet and confer over both Magma's document requests and Synopsys' document requests after the parties have had a chance to serve their responses, so that the parties can address each other's concerns more productively.

Fourth, regarding source code production, as I stated in my letter to you yesterday, it will take far longer than two weeks to investigate and produce the appropriate code in this case. Your assumption that this will take only "a matter of hours" has no basis in fact, and shows that you have no idea how Synopsys' products are set up or how its source code is organized. It is simply not technically feasible to provide the source code you demand in the time that you demand it. Moreover, we do not agree that the products identified in your December 13 letter is the proper identification of products at issue in this case. In any event, your letter indicates that Magma is not agreeing to withdraw its demand for "Synopsys's entire source code database from the time of formation to the present." Instead, Magma is demanding that Synopsys produce source code even *before* Synopsys is required to respond to Magma's document requests. Synopsys will timely respond to Magma's pending document requests. To the extent that Magma has any concerns about Synopsys' responses, we will be more than willing to meet and confer with you.

Very truly yours,

Esther H. La

Esther H. La

EHL/cs

12219383.1

EXHIBIT E



1117 California Avenue
Palo Alto, CA 94304-1106
+1 650 813 4800 Main
+1 650 813 4848 Fax
www.dechert.com

**MICHAEL EDELMAN**

michael.edelman@dechert.com
+1 650 813 4857 Direct
+1 650 813 4848 Fax

December 15, 2005

**VIA FACSIMILE**

James Pooley, Esq.
Milbank Tweed Hadley & McCloy
Five Palo Alto Square
3000 El Camino Real
Palo Alto, CA 94306

Re:     *Synopsys v. Magma, et al.*
        Case No.: USDC D. Del. No.: 05 00701 GMS

Dear Mr. Pooley:

This is in response to your letter of December 14, 2005.

We have again reviewed the requests propounded by Magma, to which our responses and/or objections are not due to be served until January. These requests are so ridiculously overbroad that it is simply impossible to know how to meet and confer over them. In essence, rather than trying to figure out what it really needs to prepare its case, Magma has decided to ask for every single one of the billions of documents that Synopsys has ever generated in the history of the company. Magma's requests absurdly ask for *any* documents in Synopsys' possession concerning *any* issue, relating to *any* product, generated at *any* time, which are in the possession of *any* employee in *any* location all over the world. Given that Synopsys has thousands of employees and former employees, and has released many dozens, if not hundreds, of products over its existence (almost none of which are even relevant to this action), Magma's requests clearly extend absurdly far past the boundaries permitted under the Federal Rules.

In order for a serious meet and confer to take place, Magma's requests need to be entirely rewritten from scratch. The only logical way that the parties can proceed is for Magma to simply start over and draft brand-new document requests that can be taken seriously by

10306371.1.LIT



James Pooley, Esq.
December 15, 2005
Page 2

the parties.  Such requests would need to start by at least identifying the relevant
Synopsys products (as opposed to every product Synopsys has ever released), by
identifying a relevant time period (as opposed to every year that Synopsys has ever been
in existence), and by identifying relevant issues (as opposed to every technical, sales, and
marketing document that has ever been generated by the company).  If we receive a set of
*reasonable* requests that are at least within the "ballpark" of something that the Federal
Rules permits, the meet and confer process will be able to move forward.


Very truly yours,

Michael N. Edelman

MNE:ek

10306371.1.LIT

EXHIBIT F



1117 California Avenue
Palo Alto, CA 94304-1106
+1 650 813 4800 Main
+1 650 813 4848 Fax
www.dechert.com

**MICHAEL EDELMAN**

michael.edelman@dechert.com
+1 650 813 4857 Direct
+1 650 813 4848 Fax

December 15, 2005

**VIA FACSIMILE**

James Pooley, Esq.
Milbank Tweed Hadley & McCloy
Five Palo Alto Square
3000 El Camino Real
Palo Alto, CA 94306

Re:    *Synopsys v. Magma, et al.*
       Case No.: USDC D. Del. No.: 05 00701 GMS

Dear Mr. Pooley:

This is in response to your letter of today.

The terms "ridiculous" and "absurd" do not carry any "personal implications." They are *adjectives* that accurately describe the nature of the requests that Magma has propounded. We simply do not understand how it is possible for Magma to have seriously believed it was entitled to propound requests under the Federal Rules which essentially ask for every single document ever generated by Synopsys on anything that has ever happened in the company. We are not "demanding" anything, but rather are *requesting* in good faith that Magma recognize the absurdity of its requests, and to try to move the process forward by submitting requests that can be taken seriously.

It is clear that Magma has made a fundamental mistake by propounding these requests. All that we are asking is for Magma to recognize this mistake and rectify it, so the parties are able to proceed efficiently and resolve their differences. If Magma refuses to do so, then Synopsys will be left with no choice but to serve the plethora of objections that will obviously attach to Magma's requests by the deadline required by the Federal Rules, after which Synopsys will try to receive an understanding from Magma as to how it could

Boston  Charlotte  Harrisburg  Hartford  New York  Newport Beach  Palo Alto  Philadelphia  Princeton  San Francisco  Washington DC
Brussels  Frankfurt  London  Luxembourg  Munich  Paris



James Pooley, Esq.
December 15, 2005
Page 2

possibly have believed that these requests were reasonably tailored to seek relevant evidence in this case.

Very truly yours,

Michael N. Edelman

MNE:ek