EXHIBIT A

1  Chris Scott Graham (State Bar No. 114498)
   chris.scott.graham@dechert.com
2  Michael N. Edelman (State Bar No. 180948)
   michael.edelman@dechert.com
3  **DECHERT LLP**
   1117 California Avenue
4  Palo Alto, CA  94304-1013
   Telephone:     650.813.4800
5  Facsimile:      650.813.4848

6  Attorneys for Plaintiff and Counter-Defendant,
   SYNOPSYS, INC.

7

8                    UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10                     SAN FRANCISCO DIVISION

11

12  SYNOPSYS, INC., a Delaware           CASE NO.: C-04-03923 MMC (JCS)
    corporation,
13                                        **THIRD AMENDED COMPLAINT FOR:**
         Plaintiff and Counter-Defendant,
14                                        **1.   PATENT INFRINGEMENT;**
         vs.
15                                        **2.   BREACH OF CONTRACT;**

16  MAGMA DESIGN AUTOMATION, INC.         **3.   INDUCING BREACH OF**
    a Delaware corporation,                    **CONTRACT/INTERFERENCE WITH**
17                                             **CONTRACTUAL RELATIONS;**
         Defendants and Counter-Claimant.
18                                        **4.   FRAUD;**

19                                        **5.   CONVERSION;**

20                                        **6.   UNJUST ENRICHMENT/**
                                               **CONSTRUCTIVE TRUST AND;**
21
                                          **7.   UNFAIR COMPETITION**
22  AND RELATED CROSS-ACTIONS
                                          **DEMAND FOR JURY TRIAL**
23

24       Plaintiff Synopsys, Inc. ("Synopsys") hereby alleges against Defendants Magma Design

25  Automation, Inc. ("Magma") and Lukas van Ginneken ("van Ginneken") as follows:

26                              **JURISDICTION**

27       1.      This is an action for patent infringement arising under the patent laws of the

28  United States.  This Court has jurisdiction over this action under 28 U.S.C. § 1331, 1338(a), and

1    1367(a) and pursuant to the Federal Declaratory Judgments Act, 28 U.S.C. § 2201-02.  This Court

2    has supplemental jurisdiction over claims arising under state law pursuant to 28 U.S.C. § 1367(a),

3    because these claims are so related to the parties' claims and counterclaims under federal law that

4    they form part of the same case and/or controversy and derive from a common nucleus of

5    operative fact.

6                                    **PARTIES**

7         2.      Synopsys is a corporation duly organized and existing under the laws of the State

8    of Delaware, with its principal place of business in Mountain View, California.

9         3.      Synopsys is informed and believes, and thereon alleges, that Magma is a

10   corporation duly organized and existing under the laws of the State of Delaware, with its principal

11   place of business in Santa Clara, California.

12                                    **VENUE**

13        4.      Venue is proper in the Northern District pursuant to 28 U.S.C. § 1391(b) & (c) and

14   28 U.S.C. § 1400(b).

15                          **INTRADISTRICT ASSIGNMENT**

16        5.      This is an Intellectual Property Action under this Court's Assignment Plan, and

17   therefore assignment to any division of the Court is proper pursuant to Civil L.R. 3-2(c).

18                                    **OVERVIEW**

19        6.      The extraordinary facts which underlie this action are truly disturbing.  It is now

20   clear that, from the very inception of the company, Magma knew that the inventions upon which

21   it built its business were misappropriated from Synopsys.  It is beyond dispute that the fixed

22   timing methodology that is the technical foundation for Magma's products was originally

23   conceived at Synopsys.  As a result, Magma products and technology infringe Synopsys'

24   intellectual property and contractual rights, and the continued sale, licensing and use of infringing

25   products must be enjoined.

26        7.      In order to bury the truth of its wrongful conduct as alleged herein, Magma has

27   spent the past several years making a series of false representations to its investors, its

28   shareholders, the press, and Synopsys.  Rather than simply admit the illicit origin of its products

THIRD AMENDED COMPLAINT; CASE NO.: C-04-03923 MMC (JCS)                                    2

1  and technology, Magma engaged in a public relations campaign designed to portray its fixed

2  timing methodology as an invention that was conceived by employees of Magma "from scratch"

3  through the use of public domain materials.  These representations were made despite Magma's

4  clear knowledge that these inventions had been taken from information contained in confidential

5  Synopsys documents.

6      8.      Magma's web of deceit crumbled soon after Magma asserted three patents, core to

7  its business, against Synopsys.  This assertion led to the discovery of the following unequivocal

8  facts:  (1) the relevant inventions had been conceived by Lukas van Ginneken ("van Ginneken")

9  while he was a Synopsys employee; (2) Synopsys' confidential materials had been copied and

10  used by Magma in its later filed patent applications; (3) Magma had known about the

11  misappropriation of these materials since at least 1997, and; (4) Magma has willfully engaged in a

12  course of conduct to hide the facts of its wrongful conduct.  Now that the truth has been revealed,

13  Synopsys seeks to obtain the relief to which it is clearly entitled under law.

**FACTUAL BACKGROUND**

**van Ginneken's Employment at Synopsys**

16      9.      In 1995, Synopsys hired van Ginneken to play a significant role in leading the

17  development of Synopsys' logic synthesis and related technologies.  van Ginneken was given the

18  responsibility to work on research pertaining to logic synthesis, and was asked to make important

19  contributions to the technical vision for Synopsys' logic synthesis team.  Given van Ginneken's

20  prior experience in the field, Synopsys heavily relied upon van Ginneken to provide leadership

21  and vision to the development of Synopsys' products and technology.

22      10.     On or about May 17, 1995, van Ginneken signed a Proprietary Information and

23  Inventions Agreement (the "Agreement") as a condition to his employment by Synopsys.  A true

24  and correct copy of the Agreement is attached hereto as Exhibit A.

25      11.     The Agreement is valid and fully enforceable against van Ginneken.

26      12.     The Agreement provides, among other things, that all Proprietary Information

27  shall be the "sole property" of Synopsys.  The term "Proprietary Information" is defined to

28  include information that "has been created, discovered, developed or otherwise become known to

1  the Company (including, without limitation, information created discovered or developed by, or

2  made known to, me during the period of or arising out of my employment by the Company)

3  and/or in which property rights have been assigned, licensed or otherwise conveyed to the

4  Company." For instance, the Agreement provides that Proprietary Information includes "trade

5  secrets, processes, data and know-how, computer software, improvements, inventions, works of

6  authorship, techniques, marketing plans, strategies, forecasts and copyrightable material and

7  customer lists."

8        13.    The Agreement further provides that "all Inventions which I make, conceive,

9  reduce to practice or develop (in whole or in part, either alone or jointly with others) during my

10  employment shall be the sole property of the Company to the maximum extent permitted by

11  Section 2870 of the California Labor Code . . ."

12        14.    The Agreement further provides that Synopsys "shall be the sole owner of all

13  patents, copyrights, trade secrets rights, rights with respect to other intellectual property or other

14  rights in connection therewith (including, without limitation, such rights in algorithms or

15  software)."

16        15.    The Agreement further assigns to Synopsys any rights that van Ginneken may

17  have or acquire in any Inventions. The term "Inventions" is broadly defined in the Agreement to

18  include any "improvements, inventions, works of authorship, processes, techniques, know-how,

19  formulae, data, ideas and other information (including, without limitation, my algorithms or

20  software), whether or not patentable, made or conceived or reduced to practice or learned by me,

21  either alone or jointly with others, during the term of my employment."

22        16.    The Agreement further requires van Ginneken to provide a complete list of all

23  "inventions or improvements" which he had contributed to before his employment at Synopsys.

24        17.    As reflected in Exhibit "A" attached hereto, van Ginneken in fact attached such a

25  list to the signed Agreement, and covenanted that this list was complete.

26        18.    None of the inventions listed by van Ginneken in the Agreement disclose the

27  inventions ultimately claimed in U.S. Patent No. 6,453,446 or U.S. Patent No. 6,725,438

28  (hereinafter collectively referred to as the "Patents"). Accordingly, by van Ginneken's own

1   representations, none of the inventions disclosed in the Patents had been conceived by him before

2   he joined Synopsys.

3       19.    After signing the Agreement, van Ginneken commenced employment at Synopsys

4   on June 26, 1995.

5       20.    At no time during his employment at Synopsys, or anytime thereafter, did van

6   Ginneken object to the scope or terms of the Agreement, or ask Synopsys for any waiver from the

7   enforcement of its provisions.

8                **van Ginneken Conceives of the Fixed Timing Inventions in the Patents**

9       21.    In or about late 1995 or early 1996, as part of his job to research and explore new

10  product ideas for Synopsys, van Ginneken developed the idea of creating an EDA product that

11  would perform particular inventions using the concept of fixed timing.

12      22.    Under the concept of fixed timing, the timing delays of a chip design are held

13  constant and "fixed," in contrast to determining timing delay at a later point in the design flow.

14  Because fixed timing involves holding the timing delay constant, it can also be referred to as

15  "constant delay."

16      23.    The inventions developed by van Ginneken while employed by Synopsys were

17  designed to implement this concept of fixed timing/constant delay into an EDA tool that

18  performed logic synthesis, placement, and/or related tasks.

19      24.    In addition, by early 1996, van Ginneken developed inventions while employed by

20  Synopsys pertaining to the use of "gain-based synthesis," which is one of the ways in which the

21  fixed timing concept can be implemented in a logic synthesis and/or placement tool.

22      25.    On or about January 30, 1996, van Ginneken participated in a meeting with other

23  Synopsys personnel to discuss ideas for Synopsys' next-generation synthesis product (code

24  named "NGSS" or "Synzilla").  During this meeting, van Ginneken set out the basic concept of

25  his fixed timing inventions.  van Ginneken was directed to research the issue further and report

26  his findings at a later meeting.

27      26.    During a subsequent meeting in or about February of 1996, van Ginneken gave a

28  further presentation to Synopsys personnel concerning the fixed timing and gain-based synthesis

THIRD AMENDED COMPLAINT; CASE NO.: C-04-03923 MMC (JCS)                                        5

1  inventions he developed while employed at Synopsys. van Ginneken specifically discussed how

2  Synopsys could implement the inventions relating to fixed timing and gain-based synthesis in its

3  tools. During the course of this meeting, van Ginneken was successful in convincing others at

4  Synopsys that the company should consider redirecting its efforts towards implementing these

5  inventions.

6       27.     The conception of the inventions developed by van Ginneken while a Synopsys

7  employee is thoroughly documented in Synopsys' records.

8       28.     In early 1996, van Ginneken filled out an invention disclosure form attesting that

9  his fixed timing inventions were conceived by him alone. This invention disclosure, under the

10  title "Constant Delay Synthesis" (the "Constant Delay Synthesis Disclosure"), states as follows:

11        Constant delay synthesis is an entirely different paradigm for delay optimization
in logic synthesis. It promises to radically simplify the design process from

12  behavioral synthesis down to physical desing [sic]. It is probably more of a
philosophy than an algorithm. Using this philosophy many common optimization

13  algorithms, such as mapping, retiming, behavioral synthesis, delay &amp [sic];
area optimization, placement can be reformulated in a much simpler form.

14

15       29.     In the Constant Delay Synthesis Disclosure, van Ginneken represents that he was

16  the sole inventor of the fixed timing inventions (by stating "Additional Inventors: none").

17       30.     In the Constant Delay Synthesis Disclosure, van Ginneken represents that the

18  inventions reflected therein were being considered as the "cornerstone" of the NGSS project at

19  Synopsys.

20       31.     In the Constant Delay Synthesis Disclosure, van Ginneken states that "[i]t is

21  important that Synopsys acquires patent protection in this area, even though some prior art

22  exists."

23       32.     van Ginneken's development of these inventions while employed at Synopsys is

24  further documented in the performance reviews he received at Synopsys. For instance, in his

25  performance review for the period March 1, 1996 to April 1, 1997, Synopsys stated that "[o]ver

26  the past year within the Advanced Technology Group, you have had basically one objective:

27  driving through the next generation synthesis effort based on constant delay." The review further

28  stated:

THIRD AMENDED COMPLAINT; CASE NO.: C-04-03923 MMC (JCS)

> Your primary objective over the past year has been driving the technical direction of the Synzilla project, bringing to fruition your ideas on applying constant delay to Synopsys next generation synthesis effort. This project represents a major milestone and direction for Synopsys, and your efforts have been instrumental in effecting the project. One year ago, Synzilla was an idea in your head; it is currently a staffed project that has met aggressive milestones and schedules and that has strong support from outside partners.

33.    Similarly, another performance review of van Ginneken discussed the presentation of the fixed timing inventions in one of the internal Synopsys meetings in early 1996:

> Lukas, you demonstrated true vision and original thinking in one of the NGSS meetings when you presented your 'constant delay' ideas. I think that in the process of one hour, you presented a change in the synthesis paradigm to the best technical minds at Synopsys, they accepted that the idea has a lot of merit, and the team initiated a project to investigate this further. This is really exciting!

**Synopsys Creates Confidential Documents to Describe van Ginneken's Inventions**

34.    In order to obtain patent protection for the fixed timing and gain-based synthesis inventions developed by van Ginneken while employed at Synopsys, van Ginneken proceeded to work with Synopsys' former outside patent counsel, Laura Majerus of Graham & James, in order to draft a patent application. Though the content of the communications between van Ginneken and Ms. Majerus is protected by the attorney-client privilege, a patent application was ultimately drafted containing the very same inventions that were later disclosed in the Patents.

35.    The first draft of the patent application was entitled "System and Method for Constant Delay Synthesis," and contained disclosure of van Ginneken's inventions for fixed timing, including use of fixed timing in relation to logic synthesis and placement, equal slack sizing, area estimation, buffering, bipartitioning, iterative placement, and net weights. This draft patent application was never disclosed by Synopsys to the public, but was instead maintained at all times relevant hereto by Synopsys as proprietary and confidential.

36.    After the creation of this initial patent application, work on the application continued, and eventually a subsequent draft was created. This draft was entitled "Method for Achieving Timing Closure of Digital Networks and Method for Area Optimization of Digital Networks Under Timing Closure." This draft more thoroughly disclosed the inventions conceived of by van Ginneken while employed at Synopsys, and described in detail the use of fixed timing in relation to network slack, library independent optimization, mapping for delay,

1   post mapping optimization, pin swapping, boundary moves, area estimation, net weights,

2   buffering, stretching, placement, and final or discrete sizing.  The copies of this draft contained

3   the clear and explicit notation "Synopsys Confidential."  This draft patent application was never

4   disclosed by Synopsys to the public, but was instead maintained at all times relevant hereto by

5   Synopsys as proprietary and confidential.

6          37.    In addition to the preparation of the draft patent applications, van Ginneken also

7   prepared a "white paper" on the fixed timing inventions.  The initial draft of the paper was titled

8   "The Constant Delay Methodology," and set forth several aspects of the inventions contained in

9   the Patents.  This paper contained, for instance, a description of the use of fixed timing as it

10  related to logical effort and gain, sizing and placement, buffering, transition time effects, area

11  optimization, and area estimation.  The end of the paper recommended that Synopsys adopt the

12  fixed timing methodology for its tools.

13         38.    After this initial draft was created, a revised version of the paper was created by

14  van Ginneken with the new title "Driving on the Left-Hand Side of the Performance Speedway."

15  Once again, this paper provided a description of numerous aspects of the inventions conceived of

16  by van Ginneken that are contained in the Patents.

17         39.    As the above indicates, by the middle of 1996, Synopsys had extensive

18  confidential documentation describing, in great detail, the fixed timing and gain-based synthesis

19  inventions developed by van Ginneken while employed at Synopsys.  At no point did Synopsys

20  ever give permission for van Ginneken to take or use this documentation, or any of the inventions

21  described therein, for the benefit of another company.  To the contrary, under the Agreement

22  these inventions were and are the exclusive property of Synopsys, and were assigned to Synopsys

23  the instant that they were conceived.

24              **Magma Misappropriates Synopsys' Confidential Information**

25         40.    At some point in 1996, van Ginneken decided to resign from Synopsys to pursue

26  other opportunities.  Instead, however, of pursuing ideas at another company that were unrelated

27  to Synopsys' confidential information, van Ginneken sought to take another position where he

28  / / /

1  could continue utilizing the fixed timing and gain-based synthesis inventions developed at

2  Synopsys.

3      41.    In May of 1997, van Ginneken formally resigned from Synopsys in order to join

4  Magma, which had been incorporated on April 1, 1997.  In his resignation letter, van Ginneken

5  stated that he was resigning to join a "newly formed startup company," and stated that his

6  departure "should not be construed as a lack of faith in the technical approaches which I have

7  been advocating."

8      42.    Unbeknownst to Synopsys, there was far more to van Ginneken's resignation than

9  appeared on the surface.  In reality, van Ginneken had only resigned from Synopsys after forming

10  a conspiracy with Rajeev Madhavan, and other founders of Magma, to develop products for

11  Magma using the fixed timing and gain-based synthesis inventions that had been developed at

12  Synopsys.  This product development was one of the overt acts in furtherance of the main goal of

13  the conspiracy, which was to use the inventions misappropriated from Synopsys in order to file

14  for patents with the United States Patent and Trademark Office, and thereafter to use the patents

15  in order to inflate the value of Magma's business to investors and shareholders and obtain a

16  patent-based monopoly to assert against Magma's competitors.

17      43.    van Ginneken entered into this conspiracy with Madhavan and the other founders

18  of Magma for his own personal interest, separate and apart from Magma's interests in furthering

19  the conspiracy.  In particular, van Ginneken was motivated to enter into the conspiracy because of

20  his personal interest in receiving attribution for the inventions he conceived, through being named

21  as an inventor on a novel technology.  Indeed, by participating in the conspiracy and obtaining

22  issuance of the '446 and '438 Patents, van Ginneken personally benefited by being revealed to the

23  public as the inventor of concepts which were deemed worthy by the PTO of patent protection.

24      44.    In furtherance of this conspiracy, on or before his resignation from Synopsys, van

25  Ginneken misappropriated for the use and benefit of Magma the information contained in the

26  detailed draft patent application, labeled "Synopsys Confidential."  The information from this

27  application was ultimately copied into patent applications for Magma.  van Ginneken also

28  misappropriated for Magma the information contained in at least one of the white papers that he

1   had created for Synopsys.  Magma and van Ginneken misappropriated this information from

2   Synopsys for the purpose of using van Ginneken's inventions as the core technical foundation for

3   Magma products, so that Magma could achieve the main goal of its conspiracy as described

4   herein.

5          45.     At no time did Magma or van Ginneken inform Synopsys that these documents

6   and related information were being taken, nor did Synopsys ever provide any permission for van

7   Ginneken to take them.  Rather, this misappropriation occurred entirely in secret.

8          46.     After these materials were misappropriated from Synopsys, Magma proceeded to

9   extensively copy the information contained in the documents in order to create the patent

10  applications that would ultimately result in the issuance of the Patents.  This copying was blatant

11  and egregious.  Indeed, the inventive concepts contained in these patents were copied from the

12  Synopsys patent application or other documents.  In dozens of instances, this copying was word-

13  for-word.

14         47.     Attached hereto as Exhibit B is a chart listing just some of the portions of the

15  Patents that were blatantly copied from the confidential patent application drafted for Synopsys.

16  This chart demonstrates that the relevant portions of the Patents are simply plagiarized versions of

17  the confidential patent application that had been drafted for Synopsys.  In addition, the Patents

18  also contain numerous passages that were copied, word-for-word, from one of the white papers

19  van Ginneken had drafted for Synopsys.

20         48.     In addition to copying the confidential information misappropriated from

21  Synopsys, Magma used the inventions that were misappropriated from Synopsys and labeled

22  them as Magma's "FixedTiming" methodology.  Magma then incorporated these misappropriated

23  inventions into its  product line, and proceeded to use these inventions as a core technical

24  foundation for its products.  By so doing, Magma was able to claim to the Securities and

25  Exchange Commission and the public that its products featured "patented" technology, thereby

26  inflating the value of its business to investors and shareholders and enabling it to assert the

27  patents as a bar against any competitor's use of the inventions claimed in the patents.

28  / / /

**Magma and van Ginneken's Fraudulent Representations to Synopsys**

49.     After van Ginneken resigned from Synopsys, Synopsys learned that he had joined Magma.  Given the inventions developed by van Ginneken and the Synopsys confidential information that he had been privy to, Synopsys sought assurances from Magma that Synopsys' confidential and proprietary information would not be used or compromised.

50.     On July 23, 1997, Synopsys forwarded the signed Agreement to Magma, and communicated its expectation that van Ginneken would honor his obligations under the Agreement.  Synopsys further asked Magma to confirm that it would not use any confidential or proprietary information of Synopsys.  Attached hereto as Exhibit C is a true and correct copy of the July 23, 1997 letter sent by Synopsys.

51.     At the time Magma received the July 23, 1997 letter from Synopsys, it was already in possession of the information set forth in the confidential patent application drafted for Synopsys, and knew that it was in the process of creating and developing products that would incorporate the very inventions misappropriated from Synopsys.  Rather than reveal the misappropriation to Synopsys, however, Magma chose to hide it.  To this end, Magma instructed its counsel at the law firm of Pillsbury, Madison & Sutro LLP ("Pillsbury") to respond by assuring Synopsys that Magma would <u>not</u> use or obtain any confidential or proprietary information of Synopsys.

52.     In particular, in a letter from Pillsbury dated August 18, 1997, through Magma's legal counsel Magma and van Ginneken made the following representations and assurances to Synopsys:  (1) "Dr. van Ginneken intends to honor his obligations under his Proprietary Information Agreement with Synopsys," (2) "Magma is in the practice of taking appropriate steps to protect . . . the trade secrets of its employees' former employers," (3) "Dr. van Ginneken will protect Synopsys' proprietary information during his employment at Magma," (4) "Magma is confident that Dr. van Ginneken has and will continue to abide by the terms of the Magma Agreement in the performance of his duties for Magma," and (5) "Magma will reiterate to Dr. van Ginneken his duty to abide by his Synopsys Agreement."  Attached hereto as Exhibit D is a true and correct copy of the August 18, 1997 letter.

53.     All of the foregoing statements from the August 18, 1997 letter were known by Magma and van Ginneken to be false.  At the time these statements were made, Magma had already misappropriated the information contained in the confidential patent application drafted for Synopsys (and the information contained in at least one confidential Synopsys white paper), and had already begun to use the information to develop its products and draft patent applications.  In an active effort to hide the truth, however, Magma and van Ginneken provided a series of false misrepresentations to Synopsys.

54.     Through the August 18, 1997 letter, Magma and van Ginneken falsely represented that the use of any "constant delay ideas" by Magma would not implicate Synopsys' confidential information, because the ideas van Ginneken would be using were already known in the public domain.  This representation was also known by Magma and van Ginneken to be false.  In truth, Magma was not relying on ideas that were already known in the public domain, but instead had willfully misappropriated the precise fixed timing inventions that van Ginneken had developed while employed at Synopsys.

55.     The fraudulent nature of the representations were enhanced by the decision to only quote in the August 18, 1997 letter a portion of Magma's employment agreement with van Ginneken, and to omit information of other facts known to Magma and van Ginneken.  Rather than produce the actual employment agreement it had with van Ginneken, Magma's counsel instead selectively quoted from it and omitted the exhibits to the agreement which had been created by van Ginneken.  These exhibits revealed that, contrary to the assertions in the August 18, 1997 letter, van Ginneken did not believe that his constant delay ideas were in the public domain and available for use by Magma.  Rather, as reflected in these exhibits van Ginneken explicitly informed Magma that the white paper discussing these inventions was outside the scope of his agreement with Magma, because it had been developed at Synopsys before he joined Magma.  By purposefully omitting the full agreement and exhibits from the August 18 letter, Magma's counsel provided information of other facts which were likely to, and did, mislead Synopsys.  Through and as a result of the fraudulent representations concerning the

/ / /

1  "public domain" nature of the inventions Magma was pursuing, Magma was thus able to pursue

2  its scheme without further question or investigation by Synopsys.

3       56.    After representing that Synopsys' confidential and proprietary information would

4  be "protected," Magma then used the Pillsbury firm to secretly submit a series of patent

5  applications to the United States Patent & Trademark Office ("PTO"), which contained the <u>same</u>

6  inventions that van Ginneken developed while he was employed at Synopsys.  These applications

7  described the inventions in language that was copied from the very same information set forth in

8  the confidential patent application that had been drafted for Synopsys.  Though Magma knew that

9  its applications had been copied from confidential Synopsys information, Magma continued to

10  prosecute the applications for years before the PTO.

11  **<u>Magma Deceives Its Investors</u>**

12       57.    In 1998, while its plagiarized patent applications were pending, Magma retained

13  the law firm of Orrick, Herrington & Sutcliffe LLP ("Orrick").  The goal of this retention was

14  purportedly to perform intellectual property due diligence at Magma.  In reality, the main purpose

15  of this retention was to use counsel to "whitewash" the misappropriation of Synopsys'

16  confidential inventions and documentation, and thereby to further the main goal of the conspiracy

17  against Synopsys as described herein.

18       58.    As part of the "due diligence" process, Orrick engaged a professor from the

19  University of Michigan, Marios Papaefthymiou, who conducted a series of interviews at Magma

20  for the purpose of assessing whether Magma had used proprietary or confidential information

21  belonging to previous employers of Magma employees.  In truth, this entire process was a sham,

22  because Magma already knew that its patent applications had been copied from confidential

23  information misappropriated from Synopsys, but had carefully avoided telling Papaefthymiou that

24  fact.

25       59.    Magma rigged the due diligence process by falsely informing Papaefthymiou that

26  van Ginneken had not used any confidential or proprietary information of Synopsys in his

27  position at Magma, and by failing to disclose to Papaefthymiou the fact that significant portions

28  of Magma's patent applications had been plagiarized from Synopsys confidential information.

60.    Papaefthymiou interviewed van Ginneken as part of the due diligence process, and yet neither Magma nor van Ginneken informed him of the critical fact that significant portions of Magma's patent applications had been plagiarized from Synopsys confidential information.

61.    Although unknown to Synopsys until after the initiation of this lawsuit, Papaefthymiou's notes from his interviews ultimately noted the "similarities" between van Ginneken's work at Synopsys and Magma's work, and indicated that some of the Synopsys technology that was similar to Magma's may have been confidential or may have been patented. Because, however, Magma did not disclose to Papaefthymiou the fact that it had misappropriated Synopsys information and used it to draft Magma's patent applications, Papaefthymiou was unable to reach any conclusion on the matter. Thereafter, Magma did not include significant portions of Papaefthymiou's observations in the due diligence report given to Magma's potential investors. By failing to provide all of the true information during the due diligence process, and by falsifying the scope and content of the report, Magma was able to represent that it had received a "clean bill of health" from the Orrick firm.

## Magma and van Ginneken Continue Their Efforts to Deceive Synopsys

62.    Rather than approach Synopsys and admit the truth about its wrongful conduct, Magma continued to take steps in 1998 and succeeding years in order to mislead Synopsys.

63.    For instance, in or about February of 1998, Magma invited Synopsys to attend a meeting at Magma's offices to discuss the possibility of a business arrangement between the two companies. The meeting was attended by at least Rajeev Madhavan and Robert Smith on behalf of Magma, and at least Aart de Geus, Raul Camposano, and Robert Dahlberg on behalf of Synopsys. Unbeknownst to Synopsys, Magma had secretly decided to arrange this meeting as part of an effort by Magma to "set up" Synopsys against future intellectual property claims.

64.    At the February 1998 meeting, Magma did not tell Synopsys anything about the origin of its technology, the misappropriation of Synopsys' information, the theft of the inventions created by van Ginneken at Synopsys, or the concerns raised by Papaefthymiou during the "due diligence" process. Rather, in furtherance of its continued course of conduct, Madhavan falsely represented (consistent with Magma's fraudulent representations in 1997 to Synopsys) that

9958386.1.LIT

1   Magma had come up with a technology that would be able to guarantee timing closure and that

2   this technology was developed by Magma.  As set forth above, this representation was knowingly

3   false, because in fact the fixed timing methodology being used at Magma was conceived at

4   Synopsys, and the inventions underlying the methodology were owned by Synopsys.  These

5   representations were designed to further mislead Synopsys into believing that the inventions

6   utilized by Magma had been independently developed from public domain sources.

7          65.    Magma also set up another sham meeting with Synopsys at Magma's offices in

8   April 30, 1998 in order to defraud Synopsys.  This meeting was attended by at least Madhavan

9   and van Ginneken on behalf of Magma, and at least Rich Goldman and Priti Vijayvargiya on

10  behalf of Synopsys.  At the meeting, the only discussion involved a brief presentation by

11  Synopsys of its In-Sync program, and there was no description at any time by Magma of fixed

12  timing or gain-based synthesis or the manner in which Magma came into possession of the

13  inventions that were utilized in its products.  Indeed, the individuals that attended the meeting on

14  behalf of Synopsys were not technical employees and therefore would not have even been able to

15  participate in a meaningful discussion over fixed timing or gain-based synthesis.

16         66.    After this brief meeting, Madhavan directed the sending of an April 30, 1998 letter

17  to Goldman purporting to "confirm" the subjects discussed during the meeting.  This letter was

18  sent in order to continue the "set up" of Synopsys.  In the letter, Magma falsely stated that there

19  had been discussion at the meeting of Magma's "patent pending approach" for place and route, as

20  well as "Magma's proposed interfaces" and "Magma's product positioning and product plans."

21  This assertion was false.  In fact, there had been no discussion of these subjects at the meeting,

22  but rather only a brief presentation of Synopsys' In-Sync program.  In addition, as Magma

23  already knew, the assertion that the "patent pending" technology was owned by Magma was also

24  false, because the inventions in Magma's tools were truly owned by Synopsys.  Nevertheless, this

25  fraudulent letter was sent in order to create a false record that Magma had "disclosed" the details

26  of its technology, so that if Synopsys ever discovered the truth about Magma's illegal conduct,

27  Magma would be able to use the letter as proof that Synopsys had waived its rights.

28  / / /

67.     At no point in 1998 or thereafter did Magma or van Ginneken ever provide the true facts to Synopsys or anyone else about the misappropriation of Synopsys' documentation or inventions.  Rather, Magma continued to repeat the misrepresentation that its fixed timing methodology had been entirely developed from scratch at Magma using public domain sources.  Magma repeated these misrepresentations even though it knew that the entire foundation for its products was the fixed timing and gain-based synthesis inventions that van Ginneken had developed while he was employed at Synopsys.  These false representations constituted an enormous fraud upon Synopsys and the general public.

68.     For instance, in a November 1999 article appearing in the Electronic Engineering Times, Magma represented that its engineers "developed" the fixed timing methodology by using "back of the envelope" design techniques and techniques that "can be found in popular VLSI design text books."  Magma further described at length how its own engineers had used this information to independently develop its "breakthrough" technology.  These representations were knowingly false.  In fact, van Ginneken had already conceived the fixed timing methodology while he was employed at Synopsys, and Magma's "development" of this invention consisted of misappropriating and copying the information contained in Synopsys' confidential draft patent application.

69.     Similarly, in a 1999 article published in SiliconIndia, Madhavan gave an interview in which he provided numerous false representations about the origin of the technology used by Magma.  Rather than admit that Magma products actually are based on the inventions developed at Synopsys and misappropriated by Magma, Madhavan represented that he came up with the idea for Magma's products by reading a book by a Sun Microsystems researcher while on a flight back to the United States from India.  Madhavan further stated that implementing "his" idea meant "re-doing the entire EDA history from scratch."  This story was another elaborate hoax, which concealed the fact that -- as Madhavan had known for years by this time -- the core inventions for Magma's products had been literally copied from information contained in Synopsys' confidential documents.

///

70.     In an article published on September 1, 2001, Magma employee Karen Vahtra, another former employee of Synopsys, also perpetuated the false representation that Magma had conceived of the inventions for its technology.  This article represented that Magma's gain-based synthesis invention was based on a "patent-pending technique," derived from ideas put forward in a public domain textbook.  Carefully omitted from the article, however, was the fact that van Ginneken had developed these inventions while he was employed at Synopsys, and that Magma had only learned of the inventions by misappropriating information contained in confidential Synopsys documentation.  By representing that Magma had independently derived the ideas from the public domain, Magma continued to perpetuate the same false story that Magma originally presented in its 1997 letter to Synopsys.  Magma's references to public domain materials in its articles gave the impression that any work that Magma had done, or would do in the future, concerning fixed timing would be based only on information in the public domain, and not on any confidential information developed at Synopsys.

71.     Magma's misrepresentations were also repeated in its public filings with the Securities and Exchange Commission.  For instance, in its S-1 Registration Statement filed in conjunction with Magma's initial public offering, Magma represented that it possessed "proprietary" fixed timing methodology that served as the "technical foundation" for its products.  Similarly, in its Annual Reports filed with the SEC, Magma expounded at length on its "patented" fixed timing methodology, and represented that this technology is an "important technical foundation" for its software products.  At no point in any of its SEC filings did Magma ever suggest or acknowledge that its fixed timing methodology had been misappropriated from Synopsys, or that its core patents had been copied from information contained in confidential Synopsys documentation.

72.     Until recently, Magma's campaign of disinformation has been successful.  Based upon the false representations made by Magma concerning the origin of the inventions and technology in its products, Magma was able to mislead Synopsys and others into believing that those inventions and technology had been independently developed by Magma exclusively from

/ / /

1    public domain sources.  As a result, Magma fraudulently induced Synopsys to avoid asserting

2    legal claims against Magma or van Ginneken and to avoid pursuing its legal rights.

3        73.    Magma was also able to successfully use its false representations to mislead its

4    investors and the EDA community in general.  As stated in a November 13, 2000 Electronic

5    News article, "Several industry executives expressed amazement at Rajeev Madhavan, Magma

6    president and chief executive officer, and his continued ability to entrance venture capitalists and

7    drive leading-edge EDA R& D."  In truth, unbeknownst to either Synopsys or Magma investors,

8    Madhavan was "entrancing" them with inventions that his company had misappropriated from

9    Synopsys.

10        **Magma Obtains Patents Based On Synopsys' Misappropriated**
        **Confidential Information**

12        74.    From 1997 to the present, Magma has prosecuted patent applications containing

13    inventions misappropriated from Synopsys and language copied from Synopsys confidential

14    documents.  At no time did Magma ever inform Synopsys that it was prosecuting patent

15    applications before the PTO that contained language copied from confidential documents created

16    for Synopsys.

17        75.    In 2002, the PTO issued the '446 Patent, which was the first issued patent that

18    contained language and inventions plagiarized and misappropriated by Magma from Synopsys'

19    confidential documentation.  In 2004, the '438 Patent was issued, which also contained

20    plagiarized language and misappropriated inventions.  Further, Magma continues to this day to

21    prosecute at least one continuation of these patents in the PTO which also contains plagiarized

22    and misappropriated language and inventions from Synopsys.

23        76.    When these patents began to issue, Magma touted the patents to the public, and

24    emphasized that the inventions in these patents encompassed the core technology in Magma's

25    products.  While discussing these patents, however, Magma continued to avoid providing any

26    facts that would reveal the true origin of the patented inventions.

27    / / /

28    / / /

**Synopsys Discovers the Truth In Response to Magma's Threats**

77.    By the time the '438 Patent issued in 2004, Magma believed that it had been successful in forever hiding the truth concerning the origins of its patents, technology, and products.  Believing that Synopsys would never be able to discover the truth, Magma decided to use the Patents offensively against Synopsys.  In other words, Magma decided to "enforce" patents against Synopsys which claimed the very same inventions Magma had secretly misappropriated from Synopsys.

78.    On July 1, 2004, Magma wrote Synopsys to "express certain concerns" with respect to Synopsys' purported implementation of a gain-based delay model in its Design Compiler product.  Magma's letter attached copies of the '446 and '438 Patents, along with another patent issued to Magma.  The letter requested that Synopsys confirm its position on whether the patents are infringed by Synopsys' delay model.  Magma's letter carefully did not reveal, however, that the '446 and '438 Patents contained plagiarized language and inventions that were misappropriated from Synopsys.  Attached hereto as Exhibit E is a true and correct copy of the July 1, 2004 letter sent by Magma.  This letter was sent in furtherance of the main goal of the conspiracy as described herein.

79.    After Magma's letter was sent, Synopsys discovered that the inventions in these patents had been misappropriated from Synopsys, and that Magma had repeatedly misled Synopsys in order to hide the evidence of its wrongful conduct.  Synopsys was only able to uncover this wrongdoing by Magma because -- unlike the situation that existed beforehand -- it was now able to compare the language of both of the issued Patents to the confidential documentation prepared by van Ginneken at Synopsys.

80.    On September 17, 2004, Synopsys responded to the July 1, 2004 letter by informing Magma that, pursuant to the Agreement signed by van Ginneken, Synopsys is the rightful owner of the inventions in the Patents.  Synopsys asked Magma (and, by copy of the letter, van Ginneken) to take whatever actions were necessary to ensure that the PTO records accurately reflected the true ownership of these patents.  Attached hereto as Exhibit F is a true

/ / /

1   and correct copy of the September 17, 2004 letter sent by Synopsys.  Concurrently, Synopsys

2   filed the instant action for patent infringement.

3              **Magma Continues Making Fraudulent Statements to Synopsys and the Public**

4           81.     When Magma received the September 17, 2004 letter from Synopsys, it learned

5   that its misappropriation of Synopsys confidential information, and its lengthy cover-up, had

6   finally been revealed.  Rather than responding by simply admitting the truth, Magma engaged in

7   yet another public relations campaign designed to continue the misleading of its investors and the

8   public.  Despite the devastating and conclusive evidence of misappropriation, Magma publicly

9   labeled Synopsys' ownership assertions as "insulting," and repeated the misrepresentation that

10  Magma's inventions had been conceived from scratch.

11          82.     In addition, in response to Synopsys' claims, Magma filed an Answer with this

12  Court that contained numerous statements which Magma knew were not true.  Apparently

13  assuming that Synopsys no longer had possession of the documents which conclusively proved

14  Magma's wrongful conduct, Magma continued its course of deceitful conduct by alleging in this

15  action that van Ginneken had never used or taken <u>any</u> proprietary or confidential information of

16  Synopsys in developing the fixed timing inventions.  Magma made this assertion even though it

17  knew that Magma's patents had been copied from information contained in the confidential draft

18  application created at Synopsys.

19          83.     In January of 2005, Synopsys produced its draft patent applications which

20  conclusively revealed that the language of the '446 and '438 Patents was plagiarized.  Synopsys

21  further produced a chart which set out dozens of instances in which Synopsys confidential draft

22  patent applications had been blatantly copied to create the specification for Magma's patents.

23  Yet, even after producing this chart, Magma still continued to make false statements about its

24  inventions, and still refused to acknowledge the obvious truth that the inventions in the Patents

25  had been misappropriated from Synopsys.

26             **Van Ginneken Confesses to His Illegal Activities Under Oath**

27          84.     On March 10, 2005, van Ginneken signed a declaration confessing to Magma's

28  misconduct.  A true and correct copy of this declaration is attached hereto as Exhibit G.  In his

THIRD AMENDED COMPLAINT; CASE NO.: C-04-03923 MMC (JCS)                                    20

9958386.1.LIT

declaration, van Ginneken admits under oath that the inventions in the '446 and '438 Patents were conceived at Synopsys, and admits that he misappropriated those inventions in violation of his obligations to Synopsys.  van Ginneken further admits that the inventions misappropriated by Magma were utilized as a technical foundation for Magma's products.

85.    Soon after van Ginneken signed his declaration, Magma's share price immediately dropped, causing van Ginneken to lose over $250,000 in value of his Magma stock.  Upset over the loss in value of Magma stock caused by public revelation of his illegal conduct, van Ginneken decided to continue his conspiracy with Magma by aiding Magma in attempting to discredit the very declaration that he had signed under oath.  To this end, Magma and van Ginneken secretly met several times in order to coach van Ginneken for his deposition, and Magma carefully scripted misleading questions that van Ginneken could be asked at his deposition.

86.    Despite this careful coaching by Magma, van Ginneken admitted under oath in his deposition that all of the statements contained in his declaration were true.  van Ginneken further testified that Magma's products utilize the inventions misappropriated from Synopsys.  Rather, however, than direct attention to this information, Magma instead made statements to the public which continued to state or imply that van Ginneken's deposition testimony discredited his declaration.  Once again, Synopsys and Magma's innocent shareholders were the victims.

87.    Rather than simply concede the obvious truth that it had misappropriated inventions from Synopsys, Magma continued to engage in a public relations campaign designed to defraud its investors and shareholders.  For instance, Madhavan informed analysts at a Magma conference call that Magma was "not conceding anything," even though Magma had already served discovery responses in the litigation which explicitly conceded that almost all of the inventions in the '446 and '438 Patents were conceived before van Ginneken left Synopsys.  Ultimately, millions of Magma shares traded hands without any public acknowledgement by Magma on the admissions made during this litigation.

88.    Magma further made public efforts to discredit van Ginneken's declaration to its investors and shareholders, leaving the impression that the fundamental truths of what van Ginneken had to say were still in dispute in the case.  To the contrary, however, those truths had

1  already been admitted by Magma itself in the litigation, and the documents produced by Synopsys

2  left Magma no choice but to admit them.  By pretending as if there was any dispute over the

3  veracity of van Ginneken's testimony, Magma continued its effort to perpetrate an enormous

4  fraud on its investors and shareholders.

5       89.     Though Magma refuses to tell the truth to its shareholders or the public, Magma

6  has now recognized in the litigation that it can only avoid a permanent injunction against sale of

7  its product line by attempting to invalidate the very same patents that it had threatened to assert

8  against Synopsys and had vigorously argued were valid before the PTO.  Further, Magma has

9  now resorted to contending that its products do not perform the inventions in the '446 and '438

10  Patents, even though Magma has repeatedly stated in SEC filings over the last several years -- and

11  has represented in dozens of press releases, public statements, and marketing materials -- that the

12  inventions are performed by the Magma products.

13                    **The Continuance of Magma's Conspiracy**

14       90.     The conspiracy as alleged herein has continued unabated all the way up to the

15  present.  Since the filing of this litigation, Magma and van Ginneken have continued to take

16  efforts to further the main goal of the conspiracy as described herein.  Indeed, Magma continues

17  to the present to prosecute patent applications around the world that are based on inventions that

18  were concededly misappropriated from Synopsys, including the pending prosecution of a

19  continuation application in the PTO.  Magma and van Ginneken also continued to conspire

20  together in 2005 pursuant to an agreement through which van Ginneken has assisted Magma in

21  trying to invalidate the '446 and '438 Patents, despite the fact that van Ginneken is obligated by

22  contract to assist Synopsys' efforts to enforce these patents against Magma.

23                    **Magma's Infringement of Synopsys' 114 Patent**

24       91.     On April 23, 2002, United States Patent No. 6,378,114 ("the '114 Patent"), entitled

25  "Method for the Physical Placement of an Integrated Circuit Adaptive to Netlist Changes," was

26  issued to Synopsys.  van Ginneken is a named inventor on the '114 Patent.  At least since the

27  issuance of the '114 Patent, Magma has manufactured, tested, and licensed products that infringe

28  the claims of the '114 Patent.  This infringement occurred despite the fact that van Ginneken, who

1  was ultimately promoted to Chief Scientist at Magma, was one of the named inventors of the '114

2  Patents and therefore knew what the claims of those patents encompassed.

### FIRST CAUSE OF ACTION
### (PATENT INFRINGEMENT)

5  92.   Synopsys incorporates by reference the above paragraphs as though fully set forth

6  herein.

7  93.   Synopsys is the owner of the Patents and '114 Patent because, among other

8  reasons, the inventions disclosed in the patents were previously assigned to Synopsys by van

9  Ginneken pursuant to the terms of the Agreement.

10  94.   While employed by Synopsys, van Ginneken made, conceived and developed

11  inventions pertaining to timing closure methodology, the use of constant delay models in logic

12  synthesis and other aspects of placement and/or synthesis.  These inventions were made,

13  conceived and developed by van Ginneken during his employment for Synopsys for the purpose

14  of developing Synopsys' products, and therefore each of these inventions is encompassed by the

15  terms of the Agreement.  By operation of law, all right, title and interest to these inventions are

16  automatically assigned to Synopsys under the Agreement.

17  95.   Before or after leaving the employment of Synopsys, van Ginneken co-founded

18  Magma.  Thereafter, Magma submitted patent applications to the Patent and Trademark Office

19  that disclosed inventions that van Ginneken had made and conceived while employed at

20  Synopsys, and which are owned by Synopsys.

21  96.   On September 17, 2002, United States Patent No. 6,453,446 ("the '446 Patent"),

22  entitled "Timing Closure Methodology," was issued to Magma.  The '446 Patent discloses

23  inventions which were made, conceived and developed by van Ginneken while employed at

24  Synopsys.  Pursuant to the terms of the Agreement, Synopsys holds legal and equitable title to the

25  inventions in the '446 Patent.  A true and correct copy of the '446 Patent is attached to this

26  complaint as Exhibit H and is incorporated by reference herein.

27  97.    On April 20, 2004, United States Patent No. 6,725,438 ("the '438 Patent"),

28  entitled "Timing Closure Methodology," was issued to Magma.  The '438 Patent contains

inventions which were made, conceived and developed by van Ginneken while employed at Synopsys.  Pursuant to the terms of the Agreement, Synopsys holds legal and equitable title to the inventions in the '438 Patent.  A true and correct copy of the '438 Patent is attached to this complaint as Exhibit I and is incorporated by reference herein.

98.    On April 23, 2002, the '114 Patent was issued to Synopsys.  van Ginneken is a named inventor on the '114 Patent.  A true and correct copy of the '114 Patent is attached to this complaint as Exhibit J and is incorporated by reference herein.

99.    Magma has been, and still is, infringing the Patents in violation of the federal patent laws by making, using, selling, distributing, advertising, marketing and creating source code for products which infringe the Patents and the '114 Patent.  Magma will continue to so infringe unless enjoined by this Court.

100.    Magma has actively induced infringement of, or contributed to the infringement of, the Patents and the '114 Patent under the federal patent laws by, among other things, making infringing products and creating source code for infringing products and then selling, distributing, advertising and marketing those infringing products to others.  Magma will continue to do so unless enjoined by this Court.

101.    Magma's infringement of the Patents and the '114 Patent in violation of the federal patent laws has been willful and deliberate, and has caused injury to Synopsys.

102.    Magma's infringement in violation of the federal patent laws will continue to injure Synopsys unless enjoined by this Court.

## SECOND CAUSE OF ACTION
### (INDUCING BREACH OF CONTRACT/INTERFERENCE WITH CONTRACTUAL RELATIONS)

103.    Synopsys incorporates by reference the above paragraphs as though set forth fully herein.

104.    As a condition of his employment, van Ginneken signed the Agreement with Synopsys.  Synopsys has performed every promise and condition required to be performed by it pursuant to the Agreement, except any which were or would be excused or prevented by the breaches of van Ginneken as set forth herein.

105.    At all times referenced herein, the Agreement was and is a valid contract between Synopsys and van Ginneken.

106.    van Ginneken breached his obligations to Synopsys under the Agreement by, among other things, engaging in the following activities: (a) misappropriating confidential and proprietary information of Synopsys and using this information to develop products for Magma, (b) failing to keep proprietary information of Synopsys in trust and confidence, (c) using and disclosing Synopsys' proprietary information on behalf of Magma without the written consent of Synopsys, (d) failing to return and deliver Synopsys' proprietary information upon termination of employment with Synopsys, (e) failing to inform the PTO and other parties that the specific inventions that were conceived while van Ginneken was employed at Synopsys, and which are the subject of this action, had already been assigned to Synopsys, (f) conspiring with Madhavan and other co-founders of Magma, before the commencement of van Ginneken's employment with Magma, to misappropriate Synopsys' confidential and proprietary information and engage in the other illegal conduct alleged herein, and (g) conspiring with Magma to use the inventions misappropriated from Synopsys in order to file for patents with the United States Patent and Trademark Office, and thereafter to use the patents in order to inflate the value of Magma's business to investors and shareholders and obtain a patent-based monopoly to assert against Magma's competitors.

107.    The activities of van Ginneken as alleged above also constitute violations of the covenant of good faith and fair dealing implied in the Agreement, because those activities injured and frustrated the right of Synopsys to the benefits of the Agreement.

108.    van Ginneken's breach of contract has continued up to the present.  For instance, van Ginneken has breached his contract in 2004 by refusing to assist Synopsys in the enforcement of the Patents, and by refusing to take all steps needed for Synopsys to pursue its legal remedies against Magma.

109.    At the time that Magma and van Ginneken entered into their conspiracy to misappropriate confidential information and inventions owned by Synopsys for the objects

///

THIRD AMENDED COMPLAINT; CASE NO.: C-04-03923 MMC (JCS)

25

9958386.1.LIT

1    alleged herein, Magma had knowledge of the existence of the contract between Synopsys and van

2    Ginneken.

3        110.    van Ginneken was induced to breach his contract with Synopsys.  van Ginneken

4    was induced by Magma to misappropriate confidential information and inventions belonging to

5    Synopsys, in order for Magma to use that confidential information as the technical foundation for

6    its products.

7        111.    The conduct constituting interference and inducing breach of the Agreement, and

8    the acts in furtherance of the conspiracy to interfere with the Agreement and misappropriate

9    confidential information and inventions belonging to Synopsys for the goal described herein, has

10   continued up to the present.  Magma has continued in 2005 to perform overt acts in furtherance of

11   this conspiracy, including but not limited to the continued prosecution of a patent application

12   containing inventions and information misappropriated from Synopsys.  Further, Magma has

13   induced van Ginneken after the filing of this lawsuit in 2004 to refrain from cooperating with

14   Synopsys, and to continue his breach of his contractual obligations to Synopsys.

15       112.    By reason of Magma's inducement, Synopsys has been damaged by the failure of

16   van Ginneken to perform and complete his obligations in accordance with the terms of the

17   Agreement, in a sum of at least $100,000,000.

18       113.    Magma's conduct has been willful, oppressive and malicious and done with intent

19   to injure Synopsys and deprive Synopsys of its property and legal rights.  Synopsys is therefore

20   entitled to exemplary and punitive damages in an amount sufficient to punish Magma and deter

21   future wrongful conduct.

22   **THIRD CAUSE OF ACTION**
**(FRAUD)**

23

24       114.    Synopsys incorporates by reference the above paragraphs as though set forth fully

25   herein.

26       115.    Magma made numerous false representations to Synopsys in its August 18, 1997

27   letter to Synopsys.  These include the false representations that (a) "Dr. van Ginneken intends to

28   honor his obligations under his Proprietary Information Agreement with Synopsys," (b) "Magma

THIRD AMENDED COMPLAINT; CASE NO.: C-04-03923 MMC (JCS)        26

1    is in the practice of taking appropriate steps to protect . . . the trade secrets of its employees'

2    former employers," (c) "Dr. van Ginneken will protect Synopsys' proprietary information during

3    his employment at Magma," (d) "Dr. van Ginneken has and will continue to abide by the terms of

4    the Magma Agreement in the performance of his duties for Magma," and (e) "Magma will

5    reiterate to Dr. van Ginneken his duty to abide by his Synopsys Agreement."  Further, Magma's

6    representation that the "constant delay ideas" that had been taken by van Ginneken were in the

7    "public domain" was false, and this false representation was bolstered by Magma's purposeful

8    decision to omit from the letter the exhibits to van Ginneken's agreement with Magma.

9        116.    These representations to Synopsys were false.  In truth, van Ginneken did not

10   intend to "honor his obligations" under his Agreement, as he had already worked with Magma to

11   misappropriate Synopsys' confidential information and inventions and was using them to create

12   Magma's products and obtain patent protection for Magma.  As it related to van Ginneken

13   Magma was not in the practice of taking "appropriate steps" to protect trade secrets of its

14   employee's former employers, but to the contrary had founded its business on confidential and

15   proprietary information owned by Synopsys. van Ginneken had not intended, and did not intend,

16   to protect Synopsys' proprietary information during his employment at Magma, and instead had

17   already conspired with Magma to misappropriate Synopsys' confidential information and

18   inventions for Magma's benefit.  van Ginneken had not abided by the terms of the Magma

19   Agreement as it related to honoring the intellectual property rights of others, and had no intention

20   of abiding by those terms. Magma did not honestly reiterate, and did not intend to so reiterate, to

21   van Ginneken that he needed to comply with his legal obligations.  Further, it was not true that

22   the constant delay ideas that Magma and van Ginneken were pursuing were in the public domain;

23   to the contrary, according to van Ginneken's own representations to Synopsys, the inventions had

24   been developed at Synopsys and had been contained solely in confidential Synopsys documents.

25       117.    Magma's representations concerning the origin of Magma's fixed timing

26   methodology were also false.  In truth, Magma never had any ownership interest in the inventions

27   disclosed in the Patents, as those inventions were misappropriated from information contained in

28   confidential Synopsys documentation.

118.    Magma knew of the falsity of these representations when they were made.  Since at least the spring of 1997, Magma has known that it misappropriated Synopsys' confidential information and inventions, and was planning to create products and apply for patents that contained this misappropriated information.  Accordingly, Magma's factual representations to Synopsys were knowingly false, and were made only in order to dissuade Synopsys from pursuing its legal rights.

119.    Magma's representations constitute fraud and deceit because they assert facts which Magma knew were not true, or did not have any reasonable ground for believing them to be true.  Magma's representations also constitute fraud and deceit because, by suppressing the true facts concerning the ownership and misappropriation of Synopsys' inventions and confidential documentation, the information that was provided to Synopsys about Magma's products and technology were misleading.  In addition, the promises in the 1997 letter to Synopsys relating to honoring Synopsys' intellectual property were made without any intention by Magma to perform such promises, and therefore those false promises were fraudulent.

120.    These false statements were made by Magma with an intent to deceive Synopsys. Knowing that Synopsys' discovery of the true facts would lead to the assertion of legal claims which would put an end to its business, Magma made these false representations in order to deceive Synopsys into believing that any inventions or technology that Magma was utilizing were independently developed from public domain sources.  In making these misrepresentations, Magma intended to deceive Synopsys so that it would be dissuaded from asserting legal claims or investigating the matter.

121.    Synopsys reasonably and justifiably relied upon Magma's fraudulent representations.  Magma explicitly provided Synopsys a series of assurances about the safeguards that would be taken to ensure that Synopsys information would not be utilized by Magma.  In reliance upon these representations, and without the knowledge of their falsity, Synopsys did not pursue legal claims against Magma, and did not take steps to assert legal rights because Magma had carefully hid the evidence that its technology was based upon misappropriated information and inventions.

122.    Magma's misrepresentations have caused tremendous damage to Synopsys. Rather than fairly and ethically compete in the marketplace, Magma has spent the last several years competing against Synopsys with technology and inventions that are actually owned by Synopsys. Magma's use of Synopsys' own confidential inventions and information has caused Synopsys hundreds of millions of dollars in lost sales and licensing revenues.

123.    Further, as a result of the issuance of the Patents beginning in 2002, the secrecy of Synopsys' confidential inventions has been forever lost. As a result, Synopsys has lost the value in maintaining the secrecy of the fixed timing and gain-based synthesis inventions contained in the Patents.

124.    The conspiracy to defraud Synopsys, and to misappropriate confidential information and inventions belonging to Synopsys, has continued up to the present, and Magma has continued in 2005 to perform overt acts in furtherance of this conspiracy, including but not limited to the continued prosecution of a patent application containing inventions and information misappropriated from Synopsys.

125.    By reason of the foregoing, Synopsys has been damaged by Magma's fraud in a sum of at least $100,000,000.

126.    Magma's conduct has been willful, oppressive and malicious and done with intent to injure Synopsys and deprive Synopsys of its property and legal rights. Synopsys is therefore entitled to exemplary and punitive damages in an amount sufficient to punish Magma and deter future wrongful conduct.

## FOURTH CAUSE OF ACTION
### (CONVERSION)

127.    Synopsys incorporates by reference the above paragraphs as though set forth fully herein.

128.    Synopsys is the owner of the confidential information misappropriated by Magma and van Ginneken, including the information contained in the confidential patent applications and white papers drafted by van Ginneken while employed at Synopsys. Under the Agreement and van Ginneken's legal obligations to Synopsys, this information is exclusively owned by

1    Synopsys.  Synopsys is the owner of this information and has the exclusive right to possession of
2    it.

3         129.    Further, under the Agreement and van Ginneken's legal obligations to Synopsys,
4    the inventions and concepts described in this documentation are also owned by Synopsys.
5    Synopsys is the owner of these inventions and concepts and has the exclusive right to possession
6    of them.

7         130.    Magma converted this property of Synopsys by a series of wrongful acts.  In
8    particular, this property was converted by (a) misappropriating the confidential information
9    containing Synopsys' inventions, (b) taking the confidential information and the inventions
10   contained therein to Magma, and (c) utilizing the confidential information and the inventions
11   contained therein to prosecute patent applications for Magma and to develop technology based on
12   the information and inventions.

13        131.    By converting the confidential information and inventions that are exclusively
14   owned by Synopsys, Magma has caused great damage to Synopsys.  Magma has spent the last
15   several years competing against Synopsys with technology and inventions that Synopsys itself
16   owns.  Magma's use of Synopsys' own confidential inventions and information has caused
17   Synopsys hundreds of millions of dollars in lost sales and licensing revenues.

18        132.    The conspiracy to convert confidential information and inventions belonging to
19   Synopsys has continued up to the present, and Magma has continued in 2005 to perform overt
20   acts in furtherance of this conspiracy, including but not limited to the continued prosecution of a
21   patent application containing inventions and information misappropriated from Synopsys.
22   Further, Magma has continued to convert Synopsys' property in 2004 and 2005 by developing
23   additional products which also incorporate inventions misappropriated from Synopsys.

24        133.    By reason of the foregoing, Synopsys has been damaged by Magma's conversion
25   in a sum of at least $100,000,000.

26        134.    Magma's conduct has been willful, oppressive and malicious and done with intent
27   to injure Synopsys and deprive Synopsys of its property and legal rights.  Synopsys is therefore
28   ///

1  entitled to exemplary and punitive damages in an amount sufficient to punish Magma and deter

2  future wrongful conduct.

3                            **FIFTH CAUSE OF ACTION**
   **(UNJUST ENRICHMENT/CONSTRUCTIVE TRUST/QUASI-CONTRACT)**

4

5          135.    Synopsys incorporates by reference the above paragraphs as though set forth fully

6  herein.

7          136.    Magma received a benefit from Synopsys through its acquisition and retention of

8  the information contained in Synopsys' confidential patent application, the white paper drafted by

9  van Ginneken at Synopsys, and other Synopsys confidential materials.  Magma further received a

10  benefit from Synopsys through its receipt of the inventions that van Ginneken had conceived

11  while employed at Synopsys.  The receipt of these benefits was enormously valuable to Magma.

12  As a result of the creation and development of products based on Synopsys' inventions, Magma

13  was able to obtain millions of dollars in funding and investment and to generate profits as a

14  business and van Ginneken was able to profit from the ownership of Magma stock.

15          137.    Magma's retention of these benefits is manifestly unjust, and is at the expense of

16  Synopsys.  All of these benefits, including the inventions conceived by van Ginneken while

17  employed at Synopsys, are owned by Synopsys pursuant to the Agreement with van Ginneken.

18  Since these inventions and other confidential information were exclusively assigned to Synopsys

19  under the Agreement, any retention of these inventions would be unjust.

20          138.    By virtue of the illegal activities by Magma and van Ginneken as alleged herein,

21  and pursuant to the legal and equitable principles of unjust enrichment, constructive trust, and

22  quasi-contract, Magma holds certain property as a constructive trustee for Synopsys' benefit,

23  including but not limited to the following:

24                  a.      The inventions claimed and/or disclosed in the Patents;

25                  b.      All profits, royalties, and other benefits resulting from the exploitation of

26  the inventions claimed and/or disclosed in the Patents, including all profits and royalties resulting

27  from the manufacture, sale, distribution, and marketing of each version of Magma's products;

28  / / /

1          c.      All software or other products that incorporate the inventions conceived by

2  van Ginneken while employed at Synopsys, and any products derived from Magma's illegal

3  activities;

4          d.      Any United States or foreign patents or patent applications that claim

5  priority to the Patents and/or that are supported by the disclosures in the Patents; and

6          e.      The confidential and/or proprietary information that was misappropriated

7  from Synopsys by Magma and van Ginneken.

8
9

### SIXTH CAUSE OF ACTION
### (UNFAIR COMPETITION)

10      139.    Synopsys incorporates by reference the above paragraphs as though set forth fully

11  herein.

12      140.    In the course of the wrongful conduct alleged herein, Magma engaged in unfair

13  and unlawful business practices in violation of the common law and Sections 17200 and 17203 of

14  the California Business and Professions Code including, but not limited to, the misappropriation

15  of confidential and proprietary information of Synopsys.

16      141.    The continuing activities of Magma in developing and exploiting the confidential

17  information stolen from Synopsys constitute an on-going pattern and practice of unfair

18  competition.  By continuing to develop this stolen information for years after the initial

19  misappropriation occurred, and by continuing to vigorously develop and sell products even after

20  the instant lawsuit was filed, Magma continues to engage in wrongful conduct prohibited under

21  California law.  Indeed, Magma is now competing in the marketplace with product, technology,

22  and inventions that are truthfully owned by Synopsys, and it has obtained millions of dollars from

23  public and private investors to fund the development and sale of products based upon and/or

24  containing stolen inventions.

25      142.    The conspiracy to commit unfair competition, and to misappropriate confidential

26  information and inventions belonging to Synopsys, has continued up to the present, and Magma

27  has continued in 2005 to perform overt acts in furtherance of this conspiracy.  Magma's unfair

28  competition in 2005 includes but is not limited to (a) its use of Synopsys' inventions to create

1  additional products, and (b) its prosecution of a continuation application containing inventions
2  and information misappropriated from Synopsys.

3      143.    By reason of this activity, Synopsys has been harmed in an amount to be proven at
4  trial, and the public misled about the true nature of Magma's business.  Injunctive relief is
5  necessary to prevent further irreparable injury to Synopsys, and to put an immediate halt to
6  Magma's on-going practice and pattern of wrongful conduct.  Magma has obtained benefits from
7  its unlawful activity in a sum of at least $100,000,000, for which Magma is required to disgorge
8  or to make restitution.

9      WHEREFORE, Synopsys prays for judgment against Magma, and requests that this Court
10  impose the following remedies under the federal patent laws and state law:

11      A.    Preliminarily and permanently enjoin Magma from continued infringement of the
12  Patents, pursuant to 35 U.S.C. § 283;

13      B.    Preliminarily and permanently enjoin Magma from:

14          (1)    disclosing, obtaining or using, or attempting to disclose, obtain or use any
15  of Synopsys' confidential or proprietary information misappropriated from Synopsys,

16          (2)    disseminating or destroying any documents, material or things now in their
17  possession that originated at Synopsys, that belong to Synopsys, or that embody or are derived
18  from Synopsys' confidential or proprietary information, or that are otherwise relevant to the
19  subject matter of this lawsuit,

20          (3)    manufacturing, selling, offering to sell, licensing, creating source code for,
21  marketing, or advertising, any product that incorporates or performs any of the inventions
22  misappropriated from Synopsys, or that is derived from any inventions or confidential or
23  proprietary information misappropriated by Magma.

24      C.    A declaration that Synopsys was assigned all rights to the inventions conceived by
25  van Ginneken while employed at Synopsys under the terms of the Agreement, and therefore that
26  these inventions are exclusively owned by Synopsys;

27      D.    An order directing Magma to correct the records of the PTO to reflect that all
28  intellectual property rights to the inventions conceived by van Ginneken are owned by Synopsys,

including but not limited to all rights to all patent applications or patents arising from Synopsys' confidential or proprietary information.

E.      An order directing the Defendants to account to Synopsys for damages sustained by Synopsys as a result of Magma's infringement of the Patents, with interest, pursuant to 35 U.S.C. § 284;

F.      An order directing Magma to pay Synopsys a reasonable royalty to compensate for Magma's infringement, pursuant to 35 U.S.C. § 284;

G.      An award of treble damages resulting from Magma's willful and deliberate infringement, pursuant to 35 U.S.C. § 284;

H.      An award to Synopsys of its costs, expenses and reasonable attorneys' fees incurred in bringing and prosecuting this action, pursuant to 35 U.S.C. § 285;

I.      An order directing specific performance of the Agreement, including the provisions of the Agreement requiring van Ginneken to honor Synopsys' intellectual property and cooperate with Synopsys in enforcing its rights;

J.      An order directing Magma to pay at least $100,000,000 in damages suffered by Synopsys as a result of the illegal activities alleged herein;

K.      An award to Synopsys of punitive damages in a sum according to proof; and

L.      An order imposing a constructive trust for the benefit of Synopsys over:

(1)      the inventions claimed and/or disclosed in the Patents, and all Magma products based on and/or incorporating those inventions;

(2)      all profits, royalties, and other benefits resulting from the exploitation of the inventions claimed and/or disclosed in the Patents, including all profits and royalties resulting from the manufacture, sale, distribution, and marketing of each version of Magma's products,

(3)      all software or other products that incorporate the inventions conceived by van Ginneken while employed at Synopsys, and any products derived from Magma's illegal activities;

(4)      any United States or foreign patents or patent applications that claim priority to the Patents and/or that are supported by the disclosures in the Patents,

1           (5)     the confidential and/or proprietary information that was misappropriated

2  from Synopsys by Magma and van Ginneken,

3           (6)     any profits, revenues, or other benefits obtained by Magma as a result of

4  their infringement of the Patents; and

5      M.     Award Synopsys such further relief that the Court may deem just and proper

6  arising from Magma's infringement of the Patents under the federal patent laws, or arising from

7  Magma's other wrongful conduct as alleged herein.

8  Dated: August 3, 2005          DECHERT LLP

9

10                    By:/s/ Chris Scott Graham

11                       Chris Scott Graham
                          Michael N. Edelman

12                       Attorneys for Plaintiff SYNOPSYS, INC.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## DEMAND FOR JURY TRIAL

2

Synopsys hereby demands trial by jury of all issues triable by jury.

3

4

Dated: August 3, 2005                    DECHERT LLP

5

6                                        By:/s/ Chris Scott Graham
                                            Chris Scott Graham
7                                           Michael N. Edelman
                                            Attorneys for Plaintiff SYNOPSYS, INC.
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

THIRD AMENDED COMPLAINT; CASE NO.: C-04-03923 MMC (JCS)                    36
                                                                          9958386.1.LIT

1

## CERTIFICATION OF INTERESTED ENTITIES OR PERSONS

2        Pursuant to Civil L.R. 3-16, the undersigned certifies that as of this date, other than the

3    named parties, there is no such interest to report.

4

5    Dated: August 3, 2005              DECHERT LLP

6

7                                     By:/s/ Chris Scott Graham
                                        Chris Scott Graham
8                                       Michael N. Edelman
                                        Attorneys for Plaintiff SYNOPSYS, INC.
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28