# EXHIBIT A

GEORGE A. RILEY (S.B. #118304) – griley@omm.com
MARK E. MILLER (S.B. #130200) – markmiller@omm.com
PETER OBSTLER (S.B. #171623) – pobstler@omm.com
CHRISTOPHER D. CATALANO (S.B. #208606) – ccatalano@omm.com
LUANN L. SIMMONS (S.B. #203526) – lsimmons@omm.com
NORA M. PUCKETT (admitted *pro hac vice*) – npuckett@omm.com
O'MELVENY & MYERS LLP
Embarcadero Center West
275 Battery Street
San Francisco, California  94111-3305
Telephone: (415) 984-8700
Facsimile: (415) 984-8701

Attorneys for Defendant and Counterclaimant
MAGMA DESIGN AUTOMATION, INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| SYNOPSYS, INC., a Delaware Corporation,<br><br>            Plaintiff,<br><br>    v.<br><br>MAGMA DESIGN AUTOMATION, INC., a Delaware Corporation,<br><br>            Defendant and<br>            Counterclaimant. | Case No.  C04-03923 MMC<br><br>**MAGMA DESIGN AUTOMATION, INC.'S POST-TRIAL REPLY BRIEF** |

AND RELATED COUNTERCLAIMS.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................ 1

ARGUMENT ............................................................................................................... 3

I.   THE JDA'S JOINT OWNERSHIP PROVISIONS APPLY TO THE
     INVENTIONS CLAIMED IN THE PATENTS ...................................................... 3

   A.   Under Section 4.1.2.1, Joint Inventions Are Jointly Owned
     Regardless Of Whether They Are Incorporated Into NGSS ...................... 3

   B.   Even Under Synopsys's Construction, Joint Inventions
     Incorporated Into Synzilla Are Jointly Owned Because Synzilla
     Was NGSS ...................................................................................................... 3

   C.   The Dissolution Agreement Did Not Terminate IBM's Ownership
     Of Joint Inventions ...................................................................................... 5

II.  KUDVA JOINTLY CONCEIVED OF THE INVENTIONS CLAIMED IN
     THE '446 AND '438 PATENTS ......................................................................... 6

   A.   Contract, Not Federal Patent Law, Governs The Burden Of Proof
     And Definition Of Conception Of An Invention Under The JDA ............. 6

   B.   Kudva's Contributions Are Sufficient To Make IBM A Co-Owner
     Of The '446 And '438 Patents ...................................................................... 9

     1.   Synopsys's Conception Arguments Violate The Court's
       Claim Construction ............................................................................ 9

     2.   The Evidence of Kudva's Contributions To Conception Is
       Clear and Convincing ...................................................................... 12

III. THE INVENTIONS WERE JOINTLY REDUCED TO PRACTICE ................. 14

   A.   Synopsys Proposes An Incorrect And Overly Burdensome Standard
     For Reduction To Practice ........................................................................ 14

   B.   The Inventions Were Jointly Reduced To Practice ................................... 15

     1.   Synzilla Practiced The Claims Of The Patents ............................. 15

     2.   The Inventions Worked For Their Intended Purposes .................. 17

   C.   The Inventions Were Jointly Reduced To Practice After Van
     Ginneken Left Synopsys ............................................................................ 18

   D.   The Inventions Claimed In The '114 Patent Were Jointly Reduced
     To Practice ................................................................................................. 18

IV.  MAGMA SHOULD NOT BE ESTOPPED FROM RAISING IBM'S
     OWNERSHIP OF THE PATENTS ................................................................... 19

   A.   Richardson Is Inapplicable ...................................................................... 19

   B.   Equity Also Precludes Synopsys From Invoking Judicial Estoppel ........ 22

     1.   The Application Of Judicial Estoppel Is Neither Necessary
       Nor Equitable .................................................................................. 22

     2.   Synopsys Cannot Show That It Has Suffered Any Harm
       Sufficient To Warrant The Application of Judicial Estoppel ........ 23

MAGMA'S POST-TRIAL REPLY BRIEF
C-04-03923 MMC

1

**TABLE OF CONTENTS**
**(continued)**

2

Page

3      3.    Neither Magma Nor van Ginneken Made Knowing
             Misrepresentations To The PTO. .................................................... 24

4   CONCLUSION ....................................................................................................... 25

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page**

## <u>CASES</u>

*Adler v. Fed. Republic of Nig.,*
219 F.3d 869 (9th Cir. 2000).................................................................................. 23

*Am. Tel. & Tel. Co. v. Integrated Network Corp.,*
972 F.2d 1321 (Fed. Cir. 1992)................................................................................ 8

*Angelo, Gordon & Co., L.P. v. Dycom Indus.,*
04 Civ. 1570 (RMB), 2006 U.S. Dist. LEXIS 15784 (S.D.N.Y. Mar. 31, 2006) .................... 7

*Becher v. Contoure Labs., Inc.,*
279 U.S. 388 (1929).............................................................................................. 21

*Beech Aircraft Corp. v. EDO Corp.,*
990 F.2d 1237 (Fed. Cir. 1993).............................................................................. 9

*Browning-Ferris Indus. of New York, Inc. v. County of Monroe,*
103 A.D.2d 1040 (N.Y. App. Div. 1984), *aff'd,* 64 N.Y.2d 1046 (N.Y. 1985) ....................... 5

*Cargill, Inc. v. Sears Petroleum & Transp. Corp.,*
2004 WL 3507329 (N.D.N.Y. Aug. 27, 2004)......................................................... 21

*Centricut, LLC v. Esab Group, Inc.,*
390 F.3d 1361 (Fed. Cir. 2004).............................................................................. 16

*Cooper v. Goldfarb,*
154 F.3d 1321 (Fed. Cir. 1998).............................................................................. 15

*Crossland Sav. FSB v. Rockwood Ins. Co.,*
700 F. Supp. 1274 (S.D.N.Y. 1988) ........................................................................ 6

*DeLong Corp. v. Lucas,*
176 F. Supp. 104 (S.D.N.Y. 1959) ......................................................................... 21

*E.G.L. Gem Lab Ltd. v. Gem Quality Inst., Inc.,*
No. 97 Civ. 7102 (LAK), 1998 WL 314767 (S.D.N.Y. June 15, 1998) ................................ 6

*Estee Lauder Inc. v. L'Oreal, S.A.,*
129 F.3d 588 (Fed. Cir. 1997)........................................................................... 14, 15

*Ethicon, Inc. v. U.S. Surgical Corp.,*
135 F.3d 1456 (Fed. Cir. 1998)........................................................................ 10, 21

*Griffin v. Bertina,*
285 F.3d 1029 (Fed. Cir. 2002).............................................................................. 17

*Hamilton v. State Farm Fire & Cas. Co.,*
270 F.3d 778 (9th Cir. 2001).................................................................................. 23

MAGMA'S POST-TRIAL REPLY BRIEF
C-04-03923 MMC

**TABLE OF AUTHORITIES**
(continued)

Page

*Hayhurst v. Rosen*,
   1992 WL 123178 (E.D.N.Y. May 18, 1992)...................................................... 21

*Hess v. Advanced Cardiovascular Sys., Inc.*,
   106 F.3d 976 (Fed. Cir. 1997)....................................................................... 6

*In re An-Tze Cheng*,
   308 B.R. 448 (B.A.P. 9th Cir. 2004.) ................................................ 2, 22, 23

*In re Corey*,
   892 F.2d 829 (9th Cir. 1989)......................................................................... 24

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*,
   381 F.3d 1111 (Fed. Cir. 2004)..................................................................... 17

*Int'l Nutrition Co. v. Horphag Research Ltd.*,
   No. 3:96CV386 (DJS), 2000 WL 1863560 (D. Conn. Apr. 14, 2000), *aff'd*, 257
   F.3d 1324 (Fed. Cir. 2001).............................................................................. 7

*Jim Arnold Corp. v. Hydrotech Sys., Inc.*,
   109 F.3d 1567 (Fed. Cir. 1997)....................................................................... 7

*Johnson v. Oregon*,
   141 F.3d 1361 (9th Cir. 1998)....................................................................... 24

*Klein v. Stahl GMBH & Co. Maschinefabrik*,
   185 F.3d 98 (3d Cir. 1999)........................................................................... 22

*Manning v. Paradis*,
   296 F.3d 1098 (Fed. Cir. 2002)..................................................................... 17

*Mattor v. Coolegem*,
   530 F.2d 1391 (C.C.P.A. 1976)................................................................ 15, 17

*McCoy v. Mitsuboshi Cutlery, Inc.*,
   67 F.3d 917 (Fed. Cir. 1995)......................................................................... 24

*McGinley v. Franklin Sports, Inc.*,
   262 F.3d 1339 (Fed. Cir. 2001)..................................................................... 13

*Nau v. Vulcan Rail & Construction Co.*,
   36 N.E.2d 106 (N.Y. 1941) ............................................................................. 8

*Newkirk v. Lulejian*,
   825 F.2d 1581 (Fed. Cir. 1987)..................................................................... 14

*Rodgard Corp. v. Miner Enterprises, Inc.*,
   No. 84-CV-397E, 1992 WL 119129 (W.D.N.Y. May 22, 1992)............................ 21

*Russell v. Rolfs*,
   893 F.2d 1033 (9th Cir. 1990)....................................................................... 22

-iv-

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3    *Saco-Lowell Shops v. Reynolds*,
     141 F.2d 587 (4th Cir. 1944)................................................................................................ 21
4

     *Scott v. Finney*,
5      34 F.3d 1058 (Fed. Cir. 1994) ...................................................................................... 14, 15

6    *Slip Track Sys., Inc. v. Metal-Lite, Inc.*,
     304 F.3d 1256 (Fed. Cir. 2002)............................................................................... 2, 14, 16
7

     *Sunbeam Prods., Inc. v. Wing Shing Prods. (BVI) Ltd.*,
8      311 B.R. 378 (S.D.N.Y. 2004) ......................................................................................... 8

9    *Synopsys, Inc. v. Magma Design Automation, Inc.*,
     No. C-04-3923 MMC, 2006 WL 825277 (N.D. Cal. Mar. 30, 2006) .................................... 19
10

     *Taylor v. Swingle*,
11     136 F.2d 914 (C.C.P.A. 1943) ........................................................................................ 15

12   *Union Carbide Chems. & Plastics Tech. Corp. v. Shell Oil Co.*,
     308 F.3d 1167 (Fed. Cir. 2002)........................................................................................ 15
13

     *Univ. of Colorado Found., Inc. v. American Cyanamid Co.*,
14     196 F.3d 1366 (Fed. Cir. 1999)......................................................................................... 7

15   *Uribe v. Merchants Bank of New York*,
     693 N.E.2d 740 (N.Y. 1998) ............................................................................................ 8
16

**STATUTES**

17

35 U.S.C. § 102(b)................................................................................................................ 23
18

35 U.S.C. § 282 ................................................................................................................... 9
19

**RULES**

20

Fed. R. Civ. P. 8(e)(2)......................................................................................................... 9
21

22

23

24

25

26

27

28

MAGMA'S POST-TRIAL REPLY BRIEF
C-04-03923 MMC

**INTRODUCTION**

At the outset of trial, the Court posed three questions: (1) what are the claimed inventions; (2) who contributed what to the inventions; and (3) what was the significance of the contributions. To answer those questions, Magma presented compelling evidence that:

(1) The inventions claimed by the '446 and '438 Patents require operative methods for automatically setting and measuring target delays for arbitrary cells in integrated circuits;

(2) Kudva discovered that the theory of logical effort provided operative methods based on the concept of gain for measuring and setting target delays for arbitrary cells in integrated circuits; and

(3) Kudva's discovery resulted in the conception of the methods claimed in the '446 and '438 Patents.

Magma also demonstrated that a joint team of IBM and Synopsys engineers reduced to practice the inventions claimed in the '446, '438, and '114 Patents (the "Patents") by implementing and testing those inventions in Synzilla.

The evidence of IBM's contributions provides a complete, consistent, and convincing record of joint conception and reduction to practice. This evidence includes documents and testimony from van Ginneken, Kudva, and other engineers and executives who worked on the joint project, as well as testimony from both Synopsys's and Magma's EDA experts. (*See generally* Magma's Post-Trial Brief (Docket No. 1133) ("Magma Br.") 12:22-20:17, 26:3-22, 28:5-34:8.)

Since the inception of this litigation, however, Synopsys has sought to avoid an adjudication on the merits of the ownership of the inventions claimed in the Patents. Synopsys's Post-Trial Brief does not depart from this pattern. Each of Synopsys's arguments is without merit.

*First*, Synopsys argues that the JDA's joint ownership provisions are "wholly inapplicable." (Synopsys's Post-Trial Brief (Docket No. 1131) ("Synopsys Br.") 12:6-8.) But the plain language of the JDA and the Dissolution Agreement as well as the parties' conduct during the relevant time period demonstrate that Joint Inventions are jointly owned under the JDA regardless of whether they were reduced to practice by incorporation into NGSS or Joint

MAGMA'S POST-TRIAL REPLY BRIEF
C-04-03923 MMC

Products. The Dissolution Agreement did not terminate IBM's ownership rights to Joint Inventions because it expressly incorporated the JDA's joint ownership provision.

*Second*, Synopsys's contention that Kudva contributed merely an embodiment of a preexisting invention is contrary to the evidence produced at trial. Before the collaboration with Kudva, van Ginneken had nothing more than the "philosophy" of Grodstein. Kudva contributed the operative methods for setting and measuring the target delays for arbitrary cells in an integrated circuit as claimed by the Patents.

*Third*, Synopsys's argument that the inventions were not reduced to practice in Synzilla applies an incorrect test for reduction to practice. The evidence proves that Synzilla practiced the claims of the Patents and that the inventions worked for their intended purposes. Nothing else is required to demonstrate reduction to practice. *Slip Track Sys., Inc. v. Metal-Lite, Inc.*, 304 F.3d 1256, 1265 (Fed. Cir. 2002).

*Fourth*, Synopsys may not rely on equitable principles to preclude Magma from asserting IBM's ownership interest and Magma's license with IBM as a defense to infringement. Equity must "avoid doing inequity." *In re An-Tze Cheng*, 308 B.R. 448, 460 (B.A.P. 9th Cir. 2004). Estopping Magma from raising IBM's ownership would create severe inequity because it would grant Synopsys dominion over patents that it knows that IBM co-owns. Not only would IBM and Magma lose their respective rights as a co-owner and licensee, Synopsys would realize an extraordinary windfall. Under Synopsys's constructions, the Patents grant it exclusive ownership over the idea of setting a target delay for a cell, regardless of the method used to set the delay and regardless of whether the target delay is later revised and reset. (Tr. 89:10-90:2.) Synopsys knows that such an elementary idea could never be patentable because it is nothing more than the premise of the constant delay philosophy described by Grodstein. Yet if Magma is estopped from asserting IBM's ownership, Synopsys will further insist that the doctrine of assignor estoppel precludes Magma from attacking the validity of the Patents. The result: Synopsys will argue that its chief competitor cannot perform a basic technique of logic synthesis and thus cannot develop and market synthesis software. Thus, equity demands a full and fair consideration of the issues on their merits.

MAGMA'S POST-TRIAL REPLY BRIEF
C-04-03923 MMC

**ARGUMENT**

**I.    THE JDA'S JOINT OWNERSHIP PROVISIONS APPLY TO THE INVENTIONS CLAIMED IN THE PATENTS.**

Synopsys offers an argument calculated to render the joint ownership provisions of the JDA "wholly inapplicable" to IBM's work on Synzilla.  In order to prevail, Synopsys must show that:  (1) under the JDA, Joint Inventions must be incorporated into NGSS to be jointly owned; (2) the Inventions developed for Synzilla were not jointly owned because Synzilla was not NGSS; *and* (3) the Dissolution Agreement "entirely terminated" IBM's patent rights arising under the JDA.  (Synopsys's Br. 11:1-14:20; 33:2-35:7.)  The plain language of the agreements and the parties' conduct refute each of these propositions.

**A.    Under Section 4.1.2.1, Joint Inventions Are Jointly Owned Regardless Of Whether They Are Incorporated Into NGSS.**

Synopsys's assertion that a Joint Invention requires that the Invention be reduced to practice through incorporation into an actual product contradicts the JDA's disjunctive definition of a "Joint Invention" as arising from a joint conception or joint reduction to practice.  (Synopsys Br. 11:4-21.)  The JDA provides that a "Joint Invention" can arise in one of two ways:  joint conception *or* joint first reduction to practice.  (Ex. 1120 §§ 1.24, 1.25, 4.1.2.1.)  *Any* "Invention" that the parties jointly conceived in furtherance of the JDA constitutes a "Joint Invention," regardless of whether that invention was ever reduced to practice through its incorporation into NGSS.  (Ex. 1120 § 1.25; *see also* Magma Br. at Section I.A.)  As long as the Invention is jointly conceived *or* jointly reduced to practice in furtherance of the JDA's product development activities, it is jointly owned even if it is never incorporated into a product meeting the definitions of NGSS or Joint Product.  (Magma Br. at Section I.A.)

**B.    Even Under Synopsys's Construction, Joint Inventions Incorporated Into Synzilla Are Jointly Owned Because Synzilla Was NGSS.**

Even if Synopsys were correct – and it is not – that a Joint Invention must be incorporated into NGSS or a Joint Product to be jointly owned, Synopsys also must show that Synzilla was not NGSS.  (Synopsys Br. 13:24-14:20.)  Synopsys cannot make this showing.  Synzilla satisfied the

MAGMA'S POST-TRIAL REPLY BRIEF
C-04-03923 MMC

JDA's definition of NGSS because Synzilla (1) "performed logic synthesis" and (2) was based on

BooleDozer and Design Compiler. (Ex. 1120 § 1.31; FF ¶¶ 176, 177, 179; Ex. 1659-1.) Thus,

even under Synopsys's construction of the JDA, Joint Inventions incorporated into Synzilla are

jointly owned because Synzilla constituted NGSS.

Synopsys's claim that NGSS is limited to a "pure synthesis" tool that could ***not*** perform

placement and routing is inconsistent with the JDA and the parties' conduct. (Synopsys Br. 13:2-

7.) The JDA defines NGSS as "an EDA synthesis software product . . . that is based on Design

Compiler or Enhanced Design Compiler . . . ." (Ex. 1120 § 1.31.) This definition does not state

or imply that NGSS must perform ***only*** synthesis. (*Id.*) Such a limitation would be improper

because it would contradict the requirement that NGSS be "based on Design Compiler," as

Synzilla was. (*Id.*; *see* FF ¶¶ 176, 177, 179; Ex. 1659-1.) Design Compiler was not a pure

synthesis tool because it took information from placement which it used when performing logic

synthesis, just as Synzilla did. (Tr. 1035:18-1036:11 (Camposano).) Moreover, the objectives set

forth in the JDA – to create tools capable of designing complex integrated circuits – show that the

parties sought to develop a product that would perform logic synthesis ***and*** physical design. (Ex.

1120 § 2.2; *see also id.* at Exhibit A-4.)

Consistent with the JDA's objectives, the parties always treated Synzilla as NGSS.

Synopsys admits that Synzilla was "the logic and physical synthesis Next Generation system

developed as part of the Joint Development Agreement between IBM and Synopsys." (Tr. 823:2-

14 (Damiano).) A July 1997 presentation regarding the joint alliance states, "NGSS/Synzilla

development well on track." (Ex. 1428 at IBM002081.) Synopsys expressly acknowledged that

Joint Inventions arising out of the parties' development of Synzilla would be jointly owned by

IBM: "[t]he problem with filing a patent with Synzilla is that IBM gets equal access rights to it

and they could potentially sell it off to anyone." (Ex. 1262; *see also* Magma Br. at Section I.C;

FF ¶¶ 161, 173-179.). The joint ownership of the Wavefront Inventions and the '205 Patent

demonstrates that IBM and Synopsys considered Joint Inventions developed for Synzilla as

jointly owned under the JDA. (FF ¶¶ 206-213; Magma Br. at Section I.B; Ex. 1524 at

SNP005694.)

MAGMA'S POST-TRIAL REPLY BRIEF
C-04-03923 MMC

Synopsys's reliance on IBM's '557 Patent is misplaced because there is no evidence (and no party has ever claimed) that any of the inventions in the '557 Patent were Joint Inventions under the JDA. Synopsys's witnesses testified that the '557 Patent is ***unlike*** the gain-based synthesis inventions described in Professor Otten's 1996 ICCAD presentation or in the '446 Patent. (Tr. 802:20-803:9 (Damiano).) Furthermore, Magma has never asserted that "any patent that IBM filed on ***any technology relating to Synzilla*** would be jointly owned by Synopsys." (*See* Synopsys Br. 11:22-24 (emphasis added).) Based on the plain language of the JDA, Magma contends only that ***Joint Inventions*** arising out of the parties' performance of the JDA are jointly owned. Inventions separately conceived and reduced to practice are not jointly owned, even if they were used in connection with the JDA projects. (Magma Br. 4:28-5:6.)

**C.    The Dissolution Agreement Did Not Terminate IBM's Ownership Of Joint Inventions.**

By expressly incorporating Section 4.1.2.1 into the Dissolution Agreement, the parties confirmed that they intended to maintain joint ownership of Joint Inventions that arose as part of their product development activities. Synopsys's assertion that IBM's ownership rights in Joint Inventions were "entirely terminated" by the Dissolution Agreement therefore fails. (Synopsys Br. at 33:4-5.) If, as Synopsys contends, the parties had intended to abrogate IBM's ownership rights by transforming Joint Inventions into NGSS Information, there would have been no reason to incorporate Section 4.1.2.1 into the Dissolution Agreement. (Ex. 1120 at IBM000098; *see Browning-Ferris Indus. of New York, Inc. v. County of Monroe*, 103 A.D.2d 1040, 1041 (N.Y. App. Div. 1984), *aff'd*, 64 N.Y.2d 1046 (N.Y. 1985) (contracts should be interpreted to give meaning and effect to every provision).

Furthermore, Synopsys's argument that the Dissolution Agreement terminated IBM's intellectual property rights relating to NGSS or Synzilla is inconsistent with other provisions in the Dissolution Agreement. The Dissolution Agreement expressly preserves IBM's rights to certain separately owned intellectual property by incorporating Section 4.4 of the JDA, under which IBM granted Synopsys a license to its separately owned intellectual property contained "***in NGSS Information as set forth in Section 4.1.1***." (Ex. 1120 § 4.4 (emphasis added); *see id.* at

MAGMA'S POST-TRIAL REPLY BRIEF
C-04-03923 MMC

1   IBM000098 (incorporating Section 4 and neither excluding nor modifying Section 4.4.) [1]

2   **II.    KUDVA JOINTLY CONCEIVED OF THE INVENTIONS CLAIMED IN THE '446 AND '438 PATENTS.**

3

4   Synopsys seeks to obscure the overwhelming evidence of Kudva's joint inventorship by

5   manufacturing a series of arguments concerning the standard of inventorship, the scope of the

6   '446 and '438 Patents' claims, and the significance of Kudva's contributions. Each argument is

7   without merit.

8   **A.    Contract, Not Federal Patent Law, Governs The Burden Of Proof And Definition Of Conception Of An Invention Under The JDA.**

9

10   Synopsys asserts that Magma must prove Kudva's inventive contributions by clear and

11   convincing evidence regardless of whether IBM's ownership is assessed under the JDA or federal

12   patent law. Synopsys also asserts that the JDA incorporated the federal patent law definition of

13   an invention. (Synopsys Br. 16:6-18:2.) These arguments are contrary to established law.

14   As to the burden of proof, Synopsys incorrectly relies on *Hess v. Advanced*

15   *Cardiovascular Systems, Inc.*, 106 F.3d 976 (Fed. Cir. 1997), for the assertion that "the clear and

16   convincing standard applies no matter the particular circumstances of the case." (Synopsys Br.

17   16:19-23.) *Hess* involved a dispute concerning the inventorship of a patent under federal patent

18   law, not ownership and inventorship rights governed by a contract. *Hess* does not address cases,

19   _____

20   [1]   Synopsys relegates to a footnote its twice previously rejected claim that Magma is precluded from raising IBM's ownership as a defense to patent infringement because Magma is not a direct

21   or implied third-party beneficiary under the JDA. (Synopsys Br. 9 n.2; *but see* Am. Order Denying Mots. for Summ. J. Re: Patent Ownership, dated Mar. 30, 2006 (Docket No. 994) ("SJ

22   Order") at 6:5-7 (finding that Magma "would not be prevented from arguing that IBM and Synopsys are co-owners of the disputed patents") and Tr. 31:25-32:20 ("if standing were an issue, that should have been raised a long time ago because nobody would be here [at the ownership

23   trial], period").) Synopsys's argument also fails on the merits because Magma is a third-party beneficiary under the JDA by virtue of IBM's licensing of the Patents to Magma. Magma's

24   license is a defense to Synopsys's claims of infringement and, as a result, it may raise IBM's ownership rights under the JDA. *See E.G.L. Gem Lab Ltd. v. Gem Quality Inst., Inc.*, No. 97 Civ.

25   7102 (LAK), 1998 WL 314767, at *3 n.38 (S.D.N.Y. June 15, 1998) (noting that licensee would be permitted to invoke arbitration clause in trademark agreement as third-party beneficiary even

26   though not signatory to agreement); *Crossland Sav. FSB v. Rockwood Ins. Co.*, 700 F. Supp. 1274, 1283 (S.D.N.Y. 1988) ("It is black letter law that a third-party beneficiary need not be

27   'identified or even identifiable at the time of the making of a contract.'") (citing *Associated Teachers of Huntington, Inc. v. Bd. of Educ.*, 33 N.Y.2d 229, 234 (N.Y. 1973)).

28

MAGMA'S POST-TRIAL REPLY BRIEF
C-04-03923 MMC

1   like this one, where the parties' patent ownership rights are governed by a joint development

2   contract.  Nor has Synopsys cited to any authority imposing the clear and convincing standard to

3   patent inventorship or ownership governed by contract.[2]

4       "[T]he question of who owns the patent rights and on what terms typically is a question

5   exclusively for state courts."  *Jim Arnold Corp. v. Hydrotech Sys., Inc.*, 109 F.3d 1567, 1572

6   (Fed. Cir. 1997).  Where a contract allocates patent ownership, courts are to decide the issue

7   based on the law of the jurisdiction selected by the parties.  *Int'l Nutrition Co. v. Horphag*

8   *Research Ltd.*, No. 3:96CV386 (DJS), 2000 WL 1863560, at *3 (D. Conn. Apr. 14, 2000), *aff'd*,

9   257 F.3d 1324 (Fed. Cir. 2001).

10      The JDA is controlled by New York law.  (Ex. 1120 § 12.2.)  New York law requires

11  contract claims to be proven by a preponderance of the evidence.  *Angelo, Gordon & Co., L.P. v.*

12  *Dycom Indus.*, 04 Civ. 1570 (RMB), 2006 U.S. Dist. LEXIS 15784, at *18 (S.D.N.Y. Mar. 31,

13  2006).  The JDA defines how Joint Inventions arise (Ex. 1120 § 1.25) and governs the ownership

14  of patents that issue on Joint Inventions.  (*Id.* § 4.1.2.1.)  Magma need only prove that IBM

15  jointly owns the Patents under the JDA by a preponderance of the evidence.

16      Synopsys's assertion that the JDA incorporates the technical patent law test for conception

17  of an invention ignores the JDA's express definition of "Invention" and violates controlling law.

18  (Synopsys Br. 17:5-18:2.)  The JDA provides that "'Invention' means ***any discovery or***

19  ***improvement***, conceived or first reduced to practice during the term of this Agreement in the

20  performance of this Agreement, solely or jointly by one or more employees of Synopsys, or

21  solely or jointly by one or more employees of IBM."  (Ex. 1120 § 1.24 (emphasis added).)  The

22  use of the term "any" means that Inventions include discoveries or improvements that are not

23  independently patentable.  The parties could have defined "Invention" to be limited to "any

24  invention patentable under federal patent law."  They did not do so.  Indeed, Synopsys decided

25

26  [2]   *Univ. of Colorado Found., Inc. v. American Cyanamid Co.*, 196 F.3d 1366, 1372 (Fed. Cir.
    1999), to which Synopsys also cites, is inapposite because it addressed the substantive standard of
27  inventorship, not the quantum of proof that a party must satisfy to prove inventorship.  That case
    also did not involve a contract governing inventorship or ownership.
28

MAGMA'S POST-TRIAL REPLY BRIEF
                                        C-04-03923 MMC

1    not to file the draft patent applications in 1996 precisely because of its concern that IBM would

2    be a co-owner of any constant delay patents under the JDA regardless of whether Kudva were a

3    co-inventor under federal patent law.  (FF ¶¶ 158-161.)

4        In contracts governing intellectual property ownership, parties are free to define terms

5    such as "conceive" and "invention" in a manner different from their technical patent law

6    meanings.  (Magma Br. 23:24-24:9 (citing *Am. Tel. & Tel. Co. v. Integrated Network Corp.*, 972

7    F.2d 1321, 1324 (Fed. Cir. 1992).)  Synopsys's authorities do not support the contrary view that

8    the JDA incorporated the technical patent law meaning of conception of an invention.  None of

9    Synopsys's cases involved a contract, such as the JDA, that defined the term "Invention"

10   differently from the definition used in federal patent law.  For example, *Uribe v. Merchants Bank*

11   *of New York*, 693 N.E.2d 740, 743 (N.Y. 1998), which did not involve patent rights, stands for the

12   proposition that contract terms should be interpreted in light of the relevant context.  (Synopsys

13   Br. 17:6-8.)  And, *Nau v. Vulcan Rail & Construction Co.*, 36 N.E.2d 106, 111 (N.Y. 1941),

14   merely stated that "[t]echnical words in a contract must be taken in a technical sense unless the

15   context of the instrument or a usage which is applicable clearly indicates a different meaning."

16   (Synopsys Br. 17:9-14.)

17       Synopsys's reliance on *Sunbeam Products, Inc. v. Wing Shing Products (BVI) Ltd.*, 311

18   B.R. 378 (S.D.N.Y. 2004) is similarly misplaced.  (Synopsys's Revised Findings of Fact and

19   Conclusions of Law ("Synopsys FFCL") ¶ 129.)  *Sunbeam* held that a party could possess patent

20   rights as a result of being a "joint developer" under a contract even if the party's contributions did

21   not rise to the level of joint inventorship under federal patent law:  "[w]hether a party has patent

22   rights as a co-inventor is a distinct issue from whether a party who is not a co-inventor has

23   acquired a right to share patent rights through an agreement with the inventor."  *Sunbeam*

24   *Products, Inc.*, 311 B.R. at 392.  Thus here, as in *Sunbeam*, even if the Court were to find that

25   Kudva's contributions were not sufficient to make him a joint inventor under federal patent law,

26   his contributions to "Joint Inventions" as defined in the JDA still could make IBM a co-owner of

27   the Patents.  This is exactly why Synopsys did not file the draft patent applications it had prepared

28   in 1996.  (FF ¶¶ 158-161.)

MAGMA'S POST-TRIAL REPLY BRIEF
C-04-03923 MMC

**B.    Kudva's Contributions Are Sufficient To Make IBM A Co-Owner Of The '446 And '438 Patents.**

Synopsys's assertion that Kudva did not contribute to the conception of the construed claims of the '446 and '438 Patents, but "at best" contributed to one embodiment of one of those claims (claim 49) is incorrect. (*See* Synopsys Br. 18:3-23:20.) Synopsys's position violates the Court's claim construction and ignores the evidence of Kudva's contributions.

**1.    Synopsys's Conception Arguments Violate The Court's Claim Construction.**

Synopsys's reading of the claimed inventions is so broad that van Ginneken could not have invented them because they were embodied by Grodstein. (Synopsys Br. 20:16-21.); *see Beech Aircraft Corp. v. EDO Corp.*, 990 F.2d 1237, 1248 (Fed. Cir. 1993) ("At the heart of any ownership analysis lies the question of who first invented the subject matter at issue . . . ."). Under the '446 and '438 Patents, the target delay is met by resizing the cell, a technique that Synopsys admits is as old as the field of logic synthesis itself. (Tr. 861:23-862:1 (Damiano).) According to Synopsys, the target delay can be set based on any value, including the prior art method of estimating wire lengths. (Tr. 95:15-18, 97:16-101:8, 108:14-17.) Thus, under Synopsys's broad reading of the claims, the basic invention in the '446 and '438 Patents is setting a target delay (which can be changed at any time) and resizing the cell to meet the delay. (Tr. 89:10-90:2.) This is nothing more than the portion of Grodstein's work that included setting a target delay and resizing the cell to meet the target delay.[3]

It was Kudva who contributed something other than methods previously disclosed by Grodstein. Kudva connected the theory of logical effort to logic synthesis, resulting in novel

---

[3]    Synopsys's assertion that Magma is precluded from arguing that Kudva's contributions were inventive because Magma has separately argued in proposed requests for reexamination that the inventions are obvious over the prior art is incorrect. (Synopsys Br. 23:9-12.) At this stage of the litigation, the Patents maintain their presumption of validity. 35 U.S.C. § 282. Assuming that the claims are valid, Kudva contributed to their conception and Synopsys is not entitled to assert them against Magma. If, however, the litigation proceeds to a stage in which validity is at issue, then Magma intends to demonstrate invalidity (if not precluded by assignor estoppel) based on a number of prior art references. Alternative theories are perfectly proper "regardless of consistency." Fed. R. Civ. P. 8(e)(2).

MAGMA'S POST-TRIAL REPLY BRIEF
C-04-03923 MMC

methods that led to the claimed inventions.  Van Ginneken emphasized the significance of this contribution in the Driving on the Left Hand Side of the Performance Speed-way paper:  "The concept of logical effort is used to motivate the constant delay model for logic synthesis, and to determine appropriate constant delays for library cells."  (Ex. 1195 at SY012221.)  All of the claims of the '446 and '438 Patents require either an "initial intended delay" or a "relative delay value."  The Court construed both terms to mean "a delay set as a target."  (Docket No. 392 at 32:8, 32:13.)  According to the Court's construction, the target delay is held constant unless it is revised at some point in the design process.  (*Id*. at 10:1-10.)  Conception of the "complete and operative invention, as it [was] hereafter to be applied in practice," *Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1460 (Fed. Cir. 1998), requires a method (1) to set the target delay, and (2) thereafter to calculate changes to the delay caused by changes in the load occurring during the design process; these load changes also must be accommodated by adjustments in cell size to maintain the target delay.  These methods must be "operative," *i.e.*, they must be independent of cell size (which will vary), and they must work in an automated system for designing integrated circuits using arbitrary cells, as further required by all the claims.  (Magma Br. 12:22-13:18.)

Kudva's contribution "helped make the invention patentable" (Synopsys Br. 18:13-15) because this contribution supplied the operative methods required by the claims.  (Magma Br. 12:22-17:3.)  Dr. Sarrafzadeh explained in detail why the theory of logical effort as applied to constant delay supplied the required operative methods, and why the methods of Grodstein, Mead, and Glasser did not.  (Tr. 1175:13-1177:22, 1179:21-1183:10, 1202:8-1203:18 (Sarrafzadeh); *see also* Magma Br. at Section II.); *see Ethicon*, 135 F.3d at 1460 (assessing inventorship by comparing inventive contributions to claims).

Synopsys argues that claim 49 merely requires "the use of an initial gain value to determine an initial intended delay."  (Synopsys Br. 18:26-27.)[4]  Synopsys ignores several

---

[4]    Synopsys focuses solely on the conception of claim 49 and makes no attempt to rebut Magma's showing that Kudva contributed to the conception of all the claims in the '446 and '438 Patents.  (Synopsys Br. 21:13-23:20.)  Magma's Post-Trial Brief demonstrated why Kudva's contributions were critical to the conception of all those claims.  (Magma Br. 12:22-13:18, 14:24-17:3.)

MAGMA'S POST-TRIAL REPLY BRIEF
C-04-03923 MMC

1  requirements of the claim, including that (1) there be an "*automated method* for modeling the

2  delay of *the cells of an integrated circuit*," (2) an "initial gain value" be associated with "*each*

3  *cell*" in the "integrated circuit," and (3) "the initial intended delay value of *each cell*" be

4  computed based on "the initial gain value." (Ex. 3 at 22:1-6 (emphasis added).) Because these

5  requirements must be met, Claim 49 requires an operative method for (among other things)

6  associating the target delay of *each cell in an integrated circuit* based on the initial gain value.[5]

7         Unlike the theory of logical effort as applied to constant delay supplied by Kudva, the

8  purported Grodstein, Mead, and Glasser "embodiments" could not supply the operative methods

9  required by the claims. Integrated circuits contain many kinds of cells, not just inverters. Mead

10  related only to a chain of inverters rather than to arbitrary cells and, therefore, did not supply the

11  methods required by claim 49. (FF ¶ 125.) Grodstein's Power x Delay is not a gain-based

12  method for setting the target delay, which claim 49 plainly requires. (Tr. 1170:16-1172:7

13  (Sarrafzadeh); Tr. 1112:8-1113:25 (Friedman).) Furthermore, Power x Delay did not teach an

14  "operative," automated method for modeling the delay of the cells of an integrated circuit because

15  it would lead to a gain of one for an inverter, a result that the Driving Paper acknowledges makes

16  no sense. (FF ¶ 105; Ex. 1195 at SY012226.) And Glasser cannot supply the necessary methods,

17  because obtaining an equation where delay is based on gain requires a mathematical derivation of

18  Glasser's equivalence 5.2. As Dr. Harris conceded, there is *no evidence* van Ginneken ever

19  performed this derivation. (Tr. 638:22-639:4 (Harris).)[6] Kudva's contributions supplied the

20  operative methods necessary for the conception of claim 49 and the other claims.

21

22  _____

23  [5]   The methods claimed by the remaining claims of the '446 and '438 Patents also must work in
an automated system for designing integrated circuits using arbitrary cells. (Magma Br. 12:28-

24  13:13.)

25  [6]   Synopsys contends that van Ginneken also solely conceived of the "fourth embodiment" of
claim 49, based on Sutherland's continuous buffering assumption. (Synopsys Br. 20:18-21.)

26  Synopsys is wrong. Even according to Synopsys's own expert, in order to arrive at this
"embodiment," one must use gain-based teachings of the Sutherland paper in order to calculate an

27  initial intended delay. (Tr. 503:24-505:1 (Harris).) This is the connection that van Ginneken and
Kudva testified was contributed by Kudva. (*See, e.g.*, van Ginneken Dep. Tr. 46:7-15; Kudva

28  Dep. Tr. 38:4-25; *see also* FF ¶¶ 97-109.)

MAGMA'S POST-TRIAL REPLY BRIEF
C-04-03923 MMC

2.      **The Evidence of Kudva's Contributions To Conception Is Clear and Convincing.**

Synopsys's assertion that Magma "***did not present <u>any evidence</u>***" to rebut the testimony of Damiano, Rudell, and Shenoy that van Ginneken had solely conceived of the "constant delay inventions" before collaborating with Kudva is false. (Synopsys Br. 18:25-20:15 (emphasis in original).) Indeed, there is substantial evidence that refutes Synopsys's position:

- Damiano admitted that as of the end of January 1996, van Ginneken did not discuss anything other than Grodstein's concept of constant delay. (Ex. 1123; Tr. 830:21-831:5.) Damiano admitted that van Ginneken did not use the word "gain" or mention the concept of ideal buffering during the February 28, 1996 NGSS meeting. (Tr. 835:25-836:19, 836:22-24.) Damiano admitted that he did not recall a discussion of constant delay at the March 6, 1996 NGSS presentation. (Tr. 841:12-17.)

- Rudell admitted that he did not know when a presentation in which van Ginneken allegedly discussed gain-based synthesis occurred. (Tr. 887:6-889:17.)

- Shenoy admitted that the curved line in his notes of the February 28, 1996 meeting reflect Grodstein's Power x Delay model rather than the straight line that would result from a gain-based delay model. (Tr. 937:22-938:7, 976:4-977:4; FF ¶¶ 77-78.) Shenoy admitted that it was not until after May 30, 1996 that he became familiar with constant delay. (Tr. 967:2-968:22.)

- Van Ginneken admitted that "[i]n early March 1996, I made a presentation to IBM and Synopsys engineers on concepts relating to the constant delay paradigm. ***At the time, I had not conceived of an effective method to select and optimize the delays of arbitrary cells.*** As a result, I incorporated into my slide presentation a discussion of 'Power' delay, or efficiency, a concept discussed in Grodstein." (Ex. 1661 ¶ 4 (emphasis added).)

Synopsys's assertion that "[e]very piece of documentation from 1996 indicates that van Ginneken was the sole inventor of the patented inventions" also is flawed. (Synopsys Br. 20:23-24.) Even the evidence that Synopsys cites affirmatively establishes that van Ginneken had not conceived of the methods required by the claims before collaborating with Kudva:

- Van Ginneken's e-mail notes of the January 30-31, 1996 meeting state, "LVG/RR: Discussion on constant delay model." (Ex. 1123 at SY013051.) This indicates, at most, that van Ginneken was aware of the bare concept of constant delay invented by Grodstein. (FF ¶¶ 69-72; Magma Br. 19:5-8.)

- Shenoy's notes of the February 28, 1996 NGSS meeting reflect Grodstein's Power x Delay model rather than a gain-based delay model. (Tr. 566:2-567:19 (Harris), 937:22-938:7, 976:4-977:4 (Shenoy); Ex. 128 at SY008567; FF ¶¶ 77-78; Magma Br. 19:9-20:2.)

- Van Ginneken's invention disclosure form dated April 25, 1996, with an alleged invention date of February 29, 1996, described a "philosophy" rather than an

MAGMA'S POST-TRIAL REPLY BRIEF
C-04-03923 MMC

actual invention. (Ex. 1152.) The disclosure identifies research possibilities and asserts that "many applications" of constant delay could potentially be patented. (*Id.*) The disclosure does not mention (a) gain, (b) gain-based synthesis, (c) initial intended delay, or (d) relative delay value. (Tr. 606:16-21, 608:17-21 (Harris); FF ¶¶ 80-85; Magma Br. 13:19-14:21.)

• Van Ginneken's March 6, 1996 presentation merely reiterated Grodstein's Power x Delay method for setting delays as well as prior art equations from Glasser that Grodstein had cited. (Ex. 1155 at IBM001573, 1578; Magma Br. 20:3-17.)

Synopsys's reliance on the draft patent applications as evidence of van Ginneken's purported sole conception of the inventions also is misplaced. (Synopsys Br. 21:4-6.) The draft patent applications were not prepared until after van Ginneken began collaborating with Kudva. (FF ¶¶ 135, 136.) Synopsys decided not to file the applications precisely because Synopsys was concerned that IBM would jointly own any resulting patents due to Kudva's contributions. (Van Ginneken Dep. Tr. 76:5-12.)

Synopsys virtually ignores the White Paper. (Synopsys Br. 21:7-12.) Synopsys argues only that "[t]he evidence did not demonstrate [] that Kudva conceived of any of the ideas or inventions contained in this paper." (*Id.* 21:8-9.) But the evidence that Kudva made substantial contributions to the ideas, inventions, drafting, experimentation, and code writing relating to the White Paper is robust. (Magma Br. 15:6-17:3; FF ¶¶ 103-121.)

Finally, Synopsys asserts that Kudva merely contributed a "public domain paper" and, as such, cannot qualify as a joint inventor. (Synopsys Br. 23:1-8.) Synopsys is wrong. Kudva did far more than merely contribute a paper. He contributed an inventive application of the theory of logical effort to the setting of target delays, and participated in the drafting, experimentation, and code writing for the White Paper. (FF ¶¶ 99, 103-121; Magma Br. 12:22-17:3.)

And even if all that Kudva did was contribute the theory of logical effort, he is still an inventor. "The genius of invention is often a combination of known elements which in hindsight seems preordained." *McGinley v. Franklin Sports, Inc.*, 262 F.3d 1339, 1351 (Fed. Cir. 2001). Synopsys's argument that Kudva "did not suggest *any* concepts relating to gain to van Ginneken *other than concepts that already appeared in the Sutherland paper*" misses the point. (Synopsys Br. 23:5-6 (emphasis in original).) Kudva did not need to suggest *additional* "concepts relating to gain" in order to be an inventor. As the Driving Paper acknowledged, it was

-13-

1   Sutherland's theory of logical effort that was used to "motivate the constant delay model for logic

2   synthesis, and to determine appropriate constant delays for library cells." (Ex. 1195 at

3   SY012221.)

4   **III.    THE INVENTIONS WERE JOINTLY REDUCED TO PRACTICE.**

5       In a further effort to obscure the evidence of IBM's ownership interest in the '446, '438,

6   and '114 Patents, Synopsys uses a standard for reduction to practice that is substantially higher

7   than that imposed by law. (Synopsys Br. 23:24-24:2, 31:25-32:3.) Synopsys incorrectly applies

8   this standard to argue that the inventions were not reduced to practice. (*Id.* 24:5-33:1.) But under

9   the correct standard for reduction to practice, the Patents' inventions were jointly first reduced to

10  practice during the term and in the performance of the JDA. (*See* Magma Br. at Section III.)

11      **A.    Synopsys Proposes An Incorrect And Overly Burdensome Standard For
            Reduction To Practice.**

12

13      Synopsys proposes a five-part test for reduction to practice that combines excerpts from

14  four different cases, none of which articulates Synopsys's purported "test." (Synopsys Br. 23:24-

15  24:2, 31:25-32:3.) Rather than supporting Synopsys's proposed test, these cases actually confirm

16  that the test has two parts, not five: "In order to establish actual reduction to practice, the

17  inventor must prove [1] that he constructed an embodiment or performed a process that met all

18  the limitations of the claim, and [2] that he determined that the invention would work for its

19  intended purpose." *Slip Track*, 304 F.3d at 1265; *see also Estee Lauder Inc. v. L'Oreal, S.A.*, 129

20  F.3d 588, 592 (Fed. Cir. 1997); *Scott v. Finney*, 34 F.3d 1058, 1061 (Fed. Cir. 1994); *Newkirk v.*

21  *Lulejian*, 825 F.2d 1581, 1582 (Fed. Cir. 1987).

22      Synopsys's attempt to add three requirements to the well-established two-part reduction to

23  practice test is wrong as a matter of law. First, sufficient testing under "proper conditions" is not

24  a separate requirement for reduction to practice. (Synopsys Br. 23:25-26, 24:21-25:2.) The

25  single case cited by Synopsys on this point mentions "testing conditions" as support for the

26  proposition that the embodiment relied upon to demonstrate reduction to practice must "actually

27  work[] for its intended purpose." *Newkirk*, 825 F.2d at 1582. The Patents do not require (nor has

28  Synopsys demonstrated) that the claimed inventions must be capable of operating in any

-14-                        MAGMA'S POST-TRIAL REPLY BRIEF
                              C-04-03923 MMC

1    particular environment.  (*See* Exs. 1, 3, 5.)

2          Second, testing that demonstrates "utility beyond a probability of failure" is not a separate

3    requirement for reduction to practice.  In *Scott*, the court analyzed the second part of the two-part

4    test for reduction to practice, stating, "When testing is necessary to show proof of actual reduction

5    to practice, the embodiment relied upon as evidence of priority *must actually work for its*

6    *intended purpose*."  *Scott*, 34 F.3d 1058, 1061 (Fed. Cir. 1994) (emphasis added).  To explain this

7    requirement, the court outlined principles set forth by its predecessor, the CCPA.  *Id.* at 1062.

8    For example, "[t]esting need not show utility beyond a possibility of failure, but only utility

9    beyond a probability of failure."  *Id.* (*citing Taylor v. Swingle*, 136 F.2d 914, 917 (C.C.P.A.

10   1943)).

11         Finally, the inventor's subjective satisfaction with the quality of the test results is not

12   required for reduction to practice.  (Synopsys Br. 31:25-32:3.)  The Federal Circuit's predecessor

13   established that "[the inventor's] standards of success are irrelevant to the issue of reduction to

14   practice."  *Mattor v. Coolegem*, 530 F.2d 1391, 1395 (C.C.P.A. 1976).  The cases cited by

15   Synopsys do not support its argument that an inventor's subjective disappointment or satisfaction

16   with test results is relevant to the reduction to practice inquiry.  *Estee Lauder*, 129 F.3d at 594-95;

17   *Cooper v. Goldfarb*, 154 F.3d 1321, 1327-30 (Fed. Cir. 1998); *Union Carbide Chems. & Plastics*

18   *Tech. Corp. v. Shell Oil Co.*, 308 F.3d 1167, 1189-90 (Fed. Cir. 2002).

19         **B.    The Inventions Were Jointly Reduced To Practice.**

20         When the proper legal standard is applied, Magma has met both requirements for

21   reduction to practice:  (1) IBM and Synopsys jointly created Synzilla, which practiced the claims

22   of the Patents, and (2) testing of Synzilla demonstrated that the inventions would work for their

23   intended purposes.  (Magma Br. 26:3-31:5.)

24              **1.    Synzilla Practiced The Claims Of The Patents.**

25         Robert Damiano, Synopsys's 30(b)(6) designee, admitted that Synzilla practiced the

26   claims of the Patents.  (FF ¶¶ 198, 204.)  At trial, he explained his admission:

27         Practiced means you use a particular claim.  That was the translation that I made.
          So we are using some of the claims that Lukas has in his patent, and it's true, we
28        coded some of those claims.

                                        -15-

1   (Tr. 792:4-9.) Damiano's admission satisfies the first part of the Federal Circuit's two-part test

2   for reduction to practice. *Slip Track*, 304 F.3d at 1265. Synopsys does not challenge Damiano's

3   admission. Instead, Synopsys argues that "[t]he question is not whether Synzilla was able to

4   'practice' the patent claims, but rather whether Synzilla reduced to practice the patent claims

5   . . . ." (Synopsys Br. 26:7-9 (emphasis omitted).) But this argument addresses the second

6   element of reduction to practice, namely, that the inventions work for their intended purposes.

7   *See Slip Track*, 304 F.3d at 1265.

8       Given Damiano's admission, Magma was not required to provide expert testimony that

9   Synzilla practiced the claims of the Patents. The one case cited by Synopsys for the proposition

10  that a party asserting reduction to practice must provide expert testimony that the embodiment

11  relied upon practiced the claims of the patents explicitly states, "We do not state a per se rule that

12  expert testimony is required to prove infringement [or, in this case, reduction to practice] . . . ."

13  *See Centricut, LLC v. Esab Group, Inc.*, 390 F.3d 1361, 1370 (Fed. Cir. 2004). Furthermore, the

14  admission of Synopsys's 30(b)(6) designee that Synzilla practiced the claims of the Patents

15  obviates the need for expert testimony on the subject. Regardless, Damiano *is* an expert on

16  Synzilla – in fact, he was Synopsys's chosen expert on the topic of "any and all joint projects

17  developed pursuant to the JDA, including, without limitation . . . Synzilla . . . ." (Tr. 812:12-18.)

18  Synopsys cannot now object to Damiano's testimony regarding Synzilla on the basis that he is not

19  qualified.

20      Unable to explain away Damiano's testimony, Synopsys seeks to identify claim elements

21  not present in Synzilla in an effort to show that there was no reduction to practice of the

22  inventions. (Synopsys Br. 25:9-24.) The only purported claim element cited by Synopsys as not

23  present in the version of Synzilla tested in July 1997 is placement. (*Id.* 25:11-13.) But Claim 49

24  of the '446 Patent ***does not require placement***. (Ex. 3 at 22:1-7.) Furthermore, ***simulated***

25  ***placement*** is sufficient to reduce to practice the inventions described in claims 1 of the '446 and

26  '438 Patents and all of the claims of the '114 Patent. (Magma Br. 29:1-20.) Thus, Synzilla's

27  ability to perform placement has no bearing upon the reduction to practice of these claims. In any

28  event, even if placement were required, Synopsys admits that Synzilla implemented actual

-16-

MAGMA'S POST-TRIAL REPLY BRIEF
C-04-03923 MMC

placement during the Intel demonstrations.  (FF ¶ 194; Synopsys Br. 25:13-15.)[7]

**2.      The Inventions Worked For Their Intended Purposes.**

The Court need look no further than the claims to determine the inventions' intended purposes.  *See Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1118 (Fed. Cir. 2004) (the intended purpose of a claimed invention is governed by the claim's language and preamble); *Manning v. Paradis*, 296 F.3d 1098, 1102 (Fed. Cir. 2002); *Griffin v. Bertina*, 285 F.3d 1029 (Fed. Cir. 2002).  The intended purpose of the inventions in claim 1 of the '446 and '438 Patents is to "design[] an initial integrated circuit layout."  The intended purpose disclosed in claim 49 of the '446 Patent is to "model[] the delay of the cells."  The intended purpose disclosed in all of the claims of the '114 Patent is to "plac[e] cells in a placement area."  (Ex. 3 at 17:14-15, 22:1-2; Ex. 1 at 17:8-9; Ex. 5 at 6:56-57, 7:13-14, 8:5-6.)  As set forth in Magma's Post-Trial Brief, the Synzilla tests demonstrate that the claimed inventions worked for their intended purposes.  (Magma Br. at Section III.)

Synopsys's assertion that "[t]he intended purpose of all the patented inventions is to ensure timing closure throughout placement and routing" is wrong.  (Synopsys Br. 28:3-4.)  The claims' language and preamble do not require timing closure and, as such, timing closure cannot be the intended purpose of the inventions.  Instead of looking to the claim language, as is required, Synopsys improperly relies upon prior art, the Patents' specifications, the Notice of Allowance issued by the PTO, Magma's arguments before the PTO, the White Paper, and van Ginneken's draft patent applications, none of which is relevant to the Court's inquiry.  (Synopsys Br. 28:3-20.)  Whether the parties in fact were attempting to develop a system that would ensure timing closure has no bearing on the reduction to practice analysis.  *See Mattor*, 530 F.2d at 1395 (reduction to practice required that claim limitations, not inventor's aspirations, be met).

---

[7]    Synopsys also suggests that, during the Intel demonstrations, Synzilla's gain-based synthesis option may have been disabled.  (Synopsys Br. 25:19-24.)  As discussed in Magma's Post-Trial Brief, this cannot be the case.  (Magma Br. 30:21-31:5.)  Gain-based synthesis was Synzilla's default setting.  *Id.*  Had this option been "turned off," the change would have been apparent from the test results.  *Id.*

MAGMA'S POST-TRIAL REPLY BRIEF
C-04-03923 MMC

**C.    The Inventions Were Jointly Reduced To Practice After Van Ginneken Left Synopsys.**

Synopsys's assertion that the inventions were not jointly reduced to practice after van Ginneken left Synopsys is wrong.  (Synopsys Br. 24:10-20.)  The Synzilla code revision history conclusively demonstrates that the Synzilla code was significantly revised after van Ginneken left Synopsys in May 1997.  (*See* Magma Br. 26:10-16; FF ¶¶ 180-182; Ex. 1659-2)  After the July 1997 NGSS joint alliance meeting, the code was further revised in preparation for the Intel demonstrations.  Code essential to the operation of the inventions was added after May 1997.  For example, the "Topotree" module was not completed until October 6, 1997, and the "sizer" and "libanal" modules were not completed until October 20, 1997.  (Ex. 1659-2 at 38, 42.)[8]

**D.    The Inventions Claimed In The '114 Patent Were Jointly Reduced To Practice.**

Synopsys's claim that Magma has "ignored the '114 Patent" is false.  (Synopsys Br. 38:14-39:15.)  Magma presented ample evidence demonstrating that the inventions claimed in the '114 Patent were jointly reduced to practice by IBM and Synopsys.  Tony Drumm, an IBM engineer, wrote code for the rough placer used in Synzilla – the portion of Synzilla that practiced the claims of the '114 Patent.  (Tr. 971:20-972:9, 980:10-14, 981:4-983:16.)  Shenoy testified that he "worked with Tony Drumm to define the interfaces for the Steiner tree calculator or the net length estimations he was going to put in," and that Drumm's code was "invoked in connection with [the] rough placer."  (Tr. 971:20-972:9.)  Drumm's Steiner tree and net length estimation code was essential to the implementation of Synzilla's rough placer.  (Tr. 1251:4-17; Drumm Dep. Tr. 137:11-13, 139:15-140:1, 142:5-16.)

---

[8] Synopsys's suggestion that IBM was somehow required to be present during the Intel tests for the reduction to practice to be joint is incorrect. (Synopsys Br. 24:17-19, 32:13-33:1.) Synzilla could not have implemented the inventions claimed in the Patents without using code contributed by IBM engineers. (Magma Br. 33:4-16.)

MAGMA'S POST-TRIAL REPLY BRIEF
C-04-03923 MMC

## IV.    MAGMA SHOULD NOT BE ESTOPPED FROM RAISING IBM'S OWNERSHIP OF THE PATENTS.

### A.    *Richardson* Is Inapplicable.

Despite the Court's rulings that the only estoppel doctrine left in the case is judicial estoppel, Synopsys relies on *Richardson v. Suzuki Motor Co.*, 868 F.2d 1226 (Fed. Cir. 1989) in an attempt to create another type of estoppel to deprive Magma of its third-party ownership defenses to infringement. (Synopsys Br. 9:19-10:26.) *Richardson* does not support, and the Court already has rejected, Synopsys's argument. In its summary judgment motion raising estoppel by contract, Synopsys cited to *Richardson* to argue that equity estopped Magma from asserting IBM's joint ownership of the Patents. (*See* Docket No. 353 at 2:11-13; 21:25-25:19.) The Court denied Synopsys's motion, explaining that Magma was not barred from asserting IBM's ownership interest:

> Even if Magma were estopped by the terms of van Ginneken's contract, ***Magma would not be prevented from arguing that IBM and Synopsys are co-owners of the disputed patents***. Synopsys's Proprietary Information and Inventions Agreement only applies to van Ginneken's interests. In arguing that IBM co-owns the disputed patents with Synopsys, Magma does not dispute that Synopsys is the sole owner of van Ginneken's interests in the inventions. ***Rather, Magma argues that IBM also possesses an interest in the inventions, independent of van Ginneken's interest and contractual agreements with Synopsys***.

*Synopsys, Inc. v. Magma Design Automation, Inc.*, No. C-04-3923 MMC, 2006 WL 825277, at *3 (N.D. Cal. Mar. 30, 2006) (emphasis added). The Court confirmed at trial that all of Synopsys's estoppel arguments, except judicial estoppel, have been rejected. (Tr. 1339:4-7.)

Despite the Court's previous rejection of the argument, Synopsys continues to insist that *Richardson* estops Magma from raising IBM's ownership as part of its license defense. *Richardson* remains wholly inapposite. The holding and reasoning in *Richardson* do not apply to a defendant's assertion of a license defense based on a third party's co-ownership of the patent in issue. And Synopsys does not cite to a single case where a party was estopped from defending against an infringement claim based on a license to patents co-owned by a third party.

In *Richardson*, the jury found that the defendant, Suzuki, had obtained the '393 patent through fraud and misappropriation of trade secrets. *Richardson*, 868 F.2d at 1244-45, 1247.

Based on the verdict, the plaintiff sought and obtained a post-trial remedy reassigning ownership of the '393 patent from Suzuki to the plaintiff. *Id.* at 1249-50. Suzuki argued that reassignment was unwarranted because (1) there was a third-party inventor, Cazort, of the '393 patent, and (2) Suzuki personnel had made "modifications in one or two claims" of the '393 patent. *Id.* at 1249. The court held that allowing Suzuki to maintain ownership of the '393 patent because of its "modification in one or two claims" would "ratify and indeed reward the wrongdoing." *Id.* The court also held that Cazort's status as an inventor was not before the court and did not affect the post-trial assignment remedy. *Id.*

Synopsys's attempt to invoke *Richardson* to preclude Magma from asserting a license defense based on IBM's ownership is therefore misplaced. *Richardson* imposed the post-trial assignment remedy in order to prevent the wrongdoer from keeping the '393 patent merely because it had modified one or two claims of the inventions misappropriated from the plaintiff. *Richardson*, 868 F.2d at 1249. Here, by contrast, Magma is not attempting to assert ***its ownership*** of the patents based on its "further modification in one or two claims of the patent." (Synopsys Br. 10:8-10 (quoting *Richardson*, 868 F.2d at 1249).) Magma withdrew its claim of an ownership interest in the '446 and '438 Patents based on the contributions to certain claims by Magma engineers after van Ginneken left Synopsys. (Docket No. 1110 ¶ 1.) Instead, Magma is relying on the ownership interests of IBM, which Synopsys wrongfully denies.

*Richardson* also does not support Synopsys's assertion that the rights of third-party inventors and owners are "irrelevant." (Synopsys Br. 10:7-8.) *Richardson* did not preclude a determination on the merits of a third party's ownership interest as the basis of a license defense. Unlike Magma, Suzuki did not have a license to the patents of the third-party inventor, Cazort, and was not accused of infringing the misappropriated '393 patent. Thus, Suzuki had no reason to seek -- and did not seek -- a determination that Cazort was a co-owner. Consequently, no such determination was made. *See Richardson*, 868 F.2d at 1249-50.[9] By contrast, Magma is licensed

---

[9] In *Richardson*, even if the '393 patent's inventorship had been corrected, that would not have affected Suzuki's position because it was not being sued for infringing, and was not licensed to, Cazort's patents.

MAGMA'S POST-TRIAL REPLY BRIEF
C-04-03923 MMC

1    to patents owned by IBM and is seeking a determination that IBM is a joint owner.

2         Nor can Synopsys establish the basis for the post-trial assignment remedy granted in

3    *Richardson*.  As Magma's pending motion for summary judgment demonstrates, Synopsys's

4    fraud and other state-law claims, all of which are based on alleged misappropriation of

5    confidential information, are time-barred.  *See Rodgard Corp. v. Miner Enterprises, Inc.*, No. 84-

6    CV-397E, 1992 WL 119129, at *1 (W.D.N.Y. May 22, 1992) ("The Court's remedy [in

7    *Richardson*] of directing the assignment of the patents was premised on the jury's finding of

8    fraud by the defendant").

9         Contrary to Synopsys's assertion, *Richardson* does not estop Magma from raising IBM's

10   ownership simply because Magma, rather than Synopsys, drafted the claims of the '446 and '438

11   patents and filed the applications.  IBM's contributions are fundamental to the conception of the

12   "complete and operative invention, as it [was] hereafter to be applied in practice." *Ethicon*, 135

13   F.3d at 1460.  Thus, no valid claims could have been drafted that would have excluded IBM's

14   ownership interest.  Magma would be entitled to a license defense regardless of who drafted the

15   claims or filed the applications.

16        Finally, Synopsys's assertion that the cases cited in *Richardson* support the proposition

17   that courts are required to ignore the rights of joint owners and joint inventors and reassign a

18   patent solely to the plaintiff is incorrect.  Those cases do not address the rights of any third party

19   as a joint inventor or joint owner at all, let alone in the context of license defense to infringement.

20   *See Becher v. Contoure Labs., Inc.*, 279 U.S. 388 (1929); *Saco-Lowell Shops v. Reynolds*, 141

21   F.2d 587 (4th Cir. 1944); *DeLong Corp. v. Lucas*, 176 F. Supp. 104 (S.D.N.Y. 1959); *see also*

22   *Hayhurst v. Rosen*, 1992 WL 123178 (E.D.N.Y. May 18, 1992).  Similarly, *Cargill, Inc. v. Sears*

23   *Petroleum & Transp. Corp.*, 2004 WL 3507329, at *13-14 (N.D.N.Y. Aug. 27, 2004), does not

24   provide any basis to estop Magma from defending against an infringement claim based on a

25   license from a third party.  (*See* Synopsys FFCL ¶¶ 150-51.)  As in *Richardson*, the defendant in

26   *Cargill* did not raise a third-party ownership defense to infringement.  Neither *Cargill* nor any

27   other case cited by Synopsys supports converting the post-judgment remedy imposed by

28   *Richardson* into an estoppel doctrine that would prevent a defendant from raising the ownership

-21-                    MAGMA'S POST-TRIAL REPLY BRIEF
                        C-04-03923 MMC

1   rights of a third party as the basis for a license defense.

2       **B.    Equity Also Precludes Synopsys From Invoking Judicial Estoppel.**

3       Synopsys's assertion that the Court apply the "extraordinary remedy" of judicial estoppel

4   and not reach the merits of the ownership issues presented at trial violates the principle that equity

5   must "avoid doing inequity."  *See An-Tze Cheng*, 308 B.R. at 460; *Klein v. Stahl GMBH & Co.*

6   *Maschinefabrik*, 185 F.3d 98, 109 (3d Cir. 1999).  Synopsys cannot meet any of the requirements

7   for the application of judicial estoppel.

8           **1.    The Application Of Judicial Estoppel Is Neither Necessary Nor**
                    **Equitable.**
9

10      Judicial estoppel is an "extraordinary remedy" that is merely "one arrow in the quiver of

11  sanctions at a court's disposal."  *Klein*, 185 F.3d at 109.  Because it precludes the resolution of a

12  claim on the merits, judicial estoppel should only be applied by the court "when absolutely

13  necessary."  *Id.*  Thus, equity limits the application of judicial estoppel to rare cases where "a

14  party's inconsistent behavior will otherwise result in a miscarriage of justice" and the estoppel

15  remedies "the damage done by a litigant's malfeasance" by "address[ing] the harm identified.'"

16  *Id.* at 108 (citations omitted); *see also Russell v. Rolfs*, 893 F.2d 1033, 1037 (9th Cir. 1990).

17  Judicial estoppel is an unnecessary and inequitable sanction in this case for at least three reasons.

18      First, this Court has available and has employed remedies other than judicial estoppel to

19  protect Synopsys's ownership interest in the Patents.  The Court has enjoined Magma from

20  "taking any steps to destroy, abandon, suspend, limit, disclaim, or seek reexamination of the '446

21  or '438 patents, or any part thereof, pending resolution of the issue of ownership."  (Docket

22  No. 771 at 8:17-20.)  If the Court recognizes IBM's ownership of the patents, Magma will not

23  obtain any permanent advantage with respect to Synopsys as a result of Magma's representations

24  to the PTO.  Synopsys will be a co-owner of the Patents and will have the opportunity to correct

25  inventorship with the PTO even if IBM is adjudicated a co-owner.

26      Second, the imposition of judicial estoppel would violate the principle that equity should

27  "***avoid*** doing inequity" because it would result in a "transfer of a windfall."  *An-Tze Cheng*, 308

28  B.R. at 460 (emphasis added).  Synopsys seeks to use judicial estoppel against Magma to obtain

1    sole ownership of Patents that the evidence shows that IBM owns under patent law and under the

2    JDA.  Thus, judicial estoppel would exacerbate rather than remedy the alleged harm by allowing

3    Synopsys to obtain sole ownership of patents that it does not exclusively own and to which

4    Magma would otherwise have a license.  *Id.*

5    Third, equity will not preclude Magma from asserting IBM's ownership because

6    Synopsys comes to the Court with unclean hands.  (Magma Br. at Section IV.D.)  *See Adler v.*

7    *Fed. Republic of Nig.*, 219 F.3d 869, 876-77 (9th Cir. 2000).  Since the inception of the JDA and

8    throughout this litigation, Synopsys has sought to deprive IBM of its ownership interest in the

9    Patents:

10   - Synopsys directed van Ginneken not to disclose the draft patent applications to
         IBM because it believed that "regardless whether he [Kudva] was an inventor or
11       not, even if he was not, the patent would still be jointly owned by—because of the
         joint development agreement that Synopsys and IBM entered into."  (Van
12       Ginneken Dep. Tr. 76:4-12.)

13   - Synopsys claimed it was the sole owner of the Patents when it filed continuation
         applications in 2005 and did not inform the PTO of IBM's ownership interest.

14   - Synopsys licensed Synzilla to Intel for $2 million in December of 1996 for use in
15       Intel's Pentium IV microprocessor.  This triggered the on-sale bar of 35 U.S.C.
         § 102(b) and rendered the Patents invalid.

16   - Synopsys refused, until compelled by the Court, to comply with Magma's
         discovery requests seeking information relating to the JDA and IBM's ownership.
17       Synopsys went so far as to threaten Magma with Rule 11 sanctions for pursuing its
         defenses and counterclaims based on IBM's ownership interest in the Patents.

18
     On this record, Synopsys cannot invoke principles of equity to estop Magma.
19

20            **2.    Synopsys Cannot Show That It Has Suffered Any Harm Sufficient To
                      Warrant The Application of Judicial Estoppel.**

21

22   Synopsys has failed to show that it has suffered any detriment as the result of the allegedly

23   inconsistent positions taken before the PTO and the Court.  Judicial estoppel only applies if the

     failure to estop Magma from raising IBM's ownership rights would "impose an unfair detriment"
24
     on Synopsys.  (Synopsys FFCL ¶ 158 (citing *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d
25
     778, 782-83 (9th Cir. 2001)).  Synopsys cannot articulate any reason why permitting Magma to
26
     raise IBM's ownership rights in this Court would impose an "unfair detriment" on Synopsys.
27
     Synopsys's assertion that allowing Magma to raise an IBM license defense to
28

MAGMA'S POST-TRIAL REPLY BRIEF
C-04-03923 MMC

1    infringement amounts to an unfair detriment to Synopsys is baseless.  (Synopsys Br. 35:24-26.)

2    IBM's ownership of the Patents (and its right to license them) arises from patent law and the

3    JDA, not from any misrepresentations to the PTO.  Magma would have the opportunity to assert

4    its license as a defense to infringement irrespective of its patent-prosecution activities.  *See*

5    *McCoy v. Mitsuboshi Cutlery, Inc.*, 67 F.3d 917, 920-21 (Fed. Cir. 1995) (a license is an

6    affirmative defense to patent infringement).  There is no connection between the purportedly

7    inconsistent positions Magma has taken and IBM's grant of a license to Magma.  Synopsys,

8    therefore, cannot show an unfair detriment to it.

9         **3.    Neither Magma Nor van Ginneken Made Knowing Misrepresentations
                    To The PTO.**

10

11       Synopsys has failed to show that Magma or van Ginneken intended to mislead the PTO.

12   Judicial estoppel does not apply where an alleged misrepresentation is based on inadvertence or

13   mistake.  (SJ Order at 9:3-5; *see Johnson v. Oregon*, 141 F.3d 1361, 1369-70 (9th Cir. 1998) ("If

14   incompatible positions are not based on chicanery, but only on inadvertence or mistake, judicial

15   estoppel does not apply."); *see also In re Corey*, 892 F.2d 829, 836 (9th Cir. 1989).

16       Magma's representations to the PTO were based on van Ginneken's misunderstanding of

17   the standards of inventorship.  Synopsys's assertion that van Ginneken knew "all the facts

18   pertaining to the conception of the claimed invention at the time" that he made his initial

19   representations to the PTO is false.  (Synopsys Br. 37:15-22.)  Van Ginneken was aware that he

20   and Kudva had collaborated on research on constant delay, but he was not "sufficiently informed

21   of what the standards for inventorship were" to ascertain whether Kudva's was a co-inventor

22   under the law.  (Van Ginneken Dep. Tr. 49:17-50:18.)  Furthermore, as van Ginneken testified,

23   Magma had no independent basis to conclude that van Ginneken's representations to the PTO that

24   he was the sole inventor of the inventions claimed in the Patents were inaccurate.  (Van Ginneken

25   Dep. Tr. 28:12-29:15.)

26       Synopsys's contention that the testimony of Magma's patent counsel shows that van

27   Ginneken was familiar with and had extensive discussions regarding inventorship and conception

28   with Magma's patent counsel is baseless.  (Synopsys Br. 37:15-22.)  Magma's patent counsel

MAGMA'S POST-TRIAL REPLY BRIEF
                                             C-04-03923 MMC

1    testified he had no basis to believe that either van Ginneken or Magma formed an intent to

2    deceive the PTO in connection with the prosecution of the '446 Patent.  (de Guzman Dep. Tr.

3    70:1-4; 71:18-72:16; 254:9-255:3.)  Synopsys's additional assertion that Magma was informed by

4    an expert consultant that van Ginneken's work could be traced back to Synopsys and IBM is also

5    unavailing.  (Synopsys Br. 37:23-27.)  Synopsys has presented no evidence that this consultant

6    ever communicated to Magma verbally or in writing that IBM or Synopsys had any involvement

7    with the inventions claimed in the Patents.

8                                                    **CONCLUSION**

9            Magma respectfully requests that the Court enter judgment in Magma's favor on Magma's

10   Second, Sixth and Tenth Counterclaims and Magma's Second, Fifth, Seventh, Eighth and

11   Fifteenth Affirmative Defenses.  Magma further requests that the Court determine that Synopsys

12   is not the sole and exclusive owner of the '446, '438 and '114 Patents, and all foreign

13   counterparts and continuations thereof, and that IBM is a joint owner of the '446, '438 and '114

14   Patents, and all foreign counterparts and continuations thereof.

15

16          Dated: June 30, 2006                    O'MELVENY & MYERS LLP

17                                                  By:  /s/ George A. Riley
                                                        George A. Riley
18
                                                   Attorneys for Defendant and Counterclaimant
19                                                 MAGMA DESIGN AUTOMATION, INC.

20   SF1:633445.8

21

22

23

24

25

26

27

28

                                            -25-          MAGMA'S POST-TRIAL REPLY BRIEF
                                                          C-04-03923 MMC