IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

SYNOPSYS, INC.,                        )
a Delaware corporation,                )
                                       )
            Plaintiff and              )        C.A. No. 05-701 (GMS)
            Counter-Defendant,         )
                                       )
        v.                             )
                                       )
MAGMA DESIGN AUTOMATION,               )
a Delaware corporation,                )
                                       )
            Defendant and              )
            Counterclaimant.           )

## NOTICE OF SUBPOENAS

PLEASE TAKE NOTICE that the attached subpoenas are being served on:

                                                        Tab

Fenwick & West LLP                                       A
Silicon Valley Center
801 California Street
Mountain View, CA  94041


NVIDIA Corporation                                       B
2701 San Tomas Expressway
Santa Clara, CA  95050


Pillsbury Winthrop Shaw Pittman LLP                      C
2475 Hanover Street
Palo Alto, CA  94304

MORRIS, NICHOLS, ARSHT & TUNNELL LLP


*/s/ Leslie A. Polizoti (#4299)*
Jack B. Blumenfeld (#1014)
Karen Jacobs Louden (#2881)
Leslie A. Polizoti (#4299)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
lpolizoti@mnat.com
    *Attorneys for Plaintiff Synopsys, Inc.*

OF COUNSEL:

Valerie M. Wagner
DECHERT LLP
1117 California Ave.
Palo Alto, CA 94304-
(650) 813-4848

George G. Gordon
DECHERT LLP
Cira Centre
2929 Arch St. 19104-2808
Philadelphia, PA
(215) 261-2382

Rebecca P. Dick
DECHERT LLP
1775 Eye St., N.W.
Washington, DC 20006-2401
(202) 261-3432

October 30, 2006
543274

# TAB A

AO 88 (Rev. 11/94) Subpoena in a Civil Case

Issued by the

# UNITED STATES DISTRICT COURT

NORTHERN    DISTRICT OF CALIFORNIA

SYNOPSYS, INC., a Delaware corporation,

## SUBPOENA IN A CIVIL CASE

v.

MAGMA DESIGN AUTOMATION, a Delaware
corporation

Case Number:[1]  05-701 GMS
(DISTRICT OF DELAWARE)

TO:  Fenwick & West LLP, Silicon Valley Center, 801 California Street, Mountain
     View, CA  94041

☐   YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to
    testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | |
| | DATE AND TIME |
| | |

☐   YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in
    the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| | |

☒   YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the
    place, date, and time specified below (list documents or objects):
Please see Attachment A.

| PLACE | DATE AND TIME |
|---|---|
| Dechert LLP, 1117 California Avenue, Palo Alto, CA 94304; (650) 813-4800 | November 16, 2006 5:00 p.m. |

☐   YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers,
directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated,
the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| Attorneys for Plaintiff SYNOPSYS, INC. | October 25, 2006 |

ISSUING OFFICER'S NAME ADDRESS AND TELEPHONE NUMBER
Daniel B. Epstein, Dechert LLP, 1117 California Avenue, Palo Alto, CA  94304
Telephone: 650-813-4800

(See Rule 45, Federal Rules of Civil Procedure, parts C & D on reverse)

[1] If action is pending in district other than district of issuance, state district under case number.

AO-88

AO 88 (Rev. 11/94) Subpoena in a Civil Case

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| | |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
                    DATE

_____
SIGNATURE OF SERVER

_____
ADDRESS OF SERVER

_____

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

**(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.**

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d) (2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to comply production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance,

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to

the provisions of clause (c) (3) (B) (iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or the demanding party to contest the claim.

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or if the party in who behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

**(d) DUTIES IN RESPONDING TO SUBPOENA.**

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

## ATTACHMENT A

Pursuant to Rules 34 and 45 of the Federal Rules of Civil Procedure, Plaintiff

SYNOPSYS, INC. ("SYNOPSYS") requests that FENWICK & WEST LLP ("FENWICK")

produce and permit the inspection and copying of the documents or tangible things described

below in its possession, custody, or control.

## INSTRUCTIONS

1.      Unless otherwise noted, this set of demands requires the production of documents

or tangible things that were prepared, created, written, sent, dated or received at any time up to

the present.

2.      In producing documents or tangible things pursuant to these demands, FENWICK

must conform to the requirements of Federal Rule of Civil Procedure 34(b).  This means that

FENWICK shall produce documents as they are kept in the usual course of business or shall

organize and label the documents to correspond with the categories in the document requests.

3.      If FENWICK withholds any documents or tangible things under a claim of

privilege, please furnish with the response to these demands a privilege and/or redaction log

identifying each document or tangible thing for which privilege is claimed, including the

following information:

       a.      The date, sender, recipient, and subject matter of the documents or

tangible thing;

       b.      The basis upon which privilege is claimed;

       c.      The paragraphs, paragraph, or subparts of the demand to which the

document or tangible thing corresponds.

ATTACHMENT TO SUBPOENA – FENWICK & WEST LLP ("FENWICK")

12513626.2

## DEFINITIONS

1.     "FENWICK" means Fenwick & West LLP and any of its predecessors, successors, assigns, agents, employees, officers, directors, affiliates, partners, subsidiaries, parent-corporations, investors, attorneys, or other persons or entities acting on its behalf.

2.     "PTO" means the United States Patent and Trademark Office.

3.     "DOCUMENT" means any "writing," as defined by Federal Rule of Evidence 1001, in FENWICK'S possession, custody or control (including the original and all non-identical copies thereof) regardless of where located and including, but not limited to, files, file folders, contracts, agreements, financial statements, ledger sheets or other accounting records, loan papers, inventory records, tape recordings, transcripts, drawings, correspondence, communications, reports, studies, summaries, indices, memoranda, calendar or diary entries, handwritten notes, working papers, minutes, agenda, bulletins, notices, announcements, instructions, charts, manuals, brochures, schedules, telegrams, teletypes, films, videotapes, photographs, microfilm or microfiche, letters, faxes, computer records, computer disks, magnetic tape, optical disks, electronic backups, source code, object code, executable files, library definitions, documentation, tutorial materials, user's guides, reference materials, installation notes, implementation details, man pages, and any other documents or data compilations.

4.     "COMMUNICATION" means any transfer of information, ideas, opinions or thoughts by any means, written, oral or otherwise, at any time or place under any circumstances. The definition is not limited to transfers between persons but also includes other transfers, such as records and memoranda to file; any written letter, memorandum, or other document which was sent by one or more individuals to another or others; any telephone call between one

2

12513626.2

or more individual and another or others, whether such call was by chance or prearranged, formal or informal; any electronic mail ("email") messages sent by one or more individuals to another or others; and any conversation or meeting between one or more individuals and another or others, whether such contact was by chance or prearranged, formal or informal. Unless otherwise indicated, a request for COMMUNICATIONS includes FENWICK'S internal COMMUNICATIONS and COMMUNICATIONS between FENWICK and any other person.

5.      "'093 PATENT" means United States Patent No. 6,854,093, Application No. 10/104,813, and any continuation applications, continuation-in-part applications, and divisional applications filed thereon, or foreign counterparts.

6.      "'116 PATENT" means United States Patent No. 6,857,116, Application No. 09/714,722, and any continuation applications, continuation-in-part applications, and divisional applications filed thereon, or foreign counterparts.

7.      "PRIOR ART" is used as that term is generally understood in proceedings before the PTO. PRIOR ART includes all information that was subject to a duty of disclosure to the PTO with respect to one or more of the applications leading to the '093 PATENT and the '116 PATENT, and all information now known to FENWICK that would have been subject to a duty of disclosure to the PTO had that information been known to the named inventors or to the prosecuting attorney during the prosecution of the '093 PATENT and the '116 PATENT. PRIOR ART also refers to, by way of example and without limitation, to the subject matter described in 35 U.S.C. §§ 102 and 103, including, but not limited to, (1) publications physical devices, prototypes, uses, sales, and offers for sale and any DOCUMENT or thing evidencing any of the foregoing and/or (2) any DOCUMENT or thing that any person has at any time

3

12513626.2

suggested, or contended invalidates (or may invalidate), anticipates (or may anticipate), or makes

obvious (or may make obvious), alone or in combination with other DOCUMENTS or things (or

the skill or knowledge of a person of ordinary skill in the art), (a) any claim of the '093 PATENT

or the '116 PATENT, or (b) any claim pending during the prosecution of the '093 PATENT or

the '116 PATENT.

8.      "RELATING TO" means constituting, containing, consisting of, composing,

comprising, embodying, referring to, summarizing, discussing, showing, commenting upon, or

describing.

## REQUESTS FOR PRODUCTION

### REQUEST FOR PRODUCTION NO. 1:

All DOCUMENTS RELATING TO prosecution in the PTO of the '093 PATENT.

### REQUEST FOR PRODUCTION NO. 2:

All DOCUMENTS RELATING TO prosecution in the PTO of the '116 PATENT.

### REQUEST FOR PRODUCTION NO. 3:

All COMMUNICATIONS RELATING TO the '093 PATENT.

### REQUEST FOR PRODUCTION NO. 4:

All COMMUNICATIONS RELATING TO the '116 PATENT.

### REQUEST FOR PRODUCTION NO. 5:

All DOCUMENTS RELATING TO any sale, offer for sale, public use or disclosure of

any system, hardware, software, product, or method covered by any claim of the '093 PATENT.

### REQUEST FOR PRODUCTION NO. 6:

All DOCUMENTS RELATING TO any sale, offer for sale, public use or disclosure of

any system, hardware, software, product, or method covered by any claim of the '116 PATENT.

4

**REQUEST FOR PRODUCTION NO. 7:**

All DOCUMENTS RELATING TO PRIOR ART to the invention of any claim of the '093 PATENT or to any invention of any claim pending during the prosecution of the '093 PATENT, cited to, or by, the named inventors of the '093 PATENT.

**REQUEST FOR PRODUCTION NO. 8:**

All DOCUMENTS RELATING TO PRIOR ART to the invention of any claim of the '116 PATENT or to any invention of any claim pending during the prosecution of the '116 PATENT, cited to, or by, the named inventors of the '116 PATENT.

**REQUEST FOR PRODUCTION NO. 9:**

All DOCUMENTS RELATING TO all PRIOR ART searches conducted in connection with the prosecution of the '093 PATENT.

**REQUEST FOR PRODUCTION NO. 10:**

All DOCUMENTS RELATING TO all PRIOR ART searches conducted in connection with the prosecution of the '116 PATENT.

**REQUEST FOR PRODUCTION NO. 11:**

All DOCUMENTS RELATING TO the conception and/or reduction to practice of the '093 PATENT.

**REQUEST FOR PRODUCTION NO. 12:**

All DOCUMENTS RELATING TO the conception and/or reduction to practice of the '116 PATENT.

**REQUEST FOR PRODUCTION NO. 13:**

All DOCUMENTS RELATING TO any invention disclosures from any of the named inventors of the '093 PATENT.

5

**REQUEST FOR PRODUCTION NO. 14:**

All DOCUMENTS RELATING TO any invention disclosures from any of the named inventors of the '116 PATENT.

**REQUEST FOR PRODUCTION NO. 15:**

All DOCUMENTS RELATING TO COMMUNICATIONS between FENWICK and the named inventors of the '093 PATENT.

**REQUEST FOR PRODUCTION NO. 16:**

All DOCUMENTS RELATING TO COMMUNICATIONS between FENWICK and the named inventors of the '116 PATENT.

**REQUEST FOR PRODUCTION NO. 17:**

All DOCUMENTS RELATING TO any advantage or improvement provided by the inventions claimed in the '093 PATENT.

**REQUEST FOR PRODUCTION NO. 18:**

All DOCUMENTS RELATING TO any advantage or improvement provided by the inventions claimed in the '116 PATENT.

**REQUEST FOR PRODUCTION NO. 19:**

All DOCUMENTS RELATING TO the existence of any problem with which the inventions claimed in the '093 PATENT are concerned, any proposed or actual solution thereto.

**REQUEST FOR PRODUCTION NO. 20:**

All DOCUMENTS RELATING TO the existence of any problem with which the inventions claimed in the '116 PATENT are concerned, and any proposed or actual solution thereto.

**REQUEST FOR PRODUCTION NO. 21:**

6

All DOCUMENTS RELATING TO any long-felt need for the inventions claimed in the '093 PATENT and the satisfaction thereof, including all DOCUMENTS RELATING TO any commercial success of the inventions claimed in the '093 PATENT.

**REQUEST FOR PRODUCTION NO. 22:**

All DOCUMENTS RELATING TO any long-felt need for the inventions claimed in the '116 PATENT and the satisfaction thereof, including all DOCUMENTS RELATING TO any commercial success of the inventions claimed in the '116 PATENT.

**REQUEST FOR PRODUCTION NO. 23:**

All DOCUMENTS RELATING TO the date when each of the inventions claimed in the '093 PATENT began to be developed, including documents sufficient to determine such date.

**REQUEST FOR PRODUCTION NO. 24:**

All DOCUMENTS RELATING TO the date when each of the inventions claimed in the '116 PATENT began to be developed, including documents sufficient to determine such date.

**REQUEST FOR PRODUCTION NO. 25:**

All DOCUMENTS and tangible things RELATING TO the research, development, or design of any of the inventions claimed in the '093 PATENT.

**REQUEST FOR PRODUCTION NO. 26:**

All DOCUMENTS and tangible things RELATING TO the research, development, or design of any of the inventions claimed in the '116 PATENT.

**REQUEST FOR PRODUCTION NO. 27:**

All DOCUMENTS and tangible things RELATING TO the modification, improvement, upgrade, construction, manufacture, assembly or testing of any of the inventions claimed in the '093 PATENT.

7

**REQUEST FOR PRODUCTION NO. 28:**

All DOCUMENTS and tangible things RELATING TO the modification, improvement, upgrade, construction, manufacture, assembly or testing of any of the inventions claimed in the '116 PATENT.

**REQUEST FOR PRODUCTION NO. 29:**

All DOCUMENTS and tangible things RELATING TO the ownership of or interest in the '093 PATENT, including all assignments, notices, notices or records RELATING TO the assignments, in the PTO or otherwise.

**REQUEST FOR PRODUCTION NO. 30:**

All DOCUMENTS and tangible things RELATING TO the ownership of or interest in the '116 PATENT, including all assignments, notices, notices or records RELATING TO the assignments, in the PTO or otherwise.

**REQUEST FOR PRODUCTION NO. 31:**

All DOCUMENTS RELATING TO telephone or in-person interviews with the PTO examiner for the '093 PATENT.

**REQUEST FOR PRODUCTION NO. 32:**

All DOCUMENTS RELATING TO telephone or in-person interviews with the PTO examiner for the '116 PATENT.

**REQUEST FOR PRODUCTION NO. 33:**

All DOCUMENTS RELATING TO the prosecution history of the '093 PATENT.

**REQUEST FOR PRODUCTION NO. 34:**

All DOCUMENTS RELATING TO the prosecution history of the '116 PATENT.

**REQUEST FOR PRODUCTION NO. 35:**

All DOCUMENTS RELATING TO the preparation of the application which matured into the '093 PATENT.

**REQUEST FOR PRODUCTION NO. 36:**

All DOCUMENTS RELATING TO the preparation of the application which matured into the '116 PATENT.

**REQUEST FOR PRODUCTION NO. 37:**

All DOCUMENTS RELATING TO any analysis, opinion, construction, or interpretation of any of the claims – or terms within the claims – of the '093 PATENT.

**REQUEST FOR PRODUCTION NO. 38:**

All DOCUMENTS RELATING TO any analysis, opinion, construction, or interpretation of any of the claims – or terms within the claims – of the '116 PATENT.

ATTACHMENT TO SUBPOENA – FENWICK & WEST LLP ("FENWICK")

12513626.2

TAB B

AO 88 (Rev. 11/94) Subpoena in a Civil Case

Issued by the

# UNITED STATES DISTRICT COURT

__NORTHERN__   DISTRICT OF __CALIFORNIA__

SYNOPSYS, INC., a Delaware corporation,

### SUBPOENA IN A CIVIL CASE

v.

MAGMA DESIGN AUTOMATION, a Delaware
corporation

Case Number: [1] 05-701 GMS
(DISTRICT OF DELAWARE)

TO:  NVIDIA Corporation
     2701 San Tomas Expressway
     Santa Clara, CA  95050

☐  YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to
   testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
| --- | --- |
| | DATE AND TIME |

☒  YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in
   the above case.

| PLACE OF DEPOSITION<br>Dechert LLP<br>1117 California Avenue, Palo Alto, CA  94304 | DATE AND TIME<br>November 17, 2006<br>9:00 a.m. |
| --- | --- |

☒  YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the
   place, date, and time specified below (list documents or objects):
See Attachment A

| PLACE<br>Dechert LLP<br>1117 California Avenue<br>Palo Alto, CA 94304 | DATE AND TIME<br>November 3, 2006<br>5:00 p.m. |
| --- | --- |

☐  YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
| --- | --- |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers,
directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated,
the matters on which the person will testify.  Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
| --- | --- |
| Attorneys for Plaintiff SYNOPSYS, INC. | October 23, 2006 |

ISSUING OFFICER'S NAME ADDRESS AND TELEPHONE NUMBER
Daniel B. Epstein, Dechert LLP, 1117 California Avenue, Palo Alto, CA  94304
tel:  650-813-4800

(See Rule 45, Federal Rules of Civil Procedure, parts C & D on reverse)
[1] If action is pending in district other than district of issuance, state district under case number.

AO-88

AO 88 (Rev. 11/94) Subpoena in a Civil Case

---

## PROOF OF SERVICE

| DATE | PLACE |
|------|-------|
|      |       |

**SERVED**

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|------------------------|-------------------|
| Steven Hillier Pettigrew, NVIDIA Corp. - Agent for Service of Process | Hand Delivery, 2701 San Tomas Expressway Santa Clara, CA 9505 |

| SERVED BY (PRINT NAME) | TITLE |
|------------------------|-------|
|                        |       |

---

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
          DATE

SIGNATURE OF SERVER _____

ADDRESS OF SERVER

A & A Legal Service, 1541 Bayshore Hwy, Burlingame, CA  94010

---

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

**(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.**

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d) (2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to comply production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance,

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c) (3) (B) (iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or the demanding party to contest the claim.

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or if the party in who behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

**(d) DUTIES IN RESPONDING TO SUBPOENA.**

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

## ATTACHMENT A

Pursuant to Rules 34 and 45 of the Federal Rules of Civil Procedure, Plaintiff

SYNOPSYS, INC. ("SYNOPSYS") requests that NVIDIA Corp. ("NVIDIA") produce and

permit the inspection and copying of the documents or tangible things described below in its

possession, custody, or control.

## INSTRUCTIONS

1.      Unless otherwise noted, this set of demands requires the production of documents

or tangible things that were prepared, created, written, sent, dated or received at any time up to

the present.

2.      In producing documents or tangible things pursuant to these demands, NVIDIA

must conform to the requirements of Federal Rule of Civil Procedure 34(b).  This means that

NVIDIA shall produce documents as they are kept in the usual course of business or shall

organize and label the documents to correspond with the categories in the document requests.

3.      If NVIDIA withholds any documents or tangible things under a claim of

privilege, please furnish with the response to these demands a privilege and/or redaction log

identifying each document or tangible thing for which privilege is claimed, including the

following information:

a.      The date, sender, recipient, and subject matter of the documents or

tangible thing;

b.      The basis upon which privilege is claimed;

c.      The paragraphs, paragraph, or subparts of the demand to which the

document or tangible thing corresponds.

12542585.1

## DEFINITIONS

1.      "ACTION" means the action entitled *Synopsys, Inc. v. Magma Design Automation, Inc.*, Case No. 05-701 GMS, filed by Synopsys, Inc. in the United States District Court for the District of Delaware, as well as any allegations, claims, and counterclaims asserted by any parties therein.

2.      "SYNOPSYS" means plaintiff, Synopsys, Inc. and any of its predecessors, successors, assigns, agents, employees, officers, directors, affiliates, partners, subsidiaries, parent-corporations, investors, attorneys, or other persons or entities acting on its behalf.

3.      "MAGMA" means defendant, Magma Design Automation, Inc. and any of its predecessors, successors, assigns, agents, employees, officers, directors, affiliates, partners, subsidiaries, parent-corporations, investors, attorneys, or other persons or entities acting on its behalf.

4.      "RESHAPE" means Reshape, Inc. and any of its predecessors, successors, assigns, agents, employees, officers, directors, affiliates, partners, subsidiaries, parent-corporations, investors, attorneys, or other persons or entities acting on its behalf.

5.      "NVIDIA" means NVIDIA Corp. and any of its predecessors, successors, assigns, agents, employees, officers, directors, affiliates, partners, subsidiaries, parent-corporations, investors, attorneys, or other persons or entities acting on its behalf.

6.      "3DFX" means 3dfx Interactive, Inc. and any of its predecessors, successors, assigns, agents, employees, officers, directors, affiliates, partners, subsidiaries, parent-corporations, investors, attorneys, or other persons or entities acting on its behalf.

7.      "'093 PATENT" means United States Patent No. 6,854,093, Application No. 10/104,813, and any continuation applications, continuation-in-part applications, and divisional

2

applications filed thereon, or foreign counterparts. A copy of United States Patent No. 6,854,093 is enclosed as Attachment C.

8.     "'116 PATENT" means United States Patent No. 6,857,116, Application No. 09/714,722, and any continuation applications, continuation-in-part applications, and divisional applications filed thereon, or foreign counterparts. A copy of United States Patent No. 6,857,116 is enclosed as Attachment D.

9.     "RESHAPE PATENTS" means the '116 PATENT and the '093 PATENT.

10.    "'658 PATENT" means United States Patent No. 5,757,658, Application No. 08/611,785, and any continuation applications, continuation-in-part applications, and divisional applications filed thereon, or foreign counterparts. A copy of United States Patent No. 5,757,658 is enclosed as Attachment E.

11.    "RESHAPE PRODUCT" means any product manufactured, distributed, acquired, licensed, leased, sold, marketed, or offered for sale by RESHAPE.

12.    "PTO" means the United States Patent and Trademark Office.

13.    "DOCUMENT" means any "writing," as defined by Federal Rule of Evidence 1001, in NVIDIA's possession, custody or control (including the original and all non-identical copies thereof) regardless of where located and including, but not limited to, files, file folders, contracts, agreements, financial statements, ledger sheets or other accounting records, loan papers, inventory records, tape recordings, transcripts, drawings, correspondence, communications, reports, studies, summaries, indices, memoranda, calendar or diary entries, handwritten notes, working papers, minutes, agenda, bulletins, notices, announcements, instructions, charts, manuals, brochures, schedules, telegrams, teletypes, films, videotapes, photographs, microfilm or microfiche, letters, faxes, computer records, computer

disks, magnetic tape, optical disks, electronic backups, source code, object code, executable files, library definitions, documentation, tutorial materials, user's guides, reference materials, installation notes, implementation details, man pages, and any other documents or data compilations.

14.    "PRIOR ART" is used as that term is generally understood in proceedings before the PTO.  PRIOR ART includes all information known to NVIDIA that would have been subject to a duty of disclosure to the PTO had that information been known to the named inventors or to RESHAPE or to RESHAPE'S attorneys during the prosecution of the RESHAPE PATENTS. PRIOR ART also refers to, by way of example and without limitation, to the subject matter described in 35 U.S.C. §§ 102 and 103, including, but not limited to,  (1) publications, physical devices, prototypes, uses,  sales, and offers for sale and any DOCUMENT or thing evidencing any of the foregoing and/or (2) any DOCUMENT or thing that any person has at any time suggested, or contended invalidates (or may invalidate), anticipates (or may anticipate), or makes obvious (or may make obvious), alone or in combination with other DOCUMENTS or things (or the skill or knowledge of a person of ordinary skill in the art), (a) any claim of the RESHAPE PATENTS, or (b) any claim pending during the prosecution of the RESHAPE PATENTS.

15.    "COMMUNICATION" means any transfer of information, ideas, opinions or thoughts by any means, written, oral or otherwise, at any time or place under any circumstances. The definition is not limited to transfers between persons but also includes other transfers, such as records and memoranda to file; any written letter, memorandum, or other document which was sent by one or more individuals to another or others; any telephone call between one or more individual and another or others, whether such call was by chance or prearranged, formal or informal; any electronic mail ("email") messages sent by one or

more individuals to another or others; and any conversation or meeting between one or more individuals and another or others, whether such contact was by chance or prearranged, formal or informal. Unless otherwise indicated, a request for COMMUNICATIONS includes NVIDIA's and 3DFX's internal COMMUNICATIONS and COMMUNICATIONS between NVIDIA or 3DFX and any other person.

16.    "RELATING TO" means constituting, containing, consisting of, composing, comprising, embodying, referring to, summarizing, discussing, showing, commenting upon, or describing.

## REQUESTS FOR PRODUCTION

### REQUEST FOR PRODUCTION NO. 1:

All DOCUMENTS RELATING TO any RESHAPE PRODUCT or any of the RESHAPE PATENTS.

### REQUEST FOR PRODUCTION NO. 2:

All DOCUMENTS RELATING TO any COMMUNICATIONS between NVIDIA or 3DFX and any person RELATING TO any RESHAPE PRODUCT or any of the RESHAPE PATENT.

### REQUEST FOR PRODUCTION NO. 3:

All DOCUMENTS RELATING TO the inventions claimed in the RESHAPE PATENTS.

### REQUEST FOR PRODUCTION NO. 4:

All DOCUMENTS RELATING TO PRIOR ART to the inventions claimed in the RESHAPE PATENTS.

12542585.1

**REQUEST FOR PRODUCTION NO. 5:**

All DOCUMENTS RELATING TO or constituting licenses, agreements of forbearance, agreements of non-assertion, covenants not to sue, or other agreements granting any rights RELATING TO any of the RESHAPE PATENTS, any of the inventions claimed in any of the RESHAPE PATENTS, or any RESHAPE PRODUCT.

**REQUEST FOR PRODUCTION NO. 6:**

All COMMUNICATIONS, and all DOCUMENTS transmitted, between RESHAPE and NVIDIA or between RESHAPE and 3DFX.

**REQUEST FOR PRODUCTION NO. 7:**

All DOCUMENTS RELATING TO any RESHAPE PRODUCT that NVIDIA or 3DFX received at any conference, exhibition, convention, or trade show, including, without limitation, advertisements, brochures, articles, pamphlets, price lists, product specifications, and other promotional, marketing, or presentation materials.

**REQUEST FOR PRODUCTION NO. 8:**

All DOCUMENTS RELATING TO marketing of any RESHAPE PRODUCT, including market requirements statements, marketing reports, market studies, market forecasts, market surveys, competitive analysis, market share date, customer need studies, advertising materials, promotional materials, trade show materials, brochures, price lists, product announcements, and product descriptions.

**REQUEST FOR PRODUCTION NO. 9:**

All DOCUMENTS RELATING TO sales or offers for sale of any RESHAPE PRODUCT, including sales training materials, responses to requests for quotations, quotes, purchase orders, invoices, shipping orders, receipts, guarantees, and warranties.

12542585.1

**REQUEST FOR PRODUCTION NO. 10:**

All DOCUMENTS RELATING TO business agreements or contracts between RESHAPE and NVIDIA or between RESHAPE and 3DFX.

**REQUEST FOR PRODUCTION NO. 11:**

All COMMUNICATIONS between RESHAPE and NVIDIA or between RESHAPE and 3DFX.

**REQUEST FOR PRODUCTION NO. 12:**

All DOCUMENTS RELATING TO the use of a computer before November 15, 2000 to change the location of a pin, port, terminal, input, output, or other object in the design of an integrated circuit.

**REQUEST FOR PRODUCTION NO. 13:**

All DOCUMENTS RELATING TO the use of a computer before November 15, 2000 to move all or part of an object from one level of a hierarchy of an integrated circuit design to a different level of the hierarchy of the integrated circuit design.

**REQUEST FOR PRODUCTION NO. 14:**

All DOCUMENTS RELATING TO the use of a computer before November 15, 2000 to create or modify an integrated circuit design having portions or blocks with abutted pins.

**REQUEST FOR PRODUCTION NO. 15:**

All DOCUMENTS RELATING TO the use of a computer before November 15, 2000 to receive information relating to the physical design of an integrated circuit, including but not limited to any such information in GDSII format or Design Exchange Format (DEF), and use that information to generate a floor plan, placement, routing, layout, or other aspect of an integrated circuit design.

12542585.1

**REQUEST FOR PRODUCTION NO. 16:**

All past and present manuals and user documentation for any RESHAPE PRODUCT.

**REQUEST FOR PRODUCTION NO. 17:**

All DOCUMENTS RELATING TO the past or present operation of any RESHAPE PRODUCT or the PdPerl programming language.

**REQUEST FOR PRODUCTION NO. 18:**

All DOCUMENTS RELATING TO RESHAPE's Application Service Provider (ASP) model.

**REQUEST FOR PRODUCTION NO. 19:**

All DOCUMENTS and things RELATING TO any integrated circuits designed, improved, or modified using any RESHAPE PRODUCT and/or the PdPerl programming language, including the integrated circuits themselves.

**REQUEST FOR PRODUCTION NO. 20:**

All DOCUMENTS and things RELATING TO RESHAPE's design, improvement, modification of, or work on any integrated circuits for NVIDIA or 3DFX, including the integrated circuits themselves.

**REQUEST FOR PRODUCTION NO. 21:**

All DOCUMENTS and things RELATING TO any work described in the paper authored by Paul Rodman entitled "A Flow-Based, Abutted-Pin, Hierarchical Physical Design of Large Graphics Chip."

**REQUEST FOR PRODUCTION NO. 22:**

All DOCUMENTS and things RELATING TO any work described in the paper authored by Paul Rodman entitled "Hopper Hierarchical Flow Improves Turnaround in Physical Design of

8

Large IC," in EE Times: Design News, July 2001. A copy of this article is enclosed as Attachment F.

**REQUEST FOR PRODUCTION NO. 23:**

All DOCUMENTS and things RELATING TO papers, articles, reports, presentations, or publications by any inventor named on the RESHAPE PATENTS, including all DOCUMENTS and things RELATING TO the work described in any such paper, article, report, presentation, or publication.

**REQUEST FOR PRODUCTION NO. 24:**

All DOCUMENTS and things RELATING TO the research, development, or design of any of the inventions claimed in the '658 PATENT.

**REQUEST FOR PRODUCTION NO. 25:**

All DOCUMENTS RELATING TO PRIOR ART to the inventions in any claim of the '658 PATENT.

12542585.1

## ATTACHMENT B

## TOPICS FOR TESTIMONY

1.  Research, design, development of the RESHAPE PRODUCTS.

2.  Sales and licensing of the inventions claimed in the RESHAPE PATENTS.

3.  Marketing, sales, and licensing of the RESHAPE PRODUCTS.

4.  Business relationships or contracts between NVIDIA and RESHAPE or between 3DFX and RESHAPE.

5.  COMMUNICATIONS between NVIDIA and RESHAPE or between 3DFX and RESHAPE.

6.  Development or use of software before November 15, 2000 for changing the location of a pin, port, terminal, input, output, or other object in the design of an integrated circuit.

7.  Development or use of software before November 15, 2000 for moving all or part of an object from one level of a hierarchy of an integrated circuit design to a different level of the hierarchy of the integrated circuit design.

8.  Development or use of software before November 15, 2000 for creating or modifying an integrated circuit design having portions or blocks with abutted pins.

9.  Development or use of software before November 15, 2000 for receiving information relating to the physical design of an integrated circuit, including but not limited to any such information in GDSII format or Design Exchange Format (DEF), and using that information to generate a floor plan, placement, routing, layout, or other aspect of an integrated circuit design.

10. Development or use of RESHAPE's Hopper software, HopperMill methodology, Silo database, and PdPerl programming language.

11. Manuals and user documentation for RESHAPE's Hopper software, HopperMill methodology, Silo database, and PdPerl programming language.

12. The past and present operation of RESHAPE's Hopper software, HopperMill methodology, Silo database, and PdPerl programming language.

12542585.1

13.    RESHAPE's Application Service Provider (ASP) model.

14.    Any integrated circuits designed, improved, or modified using RESHAPE's Hopper software, HopperMill methodology, Silo database, and/or PdPerl programming language.

15.    RESHAPE's design, improvement, modification of, or work on any integrated circuits for NVIDIA or 3DFX.

16.    The work described in the paper authored by Paul Rodman entitled "A Flow-Based, Abutted-Pin, Hierarchical Physical Design of Large Graphics Chip."

17.    The work described in the paper authored by Paul Rodman entitled "Hopper Hierarchical Flow Improves Turnaround in Physical Design of Large IC," in EE Times:  Design News, July 2001.

18.    Any papers, articles, reports, presentations, or publications by any inventor named on the RESHAPE PATENTS, including the work described in any such paper, article, report, presentation, or publication.

19.    Research, development, and design of the inventions claimed in the '658 PATENT.

12542585.1

# ATTACHMENT C

US006854093B1

(12) **United States Patent**
Dahl et al.

(10) Patent No.: **US 6,854,093 B1**
(45) Date of Patent: **Feb. 8, 2005**

(54) **FACILITATING PRESS OPERATION IN ABUTTED-PIN HIERARCHICAL PHYSICAL DESIGN**

(75) Inventors: **Peter Dahl**, Cupertino, CA (US); **Byron Dickinson**, San Jose, CA (US); **Margie Levine**, Menlo Park, CA (US); **Paul Rodman**, Palo Alto, CA (US)

(73) Assignee: **Reshape, Inc.**, Mountain View, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 279 days.

(21) Appl. No.: 10/104,813

(22) Filed: **Mar. 22, 2002**

**Related U.S. Application Data**

(63) Continuation of application No. 09/714,722, filed on Nov. 15, 2000.

(51) Int. Cl.⁷ . . . . . . . . . . . . . . . . . G06F 17/50
(52) U.S. Cl. . . . . . . . . . . . 716/2; 716/3; 716/7; 716/8
(58) Field of Search . . . . . . . . . . . . . . 716/2, 3, 7, 8

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,475,607 A | * | 12/1995 | Apte et al. | 716/10 |
| 5,519,628 A | * | 5/1996 | Russell et al. | 716/10 |
| 5,604,680 A | * | 2/1997 | Bamji et al. | 716/8 |
| 5,812,415 A | * | 9/1998 | Baisuck | 716/11 |
| 5,831,869 A | * | 11/1998 | Ellis et al. | 716/6 |
| 5,943,235 A | * | 8/1999 | Earl et al. | 700/98 |
| 5,970,238 A | * | 10/1999 | Shibata et al. | 716/8 |
| 6,009,250 A | * | 12/1999 | Ho et al. | 716/5 |
| 6,047,116 A | * | 4/2000 | Murakami et al. | 716/19 |
| 6,145,117 A | * | 11/2000 | Eng | 716/18 |
| 6,167,555 A | * | 12/2000 | Lakos | 716/3 |
| 6,167,556 A | * | 12/2000 | Sun et al. | 716/3 |
| 6,185,727 B1 | * | 2/2001 | Liebmann | 716/19 |
| 6,243,854 B1 | * | 6/2001 | Lavin et al. | 716/19 |
| 6,256,768 B1 | * | 7/2001 | Igusa | 716/11 |
| 6,275,971 B1 | * | 8/2001 | Levy et al. | 716/5 |
| 6,289,493 B1 | * | 9/2001 | Kita | 716/11 |
| 6,295,633 B1 | * | 9/2001 | Murakawa | 716/8 |
| 6,301,698 B1 | * | 10/2001 | Lin et al. | 716/19 |
| 6,327,695 B1 | * | 12/2001 | Bothra et al. | 716/8 |
| 6,343,370 B1 | * | 1/2002 | Taoka et al. | 716/21 |
| 6,453,452 B1 | * | 9/2002 | Chang et al. | 716/8 |
| 6,507,944 B1 | * | 1/2003 | Kikuchi et al. | 716/21 |
| 6,567,967 B2 | * | 5/2003 | Greidinger et al. | 716/10 |
| 6,647,543 B2 | * | 11/2003 | Yamada et al. | 716/21 |
| 6,665,857 B2 | * | 12/2003 | Ayres | 716/19 |
| 2002/0000995 A1 | * | 1/2002 | Sawada et al. | 345/620 |
| 2002/0188914 A1 | * | 12/2002 | Parashkevov et al. | 716/3 |
| 2003/0018948 A1 | * | 1/2003 | Chang et al. | 716/8 |
| 2003/0046655 A1 | * | 3/2003 | Kimura | 716/19 |

FOREIGN PATENT DOCUMENTS

JP   07140966 A   * 6/1995   . . . G09G/5/36

* cited by examiner

*Primary Examiner*—Matthew Smith
*Assistant Examiner*—Phallaka Kik
(74) *Attorney, Agent, or Firm*—Wagner, Murabito & Hao LLP

(57) **ABSTRACT**

An abutted-pin hierarchical physical design process is described. The abutted-pin hierarchical physical design provides solutions to the problems of the traditional hierarchical physical design and provides additional advantages and benefits. In particular, the abutted-pin hierarchical physical design does not have channels. Moreover, in the abutted-pin hierarchical physical design, components of the top-level netlist is merged into the block-level so that the top-level netlist is reduced significantly.

**40 Claims, 31 Drawing Sheets**



**U.S. Patent**    Feb. 8, 2005    Sheet 1 of 31    US 6,854,093 B1



# FIGURE 1
# (PRIOR ART)

**FIGURE 2**



**FIGURE 3**



**FIGURE 4**

U.S. Patent          Feb. 8, 2005          Sheet 5 of 31          US 6,854,093 B1

500



FIGURE 5



# FIGURE 6



# FIGURE 7

**U.S. Patent**    Feb. 8, 2005    Sheet 8 of 31    US 6,854,093 B1



# FIGURE 8



NETLIST

PHYSICAL DESIGN
PHASE
910

GDS II

SEMICONDUCTOR
FACTORY
920

CHIP

FIGURE 9A
(PRIOR ART)



**FIGURE 9B**



# FIGURE 10A

U.S. Patent     Feb. 8, 2005     Sheet 12 of 31     US 6,854,093 B1



# FIGURE 10B

**U.S. Patent**    Feb. 8, 2005    Sheet 13 of 31    US 6,854,093 B1



# FIGURE 10C



# FIGURE 11A



# FIGURE 11B



# FIGURE 11C

Case 1:05-cv-00701-GMS      Document 133      Filed 10/30/2006      Page 47 of 70



# FIGURE 12A



# FIGURE 12B



# FIGURE 12C



# FIGURE 13A

Case 1:05-cv-00701-GMS    Document 133    Filed 10/30/2006    Page 51 of 70

**30A**

# FIGURE 13B



# FIGURE 13C

Case 1:05-cv-00701-GMS     Document 133     Filed 10/30/2006     Page 53 of 70



# FIGURE 14A



# FIGURE 14B

U.S. Patent    Feb. 8, 2005    Sheet 25 of 31    US 6,854,093 B1



# FIGURE 14C



**FIGURE 15A**

U.S. Patent        Feb. 8, 2005        Sheet 27 of 31        US 6,854,093 B1



**FIGURE 15B**



# FIGURE 16A

# FIGURE 16B



# FIGURE 17A



**FIGURE 17B**

US 6,854,093 B1

1

# FACILITATING PRESS OPERATION IN ABUTTED-PIN HIERARCHICAL PHYSICAL DESIGN

This patent application is a continuation of application Ser. No. 09/714,722, filed Nov. 15, 2000, entitled "OPTI-MIZATION OF ABUTTED-PIN HIERARCHICAL PHYSICAL DESIGN," by Dahl et al., which is hereby incorporated by reference.

## BACKGROUND OF THE INVENTION

### 1 Field of the Invention

The present invention generally relates to the field of integrated circuit design. More particularly, the present invention relates to the field of software tools for hierarchical physical design.

### 2 Related Art

The tremendous advances in technology have been fueled by improvements in integrated circuit design. In particular, integrated circuits have become smaller and more complex. Integrated circuit design engineers depend on electronic design automation (EDA) software tools to facilitate the design of integrated circuits.

Typically, the integrated circuit design process begins with a specification which describes the functionality of the integrated circuit and may include a variety of constraints. Then, during a logic design phase, the logical implementa-tion of the integrated circuit is determined. Several opera-tions are performed to obtain a logical representation of the integrated circuit. Generally, EDA software tools use regis-ter transfer logic (RTL) to represent the integrated circuit. However, additional EDA software tools may be used.

After completing the logic design phase, the integrated circuit undergoes a physical design phase. Typically, the output of the logic design phase is a netlist, which is then used in the physical design phase. Here, EDA software tools layout the integrated circuit to obtain a representation of the physical components in the integrated circuit, whereas the representation indicates the manner in which the integrated circuit will be implemented on a semiconductor chip. A variety of operations are performed on the layout of the integrated circuit.

At the end of the physical design phase, the representation of the semiconductor chip (in which the integrated circuit is implemented) is sent to a semiconductor manufacturing plant.

Typically, in the physical design phase, EDA software tools implement a flat physical design. For example, the components (standard cells, macrocells, etc) of the inte-grated circuit are placed during a placement operation and are routed during a routing operation. However, as the integrated circuit becomes more complex, the EDA software tools struggle to perform the placement operation and the routing operation. In particular, the performance of the EDA software tools degrades since the EDA software tools have to manipulate very large files during the placement operation and the routing operation. Moreover, as the complexity of the integrated circuit increases, the time necessary to com-plete the physical design phase increases significantly.

Traditional hierarchical physical design has emerged as an alternative to the flat physical design. FIG. 1 illustrates the traditional hierarchical physical design 100. Here, the com-ponents of the integrated circuit are partitioned into a plurality of blocks 10–30. Each block 10–30 includes a plurality of pins 50, whereas each pin 50 represents a

2

location where a signal can enter the block 10–30 or a location where a signal can exit the block 10–30. As illustrated in FIG. 1, the traditional hierarchical physical design 100 includes a channel 40. The channel 40 provides space in order to connect the pins 50 of the blocks 10–30 to one another via metal (not shown) or any other wiring material. The traditional hierarchical physical design 100 enables the placement operation and the routing operation (as well as other operations) for the blocks 10–30 to be performed in parallel with EDA software tools, reducing the time period of the physical design phase. Moreover, the performance of the EDA software tools is improved because the file for each block 10–30 is much smaller than the file for the entire integrated circuit of the flat physical design. More importantly, the EDA software tools are better suited to optimize each block 10–30 than to optimize the entire integrated circuit of the flat physical design. However, the traditional hierarchical physical design 100 generates wasted space in the channel 40 and generates wiring prob-lems in the channel 40, such as congestion and crosstalk. Moreover, the traditional hierarchical physical design 100 places and routes components at a top-level (shown in FIG. 1) and a block-level (within each block 10–30), causing inefficiencies and causing problems with EDA software tools which are configured to operate with flat physical designs.

## SUMMARY OF THE INVENTION

An abutted-pin hierarchical physical design process is described. The abutted-pin hierarchical physical design pro-vides solutions to the problems of the traditional hierarchical physical design and provides additional advantages and benefits. In particular, the abutted-pin hierarchical physical design does not have channels. Moreover, in the abutted-pin hierarchical physical design, components of the top-level are merged into the block-level so that the top-level netlist is reduced significantly.

In the integrated circuit design flow according to an embodiment of the present invention, the physical design phase receives the netlist from the logic design phase. In addition, the physical design phase receives physical design information, whereas the physical design information can be any information about a prior integrated circuit that has undergone the physical design phase. In an embodiment, the physical design information is stored in a database.

In an embodiment of the present invention, the integrated circuit design flow of the present invention is utilized to optimize pin assignment. In an embodiment of the present invention, excess pins formed along a boundary between two blocks are removed.

In an embodiment of the present invention, a software tool that performs a "press" operation preserves the properties associated with a segment of a top-level shape despite the shape operation (e.g., AND) being performed with the block and the top-level shape to obtain the segment.

If the top-level object has the press property, the top-level object retains its location when the top-level object is "pressed" into a block. If the top-level object does not have the press property, the top-level object generally does not retain its location when the top-level object is "pressed" into the block.

If in the top-level netlist, the instantiation of a block includes a port that is unused, (thus, not needed for the top-level routing for pin assignment), a software tool removes the port from the top-level netlist, but the block-level netlist of the block remains unchanged.

US 6,854,093 B1

3

Some software tools are not able to represent the relationship that more than one port is coupled to a pin. Hence, a software tool removes one of the ports from the netlist based on some criteria, such as whether a port is an input port or an output port.

If in the top-level netlist, the instantiation of the block includes a port that is tied to either the power line (1) or the ground line (0) rather to a port of another block, a software tool removes the port from the top-level netlist to avoid routing the port at the top-level. Moreover, the software tool ties the port to either the power line (1) or the ground line (0) in the block-level netlist of the block.

In an embodiment, a software tool performs an unwinding operation which adds to the block-level netlist—of bonding pad blocks—the ports (which were removed earlier by the software tool) that couple to the top-level inputs and to the top-level outputs. Thus, the netlist modified by the physical design phase (e.g., repeater and buffers are added to the netlist) can be compared with the netlist originally received from the logic design phase. In particular, formal verification, layout versus schematic (LVS) verification, and design rules check (DRC) verification can be performed by software tools.

In an embodiment, each block-level netlist is partitioned into a first netlist and a second netlist. The second netlist and its associated extraction file of each block and the top-level netlist and its associated extraction file are utilized by software tools to perform the timing analysis. This timing analysis can be performed significantly faster than the case where the block-level netlist is not partitioned into the first netlist and the second netlist. In an embodiment, the timing graph resulting from the timing analysis can be analyzed to extract timing constraints (relating to the delay that can be generated by a block) for each block. Hence, if a block is optimized to meet its extracted timing constrains, the block is more likely to meet its timing parameter when the block interacts with the other blocks in the integrated circuit.

These and other advantages of the present invention will no doubt become apparent to those of ordinary skill in the art after having read the following detailed description of the preferred embodiments which are illustrated in the drawing figures.

BRIEF DESCRIPTION OF THE DRAWINGS

The accompanying drawings, which are incorporated in and form a part of this specification, illustrate embodiments of the invention and, together with the description, serve to explain the principles of the present invention.

FIG. 1 illustrates the traditional hierarchical physical design 100

FIG. 2 illustrates an exemplary computer system 200 on which embodiments of the present invention may be practiced

FIG. 3 illustrates an integrated circuit 300 generated with software tools according to an embodiment of the abutted-pin hierarchical physical design process of the present invention.

FIG. 4 illustrates the abutted-pin hierarchical physical design process 400 according to an embodiment of the present invention

FIG. 5 illustrates the abutted-pin hierarchical physical design process 500 as performed at the block-level in a particular block (450A–450C of FIG. 4) after step 440 of FIG. 4.

FIG. 6 illustrates the layout of the blocks 10–30 is established

4

FIG. 7 illustrates a clock wire 320 and a power wire 310 of the top-level

FIG. 8 illustrates a top-level route for obtaining the pin assignments for each block 10–30

FIG. 9A illustrates the integrated circuit design flow of the prior art

FIG. 9B illustrates the integrated circuit design flow according to an embodiment of the present invention

FIG. 10A illustrates an integrated circuit 300 based on the abutted-pin hierarchical physical design process of the present invention and using the integrated circuit design flow of the prior art (FIG. 9A), showing the top-level routing for pin assignment

FIG. 10B illustrates the integrated circuit 300 of FIG. 10A at the block level

FIG. 10C illustrates the integrated circuit 300 of FIG. 10B at the block-level.

FIG. 11A illustrates an integrated circuit 300 based on the abutted-pin hierarchical physical design process of the present invention and using the integrated circuit design flow of the present invention (FIG. 9B), showing the top-level routing for pin assignment.

FIG. 11B illustrates the integrated circuit 300 of FIG. 11A at the block-level

FIG. 11C illustrates the integrated circuit 300 of FIG. 11B at the block-level.

FIG. 12A illustrates an integrated circuit 300 based on the abutted-pin hierarchical physical design process of the present invention, showing the top-level routing for pin assignment

FIG. 12B illustrates the integrated circuit 300 of FIG. 12A at the block-level

FIG. 12C illustrates the integrated circuit 300 of FIG. 12B, showing the removal of excess pins

FIG. 13A illustrates an integrated circuit 300 based on the abutted-pin hierarchical physical design process of the present invention, showing the top-level routing for a top-level object 30 (e.g., routing metal).

FIG. 13B illustrates the segment 30A of FIG. 13A.

FIG. 13C illustrates the integrated circuit 300 of FIG. 13A in the top-level, showing that the segment 30A has been removed from the top-level netlist and merged into the block-level netlist of block1 10

FIG. 14A illustrates an integrated circuit 300 based on the abutted-pin hierarchical physical design process of the present invention, showing the top-level routing for a top-level object 60 (e.g., routing metal).

FIG. 14B illustrates the integrated circuit 300 at the block-level

FIG. 14C illustrates the integrated circuit 300 at the block-level

FIG. 15A illustrates an integrated circuit 300 based on the abutted-pin hierarchical physical design process of the present invention, showing the top-level routing for pin assignment

FIG. 15B illustrates that the port F of block1 10 has been removed from the top-level netlist

FIG. 16A illustrates an integrated circuit 300 based on the abutted-pin hierarchical physical design process of the present invention, showing the top-level routing for pin assignment

FIG. 16B illustrates that the port B of block1 10 has been removed from the netlist for the top-level routing for pin assignment

US 6,854,093 B1

5 | 6

FIG. 17A illustrates an integrated circuit 300 based on the abutted-pin hierarchical physical design process of the present invention, showing the top-level routing for pin assignment

FIG. 17B illustrates that the port F of block1 10 has been removed from the top-level netlist.

The drawings referred to in this description should not be understood as being drawn to scale except if specifically noted

## DETAILED DESCRIPTION OF THE INVENTION

Reference will now be made in detail to the preferred embodiments of the present invention, examples of which are illustrated in the accompanying drawings. While the invention will be described in conjunction with the preferred embodiments, it will be understood that they are not intended to limit the invention to these embodiments. On the contrary, the invention is intended to cover alternatives, modifications and equivalents, which may be included within the spirit and scope of the invention as defined by the appended claims Furthermore, in the following detailed description of the present invention, numerous specific details are set forth in order to provide a thorough understanding of the present invention. However, it will be recognized by one of ordinary skill in the art that the present invention may be practiced without these specific details. In other instances, well known methods, procedures, components, and circuits have not been described in detail as not to unnecessarily obscure aspects of the present invention.

### Notation and Nomenclature

Some portions of the detailed descriptions which follow are presented in terms of procedures, logic blocks, processing, and other symbolic representations of operations on data bits within a computer memory. These descriptions and representations are the means used by those skilled in the data processing arts to most effectively convey the substance of their work to others skilled in the art In the present application, a procedure, logic block, process, etc , is conceived to be a self-consistent sequence of steps or instructions leading to a desired result The steps are those requiring physical manipulations of physical quantities Usually, though not necessarily, these quantities take the form of electrical or magnetic signals capable of being stored, transferred, combined, compared, and otherwise manipulated in a computer system It has proved convenient at times, principally for reasons of common usage, to refer to these signals as bits, values, elements, symbols, characters, terms, numbers, or the like

It should be borne in mind, however, that all of these and similar terms are to be associated with the appropriate physical quantities and are merely convenient labels applied to these quantities Unless specifically stated otherwise as apparent from the following discussions, it is appreciated that throughout the present invention, a variety of terms are discussed that refer to the actions and processes of an electronic system or a computer system, or other electronic computing device/system The computer system or similar electronic computing device manipulates and transforms data represented as physical (electronic) quantities within the computer system's registers and memories into other data similarly represented as physical quantities within the computer system memories or registers or other such information storage, transmission, or display devices The

present invention is also well suited to the use of other computer systems such as, for example, optical, mechanical, or quantum computers

### Exemplary Computer System Environment

Aspects of the present invention are discussed in terms of steps executed on a computer system. Although a variety of different computer systems can be used with the present invention, an exemplary computer system 200 is shown in FIG. 2.

With reference to FIG. 2, portions of the present invention are comprised of computer-readable and computer executable instructions which reside, for example, in computer-usable media of an electronic system such as the exemplary computer system. FIG. 2 illustrates an exemplary computer system 200 on which embodiments of the present invention may be practiced It is appreciated that the computer system 200 of FIG. 2 is exemplary only and that the present invention can operate within a number of different computer systems including general-purpose computer systems and embedded computer systems.

Computer system 200 includes an address/data bus 110 for communicating information, a central processor 101 coupled with bus 110 for processing information and instructions, a volatile memory 102 (e g , random access memory RAM) coupled with the bus 110 for storing information and instructions for the central processor 101 and a non-volatile memory 103 (e g , read only memory ROM) coupled with the bus 110 for storing static information and instructions for the processor 101. Exemplary computer system 200 also includes a data storage device 104 ("disk subsystem") such as a magnetic or optical disk and disk drive coupled with the bus 110 for storing information and instructions. Data storage device 104 can include one or more removable magnetic or optical storage media (e.g., diskettes, tapes) which are computer readable memories. Memory units of computer system 200 include volatile memory 102, non-volatile memory 103 and data storage device 104.

Exemplary computer system 200 can further include an optional signal generating device 1108 (e g , a network interface card "NIC") coupled to the bus 1110 for interfacing with other computer systems. Also included in exemplary computer system 200 of FIG. 2 is an optional alphanumeric input device 106 including alphanumeric and function keys coupled to the bus 110 for communicating information and command selections to the central processor 101 Exemplary computer system 200 also includes an optional cursor control or directing device 107 coupled to the bus 110 for communicating user input information and command selections to the central processor 101 An optional display device 105 can also be coupled to the bus 110 for displaying information to the computer user. Display device 105 may be a liquid crystal device, other flat panel display, cathode ray tube, or other display device suitable for creating graphic images and alphanumeric characters recognizable to the user Cursor control device 107 allows the user to dynamically signal the two-dimensional movement of a visible symbol (cursor) on a display screen of display device 105. Many implementations of cursor control device 107 are known in the art including a trackball, mouse, touch pad, joystick or special keys on alphanumeric input device 106 capable of signaling movement of a given direction or manner of displacement Alternatively, it will be appreciated that a cursor can be directed and/or activated via input from alphanumeric input device 106 using special keys and key sequence commands

US 6,854,093 B1

7

## Abutted-Pin Hierarchical Physical Design

FIG. 3 illustrates an integrated circuit 300 generated with software tools according to the abutted-pin hierarchical physical design process of the present invention. The abutted-pin hierarchical physical design provides solutions to the problems of the traditional hierarchical physical design (see FIG. 1) and provides additional advantages and benefits. In particular, the abutted-pin hierarchical physical design does not have channels. Moreover, in the abutted-pin hierarchical physical design, components of the top-level are merged into the block-level so that the top-level netlist is reduced to instantiations of each block 10–30 and 60–94.

As illustrated in FIG. 3, the abutted-pin hierarchical physical design 300 includes a plurality of blocks 10–30 and 60–94. The netlist of the integrated circuit 300 is partitioned into the plurality of blocks 10–30 and 60–94 such that each block 10–30 and 60–94 has a block level netlist. Blocks 10–30 have the major or core components of the integrated circuit 300. Blocks 60–94 have the bonding pads and other support circuitry of the integrated circuit 300. The blocks 10–30 and 60–94 can be rectangular in shape and can be rectilinear in shape. It should be understood that the integrated circuit 300 can have any number of blocks.

Each block 10–30 and 60–94 has one or more pins 50, whereas each pin 50 represents a location where a signal can enter the block 10–30 and 60–94 or a location where a signal can exit the block 10–30 and 60–94. The edge or boundary of each block 10–30 and 60–94 rests against the edge or boundary of another block 10–30 and 60–94, such that the pin 50 of one block abuts the pin 50 of another block.

Moreover, the top-level components or objects (e.g., timing components, clock distribution wiring, power distribution wiring, repeaters, buffers, etc.) are not visible because they have been merged into the blocks 10–30 and 60–94 by a "press" operation performed by a software tool. First, the top-level objects (e.g., timing components, clock distribution wiring, power distribution wiring, repeaters, buffers, etc.) are placed and routed at the top-level (the top-level is shown in FIG. 3). In the "press" operation, the top-level objects (e.g., timing components, clock distribution wiring, power distribution wiring, repeaters, buffers, etc.) that are within the boundary of a block 10–30 and 60–94 are removed from the top-level netlist and merged into the block-level netlist of that block 10–30 and 60–94. Hence, the abutted-pin hierarchical physical design 300 can be optimized by separately optimizing the individual blocks 10–30 and 60–94. Thus, the software tools can generate (e.g., perform placement, routing, timing, verification, etc.) and optimize the individual blocks 10–30 and 60–94 in parallel. Moreover, a bug within an individual block 10–30 and 60–94 can be corrected by returning that individual block to the logic design phase, while the other blocks continue to undergo the physical design phase.

FIG. 4 illustrates the abutted pin hierarchical physical design process 400 according to an embodiment of the present invention. At 410, a software tool receives the netlist of the integrated circuit from the logic design phase, as described above. The netlist is partitioned into a plurality of blocks, each block having a block-level netlist. In an embodiment, the partitioning of the netlist focuses on reducing the number of pins or terminals of a block that need to couple to the ports or terminals of other blocks.

At 420, a software tool performs top-level floor planning. Here, the layout of each block is determined. At the end of the top-level floor planning, the top-level for an integrated circuit 300 (as shown in FIG. 6) is generated. As illustrated

8

in FIG. 6, the layout of the blocks 10–30 is established. In FIG. 6, the bonding pads 60–94 (of FIG. 3) have been omitted.

At 430, software tools perform top-level placement and routing for the top-level objects (e.g., timing components, clock distribution wiring, power distribution wiring, repeaters, buffers, etc.) FIG. 7 illustrates a clock wire 320 and a power wire 310 of the top-level. The clock wire 320 is routed over BlockA 10 and BlockC 30. The power wire 310 is routed over BlockA 10. It should be understood that any number of additional top-level objects can be placed and routed at the top-level.

At 440, a software tool performs a top-level route for obtaining the pin assignments for each block 10–30, as illustrated in FIG. 8. Since each block 10–30 has one or more ports or terminals 47 that needs to couple to a port or terminal of another block 10–30, the pins for each block 10–30 have to be defined. Initially, the ports 47 of each block 10–30 are placed in a general random location within each block at the top-level since the actual location of the port 47 is not known until a placement operation is performed at the block-level. As illustrated in FIG. 8, the location 45A–45F where a routing wire 48 crosses a boundary between two blocks is defined as a pin for each of the blocks 10–30, facilitating creation of pins that are abutted. In an embodiment, a software tool creates each pin to have a width that is equivalent to the width of the routing wire 48 at the boundary between the two blocks. The pins 50 are illustrated in FIG. 3.

At 450A–450C, the abutted-pin hierarchical physical design process 400 enables software tools to generate and to optimize each block 10–30 in parallel at the block-level.

FIG. 5 illustrates the abutted-pin hierarchical physical design process 500 as performed at the block-level in a particular block (450A–450C of FIG. 4) after step 440 of FIG. 4.

At 510, a software tool performs press operations. The top-level objects illustrated in FIG. 7 (e.g., a clock wire 320 and a power wire 310) and which are located within the boundary of a particular block, are pressed into the particular block. In particular, the top-level objects that are within the boundary of a particular block are removed from the top-level netlist and merged into the block-level netlist of that particular block. Moreover, the pins for the particular block are generated based on the location where the routing wire crosses the boundary between two blocks, as illustrated in FIG. 8 and FIG. 3.

At 520, a software tool performs block-level floor planning for the particular block. At 530, a software tool performs a block-level placement operation for the particular block. At 540, software tools perform a variety of block-level operations to optimize the particular block. Additionally, at 550, a block-level route is performed for the particular block by a software tool. At 552 and 554, software tools perform a block-level extraction operation for determining capacitance and resistance at the nodes and perform block-level timing analysis operations for the particular block.

At 560 and 570, a variety of software tools perform a number of verification operations such as formal verification, layout versus schematic (LVS) verification, and design rules check (DRC) verification.

FIG. 9A illustrates the integrated circuit design flow of the prior art. As illustrated in FIG. 9A, the physical design phase 910 receives the netlist from the logic design phase (not shown). The physical design phase 910 generates the physi-

US 6,854,093 B1

9

cal design for the integrated circuit and outputs a GDS II file. The GDS II file is received by the semiconductor factory 920. The integrated circuit is fabricated by the semiconductor factory 920 on a semiconductor chip.

FIG. 9B illustrates the integrated circuit design flow according to an embodiment of the present invention. As illustrated in FIG. 9B, the physical design phase 910 receives the netlist from the logic design phase (not shown). In addition, the physical design phase 910 receives physical design information 930, whereas the physical design information 930 can be any information about a prior integrated circuit that has undergone the physical design phase 910. In an embodiment, the physical design information 930 is stored in a database. For example, the physical design information 930 can be the physical design of the prior integrated circuit, optimal clock distribution tree of the prior integrated circuit, parasitic extraction data of the prior integrated circuit, locations of obstructions such as a RAM of the prior integrated circuit, identification of congested blocks of the prior integrated circuit, metal resources for the blocks of the prior integrated circuit, or any other information which can facilitate optimizing the current integrated circuit. Thus, the software tools of the physical design phase 910 can customize the current integrated circuit to avoid the problems of the prior integrated circuit and to realize the benefits of the prior integrated circuit.

In the physical design phase 910, decisions made at the top-level with respect to the top-level objects, significantly influence the creation of problems at the block-level and the optimization operations at the block-level. By using physical design information 930 (concerning the block-level of the prior integrated circuit) at the top-level of the current integrated circuit, the decisions made at the top-level with respect to the top-level objects of the current integrated circuit will be able to reduce the problems present in the prior integrated circuit and will be able to generate solutions to overcome the problems present in the prior integrated circuit, improving the optimization of the abutted-pin hierarchical physical design process of the present invention. Thus, if the physical design information 930 has information about several prior integrated circuits, the current integrated circuit is more likely to be optimized.

In addition, the physical design phase 910 generates the physical design for the integrated circuit and outputs a GDS II file. Moreover, the physical design phase 910 stores physical design information 930 of the current integrated circuit to be used in the physical design phase 910 of a future integrated circuit. The GDS II file is received by the semiconductor factory 920. The integrated circuit is fabricated by the semiconductor factory 920 on a semiconductor chip.

FIG. 10A illustrates an integrated circuit 300 based on the abutted-pin hierarchical physical design process of the present invention and using the integrated circuit design flow of the prior art (FIG. 9A), showing the top-level routing for pin assignment. The port C of block3 10 is routed to port B of block2 20. The port A of block1 10 is routed to port D of block2 20. This top-level routing has been performed after ports A–D where placed in a generally random location within each block 10–20 at the top-level since the actual locations of the ports A–D are not known until a placement operation is performed at the block-level. Here, the software tools at the top-level do not have access to the physical design information of a prior integrated circuit. The locations 15 and 16 are where the routing metal 18 crosses the boundary between two blocks 10 and 20.

FIG. 10B illustrates the integrated circuit 300 of FIG. 10A. At the block-level, the pins 15A and 16A were formed

10

for block1 10. At the block-level, the pins 15B and 16B were formed for block2 20, whereas pin 15A abuts pin 15B and pin 16A abuts pin 16B. The pins 15A and 15B were formed at location 15 of FIG. 10A. The pins 16A and 16B were formed at location 16 of FIG. 10A.

FIG. 10C illustrates the integrated circuit 300 of FIG. 10B at the block-level. As illustrated in FIG. 10C, the block-level placement operation for block1 10 placed the ports A and C at locations that are different from the locations used to generate the pin assignments in FIG. 10A. In addition, the block-level placement operation for block2 20 placed the ports B and D at locations that are different from the locations used to generate the pin assignments in FIG. 10A. Hence, the block-level routing operations for blocks 10 and 20 generated an inefficient amount of routing wire 19 to couple the ports to the pins in each block. In sum, the pin assignment affects the optimization of the routing wire 19.

FIG. 11A illustrates an integrated circuit 300 based on the abutted-pin hierarchical physical design process of the present invention and using the integrated circuit design flow of the present invention (FIG. 9B), showing the top-level routing for pin assignment. The port C of block1 10 is routed to port B of block2 20. The port A of block1 10 is routed to port D of block2 20. This top-level routing has been performed after each port A–D where placed in a particular location within each block 10–20 at the top-level, whereas the particular location was based on using the physical design information associated with the prior integrated circuit (FIGS. 1A–10C). Here, the software tools at the top-level have access to the physical design information of the prior integrated circuit (FIGS. 10A–10C). The locations 15 and 16 are where the routing metal 18 crosses the boundary between two blocks 10 and 20.

FIG. 11B illustrates the integrated circuit 300 of FIG. 11A at the block-level. At the block-level, the pins 15A and 16A were formed for block1 10. At the block-level, the pins 15B and 16B were formed for block2 20, whereas pin 15A abuts pin 15B and pin 16A abuts pin 16B. The pins 15A and 15B were formed at location 15 of FIG. 11A. The pins 16A and 16B were formed at location 16 of FIG. 11A. Here, the pins 15A and 15B are associated with ports A and D, unlike FIG. 10B where pins 15A and 15B were associated with ports C and B. Moreover, the pins 16A and 16B of FIG. 11B are associated with ports C and B, unlike FIG. 10B where pins 16A and 16B were associated with ports A and D.

FIG. 11C illustrates the integrated circuit 300 of FIG. 11B at the block-level. As illustrated in FIG. 11C, the block-level placement operation for block1 10 placed the ports A and C at locations that are different from the locations used to generate the pin assignments in FIG. 11A. In addition, the block-level placement operation for block2 20 placed the ports B and D at locations that are different from the locations used to generate the pin assignments in FIG. 11A. However, the difference in the location of the ports between FIG. 11A and FIG. 11C is less than the difference in the location of the ports between FIG. 10A and FIG. 10C. Hence, the block-level routing operations for blocks 10 and 20 generated a more efficient amount of routing wire 19 to couple the ports to the pins in each block, compared to FIG. 10C. In sum, the pin assignments generated with the use of the physical design information of the prior integrated circuit (FIGS. 10A–10C) were more optimal than the pin assignments generated without the use of the physical design information of the prior integrated circuit (FIGS. 10A–10C).

FIG. 12A illustrates an integrated circuit 300 based on the abutted-pin hierarchical physical design process of the

US 6,854,093 B1

11

present invention, showing the top-level routing for pin assignment In the course of routing source port 24 of block3 30 to destination port 22 of block2 20, the software tool that performs the top-level routing for pin assignment crosses the boundary between block1 10 and block2 20 at locations 15,16, and 17, whereas the locations 15,16, and 17 will be defined as pins. The software tool is concerned with routing a path between the source port 24 and the destination port 22, but is not concerned about the number of times the path crosses the boundary between the same blocks

FIG. 12B illustrates the integrated circuit 300 of FIG. 12A at the block-level The pins 15A–15B, 16A–16B, and 17A–17B are formed between block1 10 and block2 20 The pins 18A–18B are formed between block1 10 and block3 30. The presence of pins 16A–16B and 17A–17B causes additional routing metal to be added to block1 10 and block2 20 so that pins 15A, 16A, and 17A can be coupled within block1 10 and so that pins 15B, 16B, and 17B can be coupled within block2 20. Hence, one pair of pins (15A–15B or 16A–16B or 17A–17B) is sufficient.

FIG. 12C illustrates the integrated circuit 300 of FIG. 12B, showing the removal of excess pins As illustrated in FIG. 12C, excess pins 16A–16B and 17A–17B were removed from block1 10 and block2 20. This removal is based on a plurality of criteria, such as the current flow direction between the source port 24 and the destination port 22, the location of the excess pins relative to the source port 24 and the destination port 22, or any other criteria. Here, the criteria kept pins 15A–15B but deleted pins 16A–16B and 17A–17B

FIG. 13A illustrates an integrated circuit 300 based on the abutted-pin hierarchical physical design process of the present invention, showing the top-level routing for a top-level object 30 (e.g., routing metal) As described above, a software tool performs a press operation so that the portion of the top-level object 30 which is within the boundary of a particular block 10–20 is moved from the top-level netlist to the block-level netlist of the particular block 10–20 In particular, the segment 30A is pressed into block1 10 while the segment 30B is pressed into block2 20 In an embodiment, the shape operations of a database are utilized in performing the press operation. In FIG. 13A, an AND operation would be performed with block1 10 and the shape 30 to obtain the segment 30A (FIG. 13B) Typically, the routing metal 30 includes a plurality of properties that are stored in a database These properties identify the routing metal 30 and describe the function of the routing metal 30 However, in the shape operations (e.g., AND) of the prior art, the shape operation returns the segment 30A (FIG. 13B) without its properties Thus, these properties have to be reconstructed

In the present invention, the software tool that performs the press operation preserves the properties associated with segment 30A of the routing metal 30 despite the shape operation (e.g., AND) performed with block1 10 and the shape 30 to obtain the segment 30A (FIG. 13B)

FIG. 13C illustrates the integrated circuit 300 of FIG. 13A in the top-level, showing that the segment 30A has been removed from the top-level netlist and merged into the block-level netlist of block1 10 Moreover, the properties associated with segment 30A at the top-level are transferred to the segment 30A at the block-level

FIG. 14A illustrates an integrated circuit 300 based on the abutted-pin hierarchical physical design process of the present invention, showing the top-level routing for a top-level object 60 (e.g., routing metal) As illustrated in FIG

12

14A, the top-level object 60 is routed through block1 10, block2 20, and block3 30. The locations 51–52 indicate top-level object 60 crosses a boundary between two blocks In an embodiment, a press property is added to the properties of the top-level object 60 stored in a database. If the top-level object 60 has the press property, the top-level object 60 retains its location when the top-level object 60 is pressed into block1 10, block2 20, and block3 30, as illustrated in the block-level view of the integrated circuit 300 in FIG. 14C. If the top-level object 60 does not have the press property, the top-level object 60 generally does not retain its location when the top-level object 60 is pressed into block1 10, block2 20, and block3 30, as illustrated in the block-level view of the integrated circuit 300 in FIG. 14B. For example, top-level objects such as power and ground have the press property. As illustrated in FIG. 14B, the pins 51A–51B and 52A–52B are defined. However, the software tool is not constrained to placing the top-level object 60 in the block-level exactly as it was placed at the top-level. Moreover, the top-level object is placed in the block-level of block1 10, block2 20, and block3 30 according to the separate placement and routing requirements of block1 10, block2 20, and block3 30.

FIG. 15A illustrates an integrated circuit 300 based on the abutted-pin hierarchical physical design process of the present invention, showing the top-level routing for pin assignment As illustrated in FIG. 15A, in the top-level netlist, the instantiation of block1 10 includes a port F that is unused, thus, is not needed for the top-level routing for pin assignment Hence, a software tool removes port F from the top-level netlist, but the block-level netlist of block1 10 remains unchanged In an embodiment, the software tool that performs the press operation removes the port F FIG. 15B illustrates that the port F of block1 10 has been removed from the top-level netlist

FIG. 16A illustrates an integrated circuit 300 based on the abutted-pin hierarchical physical design process of the present invention, showing the top-level routing for pin assignment As illustrated in FIG. 16A, port F and port B of block1 10 are coupled to port C of block2 20 with a routing metal 40 However, at location 30 the routing metal 40 crosses the boundary between block1 10 and block2 20. If a pin is formed within block1 10 at location 30, the pin would be coupled to port F and to port B However, some software tools are not able to represent this relationship (i.e., more than one port coupled to a pin) Hence, a software tool removes one of the ports (port F or port B) from the netlist based on some criteria, such as whether a port is an input port or an output port FIG. 16B illustrates that the port B of block1 10 has been removed from the netlist for the top-level routing for pin assignment

FIG. 17A illustrates an integrated circuit 300 based on the abutted-pin hierarchical physical design process of the present invention, showing the top-level routing for pin assignment As illustrated in FIG. 17A, in the top-level netlist, the instantiation of block1 10 includes a port F that is tied to either the power line (1) or the ground line (0) rather to a port of another block Hence, a software tool removes port F from the top-level netlist to avoid routing the port F at the top-level Moreover, the software tool ties the port F to either power line (1) or the ground line (0) in the block-level netlist of block1 10 FIG. 17B illustrates that the port F of block1 10 has been removed from the top-level netlist

As illustrated in FIG. 3, the integrated circuit 300 based on the abutted-pin hierarchical physical design process of the present invention includes a North bond pad block 60, an

US 6,854,093 B1

13

East bond pad block 70, a South bond pad block 80, and a West bond pad block 90, each having bond pad cells. The top-level netlist of the integrated circuit 300 includes one or more top-level inputs for receiving external signals and one or more top-level outputs for transmitting signals off the chip. The top-level inputs and the top-level outputs are coupled to bond pad cells. Typically, software tools which perform a routing operation are configured to not perform the routing operation if the netlist includes bond pad cells. Since the North bond pad block 60, the East bond pad block 70, the South bond pad block 80, and the West bond pad block 90 have bond pad cells in the block-level netlist, the software tools refuse to perform the routing operation in these blocks, preventing pins to be formed on the boundary between these blocks and the blocks 10–30 (the core blocks).

In the present invention, the bond pad cells are marked as macrocells rather than bond pad cells, allowing pins to be formed on the boundary between these blocks 60, 70, 80, and 90 and the blocks 10–30 (the core blocks).

Typically, the block-level netlist of the North bond pad block 60, the East bond pad block 70, the South bond pad block 80, and the West bond pad block 90 include nets to the top-level inputs and nets to the top-level outputs. Generally, the block-level-netlist of the North bond pad block 60, the East bond pad block 70, the South bond pad block 80, and the West bond pad block 90 include nets to the bond pad cells.

In an embodiment of the present invention, a software tool removes the nets to the top-level inputs and nets to the top-level outputs so that the physical design of the integrated circuit can be accomplished as described above. In an embodiment, the software tool removes in the block-level netlist the ports that couple to the top-level inputs and to the top-level outputs. Moreover, the software tool adds a property to the nets to the bond pad cells to indicate that these nets are suppose to couple to the top-level inputs and to the top-level outputs, facilitating an unwinding operation to re-establish at the block-level netlist the nets to the top-level inputs and nets to the top-level outputs that were removed earlier. The unwinding operation adds to the block-level netlist the ports (which were removed earlier) that couple to the top-level inputs and to the top-level outputs. Thus, the netlist modified by the physical design phase (e.g., repeater and buffers are added to the netlist) can be compared with the netlist originally received from the logic design phase. In particular, formal verification, layout versus schematic (LVS) verification, and design rules check (DRC) verification can be performed by software tools.

A challenge with implementing an integrated circuit based on the abutted-pin hierarchical physical design process of the present invention involves analyzing the timing of signal paths that traverse more than one block. The timing of these global paths is difficult to analyzed compared to analyzing the timing of local paths, whereas local paths are signal paths that do not leave a block. One method of analyzing the timing of these global paths involves partitioning the block-level netlist of each block into a first netlist and a second netlist. The first netlist includes nets which start at a register (or flip-flop) and end at a register (or flip-flop) within the block, whereas each branch of the net also starts at a register (or flip-flop) and ends at a register (or flip-flop) within the block. The second netlist includes nets which are coupled to a pin of the block. Generally, the first netlist is ¾ of the initial block-level netlist while the second netlist is ¼ of the initial block-level netlist. If the second netlist ratio is greater than ¼, this indicates inefficient partitioning of the blocks.

14

Once the first netlist and the second netlist are obtain, an extraction operation to obtain parasitic resistance and capacitance is performed on the second netlist of each block. In an embodiment, the partitioning of the block-level netlist and the extraction operation in each block are performed in parallel. Moreover, an extraction operation is performed on the top-level netlist. In an embodiment, a software tool replaces the abutted pins of the top-level netlist with zero ohm resistors.

Some software tools utilized to perform the timing analysis are unable to operate on netlists having nets that are coupled to multiple pins of a block. In an embodiment of the present invention, these netlist are transformed by using "assign statements" to assign different names to the nets that are coupled to multiple pins of a block. Hence, each different named net can be coupled to a separate pin of the block.

In an embodiment, the second netlist and its associated extraction file of each block and the top-level netlist and its associated extraction file are utilized by software tools to perform the timing analysis. This timing analysis can be performed significantly faster than the case where the block-level netlist is not partitioned into the first netlist and the second netlist. In an embodiment, the timing graph resulting from the timing analysis can be analyzed to extract timing constraints (relating to the delay that can be generated by a block) for each block. Hence, if a block is optimized to meet its extracted timing constrains, the block is more likely to meet its timing parameter when the block interacts with the other blocks in the integrated circuit.

The foregoing descriptions of specific embodiments of the present invention have been presented for purposes of illustration and description. They are not intended to be exhaustive or to limit the invention to the precise forms disclosed, and obviously many modifications and variations are possible in light of the above teaching. The embodiments were chosen and described in order to best explain the principles of the invention and its practical application, to thereby enable others skilled in the art to best utilize the invention and various embodiments with various modifications as are suited to the particular use contemplated. It is intended that the scope of the invention be defined by the claims appended hereto and their equivalents.

What is claimed is:

1. A method of pressing a top-level object into one or more blocks of a physical design, comprising:

a) performing a shape operation to identify a portion of said top-level object that is within a boundary of a particular block, wherein said top-level object includes a plurality of properties, and wherein said shape operation preserves said properties associated with said portion of said top-level object; and

b) moving said portion of said top-level object and said properties associated with said portion of said top-level object from a top-level netlist to a block-level netlist of said particular block so that said top-level object changes from a flattened state to a hierarchical state.

2. A method as recited in claim 1 wherein said physical design is an abutted-pin hierarchical physical design.

3. A method as recited in claim 2 wherein said physical design includes a top-level physical design.

4. A method as recited in claim 2 wherein said physical design includes a block-level physical design.

5. A method as recited in claim 1 wherein said top-level object is a timing component.

6. A method as recited in claim 1 wherein said top-level object is a clock distribution wiring

US 6,854,093 B1

15

7. A method as recited in claim 1 wherein said top-level object is a power distribution wiring.

8. A method as recited in claim 1 wherein said top-level object is a routing metal.

9. A method as recited in claim 1 wherein said shape operation is an AND operation.

10. A method as recited in claim 1 wherein said properties are stored in a database.

11. A computer-readable medium comprising computer-executable instructions stored therein for performing a method of pressing a top-level object into one or more blocks of a physical design, said method comprising:

a) performing a shape operation to identify a portion of said top-level object that is within a boundary of a particular block, wherein said top-level object includes a plurality of properties, and wherein said shape operation preserves said properties associated with said portion of said top-level object; and

b) moving said portion of said top-level object and said properties associated with said portion of said top-level object from a top-level netlist to a block-level netlist of said particular block so that said top-level object changes from a flattened state to a hierarchical state.

12. A computer-readable medium as recited in claim 11 wherein said physical design is an abutted-pin hierarchical physical design

13. A computer-readable medium as recited in claim 11 wherein said physical design includes a top-level physical design

14. A computer-readable medium as recited in claim 12 wherein said physical design includes a block-level physical design

15. A computer-readable medium as recited in claim 11 wherein said top-level object is a timing component.

16. A computer-readable medium as recited in claim 11 wherein said top-level object is a clock distribution wiring.

17. A computer-readable medium as recited in claim 11 wherein said top-level object is a power distribution wiring.

18. A computer-readable medium as recited in claim 11 wherein said top-level object is a routing metal.

19. A computer-readable medium as recited in claim 11 wherein said shape operation is an AND operation.

20. A computer-readable medium as recited in claim 11 wherein said properties are stored in a database

21. A method of pressing a top-level object into one or more blocks of a physical design, comprising:

a) identifying a portion of said top-level object that is within a boundary of a particular block;

b) moving said portion of said top-level object from a top-level netlist to a block-level netlist of said particular block so that said top-level object changes from a flattened state to a hierarchical state;

c) if said top-level object includes a press property, performing a block-level placement for said particular block such that a block-level physical location of said portion of said top-level object is substantially equivalent to a top-level physical location of said portion of said top-level object; and

d) if said top-level object does not include a press property, performing said block-level placement for said particular block without regard to said top-level physical location of said portion of said top-level object

16

22. A method as recited in claim 21 wherein said physical design is an abutted-pin hierarchical physical design

23. A method as recited in claim 22 wherein said physical design includes a top-level physical design.

24. A method as recited in claim 22 wherein said physical design includes a block-level physical design

25. A method as recited in claim 21 wherein said top-level object is a timing component.

26. A method as recited in claim 21 wherein said top-level object is a clock distribution wiring

27. A method as recited in claim 21 wherein said top-level object is a power distribution wiring.

28. A method as recited in claim 21 wherein said top-level object is a routing metal.

29. A method as recited in claim 21 wherein said top-level object is a ground distribution wiring

30. A method as recited in claim 21 wherein said press property is stored in a database

31. A computer-readable medium comprising computer-executable instructions stored therein for performing a method of pressing a top-level object into one or more blocks of a physical design, said method comprising:

a) identifying a portion of said top-level object that is within a boundary of a particular block;

b) moving said portion of said top-level object from a top-level netlist to a block-level netlist of said particular block so that said top-level object changes from a flattened state to a hierarchical state;

c) if said top-level object includes a press property, performing a block-level placement for said particular block such that a block-level physical location of said portion of said top-level object is substantially equivalent to a top-level physical location of said portion of said top-level object; and

d) if said top-level object does not include a press property, performing said block-level placement for said particular block without regard to said top-level physical location of said portion of said top-level object.

32. A computer-readable medium as recited in claim 31 wherein said physical design is an abutted-pin hierarchical physical design

33. A computer-readable medium as recited in claim 32 wherein said physical design includes a top-level physical design

34. A computer-readable medium as recited in claim 32 wherein said physical design includes a block-level physical design.

35. A computer-readable medium as recited in claim 31 wherein said top-level object is a timing component

36. A computer-readable medium as recited in claim 31 wherein said top-level object is a clock distribution wiring

37. A computer-readable medium as recited in claim 31 wherein said top-level object is a power distribution wiring.

38. A computer-readable medium as recited in claim 31 wherein said top-level object is a routing metal.

39. A computer-readable medium as recited in claim 31 wherein said top-level object is a ground distribution wiring.

40. A computer-readable medium as recited in claim 31 wherein said press property is stored in a database.

* * * * *

# ATTACHMENT D